# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN THUESEN, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Case No. 4:20-cv-852 |
| | § | |
| BOBBY LUMPKIN, Director, Texas | § | **CAPITAL CASE** |
| Department of Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |
| | § | |

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254 OF A PERSON IN STATE CUSTODY

### ROBINS KAPLAN LLP

*Pro Bono Attorneys for Petitioner*

Glenn A. Danas (admitted *pro hac vice*)
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
(310) 552-0130
GDanas@RobinsKaplan.com

Miles A. Finn, Ph.D. (admitted *pro hac vice*)
339 Park Avenue, Suite 3600
New York, NY 10022
(212) 980-7400
MFinn@RobinsKaplan.com

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................ 1

JURISDICTION AND VENUE ........................................................................... 8

THE PARTIES..................................................................................................... 8

TIMELINESS OF THE PETITION ..................................................................... 8

PRELIMINARY STATEMENT REGARDING CITATIONS.............................. 9

REQUEST FOR BRIEFING ............................................................................... 9

STATEMENT REGARDING EXHAUSTION OF CLAIMS ............................... 9

ELIGIBILITY FOR RELIEF............................................................................... 9

STATEMENT OF FACTS ................................................................................. 10

    I.    THE TRIAL ........................................................................... 16

    II.   PUNISHMENT PHASE ......................................................... 20

PROCEDURAL HISTORY................................................................................ 27

    I.    TRIAL COURT PROCEEDINGS........................................... 27

    II.   DIRECT APPEAL .................................................................. 29

    III.  STATE HABEAS CORPUS PROCEEDINGS ....................... 29

        A.   Judge Bryan was temporarily recused ........................................ 34

        B.   Following an evidentiary hearing, Judge Bryan recommends granting Mr. Thuesen relief on multiple claims. ......................................................... 38

        C.   The CCA orders the parties to brief Judge Bryan's recusal........................................ 52

        D.   The CCA vacates Judge Bryan's findings of fact and conclusions of law. ................ 54

        E.   Judges Alcala and Walker dissent, characterizing the State's position on the recusal issue as "gamesmanship."............................................... 55

        F.   A second evidentiary hearing is held before Judge Langley. ..................................... 56

    IV.  FEDERAL HABEAS REPRESENTATION DURING THE GLOBAL PANDEMIC ... 62

RELEVANT LEGAL STANDARDS ................................................................ 64

    I.    STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL .......... 64

    II.   DUE PROCESS.................................................................... 65

CLAIMS FOR RELIEF ..................................................................................... 65

    I.    TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE GUILT/INNOCENCE PHASE OF TRIAL, IN VIOLATION OF MR. THUESEN'S SIXTH AMENDMENT RIGHTS. ................................................. 65

A.   Trial counsel failed to effectively present Mr. Thuesen's PTSD to the jury, through expert testimony, lay testimony, and medical record evidence, which failure prevented the jury from considering whether Mr. Thuesen acted with intent. ........... 68

B.   Trial counsel provided ineffective assistance during jury selection (State Habeas Claims 11 and 13). ................................................................. 118

C.   Trial counsel failed to properly object to or address the improper mention of the sexual assault kit. .................................................................... 140

D.   Trial counsel failed to move to change venue (State Habeas Claim 9). ................... 142

E.   Trial counsel failed to preserve error by making timely objections on the record on each occasion in which the State introduced inadmissible evidence. (State Habeas Claim 18). ........................................................................ 146

II.   TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE PUNISHMENT PHASE OF TRIAL, IN VIOLATION OF Mr. Thuesen'S SIXTH AMENDMENT RIGHTS. .............................................................. 152

A.   Trial counsel failed to investigate, develop, prepare, and present evidence that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the punishment phase (State Habeas Claims 1, 5, 7, 8, 15, 16). ..................................... 157

B.   Trial counsel failed to investigate, develop, prepare, and present adequate evidence that Mr. Thuesen would not pose a continuing threat of future violence (State Habeas Claim 6). ....................................................................... 173

C.   Trial counsel failed to impeach Amanda ("Mandy") Ward's aggravation testimony (State Habeas Claim 10). .......................................................... 177

D.   Trial counsel failed to object to the State's improper closing argument during the punishment phase (State Habeas Claim 17)................................................ 180

III.   APPELLATE COUNSEL Provided Ineffective Assistance, in violation of Mr. THUESEN'S sixth Amendment RIGHTS. .................................................. 182

A.   Appellate counsel failed to argue, on direct appeal, that the trial court erred in denying Mr. Thuesen's pretrial motions to preclude the death penalty.................... 182

B.   Appellate counsel's failure to appeal the trial court's denial of Mr. Thuesen's pretrial motions related to the death sentence fell below the objective standard of reasonableness........................................................................ 187

C.   Appellate counsel's failure to appeal the trial court's denial of Mr. Thuesen's pretrial motions related to the death sentence prejudiced Mr. Thuesen. .............................. 187

IV.   POST-CONVICTION COUNSEL WAS INEFFECTIVE ........................................... 187

A.   Post-conviction counsel failed to appreciate that trial counsel's ineffectiveness was established on the trial record, even in the absence of additional expert testimony, and so failed to fully argue trial counsel's effectiveness................................................ 188

B.   Post-conviction counsel failed to raise claims based on child abuse and its relation to PTSD, in opposition to Mr. Thuesen's requests. .................................... 193

C.    Post-conviction counsel failed to raise claims based on new science concerning Mr. Thuesen's purported failure to regret his actions and concerning his statements immediately following the crime. ........................................................................... 194

V.    THE STATE HABEAS PROCEEDINGS VIOLATED THUESEN'S RIGHTS UNDER THE DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS. ..................................................................................................... 195

A.    A State Court Must Observe Due Process When Adjudicating Constitutional Claims Raised in a Post-Conviction Proceeding. .................................................................. 196

B.    The state habeas court violated due process by permitting the State to removal of the first habeas judge after he issued a ruling adverse to the State. ................................. 196

C.    The court may adjudicate the claim. ...................................................................... 206

VI.   MR. THUESEN'S DEATH SENTENCE SHOULD BE VACATED BECAUSE TEXAS' REQUIRED PUNISHMENT-PHASE JURY INSTRUCTION IMPROPERLY RESTRICTS THE EVIDENCE THE JURY MAY CONSIDER AS MITIGATING ... 210

A.    The jury must be permitted to hear all mitigating evidence in a death penalty proceeding. ............................................................................................................... 210

B.    The trial court gave instructions to the jury that prevented it from considering all mitigating evidence. ............................................................................................... 212

C.    Mr. Thuesen presented mitigating evidence that the jury was actually or effectively precluded from considering. .................................................................................... 214

D.    Even if the trial court's instructions were proper, in Mr. Thuesen's case the State's gloss on those instructions improperly instructed the jury to ignore and not consider certain mitigating evidence. ...................................................................................... 218

E.    The Court may adjudicate the claim. ...................................................................... 219

VII. MR. THUESEN'S DEATH SENTENCE VIOLATES THE CONSTITUTION BECAUSE TEXAS'S STATUTORY SCHEME SET FORTH IN CODE OF CRIMINAL PROCEDURE, ARTICLE 37, IS ARBITRARY ........................................................... 219

A.    United States Supreme Court precedent precludes administering the death penalty pursuant to arbitrary procedures. ......................................................................... 219

B.    Texas's death penalty scheme is arbitrary. .............................................................. 220

VIII.MR. THUESEN'S DEATH SENTENCE VIOLATES THE CONSTITUTION BECAUSE TEXAS'S STATUTORY SCHEME SET FORTH IN CODE OF CRIMINAL PROCEDURE, ARTICLE 37, DENIES THE RIGHT OF EQUAL PROTECTION TO PEOPLE WITH MENTAL HEALTH DISORDERS. ................................................... 226

PRAYER FOR RELIEF ......................................................................................... 227

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul-Kabir v. Quarterman,*
    550 U.S. 233 (2007)............................................................................212, 213, 219, 220

*Ake v. Oklahoma,*
    470 U.S. 68 (1985)................................................................................................70, 120

*Anderson v. Bessemer City,*
    470 U.S. 564 (1985)....................................................................................................62

*Andrus v. Texas,*
    140 S. Ct. 1875, 207 L. Ed. 2d 335 (2020) ...........................................65, 153, 155

*Apprendi v. New Jersey,*
    530 U.S. 466 (2000)..........................................................................................186, 226

*Batson v. Kentucky,*
    476 U.S. 79 (1986).......................................................................127, 128, 130, 131

*Beasley v. State,*
    634 S.W.2d 320 (Tex. Crim. App. 1982)...........................................................205

*Bigelow v. Haviland,*
    576 F.3d 284 (6th Cir. 2009) ...............................................................................82

*Cadd v. State,*
    587 S.W.2d 736 (Tex. Crim. App. 1979)...........................................................205

*Daubert v. Merrell Dow Pharmaceuticals,*
    509 U.S. 579 (1993).......................................................................................... *passim*

*Davila v. Davis,*
    137 S. Ct. 2058 (2017)........................................................................................183

*Davis v. Crist Industries, Inc.,*
    98 S.W.3d 338 (Tex. App. 2003)........................................................................202

*Davis v. State,*
    956 S.W.2d 555 (Tex. Crim. App. 1997).............................................................203

*Draughon v. Dretke,*
    427 F.3d 286 (5th Cir. 2005) .........................................................................84, 96

iv

*Dunn v. Cnty of Dallas*,
  794 S.W.2d 560 (Tex. App. 1990)......................................................204

*Ethington v. State*,
  819 S.W.2d 854 (Tex. Crim. App. 1991)....................................147, 150

*Evitts v. Lucey*,
  469 U.S. 387 (1985)........................................................184, 197

*Ford v. Wainwright*,
  477 U.S. 399 (1986)................................................................197

*Foster v. Chatman*,
  136 S. Ct. 1737 (2016)............................................................128

*Franklin v. State*,
  138 S.W.3d 351 (Tex. Crim. App. 2004).........................................119

*Franks v. State*,
  90 S.W.3d 771 (Tex. App. 2002)..................................................205

*Fuentes v. Shevin*,
  407 U.S. 67 (1976)..................................................................65

*In re Gen. Elec. Capital Corp.*,
  63 S.W.3d 568 (Tex. App. 2002)............................................202, 203

*Godfrey v. Georgia*,
  446 U.S. 420 (1980)........................................................221, 224

*Gregg v. Georgia*,
  428 U.S. 153 (1976)................................................................222

*Hernandez v. New York*,
  500 U.S. 352 (1991)................................................................127

*Hinton v. Alabama*,
  512 U.S. 263 (2014)................................................................64

*Hollabaugh v. State*,
  1994 WL 284093 (Tex. App. 1994)..............................................202

*Irvin v. Dowd*,
  366 U.S. 717 (1960)........................................................119, 145

*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994)........................................................127, 128

*Jackson v. State*,
  2012 WL 955361 (Tex. App. 2012)....................................................................202

*Jefferson v. Upton*,
  560 U.S. 284 (2010).........................................................................................62

*Jurek v. Texas*,
  428 U.S. 262 (1976).........................................................................................223

*Kelley v. State*,
  823 S.W.2d 300 (Tex. Crim. App. 1992)............................................................205

*Kimmelman v. Morrison*,
  477 U.S. 365 (1986).........................................................................................82

*Lagrone v. State*,
  942 S.W.2d 602 (Tex. Crim. App. 1997)............................................................149

*Lockett v. Ohio*,
  438 U.S. 586 (1978)..................................................................................211, 212

*Lyons v. McCotter*,
  770 F.2d 529 (5th Cir. 1985) ...........................................................................131

*Marshall v. Jerrico, Inc.*,
  446 U.S. 238 (1980).........................................................................................208

*Martinez v. Ryan*,
  132 S. Ct. 1309 (2012)....................................................................................189

*Martinez v. State*,
  98 S.W.3d 189 (Tex. Crim. App. 2003)..............................................................147

*McCleskey v. Kemp*,
  481 U.S. 279 (1987).........................................................................................212

*Mead v. State*,
  819 S.W.2d 869 (Tex. Crim. App. 1991)............................................................128

*Meza v. State*,
  206 S.W.3d 684 (Tex. Crim. App. 2006)............................................................184

*Miller-El v. Dretke II*,
  545 U.S. 231 (2005).........................................................................................127

*Moawad v. Anderson*,
  143 F.3d 942 (5th Cir. 1998) ...........................................................................131

*Moody v. State*,
    827 S.W.2d 875 (Tex. Crim. App. 1992).................................................................148

*Morgan v. Illinois*,
    504 U.S. 719 (1992).......................................................................................119

*Murray v. Carrier*,
    477 U.S. 478 (1986)...............................................................................115, 143

*Penry v. Johnson*,
    532 U.S. 782 (2001).......................................................................................215

*Penry v. Lynaugh*,
    492 U.S. 302 (1989)......................................................................216, 218, 219

*Ex parte Pete*,
    517 S.W.3d 825 (Tex. Crim. App. 2017)............................................................206

*Porter v. McCollum*,
    558 U.S. 30 (2009) .................................................................................. *passim*

*Powers v. Ohio*,
    499 U.S. 400 (1991).......................................................................................128

*Prystash v. State*,
    3 S.W.3d 522 (Tex. Crim. App. 1999)................................................................206

*Ex parte Reed*,
    271 S.W.3d 698 (Tex. Crim. App. 2008)......................................................62, 210

*Rhodes v. State*,
    240 S.W.3d 882 (Tex. Crim. App. 2007)............................................................205

*Rodriguez v. State*,
    No. 10-15-00371-CR, 2016 WL 7437786 (Tex. App. Dec. 21, 2016) .................202

*Rompilla v. Beard*,
    545 U.S. 374 (2005).................................................................................65, 107

*Rousseau v. State*,
    824 S.W.2d 579 (Tex. Crim. App. 1992)............................................................131

*Sears v. Upton*,
    561 U.S. 945 (2010).........................................................................................65

*Simmons v. South Carolina*,
    512 U.S. 154 (1994).......................................................................................225

*Skilling v. United States,*
130 S. Ct. 2896 (2010) ............................................................................... 143, 145

*Skipper v. South Carolina,*
476 U.S. 1 (1986) ......................................................................................... 213, 215

*Smalis v. Pennsylvania,*
476 U.S. 140 (1986) ............................................................................................ 209

*Smith v. Robbins,*
528 U.S. 259 (2000) ............................................................................................ 183

*Smith v. State,*
2013 WL 4774054 (Tex. App. 2013) .................................................................. 205

*Snyder v. Louisiana,*
552 U.S. 472 (2008) ............................................................................................ 127

*State v. Mendoza,*
365 S.W.3d 666 (Tex. Crim. App. 2012) .............................................................. 62

*Ex parte Storey,*
584 S.W.3d 437 (Tex. Crim. App. 2019) ............................................................ 210

*Strickland v. Washington,*
466 U.S. 668 (1984) ...................................................................................... *passim*

*In re Tasby,*
120 S.W.3d 443 (Tex. App. 2003) ...................................................................... 203

*Tennard v. Dretke,*
542 U.S. 274 (2004) ............................................................................................ 212

*Thuesen v. State,*
No. AP-76,375, 2014 WL 792038 (Tex. Crim. App. Feb. 26, 2014) ....... 30, 59, 199

*Ex parte Thuesen,*
546 S.W.3d 145 (Tex. Crim. App. 2017) ......................................................... 54, 56

*Ex parte Thuesen,*
546 S.W.3d 158 (Tex. Crim. App. 2018) .............................................................. 55

*Ex parte Thuesen,*
No. WR-81,584-01, 2017 WL 2131777 (Tex. Crim. App. May 3, 2017) .............. 55

*Ex parte Thuesen,*
No. WR-81,584-01, 2020 WL 584368 (Tex. Crim. App. Feb. 5, 2020) ................ 63

*Trevino v. Thaler*,
569 U.S. 413 (2013)................................................................................189

*United States v. Cronic*,
466 U.S. 648 (1984)..................................................................................84

*Walker v. Harrison*,
597 S.W.2d 913 (Tex. 1980)....................................................................204

*Wiggins v. Smith*,
539 U.S. 510 (2003)........................................................................ *passim*

*Williams v. State*,
No. 07-15-00294-CR, 2016 WL 6024348 (Tex. App. Oct. 13, 2016) ...................202

*Williams v. Taylor*,
529 U.S. 362 (2000)..................................................................................65

*Wilson v. State*,
977 S.W.2d 379 (Tex. Crim. App. 1998).................................................202

*Woodall v. State*,
336 S.W.3d 634 (Tex. Crim. App. 2011).................................................205

*Woodson v. North Carolina*,
428 U.S. 280 (1976)......................................................................220, 226

**Statutes**

28 U.S.C. § 2201 ...............................................................................................1

28 U.S.C. § 2241 ...............................................................................................8

28 U.S.C. § 2244(d)(1) ......................................................................................9

28 U.S.C. § 2254...................................................................................1, 9, 207

42 U.S.C. § 247(d) ..........................................................................................63

Tex. Code Crim. Proc. Ann. art. 37.071 § 2(b)(1).......................................222

Tex. Code Crim. Proc. Ann. art. 37.071 § 2(e)(1).......................................222

Tex. Code Crim. Proc. Ann. art. 37.071 § 2(f)(4)........................................222

Tex. Code Crim. Proc. art. 11.071 § 8(a)........................................................31

Tex. Code Crim. Proc. art. 11.071 § 9(a)........................................................32

Tex. Code Crim. Proc. art. 35.16 ...................................................................123

Tex. Code Crim. Proc. art. 37.071 .......................................................... *passim*

Tex. Code Crim. Proc. art. 37.071(d)(2) .......................................................224

Tex. Code Crim. Proc. art. 37.071, § 2(b)(1) .......................................213, 224

Tex. Code Crim. Proc. art. 37.071, § 2(c) .....................................................224

Tex. Code Crim. Proc. art. 37.071, § 2(e) .................................................34, 187

Tex. Code Crim. Proc. art. 37.071, § 2(e)(1) .......................................213, 214

Tex. Code Crim. Proc. art. 37.071, § (2)(f) ...................................................187

Tex. Code Crim. Proc. art. 37.071, § 2(f)(1)-(3) .........................................214

Tex. Code Crim. Proc. art. 37.071, § 2(f)(4) ..................................34, 184, 187, 214

Tex. Gov't Code Ann. § 74.046 .....................................................................203

Tex. Pen. Code § 19.............................................................................34, 184, 185

Tex. Penal Code § 6.03(a).................................................................................83

Tex. Penal Code § 6.03(b).................................................................................83

Tex. Penal Code § 19.02....................................................................................82

Tex. Penal Code § 19.03....................................................................................82

Texas Code Crim. Proc. Ann. art. 37.0711, § 2(b) ......................................227

**Rules**

Tex. R. App. P. 56.1(c) ...................................................................................205

Tex. R. App. Proc. 33.1(a) .............................................................................147

Tex. R. Evid. 401 .....................................................................147, 148, 151

Tex. R. Evid. 402 ...........................................................................................147

Tex. R. Evid. 403 .....................................................................147, 148, 151

Tex. R. Evid. 404(b) ......................................................................................147

**Constitutional Provisions**

Tex. Const. Art. XVI, § 1(a) ...................................................................202

Tex. Const. Art. XVI, § 1(b) ...................................................................202

Tex. Const. Art. XVI, § 1(c) ...................................................................202

U.S. Const. amend. V.................................................................... *passim*

U.S. Const. amend. VI.................................................................... *passim*

U.S. Const. amend. VIII................................................................... *passim*

U.S. Const. amend. XIV .................................................................. *passim*

U.S. Const. amend. XIV, § 1 ......................................................................65

U.S. Const. art. I, § 9 .................................................................................1

U.S. Const. art. III ......................................................................................1

U.S. Const. § 9, cl. 2 ..................................................................................8

**Other Authorities**

38 C.F.R. § 14.803 ...................................................................................91

38 C.F.R. § 14.808 ...................................................................................91

Am. Bar Ass'n, *2003 Guideline 10.7*, AMERICANBAR.ORG (Oct. 10, 2018)................................67

Deborah Sontag & Lizzie Alvarez, *Across America, Deadly Echoes of Foreign Battles*, N.Y. Times (Jan. 13, 2008)...................................................................3

RAND Corp., *One in Five Iraq and Afghanistan Veterans Suffer from PTSD or Major Depression*, RAND (Apr. 17, 2008) ........................................................2, 3

Shawn P. Cahill & Kristin Pontoski, *Post-traumatic stress disorder and acute stress disorder I: their nature and assessment considerations*, 2(4) Psychiatry 14-25 (Edgmont 2005).......................................................................13

Shawn P. Cahill & Kristin Pontoski, *Post-traumatic stress disorder and acute stress disorder I: their nature and assessment considerations*, 2(4) PSYCHIATRY (Edgmont) 14-25 (2005) ...................................................................88

State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel*, § 11.1 ......................67

Mr. Thuesen, by and through undersigned counsel, pursuant to all rights available under Article I, Section 9 and Article III of the United States Constitution; the, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; 28 U.S.C. § 2201; and 28 U.S.C. § 2241 et seq., including 28 U.S.C. § 2254, respectfully petitions this Court for a Writ of Habeas Corpus declaring his custody in violation of the Constitution of the United States and ordering him released because his conviction for murder as well as the resulting death sentence were unconstitutionally obtained. 28 U.S.C. § 2241(c)(3) & 2254(a).

## PRELIMINARY STATEMENT

This is an original federal petition in a death penalty case. Petitioner John Thuesen is currently confined on death row at the Institutional Divisions' Polunsky Unit in Livingston, Texas.

Mr. Thuesen brings this petition because he was wrongly convicted and sentenced to death in 2010 for fatally shooting his girlfriend Rachel Joiner and her brother, Travis Joiner, due to the failure of his counsel to adequately investigate, prepare and present a defense based on his post-traumatic stress disorder ("PTSD") at the guilt and punishment phases of Mr. Thuesen's trial. Despite *knowing* that Mr. Thuesen, a recent war veteran, was suffering from undiagnosed and untreated PTSD due his traumatic combat experiences in Iraq, trial counsel dropped the ball—consulting with experts far too late in the game to prepare the defense for trial and ultimately failing to present a single competent expert witness on the key issue of PTSD at either phase of trial. The sole expert called at trial was a psychologist who, having only a basic understanding of PTSD, presented a confused and unsubstantiated theory to the jury about Mr. Thuesen's mental health in general. Due to trial counsel's failings, the State was able to convince the jury that Mr. Thuesen was a cold-blooded murderer and a future threat to society, rather than a damaged soldier who was in the grip of an untreated acute PTSD crisis. The evidence is overwhelming that, on the day of the shootings, Mr. Thuesen was in the midst of a PTSD crisis and not acting in a thinking

1

way when he shot at the Joiner siblings. Something "triggered" this crisis and what followed was a reaction due to Mr. Thuesen's enhanced "fight or flight" response. Panic from his unwinding relationship with Rachel could have been the trigger. His knowledge that Travis Joiner owned a gun, coupled with Mr. Thuesen's stress and exhaustion, could have been the trigger. Mr. Thuesen does not know the trigger because, among other things, it is difficult to form memories during a PTSD crisis. This and other crucial evidence about what PTSD is and the fact that Mr. Thuesen was suffering from it, however, were never fully developed or presented to the jury because trial counsel failed to do their job. Among other things, Mr. Thuesen's defense counsel failed to develop and present expert testimony on PTSD and its symptoms, failed to link Mr. Thuesen's PTSD to his experiences in Iraq, failed to link his PTSD to the changes to his personality upon returning to the States and failed to show the direct connection between Mr. Thuesen's PTSD and his conduct on the day of the shootings. Had they done so, there very likely would have been a different outcome to the trial.

PTSD is a growing problem for a huge number of returning combat soldiers. The National Center for PTSD and the RAND Corp. estimate that up to 20 percent of veterans who served in Iraq and Afghanistan experience PTSD. RAND Corp., *One in Five Iraq and Afghanistan Veterans Suffer from PTSD or Major Depression*, RAND (Apr. 17, 2008), https://www.rand.org/news/press/2008/04/17.html. Unfortunately, violence (particularly domestic violence) is one of the common symptoms of returning soldiers who have been exposed to horrific wartime violence. Compounding the problem, "many service members said they do not seek treatment for psychological illnesses because they fear it will harm their careers. But even among those who do seek help for PTSD or major depression, only about half receive treatment that researchers consider 'minimally adequate' for their illnesses." *Id.* In 2008, *The New York Times*

reported 121 cases in which veterans from Iraq and Afghanistan committed a killing in the United States, or were charged with one, after their return from war. Deborah Sontag & Lizzie Alvarez, *Across America, Deadly Echoes of Foreign Battles*, N.Y. Times (Jan. 13, 2008), https://www.nytimes.com/2008/01/13/us/13vets.html.

In *Porter v. McCollum*, 558 U.S. 30 (2009), the United States Supreme Court recognized that combat and military related trauma are real and serious conditions and critically relevant when assessing moral culpability. The Supreme Court in *Porter* vacated the death sentence of a Korean War veteran after finding that his trial counsel had not effectively presented the jury with mitigation evidence of his wartime experience and PTSD:

> Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines. . . . [T]he relevance of Porter's extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on [him].

558 U.S. at 43. Like the defendant in *Porter*, Mr. Thuesen enlisted at a very young age—just nine days after he turned 18—and was deployed to Iraq when he only 20 years old, leaving behind his family and a girlfriend whom he had just recently started dating. Whatever he may have imagined the Marines or Iraq would be like, those expectations would not compare to what he would actually experience on the ground. Having been trained primarily as a radio operator, Mr. Thuesen instead spent most of his time "outside the wire" and in the war zone as a machine gunner. He was regularly placed in life-or-death situations. Despite his inexperience with combat, Mr. Thuesen displayed courage and selflessness that was recognized by his fellow soldiers and supervisors. Mr. Thuesen received a Meritorious Mast for "outstanding service" in February 2005. The honor was given for Mr. Thuesen's participation in "numerous combat patrols and convoy security missions," and identified a specific instance in which, "without hesitation or guidance," he initiated the

evacuation and rescue of an injured fellow Marine. This award is given in exceptional cases when a Marine performs above and beyond the usual requirements of duty by demonstrating exceptional industry, judgment, or initiative.

These accomplishments came at a cost. While serving his country, Mr. Thuesen witnessed and participated in horrifying and traumatic experiences. During the punishment phase of the trial, witnesses testified that Mr. Thuesen followed orders to open fire on a vehicle that, it was later discovered, contained not enemy combatants, but a civilian family. A young child, covered in his family's blood, emerged from the vehicle and ran towards Mr. Thuesen's Humvee. This deeply traumatic event and others like it were never introduced to the jury during the guilt phase of trial, despite their obvious connection to Mr. Thuesen's PTSD. In fact, the judge and jury at Mr. Thuesen's trial heard only a fraction of the trauma that Mr. Thuesen experienced in Iraq—and all through lay witnesses. Trial counsel failed to provide the jury with a full, meaningful picture of who Mr. Thuesen had become because of such experiences.

Mr. Thuesen returned from serving his country a traumatized, changed man struggling to return to the civilian life he knew before. Rodney Townsend, Mr. Thuesen's platoon sergeant, described Mr. Thuesen as an average, "all around nice guy" before Iraq—focused and goal-oriented. By all accounts, this was what others thought of him as well. Although his life was not without difficulties, he was sociable, well-liked, and had been doing well in school prior to Iraq. Upon returning home, however, friends and family described Mr. Thuesen much differently. He was shaky and unsure of himself, hyper vigilant, depressed, lacking direction, and on edge. At times he seemed to lack emotion. At other times, he would start crying. He started to carry a gun on him wherever he went. They all agreed there was "something wrong" with him. One friend told trial counsel that he witnessed Mr. Thuesen experience what he described as a "flashback," in

which Mr. Thuesen suddenly started yelling orders at an empty porch. After he "snapped out of it," Mr. Thuesen had no recollection of what occurred. Trial counsel, however, never called this friend as witness at either phase of the trial.

As is typical with PTSD, Mr. Thuesen's symptoms waxed and waned, but in 2007, his symptoms began to get more severe. In 2008, Mr. Thuesen's symptoms had become so acute that he called a suicide hotline and admitted to having thoughts of killing himself. He was admitted to a psychiatric ward. He checked all the boxes necessary for a PTSD diagnosis, but he was never diagnosed with PTSD and never got the treatment he so desperately needed. In the months and days before the shootings, Mr. Thuesen was in downward, destructive spiral, exhausted from lack of sleep, anxious and irritable – all symptoms of PTSD. In the days just prior to March 6, 2009, the day of the shootings, he was headed toward an acute PTSD crisis. Trial counsel, however, failed to adequately present evidence linking his PTSD to his behavior on the day of the shootings—evidence that would have influenced the jury's appraisal of Mr. Thuesen's moral culpability and even his intent. Making matters worse, trial counsel failed to adequately prepare and rehabilitate the one expert witness that they did present, Dr. Saunders. Originally retained to testify at the punishment phase of trial in support of mitigation, at the eleventh hour, trial counsel decided to switch his testimony from the punishment phase to the guilt/innocence phase of trial *without vetting his proffered testimony or adequately preparing him to testify*. Predictably, Dr. Saunders's testimony did more harm than good, leaving the incorrect and damaging impression that Mr. Thuesen suffered from a Borderline or Dependent Personality Disorder, not PTSD. Not a single expert witness was called to testify about PTSD (or any other mental illness) during the punishment phase.

As will be detailed below, trial counsel committed a series of other errors in violation of

Mr. Thuesen's constitutional rights in addition those highlighted above, beginning with their failure to move for change of venue (despite the obvious unfair disadvantage he faced in Brazos County), and again during jury selection by failing to object to the State's challenges, failing to use their own peremptory challenges, and permitting the State to mislead the potential jurors about how to determine Mr. Thuesen's *mens rea* without objection. During the guilt phase of trial, trial counsel failed to object to and allowed the introduction of irrelevant and deeply prejudicial evidence, including but not limited to, a sexual assault kit, even though it is undisputed that Mr. Thuesen never sexually assaulted Rachel Joiner. They failed to impeach damaging testimony from a former high school girlfriend suggesting that Mr. Thuesen displayed threatening behavior toward women before he went to Iraq, even though there were witnesses readily available to refute her testimony and cast doubt on her credibility. Trial counsel also failed to call Mr. Thuesen's mother as a witness to testify regarding the family's history of mental illness, evidence that the trial court agreed was relevant given Dr. Saunders's reliance upon it. Critical to the question of Mr. Thuesen's sentence, they failed to rebut the State's argument that Mr. Thuesen was a future danger—despite copious available evidence to the contrary. Last, but not least, in an error telling of trial counsel's gross misunderstanding and under-preparation of their own case, they failed to object when the State's counsel provided an oversimplified and misleading characterization of what constitutes PTSD during closing argument. The conclusion is undeniable: Had trial counsel performed competently, with the thoroughness and preparation that the prevailing standards of care required of them, Mr. Thuesen would not be sitting on death row today.[1]

---

[1] On direct appeal, appellate counsel was ineffective as well, failing to challenge numerous unsuccessful motions that trial counsel had made. These additional errors by Mr. Thuesen's appellate counsel ensured that the trial results were undisturbed and provide an additional, independent basis for finding constitutional infirmity in this case.

*Indeed, the original trial court judge agreed with this assessment*. In July 2015, Judge Travis Bryan III—the same judge who had presided over Mr. Thuesen's criminal trial—granted relief to Mr. Thuesen in state habeas on numerous grounds, including that Mr. Thuesen's lawyers had not adequately explained Mr. Thuesen's PTSD to jurors, and how this condition had factored into his actions on the day of the murders. Judge Bryan recommended that the Texas Criminal Court of Appeals (CCA) grant Mr. Thuesen a new punishment-phase trial. Tragically, however, this new trial never occurred. In 2017, the CCA unexpectedly and in violation of Mr. Thuesen's Due Process Rights under the Fourteenth Amendment, threw out Judge Bryan's recommendations. It did so based on a hyper-technical misapplication of Texas procedure at the behest of the State, claiming that Judge Bryan—who at one point had temporarily recused himself from the case[2]— lacked the authority to have presided over Mr. Thuesen's state habeas proceedings because there had been no *written* order reinstating him as the presiding judge. The CCA reached this conclusion despite the fact that there was indisputably a reinstatement order, and that the State had acquiesced to Judge Bryan's authority over the post-conviction proceedings.

Thus, after years of post-conviction proceedings, and on the brink of obtaining relief, Mr. Thuesen had to start all over, with different state habeas counsel and a different judge (Judge Langley) who was unfamiliar with the matter. Judge Langley, acting without the benefit of having presided over Mr. Thuesen's trial or having heard the compelling live testimony presented at Mr. Thuesen's first evidentiary hearing, denied Mr. Thuesen's requested relief without explaining how he reached such a drastically different conclusion than Judge Bryan. The CCA adopted Judge Langley's Findings of Fact and Conclusions of Law on February 5, 2020.

---

[2] As explained in more detail below (*see* Procedural History, § III.A), Judge Bryan voluntarily recused himself due to campaign contributions made to Mr. Thuesen's counsel, Michelle Esparza, who was running for elected office.

This Court represents the best and only forum for Mr. Thuesen to vindicate his federal constitutional rights and secure vacatur of his unlawful conviction and death sentence.

## JURISDICTION AND VENUE

1.      This Court has personal jurisdiction over this matter pursuant to 28 U.S.C. § 2241 as Mr. Thuesen was convicted and sentenced in *State of Texas v. John Darrell Thuesen*, Trial Cause No. 09-02136-CRF-272 in the 272nd Judicial District Court in Brazos County, Texas, located in the Houston Division of the Southern District of Texas. The trial court rendered Mr. Thuesen's judgment and death sentence on May 28, 2010.

2.      Subject matter jurisdiction is conferred by 28 U.S.C. § 2254 *et seq.* and Amendments Five, Six, Eight and Fourteen to the United States Constitution and Section 9, Clause 2 of the United States Constitution confer subject matter jurisdiction onto this Court.

## THE PARTIES

3.      Petitioner John Thuesen is a 37-year-old United States veteran suffering from post-traumatic stress disorder currently confined on death row at the State of Texas Department of Criminal Justice's Institutional Division at the Polunsky Unit in Livingston, Texas. His inmate number is 999557.

4.      Defendant Bobby Lumpkin is the Director of the Texas Department of Criminal Justices' Institutional Division.

## TIMELINESS OF THE PETITION

5.      Under 28 U.S.C. § 2244(d)(1), a state prisoner has one year from the date that direct review concludes to petition for a writ of habeas corpus in federal court. The one-year deadline is tolled during the pendency of state post-conviction or other collateral review. *See* 28 U.S.C. § 2254(d)(2).

6.      Mr. Thuesen filed his state habeas application on October 9, 2012.

7.      The CCA denied Mr. Thuesen's state petition for post-conviction relief on February 5, 2020. Accordingly, this Petition is timely filed.

## PRELIMINARY STATEMENT REGARDING CITATIONS

8.      Citations to "RR" are to the Reporter's Record in Mr. Thuesen's underlying capital trial. Citations to "CR" refer to the Clerk's Record, Direct Appeal to the Court of Criminal Appeals of Texas, Trial Cause No. 09-02136-CRF-272, Volumes 1 to 6. Citations to "Supp. CR" are to the Supplemental Clerk's Record. Citations to "HR" are to the Evidentiary Hearing held on June 9-13, 2014 before Judge Bryan. Citations to "HR2" are to the Second Evidentiary Hearing held on December 3-5, 2018, before Judge Langley.

## REQUEST FOR BRIEFING

9.      Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts provides in relevant part that a petition for writ of habeas corpus "must: (1) specify all grounds for relief available to the petitioner; (2) state the facts supporting each ground; [and] (3) state the relief requested." In compliance with the requirements of Rule 2, Mr. Thuesen files this petition. Undersigned counsel will seek the Court's permission to file an additional brief in support of the Petition.

## STATEMENT REGARDING EXHAUSTION OF CLAIMS

10.     Federal habeas petitioners generally must exhaust state court remedies. 28 U.S.C. § 2254(b)(1)(A). Each of Mr. Thuesen's claims either is exhausted or falls within an exception to the exhaustion requirement. No claims are procedurally barred. Because procedural default and failure to exhaust are affirmative defenses that Respondent must assert and can waive, Mr. Thuesen reserves his right to reply to any such arguments.

## ELIGIBILITY FOR RELIEF

11.     This Petition sets forth grounds for relief that implicate rights set forth in the Fifth,

Sixth, Eighth and Fourteenth Amendments to the United States Constitution. In particular, Mr. Thuesen sets forth claims that his rights to due process of law and effective assistance of counsel, and a penalty hearing that comported with the Eighth Amendment to the United States Constitution, were violated as set forth herein.

12.     Relief under 28 U.S.C. § 2254(d)(1)&(2) is available to Mr. Thuesen as the state court decisions and fact-finding related to each of the grounds for relief discussed herein were an unreasonable application of, or were contrary to, pre-existing decisions of the United States Supreme Court and/or because the state court's resolution of his constitutional claims was premised on unreasonable fact finding. Relief is also available based upon *de novo* review of other grounds for relief, for which the state courts did not address the underlying federal constitutional claim.

**STATEMENT OF FACTS**

13.     Mr. Thuesen was born on November 18, 1983 to Patricia and Dennis Thuesen. He has two older siblings, a sister Michelle and a brother Michael. They grew up in Cat Spring, Texas, a small community in southern Austin County, Texas. Although his childhood was not perfect—his father was abusive at times and he had some early troubles with alcohol—Mr. Thuesen was well liked, a good student, and engaged with school and his community.

14.     In November 2001, following the events of 9/11, Mr. Thuesen enlisted in the Marine Corps Reserve. Still a senior in high school, he had just turned 18. In 2002, Mr. Thuesen attended Marine Corps boot camp and training in Southern California, where his friend was killed and nearly decapitated in a training accident. Mr. Thuesen saw his friend after the accident and appeared to be in shock, yet neither he nor the other Marines who witnesses the accident were given time to process the tragedy or mourn—a reality that would be repeated over and over after deployment. 53RR at 9-13; 3 HR2 at 22-23; 4 HR2 at 155-156. Mr. Thuesen completed his training

10

and entered the reserve unit in Houston. In April 2004, Mr. Thuesen was deployed to Iraq and stationed in Haditha. 44 RR at 127:15-25; 131:5-12; 132:9-19. He was not yet 21 years old. Although he was trained as a radio operator, by the time Mr. Thuesen arrived in Iraq, an insurgency had started and Mr. Thuesen was required to take on roles that he not been trained or prepared for, including that of a machine gunner providing direct fire in support infantrymen, working checkpoints, sweeping for improvised explosive devises ("IEDs"), conducting raids and engaging in combat. State Habeas Ex. 13 at 157 (exhibit submitted at evidentiary hearing); 45 RR at 135:2-5; 4 HR2 at 10-16, 22-24, 27, 29, 41, 157-60. At times, Mr. Thuesen had to spend days or weeks on end in enemy territory, was subject to mortar attacks, and was ordered to shoot people at checkpoints. *Id.*; State Habeas Ex. 13 at 58, 157, 166-67 (exhibit submitted at evidentiary hearing), 166-167. On one occasion, he was ordered to shoot at a vehicle that refused to stop at a checkpoint. It turned out that the car was occupied not by enemy combatants but by civilians, including a young boy who was the sole survivor of the incident. On another occasion, he killed a woman who had a bomb strapped under her dress to make her look pregnant while walking toward the soldiers with two young children. 4 HR2 at 41-47, 161-162; State Habeas Ex. 13 at 58 (exhibit submitted at evidentiary hearing). He saw his fellow soldiers and enemy combatants die or suffer serious wounds. 4 HR2 at 161-62; State Habeas Ex. 13 at 166-67 (exhibit submitted at evidentiary hearing).

15.     Upon his return to the States, there was no formal reintegration program in place for reserve Marines. The Marine Corps simply expected soldiers to return from combat to the civilian life they had before. Initially, it appeared as if Mr. Thuesen could resume life as he once knew it, or something similar to it. He enrolled in Blinn College and was earning good grades, and he began seeing Leah Mathis, a young woman he had started dating before deployment and with

11

whom he had continued to correspond while he was in Iraq. 50 RR at 131-133; 52 RR at 212.

16.    The reality is, however, that Mr. Thuesen returned to the United States in May 2005 mentally broken. Signs and symptoms of PTSD began to emerge in 2006 and worsened as time went on. Gone was the usually social and engaged young man Mr. Thuesen had been prior to going off to war. Friends, family members, and his counselor noted his problems with intrusive memories, hypervigilance, difficulty sleeping, interpersonal problems, irritability, and angry outbursts—all markers or symptoms of PTSD. 46 RR at 132-134; 50 RR at 134-135, 136-137; 4 HR2 at 134, 137, 167-172; State Habeas Ex. 12 (exhibit submitted at evidentiary hearing). Mr. Thuesen's delayed onset of PTSD is not unusual. In one study, the authors found delay among a quarter of PTSD cases and, in particular, those involving individuals who served in combat. 4 HR2 at 140; State Habeas Ex. 12 (exhibit submitted at second evidentiary hearing).

17.    In 2007, Mr. Thuesen began to deteriorate rapidly. He began drinking heavily and became possessive and physically abusive towards his girlfriend, Leah. Following several breakups and unsuccessful attempts to reunite, Leah ended the relationship. In July of 2007, during an attempt to confront Leah about continuing their relationship, Mr. Thuesen was arrested for stalking her. 50 RR at 120. The State used these facts at trial to portray Mr. Thuesen as an abusive partner, but Mr. Thuesen's behavior was directly related to his PTSD. 4 HR2 at 169-171. Indeed, his medical records from the Veterans Administration ("VA") show that during this same time period, Mr. Thuesen had been experiencing symptoms of anger, dyscontrol, problems with physical aggression, emotional numbing, hypervigilance, and startle response. 4 HR2 at 175-177; State Habeas Ex. 13 at 154 (evidence submitted at evidentiary hearing). Mr. Thuesen's academics began to suffer as well, and he failed the fall 2007 semester at Blinn College.

18.    Untethered from connections to school and a girlfriend, Mr. Thuesen began

drifting, and his psychological health steadily declined. During 2008, Mr. Thuesen struggled to find employment and had only a few, short-lived romantic relationships. In August of 2008, Mr. Thuesen called the Veterans Suicide Hotline. He complained of feeling depressed and having frequent and intrusive thoughts, and of thinking about shooting himself in the head. He said, "I have been feeling very lonely, and I can't talk to anybody about what I have done in Iraq." 4 HR2 at 179. Mr. Thuesen was admitted into the psychiatric ward at the VA hospital in the city, where, Dr. Ismael Carlo diagnosed him with major depressive disorder and prescribed several medications. 45 RR at 20:7-8; 20:18-21:9; 21:21-25; 22:1-13; 22:14-24: 16; 27:10-18; 83:25-84:4 However, despite his family's concerns that Mr. Thuesen needed more treatment, doctors from the VA sent him home after four days without diagnosing or properly treating his PTSD. *Id*. at 29:8-16. The VA did not diagnose Mr. Thuesen with or treat him for PTSD because, despite his testing positive on checklists for PTSD symptoms, he denied experiencing a "traumatic event," which was required for a diagnosis of PTSD under the prevailing standard of the time, the DSM-IV. 47 RR at 32; Shawn P. Cahill & Kristin Pontoski, *Post-traumatic stress disorder and acute stress disorder I: their nature and assessment considerations*, 2(4) Psychiatry 14-25 (Edgmont 2005).[3] Had the VA questioned Mr. Thuesen about his experiences in the war in Iraq, the VA staff would have discovered numerous "traumatic events," and would have arrived at a correct diagnosis of PTSD.

19.     After his release from the VA hospital in August 2008, Mr. Thuesen began to see a licensed clinical social worker, Teresa Cannon, on a monthly basis for depression, anxiety, and

---

[3] In 2013, the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) reclassified PTSD as a "trauma and stressor-related disorders." Previously, it was classified as an anxiety disorder. The DSM-V also more clearly defines what events are considered traumatic. Among other changes, the DSM-V removed the requirement that a person's response involve intense fear, helplessness, or horror. It also expanded events to include direct and indirect experiences of trauma.

PTSD symptoms. 45 RR at 74:10-16; 78:19-79:7; 79:21-25; 80:3-82:25. These symptoms included hypervigilance, anger, rage, hallucinations, seeing images out of the corner of his eye, and hearing voices. *Id*. at 81:10-82:25; 84:17-25; 85:4-23. Cannon, however, failed to diagnose or treat Mr. Thuesen for PTSD.

20.     Ten days after his release from the psychiatric ward, Mr. Thuesen met Rachel Joiner. She also attended Blinn College, and they took some classes together. Mr. Thuesen reported to his counselor, Ms. Cannon, that he was excited and happy to have met someone. He very much wanted a girlfriend and eventually to get married and have a family. 45 RR at 87:2-12; 155:20-156:3. In November 2008, Mr. Thuesen told Ms. Cannon that he was no longer depressed and attributed it to his new girlfriend. *Id*. at 97. During this time, he was working and going to school. 45 RR at 33, 85-86. In December 2008, Ms. Joiner introduced Mr. Thuesen to her parents. *Id*. at 100. Things appeared to be improving, and Mr. Thuesen decided to stop taking the medication Dr. Carlo had prescribed him, Celexa (an antidepressant), without guidance or supervision by a doctor. *Id.* at 111. In Mr. Thuesen's mind, things were getting better. Yet, while Mr. Thuesen may have been less depressed, he was still suffering from (undiagnosed) PTSD and exhibiting PTSD symptoms, including hypervigilance and anxiety. *Id*. at 126-127; 4 HR2 at 184, 191.

21.     Not long after they began dating, in February 2009, Rachel began to pull away from Mr. Thuesen while he sought ever more attention from her. She told Mr. Thuesen that she needed "space" and wanted time apart from Mr. Thuesen. 45 RR at 19-21. The more emotionally needy Mr. Thuesen became, the more Rachel pulled away. The fear that Rachel was going to abandon him caused enormous stress for Mr. Thuesen.

22.     On March 4, 2009, Mr. Thuesen met with his social worker. He reported to Ms. Cannon that he and his girlfriend were having some problems. Ms. Cannon noted that Mr. Thuesen

was tired, irritable and stressed, and that he was not sleeping well. 45 RR at 102-103.

23.     Later that night, Mr. Thuesen went to Rachel's house. She was there with Johnny Matthys, a friend and someone she had dated on and off for the prior two years. Rachel and Matthys had finished studying and were watching a movie. Rachel and Mr. Thuesen went into a bedroom to talk. There was no shouting or raised voices. 39 RR at 42-43. Matthys stayed another hour until the movie was over and then left without saying goodbye. *Id*. Rachel called Matthys about twenty minutes after he had left her house. He returned to Rachel's home and then the two of them went to Matthys's place. *Id*. at 44-45.

24.     The next day, on March 5, 2009, Mr. Thuesen went to Matthys's home—he wanted to talk with Rachel and understand why she no longer wanted to be with him. Rachel told him to leave, and he did. *Id.* at 49; 48 RR 65; State's Trial Ex. 200 [Confession] at pp. 4-5, 14-15. Later that evening, Rachel, Matthys and Matthys's brother went out together. 39 RR at 49-50. That evening, Rachel did not return to her home but stayed at Matthys's house. *Id.* at 51.

25.     On the afternoon of March 6, 2009, Rachel returned to the home she shared with her older brother, Travis, to find Mr. Thuesen waiting in her room. Mr. Thuesen had let himself in through the garage in the early morning hours and waited for Rachel to return. He had a gun. Exhausted from lack of sleep and upset, Mr. Thuesen confronted Rachel. He wanted to know why she wanted space from him and why Rachel was refusing to see him anymore. She asked him to leave and told Mr. Thuesen that her brother, Travis, had a gun. They argued, and Mr. Thuesen pointed the gun at himself, telling Rachel that he loved her. Rachel was able to take the gun from Mr. Thuesen and told him she would give the gun back to him outside. They went downstairs together. Mr. Thuesen took the gun back from Rachel, at which point Rachel ran away from Mr. Thuesen. He followed her and Rachel pushed him. Mr. Thuesen then shot Rachel in the back.

Travis, hearing the shot, suddenly burst out of his room, surprising Mr. Thuesen, who quickly shot Travis three times. Rachel ran back toward Mr. Thuesen, perhaps in response to the additional shots fired. Mr. Thuesen told the police that he "didn't know what to do . . . but then she came at me and I shot her again." When asked by the police why he kept shooting, Mr. Thuesen said, "I don't know. I felt like felt like I was in a mode . . . like training or a game or something . . . ." 47 RR 210; 48 RR 66, 90-95; State's Trial Ex. 200 [Confession] at pp. 16-21, 24-25, 26-35; 48-56. When the police arrived, they discovered Mr. Thuesen waiting with Rachel. He had called 911 and had been applying pressure to her chest in an effort to stop the bleeding. 44 RR at 55: 20-57:17. He surrendered to the police without incident. 44 RR at 58:11-24. Rachel and Travis were taken to a local hospital, where they both died shortly after.

## I.   THE TRIAL

26.   At trial, the State called approximately twenty witnesses, including the victims' father, neighbors, friends, classmates, first responders, medical professionals, and forensic experts. 38 RR at 45, 65, 113, 121; 39 RR at 5, 23, 124; 40 RR at 13, 50, 71, 101; 41 RR at 59, 130, 154; 42 RR at 11, 49, 148, 152, 162.

27.   Wayne Joiner, father of Travis and Rachel Joiner, testified to the living arrangement between Travis and Rachel, his children's dreams and aspirations, and the nature of the relationship between Mr. Thuesen, Rachel, and the rest of the Joiner family. 38 RR at 45, 54-64. After Wayne Joiner, the Joiner children's neighbor, Tabitha Foreman, testified that she saw Mr. Thuesen shortly after the police had arrived at the Joiner residence and that he did not seem mad or angry and had "a look of no remorse." 38 RR at 88-89, 106:17.

28.   The State also called a Marine gunnery sergeant, Brian Keith, who testified that Mr. Thuesen had called him the night before the shooting asking for relationship advice concerning Rachel. 38 RR at 125.

29.     The State then called two friends of the Joiner siblings, Douglas Perry and Johnny

Matthys—who testified to their relationships with the siblings. 39 RR at 5-90.

30.     The State concluded its case by calling a number of law enforcement officers and

medical and forensic professionals to establish a timeline for the shootings, as well as to provide

cause and time of death. 39 RR at 124; 40 RR at 13, 50, 71, 101; 41 RR at 59, 130, 154; 42 RR at

11, 49, 148, 152, 162.

31.     The defense called twelve witnesses, including responding officers, Dr. Carlo,

Teresa Cannon, former Marines who served with Mr. Thuesen, Mr. Thuesen's mother, and Dr.

Roger Saunders. 44 RR at 55, 95; 45 RR at 11, 20, 74, 127; 46 RR at 14, 55, 119, 150, 179; 47 RR

at 5.

32.     The first witness called was Officer Tom Jagielski, the officer who arrived at the

scene after Mr. Thuesen called 911. Like the neighbor, Tabitha Foreman, Officer Jagielski testified

that Mr. Thuesen's face showed no emotion; that he had a "flat affect." 44 RR at 67.

33.     It is important to note that the DSM-V recognizes that PTSD can cause dissociative

behavior. DSM-V 300.6 (F48.1). Dissociative behavior means responding to trauma-related

stimuli with dissociative symptoms (depersonalization or derealization) and associated emotional

detachment, such as "[e]xperiences of unreality, detachment, or being an outside observer with

respect to one's thoughts, feelings, sensations, body, or actions (e.g., perceptual alterations,

distorted sense of time, unreal or absent self, emotional and/or physical numbing)" or

"[e]xperiences of unreality or detachment with respect to surroundings (e.g., individuals or objects

are experienced as unreal, dreamlike, foggy, lifeless, or visually distorted)." *Id.*

34.     Dissociative features may include having flashbacks to traumatic events; briefly

losing touch with events going on around oneself (like daydreaming); blanking out or being unable

to remember anything for a period of time; memory loss about certain events, people, information, or time periods; a distorted or blurred sense of reality; feeling disconnected or detached from one's emotions; feeling that the world is unreal and distorted; feeling numb or distant from oneself and one's surroundings; and having an altered sense of time and place. This dissociative behavior can be triggered by a PTSD crisis. Dissociative behavior may include involuntary behavior (such as training, habits, or instincts), flat affect, memory loss, and emotional detachment. It is generally short-term.

35.     *Shortly after a PTSD event, a person suffering from PTSD could be expected to have a flat affect or otherwise seem emotionally detached from recent events*.

36.     Similarly, during a PTSD incident, it is difficult to form and retrieve memories. Thus, a person suffering from PTSD could be expected to confabulate. Confabulation can involve gaps in memory, or it could involve filling in those gaps with misinterpreted, distorted, or imagined information that then seems true. Soldiers are trained to recover quickly from firefights, and to report immediately on what happened. This training can further suppress a "normal" emotional affect and accuracy of reporting.

37.     Trial counsel, however, never developed or presented any evidence establishing the foregoing, and the State seized upon it as evidence that Mr. Thuesen lacked remorse.

38.     Dr. Carlo, the psychiatrist who treated Mr. Thuesen at the VA Hospital, testified about his diagnosis and treatment of Mr. Thuesen following his arrival at the hospital until his discharge. Dr. Carlo noted PTSD symptoms, but diagnosed Mr. Thuesen with major depressive disorder. He discharged Mr. Thuesen from the VA hospital with the understanding that he would continue to take his prescribed anti-depressant medication and participate in outpatient treatment in College Station. 45 RR at 72. Although Dr. Carlo's notes of his initial interview with Mr.

Thuesen indicates he had PTSD symptoms, Dr. Carlo did not diagnose him with PTSD, and was not asked by trial counsel if he thought Mr. Thuesen was suffering from PTSD at the time Dr. Carlo interviewed him.

39.     Fellow Marines Jeremy Abbott and Romero Garcia testified about their experiences in Iraq serving with Mr. Thuesen, Mr. Thuesen's duties during deployment, and their own experiences after returning to civilian life. 45 RR at 127-157; 46 RR at 150-177. Sergeant Abbott testified that Mr. Thuesen had been a machine gunner in his platoon in Iraq. Sergeant Abbott described their duties and activities while in Iraq and testified that they were under fire several times, including one occasion where two rocket-propelled grenades exploded about ten to fifteen feet from their vehicle.

40.     Marine Corps Sergeant Romero Garcia supervised Mr. Thuesen's platoon in Iraq. He testified that their platoon's mission was to drive through populated areas and draw fire so that they could locate and defeat armed adversaries. He described how they set up vehicle checkpoints where they sometimes had to "take out" vehicles that did not stop to be searched. At times, women and children would be in those vehicles. Sergeant Garcia, who himself had been diagnosed with PTSD upon returning to the United States, testified that he believed that Mr. Thuesen also had PTSD.

41.     Mr. Thuesen's mother, Patti Thuesen, testified that she noticed a difference in Mr. Thuesen about six to eight months after he returned home. For example, his room was orderly with everything in a certain place. If something was moved, he knew it. He startled so easily that he would grab for her if she tapped him on the shoulder, and he would "take a swing" when she went into his room to wake him up in the morning. Sometimes when Mr. Thuesen had been drinking, he would cry and tell her he "didn't mean to do it, but . . . [he] had to save [his] brothers." 46 RR

at 132-133.

42.     David Ottmer, a friend of Mr. Thuesen's family who was also a veteran, testified that, when Mr. Thuesen returned from Iraq in 2005, he had a look in his eyes like he was disconnected from reality. 46 RR at 120.

43.     However, missing from the defense's case was testimony establishing a causal connection between Mr. Thuesen's experiences in Iraq, his PTSD, and the deaths of Rachel and Travis.

44.     Dr. Saunders was the last witness called by the defense in the guilt/innocence phase of the trial. 47 RR at 5. He was questioned about the mental illnesses he suspected Mr. Thuesen suffered from: dependent personality disorder, borderline personality disorder, PTSD, and depression. 47 RR at 18-21, 33, 142-143. Dr. Saunders explained generally the causes and symptoms of PTSD and gave his opinion that Mr. Thuesen suffered from this disorder, but Dr. Saunders was not offered as, and was not, a PTSD expert. Dr. Saunders also testified that, in his opinion, Mr. Thuesen did not intentionally or knowingly cause the deaths of Rachel and Travis, but his testimony focused on his diagnoses of personality disorders, not PTSD. 47 RR at 37-46; 61-62. Dr. Saunders did not explain to the jury that, at the time of the shooting, something triggered in Mr. Thuesen a maladapted "fight-or-flight" response. He did not, nor was he asked to, explain how PTSD might have reduced Mr. Thuesen's moral culpability in causing their deaths.

## II.     PUNISHMENT PHASE

45.     The State opened the punishment phase of Mr. Thuesen's trial on May 21, 2010, with the State delivering a very brief opening statement informing the jury it would hear testimony about Mr. Thuesen's history of "escalation." 50 RR at 34-35.

46.     The State called several witnesses to testify to previous incidents where it alleged that Mr. Thuesen displayed emotional instability. 50 RR at 36, 60, 110, 129; 51 RR at 9. For its

first punishment-phase witness, the State called Amanda Ward, who testified to an incident at a party she and Mr. Thuesen attended when they were in high school. 50 RR at 37-49. According to Ward, Mr. Thuesen had a verbal altercation with a boy at the party who was talking with her; later Mr. Thuesen refused to leave Ward's home after dropping her off, and this led to a physical altercation with another boy when Mr. Thuesen returned to Ward's house later in the evening. 50 RR at 37-49.

47.     Despite three credible witnesses being available to refute Amanda Ward's testimony—including Ward's own mother, and two other students Ward alleged were involved in the incident—Mr. Thuesen's trial counsel failed to offer evidence that would have impeached Ward's credibility. Trial counsel's proffered reasons for failing to impeach Ward—that it was better to ignore her testimony and hope the jury did too rather than address it—were objectively unreasonable. 5 HR 224-226. This was a boon for the State, allowing it to argue in punishment phase closing that Ward's testimony was "unimpeached." 54 RR at 21.

48.     The State also called James Powlowski, a high-school acquaintance of Mr. Thuesen, and Leah Mathis, Mr. Thuesen's former girlfriend. Both testified as to several incidents in high school in which Mr. Thuesen had been violent with Mathis. 50 RR at 136, 138, 147, 154, 158-164. The State also called Mathis's mother Joanne to support her daughter's testimony and give her impression of Mr. Thuesen as "obsessive[]" and "not normal." 51 RR at 28.

49.     After calling witnesses whom the State argued established Mr. Thuesen's long-standing pattern of violence against women, the State also called witnesses to provide victim impact statements. 50 RR at 51, 85. Travis and Rachel's aunt testified to Travis and Rachel's good characters and personalities, as well as to the impact the shooting had on the lives of the Joiner family. 50 RR at 51-59. The State also called Kitty Gibson, a former track coach for Rachel, who

expressed a high opinion of Rachel. 50 RR at 85-96.

50.     After the State rested its case, trial counsel Michele Esparza gave a brief opening statement highlighting Mr. Thuesen's good upbringing, his eventual alcoholism, and his remorse for the killings. 51 RR at 35-38. At no point did Esparza's opening statement mention PTSD or mental illness, despite those conditions likely being the strongest mitigating factors available to the defense.

51.     Trial counsel began by calling witnesses to testify regarding Mr. Thuesen's academic achievement in high school—including his principal, who testified that Mr. Thuesen was a "good student"; his government teacher, who testified that Mr. Thuesen was a "very good student" who "always had his work done" and whose defining trait would be "respect"; and his pre-calculus teacher, who spoke about Mr. Thuesen's aptitude for math, and the pride he felt in serving his country in the Marines. 51 RR at 43, 51, 101, 104, 113-14.

52.     Next, the defense called several of Mr. Thuesen's former employers, each of whom spoke to his commendable work ethic. 51 RR at 44, 115; 52 RR at 20, 36. These witnesses described Mr. Thuesen as "always eager" and "hard-working" 51 RR at 51; "trustworthy" and "respectful" 51 RR at 116; a "quiet" person who "did his work" 52 RR at 26; and, as a very "diligent" person. 52 RR at 41. One employer testified that Mr. Thuesen helped to tutor her son in algebra. 51 RR at 117.

53.     To help the jury understand Mr. Thuesen's military experience, the defense called a number of former active-duty Marines who served in Iraq around the same time as Mr. Thuesen. 52 RR at 89, 146, 190; 53 RR at 5. These Marines explained that the duty of Mr. Thuesen's unit was to draw and return fire to the enemy in Iraq, 52 RR at 94-95, 149; 53 RR at 17-19. They also testified that the job was often violent, frightening, and stressful, 52 RR at 97, 105, 149-56; 53 RR

at 17-19, 23-24; and that the unit came into frequent contact with IEDs. 52 RR at 149; 53 RR at 18. Across the board, the Marines testified that Mr. Thuesen had come back from Iraq a changed man. 52 RR at 97-99, 195-96; 53 RR at 29-31.

54.     Two Marine witnesses who served directly with Mr. Thuesen for extended periods, Corporal Tim Rojas and Sergeant Rodney Townsend, spoke positively about his service and his commitment to his country. 52 RR at 165-66; 53 RR at 25-27. One Marine described a harrowing and traumatizing experience for Mr. Thuesen in gruesome detail: he was ordered to open fire on a vehicle that, it was discovered, contained not enemy combatants but a civilian family. A young child, covered in his family's blood, emerged from the vehicle and ran towards Mr. Thuesen's Humvee. 52 RR at 158-63.

55.     However, while this testimony might have shown that Mr. Thuesen had experienced difficult, violent conditions, Mr. Thuesen's counsel failed to connect it with the dearth of services available to reserve soldiers, like Mr. Thuesen, upon return. Mr. Thuesen's trial counsel likewise failed to present testimony that would have explained to the jury how such traumatic events would have affected the fight-or-flight responses of a soldier like Mr. Thuesen, or how they actually affected Mr. Thuesen when he was in the grip of an acute PTSD episode, as he was in the fateful period of March 4-6, 2009.

56.     When the Marines finished testifying, the defense abandoned the topic of PTSD, and simply moved on to calling witnesses who went to junior high and high school with Mr. Thuesen who testified primarily about his solid work ethic and capacity for friendship. 51 RR at 85, 89, 121; 52 RR at 44, 49, 54. These witnesses alternatively described him as a "good team member" in his high-school band, 51 RR at 86-8; as a "very hard worker," 51 RR at 92; as someone who "was always pushing to better himself as best he could," 51 RR at 126; as someone who had

become more despondent and an alcoholic after Iraq, 51 RR at 128-29; as "one of the good guys," 52 RR at 51; and as a "caring, understanding, [and] dependable" individual. 52 RR at 55. One high-school classmate testified that she wrote letters to Mr. Thuesen when he was in county jail awaiting trial, and that he helped her overcome the grief she felt over losing her own husband. 52 RR at 44-47.

57.     The defense called an employee of the medical division of the Brazos County Sheriff's Office who testified that those who have mental illnesses often neglect to take their medication and end up acting out as a result, but that Mr. Thuesen took his medication and was "very respectful [and] calm" in the jail setting." 52 RR at 6-7, 20. Similarly, a jailer at the Brazos County Sheriff's Office who had minimal personal contact with Mr. Thuesen testified that Mr. Thuesen was always well-behaved, and that he would be comfortable describing Mr. Thuesen as a "model prisoner." 52 RR at 126. The defense did not, however, call any of the numerous available corrections officers from the Brazos Country Detention Center with whom Mr. Thuesen interacted regularly, despite their praise for him and availability to testify.

58.     Trial counsel called several members of Mr. Thuesen's family who testified regarding Mr. Thuesen's good character, including his altruism. Mr. Thuesen's brother testified that he had been "proud" of his brother for his helpfulness before the incident. 52 RR at 74. Mr. Thuesen's sister testified that Mr. Thuesen had helped her raise her young son. 52 RR at 75. Mr. Thuesen's aunt described Mr. Thuesen as "a very caring, compassionate person" who was "willing to give up his time to [her] family, to share, be joyful." 52 RR at 137. Mr. Thuesen's father admitted that he and his son never developed a relationship where they could share their feelings with each other, but also testified that Mr. Thuesen was "the nicest son a father could ask for," and that he missed his son very much. 52 RR at 180-181, 186-87. Finally, Mr. Thuesen's mother told a story

about Mr. Thuesen wherein he volunteered his bed to a friend so that this friend would not have to sleep on the floor, and a story about how Mr. Thuesen volunteered to push the wheelchair of the disabled mother of a deceased friend. 52 RR at 202-04.

59.     Notably absent from Mr. Thuesen's family's testimony was any mention about the Thuesen family's long history with mental illness. Several of Mr. Thuesen's relatives have been diagnosed with bipolar disorder, including a great aunt, an aunt, an uncle, a cousin, and Mr. Thuesen's sister. 4 HR2 152-53; App'x 68, 123, 124, 129-131.

60.     Several of the Thuesen family's friends also testified on Mr. Thuesen's behalf at sentencing. 51 RR at 146; 52 RR at 139. Barbara Feldtman, a registered nurse who had known Mr. Thuesen since he was a baby, testified that when Mr. Thuesen was on his medication, he could be "distant and depressed," or he could smile, depending on the circumstances. 51 RR at 155.

61.     Finally, the sister of a former girlfriend of Mr. Thuesen testified that Mr. Thuesen's break-up with her sister had been amicable and that they had remained friends. 51 RR at 59. However, she also described Mr. Thuesen as "needy." 51 RR at 64.

62.     Despite putting on 31 witnesses during the punishment phase, trial counsel failed to elicit any testimony regarding Mr. Thuesen's PTSD that would allow the jury to understand the disorder as a potential source of mitigation. Not a single expert opined on how PTSD might have affected Mr. Thuesen's brain or his decision-making ability. Not a single witness provided a basis for connecting Mr. Thuesen's PTSD to the shooting in any way, such as that he had been in the midst of an acute PTSD episode when he shot Rachel and Travis Joiner, triggered by panic over losing Rachel, and compounded by Travis (whom Mr. Thuesen knew to own a gun) bursting unexpectedly into the room. Trial counsel failed to offer testimony that could have been instrumental in explaining Mr. Thuesen's diminished volition in the shootings.

63.     The defense also failed to offer any testimony whatsoever to rebut the State's argument that Mr. Thuesen was likely to commit other violent acts in the future, leaving unanswered the State's testimony satisfying the statutory future dangerousness issue.

64.     Trial counsel also presented no testimony showing that the staff at the VA Hospital failed to diagnose him with PTSD despite his apparent PTSD or treat him for the condition.

65.     After both sides rested and closed their punishment-phase cases, the court charged the jury, and both sides delivered their closing arguments. 53 RR at 60; 54 RR at 5, 14, 32, 51, 68.

66.     The State's closing argument addressed the impact the crime had on the Joiner family, asserted that Mr. Thuesen's emotional instability did not result from his experience in Iraq, and argued that Mr. Thuesen's upbringing was not a source of mitigation. 54 RR at 14, 21-22, 27-28. The State also offered the jury an opinion as to what constituted PTSD, expressly asserting that Mr. Thuesen did not suffer from PTSD. The prosecutor explained to the jury that his own stepfather, a World War II veteran, would suffer from flashbacks whenever he heard gunshots and would hurry his family indoors to prevent them from being harmed. 54 RR at 82. "That," the prosecutor concluded, "is PTSD"—the implication being that whatever Mr. Thuesen suffered from was not PTSD. 54 RR at 82. Critically, trial counsel failed to object to this damaging testimony regarding what the prosecutor believed constituted PTSD, despite the total absence of evidence supporting the State's opinion in the record.

67.     Trial counsel Esparza's closing argument consisted of a condensed telling of "the John Thuesen story," starting from his birth and leading to the afternoon of the shootings. 54 RR at 34. While Esparza alluded to Mr. Thuesen's suffering from PTSD, she failed to explain how Mr. Thuesen's PTSD was mitigating. 54 RR at 39. Trial counsel William Carter emphasized the severity of a life without parole sentence, and rehashed much of the testimony given in the guilt

and punishment phases of Mr. Thuesen's trial. 54 RR at 68. Like Esparza, Carter made only a terse reference to PTSD, but offered no explanation how and why PTSD was a source of mitigation. 54 RR at 82.

68.     Later that day, Thursday, May 27, shortly before noon, the jury retired to deliberate. 54 RR at 90. At 8:30 p.m. that evening, the jury had still not reached a verdict, so the court ordered its overnight sequestration. 54 RR at 92-93. When the jury returned the next morning, Friday, May 28, it deliberated for another two hours before returning with its verdict: "Yes" to the first Special Issue (whether Mr. Thuesen presented a threat of future dangerousness), and "No" to the second (whether there was sufficient evidence of mitigation). 55 RR at 7. The trial court then sentenced John Thuesen, decorated veteran of the Iraq War, to death on the Friday before Memorial Day weekend, 2010.

**PROCEDURAL HISTORY**

## I.    TRIAL COURT PROCEEDINGS

69.     On May 14, 2009, a grand jury indicted Mr. Thuesen for capital murder for intentionally causing the deaths of Rachel Joiner and her brother, Travis Joiner. CR at 1.

70.     The court initially appointed William Carter and Michele Esparza to represent Mr. Thuesen. CR at 8-9. Esparza withdrew as counsel on May 18, 2009, and Clint Sare was appointed as second chair trial counsel. CR at 11. On February 10, 2010, the court granted Esparza's motion to replace Sare as Carter's co-counsel and she resumed her former position as second chair trial counsel. CR at 167. Carter and Esparza represented Mr. Thuesen at trial, along with Frank Blazek. 6 RR at 2.

71.     Mr. Thuesen was arraigned on June 15, 2009, and entered a plea of not guilty. 2 RR at 4. The State filed notice of intent to seek the death penalty on January 29, 2010. CR at 15; 3 RR at 4.

27

72.     Voir dire commenced on March 29, 2010. 6 RR at 8. After the reading of the indictment, the State gave its opening statement on May 10, 2010. (8 RR at 28-30.) The State rested its case on May 12, 2010. 42 RR at 210. On May 14, 2010, trial counsel gave its opening statement and rested its case on May 20, 2010. 44 RR at 50; 49 RR at 85. The trial was presided over by Judge Travis Bryan, III.

73.     The case was submitted to the jury for guilt/innocence determination on May 20, 2010. 49 RR at 111. Following approximately 3 hours of deliberation, the jury returned a verdict of guilt. 49 RR at 112.

74.     The punishment phase began on May 21, 2010. 50 RR at 5. Jury deliberations commenced on May 27, 2010. 54 RR at 90.

75.     The jury was tasked with answering two special verdict questions. The first question (Special Issue One) asked the jury to answer:

> Whether there is a probability that the defendant, John Thuesen, would commit criminal acts of violence that would constitute a continuing threat to society.

54 RR at 6.

76.     In the event of a "Yes" to the first question, the jury was directed to answer the following question (Special Issue Two):

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, John Thuesen, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

54 RR at 7-8.

77.     The following day, the jury returned the verdict answering "Yes" to special issue one and "No" to special issue two. 55 RR at 4. Mr. Thuesen was then sentenced to death. 55 RR

at 7.

78.     Mr. Thuesen filed a motion for new trial on June 25, 2010 and an amended motion

on June 28, 2010. 1 Supp. CR at 27-42. The trial court denied the first amended motion for a new

trial on July 29, 2010. 1 Supp. CR at 76.

79.     On May 28, 2010, the court appointed John Edward Wright to represent Mr.

Thuesen in his post-conviction habeas litigation. 6 CR at 1233-34; 1 Supp. CR at 23-26. On June

2, 2010, the court appointed Frank Blazek to represent Mr. Thuesen in his direct appeal. 1 Supp.

CR at 25-26. On December 21, 2010, the court substituted the Office of Capital & Forensic Writs

("OCFW") to represent Mr. Thuesen in his post-conviction habeas litigation, permitting Mr.

Wright withdraw.

## II.   DIRECT APPEAL

80.     Mr. Blazek timely filed a notice of direct appeal on Mr. Thuesen's behalf with the

CCA.

81.     Mr. Thuesen filed his opening appellate brief on December 23, 2011, raising forty-

five claims of error.

82.     The State filed their response on May 29, 2012. Counsel for Mr. Thuesen did not

file a reply brief.

83.     The case was submitted to the CCA on September 12, 2012, following oral

argument.

84.     On February 26, 2014, the CCA affirmed Mr. Thuesen's conviction and sentence

on direct appeal, rejecting all forty-five claims of error. *Thuesen v. State*, No. AP-76,375, 2014

WL 792038 (Tex. Crim. App. Feb. 26, 2014). Mandate was issued on March 24, 2014.

## III.   STATE HABEAS CORPUS PROCEEDINGS

85.     On October 9, 2012, while Mr. Thuesen's direct appeal was pending in the CCA,

Mr. Thuesen filed an Initial Application for Writ of Habeas Corpus, alleging twenty-two claims of error: (1) trial counsel failed to properly develop expert witnesses for trial; (2) trial counsel failed to effectively present expert testimony at the guilt phase regarding Mr. Thuesen's intent; (3) trial counsel failed to effectively present evidence of PTSD at the guilt/innocence phase of trial; (4) trial counsel failed to adequately prepare and rehabilitate their one expert witness; (5) trial counsel failed to present expert testimony at the punishment phase of Mr. Thuesen's trial; (6) trial counsel was ineffective in their presentation of evidence that Mr. Thuesen would not be a future danger in prison; (7) trial counsel was ineffective by failing to present evidence that Mr. Thuesen was never diagnosed or treated for PTSD; (8) trial counsel failure's to effectively investigate, discover and present lay witness testimony regarding Mr. Thuesen's PTSD prejudiced his punishment phase of trial; (9) trial counsel failed to file a motion for change of venue; (10) trial counsel was ineffective for failing to impeach the testimony of Amanda Ward; (11) trial counsel was ineffective for failing to object to the State's preemptory strike of venirewoman Brownlee on the basis of her gender; (12) appellate counsel was ineffective for failing to appeal the trial court's ruling on trial counsel's Batson objection to venirewoman Brownlee; (13) trial counsel was ineffective in jury selection; (14) trial counsel was ineffective in the selection and presentation of certain lay witness testimony; (15) trial counsel was ineffective for failing to recall Patricia Thuesen, at either phase of trial, to testify about Mr. Thuesen's family history of mental illness; (16) trial counsel was ineffective for failing to raise the theme of mental illness in opening punishment phase argument; (17) trial counsel was ineffective by failing to object to the prosecutor's closing argument that included comments on evidence not on the record; (18) trial counsel failed to sufficiently preserve error by making proper, timely objections to each introduction of inadmissible evidence during trial; appellate counsel was ineffective for failing to raise these issues on direct appeal; (19) Mr.

Thuesen's death sentence should be vacated because appellate counsel was ineffective for failing to argue that the trial court erred in failing to grant Mr. Thuesen's pretrial motions precluding the death penalty; (20) trial counsel was ineffective for objecting to the statutory "10-12" instruction and then reminding the jurors, twice, of the rule during closing argument; (21) Mr. Thuesen's death sentence should be vacated because the punishment phase jury instruction restricted the evidence the jury could determine was mitigating; and (22) Mr. Thuesen's death sentence is unconstitutional because it was assigned based on Texas' arbitrary system of administering the death penalty.

86.     On February 4, 2013, the trial court granted the State's Motion for Extension of Time to file its response.

87.     On April 8, 2013, the State filed its response.

88.     Once an application challenging a judgment imposing death is filed, the Texas Code of Criminal Procedure directs the habeas court to determine, based on the application and the State's answer, "whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist" and then "issue a written order of the determination.' Tex. Code Crim. Proc. art. 11.071 § 8(a).

89.     Section 9 of Article 11.071, entitled "Hearing," governs the proceeding when the habeas court "determines that controverted, previously unresolved factual issues exist material to the legality of [ ] confinement exist." Tex. Code Crim. Proc. art. 11.071 § 9(a). In that circumstance, the habeas court must designate by written order the issues of fact that are to be resolved and the manner by which the court will consider evidence to resolve those issues. *Id*. To resolve the issues, the court can hold a hearing appropriate to the case; the statute authorizes the court to receive evidence via affidavits, depositions, interrogatories, live witnesses, and personal recollection. *Id.*

31

90.     Judge Bryan, who had presided over Mr. Thuesen's trial, was assigned to hear Mr.

Thuesen's state habeas petition and make Findings of Fact and Conclusions of Law.

91.     On April 26, 2013, Judge Bryan ordered twenty factual issues to be resolved

following an evidentiary hearing:

1.     Claim One: Whether Applicant was denied the effective assistance of trial counsel during the selection, preparation and presentation of their defense (by allegedly failing to develop expert testimony regarding PTSD).

2.     Claim Two: Whether Applicant was denied the effective assistance of trial counsel when counsel presented the testimony of their expert, Dr. Roger Saunders, during the guilt/innocence phase.

3.     Claim Three: Whether Applicant was denied the effective assistance of trial counsel during the selection, preparation and presentation of their defense (by allegedly failing to present expert testimony regarding PTSD during the guilt/innocence phase).

4.     Claim Four: Whether Applicant was denied the effective assistance of trial counsel during the selection, preparation and presentation of their defense (by allegedly failing to adequately prepare and rehabilitate Dr. Saunders).

5.     Claim Five: Whether Applicant was denied the effective assistance of trial counsel during the selection, preparation and presentation of their defense (by allegedly failing to present expert testimony regarding PTSD during the punishment phase).

6.     Claim Six: Whether Applicant was denied the effective assistance of trial counsel during its presentation of evidence concerning whether Applicant would be a future danger (Special issue no. 1).

7.     Claim Seven: Whether Applicant was denied the effective assistance of trial counsel during the selection, preparation and presentation of their defense (by allegedly not fully reviewing Applicant's military records in their possession and presenting evidence that Applicant was never treated for PTSD).

8.     Claim Eight: Whether Applicant was denied the effective assistance of trial counsel during the selection, preparation and presentation of their defense, through the testimony of the following lay witnesses during the punishment phase: Patricia Thuesen; Dennis Thuesen; Michael Thuesen; Michele Thuesen; Jeremy Abbott; Rodney Townsend; Charisse Blezinger; Lisa Gisler. Also whether Applicant was denied the effective assistance of trial counsel because the following witnesses were not called to testify: Mark Torres and Jeff Hood; Craig Novak; Michael Novak; Karolyn Ottmer; Stephen Snell; Brian Smith; Dianne Appolito; Andy Rodnesny.

9.     Claim Nine: Whether Applicant was denied the effective assistance of trial counsel

when counsel failed to file for a motion for change of venue.

10.     Claim Ten: Whether Applicant was denied the effective assistance of trial counsel when counsel allegedly failed to impeach Mandy Ward's testimony by failing to call Haley McDowell, Jimmy Kleimann and Mandy Ward's mother, Sandra, to impeach Mandy Ward's testimony.

11.     Claim Eleven: Whether Applicant was denied the effective assistance of trial counsel when counsel allegedly failed to object to the State's peremptory strike of venireperson Brownlee on the basis of her gender.

12.     Claim Twelve: Whether Applicant was denied the effective assistance of appellate counsel when counsel allegedly failed to appeal the trial court's overruling of trial counsel's Batson challenge.

13.     Claim Thirteen: Whether Applicant was denied the effective assistance of trial counsel during jury selection for: failing to object to the State's removal of venireperson Burroughs; failing to use a peremptory strike on juror Bryant; failing to use a peremptory strike on juror Brynildsen. Also whether appellate counsel was ineffective for failing to raise the above issues on direct appeal.

14.     Claim Fourteen: Whether Applicant was denied the effective assistance of trial counsel in the selection and presentation of the following defense lay witnesses: by calling Officer Tom Jagielski as a witness during the guilt phase; by failing to call Janet Walker as a witness during the guilt phase; by calling Amanda Wagner as a witness during the punishment phase.

15.     Claim Fifteen: Whether Applicant was denied the effective assistance of trial counsel for allegedly failing to call Patricia Thuesen about the Thuesen's family history of mental illness.

16.     Claim Sixteen: Whether Applicant was denied the effective assistance of trial counsel for allegedly failing to raise the theme of mental illness in opening punishment phase argument.

17.     Claim Seventeen: Whether Applicant was denied the effective assistance of trial counsel for failing to object to the State's allegedly improper closing argument. Also whether *appellate* counsel was ineffective for failing to argue, on direct appeal, that trial counsel was ineffective as to this issue.

18.     Claim Eighteen: Whether Applicant was denied the effective assistance of trial counsel for allegedly failing to preserve error as to the introduction of evidence: by stating "no objection" when the State offered a protective order into evidence; by opening the door to Tabitha Foreman's testimony—that Applicant had a look of no remorse; by not timely objecting to background character evidence of the victims (Rachel and Travis Joiner) obtained from Wayne Joiner, Douglas Jordan Perry and Johnny Matthys; by not continuing to object to phone records each time the State used them; by objecting to an anti-sympathy charge-as a result of counsel's

objection, the charge was omitted which "could have left the jury with the impression that sympathy for the victims was sufficient to impose death." Also whether appellate counsel was ineffective for failing to raise the above issues on direct appeal.

19.   Claim Nineteen: Whether Applicant was denied the effective assistance of appellate counsel for failing to raise, on direct appeal, the trial court's rulings on Applicant's pretrial motions: Motion to declare Tex. Pen. Code Chapter 19 unconstitutional; Motion to find Tex. Code Crim. Proc. art. 37.071 unconstitutional because it fails to provide a meaningful appellate review for the jury's answers to the special issues at punishment; Motion to preclude death penalty due to grand jury's failure to allege all elements in the indictment necessary to make Applicant death eligible; Motion to declare Tex. Code Crim. Proc. art. 37.071 unconstitutional because it places the burden of proof, as to mitigation, on the defendant; Motion to preclude the death penalty as a sentencing option: probability; Motion to find Tex. Code Crim. Proc. art. 37.071 unconstitutional because it is unreliable; Motion to find Tex. Code Crim. Proc. art. 37.071, § 2(f)(4) unconstitutional; Motion to preclude the State from seeking death because Tex. Code Crim. Proc. art. 37.071, §§ 2(e) and 2(f)(4) fail to require that mitigation be considered; Motion to preclude the State from seeking death because the juror's predictions of Applicant's future dangerousness would be unreliable; Motion to admit evidence of other Brazos County sentences in capital cases; Motion to preclude the death penalty as a sentencing option, or in the alternative, to quash the indictment under *Apprendi v. New Jersey/Ring v. Arizona/Blakely v. Washington/Bush v. Gore*.

20.   Claim Twenty: Whether Applicant was denied the effective assistance of trial counsel when it allegedly objected to the "10-12" rule but later reminding the jurors, during closing argument in the punishment phase, of the rule.

92.   Judge Bryan scheduled the evidentiary hearing for December 10, 2013.

## A.   Judge Bryan was temporarily recused

93.   Before the evidentiary hearing took place, on November 18, 2013, Judge Bryan *sua sponte* signed an order voluntarily recusing himself from the case and requesting that the proceeding be assigned to another judge. The Voluntary Recusal Order did not specify a basis for the recusal. Thus, that same day, the OCFW sent an email to Judge Bryan, cc-ing counsel for the State, asking for an opportunity to discuss the matter with the court. Ex. 18 [Response to Court's Order of February 24, 2016, Exhibit B]. Judge Bryan responded, informing counsel for both parties that he had decided to recuse himself because he had recently made a campaign contribution to

Michelle Esparza, one of the trial lawyers who had represented Mr. Thuesen, who was then running for the Republican primary nomination to the 361st District Court. Ex. 18 [Response to Court's Order of February 24, 2016, Exhibit C]. Although he believed that he could be objective, Judge Bryan was concerned about the appearance of partiality. *Id.* The OCFW suggested, and later confirmed after conferring with Mr. Thuesen, that the recusal was unnecessary and should be reconsidered. Ex. 18 [Response to Court's Order of February 24, 2016, Exhibit D].

94.     On November 20, 2013, counsel for the State sent an email taking the position that Judge Bryan should proceed with the recusal based on purported concerns that *Mr. Thuesen* might use Judge Bryan's involvement as a basis to seek relief from an unfavorable result:

> The last thing that I don't think we can defend against is that some capital writ lawyer in the federal system . . . doesn't come back and say at a later time the fact that Michelle [Esparza] lost, now her livelihood depends on her private practice and that that would somehow, because you have backed her in the election, that you had some reason to make sure that she didn't be found ineffective [sic] in a capital death penalty case and that that somehow inadvertently swayed your ability to make a straight call.

Ex. 18 [Response to Court's Order of February 24, 2016, Exhibit E].

95.     On November 20, 2013, the Honorable Olen Underwood, Presiding Judge of Second Administrative Judicial Region, entered an order assigning the matter to the Honorable Harold R. Towslee ("Order of Assignment"). Ex. 18 [Response to Court's Order of February 24, 2016, Ex. G]. The Order of Assignment stated that Judge Towslee's "assignment shall continue as may be necessary . . . or until termination by the Presiding Judge." *Id.*

96.     In light of the reassignment, on November 21, 2013, the scheduled evidentiary hearing was postponed. The parties filed an "Agreed Upon Motion to Reset Evidentiary Hearing Date." Ex. 18 [Response to Court's Order of February 24, 2016, Ex. H]. The next day, on November 22, 2013, the parties received a "Notice of Setting" from the court coordinator for the

272nd District Court setting a status conference before Judge Towslee on December 10, 2013. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. I.]

99.    After the status conference before Judge Towslee, the parties received another "Notice of Setting" on December 19, 2013, setting a bench conference for March 24, 2014, to be followed by an evidentiary hearing to commence on June 9, 2014 before Judge Towslee. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. J].

98.    Shortly before that bench conference was to take place, Ms. Esparza was defeated on March 4, 2014 in the primary election for the Republican nomination to the 361st District Court. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. K]. Thereafter, on March 11, 2014, the OCFW, on Mr. Thuesen's behalf, filed a Motion to Reassign Original Trial Court Judge ("Motion to Reassign") because the basis for Judge Bryan's recusal—his campaign contribution to Ms. Esparza—had been resolved with Ms. Esparza's defeat in the Republican primary. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. L].

99.    On March 14, 2014, in response to the Motion to Reassign, Presiding Judge Underwood contacted Judge Bryan directly and advised him that, since he had originally recused himself *sua sponte*, Judge Bryan could now enter an order withdrawing his own recusal order.

100.    That same day, Judge Bryan, through his court coordinator, informed counsel for both parties of this development. *Id.* Judge Bryan stated that he had responded to Presiding Judge Underwood, advising that he would soon file an order withdrawing the voluntary recusal. *Id.* Judge Bryan also relayed that, according to Presiding Judge Underwood, "it will then fall on either of the parties to object to [Judge Bryan's] presence in the case." *Id.* Both Presiding Judge Underwood and Judge Towslee were cc-ed on these communications. *Id.*

101.    Counsel for the State responded by email that it objected to the reassignment. *Id.* at

2. Judge Bryan held a telephonic hearing on March 17, 2014 to reconsider the voluntary recusal and the State's objection. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. B]. During that hearing, Judge Bryan advised that he had spoken with Judge Underwood "who suggested that [Judge Bryan] withdraw [his] recusal and get back on the case." *Id.* at 4. Judge Bryan reported that he had initially been concerned that, because of the voluntary recusal, he was no longer the judge on the case and thus could not enter an order. *Id.* at 5. However, Presiding Judge Underwood had told Judge Bryan that he could do so. *Id.*

102.    The State initially stated that its concern was the "perception of bias," not concern of actual bias. *Id.* at 5-6. If Judge Bryan denied Mr. Thuesen relief, the State argued, future federal habeas counsel for Mr. Thuesen might be able to use the possible bias to support a claim attacking the denial. *Id.* at 8.

103.    In response, Mr. Thuesen's counsel stated categorically that they had no intention of trying to inject error into the process by declining to object to Judge Bryan presiding over the habeas proceeding. *Id.* at 16-17. The OCFW also noted that there had never been facts sufficient to suggest the appearance of partiality based on a campaign donation to Esparza—and especially not now that the campaign was over. *Id.* at 10.

104.    The State advised that it wanted to confer with a member of the Harris County District Attorney's Office, Roe Wilson, to get advice about the issue because she spent all of her time on state writs. *Id.* at 9. The State also described plans to confer with the Attorney General's Office about the issue. *Id.*

105.    Judge Bryan noted that, even if he did overrule the State's objection, the State would "*still have the right to file an involuntary recusal against me and have a full blown hearing on that*." *Id.* (emphasis added).

106.   On March 18, 2014, Judge Bryan signed an "Order Withdrawing Recusal and Withdrawing Request to Assign Another Judge." Ex. 18 [Response to Court's Order of February 24, 2016, Ex. N].

107.   That same day, *the State withdrew its objection* to Judge Bryan presiding over the matter in an e-mail:

> Judge Bryan,
>
> The State of Texas no longer has any objections relating to you presiding over the John Thuesen writ. Based on further research and contact with a number of experts in the area of federal writs, the statements and assurances made by the Office of Capital Writs in the telephone hearing yesterday, March 17, 2014, are sufficient to alleviate our concerns about their motives for having you preside. With those issues resolved, our original desire to have you preside can now be realized without any apprehension of future legal ramifications

Ex. 18 [Response to Court's Order of February 24, 2016, Ex. M].

108.   Subsequently, neither the State nor Mr. Thuesen filed a motion seeking to recuse Judge Bryan or otherwise objecting to his presiding over the Article 11.071 proceeding.

**B.   Following an evidentiary hearing, Judge Bryan recommends granting Mr. Thuesen relief on multiple claims.**

109.   From June 9-13, 2014, with the agreement of all the parties, Judge Bryan presided over a five-day evidentiary hearing during which voluminous documentary evidence was admitted and numerous witnesses appeared live and were subjected to cross-examination, including appellate counsel Frank Blazek; trial counsel William Carter and Michelle Esparza; Dr. Mark Cunningham; Dr. Eric Elbogen; Dr. Kenneth Kopel; Craig Novak; Michelle Novak; Karolyn Ottmer; Dr. Elspeth Ritchie; Brian Smith; Stephen Snell; John Stetter; Dennis Thuesen; Michelle Thuesen; and Patricia Thuesen.

110.   These witnesses testified as to Mr. Thuesen's military service; the trauma that

service engendered; the lack of care he received following his return to the United States; Mr. Thuesen's struggles following his return due to inadequate care; his relationships with his family; his relationships with women; Mr. Thuesen's demeanor in the Brazos County Detention Center; how PTSD affects the brain and behavior (including following induction of the fight-or-flight response in a PTSD crisis); the likelihood that Mr. Thuesen would have committed future violence; and the decision making of his trial attorneys.

111.    In addition, Judge Bryan admitted 145 exhibits into evidence, including Mr. Thuesen's medical records following his service.

112.    Judge Bryan specifically and explicitly found that the testimony of each of the expert witnesses who testified—Dr. Ritchie, Dr. Elbogen, Dr. Cunningham, and Dr. Kopel—was credible. Judge Bryan's Findings of Fact and Conclusions of Law ("FFCL") at 2. In addition, he found that testimony from each would have been admissible at Mr. Thuesen's trial and would have met sufficient reliability standards under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993). *Id.*

113.    Judge Bryan also found credible the testimony of lay witnesses Patricia Thuesen, Dennis Thuesen, Michelle Thuesen, Craig Novak, Brian Smith, Karolyn Ottmer, Stephen Snell, Michael Novak, and John Stetter. *Id.*

114.    After reviewing affidavits submitted by fourteen other lay witnesses and an expert sociologist focusing on veteran reintegration, Dr. William Brown, Judge Bryan found the testimony of all, "both expert and lay, to be credible based on their affidavits." *Id*. at 3. Further, he found that Dr. Brown's testimony met "sufficient reliability standards under *Daubert*" such that it "would be admitted at a live hearing." *Id.* at 2.

115.    Finally, while Judge Bryan found Mr. Thuesen's trial counsel, Billy Carter and

Michele Esparza, and trial and appellate counsel Frank Blazek, to be credible overall, he excluded "specific determinations of the credibility to particular factual issues" in line with his decisions finding their representation ineffective. *Id.*

116.    Reviewing the evidence presented at the evidentiary hearing, Judge Bryan recommended that Mr. Thuesen be granted relief on Claims One, Five, Six, Seven, Eight, Ten, Thirteen (in part), Fifteen, Sixteen, Seventeen, and denied as to Claims Two, Three, Four, Nine, Eleven, Twelve, Fourteen, Eighteen, Nineteen, Twenty, Twenty-One, and Twenty-Two.

### 1.  Trial counsel failed to effectively investigate and present mitigation evidence related to PTSD at the punishment phase (Claims One, Five and Eight).

117.    Judge Bryan first addressed the ineffectiveness of trial counsel with regard to the investigation and presentation of mitigation evidence related to PTSD at the punishment phase of the trial, grouping together Claims One, Five, and Eight, and recommending relief based on each.

118.    Judge Bryan determined that, although trial counsel had presented some evidence of Mr. Thuesen's mental illness at trial, trial counsel was ineffective in the punishment phase for failing to adequately explain or present expert witness testimony concerning Mr. Thuesen's illness to the jury.

119.    Carter testified that at the time he was appointed to represent Mr. Thuesen as lead trial counsel on March 9, 2009, he was counsel in two other capital murder cases, one that ended on March 11, 2009 (Christian Olsen) and one that would go to trial in September 2009 (Jerry Martin). FFCL, ¶ 26. Mr. Carter also testified that he had been counsel on over *fifty* non-capital criminal cases at the time of his appointment to Mr. Thuesen's case. *Id.*

120.    Esparza testified that she had been appointed to represent Mr. Thuesen as second chair. At the time, Esparza had just finished working on the Olsen case, was counsel in another pending capital murder case and had between fifty and seventy-five pending non-criminal cases.

FFCL, ¶ 27.

121.    Esparza withdrew as Mr. Thuesen's counsel on June 2, 2009 because she "personally couldn't start another [capital case]" after having just finished the Olsen case. 5 HR at 145, Ex. 51 [Clerk's Record Index]. Esparza testified that she "didn't do that much work on the [Thuesen] case" prior to withdrawing. 5 HR at 144. Clint Sare was appointed to replace Esparza on the same day. Sare did "very little" on the case for the rest of 2009. FFCL, ¶ 29.

122.    In December 2009, Carter asked Esparza to rejoin the Thuesen case. 5 HR at 142-43. Esparza agreed to rejoin the case because "this was a kid who went to war and came back different, and [she] wanted to save his life." *Id.* at 146. She was substituted back onto the case for Sare in February 2010. 2 HR at 43; Ex. 51 [Clerk's Record Index]. Esparza and Carter represented Mr. Thuesen until the completion his capital trial. 2 HR at 40-44, 120-23; FFCL, ¶ 30.

123.    Shortly after being appointed, trial counsel hired mitigation specialist Gerald Byington. Carter had worked with Byington before on multiple occasions, including the Jerry Martin and Christian Olsen cases. 2 HR at 37, 53-54. Byington's role was to collect and review records, create timelines based on the records, and summarize discovery. Trial counsel did not direct Byington on what records to collect. 2 HR at 53-55. Trial counsel did not "police" Byington's work as the mitigation specialist. *Id.* at 59. Instead, counsel's approach was to "turn him loose and have him do the job he's supposed to do." *Id.* at 54; FFCL, ¶ 34-35.

124.    In late June 2009, Byington sent out various record requests. FFCL, ¶ 36. Carter testified that he expected Byington to identify relevant witnesses from the records and interview them. Trial counsel did not personally review any of these records until after January 1, 2010. FFCL, ¶ 37. Carter also testified that he did not turn his fully attention to Mr. Thuesen's case until after January 1, 2010. FFCL, 42.

125.    In March 2009, trial counsel requested psychologist Dr. Roger Saunders be appointed to Mr. Thuesen's case. Carter had worked with Dr. Saunders on other cases, including the recently completed Christian Olsen case and the ongoing Jerry Martin case. 2 HR at 38, 54. Trial counsel did not understand Dr. Saunders to have a particular specialty within psychology other than "[j]ust the mental health issues for a client." *Id.* at 38-39.

126.    Shortly after being appointed, Dr. Saunders met with Mr. Thuesen at the Brazos County Detention Center. Trial counsel did not ask Dr. Saunders to conduct a full assessment of Mr. Thuesen, but only to gain some "preliminary thoughts about [Mr. Thuesen]." 2 HR at 39, 74.

127.    Following his initial meeting with Mr. Thuesen, Dr. Saunders did not take any specific action on the case again until February 2010, when Esparza returned to the defense team. 2 HR at 75. FFCL, ¶ 40. Dr. Saunders did not meet with Mr. Thuesen again until May 13, 2010, after the trial had already commenced. State Habeas Ex. 39-H at 2 (submitted at evidentiary hearing) [Saunders Billing Records]; 2 HR at 191; FFCL, ¶ 46.

128.    Despite the early indications that PTSD would be a major issue in the trial, trial counsel did not even begin to investigate the matter until the month before trial. It was not until February 2010, for example, that trial counsel hired Rick Starnes as an investigator, and did not hire a second until March 27, 2010. Those investigators, in turn, only began to locate and interview lay witnesses *after* jury selection had already started; they relayed information to trial counsel as counsel was conducting the trial. 2 HR at 104-06; FFCL, ¶ 43.

129.    On February 22, 2010, trial counsel hired Dr. Robert Yohman to conduct a neuropsychological evaluation. 2 HR at 77, 127-28, 177, 188-89; Ex. 51 [Clerk's Record Index].) Dr. Yohman noted that Mr. Thuesen appeared to suffer from PTSD and suggested that trial counsel pursue that issue at trial. 2 HR at 188-89; FFCL, ¶ 47.

130.     In March 2010, trial counsel communicated with Texas Defender Service attorney John Niland, who recommended that trial counsel call an expert to educate the jury about PTSD. 2 HR at 85; FFCL, ¶ 48.

131.     On March 26, 2010, trial counsel contacted Dr. Michael Gottlieb, a family psychologist, who recommended that counsel provide the jury with information about PTSD. 2 HR at 85, 189; 5 HR at 246; State Habeas Ex. 39-E (submitted at evidentiary hearing) [Billing for Dr. Michael Gottlieb]; FFCL, ¶ 4.

132.     Trial counsel contacted Dr. Howard Detwiler, a psychologist in Alaska, in February 2010 in order to discuss potential PTSD testimony but ultimately decided Dr. Detwiler was not the appropriate defense expert. *Id;* 2 HR at 87-92. Dr. Detwiler never met or evaluated Mr. Thuesen. *Id*. FFCL, ¶ 50.

133.     Based on a recommendation from Dr. Saunders, trial counsel retained Dr. Kenneth Kopel, a Houston psychologist with experience treating veterans with PTSD, on April 27, 2010. 4 HR at 140. After sending Dr. Kopel records to review, trial counsel drove to Houston on Saturday, May 22, 2010, to meet personally with Dr. Kopel for the first time. By this time, however, *the punishment phase of Mr. Thuesen's trial was already underway*. Although Carter planned to call Dr. Kopel as an expert in PTSD, the night before Dr. Kopel was scheduled to testify, trial counsel abruptly decided not to call him. 2 HR at 83-84, 92-93; 4 HR at 141-43; FFCL, ¶ 51.

134.     Despite the multiple strong recommendations that trial counsel pursue a defense related to PTSD, trial counsel did not call any expert to testify about PTSD during the punishment phase of Mr. Thuesen's trial. FFCL, ¶ 52.

135.     Judge Bryan found that other than the above and filing a few form motions, "counsel appears to have done little to no other work on Thuesen's case during 2009." FFCL, ¶ 41.

136.    Judge Bryan found that trial counsel should have known that PTSD would be a significant issue in the case as early as March 2009. *Id.* at 16. Specifically, Judge Bryan found that a review of the VA's medical records, which trial counsel received in March, 2009, "would have shown counsel that Thuesen had been consistently reporting symptoms of PTSD for approximately two and half years prior to the crime," *id.*, but that trial counsel "did not begin an investigation into the basis for Mr. Thuesen's PTSD, or consult potential avenues for developing PTSD evidence until the months leading up to trial." *Id.* at 18. Judge Bryan found that, with regard to Mr. Thuesen's specific experiences during combat and evidence of his PTSD, counsel's mitigation specialist and investigators did not begin lay witness interviews in the case until late January to-early-February 2010. *Id.* at 21.

137.    Critically, Judge Bryan found that Mr. Thuesen's counsel failed to present expert testimony to substantiate Mr. Thuesen's PTSD and connect it to the crimes at issue. Judge Bryan found that, "despite the numerous indications that PTSD was a central component in Thuesen's case, and the suggestions by several mental health professionals that counsel present testimony from a PTSD expert, counsel did not secure the assistance of an expert witness or witnesses qualified to explain the mitigating impacts of PTSD." *Id.* at 21-22. As a consequence, "the ultimate presentation of information regarding PTSD during Thuesen's capital trial, including information specific to Thuesen's experience and information placing Thuesen's struggle with PTSD in a broader context, was *significantly incomplete*." *Id.* at 25 (emphasis added).

138.    Judge Bryan further found that trial counsel failed to corroborate the PTSD evidence with copious available evidence, including: evidence regarding Mr. Thuesen's military experience and training, the extensive trauma he suffered in Iraq, the lack of counseling or programs available to him upon his return, his difficulty of reintegrating following his service,

how reservists, like Mr. Thuesen, often experience the most acute difficulties with reintegration because they often return "directly back to the civilian world" rather than to a military base where others comprehend their experiences, and the lack of proper treatment by the VA. *Id.* at 28-39.

139.    Judge Bryan concluded that, "having identified the predominant issue in their defense case, counsel had a duty to sufficiently investigate the potential building blocks of that case, well in advance of trial. Counsel failed to thoroughly review VA medical records or speak to VA staff who treated Thuesen until the eve of trial." *Id.* at 43. Further, Judge Bryan ruled that trial counsel's "last minute decisions [regarding potentially retaining PTSD experts] were not based on careful and thorough investigation and were therefore not based on strategic grounds." *Id.* at 45.

140.    Judge Bryan ruled that those failures were both deficient compared to professional norms, and that they were prejudicial to Mr. Thuesen at the punishment phase of trial. *Id.* at 45.

141.    Judge Bryan separately recommended granting relief based on trial counsel's failure to investigate and present evidence at the punishment phase showing that Mr. Thuesen was not properly treated for PTSD by the VA. *Id.* at 48.

142.    Judge Bryan noted that the defense's presentation of testimony from VA employees, Dr. Ismael Carlo and social worker Teresa Cannon, actually obscured the fact that the VA never properly diagnosed or treated Mr. Thuesen for PTSD. *Id.* at 48-49.

143.    Judge Bryan found that, "had counsel fully reviewed the records in their possession, they would have noted (and could have presented evidence) that despite Thuesen's consistent report of PTSD symptoms, neither Dr. Carlo nor any other VA medical professional had ever actually diagnosed Thuesen with PTSD or provided proper treatment." *Id.* at 49.

144.    Judge Bryan concluded, "Counsel's failure to investigate and present evidence that the VA failed to properly diagnose and treat Thuesen's PTSD fell below the norms of professional

standards for capital counsel. Counsel were clearly aware of the discrepancy between what the VA records showed about Thuesen's treatment and what Dr. Carlo and Teresa Cannon could testify to at trial. It is unreasonable to suggest that such evidence would not have been compelling and highly mitigating to Thuesen's jury." *Id.* at 55.

145.    Further, Judge Bryan found that counsel's explanation that they did not present this evidence for strategic reasons was "not a reasonable strategic ground" because the decision was "not based on reasonable investigation [of Mr. Thuesen's VA records] and complete information." *Id.* at 55-56.

**2.    Trial counsel failed to adequately investigate and present evidence that there was no meaningful probability of future violence (Claim Six).**

146.    With regard to Mr. Thuesen's Sixth Claim, Judge Bryan ruled that trial counsel was ineffective for failing to adequately investigate and present evidence at the punishment phase that there was no meaningful probability that Thuesen would commit future violence. *Id.* at 57.

147.    Judge Bryan noted that trial counsel did not present any expert regarding the probability that Mr. Thuesen would commit future violent acts of be a danger to society. *Id.* He further found that Dr. Mark Cunningham, an expert in the field, would have been able to "explain to the jury that Mr. Thuesen exhibited at least nine factors that reduced his risk of future violence and zero factors that increased the risk." *Id.* at 57-58. Without such assistance, Judge Bryan observed that, without a testifying expert, Mr. Thuesen's chances of persuading the jury that he did not pose a future threat to the community were substantially diminished because "jurors tend to inaccurately predict a defendant's risk of future violence because the scientifically-validated factors that impact the risk can be counter-intuitive. One study found that jurors over-predicted future violence by anywhere between fifty and two hundred and fifty fold." *Id.* at 58.

148.    Judge Bryan also found that trial counsel failed to meet minimal levels of

competency in their presentation of lay witnesses regarding Mr. Thuesen's risk of future dangerousness. For instance, Judge Bryan noted trial counsel failed to call John Stetter, the correctional officer at the Brazos County Detention Center who "knew Thuesen better than any other jail personnel." *Id.* at 59-60.

149.    At the evidentiary hearing, Stetter testified "that Thuesen was 'very, very reserved, almost isolated.' There were fights and other altercations in the pod while Thuesen was housed there, but Thuesen was never involved in them. He was never a threat to anyone in the pod or to any of the guards." *Id.* at 61.

150.    Likewise, Judge Bryan found ineffective trial counsel's failure to elicit testimony from correctional officer David Zavala, who testified, "Thuesen was a positive influence on his fellow inmates; that Thuesen was an 'unselfish' inmate; that Zavala did not fear Thuesen; and that Zavala believes he could have turned his back on Thuesen without consequence." *Id.* at 62.

151.    Finally, based on evidence elicited at the June 2014 hearing, Judge Bryan found that calling an expert in PTSD at the punishment phase could have helped the jury understand that the structured environment of prison would have substantially decreased Mr. Thuesen's likelihood of committing any violent acts in the future. *Id.* ("prison is a structured setting, which can provide consistency and treatment for Thuesen's PTSD." Accordingly, it was "very unlikely Thuesen [would] commit any violent acts while incarcerated in the future.")

152.    In light of the testimony for the evidentiary hearing showing that Mr. Thuesen was unlikely to be a threat in the future, Judge Bryan found that trial counsel's failure to present any affirmative evidence that Mr. Thuesen would not have been such a threat deficient and prejudicial, and recommended relief. *Id*. at 63.

### 3. Trial counsel was ineffective for failing to impeach Amanda Ward (Claim Ten).

153.     Judge Bryan also recommended granting relief on Claim Ten, that trial counsel's failure to impeach witness Amanda Ward's punishment-phase testimony amounted to ineffective assistance under *Strickland*. Ward testified regarding an incident when she and Mr. Thuesen were in high school in which Mr. Thuesen allegedly became violent and jealous after he saw her talking to another man at a party. *Id.* at 64. This testimony was key to the State's punishment phase strategy of presenting Mr. Thuesen as someone who was habitually violent, even prior to his war service, and especially towards women. Following Ward's direct testimony, trial counsel explained to the court that another witness, Haley McDowell, was available to testify and would directly contradict Ward's testimony. *Id.* at 64-65. Therefore, trial counsel stated that they planned to have McDowell testify and Ward recalled for cross-examination. Inexplicably, trial counsel failed to call McDowell or to cross-exam Ward. These failures allowed the State to argue in closing that Ward's testimony was unimpeached. *Id.* at 65.

154.     Judge Bryan also found that trial counsel failed to investigate at least two other available witnesses who could have refuted Ward's testimony—Ward's friend Jimmy Kleimann and Ward's mother, Sandra Ward. *Id.* at 65-66. Judge Bryan held that counsel's failure to investigate and call those witnesses was objectively deficient and prejudicial, particularly in light of the State's highlighting of that testimony in its closing argument as evidence that Mr. Thuesen was not suffering from PTSD, but was simply violent toward women, and that it had not been impeached. *Id.* at 66-67. He found that, had the third parties Ward claimed were involved in the incident testified and refuted her story, it would have undermined the State's theme throughout trial, and that counsel had no valid reason for the deficiency. *Id.* at 67.

### 4. Trial counsel was ineffective during jury selection (Claim Thirteen).

155.   With regard to Claim Thirteen—that trial counsel was ineffective during jury selection—Judge Bryan recommended granting relief in part, and denying in part. Specifically, the State moved to excuse a potential juror, Burroughs, for cause. Burroughs was "a former Marine who experienced problems returning from war" who "would likely have benefited the defense as a juror in Thuesen's case." *Id.* at 81. Trial counsel, however, never questioned Burroughs and did not object to his removal. *Id.*

156.   Judge Bryan found that there "was no strategic reason for failing to demand the State provide a reason for challenging prospective juror Burroughs for cause. Rather, given Burroughs [sic] answers during voir dire that appeared to favor the defense's trial strategy, reasonable counsel would have made efforts to keep Burroughs on the jury." *Id.* at 82-83. Judge Bryan also found that trial counsel's failure prejudiced the ultimate selection and makeup of the jury, and recommended that Mr. Thuesen be granted a new punishment phase as a result. *Id.*

### 5. Trial counsel failed to present evidence of history of mental illness (Claim Fifteen).

157.   Judge Bryan also recommended granting relief pursuant to Claim Fifteen, because trial counsel failed to present evidence from Mr. Thuesen's mother, Patricia Thuesen, regarding Mr. Thuesen's family history of mental illness. During trial, trial counsel had initially attempted to present such evidence, but the court sustained an objection by the State that the evidence could not be presented until the defense's mental health expert, Dr. Saunders, testified regarding Mr. Thuesen's mental health. *Id.* at 85.

158.   After Dr. Saunders testified, however, the defense never elicited testimony from Patricia Thuesen regarding her family's history of mental illness. *Id.* at 86.

159.   Judge Bryan found that, had Patricia Thuesen been called to testify on the subject,

she would have explained how "Ms. Thuesen's mother was an alcoholic; Ms. Thuesen's father did

not live with the family and her visits with him were monitored by her grandmother; Ms. Thuesen's

father showed signs of depression; Ms. Thuesen's brother, George, attended a state school, showed

signs of depression throughout his life, and was then homeless living somewhere in the Corpus

Christi area; Ms. Thuesen's half-sister, Lisa, also showed signs of depression and had been

admitted to a psychiatric hospital; Ms. Thuesen's daughter, Michelle, also spent time in a

psychiatric hospital; and Ms. Thuesen's mother-in-law showed signs of depression and

alcoholism." *Id.* at 85.

160.    Judge Bryan found that this evidence would have been probative at the punishment

phase, because if presented, it would have provided "a context for the crime by describing a set of

life experiences that inspire compassion, empathy, mercy, and understanding." *Id.* at 86-87. He

ruled that "[c]ounsel's failure to present it cannot be considered tactical and this deficient

performance prejudice Thuesen's case." *Id.* at 87. In addition, he found that "Appellate counsel

was also ineffective for failing to raise this record-based claim on direct appeal." *Id.*

### 6.    Trial counsel was ineffective for failing to mention mental illness during opening (Claim Sixteen).

161.    Judge Bryan next recommended relief under Claim Sixteen, because trial counsel

was ineffective by failing even to mention mental illness in their punishment phase opening

argument during the punishment phase. *Id.* at 88.

162.    He found that "[e]vidence that a defendant is mentally ill can be powerful

mitigation when jurors are charged with assessing individualized culpability. To that end, evidence

of mental illness may explain the succession of facts and circumstances that led to the crime and

how that distorted the defendant's judgment and reactions." *Id.* That was particularly true in Mr.

Thuesen's case, Judge Bryan found, because Mr. Thuesen's PTSD, depression, and Dependent

Personality Disorder were major defense themes. *Id.*

163.    Because of trial counsel's failure to mention mental illness in the opening, "the jurors were left with little or no guidance from the defense as to what they were looking for in determining that Thuesen should not be sentenced to death." *Id.*

### 7. Trial counsel failed to object to State's improper closing argument (Claim Seventeen).

164.    Judge Bryan also recommended granting relief as to Claim Seventeen, which was based on trial counsel's failure to object to the State's improper closing argument, in which the prosecutor offered his own lay testimony defining PTSD and that Mr. Thuesen did not suffer from it.

165.    Specifically, during the closing of the punishment phase, the prosecutor offered a "story" about his stepfather and PTSD:

> My stepfather fought in the Battle of the Bulge. His friends and comrades were dying left and right of him as they were there. And years later as we're sitting on the porch after dinner, a gunshot goes off. We all think it is nothing. He knows, he yells for all of us to get down, get inside. That's PTSD.

54 RR at 82.

166.    Judge Bryan held that the argument was improper: "The prosecutor's opinion of whether Thuesen suffered from PTSD falls outside of the acceptable range of subjects during closing argument because it was his personal opinion and unsupported in the record. The State proffered no evidence that suggested Thuesen was not suffering from PTSD. No expert witnesses testified that the type of experience described by the prosecution was the true nature of PTSD, and no lay witness offered any stories that were similar to the one described by the prosecutor of his stepfather. In fact, all the evidence on the record regarding PTSD symptoms was offered in support of finding that Thuesen indeed suffered from PTSD." *Id.* at 90-91.

167.    Judge Bryan found that trial counsel's failure to object to that improper comment by the prosecutor was objectively deficient, and could not have been considered strategic. *Id.* at 91. "The defense's primary theme focused on Thuesen's experiences in Iraq 'outside the wire' and the resulting impacts of PTSD on Thuesen when he returned home. By failing to object, counsel allowed the prosecution to offer 'evidence' about PTSD during the closing argument." *Id.* "Further, trial counsel's failure to object prevented him from being able to challenge the improper comments on direct appeal." *Id.* "No reasonable strategy entails allowing the prosecutor to make unsupported, prejudicial comments and then waive the ability to appeal the harm they cause." *Id.* at 92.

168.    Lastly, Judge Bryan held that "Thuesen's rights were further prejudiced by the failure of his direct appeal counsel to raise the issue of ineffective assistance of trial counsel in not objecting to this closing argument." *Id.*

169.    In all, based on the testimony at the evidentiary hearing, Judge Bryan's evaluation of the credibility of witnesses, and a thorough analysis of the thousands of pages of documentary evidence presented during the hearing, Judge Bryan found that trial counsel's and direct appeal counsel's performance were objectively deficient in numerous respects. Judge Bryan also found that these deficient performances severely prejudiced Mr. Thuesen at the punishment phase of his trial. As a result, Judge Bryan recommended that Mr. Thuesen be granted *habeas corpus* relief and a new punishment phase trial.

170.    The trial court thereafter sent the record to the CCA for review on the merits.

## C. The CCA orders the parties to brief Judge Bryan's recusal.

171.    On February 24, 2016, the CCA entered an order directing the parties to brief three issues related to Judge Bryan's withdrawal of his voluntary recusal:

1.      In the absence of any subsequent written order signed by Judge Underwood, did Judge Bryan have judicial authority to sign and execute an order reinstating himself on applicant's habeas case and, if he did have such authority, what was the legal basis for that authority?

2.      What is the meaning of the term "good cause" in the context present. Did Judge Bryan's reinstatement order show "good cause"' for him executing the order, rather than Judge Towslee or Presiding Judge Underwood? Can "good cause" as stated in Tex. R. Civ. P. 18(a)(f)(2) justify a recused judge removing his assigned replacement judge and reinstating himself to take all further actions in a case?

3.      If Judge Bryan lacked the authority to reinstate himself as judge presiding over the instant habeas case, and his action cannot be justified by "good cause" as provided in Tex. R. Civ. P. 18(a)(f)(2), are his rulings while presiding over the evidentiary hearing, other orders he executed in this case after his recusal, and his order adopting findings of fact and conclusions of law "void and of no effect"?

172.    On September 21, 2016, the CCA ordered Judge Underwood to review the record "for any record of an order that he may have rendered removing Judge Towslee and reinstating Judge Bryan, if any such order exists." On October 3, 2016, Presiding Judge Underwood responded, stating that (1) there was no written order because no order was required to reinstate Judge Bryan because no formal motion to recuse had ever been filed; and (2) there was also no order rescinding the appointment of Judge Towslee.

173.    On April 8, 2016, Mr. Thuesen filed a response to the CCA's request for briefing.

174.    In its response, the State—*for the first time*—argued that Judge Bryan lacked jurisdiction to withdraw his recusal and then preside over the five-day-long evidentiary hearing. In other words, following receipt of this unfavorable ruling from Judge Bryan—who the State had explicitly consented to have presided with Mr. Thuesen's habeas petition—the State switched gears, and proceeded to pursue a litigation strategy focused around retroactively replacing Judge Bryan and thereby manufacturing a second bite at that apple.

53

**D.  The CCA vacates Judge Bryan's findings of fact and conclusions of law.**

175.    On February 8, 2017, almost two years after Judge Bryan found that Mr. Thuesen should be granted a new punishment phase trial, the CCA delivered its Opinion, finding that Judge Bryan lacked authority to preside over Mr. Thuesen's evidentiary hearing or rule on the habeas petition and, therefore, his findings and conclusions would be disregarded. *Ex parte Thuesen*, 546 S.W.3d 145, 157 (Tex. Crim. App. 2017). The CCA concluded, "[b]ecause Judge Underwood [had] not issued a *written* order rescinding Judge Towslee's assignment, Judge Towslee retains judicial authority to preside over [Mr. Thuesen's] habeas proceedings" and remanded the habeas case to the lower court to its position immediately following Judge Towslee's assignment to the case. *Id.* (emphasis added).

176.    On February 21, 2017, Presiding Judge Underwood terminated Judge Towslee's assignment and reassigned Mr. Thuesen's case to the Honorable J.D. Langley.

177.    On February 24, 2017, Mr. Thuesen filed a motion for rehearing and a request to stay the proceedings in the lower court pending the rehearing.

178.    On May 3, 2017, the CCA *granted* Mr. Thuesen's motion for rehearing and request for a stay. *Ex parte Thuesen*, No. WR-81,584-01, 2017 WL 2131777 (Tex. Crim. App. May 3, 2017) (not designated for publication).

179.    Nearly a year later, on March 7, 2018, the CCA issued a cursory order announcing that its previous order granting a rehearing had been improvidently granted. The CCA lifted the stay of the lower court proceedings, but failed to offer any basis for the decision. *Ex parte Thuesen*, 546 S.W.3d 158, 159 (Tex. Crim. App. 2018) (stating only that it "conclude[d] that the motion was improvidently granted.").

### E. Judges Alcala and Walker dissent, characterizing the State's position on the recusal issue as "gamesmanship."

180.    Judge Elsa Alcala dissented from the denial of rehearing, joined by Judge Scott Walker, and stated that the CCA should have "accepted [Judge Bryan's] findings of fact and conclusions of law, and grant applicant relief in the form of a new punishment trial." *Id.,* Alcala Dissent at 2.

181.    Judge Alcala's dissent centered on how the Court disregarded ruling in favor of granting state habeas relied on by the trial court judge and, instead, agreed with the State current position that, because of missing administrative paperwork, that trial court judge could not have properly presided over the state habeas proceedings. Judge Alcala highlighted that, in so arguing, the State "flip-flop[ped]" its position—"agreeing to have Judge Travis Bryan preside over the habeas case before he ruled against the State and then complaining about him having presided over the case after he ruled against the State." Alcala Dissent at 2. She described the State's conduct as "the type of gamesmanship or manipulation by parties that has no place in death penalty proceedings." *Id.*

182.    Judge Alcala finished by noting that the majority opinion, rejecting the agreed-upon authority of Judge Bryan, "has improperly elevated a recusal matter into one of jurisdiction and a judge's authority to act, in conflict with the rules of civil procedure that permit a knowing waiver of recusal matters." *Id.* at 10.

183.    On May 3, 2018, Mr. Thuesen's application for writ of habeas corpus was remanded to the trial court. Unlike the previous remand order that required that the entire evidentiary hearing, as well as the Court's findings of fact and conclusions of law, be accomplished in 180 days, neither the CCA's March 7, 2018 order or the May 3, 2018 Mandate imposed a deadline to complete the process.

**F.  A second evidentiary hearing is held before Judge Langley.**

184.   Following the CCA's remand, Mr. Thuesen's case was reassigned to the Judge J.D. Langley.

185.   Judge Langley then conducted a second, abbreviated evidentiary hearing, from December 3 to December 5, 2018. All of the attorneys from the OCFW who represented Mr. Thuesen at the first evidentiary hearing in 2014 had since departed the OCFW. Accordingly, a new team of attorneys from the OCFW had to be assembled to represent Mr. Thuesen at the second evidentiary hearing.

186.   Instead of rehearing the witnesses from the first hearing, Judge Langley instead merely took judicial notice of the first hearing. Pursuant to the agreement of the parties, the court entered an order granting the admission of the certified transcripts of the testimony and exhibits that had been admitted into evidence at the June 2014 evidentiary hearing before Judge Bryan. Order on Agreed Motion Regarding the Admission of Previous Testimony and Exhibits into Evidence (Apr. 13, 2017); 2 HR2 11. Judge Langley therefore denied himself the opportunity to measure each witness's credibility in person, contrary to the strong preference of Texas public policy. However, eight additional witnesses did provide live testimony.

187.   Mr. Thuesen's company commander Stace Hayward, squad leader Thomas Rogers, and Lance Corporal Edgar Kyger testified to the intensity of Mr. Thuesen's military experience in Iraq. They testified that Mr. Thuesen and others in his unit were not adequately trained for the tasks they were required to perform. Hayward testified that "the reality on the ground . . . was different than what we had . . . focused our effort in training for before we got [to Iraq]." Before going to Iraq, Mr. Thuesen was trained to serve as a radio operator in a unit that would primarily support troops from behind the lines. Upon arrival in Iraq, instead of operating a radio, Mr. Thuesen spent most of his time "outside the wire," (i.e., outside the safety zone) working as a

machine gunner, providing direct fire in support infantrymen. FFCL2, ¶ 308; 2 HR2 62-66, 64-65; 3 HR2 20-21, 50, 62, 76; 4 HR2 48. Former Staff Sergeant Ramiro Garcia, who served with Mr. Thuesen, testified that his tour in Iraq was the worst of many tours that he was deployed on. Sergeant Garcia testified that he suffered from and was being treated for PTSD. 2 HR2 94, 160-163.

188.    Mr. Thuesen presented evidence that, unlike active-duty Marines, Mr. Thuesen and other reservists returned to civilian life without a formal reintegration program. 6 HR 31-33.

189.    Dr. Erin Bigler, a neuropsychologist, testified that brain-imagining technology has shown brain deviations in the sizes of brains of people suffering from PTSD, including smaller than normal hippocampi, the area of the brain that relates to memory and recall, and reductions in the thickness or volume of the cerebral cortex, whose functions include rational decision-making.

190.    Dr. Stephen Xenakis, a retired Brigadier General in the United States Army and expert in adult/child psychiatry, PTSD, and the treatment of military personnel and veterans, testified that Mr. Thuesen's brain was still developing when he was deployed to Iraq, specifically, the prefrontal cortex that regulates executive functioning such as rational decision-making. He also testified as to research showing that traumatic experiences before the brain has fully developed could disrupt the prefrontal cortex's normal development and increase the risk of developing PTSD.

191.    Dr. Xenakis also testified that family history can increase a person's risk of developing PTSD. Specifically, studies have found that a genetic history of psychiatric disorders increases the risk of PTSD. In this case, several of Mr. Thuesen's relatives have been diagnosed with bipolar disorder, including a great aunt, an aunt, an uncle, a cousin, and Mr. Thuesen's sister. As a result, Dr. Xenakis testified that Mr. Thuesen had a higher likelihood of returning from Iraq

with PTSD than others who served alongside him and did not have a family history of serious

mental illness. 4 HR2 152-53; App'x 68, 123, 124, 129-131.

192.    Dr. Xenakis testified that PTSD may not show up right away but may take months

or years to manifest, and that "flashbacks" are *un*common. He testified that common symptoms

include hypervigilance, difficulty sleeping, irritability or outbursts of anger, difficulty

concentrating, and exaggerated startle responses. In his opinion, Mr. Thuesen returned from Iraq

with PTSD, which went undiagnosed and untreated, and was exhibiting the signs and symptoms

of the illness at the time of the shootings.

193.    The State and Mr. Thuesen submitted their respective Proposed Findings of Fact

and Conclusions of Law on January 18, 2019.

194.    On January 27, 2019, Judge Langley signed the State's proposed Findings of Fact

and Conclusions of Law wholesale,[4] ignoring all of Judge Bryan's recommendations, and issued

an Order recommending that Mr. Thuesen be denied all relief. In doing so, and at the State's behest,

Judge Langley ignored the majority of the witness testimony, affidavit testimony and documentary

evidence that had been presented at either the 2014 writ hearing or the 2018 writ hearing.

195.    Judge Langley did not critically engage with the testimony of witnesses at the first

evidentiary hearing. His Findings are, in large part, merely extended quotations from testimony,

unaccompanied by analysis or explication.[5] Notably, the Findings do not address the majority of

---

[4] Indeed, Judge Langley's only alteration to the State's proposed findings of fact and conclusions of law were changes to the case number, the document title and two paragraphs at the end ordering that additional portions of the record be forwarded to the CCA. The Findings are otherwise a verbatim adoption of the State's proposed findings of fact and conclusions of law submitted on January 18, 2019.

[5] At times, Judge Langley's "Findings" rely on and quote from the CCA ruling on Mr. Thuesen's direct appeal, 2014 WL 792038 (Tex. Crim. App. 2014), which is unpublished, not part of the record, and an inappropriate basis for making factual findings following an evidentiary hearing.

the witness testimony, affidavit testimony, or documentary evidence that had been presented at the first evidentiary hearing. Despite not attending the hearing, and not making credibility determinations of his own, Judge Langley's rulings were undergirded by implicit findings of credibility diametrically opposed to the findings of Judge Bryan, despite his lacking the ability to observe the testimony of those witnesses first hand.

196.    Even more concerning, Judge Langley's Findings also largely fail to address the majority of testimony adduced from the eight witness during the three-day 2018 evidentiary hearing, over which he presided. The focus on the first evidentiary hearing in the State's proposed findings, which Judge Langley adopted verbatim, raises the concerning inference that they may have largely been drafted before the second evidentiary hearing even occurred.

197.    Mr. Thuesen presented new witness testimony and evidence about his PTSD, military history and family psychiatric history. Judge Langley's Findings provide no explanation for why he ignored the additional and substantial evidence that was presented regarding those topics.

198.    As described above, for example, Mr. Thuesen presented the expert testimony of Retired Brigadier General Stephen Xenakis. Dr. Xenakis's testimony was relevant to both Mr. Thuesen's guilt/innocence-phase and punishment-phase claims. Dr. Xenakis's testimony comprises approximately 200 pages of the record. 4-5 HR at 2.[6] However, Judge Langley's findings dispatch with Dr. Xenakis's testimony in one paragraph. They dismiss Dr. Xenakis's testimony as being cumulative of Dr. Saunders's testimony at trial. *Findings* at 130 ¶ 239. Judge Langley's Findings totally ignore the substance and relevance of Dr. Xenakis's testimony.

199.    The testimony was not cumulative, however. Dr. Xenakis provided testimony

---

[6] A declaration by Dr. Xenakis is submitted with this Petition. It is cited as "Xenakis Decl."

regarding PTSD, covering seven major topics that had not been discussed in any testimony presented at trial. Unlike Dr. Saunders, Dr. Xenakis explained that: (1) PTSD is an injury; (2) PTSD impacts veterans in multiple ways; (3) the military lacked a reintegration process for soldiers like Mr. Thuesen, who returned from Iraq in 2005; (4) Mr. Thuesen had an increased risk for developing PTSD due to his age and his family history of mental illness; (5) the VA failed to diagnose and properly treat Mr. Thuesen for PTSD and alcoholism; (6) medical records documented the decline of Mr. Thuesen's mental health in the months leading up to this offense; and (7) the correlation between combat-related PTSD and violence is a national problem. 4 HR2 137-38, 141, 142, 147-53, 163-64, 169-171, 173-80, 186, 201-09, 211-2, 215-16, 236, 255-60; *accord* Xenakis Decl. ¶¶ 44-47.

200. Additionally, as described in ¶¶ 411-420 of Mr. Thuesen's proposed findings of fact and conclusions of law, trial counsel's expert, Dr. Saunders, did not present to the jury information that was available, compelling and relevant to Mr. Thuesen's mens rea. *See* Proposed Findings of and Conclusions of Law Relating to Mr. Thuesen's Article 11.071 Writ Application filed on Jan. 18, 2019. Rather, Dr. Saunders, who was not a specialist in PTSD, testified that Mr. Thuesen has dependent personality disorder, a personality disorder. However, Dr. Xenakis testified unequivocally that Mr. Thuesen does *not* suffer from any personality disorder. 4 HR2 at 193, 196; Xenakis Decl. ¶ 49. Dr. Xenakis further testified that Mr. Thuesen's service in the Marines, his school and employment records, his medical records and his extracurricular activities show Mr. Thuesen did not suffer from any disorder prior to serving in the Iraq War. 4 HR2 192-201, 254; *accord* Xenakis Decl. ¶ 18.

201. The testimony of Retired Colonel Dr. Elspeth Ritchie corroborated Dr. Xenakis's opinion. She also unequivocally testified that Mr. Thuesen does not suffer from a personality

disorder. Dr. Ritchie testified that Mr. Thuesen could not have completed boot camp or his service with the Marines with a personality disorder. 6 HR 72, 80-82, 101.

202.    Although the State offered no rebuttal of Dr. Xenakis's opinions, Judge Langley essentially ignored the substance of Dr. Xenakis's testimony in adopting the State's proposed findings of fact, merely noting that he believed it duplicative of Dr. Saunders's testimony. This was a clearly incorrect factual conclusion, even judging solely from the differences in opinion between Drs. Saunders and Xenakis about Thuesen's purported dependent personality disorder. Accordingly, by finding only that Dr. Xenakis's testimony was duplicative of Dr. Saunders's, Judge Langley failed to make findings meaningfully informed by the evidence presented.

203.    The pattern holds, again and again, regarding the witnesses and documentary evidence presented at the 2018 hearing. Aside from a footnote indicating that Dr. Bigler was an unreliable witness due to his not meeting with Mr. Thuesen before testifying—despite Dr. Bigler's testimony being educational in nature and limited to describing the biological effects of PTSD, unrelated to the specific claims of Mr. Thuesen—and a similar assertion related to Dr. Brown, Judge Langley did not make credibility determinations regarding any of Mr. Thuesen's witnesses.

204.    It was incumbent upon the trial court to make explicit factual findings and determine the credibility of the witnesses. A reviewing court cannot speculate, nor should it have to speculate, about implicit credibility determinations or ambiguous factual findings. *State v. Mendoza,* 365 S.W.3d 666, 670-673 (Tex. Crim. App. 2012). Instead, Judge Langley's Findings rely heavily on the testimony of certain witnesses, but not others, *without any explanation*.

205.    Notably, Judge Langley accepted the State's proposed findings wholesale, despite both the CCA and the United States Supreme Court having criticized lower courts for adopting wholesale the allegations and conclusions offered by the State during post-conviction proceedings.

*Jefferson v. Upton*, 560 U.S. 284, 293-94 (2010); *Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985); *Ex parte Reed*, 271 S.W.3d 698, 729 (Tex. Crim. App. 2008). In addition to unnecessarily complicating the CCA's independent review of the record, *Ex parte Reed*, 271 S.W.3d 698, 698 (Tex. Crim. App. 2008), the practice raises serious doubts about the fairness of proceedings that are intended to ensure that this State's most-severe punishment has been lawfully imposed. *See also Mendoza,* 365 S.W.3d at 670-673.

206.   On February 6, 2019, Mr. Thuesen filed objections to the Findings of Fact and Conclusions of Law.

207.   The record was then conveyed to the CCA for review on the merits/writ.

208.   On February 5, 2020, the CCA offered a cursory affirmation of Judge Langley's Findings of Fact and Conclusions of Law. The entirety of the analysis offered by the CCA, after it had laid out the legal framework, was that "[i]n the instant case, Applicant has failed to satisfy the *Strickland* test regarding all of his allegations of ineffective assistance."[7] *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). The CCA denied all relief. *Id.*

## IV.   FEDERAL HABEAS REPRESENTATION DURING THE GLOBAL PANDEMIC

209.   Following the CCA's denial, undersigned federal habeas pro bono counsel began its preparation of Mr. Thuesen's federal habeas petition on June 4, 2020. By this time, the country was already in the midst of the COVID-19 pandemic.

210.   On March 11, 2020, the World Health Organization officially classified a novel strain of coronavirus, COVID-19, as a pandemic. On March 13, 2020, the White House declared

---

[7] The only exceptions were Factual Findings 12, 137, the first sentence of 145, sub-claim E of 253, 262, footnote 5, and Conclusions of Law 2 and 60.

a national emergency under Section 319 of the Public Health Service Act, 42 U.S.C. § 247(d) and issued guidance a few days later recommending that, for the next eight weeks, gatherings of ten persons or more be cancelled or postponed.

211.    On March 13, 2020, the Governor of the State of Texas issued a disaster proclamation stating that COVID-19 posed an imminent threat of disaster for all counties in the State of Texas. In each subsequent month, the Governor has issued proclamations renewing the disaster declaration for all Texas counties, with the latest proclamation issued on January 5, 2021.

212.    On March 11, 2020, Harris County issued a Declaration of Local Disaster. On March 13, 2020, the Institutional Division's Polunsky Unit suspended visitation until further notice.

213.    On March 19, 2020, the Commissioner of the Department of State Health Services issued a public health disaster declaration in Texas that prohibited gatherings of more than 10 people. On March 24, 2020, Harris County issued a stay-at-home order.

214.    As of January 15, 2021, the New York Times reported that the State of Texas alone had more than 2.1 million cases, with a daily average of 23,006 new cases per day.

215.    Notwithstanding Mr. Thuesen's and undersigned counsel's reasonable diligence in preparing his federal habeas petition since June 2020, national, state and local emergency responses to the pandemic have prevented counsel from visiting Mr. Thuesen in person as well as impeded their ability to communicate with Mr. Thuesen and others with information relevant to his petition, including investigators, experts, and witnesses. Counsel has also faced difficulty collecting documents and records.

216.    As an example, at least one member of Mr. Thuesen's current defense team and one of their investigators have contracted COVID-19. As a result, their work on this matter has

been interrupted and delayed. Because of the pandemic, counsel's consultant and expert witness, Dr. Xenakis, also has been unable to travel, both to work with counsel and to interview Mr. Thuesen.

217.    Undersigned counsel anticipates that, because of the foregoing impediments, it will need to file an amended petition as its investigation continues.

## RELEVANT LEGAL STANDARDS

## I.    STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL

218.    Under *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner seeking to establish the ineffective assistance of trial counsel must show: (1) that counsel's performance was deficient because it fell below "an objective standard of reasonableness," *id*. at 688; and (2) that the deficient performance prejudiced the defense because there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt with respect to the defendant's guilt or the appropriate punishment, *id.* at 695; *see also Hinton v. Alabama*, 512 U.S. 263, 267 (2014) (prejudice exists because of reasonable probability that new evidence would lead jury to have reasonable doubt about defendant's guilt); *Sears v. Upton*, 561 U.S. 945, 955-56 (2010); *Porter v. McCollum*, 558 U.S. 30, 32 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 538 (2003); *Williams v. Taylor*, 529 U.S. 362, 398 (2000).

219.    To show deficiency, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S at 688. Counsel in a death-penalty case has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. [citations omitted]." *Andrus v. Texas*, 140 S. Ct. 1875, 1880, 207 L. Ed. 2d 335 (2020) "To assess whether counsel exercised objectively reasonable judgment under prevailing professional standards, [the court] first ask[s] 'whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's]

background was itself reasonable.'" *Id.* at 1882 (quoting *Wiggins*, 539 U.S. at 523).

220.    In assessing prejudice, a reviewing court considers the effects of more than one

deficiency cumulatively. *Dodson v. Stephens*, 611 F. App'x 168, 178-79 (5th Cir. 2015)

(unpublished) (assuming that cumulative prejudice analysis is required and collecting cases). In

assessing prejudice at the penalty phase of a capital case, a reviewing court must decide if there is

a reasonable probability that, but for counsel's deficient performance, at least one juror would have

voted for life. *See Wiggins*, 539 U.S. at 537; *Escamilla v. Stephens*, 602 F. App'x 939, 941-42 (5th

Cir. 2015); *Ruiz v. Stephens*, 728 F.3d 416, 424 (5th Cir. 2013).

## II.    DUE PROCESS

221.    The Fourteenth Amendment of the United States Constitution protects against

deprivation of life, liberty, or property by the State "without due process of law." U.S. Const.

amend. XIV, § 1. "For more than a century the central meaning of procedural due process has been

clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may

enjoy that right they must first be notified.'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1976) (quoting

*Baldwin v. Hale*, 1 Wall. 223, 233 (1863)). "It is equally fundamental that the right to notice and

an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'"

*Id.* (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

## CLAIMS FOR RELIEF

## I.    TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE GUILT/INNOCENCE PHASE OF TRIAL, IN VIOLATION OF MR. THUESEN'S SIXTH AMENDMENT RIGHTS.

222.    The Sixth Amendment guarantees Mr. Thuesen the right to counsel. *Strickland*, 466

U.S. at 684 ("[T]his Court has recognized that the Sixth Amendment right to counsel exists, and

is needed, in order to protect the fundamental right to a fair trial."). And "the right to counsel is

the right to the effective assistance of counsel." *Id.* at 686 (quoting *McMann v. Richardson*, 397

U.S. 759, 771 n.14 (1970)).

223.    To state a claim for ineffective assistance of trial counsel, Mr. Thuesen must show that trial counsel's performance was deficient and that trial counsel's deficient performance prejudiced his defense—"[t]his requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

224.    To prove deficient performance, Mr. Thuesen must show that trial counsel's performance fell below an objective standard of reasonableness. *Porter*, 558 U.S. at 38 (quoting *Strickland*, 466 U.S. at 688). "To establish prejudice, [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 38-39.

225.    In the guilt/innocence phase of Mr. Thuesen's trial, trial counsel provided ineffective assistance of counsel when they failed to adequately or meaningfully present Mr. Thuesen's mental health to the jury. Trial counsel knew about Mr. Thuesen's military service and his PTSD symptoms. But trial counsel largely ignored Mr. Thuesen's PTSD during the guilt/innocence phase and failed to explore and present critical relevant evidence and argument regarding PTSD. "It is unquestioned that under the prevailing professional norms . . . counsel had an obligation to conduct a thorough investigation of the defendant's background." *Id.* at 39 (internal citation omitted). Counsel cannot "ignore[] pertinent avenues for investigation of which he should have been aware." *Id.* at 40. "Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."[8]

---

[8] State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel*, § 11.1, available at https://www.texasbar.com/AM/Template.cfm?Section=Consider_a_State_Bar_Committee&Template=/CM/ContentDisplay.cfm&ContentID=28741 (last visited Feb. 3, 2021); *see also* Am. Bar Ass'n, *2003 Guideline 10.7*, AMERICANBAR.ORG (Oct. 10, 2018),

226.     Trial counsel had a duty to investigate, develop, and present critical evidence related to Mr. Thuesen's intent during the guilt/innocence phase of trial. Trial counsel's preparation and presentation of evidence was negligent and fell below prevailing professional standards.

227.     Despite a clear duty, they failed to secure a PTSD expert who would have testified about how the condition affected Mr. Thuesen's behavior at the time of the crime.

228.     Trial counsel failed to investigate, develop, and present expert evidence related to Mr. Thuesen's PTSD and his intent during the guilt/innocence phase of trial. That evidence would have altered the jury's guilt/innocence phase determinations.

229.     Trial counsel also failed to investigate, develop, and present lay witnesses and medical record evidence regarding Mr. Thuesen's PTSD, his family history of mental illness, the impact of Mr. Thuesen's PTSD on his actions and ability to form intent, and on the fact that his PTSD was undiagnosed and untreated at the time of the crime.

230.     Trial counsel also failed to object to improper evidence, which left the impression that Mr. Thuesen had committed a sexual assault that never occurred; failed to request a change of venue to secure a fair trial; failed to select a fair and impartial jury for Mr. Thuesen; and failed to preserve objections for appeal.

231.     Mr. Thuesen's appointed trial counsel were overwhelmed with other cases and, as a result, their investigation of and preparation for guilt-phase issues was delayed, hurried, and incomplete. Their multiple failures, both individually and cumulatively, severely prejudiced Mr. Thuesen's defense at the guilt/innocence phase of his trial.

---

https://www.americanbar.org/groups/committees/death_penalty_representation/resources/aba_gu idelines/2003-guidelines/2003-guideline-10-7/.

232.    The Sixth Amendment requires a new trial to allow a jury to fairly and impartially consider whether Mr. Thuesen is guilty of the crime for which he is currently on death row. Mr. Thuesen asks this Court to grant him relief on his ineffective assistance of trial counsel claims related to the guilt/innocence phase of the trial and order a new trial to determine whether Mr. Thuesen is innocent or guilty.

**A. Trial counsel failed to effectively present Mr. Thuesen's PTSD to the jury, through expert testimony, lay testimony, and medical record evidence, which failure prevented the jury from considering whether Mr. Thuesen acted with intent.**

233.    Trial counsel provided ineffective assistance when they failed to investigate, develop, and present any meaningful evidence regarding Mr. Thuesen's PTSD during the guilt/innocence phase of Mr. Thuesen's trial.

234.    Mr. Thuesen's trial counsel were appointed approximately fifteen months before the guilt/innocence phase of the trial commenced. From several of the witnesses interviewed during this investigation, trial counsel learned that Mr. Thuesen had been a well-liked, "All-American" kid, but he returned from his tour of duty in Iraq a changed person. Trial counsel interviewed numerous witnesses who could have provided compelling testimony regarding Mr. Thuesen's PTSD. Despite being on notice of the significance of PTSD to Mr. Thuesen's defense, trial counsel did not present their testimony at the guilt/innocence phase of Mr. Thuesen's trial. *See, e.g.*, State Habeas Petition, Ex. 35 ¶¶ 18-19 ("It looked to me like he was having a flashback to Iraq the way he was giving directives to persons who were not there. Jeff and I ended up restraining John. I held his shoulders from the front and Jeff held John's waist. John snapped out of it and went back to normal. He did not seem to be aware of what had happened. A few weeks later, I mentioned what had happened that night to John, but he did not appear to remember it at all."); Ex. 36 ¶¶ 4, 6-7("After John returned from Iraq, he was shaky and unsure of himself, unlike

the John I knew before who was goal oriented and focused. John post-Iraq consistently sought approval from others, lacked direction and drive, and seemed depressed and edgy. I also noticed that every time I saw John he was carrying around a pistol. He was also edgy and hyper-alert."); Ex. 25 ¶¶ 2, 4-10 ("John Thuesen and I knew each other growing up. . . . After John returned from Iraq he seemed changed—even damaged. He was a totally different person, more edgy. He would often have a blank look on his face. . . . I remember one incident where John and I were at a bar. While describing an episode in Iraq where he shot some people in a car, John went from showing no emotion to hysterical crying."); Ex. 26 ¶¶ 4-10 ("When John and the other two Marines got back from Iraq, a bunch of mothers from the area, including Patty and I, organized a gathering for them. John was the first to arrive. It was then that I noticed John had definitely changed. He seemed as if he had a mask on and did not show emotions."); Ex. 29 ¶¶ 2, 4-7, 9-10 ("I have known John Thuesen since the fourth or fifth grade. . . . Before John went over and fought in Iraq, I would describe him as a great guy, energetic, happy-go-lucky, and someone that everybody loved to be around. After his return from Iraq, participating in social events seemed like a chore for John. I could tell that John was different. . . . Prior to John's trial, I spoke with a male investigator on the telephone. I was asked questions about John, and how he behaved before and after Iraq. I also met with John's attorney, Billy Carter. I remember I told one of them that John was a completely different person when he returned from Iraq. When I went to John's trial, during the punishment phase, Billy Carter told me my testimony was not necessary because 'they had everything they needed.' I went back the following day and again asked Billy if my testimony was needed. Again Billy said that it was not. I was really surprised.").

235.    These witnesses described a vivid change in Mr. Thuesen's behavior and personality and provided a stark picture of someone devastated by traumatic wartime experiences

and PTSD, struggling to return to civilian life. Trial counsel had this information before trial. But they neither timely nor adequately investigated Mr. Thuesen's PTSD and its effects on his actions and behaviors.

236.    Mr. Thuesen admitted shooting both victims. The theory that trial counsel presented during the guilt/innocence phase was that Mr. Thuesen did not commit capital murder because he lacked the requisite intent to kill Rachel and Travis Joiner. 49 RR at 55, 61. Trial counsel focused on the impact that Mr. Thuesen's "mental illness, generally, had on his actions during the crime." 49 RR at 44-47. Thus, trial counsel was aware of the importance of intent to the defense and of the importance of Mr. Thuesen's PTSD. However, trial counsel was unreasonable because they did not provide representation consistent with prevailing professional norms. Trial counsel did not reasonably investigate Mr. Thuesen's PTSD, nor did trial counsel reasonably present evidence of Mr. Thuesen's PTSD to the jury. Instead, trial counsel's investigation and presentation of Mr. Thuesen's PTSD fell below prevailing professional norms.

**1. Trial counsel failed to investigate, develop, and present expert testimony related to Mr. Thuesen's PTSD during the guilt/innocence phase (State Habeas Claims 1 and 2).**

237.    Trial counsel provided ineffective assistance when they failed to investigate, develop, and present expert testimony about Mr. Thuesen's PTSD during the guilt/innocence phase of trial.

238.    In cases where the mental health of the defendant may be an issue, the Supreme Court has recognized that "the potential accuracy of the jury's determination is so dramatically enhanced" by expert testimony regarding mental health issues. *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985).

239.    Trial counsel failed to take what little information they gathered in their minimal investigation—that Mr. Thuesen was suffering from PTSD—and identify vital expert witness

testimony regarding PTSD and its impact on Mr. Thuesen's actions and behavior. That error prejudiced Mr. Thuesen, in violation of his Sixth Amendment rights.

240.    Trial counsel knew or should have known that Mr. Thuesen suffered from PTSD and that expert testimony related to Mr. Thuesen's PTSD would provide critical evidence related to intent during the guilt/innocence phase.

241.    But they neither developed nor presented expert testimony to explain Mr. Thuesen's PTSD, including its effects on his actions and behaviors, to the jury.

242.    Trial counsel's initial consultation with a mental health expert—though late in the game—should have confirmed that trial counsel needed to investigate and prepare expert testimony related to Mr. Thuesen's PTSD for the guilt/innocence phase. Carter first contacted Dr. Roger Saunders in early March 2009 to conduct a general psychological interview of Mr. Thuesen for competency. 47 RR at 9-10. Dr. Saunders, a licensed clinical psychologist who does assessments for courts of behavioral problems, competency, insanity, and mental retardation, determined that Mr. Thuesen was competent but suffering from severe depression. 47 RR at 6-10; State Habeas Petition, Ex. 15 at 22, Ex. 10 ¶¶ 4-5.

243.    It was not until February 2010, just one month before voir dire commenced, that trial counsel consulted with Dr. Saunders regarding Mr. Thuesen's possible PTSD. (Mr. Thuesen had yet to receive a diagnosis of PTSD.) Dr. Saunders was *not* a PTSD expert. But through his evaluations of Thuesen, Dr. Saunders identified PTSD as a "significant condition germane to the case." State Habeas Petition, Ex. 10 ¶ 7. However, Dr. Saunders informed trial counsel that PTSD was not a diagnosis that he could develop for the case, as he was not a "specialist" in PTSD. *Id.* ¶¶ 7, 8. Instead, Dr. Saunders told trial counsel that he believed that Mr. Thuesen also suffered from Dependent Personality Disorder, which could be a primary focus of his presentation in mitigation.

*Id.* ¶ 6. In addition, Dr. Saunders recommended that counsel consult a PTSD expert he knew, Dr. Kenneth Kopel. *Id.* ¶ 8.

244.    Around this same period, trial counsel consulted Dr. Richard Yohman, a clinical neuropsychologist from Houston. On February 20, 2010, Dr. Yohman conducted a neuropsychological evaluation of Mr. Thuesen at the Brazos County Jail. State Habeas Petition, Ex. 11 ¶¶ 6-8. During the interview with Dr. Yohman, Mr. Thuesen disclosed his combat experience in Iraq as well as his suffering from daily nightmares in 2008 and 2009 about killing people and being attacked. Mr. Thuesen told Dr. Yohman that he felt threatened in public and would sit in a corner so he could always keep an eye on the door of the room. Mr. Thuesen also stated that he watched You Tube videos of battles in Iraq. *Id.* ¶¶ 9, 10. Based on his evaluation, Dr. Yohman told trial counsel that Mr. Thuesen "met diagnostic criterion for PTSD." *Id.* ¶ 11. But trial counsel told Dr. Yohman that they "were going in a 'different direction,' and would not need [Dr. Yohman] as a testifying witness." *Id.* ¶ 13.

245.    Further, trial counsel consulted with Dr. Michael Gottlieb in March 2010 for advice regarding the themes that they should presented in Mr. Thuesen's defense. State Habeas Petition, Ex. 40 at 1-2. Dr. Gottlieb, a psychologist in Dallas, Texas, advised trial counsel to put on evidence of Mr. Thuesen's "military service and subsequent diagnosis" and "how serious this disorder can be." *Id.* at 1, 3. He noted that evidence could be presented by someone who evaluated Mr. Thuesen or, at the very least, "a pure/education expert might help to explain the disorder as it is easily misunderstood—even today." *Id.* at 1. Dr. Gottlieb also advised trial counsel to explore whether Mr. Thuesen's "drinking was exacerbated after his trauma." *Id.* "This sadly, is a very common reaction," he noted, telling trial counsel that "[s]oldiers and vets have strong prejudices against mental health treatment, and when they develop symptoms, they self medicat[e]—with alcohol.

Doing so often makes matters much worse for them." *Id*.

246.    As a result of these consultations, in addition to the investigation done in Mr. Thuesen's case, it was, or should have been, abundantly clear to counsel that Mr. Thuesen's PTSD was a significant factor in Mr. Thuesen's behavior and would be relevant to his intent during the guilt/innocence phase. It was objectively unreasonable for trial counsel to fail to adequately investigate or prepare the necessary expert testimony to develop this defense or theme at trial. Trial counsel's performance was deficient.

247.    Trial counsel did not engage in the selection of expert witnesses for trial until early 2010, just before trial began. Even then, despite discussions with fact witnesses and warnings from Dr. Saunders, Dr. Yohman, and Dr. Gottlieb, trial counsel declined to develop, prepare, or present expert testimony sufficient to address Mr. Thuesen's PTSD and its relationship to Mr. Thuesen's intent during the guilt/innocence phase. Trial counsel failed to ultimately secure the assistance and testimony of a PTSD expert. That unreasonable decision amounted to deficient performance.

248.    Trial counsel's first contact with a potential PTSD expert was in late February 2010, with Dr. Howard Detwiler, a psychiatrist from Anchorage, Alaska. Despite communicating throughout March and April 2010, trial counsel ultimately decided to abandon Dr. Detwiler *after* voir dire had commence and little more than a month before Mr. Thuesen's guilt/innocence phase of trial.

249.    Instead, trial counsel turned to the expert previously recommended by Dr. Saunders: Dr. Kenneth Kopel, a licensed psychiatrist and former military veteran. State Habeas Petition, Ex. 10 ¶ 8. Trial counsel contacted Dr. Kopel in April 2010—again, *after* voir dire had commenced and a mere month before the guilt/innocence phase would start—and asked Dr. Kopel to evaluate Mr. Thuesen and the medical and mental health care that Mr. Thuesen received through

the VA system.

250.    Because of the severe time constraints created by trial counsel's delay, Dr. Kopel's case review was limited to reading various records, including Mr. Thuesen's military and medical records, police reports, and interviews with individuals who knew Mr. Thuesen while in the military. State Habeas Petition, Ex. 8 ¶ 7. Dr. Kopel was not asked and did not have time for an in-person interview with Thuesen. Ex. 8 ¶ 9. After a review of the records, Dr. Kopel informed counsel that he believed that Mr. Thuesen suffered from PTSD and Major Depressive Disorder. *Id.* ¶ 8. Dr. Kopel was willing to testify to that opinion and about Mr. Thuesen's inadequate VA medical care—i.e., how Mr. Thuesen suffered from *untreated* PTSD. *Id.*

251.    Most significant, Dr. Kopel informed trial counsel that Mr. Thuesen's PTSD impaired his ability to form the intent to kill during the crime itself, raising a defense to capital murder. *Id.* ¶ 31. *Accord* Xenakis Decl. ¶36. Dr. Kopel believed that Mr. Thuesen's PTSD had caused his startle response, or "fight-or-flight" response, to become exaggerated. According to Dr. Kopel, during the crime, Mr. Thuesen's actions suggested that he was acting out of this exaggerated "fight or flight" response, a clear consequence of his wartime trauma and PTSD, rather than out of intentional conduct. *Id.* ¶ 37; *accord* Xenakis Decl., ¶¶ 37-40.

252.    Yet trial counsel never prepared Dr. Kopel for testimony. *Id.* ¶ 11. The day before his testimony, Carter contacted Dr. Kopel and said he would not be needed as a witness. *Id.* ¶ 10.

253.    Instead of presenting evidence related to Mr. Thuesen's PTSD through a proper expert, trial counsel offered only the testimony of Dr. Saunders. Dr. Saunders is a forensic psychologist. State Habeas Petition, Ex. 10 ¶ 2. He is not trained in the area of medical pathology—the area of study that would relate to trajectory of bullets and bullet wounds. *Id.* ¶ 9.

254.    Initially, trial counsel did not have any PTSD expert prepared to testify at the

guilt/innocence phase. They planned to use Dr. Saunders to testify during the punishment phase. However, trial counsel made a sudden, inexplicable change during the state's case-in-chief. Upon hearing the testimony of the State's medical examiner, Dr. Saunders concluded that Mr. Thuesen did not intend to kill Rachel Joiner.[9] He based his theory in part on reviewing the autopsy reports and on "the trajectory of the three bullet wounds [Rachel] had suffered at close range that did not immediately cause her death." *Id*. ¶ 10. Notably, Dr. Saunders is a psychologist, not a physician nor a medical examiner, and he never explained his qualifications to opine on bullet wound trajectories. Dr. Saunders believed that Mr. Thuesen was simply trying to prevent Rachel from leaving the house. *Id.*

255.    Dr. Saunders, however, seemingly ignored the fact that Rachel told Mr. Thuesen that her brother, in the house, had a gun, and that this knowledge could have been interpreted by Mr. Thuesen as a significant threat. Xenakis Decl. ¶ 37.

256.    Based on Dr. Saunders's theory, trial counsel decided to present his testimony during the guilt/innocence phase of trial. State Habeas Petition, Ex. 10 ¶ 10. In his testimony, Dr. Saunders told the jury that he had diagnosed Mr. Thuesen with Dependent Personality Disorder, depression, and PTSD. 47 RR at 15-18, 33. Dr. Saunders believed that on the day of the crime, Mr. Thuesen's anxiety and dependency issues came to bear on him at the moment of the shooting. 47 RR at 35. The psychologist further explained that Mr. Thuesen's identity was tied with Rachel in a way that would prohibit him from wanting her dead. 47 RR at 38, 43.

---

[9] The medical examiner testified that the shot to Rachel Joiner's chest likely passed through some other object, likely her hand, before entering the chest. 42 RR at 117-18. With this information, the defense may have been attempting to suggest that Rachel's hand was not near her chest, but deflected the bullet there. 42 RR at 125-29. This would suggest that the gunshots were aimed at Rachel's extremities and not the center of her body / her vital organs. 42 RR at 134.

257.     To Dr. Saunders, Mr. Thuesen's actions during the shooting suggested that his goal was to reestablish the relationship, not end it. Mr. Thuesen sought reassurance from Rachel and reconnection. 47 RR at 38. The shooting itself, according to Dr. Saunders, provided evidence that Mr. Thuesen was trying to stop Rachel from leaving. 47 RR at 41. Dr. Saunders concluded that Mr. Thuesen did not have the intent to kill or cause the death of Rachel Joiner, but he could not offer an opinion on the death of Travis Joiner. 47 RR at 63. Of course, Mr. Thuesen's recollection of, and statements about, the shooting are inherently unreliable because one of the symptoms of his PTSD crisis is the inability to form a memory of the event or to accurately report on the event, perhaps causing Mr. Thuesen to confabulate. *See* Xenakis Decl., ¶ 41.

258.     Trial counsel unreasonably relied on Dr. Saunders as the sole expert at the guilt/innocence phase and in asking Dr. Saunders to testify outside his expertise. First, Dr. Saunders developed his theory based on evidence he was not qualified to evaluate—Rachel Joiner's bullet wounds. And second, trial counsel was well aware of this fact as they had consulted a qualified expert witness (Dr. Charles Harvey, M.D., a specialist in Anatomic, Clinical, and Forensic Pathology) who not only could have testified on this topic, but also warned them about potential limitations of the evidence. *See* State Habeas Petition, Ex. 7.

259.     The gravity of trial counsel's mistakes quickly became apparent when the State zeroed in on Dr. Saunders's lack of qualification during cross-examination. The State asked Dr. Saunders about his theory that the bullet wounds showed that Mr. Thuesen did not intend to kill. 47 RR at 164. Dr. Saunders was forced to admit that he had looked at the evidence of the gunshots and "abandoned looking" because the evidence was inconclusive. 47 RR at 165. Eventually, Dr. Saunders even admitted that his theory had been based on "speculating" about the wounds and that he was not an expert in that field. 47 RR at 167. Yet the evidence of the bullet wounds and the

testimony of the medical examiner about those wounds was supposedly the catalyst for Dr. Saunders to testify about Mr. Thuesen's intent. Without the support of this evidence, Dr. Saunders was forced to fall back on the evidence that Mr. Thuesen rendered aid to Rachel as proof that he did not intend to kill her. 47 RR at 166. Dr. Saunders relied on his own diagnosis of Mr. Thuesen with Dependent Personality Disorder to suggest that Mr. Thuesen could not have formed an intent to kill. 47 RR at 173-74. Dr. Saunders's unhelpful, and ultimately, harmful, testimony as Mr. Thuesen's only expert witness during the guilt/innocence phase of trial confirms that trial counsel was objectively unreasonable to not prepare and present (1) a PTSD expert capable of testifying regarding Mr. Thuesen's diminished intent, or (2) a *qualified* bullet trajectory expert, like Dr. Harvey. Trial counsel set their *one* mental health expert up to fail by asking him to offer baseless opinions outside of his expertise.

260.    Trial counsel had two other available options for expert testimony, Dr. Harvey and Dr. Kopel, and inexplicably declined to pursue them. Dr. Harvey was available to testify in Mr. Thuesen's case. State Habeas Petition, Ex. 7 ¶ 10. Trial counsel asked Dr. Harvey to look at the autopsy reports in Mr. Thuesen's case and opine as to whether there was evidence that showed that Mr. Thuesen did not intend to kill either victim. *Id.* ¶ 6. After reviewing the evidence, Dr. Harvey, who billed at least 35 hours for this matter, concluded that an argument could be made that the trajectory of the bullets indicated that Mr. Thuesen did not intend to kill Rachel Joiner. *Id.* ¶ 8. However, trial counsel did not take advantage of his availability. This failure meant that trial counsel had no choice but to present this testimony through Dr. Saunders, even though Dr. Saunders did not have the education, training, or experience needed to adequately testify. That decision, alone, amounted to deficient performance.

261.    Trial counsel also could have called Dr. Kopel. Had Dr. Kopel—or *any* PTSD

expert, for that matter—testified, the jury would have received critical information from a qualified expert regarding Mr. Thuesen's PTSD and, especially important to the guilt/innocence phase, how that condition affected Mr. Thuesen's intent, or lack thereof, during the crime. Dr. Kopel's testimony would have provided a meaningful defense to capital murder in a way that lay witness testimony regarding Mr. Thuesen's behavior could and did not. *Accord* Xenakis Decl. ¶ 34 (explaining that diminished rational thought during a PTSD crisis is outside the public's appreciation of PTSD at the time of the trial).

262.    Had Dr. Kopel testified, he could have told the jury that Mr. Thuesen was suffering from PTSD because of his wartime experiences while serving his country in Iraq. State Habeas Petition, Ex. 8 ¶¶ 13-22. Dr. Kopel would have testified that Mr. Thuesen's PTSD diminished his ability to form an intent to kill on the day of the crime. *Id.* ¶ 31. Specifically, the effect that Mr. Thuesen's PTSD had on his "fight-or-flight" response impaired his capacity to form an intent to kill Rachel or Travis Joiner. *Id.*; *accord* Xenakis Decl. ¶¶ 31-36.

263.    Dr. Kopel would have testified that a normal person experiences a startle response, or "fight-or-flight" response, when the person encounters a danger or experiences fear. State Habeas Petition, Ex. 8 ¶ 32. Physiologically, the "fight-or-flight" response has significant impact on a person's brain. When a person goes into "fight-or-flight," blood flow increases in the areas of the brain that are responsible for creating intense emotions. At the same time, the blood flow in the brain decreases in areas that are responsible for planning, anticipating consequences, and inhibiting inappropriate responses. Thus, these appropriate responses are impaired. *Id.* ¶ 33. The brain's ability to create normal memory storage gets disrupted. *Id.* ¶ 34. Also, the blood flow in the brain decreases in the area of the brain responsible for translating an experience into communicable language, making it difficult for a person to express himself or herself. *Id.* ¶ 33.

264.   In addition, Dr. Kopel would have testified that the "fight-or-flight" response also impacts a person's physical response. When startled, the body releases hormones that increase the person's heart rate and blood pressure, impairing the body's normal "autonomic" (or reflex) nervous system responses. This means that individuals who are experiencing a "fight-or-flight" response are more likely to have cognitive impairment, dissociative experience, and to react physically even if not appropriate to the situation. *Id.* ¶ 35.

265.   According to Dr. Kopel, people suffering from PTSD often have what is called an exaggerated startle response. *Id.* ¶ 32. Often, their "fight-or-flight" response will be triggered by non-dangerous events such as loud noises or sudden movements. *Id.* Veterans suffering PTSD are also likely to have "fight-or-flight" responses that are more intense and last longer than a normal startle response. *Id.* ¶ 36.

266.   Rather than decreasing as time goes on, veterans with PTSD are likely, according to Dr. Kopel, to instead have exaggerated "fight-or-flight" responses to increasingly innocuous stimuli. This is true even if the stimuli do not resemble the traumatic war experience of the veteran. Veterans with PTSD will experience this exaggerated "fight-or-flight" even when the veteran knows intellectually that the situation is not dangerous and does not deserve an emotional response. *Id.* ¶ 32. Thus, as veterans continue to suffer from PTSD, they are likely to react to innocuous events when presented suddenly or in stressful situations and to react emotionally and physically, rather than with planning or communication. *Id.* ¶ 36.

267.   Based on his review of Mr. Thuesen's records and evidence from witnesses, Dr. Kopel formed the opinion that Mr. Thuesen experienced an exaggerated "fight-or-flight" response on the day of the crime. *Id.* ¶ 37; *accord* Xenakis Decl. ¶¶ 30, 32. Evidence showed that leading up to the crime, Mr. Thuesen was experiencing significant stressors related to his school, his work,

financial pressures, and the instability of his relationship with Rachel Joiner. State Habeas Petition, Ex. 8 ¶ 37. This instability would have put Mr. Thuesen under stress, as many people with PTSD are hypersensitive about rejection from others and react in intense ways when attempting to regain control of their relationships. *Id.*

268.    Dr. Kopel would have testified that based on this stressful situation, Rachel's decision to end the relationship and her physical attempt to leave the house that day may have caused Mr. Thuesen to feel threatened. *Accord* Xenakis Decl. ¶ 37. This caused his body to overreact and enter an exaggerated "fight-or-flight" response. State Habeas Petition, Ex. 8 ¶ 37. Mr. Thuesen's statements to the police immediately after the crime support that he experienced a "fight-or-flight" response. Mr. Thuesen stated that during the shooting he felt "in a mode . . . like training" and that he "came to" after the shooting was over. *Id.* ¶ 38. In addition, Mr. Thuesen was able to express details about what happened leading up to the shooting, but not during, suggesting that the blood in Mr. Thuesen's brain had moved from the parts devoted to memory into the parts that inspire emotion and impulsive action. *Id.* ¶ 38.

269.    Further, Dr. Kopel would have testified that the nature of the shooting itself suggested Mr. Thuesen experienced an exaggerated "fight-or-flight" response. Mr. Thuesen reacted reflexively, and in line with his military training, when an unexpected threat suddenly appeared in the form of a quickly-moving Travis Joiner. Mr. Thuesen *stopped* shooting Rachel Joiner as soon as her action ceased. With no movement to stimulate his "fight-or-flight" response, Mr. Thuesen stopped reacting, called 911, and attempted to render aid. This sequence of events is consistent with the conclusion that Mr. Thuesen's body was acting reflexively and without thought until the shooting ended. *Id.* ¶ 39; *accord* Xenakis Decl. ¶ 43 (discussing the "instinctive" and not "rational" behavior engendered by the PTSD crisis, especially given the Marine Corp's training of

Mr. Thuesen to suppress his "flight" response and strengthen his "fight" response). Because of this, according to Dr. Kopel, Mr. Thuesen did not form any intent to kill either Rachel or Travis Joiner.

270.    PTSD may impact intent, and Dr. Kopel would have testified as much had trial counsel prepared and presented his testimony, or *any* PTSD expert to speak to intent. Trial counsel never presented Dr. Kopel's testimony to the jury at all. Instead, trial counsel relied on Dr. Saunders's unsupported and unqualified testimony regarding the crucial element of intent.

271.    Had trial counsel timely engaged a PTSD expert, afforded the expert sufficient time and resources to develop opinions related to Mr. Thuesen's PTSD and his intent, and allowed the expert to testify during the guilt/innocence phase, trial counsel could have provided a wealth of information to the jury regarding PTSD and how Mr. Thuesen's symptoms prevented him from forming intent the night of the crime.

272.    The failure to prepare and present expert testimony about Mr. Thuesen's PTSD—and specifically to decline to present any expert testimony related how that PTSD would have affected Mr. Thuesen's ability to form the requisite criminal intent—amounted to deficient performance.

273.    Trial counsel's deficient performance prejudiced Mr. Thuesen's guilt/innocence phase defense. By failing to present expert testimony regarding Mr. Thuesen's PTSD, symptoms, and treatment, trial counsel presented only a shadow of the picture that could have been presented regarding Mr. Thuesen's PTSD. The effect of this presentation was to rob Mr. Thuesen of the most powerful evidence that could have been presented on his behalf and in his defense in each of the trial's two phases.

274.    Trial counsel's decisions were not reasoned trial strategy but were instead the result

of a woefully incomplete investigation. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). Trial counsel engaged late in the process of developing their themes and expert testimony. The PTSD expert they ultimately hired (though never used), Dr. Kopel, had little more than a month to review materials and provide guidance. Without sufficient assistance from a PTSD expert, in the face of clear evidence that PTSD was a significant defense in the case, counsel did not have the proper information to make a decision whether and how to present that information. *Id.* at 527 ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

275.    Ultimately, trial counsel's decision to not present a full picture of Mr. Thuesen's PTSD, including especially an enhanced fight-or-flight response in certain limited circumstances, for fear of compromising the issue of future danger was not based on sufficient investigation and was, therefore, neither tactical nor reasonable. Without the full presentation of PTSD, counsel failed to present any explanation of Mr. Thuesen's behavior. Thus, counsel's actions cannot be considered strategic, or even reasonable. *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986); *Bigelow v. Haviland*, 576 F.3d 284, 288 (6th Cir. 2009).

276.    To establish Mr. Thuesen's guilt, the State had to prove that he acted intentionally or knowingly. Tex. Penal Code §§ 19.02 and 19.03. A PTSD expert such as Dr. Kopel would have testified that Mr. Thuesen did not act with the intent to kill Rachel or Travis Joiner. State Habeas Petition, Ex. 8 ¶ 40. Instead, he acted instinctively in the midst of a PTSD crisis as he was compelled to act by his "fight-or-flight" response and his military training. *Id.*, ¶¶ 31-40; Xenakis Decl. ¶¶ 35-43. This testimony would have given the jury a strong basis on which it could have

determined that Mr. Thuesen did not act intentionally or knowingly, and therefore that he was not guilty of capital murder.

277.    Instead, Mr. Thuesen's jury heard a muddled, unsupported theory regarding Mr. Thuesen's mental state, rather than a cohesive presentation regarding the impact of Mr. Thuesen's PTSD on his intent during the crime.

278.    Trial counsel's decision to present Dr. Saunders as their sole testifying expert prejudiced Mr. Thuesen's guilt-phase defense. This decision was unreasonable given Dr. Saunders's lack of expertise, lack of preparation for this line of testimony, and disconnection from the defense's main theme. Had counsel not made this error, the jury would have heard relevant testimony about Thuesen's "fight-or-flight" response and diminished intent.

279.    Particularly, this evidence would have directly affected the jury's decision about whether Mr. Thuesen was guilty of capital murder. Evidence of Mr. Thuesen's PTSD and "fight-or-flight" response would have undermined the State's arguments that Mr. Thuesen had a "conscious objective or desire" to commit murder or that he was "aware that his conduct is reasonably certain to cause the result." *See* Tex. Penal Code § 6.03(a), (b) (definitions of "intentionally" and "knowingly").

280.    Thus, had the jury heard the information above, reasonable doubt would have been raised about an essential element of the crime. At least one juror reasonably would have questioned whether Mr. Thuesen intended to kill the Joiners. Because trial counsel squandered this opportunity, Mr. Thuesen was deprived his opportunity for "meaningful adversarial testing" of the State's case. *United States v. Cronic*, 466 U.S. 648, 656 (1984). But for this error, there is a reasonable probability that the results of the proceedings at Thuesen's trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

281.   Because of trial counsel's ineffective assistance during the guilt/innocence phase of trial, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

282.   Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claims 1 and 2.

283.   During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the guilt/innocence phase of trial related to expert testimony regarding Mr. Thuesen's PTSD and his intent, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

284.   Because of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about Mr. Thuesen's guilt or innocence.

**2.   Trial counsel failed to effectively present evidence of PTSD during the guilt/innocence phase of trial (State Habeas Claim 3).**

285.   Trial counsel had a duty to effectively prepare expert witnesses to present evidence of innocence. *See Wiggins*, 539 U.S. at 522; *Draughon v. Dretke*, 427 F.3d 286, 296 (5th Cir. 2005) (counsel ineffective for failing to present an expert that, in turn, "set up an unchallenged factual predicate for the State's main argument.").Trial counsel provided ineffective assistance when they failed to effectively present evidence of PTSD during the guilt/innocence phase of trial.

286.    Instead, trial counsel only developed vague themes of mental health and military service. Trial counsel never effectively presented evidence of Mr. Thuesen's PTSD or explained how it affected his culpability. Instead, the evidence that trial counsel did present was either so muddled that it was not helpful to the jury, or it actually undermined Mr. Thuesen's PTSD defense. Ultimately, the evidence that trial counsel *did* manage to present was poorly focused and could not help the jury understand the relationship of Mr. Thuesen's PTSD to the critical guilt-phase issue: whether Mr. Thuesen intended to kill Rachel and Travis Joiner.

287.    Had the jury received a more effective presentation of available evidence, they would have understood the significance of Mr. Thuesen's PTSD and why it he could not have intended to kill Rachel and Travis Joiner.

288.    Trial counsel made several erroneous decisions regarding the presentation of that theme during the guilt/innocence phase of trial.

289.    First, as discussed above, their primary (and ultimately only) expert witness in the guilt phase, Dr. Saunders, had informed them that he was not a PTSD expert and that his testimony could not focus on that disorder as a primary motivator of Thuesen's conduct. Independent and apart from trial counsel's failure to develop the expert testimony they needed but never introduced, trial counsel further erred by presenting the evidence that they did submit to the jury. That evidence was confusing, contradictory, and made it impossible for the jury to adequately assess the impact of Mr. Thuesen's PTSD on his intent.

290.    Trial counsel also presented testimony from Dr. Ismael Carlo, the VA physician who had treated Mr. Thuesen at the VA Medical Center following his call to the suicide hotline. Trial counsel used Dr. Carlo to testify about some of Mr. Thuesen's mental health treatment. But Dr. Carlo never diagnosed Mr. Thuesen with PTSD, and even if he had, Dr. Carlo was statutorily

precluded from testifying beyond his diagnosis of depression.

291.    Finally, the VA counselor who gave Mr. Thuesen counseling sessions for PTSD, Ms. Theresa Cannon, a licensed master social worker, could neither properly diagnose nor treat Mr. Thuesen's PTSD, and the deficiency in using her testimony became apparent on cross-examination.

### a. Dr. Saunders

292.    Trial counsel called Dr. Saunders to testify during the guilt/innocence phase of trial regarding Mr. Thuesen's intent to kill. Dr. Saunders discussed the three diagnoses he had made of Mr. Thuesen's mental health: Dependent Personality Disorder, depression, and PTSD. 47 RR at 15; State Habeas Petition, Ex. 10 ¶ 5. Regarding Mr. Thuesen's PTSD, Dr. Saunders testified that he diagnosed Mr. Thuesen with PTSD based on Mr. Thuesen's experience of trauma in Iraq and the reporting of distinct personality changes upon his return to the States. 47 RR at 18. Dr. Saunders reviewed the symptoms of PTSD that Mr. Thuesen experienced, including avoiding talking about his time in Iraq, estrangement from others, hypervigilance, exaggerated startle response, and outbursts of anger and irritability. *Id.* Dr. Saunders noted that the PTSD symptoms that Mr. Thuesen experienced would interfere with interpersonal relationships. 47 RR at 26. He also stated that PTSD would make it difficult for Mr. Thuesen to negotiate his emotions, which could easily spill out onto others. 47 RR at 27.

293.    Trial counsel knew, or should have known, that Dr. Saunders's testimony would obscure the critical importance of Mr. Thuesen's PTSD. As Dr. Saunders had informed trial counsel in advance, the primary focus of his testimony was that Mr. Thuesen was suffering from Dependent Personality Disorder, a condition marked by fear of separation and an excessive need to be taken care of. 47 RR at 33-35. Dr. Saunders believed that on the day of the crime, Mr. Thuesen's Dependent Personality Disorder prevented him from forming an intent to kill. 47 RR at

37-44. Though Mr. Thuesen's PTSD contributed to his mental condition at the time of the crime, Dr. Saunders believed it merely exacerbated the anxiety and depression already present because of the Dependent Personality Disorder. 47 RR at 47.

294.    Dr. Saunders's lack of expertise in PTSD led to several incorrect statements about Mr. Thuesen's particular experience with PTSD, muddying trial counsel's presentation to the jury about Mr. Thuesen's mental state and his intent. Dr. Saunders downplayed the significance of Mr. Thuesen's PTSD based on symptoms he believed Mr. Thuesen was not experiencing. *Id.* For example, he disagreed with testimony from Mr. Thuesen's VA counselor that Mr. Thuesen's experience of auditory hallucination was a symptom of PTSD. 47 RR at 27. Despite not having PTSD expertise, trial counsel permitted Dr. Saunders to inappropriately contradict a VA social worker with ten years of experience treating veterans with PTSD. State Habeas Petition, Ex. 3 ¶ 2. Further, according to Dr. Xenakis, if both PTSD and Dependent Personality Disorder were both present—a point he disputes—then the effects of PTSD would be the ones that matter. *See* Xenakis Decl. ¶ 29-30.

295.    Dr. Saunders offered additional PTSD-related opinions that further confused the jury's view of PTSD. He stated that Mr. Thuesen did not experience war flashbacks, which was a criterion for PTSD according to Dr. Saunders, and that specifically there was no evidence that Mr. Thuesen was experiencing a flashback at the time of the crime. 47 RR at 33, 139; State Habeas Petition, Ex. 10 ¶ 7. In reality, Mr. Thuesen *had* experienced flashback episodes following his return from Iraq. State Habeas Petition, Ex. 35 ¶¶ 11-13, Ex. 21 ¶ 5, Ex. 8 ¶ 44. Also, regardless of whether Mr. Thuesen experienced flashbacks, Dr. Saunders was incorrect to suggest that all PTSD patients will experience flashbacks. State Habeas Petition, Ex. 8 ¶ 45; *accord* Xenakis Decl. ¶ 24. The impact of PTSD presents itself differently depending on the person. *Id.* For someone like

Mr. Thuesen, PTSD flare-ups might be triggered by a breakdown in feeling order and control in the world around him, rather than experiencing conditions that reminded him of his war trauma. State Habeas Petition, Ex. 8 ¶ 46.

296.    Dr. Saunders's lack of knowledge about a traumatic event was an evidentiary gap in concluding that Mr. Thuesen had PTSD. But Dr. Saunders was not ignorant about the effects of PTSD and could have provided some evidence that would have been helpful to the jury. Trial counsel knew how to fill this gap in two ways. Their failure to use the testimony at their disposal amounted to deficient performance.

297.    The DSM-IV requires both of the following for an event to qualify as a "trauma": (A1) that person has "experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or threat to the physical integrity of self or others" and the subjective criterion (A2) that "the person's response involved intense fear, helplessness, or horror" be met. Shawn P. Cahill & Kristin Pontoski, *Post-traumatic stress disorder and acute stress disorder I: their nature and assessment considerations*, 2(4) PSYCHIATRY (Edgmont) 14-25 (2005); *accord* Xenakis Decl. ¶ 23.

298.    First, sitting in trial counsel's files was an interview summary, dated April 29, 2010, with Tim Rojas. Ex. 10. The notes describe a traumatic event Rojas observed in Iraq, when Mr. Thuesen shot his "big gun" at a car containing an elderly man and a young boy. Of the event, Rojas stated, "Thuesen's fear was an elderly man and a young boy, and even though they survived, *it doesn't go away*." *Id.* (emphasis added).

299.    This event was a "traumatic event" within the meaning of the DSM-IV that would have allowed Dr. Saunders to fill the gap and to make a diagnosis of PTSD. Trial counsel knew it had Rojas's testimony. Indeed, they called Rojas during the punishment phase to explain the

horrific event. 52 RR 158-162. Yet trial counsel never prepared Dr. Saunders with this information.

300.     The second gap-filling fact known to trial counsel, but not properly marshalled to aid in Mr. Thuesen's defense, came from Jeremy Abbott, a witness trial counsel called the day before Dr. Saunders would testify.

301.     Abbott was a friend of Mr. Thuesen's in Iraq. Abbott was a radioman, and Mr. Thuesen was his machine gunner. 46 RR 156-157. Abbott testified to the jury on May 17, 2010, one day before Dr. Saunders testified to the jury. Abbott described a second devastating, traumatic event that Mr. Thuesen experienced in Iraq. Mr. Thuesen and Abbott were part of a 15-Marine deployment that was ordered to hold a bridge against an unknown number of insurgents rumored to be 500 strong. A resupply vehicle hit a mine. Mr. Thuesen's unit had to extract the badly-injured driver and navigator from the vehicle under fire so they could be evacuated. 46 RR 161-162. Abbott testified that experience was the most frightening event he encountered during his service. *Id*.

302.     In light of trial counsel's knowledge of the traumatic experiences that Mr. Thuesen underwent in Iraq, trial counsel clearly failed to prepare Dr. Saunders to testify accurately regarding Mr. Thuesen's experiences. Had trial counsel properly prepared Dr. Saunders to testify with information that was clearly available to trial counsel, Dr. Saunders could have testified in a manner helpful to the jury, consistent with Dr. Carlo and Ms. Cannon, and in support of Mr. Thuesen defense related to intent. Trial counsel's failure to effectively prepare and present Dr. Saunders's testimony was unreasonable and amounted to deficient performance.

303.     Because of the brevity and misleading nature of Dr. Saunders's testimony regarding Mr. Thuesen's PTSD and mental health generally, the jury received only a cursory, confusing, and "technical" description of it. State Habeas Petition, Ex. 8 ¶ 43. Dr. Saunders's testimony failed to

provide the jury with anything more than a general description of the PTSD symptoms that Mr. Thuesen suffered and barely touched on how those symptoms directly impacted Mr. Thuesen's behavior, relationships with others, and, more important, his intent during the crime. *Id.*

304.     The incorrect opinions and gaps in Dr. Saunders's testimony likely created a misconception in the jury's mind that Mr. Thuesen was either not truly suffering PTSD or, even if he were, that PTSD was not a significant factor in Mr. Thuesen's life and the events surrounding the crime.

### b.  Dr. Carlo

305.     Trial counsel was deficient in presenting evidence through Dr. Carlo because Dr. Carlo never diagnosed Mr. Thuesen with PTSD and Dr. Carlo was statutorily prohibited from offering any expert opinions about PTSD. Trial counsel knew or should have known these crucial limitations prior to Dr. Carlo's testimony, yet trial counsel called Dr. Carlo anyway, creating significant confusion and doubt on the central issue of Mr. Thuesen's PTSD.

306.     Dr. Carlo was Mr. Thuesen's treating physician during his four-day stay at the Houston VA Medical Center following his call to the suicide hotline. 45 RR at 21. Dr. Carlo testified that Mr. Thuesen was severely depressed on admission to the hospital. 45 RR at 22-23. Based upon his observations and discussions with Mr. Thuesen, Dr. Carlo diagnosed him with Major Depressive Disorder. 45 RR at 24. Dr. Carlo testified that Mr. Thuesen was still a long way away from being well when he was discharged from the hospital. 45 RR at 28.

307.     Dr. Carlo only diagnosed Mr. Thuesen with depression, and that was the condition he treated, because Mr. Thuesen's immediate presentation at the hospital was suicidal ideation. State Habeas Petition, Ex. 4 ¶ 7. Of course, the State highlighted this fact on cross-examination, including that Mr. Thuesen's chart at the time said "[p]atient denied any traumatic event." 45 RR at 35. The State also noted that Mr. Thuesen did not report symptoms of flashbacks, avoidance, or

aggression. 45 RR at 31. Thus, one of trial counsel's key witnesses regarding Mr. Thuesen's PTSD had not actually diagnosed Mr. Thuesen with PTSD and could not provide the evidence that trial counsel wanted and needed to present.

308.   Further, trial counsel unsuccessfully attempted to have Dr. Carlo diagnose Mr. Thuesen with PTSD after the fact. 45 RR at 37-58. However, as a federal employee, Dr. Carlo was permitted to testify only as a fact witness on permission of the United States Attorney's Office. 45 RR at 54-57; *see* 38 C.F.R. §§ 14.803, 14.808. Because he had not diagnosed Mr. Thuesen with PTSD when treating him at the VA Medical Center, Dr. Carlo could not offer any expert opinions about whether Mr. Thuesen suffered from PTSD.

309.   Trial counsel objected to this limitation, causing a heated argument at the bench with an Assistant U.S. Attorney who represented the VA. Counsel wanted to ask Dr. Carlo his opinion about whether Mr. Thuesen had PTSD (even though Dr. Carlo had never formally diagnosed Thuesen with it). 45 RR at 37. Because of the federal regulation governing expert testimony by a federal employee like Dr. Carlo, however, the trial court did not order Dr. Carlo to provide an expert opinion.

310.   Trial counsel should have known this limitation on Dr. Carlo's testimony. Instead, trial counsel had to attempt to offer statutorily-barred testimony through Dr. Carlo to make up for their own lack of preparation and planning on the presentation of expert testimony. Had trial counsel reasonably investigated and prepared, trial counsel would have known the limitations on Dr. Carlo's testimony prior to calling him as a witness.

### c.   Theresa Cannon

311.   The other VA witness relied upon by trial counsel proved no better a source of evidence of Mr. Thuesen's PTSD. Instead, trial counsel deficiently created further confusion about Mr. Thuesen's PTSD by calling Theresa Cannon without also giving the jury a complete picture

of Mr. Thuesen's mental health.

312.    Ms. Teresa Cannon, a VA social worker, treated Mr. Thuesen with supportive counseling sessions following his four-day stay at the Houston VA Medical Center. 45 RR at 78-79. Trial counsel elicited testimony from Cannon regarding the various elements of PTSD that Mr. Thuesen self- reported during their sessions together. 45 RR at 81-94. In addition, Cannon testified about the positive impact Mr. Thuesen's relationship with Rachel Joiner had on his mental state. 45 RR at 93-101.

313.    There were numerous, obvious flaws with Cannon's testimony. Trial counsel either should not have called her, or should have been prepared to clear up the confusion her testimony created. Instead, trial counsel's decision to call Cannon further muddied the presentation of Mr. Thuesen's PTSD to the jury.

314.    Cannon had herself never diagnosed Mr. Thuesen with PTSD, as she was unqualified to do so. As a social worker, Cannon cannot diagnose or prescribe treatment of patients. State Habeas Petition, Ex. 3 ¶ 9.

315.    Cannon only offered Mr. Thuesen limited supportive counseling sessions. *Id.* ¶ 10. But those counseling sessions did not adequately address or treat Mr. Thuesen's PTSD symptoms. State Habeas Petition, Ex. 8 ¶ 25 ("While well-intentioned, this course of treatment did nothing to repair the daily damage PTSD would have done to Thuesen's functioning in society."), Ex. 9 ¶ 53 ("Supportive therapy, while somewhat helpful in some cases, does not address the specific triggers that may set off a veteran's PTSD."). Thus, not only was Cannon's testimony damaging to the defense, but it prevented the defense from developing the theme that Mr. Thuesen's PTSD was not properly treated.

316.    What's more, Ms. Cannon *mistakenly* testified that Mr. Thuesen had been

diagnosed with PTSD before starting sessions with her. 45 RR at 80. In actuality, Mr. Thuesen had never been diagnosed with or properly treated for PTSD, even while in treatment at the VA Medical Center in Houston. Cannon had received only cursory information over the phone from the suicide prevention coordinator at the Houston VA regarding Mr. Thuesen's brief treatment related to his call to the suicide hotline. State Habeas Petition, Ex. 9 ¶ 6. She never received any medical records from the VA system, including past diagnoses, treatment history, or mental health assessments. *Id.* This further confused the issue of Mr. Thuesen's PTSD for the jury, and damaged the defense by incorrectly implying that Mr. Thuesen's PTSD was being managed at the time of the incident.

317.    Unsurprisingly, on cross examination the State undermined any impact of Cannon's testimony, by suggesting either Mr. Thuesen was not really suffering from PTSD or Cannon was not that familiar with Mr. Thuesen's condition. The prosecution elicited from Cannon that she had never seen Mr. Thuesen withdraw from his family or experience trouble with employment or school. 45 RR at 107. In addition, she confirmed that Mr. Thuesen chose to stop taking his medication and declined to go to group therapy sessions.[10] 45 RR at 111-13. Finally, Cannon stated that Mr. Thuesen requested their sessions be decreased from once every month to once every sixty days. 45 RR at 120-21. This cross-examination further left the jury with the impression that Mr. Thuesen was somehow responsible for his condition, or that it could not have been too serious, because he was not taking medication or attending counseling.

318.    The evidence the defense was able to elicit from these witnesses was insufficient because trial counsel were wholly unprepared. It would have been possible to convince the jury

---

[10] In fact, "[a]version to taking medication is very common in service members for a host of reasons, including side-effects and the patient's belief that the medication may interfere with their work or social life." Ex. 9 ¶ 56.

that Mr. Thuesen had PTSD and that it severely impacted his intent during the crime. But by the end of Dr. Saunders's testimony, the jury realized what trial counsel already knew—Dr. Saunders was not a PTSD expert, and his testimony was therefore not relevant to the PTSD that was central to the defense theory.

319.   Compounding the inadequacy of Dr. Saunders's testimony, Dr. Carlo and Cannon did not provide evidence of PTSD that trial counsel believed they would provide. If anything, their testimony was damaging, highlighting the lack of a formal diagnosis or treatment of Mr. Thuesen's PTSD by the VA system.

320.   The testimony presented by trial counsel failed to specifically draw a connection between Mr. Thuesen's PTSD and the crime. Rather than use these witnesses to tie Mr. Thuesen's struggles with PTSD to his actions during the crime, trial counsel deferred to Dr. Saunders's unsupported theory about bullet wounds and Dependent Personality Disorder and allowed Dr. Carlo and Cannon to question whether Mr. Thuesen even *has* PTSD. As a result, the modest evidence presented to the jury about Mr. Thuesen's PTSD (from lay witness testimony about changes in Mr. Thuesen's behaviors) was left untethered to any coherent or reasonable defense theory.

321.   Had trial counsel properly investigated, prepared, and presented the testimony of Dr. Saunders, Dr. Carlo, and Cannon, the three would have presented a cohesive picture of Mr. Thuesen's PTSD symptoms. Dr. Saunders could have testified regarding Mr. Thuesen's mental health generally, providing evidence of diminished intent and culpability. Dr. Carlo and Cannon could have testified to Mr. Thuesen's crises, need for treatment, and symptoms. Rather than allowing the lack of PTSD diagnosis and treatment to hurt Mr. Thuesen's defense, effective trial counsel would have known to use the testimony to show that Mr. Thuesen was living undiagnosed

and untreated until the night of the crime.

322.     There is a reasonable probability that the ineffective presentation of Mr. Thuesen's PTSD, and his lack of treatment for that PTSD, led the jury to reject the notion that Mr. Thuesen actually suffered from PTSD. As a result, by the punishment phase, the jury had rejected Dr. Saunders's theory that mental illness impacted Mr. Thuesen's behaviors during the crime.

323.     As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial.

324.     Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 3.

325.     During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the guilt/innocence phase of trial related to Claim 3, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

326.     As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial, in which a jury will be permitted to consider all relevant and necessary evidence for it to make a fair determination about Mr. Thuesen's guilt or innocence.

### 3.   Trial counsel failed to adequately prepare and rehabilitate their one expert witness (State Habeas Claim 4).

327.     Trial counsel provided ineffective assistance when they failed to adequately prepare and rehabilitate their one expert witness, Dr. Saunders.

328.     As discussed above, trial counsel performed deficiently by failing to present

adequate expert testimony on Mr. Thuesen's PTSD. The testimony that trial counsel did introduce through Dr. Saunders damaged Mr. Thuesen's defense. In addition to those shortcomings, trial counsel also failed to adequately prepare Dr. Saunders to testify, and then failed to rehabilitate him following cross-examination, which failures critically damaged the credibility of the sole defense expert who testified at the guilt/innocence phase of Mr. Thuesen's trial.

329.   Capital trial counsel have a well-established duty to investigate, prepare, and present evidence of innocence at a defendant's trial. *See Wiggins v. Smith*, 539 U.S. 510,522 (2003). To sufficiently present this testimony, though, counsel must adequately prepare the expert witness. *See Draughon*, 427 F.3d at 296 (finding counsel ineffective for failing to present an expert that, in turn, "set up an unchallenged factual predicate for the State's main argument.").

330.   Dr. Saunders's consultation on Mr. Thuesen's case began in earnest only a few months before trial. Although Dr. Saunders initially evaluated Thuesen in March 2009 for competency, he was not retained by trial counsel to investigate how Mr. Thuesen's mental health may have impacted his ability to form a criminal intent until February 2010, one month before voir dire and three months before the guilt/innocence phase would commence. State Habeas Petition, Ex. 15 at 22. After interviewing Mr. Thuesen in March 2010, Dr. Saunders consulted with trial counsel *once* that month and *once* again in April. *Id.*

331.   Trial counsel spent the most time consulting with Dr. Saunders just days before the trial, on May 9, 13, and 17, 2010. *Id.* at 23. In fact, Dr. Saunders was still working on his evaluation during this time, interviewing Mr. Thuesen again on May 13, 2010. *Id.* Counsel only prepared Dr. Saunders for his testimony just briefly the day before.

332.   However, this little preparation was not enough given that the focus of Dr. Saunders's testimony had shifted just before his testimony. *Strickland*, 466 U.S. at 688 ("[T]he

performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."). Dr. Saunders was originally retained to evaluate Mr. Thuesen for general mental health mitigation themes and to testify at the punishment phase of trial. State Habeas Petition, Ex. 10 ¶ 10. As previously discussed, though, upon hearing the testimony of the State's medical examiner, Dr. Saunders told trial counsel that he could testify about Mr. Thuesen's lack of intent during the crime. *Id.* Trial counsel chose at that point to switch Dr. Saunders's testimony from the punishment phase to the guilt/innocence phase of trial. *Id.*

333.    Trial counsel did not augment their preparation.

334.    As a predictable result, Dr. Saunders's testimony was unprepared and provided testimony with factual mistakes and statements harmful to Mr. Thuesen's defense. It was apparent from Dr. Saunders's testimony regarding Mr. Thuesen's lack of intent that trial counsel had not fully considered or prepared this testimony. 47 RR at 37.

335.    Dr. Saunders stated multiple times that the evidence was not actually supportive that Mr. Thuesen did not intend to kill Travis Joiner—a harmful and damaging statement. 47 RR at 63, 112, 163.

336.    Dr. Saunders struggled throughout cross-examination to define when Mr. Thuesen did or did not have the capacity to form intent. He first suggested that Mr. Thuesen was aware of his actions and intended them up to the moment he pulled the trigger, but that he lacked the intent to kill after that moment. 47 RR at 102. Next, he explained that Mr. Thuesen had the intent to shoot Rachel to stop her, forming "an intent" but just not the specific intent to kill. 47 RR at 107. Finally, Dr. Saunders offered that Mr. Thuesen could have formed the intent to kill Rachel and Travis in the days leading up to the crime, but just not at the moment of the crime itself. 47 RR at 169.

337.    The State's devastating cross-examination of Dr. Saunders's testimony was entirely

predictable and illustrative of trial counsel's lack of preparation.

338.    Several other points of Dr. Saunders's testimony were not beneficial to Mr. Thuesen's case because they were inaccurate and prejudicial. For example, Dr. Saunders stated that Mr. Thuesen had presented himself as "well defended" during their interviews. 47 RR at 58-59. This meant that Mr. Thuesen hid his feelings and suppressed his emotions. However, this characterization of Mr. Thuesen directly conflicted with lay witness testimony that Mr. Thuesen was often needy and emotional, and that he cried frequently. 46 RR at 133, 166; 51 RR at 64.

339.    Dr. Saunders also posited that Mr. Thuesen had gone to Rachel's house the day of the crime to make a suicidal gesture. 47 RR at 40. However, Mr. Thuesen had stated to the police that he was not intending to use the gun and was at most trying to scare Rachel back into a relationship. The fact that his testimony was in direct contrast to the statements made by Mr. Thuesen (and known to the jury) simply undermined Dr. Saunders's credibility. And trial counsel knew or should have known that those contradictions would undermine Mr. Thuesen's defense. In addition, this testimony damaged the credibility of both Dr. Saunders and Mr. Thuesen—whose version of events was impacted by the effects of PTSD, such as an inability to form memories and the risk of confabulation. *See* Xenakis Decl. ¶ 41.

340.    Finally, Dr. Saunders's testimony left the jury with the incorrect impression that Mr. Thuesen suffered from Borderline Personality Disorder. 47 RR at 142. He stated that Mr. Thuesen showed "borderline features" and agreed with the State that a Borderline patient would have unstable relationships, rage, and anger. *Id.* Yet Dr. Saunders had not in fact diagnosed Mr. Thuesen with that disorder. 47 RR at 36 (diagnosing Mr. Thuesen with PTSD, Dependent Personality Disorder, and depression). Borderline Personality Disorder is an incurable disorder known for causing rage and anger. Leaving this suggestion hanging out for the jury with no further

explanation amounted to deficient performance.

341.    With adequate preparation, trial counsel would have been aware of the above problematic statements from Dr. Saunders and taken steps to cure them. Further, trial counsel failed to rehabilitate Dr. Saunders's testimony sufficiently on redirect. In the few questions they asked on redirect, trial counsel elicited from Dr. Saunders that Mr. Thuesen was overly dependent on Rachel, he went into a rapid descent into mental illness before the crime, and he did not intend to kill Rachel. 47 RR at 173-78. The questioning did not address any of the issues brought up during the cross-examination including what specifically Dr. Saunders's opinion was regarding when Mr. Thuesen could and could not form an intent, whether Mr. Thuesen did or did not have the intent to kill Travis Joiner, and whether Mr. Thuesen did or did not suffer from Borderline Personality Disorder.

342.    As the sole expert witness provided by the defense, Dr. Saunders's testimony was critical to support the defense theory that Mr. Thuesen was suffering from PTSD and lacked the necessary intent to commit capital murder. Trial counsel's failure to sufficiently prepare Dr. Saunders led to inaccurate, damaging testimony that hurt Dr. Saunders's credibility before the jury.

343.    Had trial counsel instead spent the necessary time preparing him, Dr. Saunders's testimony might have been seen as credible, ultimately leading to a different verdict.

344.    As a result of trial counsel's ineffectiveness, Mr. Thuesen is entitled to a new guilt/innocence phase trial, in which a jury will be permitted to consider all relevant and necessary evidence for it to make a fair determination about Mr. Thuesen's guilt or innocence.

345.    Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 4.

346.    During the state habeas proceedings, the state courts did not dispose of Mr.

Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the guilt/innocence phase of trial related to Claim 4, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

347.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about Mr. Thuesen's guilt or innocence.

### 4.   Trial counsel failed to present evidence that the VA failed to diagnose or to properly treat Mr. Thuesen for PTSD, despite his obvious need for such treatment. (State Habeas Claim 7).

348.    Trial counsel knew or should have known that Mr. Thuesen suffered from PTSD. Just as significantly, trial counsel knew or should have known that Mr. Thuesen's PTSD was never adequately diagnosed or treated.

349.    At the end of his deployment in Iraq, Mr. Thuesen completed a post-deployment health assessment survey in March 2005, just before being sent home. State Habeas Petition, Ex. 12 at 136-37. The only medical issue Mr. Thuesen noted at that time was that he had experienced frostbite, which had been resolved. *Id.* The assessment did not ask any questions regarding symptoms that could indicate PTSD.

350.    A little more than a year later, in August 2006, Mr. Thuesen was again given a post-deployment health assessment. *Id.* at 118-21. That assessment specifically asked Mr. Thuesen whether he was experiencing any mental health symptoms. *Id.* at 119-20. In it, Mr. Thuesen reported having "problems sleeping," "difficulty remembering," "weakness," and "numbness." *Id.* at 119. Mr. Thuesen also agreed that he had "a health concern or condition that . . . is related to

[his] deployment" and that it was "[o]ther than wounds or injuries." *Id.*

351.    Following and as a result of that assessment, Mr. Thuesen was referred to a military health care provider for further evaluation. State Habeas Petition, Ex. 12 at 120-21. That provider noted that Mr. Thuesen complained of "feeling numb or detached from others, activities, or [his] surroundings," as well as having "little interest or pleasure in doing things" and "feeling down, depressed, or hopeless." *Id.* at 121. Mr. Thuesen indicated that these feelings were making it "very difficult" to do his work, to take care of things at home, and to get along with others. *Id.* Despite the symptoms reported by Mr. Thuesen, he was not tested further for PTSD, diagnosed with the condition, or treated for it.

352.    Mr. Thuesen was not seen again the VA system for another "Iraq/Afghanistan Mental Health Assessment" until March 2007. State Habeas Petition, Ex. 13 at 154. During that assessment, Mr. Thuesen reported that he was "constantly on guard, watchful, or easily startled." *Id.* He also reported feeling "numb or detached from others, activities, or [his] surroundings." *Id.* Those two reported symptoms—hypervigilance and avoidance symptoms—are two of the four identifying symptoms of PTSD. See Xenakis Decl., ¶ 26. In addition, the VA counselor and psychologist conducting the survey noted that Mr. Thuesen endorsed symptoms of depressed mood, impaired concentration, irritability, reduced energy level, worthlessness, anger dyscontrol, emotional numbing, hypervigilance, startle response, and the experience of a traumatic event. State Habeas Petition, Ex. 13 at 158-59.

353.    Yet in the results of the assessment aligning almost perfectly with the classic symptoms of PTSD, there is no indication that the survey conductors diagnosed Mr. Thuesen with PTSD, made any special note of his positive endorsement of PTSD symptoms in his file, or informed Mr. Thuesen of the possibility that he suffered from PTSD. Indeed, the only problems

identified by the counselor and psychologist were "anger/irritability" and "some mild depressed mood." *Id.* at 160. As a result, Mr. Thuesen *still* did not receive treatment for PTSD.

354. Mr. Thuesen next encountered the VA was four months later, following his July 2007 arrest, when his mother brought him to see a VA psychiatrist. *Id.* at 148. Although Mr. Thuesen did not endorse any specific symptoms of PTSD at that time, the psychiatrist noted that she had the results of the prior assessment Mr. Thuesen had completed. *Id.* at 149. However, that VA psychiatrist again ignored the strong evidence Mr. Thuesen was suffering from PTSD and merely recommended "counseling at the Vet Center or through church to improve quality of life and deal with psychosocial stressors." *Id.* at 153.

355. Following his visit to the VA in July 2007, Mr. Thuesen followed the recommendation of the psychiatrist and sought counseling from a private counselor, social worker Dianne Appolito. State Habeas Petition, Ex. 1 ¶ 4. Unlike the VA, Appolito was able to recognize almost immediately that Mr. Thuesen was suffering from PTSD. *Id.* ¶¶ 6, 7. She noted his description of several of the same symptoms noted in the March VA assessment—depression, hypervigilance, and angry outbursts. *Id.* ¶ 7. Unfortunately, as a social worker, Appolito was unable to formally diagnose Mr. Thuesen, and her therapy ended after only six sessions when Mr. Thuesen relocated. *Id.* ¶¶ 4, 6.

356. Over the course of the next year, Mr. Thuesen's struggle with PTSD continued unnoted and untreated. In July 2008, Mr. Thuesen returned to the VA with complaints of lower back pain. State Habeas Petition, Ex. 13 at 139-41. While being treated, Mr. Thuesen completed a PTSD screening that asked four questions related to the common symptoms of PTSD. *Id.* at 139. Mr. Thuesen answered "Yes" to all four questions, indicating symptoms of re-experiencing the trauma, avoidant thoughts, hypervigilance, and emotional numbing. *Id.* In response to Mr.

Thuesen's answers, a VA nurse practitioner noted that the results "have been reviewed and the patient assessed including assessment of suicidal risk." *Id.* at 138. But still, two years after Mr. Thuesen first began reporting symptoms consistent with PTSD, the VA failed to diagnose him. The VA nurse who saw him specifically disclaimed that treatment for PTSD was necessary; she noted there was "[n]o mental health condition requiring further intervention" and instructed that "[i]n case of crisis" Mr. Thuesen was to the call the National Suicide Prevention Lifeline. *Id.*

357.    Forty-five days later, on August 29, 2008, Mr. Thuesen called the suicide hotline. State Habeas Petition, Ex. 13 at 136. He was intoxicated and stated he was having thoughts of shooting himself. *Id.* Mr. Thuesen was picked up by the police and taken to the Houston VA Medical Center. *Id.* at 133-36. During his initial evaluation on admission to the hospital, the admitting psychologist noted that Mr. Thuesen had experienced wartime trauma and was experiencing symptoms consistent with PTSD, including nightmares, irritability, and an increased startle response. *Id.* at 130. Although Mr. Thuesen did not report experiencing flashbacks or aggressive outbursts at that time, the psychologist requested that further treating physicians determine whether a diagnosis of PTSD was warranted. *Id.*

358.    Unfortunately, that diagnosis was not made. Mr. Thuesen's primary diagnosis and treatment focus was limited to depression and suicidal ideation. *Id.* at 131. It was at this stage that Mr. Thuesen was seen by Dr. Carlo, the VA psychiatrist. *Id.* at 113-20. And once again, the VA doctor treating Mr. Thuesen ignored the symptoms of PTSD he reported. Dr. Carlo focused his diagnosis and treatment on the major problem Mr. Thuesen presented, which was his risk of suicide. State Habeas Petition, Ex. 4 ¶¶ 6, 7. Dr. Carlo neither confirmed nor ruled out PTSD as a diagnosis, but instead prescribed Mr. Thuesen a regime of antidepressants and a period of detox for his alcohol abuse. *Id.* ¶ 6. Because Mr. Thuesen came to the VA Medical Center on a Friday

before a holiday weekend, he was kept for the next three days and observed by the VA's nursing staff. *Id.* ¶ 8. Despite the additional observation time, no further mental health assessment for PTSD was done, and there is no further mention of PTSD or PTSD symptoms in the records of his stay at the VA Medical Center that weekend. State Habeas Petition, Ex. 13 at 70- 112.

359.   On the following Tuesday, Mr. Thuesen expressed that he was feeling better and wanted to return home so that he could resume classes and work. *Id.* at 71. Dr. Carlo again evaluated Mr. Thuesen's condition with regard to his suicide risk and depression, and found that Mr. Thuesen had logical reasons for returning home and was no longer at an immediate risk of suicide. *Id.* at 62-64. Yet again, despite the triage psychologist noting that follow-up regarding PTSD was necessary, Dr. Carlo made no inquiry or findings regarding a potential diagnosis of PTSD, nor recommended to Mr. Thuesen that he seek treatment for PTSD.

360.   On the day of his release, a VA social worker performed one final assessment of Mr. Thuesen's mental health. State Habeas Petition, Ex. 13 at 58. And once again, Mr. Thuesen indicated he was struggling with his wartime experiences. Mr. Thuesen told the social worker that he had trouble talking to other people about his war trauma and that he felt his excessive use of alcohol was his way of "trying to deal with what happened and not fitting in in the civilian world." *Id.* In this assessment, Mr. Thuesen went into further detail about the trauma he had experienced, describing the incident at the checkpoint as well as a time his unit had encountered a woman with a bomb strapped to herself. *Id.* Mr. Thuesen admitted that he was having trouble with drinking and that his anger was difficult to manage. *Id.* The VA social worker did not make any notations in Mr. Thuesen's file regarding possible PTSD, noting only that her assessment was unable to be completed. *Id.* Upon his release, Mr. Thuesen was given a prescription for antidepressants and the recommendation to seek counseling through the VA to manage his depression. *Id.* at 62-64. No

diagnosis of PTSD was made.

361.    Mr. Thuesen confirmed multiple times that he was very interested in individual psychotherapy sessions. State Habeas Petition, Ex. 13 at 57, 58. Unfortunately, when he did go to see a social worker, Teresa Cannon, the VA failed to transfer the bulk of the years of assessments he had completed indicated symptoms consistent with PTSD. Cannon received only cursory information over the phone from the suicide prevention coordinator at the Houston VA Medical Center regarding Mr. Thuesen's brief treatment related to his suicide threat. State Habeas Petition, Ex. 3 ¶ 6. She never received any medical records from the VA system, including past diagnoses, treatment history, or mental health assessments. *Id.* Staff at the Houston VA Medical Center only followed up with Mr. Thuesen a few times to ensure that he was in contact with Cannon and that he was no longer at risk of suicide. State Habeas Petition, Ex. 13 at 51-54. No follow up was made regarding Mr. Thuesen's symptoms consistent with PTSD.

362.    Even without Mr. Thuesen's previous records, Cannon was able to determine that Mr. Thuesen was likely suffering from PTSD. State Habeas Petition, Ex. 13 at 41- 43; Ex. 3 ¶ 7. As a social worker, however, Cannon was neither qualified to diagnose medical disorders nor could she prescribe treatment. State Habeas Petition, Ex. 3 ¶ 9.

363.    Despite noting that Mr. Thuesen was likely suffering from PTSD, and knowing that she was not qualified to formally diagnose or to treat the condition, Cannon did not refer Mr. Thuesen to see a VA physician about his PTSD.

364.    Cannon only provided Mr. Thuesen with supportive counseling sessions once a month, during which they discussed his symptoms or other issues he wanted to discuss. State Habeas Petition, Ex. 3 ¶¶ 8, 9, 12. Ultimately, after decreasing the frequency of her counseling sessions, Cannon saw Mr. Thuesen just two days before the crime occurred. State Habeas Petition,

Ex. 13 at 16. During that session, Mr. Thuesen again noted suffering from issues of anger, panic, hypervigilance, and avoidance, all consistent with PTSD. *Id.* In response, Cannon provided supportive counsel, offering "symptom management techniques," so that Mr. Thuesen could recognize and deal with these symptoms on his own. *Id.*

365.     While supportive counseling is beneficial, proper treatment of PTSD requires much more intensive outpatient treatment, such as a combination of cognitive-based therapy, exposure therapy, medication, and counseling with a psychologist or physician. State Habeas Petition, Ex. 9 ¶¶ 52-53; Ex. 8 ¶ 25. Some patients may even need to be treated in an in-patient residential program for months. State Habeas Petition, Ex. 9 ¶ 53.

366.     The only time Cannon did refer Mr. Thuesen to a treating physician was after he ran out of his antidepressant medication in late 2008. State Habeas Petition, Ex. 13 at 33. At that time, Mr. Thuesen reported—on a video conference with a VA nurse practitioner arranged by Ms. Cannon—that his depression was lessening and that he was feeling "pretty upbeat." *Id.* at 32. As a result, based only on this one short video session the nurse practitioner canceled Mr. Thuesen's prescription for antidepressants and removed all psychiatric diagnoses from Mr. Thuesen's chart. *Id.*

367.     Had trial counsel fully reviewed the military records in their possession, they would have noted that neither Dr. Carlo nor any other VA medical professional had ever actually diagnosed Mr. Thuesen with PTSD. *See Rompilla v. Beard*, 545 U.S. 374, 385 (2005) (finding counsel committed deficient performance by failing to review a "readily available file").

368.     Of course, as detailed above, trial counsel failed to hire a PTSD expert (other than Dr. Detwiler, whom they never used, and Dr. Kopel, whom they retained late and never used) or properly investigate or develop expert testimony regarding PTSD. Had trial counsel properly

investigated Mr. Thuesen's mental health condition, trial counsel would have known that Mr. Thuesen did not receive and appropriate diagnosis or treatment for his PTSD. *Wiggins*, 539 U.S. at 527 ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

369.     The central theme trial counsel could have presented during the guilt/innocence phase of Mr. Thuesen's trial was that Mr. Thuesen suffered through horrific trauma while serving in Iraq, and that those experiences caused Mr. Thuesen to develop PTSD. Mr. Thuesen's PTSD impacted every aspect of his life, and the onset of an acute PTSD event was directly related to Mr. Thuesen's crime. *See* Xenakis Decl., ¶¶ 34-40. Evidence of the acute PTSD episode was paramount to trial counsel's argument that Mr. Thuesen did not intend to kill Rachel and Travis, and was therefore not guilty of capital murder.

370.     One of the primary reasons that Mr. Thuesen suffered an acute PTSD event was that he had never received appropriate medical treatment. Trial counsel, however, failed to explain to the jury how abjectly the VA had failed Mr. Thuesen by neglecting to provide the necessary care for his condition.

371.     Trial counsel's failure to offer testimony to the jury showing that Mr. Thuesen was never diagnosed and properly treated for PTSD prejudiced his defense. This evidence would have impacted the jury's decision regarding Mr. Thuesen's guilt/innocence phase for multiple reasons.

372.     First, this evidence would have shown the jury that Thuesen was receiving only nominal care from the VA system. State Habeas Petition, Ex. 8 ¶ 23.

373.     Second, this testimony would have helped neutralize damaging testimony the State was able to elicit from Cannon and Dr. Carlo. During Ms. Cannon's testimony, the State suggested that in the days before the crime Mr. Thuesen did not appear to be in any distress. 45 RR at 108-

09. And during Dr. Carlo's testimony, the State targeted the symptoms of PTSD not reported in Dr. Carlo's records, suggesting that Mr. Thuesen may not have truly been suffering from PTSD at all. 45 RR at 31, 35. The history of Mr. Thuesen's reports to the VA of PTSD symptoms would have countered this suggestion by the State by making clear that while Mr. Thuesen had continuously struggling with PTSD, neither Dr. Carlo no anyone else at the VA had properly diagnosed Mr. Thuesen or provided adequate care for his PTSD. State Habeas Petition, Ex. 8 ¶¶ 23-25; Ex. 4 ¶ 13 ("The treatment [Mr. Thuesen] received . . . were designed to impact his suicidal thoughts and depression, and is not how I would treat PTSD.").

374.    Third, this evidence would have given needed support to the argument that PTSD—rather than simple jealousy—was the major factor behind Mr. Thuesen's behavior. As both Drs. Kopel and Xenakis opined—and could have testified, if called by trial counsel—people with PTSD can suffer PTSD crises cause by unwinding relationships. Xenakis Decl. ¶ 37, State Habeas Petition, Ex. 8 ¶ 27, 28. Had it heard the evidence, the jury would have seen a starkly different picture than the one that came out at trial—instead of a jealous, violent boyfriend, Mr. Thuesen's behavior was the sign of an ongoing mental health crisis, tragically ignored by the VA system. Instead of a disinterested, irresponsible patient, his declarations were a signal that he needed and was asking for help that he never received.

375.    As a result of trial counsel's ineffective assistance during the guilt/innocence phase of trial, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

376.    Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 7.

377.    During the state habeas proceedings, the state courts did not dispose of Mr.

Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the guilt/innocence phase of trial related to Claim 7, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

378.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about Mr. Thuesen's guilt or innocence.

### 5. Trial counsel failed to develop, prepare, or present testimony related to the PTSD recovery period and confabulations (State Habeas Claim 14).

379.    Trial counsel provided ineffective assistance when they failed to develop, prepare, and present testimony related to the PTSD recovery period and confabulations.

380.    In 2013, DSM-V reclassified PTSD from the category of anxiety disorders and into the "trauma and stressor-related disorders."

381.    Significantly, DSM-V recognized that PTSD can cause dissociative behavior. DSM-V 300.6 (F48.1) (attached as Ex. 11). Dissociative behavior means responding to trauma-related stimuli with dissociative symptoms (depersonalization or derealization) and associated emotional detachment. Depersonalization means "[e]xperiences of unreality, detachment, or being an outside observer with respect to one's thoughts, feelings, sensations, body, or actions (e.g., perceptual alterations, distorted sense of time, unreal or absent self, emotional and/or physical numbing)." *Id.* Derealization means "[e]xperiences of unreality or detachment with respect to surroundings (e.g., individuals or objects are experienced as unreal, dreamlike, foggy, lifeless, or visually distorted)." *Id.*

382.    Dissociative features may include having flashbacks to traumatic events; briefly losing touch with events going on around oneself (like daydreaming); blanking out or being unable to remember anything for a period of time; memory loss about certain events, people, information, or time periods; a distorted or blurred sense of reality; feeling disconnected or detached from your emotions; feeling that the world around you is unreal and distorted; feeling numb or distant from yourself and your surroundings; and having an altered sense of time and place. This dissociative behavior can be triggered by a PTSD crisis. Dissociative behavior may include involuntary behavior (such as training, habits, or instincts), flat affect, memory loss, and emotional detachment. It is generally short-term.

383.    Consistent with DSM-V, shortly after a PTSD event, a person suffering from PTSD could be expected to have a flat affect or otherwise seem emotionally detached from recent events. Xenakis Decl. ¶¶ 38-40.

384.    Similarly, during a PTSD incident, it is difficult to form and retrieve memories. Xenakis Decl. ¶ 32; State Habeas Petition, Ex. 8 ¶¶ 34, 38. Thus, a person suffering from PTSD could be expected to confabulate. Xenakis Decl. ¶ 41. Confabulation can involve gaps in memory, or it could involve filling in those gaps with misinterpreted, distorted, or imagined information which then seems true. Soldiers are trained to recover quickly from firefights, and to report immediately on what happened. This training can further suppress emotional affect and accuracy of reporting. Mr. Thuesen's lack of memory of the event is consistent with a PTSD crisis and sympathetic storm, which can also cause a flat affect. *See* Xenakis Decl. ¶¶ 35-43.

385.    Trial counsel knew, or should have known, that they needed to present critical evidence that their client was suffering from PTSD. That also meant they should *not* present witnesses who would undermine that PTSD defense. Instead, trial counsel presented a witness at

the guilt phase (Officer Jagielski) whose testimony significantly undermined the defense's PTSD theory; trial counsel failed to call at the guilt phase a witness (Janet Walker, not called until punishment phase) that they could and should have called to counter the State's position that Mr. Thuesen intended to kill Rachel; and trial counsel failed to rebut the testimony of another lay witness (Tabitha Foreman), whose testimony indicated that Mr. Thuesen lacked remorse, when in reality his flat affect was a product of his PTSD crisis.

386.    In their opening guilt/innocence phase argument, trial counsel told the jury that Mr. Thuesen suffered from a hodgepodge of mental illnesses—PTSD, depression, and Dependent Personality Disorder—and therefore did not have the requisite intent to be convicted of capital murder. 44 RR at 50-55. Moments later, the defense called their first guilt/innocence phase witness.

387.    The first witness the defense called during the guilt/innocence phase was City of College Station Police Officer Tom Jagielski, who testified that he saw nothing wrong, mentally, with Mr. Thuesen immediately following the crime.

388.    Jagielski was one of the police officers who responded to the Joiner's residence immediately after the shooting. Jagielski testified to the following: as he approached the Joiner house the garage door opened and Mr. Thuesen was there crouching next to Rachel; Mr. Thuesen showed his hands and laid in the grass as instructed; Mr. Thuesen was very cooperative with the officer; Mr. Thuesen was then transported to the police station. 44 RR at 55-58. Jagielski, who had training to assist people in mental health crises, testified that Mr. Thuesen had a "flat affect" and an "emotionally stone face." *Id.* at 67-69. Jagielski also testified that Mr. Thuesen cried, expressed concern for the victims, and did not appear to be angry or hostile. *Id.* at 70-75.

389.    This testimony falsely conveyed the impression that Mr. Thuesen was remorseless.

Competent, adequately prepared counsel would have been able to use such testimony as evidence that Mr. Thuesen was experiencing a mental health crisis. *See* Xenakis Decl. ¶¶ 35-40.

390.    On cross-examination, however, Jagielski testified that in his opinion as a certified health crisis officer Mr. Thuesen was *not* experiencing a mental health crisis that night, and that Mr. Thuesen appeared mentally competent, seemed to understand the consequences of his actions, and was not experiencing delusions or seeing things. Jagielski also testified that if you wanted to kill someone you would do it with a gun rather than a knife and that you would shoot someone multiple times as opposed to a single time—referring to Mr. Thuesen's shooting of the Joiners. 44 RR at 78. Jagielski also testified that Mr. Thuesen was crying like Jagielski's three-year-old granddaughter would after being scolded—as a way to get sympathy. *Id.* at 83.

391.    There is no strategic or reasonable explanation for trail counsel to call a witness like Jagielski, whose testimony would inflict such damage to their central defense theme; or be so unprepared to address the testimony in a way that was consistent with Mr. Thuesen's defense. The only explanation is that trial counsel was unprepared; they failed to prepare adequately and conduct the reasonable investigation that would have either flagged this witnesses' testimony as damaging or prepared them to counter or limit the damage.

392.    Jagielski's testimony was the exact opposite of what counsel intended to tell the jury, i.e., that Mr. Thuesen was experiencing a mental health episode and that, as a result, he could not have formed the intent required for capital murder. Instead, Jagielski testified that Mr. Thuesen did *not* appear to be experiencing a mental health crisis, that he appeared to be mentally competent, and that bringing a gun to the scene and shooting the individuals multiple times *demonstrated* intent to kill. In other words, Jagielski's testimony was unequivocally detrimental to Mr. Thuesen's case.

112

393.    Trial counsel never re-directed the witness regarding a lack of fear, flashback, hallucination, or anger. Instead, trial counsel minimized the impact of the defense's own witness by confirming that the officer did not know whether or not Mr. Thuesen was experiencing a mental health crisis at the time of the incident. 44 RR 88.

394.    Trial counsel's failure to develop, prepare, and present testimony related to Mr. Thuesen's PTSD recovery period and confabulations and their failure in calling Jagielski prejudiced Mr. Thuesen's defense.

395.    Trial counsel also failed to contradict damaging lay testimony about Mr. Thuesen's intent. Dr. Saunders testified at the guilt/innocence phase of trial that Mr. Thuesen told his friend Janet Walker that he was so mad at Rachel that he could shoot her. However, Janet Walker testified at the punishment phase that Mr. Thuesen never made such a comment to her. Trial counsel could, and should, have called Walker at the guilt/innocence phase of the trial to refute this alleged damaging statement.

396.    There is no reasonable strategy that supports trial counsel's decision to not call Walker at the guilt/innocence phase. The entire issue at guilt was whether Mr. Thuesen had the requisite intent to kill Rachel that would subject him to a conviction of capital murder. Trial counsel however, left unchecked the allegation that Mr. Thuesen told Walker that he thought about shooting Rachel. This false statement lent support to the State's theory that Mr. Thuesen went to Rachel's house intentionally to shoot her. Trial counsel knew that Walker could rebut this by clearly stating that Mr. Thuesen had never told her such a thing. Without reason, counsel chose not to call Walker at the guilt/innocence phase, where her testimony would have been important and relevant evidence for the jury to hear and take into account when evaluating guilt.

397.    Adding to the evidence that Mr. Thuesen acted with intent to kill, Rachel Joiner's

neighbor, Tabitha Foreman, testified that she saw Mr. Thuesen in the minutes after the murders. She testified that she saw his face clearly, and that he did not seem mad or angry. 38 RR 88-89. On redirect, she testified that the expression was "a look of no remorse." 38 RR 106.

398.    Although there is significant evidence that flat affect and lack of memory were additional symptoms of a PTSD crisis, those facts were actually used to support Mr. Thuesen's conviction, further cementing the misunderstanding and mishandling of Mr. Thuesen's PTSD at the guilt/innocence phase of trial.

399.    Trial counsel's decision to call Jagielski, failure to understand Jagielski's testimony in light of the PTSD defense, failure to rebut the impact of Foreman's testimony, and failure to call Walker at the guilt/innocence phase of the trial prejudiced Mr. Thuesen and was objectively deficient. The testimony should have showed that Mr. Thuesen's behavior immediately following the killings was consistent with a person in a PTSD crisis. *See* Xenakis Decl. ¶¶ 35-43. Instead, the jury was left with the impression that Mr. Thuesen was remorseless.

400.    Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 14.

401.    During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the guilt/innocence phase of trial related to Claim 14, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

402.    To the extent that the Court finds this claim was not exhausted, it is subject to

review in this proceeding. There is cause and prejudice for the failure to properly present the claim. Alternatively, allowing the conviction to stand in light of the improperly presented evidence and failure of trial counsel will result in a miscarriage of justice if this claim is not reviewed. *See Murray v. Carrier*, 477 U.S. 478, 492-96 (1986).

403.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about Mr. Thuesen's guilt or innocence.

### 6. Trial counsel failed to recall Patricia Thuesen at trial to testify about Mr. Thuesen's family history of mental health conditions. (State Habeas Claim 15).

404.    Trial counsel knew that Mr. Thuesen's mother, Patricia Thuesen, was available and willing to testify about the history of mental health challenges in the Thuesen family. This testimony would have further established Mr. Thuesen's PTSD defense and supported a jury conclusion that Mr. Thuesen did not form the requisite intent to be guilty of capital murder. Instead, trial counsel failed to call Mrs. Thuesen, leaving the jury without material evidence about Mr. Thuesen's mental health, the central issue for the defense.

405.    Trial counsel actually moved to call Mrs. Thuesen to testify on the Thuesen family mental health history. Before Mrs. Thuesen's guilt-phase testimony about the Thuesen family history of mental illness, the State objected on relevance grounds. 46 RR at 92-93. In response, trial counsel argued that Mr. Thuesen's family had an "incredible, severe history of mental illness," and the evidence was relevant as Dr. Saunders relied upon it when coming to his conclusions about Mr. Thuesen's own mental health. 46 RR at 93-94; *accord* Xenakis Decl. ¶¶ 44-46.

406.    Trial counsel proffered what Mrs. Thuesen would testify to: that Mrs. Thuesen's mother was an alcoholic; that Mrs. Thuesen's father did not live with the family and her visits with him were monitored by her grandmother; that Mrs. Thuesen's father showed signs of depression;

that Mrs. Thuesen's brother, George, attended a state school, showed signs of depression throughout his life, and was at that time homeless and living somewhere in the Corpus Christi area; that Mrs. Thuesen's half-sister, Lisa, also showed signs of depression and had been admitted to a psychiatric hospital; that Mrs. Thuesen's daughter, Michelle, also spent time in a psychiatric hospital; and that Mrs. Thuesen's mother-in-law showed signs of depression and alcoholism. 46 RR at 108-12.

407.    After hearing argument, 46 RR at 107, the court sustained the State's objection "until Dr. Saunders testifies." *Id.* at 107-08, 112.

408.    Dr. Saunders's testimony unequivocally laid the foundation for Mrs. Thuesen's testimony and primed the jury to understand its relevance. He testified that there is a genetic component to mental health, and that people with first or second-degree relatives with mental health conditions have a higher degree of suffering themselves from such conditions—and then linked that to Mr. Thuesen's own family history of mental health conditions (which he had read about). 47 RR at 50-53; *accord* Xenakis Decl. ¶¶ 44-46.

409.    Shortly after Dr. Saunders offered his testimony, the court ruled that "the testimony of Mrs. Thuesen, the mother, regarding mental illness of her family members is now relevant and admissible." 47 RR at 120. Inexplicably, however, trial counsel never recalled Mrs. Thuesen or presented this evidence to the jury.

410.    In light of their initial attempt to have Mrs. Thuesen testify regarding the history of mental health challenges members of Thuesen family have faced, and with knowledge of Dr. Saunders's opinion that a family history of mental health were more likely to suffer from mental health conditions, trial counsel knew or should have known that Mrs. Thuesen's testimony was critical to Mr. Thuesen's defense at the guilt/innocence phase of the trial.

411.     Trial counsel's failure to call Mrs. Thuesen was objectively deficient. Trial counsel inexplicably failed to recall Mrs. Thuesen after Dr. Saunders testified. As a result, she never presented critically important testimony about her family's struggles with mental health. 46 RR at 130-49.

412.     Trial counsel's decision not to call Mrs. Thuesen to testify on this point was unreasonable and could not have been strategic. Given Dr. Saunders's testimony that family history of mental health conditions was a strong predictor of whether an individual was at risk of developing a mental health condition, any reasonable counsel would have known that it was critical to develop testimony regarding the history of mental health conditions faced by Mr. Thuesen's family.

413.     Trial counsel's failure to offer Mrs. Thuesen's testimony was unreasonable and deficient.

414.     Mr. Thuesen was prejudiced by trial counsel's failure to offer this testimony.

415.     Evidence of Mr. Thuesen's family history of mental health conditions was relevant as it formed the basis, at least in part, for Dr. Saunders's testimony that Mr. Thuesen suffered from Dependent Personality Disorder and depression, both of which could have been the result of multi-generational history of similar mental health conditions. The court even agreed with counsel that the evidence was relevant following Dr. Saunders's testimony.

416.      It is reasonably probable that had the jury heard this evidence directly from Patricia Thuesen, the jury would have given more credibility to Dr. Saunders's intent testimony. Had trial counsel not neglected to offer Mrs. Thuesen's testimony on this issue, the jury would have had further contextualization for Dr. Saunders's opinions that Mr. Thuesen suffered from a variety of mental health conditions and may have reconsidered whether those conditions prevented him from

117

forming the intent necessary to be held criminally liable.

417.     As it was presented, the jury was left without a valuable piece of information bolstering the defense that Mr. Thuesen suffered from a mental health condition.

418.     As a result of trial counsel's ineffective guilt/innocence phase representation in failing to elicit testimony from Mrs. Thuesen regarding the family mental-health history, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

419.     Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 15.

420.     During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the guilt/innocence phase of trial related to Claim 15, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

421.     As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about Mr. Thuesen's guilt or innocence.

### B.  Trial counsel provided ineffective assistance during jury selection (State Habeas Claims 11 and 13).

422.     "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1960); *see also Franklin v. State*, 138 S.W.3d 351, 354 (Tex. Crim. App. 2004) ("The Sixth Amendment guarantees the right

to a trial before an impartial jury"). To be considered an impartial jury in a capital case, jurors must not only meet typical standards regarding biases and prejudices; they must also be able to consider whether evidence presented by the defense is mitigating. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) ("A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.").

423.    Trial counsel provided ineffective assistance during the jury selection process as they failed to educate the jury and prime them to receive expert testimony regarding PTSD and its effects on Mr. Thuesen's behavior and actions, failed to object to the State's excusal for cause of prospective juror Burroughs, failed to use any of their peremptory challenges on jurors Bryant and Brynildsen, and failed to object to the State's use of a strike on potential juror Brownlee. Trial counsel's errors prejudiced Mr. Thuesen's rights and rendered his conviction and death sentence unlawfully and unconstitutionally imposed, in violation of the Sixth Amendment.

   **1.    Trial counsel's failure to educate the prospective jurors during voir dire concerning "common sense" amounted to deficient performance that prejudiced Mr. Thuesen.**

424.    During voir dire, the State (properly) told potential jurors that they should not leave their common sense at the door. 6 RR at 97-98. However, due to their ignorance about PTSD, trial counsel missed a crucial opportunity to educate the jurors (and even to strike jurors who resisted crediting expert witness testimony).

425.    For example, the State explained how one can infer intent to injure if a person throws an object toward other people. The nature of the object (baseball or pen) and nature of the throw (overhand baseball-pitch style, or underhand toss) can inform the juror of the thrower's intent. See 6 RR at 101-102.

426.    As discussed above, key to Mr. Thuesen's guilt-phase defense was the concept that

PTSD can destroy or diminish intent. For example, in the context of the enhanced fight-or-flight response that arises in a PTSD crisis, a person may not be able to think rationally. Xenakis Decl. ¶ 32.

427.    This consequence of a PTSD crisis is a subject for expert testimony. This consequence is not a part of common sense. It is not something to be inferred, as the State suggested. *See, e.g., Ake v. Oklahoma*, 470 U.S. 68, 79-81 (1986) (noting the importance of expert testimony on psychiatric issues in criminal cases).

428.    Trial counsel made no effort during voir dire to educate the jurors or to prime them to consider meaningfully expert testimony regarding Mr. Thuesen's diminished intent that may not "fit" with his actions the night of the crime.

429.    Trial counsel's failure to educate the jury concerning the State's "common sense instruction" was objectively unreasonable and amounted to deficient performance because the public does not have "common sense" about this aspect of PTSD. Xenakis Decl. ¶ 34. The "intentionally or knowingly" element of the charge against Mr. Thuesen required the State to establish his intent. But, as trial counsel knew that PTSD and its effect on behavior and actions would be a central theme at trial, and because PTSD could destroy or diminish intent (and make rational thought impossible), it was objectively deficient for trial counsel to not address the issue.

430.    Trial counsel's failure to educate the jury concerning the State's "common sense instruction" prejudiced Mr. Thuesen. Because the burden of proof was on the State to establish Mr. Thuesen's *mens rea* at the time of the killings, and because trial counsel knew that Mr. Thuesen's PTSD could destroy or diminish intent (and make rational thought impossible), Mr. Thuesen was prejudiced by trial counsel's complete failure to mitigate the State's simplistic and misleading suggestion that the jurors could evaluate Mr. Thuesen's intent using their common

sense.

### 2. Trial counsel's failure to object to the removal of prospective juror Burroughs during voir dire amounted to deficient performance that prejudiced Mr. Thuesen.

431.    Prospective juror Burroughs, a long-time resident of Brazos County, told counsel that he was the father of two sons and husband to a chaplain who worked at a long-term acute care unit ministering to people who were near death. 22 RR at 6-10. Burroughs himself worked with young children. *Id.* at 13. When asked about one of his favorite movies, "The Green Mile," Burroughs said he liked the movie because it made him think that "[t]hings aren't always as they seem." 22 RR at 10-11.

432.    Burroughs himself was a former marine corporal, serving in the military for four years. When asked about his experience in the Marines, Burroughs said he learned to become a man there, to work hard, to do a good job, and to treat everyone fairly. 22 RR at 11-12. Burroughs also testified that he was in combat and that combat "changes you." *Id.* at 24. When asked by the State whether he suffered any ill effects from serving in the military, Burroughs replied, "I slept in the closet" and that "it's not a good idea to surprise me." *Id.* at 30-31.

433.    Burroughs also stated that "[w]e don't do a very good job of decompressing people who come back from war." 22 RR at 32. According to Burroughs, people handle the return in different ways—drinking, taking drugs, chasing women, or getting divorced—and "we're not very good at taking the time we need to decompress." *Id.* Burroughs also stated that he believes soldiers returning from the war needed to abide by the same rules as everyone else in society. *Id.* at 31-34.

434.    One of Burroughs's children served as a Marine in Iraq in the early 2000s. 22 RR at 16, 29. When his son returned home, he "tended to run wild," taking him a "while to get [] settled down," which he eventually did. *Id.* at 17-18, 29-30.

435.    Burroughs stated in voir dire that "taking a life is something that should not be done

unless there really is no other option," but also stated that if chosen to be a juror, he would be able to give the death penalty if he was "damn sure" it was warranted. 22 RR at 24-26. Burroughs also announced that he would not be hasty in his decision whether to convict or sentence someone to death. *Id.* at 25-26.

436.    Burroughs also answered questions about his two children who had had trouble with the law (one had two DWIs and the other possession of marijuana). Burroughs offered that both of his children had been represented by defense attorney Esparza. Burroughs also offered that Esparza was a good lawyer. 22 RR at 15-21. However, when asked whether Burroughs's prior relationship with Esparza would put Esparza "a step ahead" of the prosecution in terms of credibility, Burroughs answered "no" and that he would listen to the evidence presented by both sides. *Id.* at 22-23.

437.    At the conclusion of the State's questioning, the State moved to excuse Burroughs for cause. Trial counsel never questioned Burroughs and did not object to his removal. 22 RR at 35.

438.    There was no reason for trial counsel to fail to object to the State's removal of Burroughs and every reason to empanel Burroughs. Burroughs was precisely the type of juror that would have listen to and been receptive to Mr. Thuesen's defense. Burroughs was a former Marine who understood that one could come back changed from serving in the military. 22 RR at 24. Burroughs himself came home a changed person, admitting that he did not like to be approached from behind and that he slept in the closet when he first arrived home from the war. *Id.* at 30-31. Further, Burroughs's son had returned from Iraq with his own problem, excessive drinking. *Id.* at 17, 29-30. Burroughs also understood that society did not do enough to ready soldiers for their return to civilian life. *Id.* at 32.

439.    In addition, Burroughs demonstrated in his voir dire answers that he would be a person who closely listened to and weighed all the evidence at trial. Burroughs stated that a life was not something that should be taken unless he was "damn sure" it was warranted. Burroughs also stated that he would not be hasty in his decision in either phase of the trial—whether to convict Mr. Thuesen or sentence him to death. 22 RR at 24-26.

440.    On the other hand, there was nothing in Burroughs's answers that warranted his removal for cause. *See* Tex. Code Crim. Proc. art. 35.16. Burroughs was clear that he would listen to all the evidence and that if he was chosen as a juror he would be prepared to give the death penalty if it was warranted. 22 RR at 24-26. And with regard to his sons having previously been represented by Esparza, Burroughs made it very clear that the prior relationship he had with her would not in any way interfere with his job as a juror. Further, Burroughs was clear that even people who had served their country in times of war had to follow the law when they returned from battle.

441.    Trial counsel's failure to object to the removal of Burroughs for cause was deficient. Also deficient was counsel's failure to have the State put on the record the reason for the removal for cause—trial counsel could have moved to rehabilitate Burroughs, if necessary.

442.    By failing to object to Burroughs' removal for cause—and correspondingly foregoing the opportunity to rehabilitate Burroughs—trial counsel deprived Mr. Thuesen of a juror who would have been fair, impartial, and who would have considered the evidence Mr. Thuesen presented

### 3.    Trial counsel's failure to strike juror Bryant during voir dire amounted to deficient performance that prejudiced Mr. Thuesen.

443.    Trial counsel was deficient for failing to use one of their peremptory challenges on juror Bryant, who was one of the twelve jurors who ultimately passed judgment on Mr. Thuesen.

444.     Juror Bryant, a divorced mother of two, wrote in her questionnaire that she had "dated a violent tempered man. He was violent towards police when called to have him removed from my house." Ex. 7 at 8. When asked to talk about that during voir dire, Bryant explained the following: she and the man had been in a relationship for about six or seven years; the man was an alcoholic and perhaps bipolar; when he drank he became mean; once the man punched her in the face and knocked her out; she tried to end the relationship a number of times but the man kept returning to Bryant's home; he was finally escorted out of the home by the police. 27 RR at 8-11.

445.     Bryant also stated that she believed her former boyfriend suffered from mental illness, but she stated that his illness did not excuse his behavior. 27 RR at 65-66. Bryant had also sought mental health treatment herself due to the stress of the situation. Ex. 7 at 13.

446.     At the conclusion of Bryant's voir dire, neither side raised a challenge and Bryant was qualified to sit on Mr. Thuesen's jury, despite her clear prejudice against men who may be violent as a result of mental illness. 27 RR at 70.

447.     Trial counsel should have used one of their peremptory challenges against Bryant. Bryant was involved in a relationship that ended in domestic violence. The relationship culminated with the police forcibly removing the boyfriend from Bryant's home. Bryant's former boyfriend knocked her out with a punch to the face, was a drinker, and was mean. And even though Bryant believed that her former boyfriend suffered from mental illness, she did not think that illness was an excuse for his behavior.

448.     Trial counsel knew that the State intended to introduce evidence that Mr. Thuesen was violent to not only Rachel Joiner but to two former girlfriends, Leah Mathis and Amanda Ward. The fact that Bryant was involved in a situation in which she herself was a victim should have been a red flag to trial counsel that Bryant was not someone that they could afford to have sit

as a juror determining the fate of their client. Trial counsel's failure to use one of their peremptory challenges on Bryant amounted to deficient performance that prejudiced Mr. Thuesen's case.

### 4. Trial counsel's failure to strike juror Brynildsen during voir dire amounted to deficient performance that prejudiced Mr. Thuesen.

449.   Similarly, trial counsel erred in not using a peremptory challenge on juror Brynildsen (who ended up being the juror foreperson) based on Brynildsen's experience with domestic violence and Brynildsen's military experience.

450.   The first red flag for trial counsel should have been Brynildsen's daughter's "not-so-good divorce." 17 RR at 72. According to Brynildsen, his daughter's former husband, who he referred to as a "psychopath," tried to take out a contract against the life of the daughter and Brynildsen's wife. *Id*. at 80; Ex. 5 at 8. Brynildsen went on to describe the problems that his daughter continued to have with the former husband, including the fact he was a controlling person and extremely mentally ill. That same daughter was also stalked by a man who went into her apartment, unauthorized, and stole her underwear. 17 RR at 81-84.

451.   With regard to Brynildsen's own prior military experience, counsel also should have known to use one of their peremptory challenges. During voir dire, Brynildsen stated that he had seen combat while serving in Vietnam; however, he never experienced any negative effects. 17 RR at 76. Brynildsen also stated that he had never known anyone returning from combat who had been violent towards family or loved ones. *Id.* Brynildsen also testified that if someone came back from battle with mental illness, that mental illness would not lessen their responsibility for their actions. *Id.* at 79.

452.   Brynildsen also had a negative take on trial experts, based upon his daughter's divorce. Brynildsen believed that his daughter's ex-husband got visitation with his children because he paid off the expert psychiatrist to say that the former husband was not mentally ill. 17

RR at 118-19. According to Brynildsen, "for money, people, in my judgment, you can always find an expert that you can buy that will present a case in your [favor]." 17 RR at 119.

453.     It was clear, or should have been clear, to trial counsel that they need to strike Brynildsen. Brynildsen would not be inclined to listen to evidence regarding Mr. Thuesen's PTSD—expert or otherwise—as it related to diminishing Mr. Thuesen's intent and moral culpability. Nor would Brynildsen be one that would have any understanding of Mr. Thuesen and his prior relationships with women, based on Brynildsen's daughter's negative history with her former husband.

454.     Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 13.

455.     During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the guilt/innocence phase of trial related to Claim 13, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

456.     As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about Mr. Thuesen's guilt or innocence.

> **5.   Trial counsel failed to object to the State's peremptory strike of prospective juror Brownlee based on gender.**

457.     Trial counsel provided ineffective assistance when they failed to object to the State's peremptory strike of prospective juror Brownlee based on gender.

458.    When the State exercises its peremptory strikes based on stereotypes about historically underrepresented classes of citizens, it causes profound harm to both the defendant and the stricken juror, and the criminal justice system—adjudication by a fair and representative jury—to its foundations. *See Batson v. Kentucky*, 476 U.S. 79, 86-87 (1986). By failing to object to this injustice before the jury was impaneled, trial counsel deprived Mr. Thuesen of effective assistance of counsel. Mr. Thuesen is therefore entitled to reversal of his conviction and a new trial.

459.    In *Batson*, the Court laid out a three-step analytical process for raising a claim of discrimination in the State's exercise of peremptory strikes. *Batson*, 476 U.S. at 93-94. First, the defendant must make out a prima facie case for discrimination by demonstrating that "the totality of the facts gives rise to an inference of discriminatory purpose." *Id*. at 94. The burden then shifts to the State to provide a plausible race-neutral account for the motivation(s) behind the strike. *Id*. If this can be done, "the trial court then will have the duty to determine if the defendant has established purposeful discrimination" in the State's use of its peremptory strikes. *Id*. at 98; *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008); *Miller-El v. Dretke II*, 545 U.S. 231, 239 (2005); *Hernandez v. New York*, 500 U.S. 352, 363 (1991).

460.    This prohibition on the exercise of discriminatory peremptory strikes extends to strikes grounded in racial stereotypes as well as gender stereotypes. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994). The *J.E.B.* Court emphasized the fact that oftentimes State-sponsored discrimination occurs when the State adheres to "'archaic and overbroad' generalizations about gender." *J.E.B.*, 511 U.S. at 135 (quoting *Schlessinger v. Ballard*, 419 U.S. 498, 506-07 (1975)). The Court furthermore warned that "[s]triking individual jurors on the assumption that they hold particular views simply because of their gender is 'practically a brand

upon them, affixed by the law, an assertion of their inferiority.'" *Id*. at 142 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1880)).

461.    However, a defendant whose trial was tainted by the State's violation of *Batson* and its progeny need not be a member of the same class or group as the stricken juror to seek judicial relief. See *Powers v. Ohio*, 499 U.S. 400, 402 (1991); *Mead v. State*, 819 S.W.2d 869, 870 (Tex. Crim. App. 1991). To the contrary, "both the excluded juror and the criminal defendant have a common interest in eliminating . . . discrimination from the courtroom." *Powers*, 499 U.S. 400 at 413. Consequently, a criminal defendant whose jury-selection process was corrupted by the State's use of discriminatory strikes is imbued with standing, regardless of his race or gender, to object to the prosecution's impermissible use of its peremptory challenges. *See id*. at 416; *see also* J.E.B., 511 U.S. at 129.

462.    Finally, the State's discriminatory use of a peremptory strike with respect to even a single potential juror invalidates the entire jury selection process, and in turn necessitates that the aggrieved defendant receive a new trial. *See Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) ("The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'"). A corollary is that the State may not claim, based on its use of less than the maximum number of allowed peremptory strikes, that its failure to strike certain minorities demonstrates *non-*discrimination.

463.    Mr. Thuesen's case began in earnest on the morning of Monday, March 29, 2010, when the full venire panel was sworn in, jury questionnaires were filled out, and preliminary excusals were made. 6 RR at 8, 47, 73. Individual voir dire did not begin until a week and a half later, on Thursday, April 8. 9 RR at 34. The parties and the court agreed on the following procedure for selecting a jury: after each potential juror had been interviewed by each side, the State, then

trial counsel, would raise any challenges for cause. If the juror was not excusable for cause, either side could, at that point, exercise a peremptory strike to excuse the juror; however, if neither side exercised a strike, the potential juror would be accepted as a juror in Mr. Thuesen's trial.

464.     More than 100 venire members were ultimately interviewed before a jury of twelve jurors and two alternates were empaneled. 36 RR at 91. In the process of reaching an agreement on the composition of this jury, both the State and trial counsel were allowed up to fifteen peremptory strikes. 6 RR at 86. Of these fifteen available strikes, the State used ten. 10 RR at 55; 14 RR at 164; 15 RR at 57; 18 RR at 75; 20 RR at 99; 23 RR at 78; 28 RR at 48; 30 RR at 126; 31 RR at 132; 33 RR at 33. Trial counsel used fifteen. 11 RR at 98; 13 RR at 99, 158; 14 RR at 102; 16 RR at 161; 17 RR at 68, 217; 21 RR at 73; 25 RR at 78, 151; 26 RR at 78; 28 RR at 141; 31 RR at 93; 32 RR at 68; 35 RR at 130.

465.     Of the State's ten peremptory strikes, eight—80 percent—were used against women. 14 RR at 164; 15 RR at 57; 18 RR at 75; 20 RR at 99; 23 RR at 78; 30 RR at 126; 31 RR at 132; 33 RR at 33. The jury, including alternates, included six men and eight women.

466.     Prospective juror Brownlee was the 35th potential juror on the venire panel. 20 RR at 31. After acknowledging her oath to answer all voir dire questions truthfully, Brownlee, an African-American hospital medication aide, expressed her belief that she could be open-minded and consider all the evidence presented to her; that she could take her evidence solely from the witness stand; and that she would be willing to fairly deliberate with her fellow jurors. In short, Brownlee believed she could take the oath to be a fair, honest, and obedient juror. 20 RR at 31-33.

467.     Brownlee's questionnaire revealed that she was related to or closely acquainted with a number of individuals "accused, arrested, or convicted . . . of a crime above the level of a traffic ticket." Ex. 8 at 6. The individuals in question were: (i) Brownlee's ex-husband and the

father of her children, for aggravated robbery; (ii) Brownlee's son, for burglary of habitation (whose case was pending at the time of voir dire); and (iii) Brownlee's brother, for a drug-related offense. *Id.*; 20 RR at 40-41. In spite of the fact that the Brazos County District Attorney's Office might prosecute her son, Brownlee was adamant that her ability to be fair would be unaffected by her son's case: "if you do the crime," Brownlee observed, "you got to do the time." 20 RR at 40-42. Brownlee told the prosecution that she did not believe the criminal justice system to be unfair—to the contrary, Brownlee expressed her view that the Brazos County criminal justice system was "fine." 20 RR at 42.

468.    When asked, on a scale of one to ten, how frequently she thought the death penalty should be imposed in cases of capital murder, Brownlee answered "9"—with ten being equivalent to "every time." Ex. 8 at 19.

469.    The State moved to exercise one of its peremptory challenges against her. 20 RR at 99. This was only the fifth peremptory exercised by the State, and already the fourth exercised against a female prospective juror. 10 RR at 55; 14 RR at 164; 15 RR at 57; 18 RR at 75; 20 RR at 99. Because Brownlee was the first Black prospective juror struck by the State, trial counsel raised a *Batson* objection to the State's use of a peremptory against her. 20 RR at 99, 102. The State gave four supposedly race-neutral reasons for striking Brownlee: (i) Brownlee had various family members and acquaintances either in jail or soon to be on trial; (ii) Brownlee expressed a view that life without parole is a "severe" punishment; (iii) Brownlee seemed compassionate, as evidenced in part by her nurse-like occupation; and (iv) Brownlee "teared up" at various points in the voir dire process. 20 RR at 104-06. When the State finished its proffer for Brownlee's strike, the court held that trial counsel had failed to prove purposeful racial discrimination, upholding the

State's challenge.[11] 20 RR at 106.

470.    Prevailing professional norms at the time of Mr. Thuesen's trial mandated that counsel has the duty of "raising . . . any appropriate issues concerning the method by which the jury panel was selected." ABA Criminal Justice Standards for the Defense Function, Standard 4-7.3(a) (4th ed. 2017). Further, the specific failure to make an objection can be the basis of deficient performance. *See, e.g.*, *Moawad v. Anderson*, 143 F.3d 942, 946 (5th Cir. 1998) (failure to object to faulty jury instruction can constitute deficient performance); *Lyons v. McCotter*, 770 F.2d 529, 535 (5th Cir. 1985) (failure to object to the introduction of prior- conviction evidence can constitute deficient performance).

471.    Though they had the opportunity,[12] trial counsel did not raise a *Batson-J.E.B.* objection to the State's gender discrimination after the jury was selected and before it was sworn. But it is apparent from the record, based on a comparison of the State's explanation with the responses of similar male prospective jurors, that the State's explanation was merely a pretext for purposeful gender discrimination. Thus, trial counsel's failure to object to the State's purposeful gender discrimination constituted deficient performance.

472.    To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

---

[11] Mr. Thuesen's trial counsel lodged its initial *Batson* objection with a view to ferreting out the State's *racial* discrimination in striking Brownlee, and the State may be presumed to have responded to this specific objection. But if the State were truly exercising its peremptory strike against Brownlee without regard to her race *and* her gender, then its race-neutral explanation for her removal must also serve as a gender-neutral explanation.

[12] In Texas, counsel may raise *Batson* objections until the jury is empaneled—that is, until it has been selected *and sworn. See, e.g.*, *Rousseau v. State*, 824 S.W.2d 579, 582 (Tex. Crim. App. 1992). Thus, trial counsel had the opportunity to object to the State's gender discrimination until the jury was sworn on May 10, 2010. 38 RR at 18.)

different." *Strickland*, 466 U.S. at 694. A "reasonable probability," in turn, is "a probability sufficient to undermine confidence in [the] outcome." *Porter*, 130 S. Ct. at 455-56 (quoting *Strickland*, 466 U.S. at 693-94). While a petitioner must demonstrate that "the likelihood of a different result [is] substantial, [and] not just conceivable," *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011), he need not show that counsel's deficient conduct "more likely than not altered the outcome" in his case, *Strickland*, 466 U.S. at 693—but, again, only that there is a "reasonable probability" that counsel's deficient performance altered the outcome.

473.    Comparison of the State's explanation for Brownlee's strike with the responses of similar male prospective jurors reveals that that explanation was merely a pretext for purposeful gender discrimination. Furthermore, the glaring nature of these similarities establishes that there is *at least* a reasonable probability that the failure to object to the State's discrimination altered the outcome of Mr. Thuesen's trial.

474.    Prospective juror Miller was the 48th prospective juror on the venire panel. 24 RR at 122. Based on his responses to the juror questionnaire and his answers on individual voir dire, he was accepted as a juror by the State and trial counsel, and ultimately served in that capacity in Mr. Thuesen's capital murder trial. 24 RR at 189.

475.    A review of Miller's juror questionnaire reveals the following profile: at the time of voir dire, Miller, who listed his race as Hispanic, was twenty-seven years old and working as a pharmacy technician. Ex. 6 at 2. Like Brownlee, Miller had close relatives who had serious run-ins with the criminal justice system; both his father and his uncle had been arrested and imprisoned for drug-related offenses. *Id.* at 6. Nevertheless, like Brownlee, Miller felt the criminal justice system "works well most of the time." *Id.* at 7. Unlike Brownlee—who gave herself a death penalty rate of "9"—Miller listed himself as a "5" on the "death penalty scale," with "10" being the most

132

State-friendly response. *Id.* at 19.

476.    In individual questioning, Miller talked about some of his duties as a pharmacy technician, which primarily included helping patients receive their medications. 24 RR at 126. While this job description was remarkably similar to Brownlee's, the State, arguably because of the gender difference between Miller and Brownlee, was not apparently concerned with any sort of occupational "compassion." However, any question about whether Miller was compassionate should have been resolved for the State when Miller responded that he would spare Mr. Thuesen's life if he found there to be even a single significant piece of mitigating evidence. 24 RR at 166. Finally, though the State emphasized that one of its chief reasons for striking Brownlee was her acknowledgment that life without parole is a "severe" punishment, it declined to ask Miller whether he shared this view.

477.    A comparison of the State's treatment of Brownlee with the State's treatment of Miller provides compelling evidence that the State was engaging in purposeful gender-discrimination when it peremptorily struck Brownlee.

478.    The discrepancy in treatment, despite the similarity of qualification, of these two potential jurors is explicable only on account of Brownlee's gender. Given that the State had, at that time it struck Brownlee, exercised four of its five peremptory strikes against women (and would go on to exercise eight of its total ten against woman), it is apparent that the State's proffered explanation for striking Brownlee was mere pretext for purposefully removing yet another woman from the jury.

479.    Prospective juror Smith was the 50th prospective juror on the venire panel. 25 RR at 79. While the State deemed Smith acceptable and wanted him to be seated as a juror for Mr. Thuesen's capital-murder trial, he was challenged for cause, and ultimately peremptorily struck,

by Mr. Thuesen's trial counsel. 25 RR at 140, 150.

480.    A comparison of the State's treatment of Brownlee with the State's treatment of Smith provides strong evidence that the State was engaging in purposeful gender-discrimination when it peremptorily struck Brownlee. Like Brownlee, Smith indicated on his questionnaire that an acquaintance of his had a drug related criminal case pending against him. The State never asked Smith about this aspect of his questionnaire; it asked Brownlee to speak at length about her family's run-ins with the law. Also like Brownlee, Smith indicated that, in spite of his acquaintance's experience with the law, he [Smith] considered the criminal justice system to be "fair." But, as with prospective juror Miller, the State never asked Smith whether he thought life without parole would be a "severe" punishment—even though this was alleged as an important reason why Brownlee was struck.

481.    Smith was furthermore engaged in a number of activities that evidenced the kind of "compassion" that the State disliked in Brownlee. As indicated on his questionnaire, Smith participated in a program called "Save Our Streets," ("SOS") which is dedicated to ministering and caring for "gang[] [members], drug addicts, and those trapped in poverty." Save Our Streets Ministries, http://saveourstreetsministries.org/vision.html. At the time of voir dire, Smith served as a mentor at SOS, and occasionally led Bible studies for underprivileged men. 25 RR at 86-87. Despite the multitude of similarities between Brownlee and Smith, Brownlee was peremptorily struck by the State, and Smith was not. Given that, at the time it accepted Smith as a juror, the State had exercised five out of six of its peremptory challenges against females, this disparity serves as further proof that the State's explanation for its strike of Brownlee was mere pretext for purposeful discrimination against women in the venire.

482.    Prospective juror Kilgore was the 53rd prospective juror on the venire panel. 26 RR

at 7. While the State deemed him acceptable, he was challenged for cause and ultimately peremptorily struck by Mr. Thuesen's trial counsel. 26 RR at 77-78.

483.    Still, a comparison of the State's treatment of Brownlee with the State's treatment of Kilgore provides strong evidence that the State was engaging in purposeful gender-discrimination when it peremptorily struck Brownlee. Like Brownlee, Kilgore indicated on his questionnaire that certain close family members and friends had served time in prison. Ex. 3 at 6. Although it asked Brownlee to go in-depth as to her family's experience with the criminal justice system, and listed that as a supposedly race-neutral reason for striking Brownlee, the State never asked Kilgore to comment on this aspect of his questionnaire. Also like Brownlee, Kilgore indicated that, in spite of his family and friends' experiences with the law, he considered the criminal justice system to be "the best system," in spite of its "flaws." *Id.* at 7. As with prospective jurors Miller and Smith, the State never asked Kilgore whether he thought of life without parole as a "severe" punishment—even though it had claimed that this was an important consideration in Brownlee's strike.

484.    Despite the strong similarities between Kilgore and Brownlee, Kilgore was accepted by the State, and Brownlee was struck. Given that, at the time it accepted Kilgore as a juror, the State had exercised five out of six of its peremptory challenges against females, this difference in treatment further evidences the fact that the State's explanation for Brownlee's strike was no more than pretext for purposeful discrimination against women in the venire.

485.    Prospective juror Anderson was the 87th prospective juror on the venire panel. 32 RR at 4. While the State deemed him acceptable and was ready to have him seated as a juror in Mr. Thuesen's capital-murder trial, he was ultimately peremptorily struck by trial counsel. 32 RR at 68.

486.    Still, a comparison of the State's treatment of Brownlee with the State's treatment of Anderson also reveals that the State was engaging in purposeful gender-discrimination when it peremptorily struck Brownlee. Similar to Brownlee, Anderson indicated on his questionnaire that his best friend had been convicted of, and had served time for, theft. Ex. 9 at 6. Although it asked Brownlee to go in-depth as to her family's experience with the criminal justice system, and listed that as a supposedly race- neutral reason for striking Brownlee, the State only asked two questions about Anderson's friend's experience. 32 RR at 9-10. Neither of these questions explored Anderson's views of the prosecutorial process as a result of his friend's incarceration, but instead focused on his friend's response to incarceration. 32 RR at 9-10.

487.    As with Brownlee, trial counsel was able to elicit on cross-examination that Anderson considered life without parole to be "as bad [as] a sentence of death." 32 RR at 38. Unlike Brownlee, Anderson expressed this view in his own words, and not merely as a one-word response to counsel's pointed questions. 32 RR at 38. Indeed, Anderson went further to express tentative agreement with the notion that life without parole is harsher than the death penalty—a defense-friendly position that Brownlee did not even come close to endorsing. 32 RR at 38. And while the State was alarmed by Brownlee's views on the harshness of the death penalty, it was evidently unconcerned with Anderson's very similar (arguably even more defense-friendly) observations.

488.    In addition, Anderson listed himself as an "8" on the death penalty rate scale—a score lower than Brownlee's "9" in terms of State-friendliness—and was accepted. Anderson even admitted that, after hearing the lawyers explain the law of capital punishment, he considered himself to be lower than an "8" on the death penalty rate scale (but "still . . . above 5"). 32 RR at 61; Ex. 9 at 19.

489.    Despite the strong similarities between Anderson and Brownlee—and even several indications that Anderson was more defense-friendly than Brownlee— Anderson was accepted by the State, and Brownlee was struck. Given that, at the time it accepted Anderson as a juror, the State had exercised seven out of nine of its peremptory challenges against females, this difference in treatment further evidences the fact that the State's explanation for Brownlee's strike was no more than pretext for purposeful discrimination against women in the venire.

490.    Prospective juror Smith was the 97th prospective juror on the venire panel. 36 RR at 5. Like prospective juror Miller, he was accepted by the State and trial counsel, and ultimately served as an alternate juror in Mr. Thuesen's capital murder trial. 36 RR at 61.

491.    A comparison of the State's treatment of Brownlee with the State's treatment of Smith reveals that the State was engaging in purposeful gender-discrimination when it peremptorily struck Brownlee. Similar to Brownlee, Smith indicated on his questionnaire that several close family members had been convicted of, and had served time for, criminal offenses. 36 RR at 13. Specifically, Smith's uncle pled guilty to murder—an offense more serious than any committed by any family member of Brownlee—and served a life sentence as a result. 36 RR at 13-14. In a response that should have troubled the State, Smith expressed his view that he thought his uncle's life sentence was the "just" result of his murder conviction. 36 RR at 14. Like Brownlee, Smith expressed his belief that the criminal justice system was "fair." 36 RR at 14.

492.    Also like Brownlee, Smith expressed his agreement with the proposition that life without parole is a "harsh" punishment. 36 RR at 42. And while the State was allegedly concerned when Brownlee expressed this view of life without parole, its concern was suspiciously absent when the same response was given by Smith. Finally, Smith rated himself as being "somewhere around" a "7" or "8" on the death penalty scale. 36 RR at 60. Either of these scores is less than the

"9" Brownlee gave herself—and on that account, one would expect the State to be more likely to strike Smith than Brownlee.

493.    Ultimately, despite the strong similarities between Smith and Brownlee, Smith was accepted by the State, and Brownlee was struck. Given that, at the time it accepted Smith as a juror, the State had exercised eight of its ten peremptory challenges against females, this difference in treatment serves as further proof that the State's explanation for its strike of Brownlee was mere pretext for purposeful discrimination against women in the venire.

494.    Prospective juror Sprouse was the 102nd, and last, prospective juror on the venire panel. 36 RR at 91. Based on his responses to the juror questionnaire, neither the State nor trial counsel saw fit to question him in individual voir dire. 36 RR at 91. He was accepted by both parties as an alternate juror, and served in that capacity in Mr. Thuesen's capital murder trial. 36 RR at 91.

495.    Sprouse's juror questionnaire indicated that his uncle had been "in [and] out [of prison] his whole life." Ex. 4 at 6. While the State strongly emphasized Brownlee's family's trouble with the law as a reason for striking her, it evidently did not think the matter even merited questioning during Sprouse's individual voir dire.

496.    Sprouse's juror questionnaire also indicated that he ranked himself a "7" on the death penalty rate scale. *Id.* at 19. To the extent that this score was lower than Brownlee's ("9"), one would expect the State to be more likely to strike Sprouse than Brownlee—or that at the very least, the State would wish to subject Sprouse to some kind of questioning. Finally, while the State mentioned Brownlee's opinion of life without parole as a "severe" punishment as a reason for striking her, it was apparently so unconcerned with this in Sprouse's case that it asked him absolutely no questions about life without parole—or indeed, anything else.

497.     Ultimately, despite the presence of two red-flags on Sprouse's questionnaire (and the potential for many more), Sprouse was accepted by the State without a single question asked, and Brownlee was struck. Given that, at the time it accepted Sprouse as a juror, the State had exercised eight (eighty percent) of its ten peremptory challenges against females, this difference in treatment serves as compelling evidence that the State's explanation for its strike of Brownlee was pretext for purposeful discrimination against women in the venire.

498.     The State exercised a peremptory challenge against Brownlee, an African American woman, and gave four supposedly non-discriminatory reasons for its strike. Although the State claimed that it was not discriminating against Brownlee, it proceeded to accept six male jurors who provided answers remarkably similar to those given by Brownlee. Because of the obvious nature of these similarities, if Mr. Thuesen's counsel had objected to the State's gender discrimination prior to the jury's impaneling, there is a reasonable probability that the objection would have been sustained, and that Mr. Thuesen would be entitled to a new jury-selection process. Consequently, Mr. Thuesen was given constitutionally ineffective assistance of counsel, and he is entitled to a new trial.

499.     As a result of trial counsel's ineffective assistance during the guilt/innocence phase of trial, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

500.     Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 11.

501.     During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the

guilt/innocence phase of trial related to Claim 11, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

502.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about Mr. Thuesen's guilt or innocence.

### C. Trial counsel failed to properly object to or address the improper mention of the sexual assault kit.

503.    Trial counsel provided ineffective assistance when they failed to properly object to or otherwise address the prosecution's improper reference to a sexual assault kit.

504.    The prosecution elicited testimony that improperly suggested that Mr. Thuesen may have sexually assaulted Rachel Joiner. Such an occurrence—had it happened—would have significantly bolstered the State's argument that Mr. Thuesen was a remorseless predator, and would have undermined Mr. Thuesen's defense that he lacked the intent to kill. As a result of trial counsel's objectively deficient failure to address the improper implication that Mr. Thuesen may have committed a sexual assault, the jury could infer that Mr. Thuesen had sexually assaulted Rachel before she died. That inference was extremely prejudicial, and trial counsel should have cured it.

505.    As discussed, trial counsel's guilt/innocence phase theme was that Mr. Thuesen did not have the requisite intent to be convicted of the capital murder of Rachel and Travis Joiner. Nonetheless, trial counsel failed to object to testimony that inaccurately suggested that Mr. Thuesen sexually assaulted Rachel. The prejudice of this evidence—to Mr. Thuesen's intent defense and to his credibility in the eyes of the jury—was, or should have been, obvious to trial

counsel.

506.     The prosecution first mentioned a sexual assault kit in front of the jury during the direct examination of Carl Gaines, PhD. 41 RR 133. Gaines described the use of sexual assault kits in general and how they contain swabs for the vagina, the anus, and the mouth. *Id*. at 134. He also discussed that before any DNA analysis is performed, a simpler "presumptive" test is performed on the swabs. *Id*. at 134-35. The presumptive test merely looks for semen. *Id.* at 135.

507.     After the State offered the sexual assault kit into evidence, trial counsel Esparza approached the bench and objected to the admission of the kit based on relevance. *Id*. at 136. The presumptive test revealed that *no semen was found*. *Id*. at 137, 139, 140. In addition, trial counsel did not intend to raise a "crime of passion" defense (*see id*. at 140-42), possibly the only colorable way that the kit may have been relevant.

508.     Judge Bryan also raised the kit with trial counsel, essentially asking trial counsel to consider that the jury had heard that a sexual assault kit had been used in the case and that "[t]hey may be thinking John Thuesen sexually assaulted [Rachel Joiner]." *Id.* at 149. After Judge Bryan's comments, trial counsel elicited testimony from Gaines, in front of the jury, that the sexual assault kit did not detect semen. *Id*. at 152. But that was all trial counsel did to cure the prejudicial evidence.

509.     Later, the State pursued redirect that invited the jury, again, to believe that Mr. Thuesen had sexually assaulted Rachel:

> BY MR. PARSONS:
>
> Q. Just to make sure, Doctor, you can't tell if there is a sexual or not a sexual assault, am I correct, when doing the sexual assault kit.
>
> A. That's correct. I am just testing for the presence of semen.

*Id.* at 153.

510.     Trial counsel failed to object to this question. Later discussion at a bench conference indicates that both trial counsel (Esparza) and the Court recognized that the State's redirect of Gaines that suggested that Mr. Thuesen could have sexually assaulted Rachel, even in the absence of a positive semen test, was impermissible. 43 RR at 96. Yet trial counsel did nothing to try to exclude the evidence or cure the jury's understanding of Gaines's testimony.

511.     The testimony presented to the jury left the clear impression that Mr. Thuesen may have sexually assaulted Rachel. Both trial counsel and the trial court recognized the high degree of prejudice this testimony caused. A sexual assault fed into the prosecution's portrayal of Mr. Thuesen as a predator, and was inconsistent with trial counsel's theory that Mr. Thuesen experienced a mental health crisis and did not intend to harm Rachel.

512.     Because of trial counsel's ineffective assistance during the guilt/innocence phase of trial, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

513.     This issue was presented to the state habeas court, in that Mr. Thuesen raised the issue in his proposed Findings of Fact and Conclusions of Law. Ex. 2 ¶ 484. In the alternative, if the Court finds that this claim was not fully and fairly presented in the state habeas proceeding, this Court may still consider it. There is cause and prejudice for the failure to properly present the claim. Alternatively, allowing the conviction to stand in light of the improperly presented evidence and failure of trial counsel will result in a miscarriage of justice if this claim is not reviewed. *See Murray v. Carrier*, 477 U.S. 478 (1986).

**D. Trial counsel failed to move to change venue (State Habeas Claim 9).**

514.     Trial counsel provided ineffective assistance when they failed to move to change venue.

515.    The Sixth Amendment guarantees criminal defendants a fair trial by an impartial jury. Courts consider several factors in determining whether pretrial publicity and community prejudice prevent a fair trial, including the size and characteristics of the community in which the crime occurred, whether the news stories covering the crime contained blatantly prejudicial information, and the amount of time that had elapsed between the crime and the beginning of trial. *Skilling v. United States*, 130 S. Ct. 2896, 2902 (2010).

516.    In Mr. Thuesen's case, the pretrial publicity and the community prejudice against an ex-military, non-Aggie[13] person who killed two Aggies prevented him from receiving a fair trial in Brazos County. Trial counsel knew these facts, and knew about the extent of pretrial publicity.

517.    Trial counsel's failure to recognize and effectively respond to the likelihood that Mr. Thuesen would be unable to secure an unbiased jury in Brazos County was objectively deficient and prejudiced Mr. Thuesen's right to a fair trial.

518.    The Aggie community is a small, close-knit community. It hardly seems possible for members to serve as impartial jurors on a case where they would be called upon to judge an individual accused of killing two of their own. This atmosphere provided a very prejudicial environment for Mr. Thuesen, and trial counsel should have requested a change of venue.

519.    Rachel and Travis Joiner were both students at Texas A&M and thus they were both Aggies. And while Mr. Thuesen lived in the area, he was an "outsider" as a student at Blinn Community College. Articles describing the murder of two Aggies in the Aggie community were

---

[13] A person who attends Texas A&M University is referred to as an "Aggie" which is a diminutive form of the word "agriculture."

prejudicial and "poisoned" the jury pool well.[14]

520.    Although College Station is a University town, it feels like a small town. In 2010, the population of Brazos County was less than 195,000, with close to half of the individuals living in College Station, home of Texas A&M.[15] Many in the community and the jury itself had close ties to the school.

521.    "It has been said that being an Aggie doesn't just define where you went to school, it defines who you are."[16] Students, graduates, employees, family members, and friends of individuals with ties to Texas A&M University share a special type of school spirit that may appear to others as strange or even cult-like.

522.    The Aggie Muster, one of the oldest traditions at Texas A&M University, is a special ceremony to recognize Aggies who have died the previous year.[17] Each year on April 21, Aggies meet in over three hundred locations around the world for camaraderie and to remember departed Aggies.

523.    Trial counsel's failure to appreciate the nature of Brazos County jury pool and what that would mean for Mr. Thuesen was objectively unreasonable and amounted to deficient performance.

---

[14] Sample headlines from news stories reporting the incident include: Friends remember murdered Aggies" (March 8, 2009) (attached as Exhibit 13); "Memorial service set for fallen Aggies" (March 25, 2009) (attached as Exhibit 14); "Student indicted in deaths of Aggies" (May 15, 2009) (attached as Exhibit 15.).

[15] 2010 Brazos County Population 194,851, https://www.tsl.texas.gov/ref/abouttx/popcnty12010.html (last visited Jan. 31. 2021). 2010 College Station population 93,857, http://censusviewer.com/city/TX/College%20Station (last visited Jan. 31. 2021).

[16] Texas A&M University, Former Students, http://www.tamu.edu/former-students/index.html (last visited Jan. 31. 2021).

[17] Aggie Network, https://www.aggienetwork.com/muster/ (last visited Jan. 31. 2021).

524.    Individual voir dire in Mr. Thuesen's case occurred between April 8, 2010, and April 30, 2010. However, no voir dire activity occurred on April 21, 2010, the day reserved for Aggie Muster. The trial started less than a month after the 2010 Muster, leaving the thought of departed Aggies fresh in the minds of everyone throughout the jury selection and trial process. This atmosphere set the stage for strong community prejudice against Mr. Thuesen.

525.    In Mr. Thuesen's case, media coverage documenting the murder of Aggie siblings started soon after the incident and continued through the end of the trial, which was some 15 months later. Many of these stories mentioned that Rachel and Travis Joiner were both Texas A&M students, or Aggies, and that Mr. Thuesen was a Blinn College student, or an outsider. *See supra* n.14. In addition, stories also mentioned that Mr. Thuesen had previously stalked another female. *See id.* These stories were widely circulated within the community. This is not unlike the publicity in *Irvin* where the court considered whether the publicity was blatantly prejudicial when it included details of the defendant's background, previous crimes committed, and an announcement of a confession to the crimes. *Irvin v. Dowd*, 366 U.S. 717, 725 (1960).

526.    In Mr. Thuesen's case, the Batallion (an Aggie newspaper), the Eagle (a Bryan-College Station newspaper), KTBX and KRHD (Bryan-College Station television stations), and WTAW (a Bryan-College Station radio news network) all covered the story in detail. In addition, there were live blogs throughout the trial from reporters inside the courtroom, a fact that even concerned attorneys in the case.[18]

527.    The type of information published in this case, coupled with the fact that Mr. Thuesen was an outsider, is very prejudicial. No defendant—much less an "outsider"—could have

---

[18] Attorneys discussed concerns with the judge about reporters who were live blogging the events in the courtroom and the possibility that information discussed outside the presence of the jury would somehow get back to them. 38 RR at 5, 41.

secured an impartial jury in light of the publicity surrounding the trial. Given the amount and type of media coverage, Mr. Thuesen could not receive a fair trial in Brazos County. Trial counsel was objectively deficient by failing to seek a venue change.

528.    As a result of trial counsel's ineffective assistance during the guilt/innocence phase of trial, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

529.    Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 9.

530.    During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the guilt/innocence phase of trial related to Claim 9, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

531.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about Mr. Thuesen's guilt or innocence.

**E.  Trial counsel failed to preserve error by making timely objections on the record on each occasion in which the State introduced inadmissible evidence. (State Habeas Claim 18).**

532.    In order to preserve error at trial on the admission of improper evidence, counsel must make a timely, proper objection and obtain a ruling. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003). Texas Rule of Appellate Procedure 33.1(a) states that in order to preserve

146

an error on appeal, the record must show that a "complaint was made to the trial court by a timely request, objection, or motion that [states] the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." Tex. R. App. Proc. 33.1(a).

533.     Additionally, the law in Texas requires counsel to continuously object to the inadmissible evidence each time it is offered. *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). If the inadmissible evidence is admitted elsewhere in the trial without objection, the error is cured. *Id*.

534.     Trial counsel failed to properly preserve error in six of the forty-five claims raised on appeal.

535.     *First*, during the guilt/innocence phase of the trial the State indicated its intention to offer evidence that Mr. Thuesen was subject to a protective order at the time of the alleged offense. Trial counsel initially objected on relevance grounds, Texas Rules of Evidence 401 and 402, that the prejudice of the evidence far outweighed the probative value, Texas Rules of Evidence 403, and that it was evidence of other crimes, wrongs, or acts not admissible to prove action in conformity therewith, Texas Rules of Evidence 404(b). 46 RR at 81-82. The trial court overruled each objection. 46 RR at 141. During subsequent testimony by Leah Mathis, trial counsel stated "no objection" when the State admitted the protective order into evidence. 50 RR at 174.

536.     Appellant's response of "no objection" waived his claim to inadmissibility of the challenged evidence." *Moody v. State*, 827 S.W.2d 875, 889 (Tex. Crim. App. 1992). Because trial counsel erred in failing to preserve this error for appeal, their representation prejudiced Mr. Thuesen.

537.     *Second*, during the guilt/innocence phase of the trial, the State called Rachel and

Travis Joiner's neighbor, Tabitha Foreman, as a witness. 38 RR at 65. Foreman arrived home when the shootings were taking place and had a chance to observe Mr. Thuesen on the front lawn after his arrest. 38 RR at 79-89. The State asked Foreman about Mr. Thuesen's appearance after determining she had a chance to look at his facial expressions. 38 RR at 88-89. Specifically, the State asked "Did he seem to be mad?" and "Did he seem to be angry?" 38 RR at 89. Trial counsel initially objected to these questions as speculative under Texas Rules of Evidence 401 and 403 and as leading, all of which were overruled. 38 RR at 89.

538.    During cross-examination, trial counsel asked "Did he have a dazed look on his face?" 38 RR at 105. The witness answered "no" to the question, leaving open the issue of Thuesen's appearance at the time. The State attempted to clarify the issue on re-direct and asked the witness what she would call the look. 38 RR at 106. By continuing the line of questions trial counsel initially objected to, counsel ultimately opened the door for the damaging answer the State elicited from this witness. In answering the State's question of what the look was, Foreman stated "It was a look of no remorse." 38 RR at 106.

539.    After opening the door to testimony about Mr. Thuesen's emotional state directly after the shootings, trial counsel failed to object to the response that Mr. Thuesen appeared to have no remorse. Since Mr. Thuesen's intent at the time of the shootings was central to trial counsel's case, this piece of evidence was very damaging. Trial counsel erred when they continued this line of questions after initially objecting to it, waiving their earlier objection and failing to preserve the error for appeal. Because trial counsel erred in failing to preserve this error for appeal, their representation prejudiced Mr. Thuesen.

540.    *Third*, on cross-examination of Dr. Saunders, the State elicited testimony regarding sources of information the expert relied on in forming his opinion. 47 RR at 150. One of those

sources was a Hempstead police report describing a prior incident between Mr. Thuesen and Leah Mathis. 47 RR at 150. The State specifically asked Dr. Saunders if the police report "stated that Thuesen's behavior was consistent with a deranged person" and that it said "propensities for one that could harm another." 47 RR at 151. Trial counsel did not object until after both questions had been asked and answered with a "yes." 47 RR at 151. While trial counsel correctly argued this information was improper character evidence introduced by the State to show Mr. Thuesen would be a future danger, this argument was untimely. 47 RR at 152-54.

541.   Counsel must make an objection as soon as the ground for objection becomes apparent. *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997). "If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and the error is waived." *Id*. The objection should have been made as soon as the state asked the witness about the deranged person comment. Instead, trial counsel did not object until after the second objectionable question was asked and answered, therefore the objection was untimely. 47 RR at 151. Introduction of this evidence unfairly prejudiced Mr. Thuesen and trial counsel failed to preserve this error by making a proper, timely objection to the testimony elicited. Because trial counsel erred in failing to preserve this error for appeal, their representation prejudiced Mr. Thuesen.

542.   *Fourth*, prior to the State first introducing evidence regarding the character and personality traits of the victims, trial counsel objected to all background information on the grounds that the information was irrelevant and inflammatory to the point of outweighing its probative value. 38 RR at 44. The trial court overruled this objection, but allowed trial counsel to have a running objection during testimony of the first witness, Wayne Joiner. 38 RR at 44. However, a running objection may not encompass too broad a reach of subject matter over too

broad a time or over different witnesses. *Ethington*, 819 S.W.2d at 859. In this case, the objection was to background information in general and thus not specific in nature.

543.    During the testimony of Wayne Joiner, the State went too far in eliciting background testimony. For example, questions eliciting information such as Travis choosing A&M over MIT and Rachel being a "clean" person attempted to make the victims' lives worth more than that of Mr. Thuesen. 38 RR at 53, 64. Thus, it was imperative for trial counsel to make a more specific objection when the testimony started to measure the comparative worth of Mr. Thuesen against Travis and Rachel Joiner, something they failed to do. Because trial counsel erred in failing to preserve this error for appeal, their representation prejudiced Mr. Thuesen.

544.    *Fifth*, trial counsel did not raise an objection to background character evidence about the victims during the testimony of Douglas Jordan Perry until after he testified about information such as Travis Joiner being an honor student at A&M University and having a telescope. 39 RR at 7, 21. In addition, the judge made it clear that he was not permitting a running objection with regard to Perry's testimony when he denied trial counsel's request for such a running objection, stating, "I think we'll just take them up one by one." 39 RR at 21. This statement by the judge made it clear to trial counsel that they needed to object continuously to each impermissible question asked by the State, but trial counsel failed to make individual objections. Because trial counsel erred in failing to preserve this error for appeal, their representation prejudiced Mr. Thuesen.

545.    *Sixth*, trial counsel did not object to improper character evidence about Rachel Joiner during testimony by Johnny Matthys until after Matthys answered several questions, including information about his first date with Rachel and how she danced. 39 RR at 26. After the State asked several more questions, trial counsel objected to the testimony and obtained a running

objection outside the presence of the jury to evidence of the character and personality qualities of the victim. 39 RR at 27-31. At that point the judge noted that the State had "gone a little too far on that" referencing the attempts by the State to comment on the life-worthiness and value of the victims. 39 RR at 31.

546.    *Seventh*, the State initially sought to introduce business records of Mr. Thuesen's cellular phone calls, State's Exhibit 201, during testimony of Brian Keith, the Marine Gunnery Sergeant Mr. Thuesen called the night before the shooting occurred. 38 RR at 132. Trial counsel initially objected to the relevancy of the records under Texas Rules of Evidence 401 and 403 issues. 38 RR at 133. After a discussion at the bench, the parties agreed to admit only the single page with the record of the phone call from Mr. Thuesen to Keith. 38 RR at 133-34. When the State next moved to introduce the records, trial counsel objected on relevancy and right of privacy grounds. 39 RR at 81. The court overruled the objections and the records were admitted.

547.    The State introduced these same records at two other locations in trial without trial counsel raising any objections. During testimony from Douglas Jordan Perry, the State questioned him about a phone call on the records from Mr. Thuesen to Travis Joiner on the night of the shootings. 39 RR at 18. In subsequent testimony by Detective Liza Phillips, the State once again used the phone records to question a witness about Mr. Thuesen's phone calls and texts to Rachel Joiner on the day of the shootings. 41 RR at 90-91. Because trial counsel did not continue to object to the phone records each time the State used them, the error was not preserved for appeal. Because trial counsel erred in failing to preserve this error for appeal, their representation prejudiced Mr. Thuesen.

548.    To the extent any of the errors alone did not prejudice Mr. Thuesen, their cumulative effect did prejudice him.

549.     As a result of trial counsel's ineffective assistance during the guilt/innocence phase of trial, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

550.     Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 18.

551.     During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the guilt/innocence phase of trial related to Claim 18, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

552.     As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about Mr. Thuesen's guilt or innocence.

## II.     TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE PUNISHMENT PHASE OF TRIAL, IN VIOLATION OF MR. THUESEN'S SIXTH AMENDMENT RIGHTS.

553.     The Sixth Amendment guarantees Mr. Thuesen the right to counsel. *Strickland*, 466 U.S. at 684 ("[T]his Court has recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial."). And "the right to counsel is the right to the effective assistance of counsel." *Id.* at 686.

554.     To state a claim for ineffective assistance of trial counsel, Mr. Thuesen must show that trial counsel's performance was deficient and that trial counsel's deficient performance prejudiced his defense—"[t]his requires showing that counsel's errors were so serious as to deprive

the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

555. To prove deficient performance, Mr. Thuesen must show that trial counsel's performance fell below an objective standard of reasonableness. *Porter*, 558 U.S. at 38. "To establish prejudice, [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 38-39.

556. "It is unquestioned that under the prevailing professional norms . . . counsel had an obligation to conduct a thorough investigation of the defendant's background." *Id.* at 39. Trial counsel cannot "ignore[] pertinent avenues for investigation of which he should have been aware." *Id.* at 40. Counsel *must conduct a mitigation investigation. Id.*; *see also Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020) (finding ineffective assistance when "counsel performed almost no mitigation investigation, overlooking vast tranches of mitigating evidence").

557. Indeed, the American Bar Association ("ABA") Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases state that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."[19] Trial counsel "at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation."[20] And trial counsel must consider expert and fact witnesses "to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the

---

[19] https://www.americanbar.org/groups/committees/death_penalty_representation/resources/aba_guidelines/2003-guidelines/2003-guideline-10-7/ (Guideline 10.7).

[20] https://www.americanbar.org/groups/committees/death_penalty_representation/resources/aba_guidelines/2003-guidelines/2003-guideline-10-11/ (Guideline 10.11).

underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs; or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor."[21] In short, "[c]ounsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client."[22] *See also Strickland*, 466 U.S. at 688-89 (discussing the use of ABA standards as guides for determining "[p]revailing norms of practice"). Texas has similar—if not more rigorous—guidelines in place for capital counsel.[23]

558.    The Supreme Court has held that trial counsel's failure to investigate, prepare, and present mitigating evidence during the punishment phase of trial constitutes ineffective assistance. In *Porter*, the petitioner was a veteran with combat experience that "left him a traumatized, changed man." *Porter*, 558 U.S. at 30. A jury convicted Mr. Porter of two counts of first-degree murder after he killed his former girlfriend and her boyfriend, and the trial court sentenced Mr. Porter to death. *Id.* at 31. Mr. Porter's trial counsel failed to discover and present critical mitigating evidence during the punishment phase of trial. Evidence presented during Mr. Porter's state habeas proceedings confirmed that trial counsel left compelling mitigating evidence unpresented during the punishment phase of trial. After Mr. Porter returned from the Korean War, he experienced nightmares and would attempt to climb his bedroom walls with knives, and he "developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all." *Id.* at 35-36. A neuropsychology expert concluded that Mr. Porter suffered from brain

---

[21] *Id.*

[22] *Id.*

[23] State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel*, Guideline 10.1 (requiring the defense team employ a "mitigation expert"), Guideline 11.1, https://www.texasbar.com/AM/Template.cfm?Section=Consider_a_State_Bar_Committee&Template=/CM/ContentDisplay.cfm&ContentID=28741.

damage and "extreme mental or emotional disturbance." *Id.* at 36. The Supreme Court held that trial counsel provided ineffective assistance when they failed to conduct a thorough investigation into Mr. Porter's background. *Id.* at 39. Trial counsel "ignored pertinent avenues for investigation of which he should have been aware." *Id.* at 40. And "[t]he decision not to investigate did not reflect reasonable professional judgment." *Id.* Indeed, "the sentence would have been different if the sentencing judge and jury had heard the significant mitigation evidence that Porter's counsel neither uncovered nor presented." *Id.* at 31.

559.     In *Andrus*, too, trial counsel's mitigation investigation and presentation fell short of professional standards. Trial counsel did not contact some witnesses "until just before *voir dire*" and became aware of others "only partway through trial." *Andrus*, 140 S. Ct. at 1882. Trial counsel did not meet with or call witnesses "whom had disturbing stories about Andrus' upbringing." *Id.* Trial counsel "ignored pertinent avenues for investigation of which he should have been aware"— he knew that Andrus had been diagnosed with a "seemingly serious mental health issue." *Id.* at 1882-83. "In short, counsel performed virtually no investigation, either of the few witnesses he called during the case in mitigation, or of the many circumstances in Andrus' life that could have served as powerful mitigating evidence." *Id.* at 1883. And trial counsel failed to investigate and rebut the State's aggravating evidence. *Id.* at 1884.

560.     The facts in Mr. Thuesen's case are strikingly similar to those in Mr. Porter's and Mr. Andrus's and compel similar findings that trial counsel here were also ineffective.

561.     Mr. Thuesen's case is not unlike Porter's and Andrus's. Had Mr. Thuesen's trial counsel been effective, "the judge and jury would have learned of the kind of troubled history [the Supreme Court has] declared relevant to assessing a defendant's moral culpability." *Porter*, 558 U.S. at 41.

562.     Mr. Thuesen's trial counsel failed to prepare for the punishment phase of trial. They failed to investigate and prepare critical mitigating evidence. As part of trial counsel's investigation and preparation for the punishment phase of trial, they needed to develop expert and fact witness testimony relevant to Mr. Thuesen's moral culpability. Expert testimony related to a defendant's mental health, in particular, is critical to educating the jury and to explaining how it reduces the defendant's moral culpability.

563.     As in the guilt phase of trial, trial counsel failed to investigate, develop, prepare, and present an effective defense. Trial counsel did not develop or prepare evidence related to Mr. Thuesen's PTSD and other compelling mitigating evidence. Trial counsel knew about Mr. Thuesen's PTSD symptoms. But trial counsel ignored Mr. Thuesen's PTSD during the punishment phase and presented no argument or evidence regarding PTSD, much less any cohesive narrative regarding diminished moral culpability. Mr. Thuesen's trial counsel—Carter and Esparza—were overwhelmed with other cases and, as a result, their investigation of critical punishment phase issues was delayed, hurried, and incomplete. They failed to secure a PTSD expert who would actually testify about how the condition affected Mr. Thuesen's behavior and his culpability and did not call available witnesses or meaningfully review critical evidence related to Mr. Thuesen's PTSD and how it affected his behavior.

564.     By failing to promptly commence and develop an investigation into mitigating evidence, trial counsel's performance was deficient. And trial counsel's failures prejudiced Mr. Thuesen's defense during the punishment phase of the trial. Available mitigating evidence—in particular, evidence explaining how Mr. Thuesen's PTSD affected his behavior—was reasonably likely to have altered the jury's punishment phase determinations.

565.     Mr. Thuesen asks this Court to grant him relief on his ineffective assistance of trial

counsel claims related to the punishment phase of trial and grant him a new sentencing hearing, as Judge Bryan intended.

**A. Trial counsel failed to investigate, develop, prepare, and present evidence that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the punishment phase (State Habeas Claims 1, 5, 7, 8, 15, 16).**

566.    Trial counsel provided ineffective assistance when they failed to investigate, develop, prepare, and present expert and fact witness testimony that would have explained and contextualized Mr. Thuesen's PTSD during the punishment phase of trial. Trial counsel did not prepare for trial and, as a result, left valuable mitigating evidence undeveloped and unpresented.

567.    As a result of trial counsel's failure to investigate, develop, prepare, and present expert and fact witness testimony related to Mr. Thuesen's PTSD, the jury heard (1) *no* expert explanation of PTSD or its effects and, more important, no explanation of *Mr. Thuesen's* PTSD; (2) ill-developed fact witness testimony describing Mr. Thuesen's ongoing battle with his mental health following his return from Iraq; and (3) no evidence connecting fact witness observations to expert diagnosis or demonstrating how that diagnosis triggered a trained, automatic response the night of the crime and, as a result, reduced Mr. Thuesen's moral culpability for the crime.

568.    Trial counsel's failure to prepare for trial amounted to deficient performance that prejudiced Mr. Thuesen's defense during the punishment phase of trial and, as a result, will cost him his life. Under the most rudimentary professional standards, trial counsel was obligated to prepare and present an expert (or experts) who would have explained to the jury (1) that many combat veterans returning from Iraq and Afghanistan, like Mr. Thuesen, suffer from PTSD; (2) that Mr. Thuesen suffers from PTSD; (3) that PTSD affects all aspects of Mr. Thuesen's life and mental processes; (4) how PTSD symptoms manifest in general, and how they manifest in Mr. Thuesen's behavior and actions; and (5) how Mr. Thuesen's PTSD diagnosis impacted his

decision-making to create a perfect storm the evening of the crime. Further, trial counsel was obligated to investigate, develop, prepare, and present fulsome, compelling fact witness testimony to tell Mr. Thuesen's story and support an expert's PTSD diagnosis.

569.    That expert (or experts) and critical fact witnesses would have provided crucial, relevant, mitigating evidence for the jury to consider during punishment phase deliberations, placing Mr. Thuesen's symptoms and behaviors in the appropriate medical context.

570.    Trial counsel knew or should have known that Mr. Thuesen suffers from PTSD; that a PTSD expert (or experts) would educate the jury and explain that Mr. Thuesen's post-Iraq behavior and mental state are consistent with and attributable to PTSD; that more than a dozen fact witnesses would testify that war changed Mr. Thuesen and, thus, support an expert's PTSD opinions; and that expert and fact witness testimony explaining Mr. Thuesen's PTSD would provide compelling mitigating evidence during the punishment phase.

571.    Mr. Thuesen's trial timeline provides context critical to understanding trial counsel's complete failure to prepare compelling mitigating evidence for the punishment phase of trial, even though they *knew* better and were duty-bound to *do* better. On **March 9, 2009**, the court appointed Carter and Esparza to represent Mr. Thuesen. 2 HR at 33. On **May 14, 2009**, a grand jury indicted Mr. Thuesen for capital murder. 1 CR at 1. On **May 18, 2009**, Esparza withdrew as counsel, and she only re-joined the case on **February 10, 2010**. CR at 167. Voir dire commenced more than one year after the court appointed trial counsel, on **March 29, 2010**, notwithstanding the fact that Esparza had returned to the case little more than a month before (and despite her having only worked on the case for 2 months prior to her withdrawal). 6 RR at 8. Trial commenced on **May 10, 2010**. 38 RR at 28. The parties submitted the case to the jury for guilt / innocence deliberation on **May 20, 2010**. 49 RR at 110-11. The jury returned a guilty verdict later that day,

and the punishment phase commenced on **May 21, 2010**. 49 RR at 112; 50 RR at 5. The parties submitted the punishment phase case to the jury for sentencing deliberation on **May 27, 2010**. 54 RR at 90. The next day, the jury returned its verdict, answering "yes" to Special Issue No. 1 and "no" to Special Issue No. 2. 55 RR at 4. The court sentenced Mr. Thuesen to death. 55 RR at 7.

572.    Trial counsel knew early in its representation—in 2009—that PTSD "may be an issue in this case." 2 HR at 79. Trial counsel moved the court to appoint Dr. Roger Saunders to Mr. Thuesen's case in March 2009, and trial counsel, knowing "very little about the case at that time," asked Dr. Saunders to speak with Mr. Thuesen and provide "preliminary thoughts." State Habeas Petition, Ex. 10 ¶ 4; 2 HR at 37-40. Trial counsel did not ask Dr. Saunders "to conduct a full assessment." 2 HR at 39. But Dr. Saunders and trial counsel "talked about [it] being a strong possibility" that Mr. Thuesen suffers from PTSD and that "[t]hat was one of the directions we felt like we would be going down." 2 HR at 79.

573.    Trial counsel knew that they needed to start investigating Mr. Thuesen's background. Trial counsel hired a mitigation specialist, Gerald Byington, and in June 2009, Byington collected records relevant to building Mr. Thuesen's story. *See, e.g.*, 2 HR at 37, 40, 53-54, 59-60. "A review of these records would have shown counsel that Thuesen had been consistently reporting symptoms of PTSD for approximately two and half years prior to the crime." FFCL ¶ 55 (citing Mr. Thuesen's military and VA records). But trial counsel did not review those records *until early 2010*, mere months before voir dire would begin. 2 HR at 192.

574.    Effective counsel would have known that they needed to investigate and develop evidence related to Mr. Thuesen's PTSD. Yet trial counsel did not begin any meaningful PTSD investigation until the eve of trial. Trial counsel hired one investigator, Rick Starnes, in late February 2010 and a second investigator, Pamela "Kay" Sanders, two days before voir dire would

begin. 2 HR at 104. Trial counsel relied on the investigators "pretty heavily to locate and interview witnesses" for them. *Id.* One year into trial counsel's representation of Mr. Thuesen, *during trial*, the investigators' interviews confirmed that Mr. Thuesen "returned from his tour of duty in Iraq a changed person." FFCL ¶ 67 (citing fact witness affidavits).

575.    More significant, trial counsel knew or should have known that they needed to prepare a PTSD expert. Trial counsel did not consult any mental health expert—let alone a PTSD expert—until they reengaged Dr. Saunders in February 2010, one month before voir dire would begin—despite the fact that PTSD is a complex subject, and one that is largely outside the understanding of the generally public. See Xenakis Decl. ¶ 34. Although Dr. Saunders evaluated Mr. Thuesen in 2009, trial counsel did not ask Dr. Saunders to "take any specific action on Mr. Thuesen's case" until almost one year later. 2 HR at 75.

576.    Dr. Saunders was not a PTSD expert. Still, after evaluating Mr. Thuesen, Dr. Saunders diagnosed Mr. Thuesen as suffering from Dependent Personality Disorder, Depression, and PTSD. State Habeas Petition, Ex. 10 ¶ 5. Dr. Saunders told trial counsel that, in his opinion, Mr. Thuesen's Dependent Personality Disorder "was a primary condition that impacted Mr. Thuesen's behavior and should be a primary focus of their mitigation presentation." *Id.* ¶ 6.[24] But Dr. Saunders also told trial counsel that Mr. Thuesen's PTSD "was a significant condition germane to the case." *Id.* ¶ 7. Dr. Saunders emphasized to trial counsel that he was not qualified to and would not develop a PTSD diagnosis for the case. *Id.* ¶ 8. Dr. Saunders recommended that trial counsel contact Dr. Kenneth Kopel to provide additional information specific to whether Mr.

---

[24] Dr. Xenakis, a retired soldier, disputes this diagnosis, noting that "[i]t is uncommon for soldiers to graduate from boot camp with either BPD or [Dependent Personality Disorder]. That is because these disorders make it very difficult for those individuals to adjust to military life and to succeed in the military environment." Xenakis Decl. ¶43

Thuesen suffers from PTSD, and if so, how it affected him. *Id.*

577.    Trial counsel also consulted Dr. J. Robert Yohman (again, just one month before voir dire, in February 2010). State Habeas Petition, Ex. 11 ¶ 6. Dr. Yohman conducted a "complete neuropsychological evaluation" of Mr. Thuesen—trial counsel had requested the evaluation "and wanted to know if there [were] any neuropsychological impairment as a result of Thuesen's military service." *Id.* ¶ 7. Based on his evaluation, Dr. Yohman told trial counsel that Mr. Thuesen "met diagnostic criterion for PTSD." *Id.* ¶ 11. Yet despite Dr. Yohman's findings, trial counsel inexplicably told Dr. Yohman that they "were going in a 'different direction,' and would not need [Dr. Yohman] as a testifying witness." *Id.* ¶ 13. In that moment, trial counsel had the opportunity to develop and prepare expert testimony diagnosing Mr. Thuesen with PTSD. But trial counsel walked away, with no alternative and no plan.

578.    In March 2010—another month closer to trial—trial counsel consulted Dr. Michael Gottlieb. Dr. Gottlieb encouraged trial counsel to "put someone on to talk about" Mr. Thuesen's "military service and subsequent diagnosis [of PTSD]" and "how serious this disorder can be." State Habeas Petition, Ex. 40 at 1. Important, Dr. Gottlieb encouraged trial counsel to use a "pure/education expert . . . to explain the disorder as it is easily misunderstood." *Id.*

579.    Consistent with Dr. Gottlieb's recommendation, the Texas Defender Service told trial counsel to retain and present an expert to "educate the jury on PTSD" and "provide the jury with a full explanation of [PTSD]." 2 HR at 51, 84-85.

580.    Trial counsel knew or should have known that they needed to investigate, develop, prepare, and present evidence related to Mr. Thuesen's PTSD and its effects on his behavior and actions. Indeed, they had experts *telling them as much*. Trial counsel knew that Mr. Thuesen suffers from PTSD and, more important, that expert and fact witness testimony explaining its significance

would provide critical mitigating evidence during the punishment phase. But trial counsel's limp, eleventh-hour investigation and attempt at trial preparation fell short. And despite valuable interviews of fact witnesses and advice and warnings from experts—including Dr. Saunders, Dr. Yohman, Dr. Gottlieb, and the Texas Defender Service—trial counsel did not prepare *any* expert testimony or adequate fact witness testimony related to Mr. Thuesen's PTSD for the punishment phase. Trial counsel's failure to investigate, develop, prepare, and present critical mitigating evidence during the punishment phase amounted to deficient performance.

581.    Trial counsel did not engage a PTSD expert, Dr. Kopel, until *after* voir dire was underway, on the eve of the guilt phase of trial (late April 2010). State Habeas Petition, Ex. 8 ¶ 6.[25] Trial counsel asked Dr. Kopel to evaluate whether Mr. Thuesen suffers from PTSD. *Id.* Although Dr. Kopel had the opportunity to review Mr. Thuesen's records, due to his late engagement he did *not* have the opportunity speak with Mr. Thuesen, nor did he have the opportunity to advise trial counsel or participate in or contribute to Mr. Thuesen's punishment phase defense. *Id.* ¶ 7. Still, Dr. Kopel *did* diagnose Mr. Thuesen with PTSD, and trial counsel asked Dr. Kopel to testify during the punishment phase. *Id.* ¶¶ 8-9.

582.    But trial counsel took no steps to prepare Dr. Kopel to testify, including failing to work with Dr. Kopel to develop an outline of his testimony. *Id.* ¶ 11. In light of trial counsel's failure to take even the most basic steps to prepare Dr. Kopel's testimony, it is unsurprising that trial counsel cancelled Dr. Kopel's testimony the day before he planned to testify—trial counsel never called him as a witness. *Id.* ¶ 10.

---

[25] Trial counsel contacted a prospective PTSD expert, Dr. Howard Detwiler, in February 2010, but trial counsel "was not satisfied . . . that he was going to be as good a witness as people at told [them]," and trial counsel "decided [they were] not going down that road." 2 HR at 88. Indeed, based on Dr. Detwiler's CV, his practice focused on general psychiatry as opposed to PTSD diagnosis and treatment. FFCL ¶ 72 (citing H. Detwiler CV).

583.    Trial counsel's failure to prepare expert testimony for the punishment phase prejudiced Mr. Thuesen's defense. Had trial counsel prepared and called Dr. Kopel,[26] he would have testified that Mr. Thuesen "suffered from PTSD stemming from trauma he experienced while serving in Iraq with the Marine Corps Reserves." *Id.* ¶ 13. Dr. Kopel would have explained Mr. Thuesen's diagnosis and the bases for the diagnosis. *Id.* ¶¶ 14-19. For example, he would have explained to the jury that PTSD often induces hyperarousal, hypervigilance, and an exaggerated startle response. *Id.* ¶ 14. Dr. Kopel would have explained that Mr. Thuesen's medical records track consistent PTSD symptoms following his return from Iraq, yet no one treated him. *Id.* ¶¶ 15-19. Dr. Kopel would have explained that Mr. Thuesen had yet to receive proper treatment for his PTSD. *Id.* ¶¶ 23-25 ("First, it does not appear the VA system fully identified or diagnosed that Thuesen was suffering from PTSD. . . . Next, the treatment that Thuesen did in fact receive that targeted his PTSD was inadequate to treat Thuesen's PTSD."). Indeed, Dr. Kopel would have explained to the jury that the VA's "course of treatment did nothing to repair the daily damage PTSD would have done to Thuesen's functioning in society. Rather, he was left to self-medicate with alcohol and rely on relationships for support, such as the ones with Leah Mathis and Rachel Joiner." *Id.* ¶ 25. Further, Dr. Kopel would have explained how Mr. Thuesen's PTSD played a role in the crime and how it mitigated Mr. Thuesen's moral culpability. *Id.* ¶¶ 26-30 ("I believe that PTSD played a significant factor in Thuesen's behavior leading up to and during the crime. . . . It is my opinion, and I would have so testified, that the presence of PTSD (and the lack of treatment for his illness) greatly contributed to Thuesen's actions leading up to and during the crime."). "Unlike a healthy individual not confronted with PTSD symptoms, Thuesen was an individual

---

[26] During the state habeas proceedings, Judge Bryan determined that Dr. Kopel was credible and that his "testimony would have been admissible at Thuesen's trial and would have met sufficient reliability standards under *Daubert*." FFCL ¶ 3.

who served his country and came back with a debilitating, long-lasting illness that impacted every moment of his life, including during the crime." *Id.* ¶ 30; *accord* Xenakis Decl. ¶ 50.

584.    Had trial counsel prepared and called a PTSD expert like, for example, Dr. Elspeth Ritchie,[27] she would have explained Mr. Thuesen's PTSD *in context* and with respect to Mr. Thuesen's "final breakdown leading up to the crime." State Habeas Petition, Ex. 9 ¶ 61. Dr. Ritchie—a physician with military and PTSD expertise—would have testified that "at the time of the crime Thuesen was suffering from PTSD" and that Mr. Thuesen's "PTSD clearly contributed to impairments in his social and occupational functioning." *Id.* ¶¶ 26, 34. Dr. Ritchie would have walked the jury through Mr. Thuesen's combat experience, how Mr. Thuesen's "military service has numerous hallmarks of the traumatic exposure that can lead to PTSD," how no one prepared Mr. Thuesen to re-enter civilian life, how war changed Mr. Thuesen and affected all aspects of his daily life and functioning, and, ultimately, Mr. Thuesen's downward, PTSD-induced spiral, among other important testimony that would explain Mr. Thuesen's behaviors in context and undercut the prosecutions story of a violent man. *See generally*, *id.* Dr. Ritchie's testimony would have provided compelling evidence showing that Mr. Thuesen's PTSD diminished his moral culpability for the crime. Without expert testimony, the jury did not understand PTSD, did not understand that Mr. Thuesen suffered from PTSD, and had no reason to correlate Mr. Thuesen's PTSD with his conduct, much less understand that Mr. Thuesen's PTSD mitigated against imposing the death penalty. Further, expert testimony, like Dr. Ritchie's, would have allowed trial counsel to rebut the State's arguments mischaracterizing PTSD and dismissing Mr. Thuesen's condition. Expert testimony explaining PTSD and educating the jury would have allowed trial counsel to rebut the

---

[27] During the state habeas proceedings, Judge Bryan determined that Dr. Ritchie was credible and that her "testimony would have been admissible at Thuesen's trial and would have met sufficient reliability standards under *Daubert*." FFCL ¶ 3.

State's arguments related to, for example, Leah Mathis. A PTSD expert would have connected Mr. Thuesen's behavior with Mathis to his PTSD, undermining the prosecution's themes related to Mr. Thuesen's purported pattern of violence. *See also* 4 HR2 at 137-38, 141, 142, 147-53, 163-64, 169-71, 173-80, 186, 201-09, 211-12, 215-16, 236, 255-60 (Dr. Xenakis explaining that (1) PTSD is an injury; (2) PTSD impacts veterans in multiple ways; (3) the military lacked a reintegration process for soldiers like Mr. Thuesen, who returned from Iraq in 2005; (4) Mr. Thuesen had an increased risk for developing PTSD due to his age and his family history of mental illness; (5) the VA failed to diagnose and properly treat Mr. Thuesen for PTSD and alcoholism; (6) medical records documented the decline of Mr. Thuesen's mental health in the months leading up to this offense; and (7) the correlation between combat-related PTSD and violence is a national problem).

585.    Had trial counsel prepared and called a PTSD expert like, for example, Dr. Eric Elbogen,[28] the jury would have understood that Mr. Thuesen's experience was not unlike other combat veterans'. A PTSD expert, like Dr. Elbogen, would have explained to the jury that Mr. Thuesen's actions were not pathologies of his personality but were instead symptoms of PTSD. For example, Dr. Elbogen would have explained the scientific connection between PTSD and violence, in particular domestic or intimate partner violence. State Habeas Petition, Ex. 6 ¶¶ 1120. "Whatever the exact relationship, studies done before and after May 2010 have confirmed violence and aggression are problems for Iraq and Afghanistan War veterans." *Id.* ¶ 30. An expert—like Dr. Elbogen—would have armed the jury with data to understand the link between combat experience, PTSD, and domestic violence. *See* Xenakis Decl. ¶¶ 44-46.

586.    Had trial counsel prepared and called a PTSD expert like, for example, Dr.

---

[28] During the state habeas proceedings, Judge Bryan determined that Dr. Elbogen was credible and that his "testimony would have been admissible at Thuesen's trial and would have met sufficient reliability standards under *Daubert*." FFCL ¶ 3.

Brown,[29] he would have explained to the jury military culture (the "Military Total Institution"), how Mr. Thuesen's military training reprogrammed his thinking (e.g., "recruits are trained to react instantaneously to social stimuli they perceive as a threat," and recruits "are conditioned to select the 'fight' option" over flight), and the problems that many combat veterans experience as they attempt to reintegrate into civilian life. State Habeas Petition, Ex. 2. Again, a PTSD expert, like Dr. Brown, would have armed the jury with knowledge to better understand Mr. Thuesen's mental state leading up to and during the crime, providing valuable mitigating evidence to consider.

587.    But trial counsel did not prepare *any* expert to testify during the punishment phase.[30] Denied any expert testimony as a result of trial counsel's deficient performance, the jury could not connect Mr. Thuesen's PTSD symptoms to his conduct—a connection would have provided significant mitigating evidence for the jury to consider. As stated by Dr. Xenakis, the enhanced fight or flight response of a person in a PTSD crisis, and their diminished rational thought, is outside the public's appreciation. Xenakis Decl. ¶ 34. Indeed, in support of Mr.

---

[29] During the state habeas proceedings, Judge Bryan determined that Dr. Brown "would meet sufficient reliability standards under *Daubert*, and that [his] complete testimony would be admitted at a live hearing." FFCL ¶ 7.

[30] Indeed, trial counsel inexplicably and unreasonably relied on only Dr. Saunders to provide testimony regarding PTSD, during the guilt phase of trial. But Dr. Saunders's guilt phase testimony was no substitute for Dr. Kopel's or another PTSD expert's testimony. First, Dr. Saunders testified only during the guilt phase—he considered criminal intent, not mitigating evidence or moral culpability. State Habeas Petition, Ex. 5 ¶ 26 (Guilt phase "testimony did not educate the jury about the logical nexus between the damaging factors in Mr. Thuesen's background and the capital offense—why, even if Thuesen's conduct was intentional . . . Thuesen's struggle with PTSD formed the person that he was when he committed the criminal acts."). Second, Dr. Saunders was not a PTSD expert and did not testify as one. Claims for Relief § I.A., *supra*. For example, as Dr. Kopel explains, Dr. Saunders's "testimony was deficient in linking [PTSD] symptoms to their impact on Thuesen as an individual. Dr. Saunders downplayed their significance, focusing too heavily on symptoms of PTSD allegedly not experienced by Thuesen, such as flashback and auditory hallucinations." State Habeas Petition, Ex. 8 ¶ 43. Moreover, in returning a guilty verdict, the jury had already rejected Dr. Saunders's testimony.

Thuesen's state habeas petition, Dr. Mark Cunningham[31] explained the importance of expert testimony in understanding and weighing moral culpability: "[a]n understanding of evidence impacting the moral culpability of a defendant is critical to a jury's consideration of the appropriate punishment for a capital offense." State Habeas Petition, Ex. 5 ¶ 10. According to Dr. Cunningham, when the jury considers moral culpability, it must consider "the degree to which the background and circumstances of the defendant influenced, predisposed, or diminished the defendant's moral sensibility and the exercise of volition or free will." *Id.* ¶ 12. Only a PTSD expert would have been in a position to equip the jury with the information it needed when it considered Mr. Thuesen's moral culpability. And, as Dr. Cunningham notes, an effective defense "educate[s] the jury about the various damaging and impairing factors that exist in the defendant's life *and then further* [explains] how these factors played a role in shaping the conduct of the defendant." *Id.* ¶ 20 (emphasis in original). Indeed, a PTSD expert would have been critical to providing this explanation, and a PTSD expert would have rebutted the State's efforts to focus the jury on criminal responsibility (as opposed to moral culpability). *Id.* Using an expert "is standard professional practice in capital trials." *Id.* ¶ 23. Particularly because "[t]he nexus between psychological impairment and adult behavior is typically neither conscious nor simplistically obvious." *Id.* ¶ 28. In Dr. Cunningham's expert opinion,

> With this wealth of evidence about [Mr.] Thuesen's military experience, it was imperative that the defense team presented the testimony of someone that had an expertise in diagnosing, treatment, and/or researching the impacts of PTSD. Such a PTSD-focused expert witness could have educated the jury about how that specific psychological impairment would have affected Thuesen's mental health and outward behaviors.

---

[31] During the state habeas proceedings, Judge Bryan determined that Dr. Cunningham was credible and that his "testimony would have been admissible at Thuesen's trial and would have met sufficient reliability standards under *Daubert*." FFCL ¶ 3.

*Id.* ¶ 25. But Mr. Thuesen's jury received *no* "explanation for how [Mr. Thuesen's] experience related to Thuesen's moral culpability for the capital offense." *Id.* ¶ 21. Because trial counsel did not arm the jury with sufficient information to connect PTSD to mitigation or to place the prosecution's "aggravating" evidence in its proper context, trial counsel's deficient performance prejudiced Mr. Thuesen's punishment phase defense.

588.    Further, trial counsel failed to prepare adequate fact witness testimony for the punishment phase. Trial counsel appears to have investigated Mr. Thuesen's background and interviewed numerous witnesses (albeit far too late to properly prepare for trial), each with stories to share regarding how war changed Mr. Thuesen, all of which an expert could have tied to Mr. Thuesen's PTSD diagnosis. But trial counsel failed to prepare that testimony, again failing in its presentation of Mr. Thuesen's mitigating mental state. That unreasonable decision amounted to deficient performance that prejudiced Mr. Thuesen's punishment phase defense.

589.    For example, had trial counsel prepared and presented Patricia Thuesen's more fulsome testimony, she would have provided a more complete, compelling picture of her son before his combat experience and contrasted it to the man who returned from Iraq. Before Iraq, Mr. Thuesen was "a jokester and very outgoing." State Habeas Petition, Ex. 34 ¶ 4. He liked to have fun; he liked people. *Id.* Iraq changed Mr. Thuesen. After he returned home, he was no longer comfortable around new people. *Id.* ¶ 5. He began drinking heavily. *Id.* ¶ 7. He was angry. *Id.* ¶ 11.

590.    Further, had trial counsel prepared and presented Mrs. Thuesen's testimony related to the family's history of mental illness, the jury would have learned that Mr. Thuesen's maternal grandmother was an alcoholic; Mr. Thuesen's maternal grandfather showed signs of depression; Mr. Thuesen's uncle showed signs of depression throughout his life and was homeless much of his adult life; Mrs. Thuesen's half-sister also showed signs of depression and had been admitted

to a psychiatric hospital; Mr. Thuesen's sister spent time in a psychiatric hospital; and Mr. Thuesen's paternal grandmother showed signs of depression and alcoholism. 46 RR at 108-12 (Patricia Thuesen proffer during guilt phase). Had trial counsel prepared and presented Mrs. Thuesen's testimony related to the family's history of mental illness, the jury would have received additional mitigating evidence to consider. Mitigating evidence "provides a context for the crime by describing a set of life experience that inspire compassion, empathy, mercy and understanding." FFCL ¶ 286. And again, that testimony would have supported an expert's opinions and explanations of Mr. Thuesen's PTSD. Had trial counsel offered Mrs. Thuesen's testimony related to the family's history of mental illness, and had trial counsel offered expert testimony related to Mr. Thuesen's PTSD, the expert could have further opined that the family history made Mr. Thuesen more susceptible to PTSD. 4 HR2 at 151-53; *accord* Xenakis Decl. ¶¶ 44-46.

591.    Had trial counsel *prepared for trial*, they would have been able to present testimony from more than 15 fact witnesses describing Mr. Thuesen's changed behavior and struggle with PTSD following his return from Iraq. As Judge Bryan determined during the state habeas proceedings, "[s]ubstantially more information was available at the time of Thuesen's trial that would have been relevant and compelling mitigation for a juror's consideration." FFCL ¶ 88.

592.    During the punishment phase, trial counsel had family members, including Mr. Thuesen's father, brother, and sister, and family friends describe Mr. Thuesen as a "good person" before Iraq—testimony with questionable mitigating value. Trial counsel should have had these witnesses describe the drastic transformation they witnessed in Mr. Thuesen's personality and mental state following Iraq. State Habeas Petition, Ex. 31 (father describing losing the "social, out-going, energetic [son]" he once knew and stating that after Iraq, Mr. Thuesen was often "very depressed" and in a "daze"), Ex. 32 (brother describing that before Iraq, Mr. Thuesen was

"outgoing, talkative, a joker, and someone who got along with everyone" but that after Iraq, Mr. Thuesen "seemed edgy, quiet, and quick to anger" and "easy to startle"), Ex. 33 (sister describing Mr. Thuesen as "caring and loving" before Iraq but noticing extreme changes when he returned, including the fact that he experienced nightmares, startled easily, and "seemed to have a hard [time] holding his emotions together"), Ex. 19 (family friend describing that when "John returned from Iraq he did not have the patience he had before" and that "he was more distant and colder"), Ex. 20 (family friend describing that Mr. Thuesen "did not want to talk about his experiences [in Iraq]" and that she believed that Mr. Thuesen "needed counseling, someone to talk to about his war experiences").

593.    Trial counsel had marines who served with Mr. Thuesen in Iraq testify during the guilt phase, to describe their experience in Iraq. But trial counsel could have had these witnesses describe *how Iraq changed Mr. Thuesen* and that, in their experience, Mr. Thuesen displayed signs of PTSD. State Habeas Petition, Ex. 18 (Abbott describing post-Iraq Mr. Thuesen as "more of a loner and on edge or on guard" and stating that he "recognized the signs [of PTSD] in John"), Ex. 36 ("If my role had been better explained by John's attorneys," Townsend would have testified that Mr. Thuesen returned from Iraq "shaky and unsure," constantly "carrying around a pistol," and "edgy and hyper-alert.").

594.    And had trial counsel called additional witnesses—*most of whom they knew about*—including Mark Torres, Jeff Hood, Craig Novak, Michael Novak, Karolyn Ottmer, Stephen Snell, Brian Smith, Dianne Appolito, and Andy Rodesney, those witnesses would have described first-hand knowledge of Mr. Thuesen's visible PTSD symptoms after he returned from Iraq, including vivid flashbacks, seeing "the Marine come out of John," and "seem[ing] unstable" and "damaged"—all knew something was wrong, that Iraq had changed Mr. Thuesen. State

Habeas Petition, Ex. 1, Ex. 21, Ex. 24, Ex. 25, Ex. 26, Ex. 27, Ex. 28, Ex. 29, Ex. 35.

595.    Further, trial counsel mishandled presentation of fact witnesses during the guilt phase and obscured the limited record that they managed to develop on Mr. Thuesen's PTSD. During the guilt phase of trial, trial counsel called Dr. Carlo and Cannon ostensibly to speak to Mr. Thuesen's longstanding struggle with PTSD. But had trial counsel understood Mr. Thuesen's records[32] and the limits on Dr. Carlo's and Cannon's testimony—i.e., had trial counsel prepared for trial—they would have understood that despite Mr. Thuesen's persistent PTSD symptoms, neither Dr. Carlo nor any other VA medical professional diagnosed Mr. Thuesen with PTSD or provided proper treatment. Instead, trial counsel mishandled Dr. Carlo's and Cannon's testimony, failing to teach the jury about critical mitigating evidence[33]: at the time of the crime, Mr. Thuesen was suffering from undiagnosed, untreated PTSD.

596.    Trial counsel had a duty to investigate, develop, prepare, and present relevant mitigating testimony. Trial counsel's own investigation (albeit at the eleventh hour) revealed almost all of the evidence described regarding the impact of Mr. Thuesen's military experience on his physical and mental daily functioning. No fewer than 17 witnesses were available to give detailed testimony regarding the changes they witnessed in Mr. Thuesen after he returned from Iraq. That testimony would have supported and informed an expert's analysis and helped the jury understand the full extent of Mr. Thuesen's mental health leading up to and during the crime. Fulsome fact witness testimony would have supported compelling expert testimony related to PTSD. Had trial counsel presented the fact witness testimony available, the jury would have

---

[32] Trial counsel had access to Mr. Thuesen's VA records and knew or should have known that his reported symptoms did not match the treatment he received. 2 HR at 102-03; 5 HR at 170-71.

[33] *See* Claims for Relief § I.

received an overwhelming amount of expert and fact witness testimony to suggest that Mr. Thuesen should not bear the full weight of his crime, as the prosecution argued.

597.    To not prepare fulsome fact witness testimony related to Mr. Thuesen's PTSD amounted to deficient performance that prejudiced Mr. Thuesen's defense.

598.    As a result of trial counsel's ineffective assistance during the punishment phase of trial, Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

599.    Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claims 1, 5, 7, 8, 15, 16.

600.    During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the punishment phase of trial, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

601.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new punishment phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about whether Mr. Thuesen was properly sentenced to death or whether he should have instead been sentenced to life imprisonment without the possibility of parole.

**B. Trial counsel failed to investigate, develop, prepare, and present adequate evidence that Mr. Thuesen would not pose a continuing threat of future violence (State Habeas Claim 6).**

602. Trial counsel provided ineffective assistance when they failed to investigate, develop, prepare, and present adequate evidence that Mr. Thuesen would not pose a continuing threat of future violence in prison (assuming a sentence of life without parole).

603. At the conclusion of the punishment phase, the court required the jury to answer two "Special Issue" questions to determine Mr. Thuesen's sentence. Special Issue No. 1 asks the jury whether "there is a probability that [Mr. Thuesen] would commit criminal acts of violence that would constitute a continuing threat to society." 6 CR at 1223.

604. Trial counsel knew that Mr. Thuesen's life would turn on whether the jury received evidence showing that Mr. Thuesen did not pose a continuing threat of future violence. Trial counsel—experienced capital murder defense attorneys—knew that the jury would need to answer Special Issue No. 1. Trial counsel knew or should have known that they needed an expert—or experts—to testify that PTSD does not create a likelihood of future violence in a controlled environment. Trial counsel knew or should have known that the jury was unlikely to understand that Mr. Thuesen did not pose a continuing threat of future violence absent expert testimony.

605. Trial counsel knew enough to present two fact witnesses to testify to Mr. Thuesen's temperament in jail, awaiting trial. Wright, a sergeant in the medical division within the Brazos County Sheriff's Office, testified that she and her staff treated Mr. Thuesen during his pretrial confinement, that Mr. Thuesen took his medicine without problem, and that Mr. Thuesen's behavior had "been very respectful, very calm." 52 RR at 6-8. Wright testified that Mr. Thuesen performed well in the structured environment. *Id.* Zavala, a Brazos County Sheriff's Office jailer, often escorted Mr. Thuesen when he was awaiting trial and testified that "John Thuesen has been an inmate that always complied with the orders given," that he "[n]ever had any incident reports,"

173

and that Mr. Thuesen was a "model prisoner." 52 RR at 125-26.

606.    Trial counsel knew that they needed to investigate and present evidence related to Special Issue No. 1 and whether Mr. Thuesen posed a continuing threat of future violence. Trial counsel knew to call Brazos County Sherriff's Office employees. Yet trial counsel failed to prepare additional helpful testimony from Zavala regarding Mr. Thuesen's temperament in a controlled prison environment, and trial counsel failed to investigate, develop, prepare, and present John Stetter's testimony. Stetter, a Brazos County Sherriff's Office detention officer, knew Mr. Thuesen better than any other jail employee, as the two interacted regularly over 15 months. Trial counsel never contacted Stetter. State Habeas Petition, Ex. 30 ¶ 19.

607.    Trial counsel had a duty to prepare and present evidence that Mr. Thuesen would not pose a continuing threat of future violence. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.11 cmt. ("Studies show that future dangerousness is on the minds of most capital jurors, and is thus 'at issue' in virtually all capital trials, whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration.").[34] Trial counsel did not prepare or present an expert to testify to whether Mr. Thuesen posed a continuing threat of future violence. Nor did trial counsel prepare and present its most valuable fact witness testimony. Those unreasonable decisions amounted to deficient performance that prejudiced Mr. Thuesen's punishment phase defense.

608.    Indeed, without expert guidance, "jurors often make predictions of future violent conduct based on multiple faulty conceptual strategies." State Habeas Petition, Ex. 5 ¶ 34; 3 HR at 40 ("Unassisted by expert testimony . . . jurors are subject to grave errors" when judging whether

---

[34] https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/2003guidelines.pdf.

a defendant poses a continuing threat to society.). An expert would have testified that Mr. Thuesen would not pose a continuing threat of future violence in prison, for a variety of reasons supported by empirical studies and data. An expert, like Dr. Cunningham, would have opined that "there is a very low likelihood that [Mr. Thuesen] could commit serious acts of violence confined for life in the Texas Department of Criminal Justice." 3 HR at 33. An expert, like Dr. Cunningham, would have explained to the jury that Mr. Thuesen exhibits at least nine factors that reduce his risk of future violence:

- Mr. Thuesen's age;

- The fact that he had been a model inmate when awaiting trial (no disciplinary issues over 15 months);

- The level of security correctional staff provided (e.g., low given Mr. Thuesen's offense);

- Mr. Thuesen's education (high school diploma and college credits);

- Mr. Thuesen's employment history;

- Mr. Thuesen's continuing contact and relationships with family and friends;

- The fact that Mr. Thuesen would be a capital inmate serving a life term;

- The fact that Mr. Thuesen would be serving life without parole;

- The fact that Mr. Thuesen would be serving his sentence in the Texas Department of Criminal Justice.

3 HR at 49-76; *see also* State Habeas Petition, Ex. 5 ¶ 33 ("[E]vidence that Mr. Thuesen is likely to have a positive adjustment to a life sentence in TDCJ would tend to rebut any implicit, if erroneous, future risk implications of personal characteristics, offense features, or other aggravating factors that may be asserted or implied by the State."), ¶¶ 37-155. Zero factors

increased Mr. Thuesen's risk of future violence. 3 HR at 76. Further, an expert would have rebutted the State's unsupported arguments related to Mr. Thuesen's alleged future dangerousness.

609.   Further, had trial counsel prepared and presented expert testimony related to Mr. Thuesen's PTSD, that expert or those experts would have helped the jury understand how Mr. Thuesen's violent behaviors are connected to his PTSD symptoms and, more important, that Mr. Thuesen could receive treatment for those symptoms. They would have also heard how those symptoms were likely to manifest differently in a structured setting—like prison—such that Mr. Thuesen was unlikely to present a risk of future violence while incarcerated. State Habeas Petition, Ex. 9 ¶ 71.

610.   Had trial counsel investigated, prepared, and presented Stetter's testimony, he would have testified that he got to know Mr. Thuesen as he awaited trial in the Brazos County jail. Stetter "never saw John act up or step out of line." State Habeas Petition, Ex. 30 ¶ 8. Despite all Mr. Thuesen was experiencing, he remained a "model prisoner." *Id.* ¶ 13.

611.   Had trial counsel developed more fulsome testimony from the fact witness that they *did* offer—Zavala—he would have further testified that Mr. Thuesen "did well in a structured environment" and "was a positive influence on the others" housed in his unit. State Habeas Petition, Ex. 38 ¶¶ 5, 7. Zavala never feared Mr. Thuesen or worried that he posed a threat. *Id.* ¶ 10.

612.   To not prepare expert or fact witness testimony related to Special Issue No. 1 amounted to deficient performance that prejudiced Mr. Thuesen's punishment phase defense. With additional, more helpful evidence relevant to Special Issue No. 1, members of the jury may have answered Special Issue No. 1 in favor of life without parole, rather than death.

613.   As a result of trial counsel's ineffective assistance during the punishment phase of trial, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the

Constitution of the United States.

614.    Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 6.

615.    During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the punishment phase of trial, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

616.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new punishment phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about whether Mr. Thuesen was properly sentenced to death or whether he should have instead been sentenced to life imprisonment without the possibility of parole.

### C.  Trial counsel failed to impeach Amanda ("Mandy") Ward's aggravation testimony (State Habeas Claim 10).

617.    During the punishment phase, Amanda ("Mandy") Ward, a woman who dated Mr. Thuesen for a short time when Ward and Mr. Thuesen were in high school—before he deployed to Iraq—testified (for the State) that she experienced an incident with Mr. Thuesen in high school in which Mr. Thuesen displayed inappropriate jealousy. The prosecution used Ward's testimony to argue that Mr. Thuesen has always acted with extreme possessiveness in his domestic relationships and that, as a result, the crime had nothing to do with PTSD.

618.    Trial counsel knew that they could impeach Ward's testimony. Trial counsel knew

177

that three individuals present during the purported event, Haley McDowell, Jimmy Kleimann, and Ward's mother, could call Ward's testimony into question. None remembered the angry, obsessive Mr. Thuesen that Ward described.

619.    But trial counsel neither cross examined Ward nor offered McDowell, Kleimann, or Ward's mother. Trial counsel's failure amounted to deficient performance that prejudiced Mr. Thuesen's defense. Indeed, trial counsel's failure to cross or impeach Ward allowed the prosecution to argue that her testimony stood unrebutted and that Mr. Thuesen's troubling, aggravating behavior is "his character" and "his nature." 54 RR at 20.

620.    Had trial counsel called McDowell, she would have testified that she remembers the party that Ward described but that she remembers little else about the evening. State Habeas Petition, Ex. 23-A (mislabeled 33-A). McDowell would not have testified that Mr. Thuesen was aggressive; she remembers no violent outbursts. *Id.* She remembers only feeling like she "was in the middle of John and Mandy's date gone wrong." *Id.* ¶ 3.

621.    Had trial counsel called Kleimann, he would have testified that he does not remember the events Ward described. He does not recall a John Thuesen. And he has "no idea why Ms. Ward listed me in the police report." State Habeas Petition, Ex. 22.

622.    Had trial counsel called Ward's mother, she would have testified that she has no specific memory involving Mr. Thuesen, that she does not know Mr. Kleimann, and that she does not recall any incidents involving Mr. Kleimann at her home. State Habeas Petition, Ex. 37.

623.    Moreover, trial counsel should have known that they could impeach Ward during cross examination using information in her probation records. Trial counsel failed to investigate and obtain records related to Ward's deferred-adjudication community supervision for cocaine possession. Had trial counsel investigated Ward, they would have been able to question her

motivation for testifying against Mr. Thuesen and her ability to recall past events.

624.     Trial counsel's deficient performance—their failure to investigate and their decision to leave Ward's testimony unrebutted—prejudiced Mr. Thuesen's punishment phase defense. The State used Ward's testimony to discredit Mr. Thuesen's most compelling mitigating evidence: that his combat experience changed him and that his PTSD played a significant role in the underlying crime. Ward's unimpeached testimony allowed the prosecution to argue that Mr. Thuesen displayed a pattern of violence against women and that the pattern began before his combat experience. Ward's testimony was important enough that the prosecution pointed to it in their closing argument, reminding the jury that it was unrebutted. 54 RR at 20.

625.     As a result of trial counsel's ineffective assistance during the punishment phase of trial, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

626.     Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 10.

627.     During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the punishment phase of trial, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

628.     As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new punishment phase trial, in which a jury will be permitted to consider all of the necessary evidence

for it to make a fair determination about whether Mr. Thuesen was properly sentenced to death or whether he should have instead been sentenced to life imprisonment without the possibility of parole.

**D. Trial counsel failed to object to the State's improper closing argument during the punishment phase (State Habeas Claim 17).**

629.    Trial counsel provided ineffective assistance when they failed to object to the State's improper closing argument remark related to PTSD during the punishment phase of trial.

630.    During punishment phase closing arguments, the State told a story about a relative with PTSD and proceeded to tell the jury what PTSD is: reacting to a gunshot. The State offered an oversimplified, inaccurate, non-expert characterization of what PTSD is—and, by implication, what it is *not*:

> [L]et me tell you a story. My stepfather fought in the Battle of the Bulge. His friends and comrades were dying left and right of him as they were there. And years later as we're sitting on the porch after dinner, a gunshot goes off. We all think it is nothing. He knows, he yells for all of us to get down, get inside. That's PTSD.

54 RR at 82. The State went on to argue that Mr. Thuesen's symptoms were *not* PTSD. 54 RR at 84. And trial counsel did not object. That failure to object amounted to deficient performance that prejudiced Mr. Thuesen's punishment phase defense.

631.    Trial counsel knew or should have known that the State's PTSD comments were improper and based on no evidence of record. Trial counsel had a duty to object to improper argument. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.8 cmt.[35] Trial counsel knew or should have known that the State's arguments related to PTSD were both improper—counsel may not claim in closing

---

[35] https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/2003guidelines.pdf.

180

argument to have certain expertise that they do not—and unsupported by evidence of record.

632.    Had trial counsel objected, the court would have sustained the objection and corrected or mitigated the State's statements to the jury. That, or the court's failure to sustain the objection would have constituted reversible error.

633.    Trial counsel's failure to object to the State's improper arguments prejudiced Mr. Thuesen's punishment phase defense. The State's improper, unsupported statements—presenting his personal opinion as a medical diagnosis—planted seeds of doubt in the jury's mind as to whether Mr. Thuesen actually suffered from PTSD. This injection of the prosecutor's personal opinion was the only "evidence" that Mr. Thuesen does not suffer from PTSD.

634.    As a result of trial counsel's ineffective assistance during the punishment phase of trial, Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

635.    Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 17.

636.    During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the punishment phase of trial, it (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

637.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new punishment phase trial, in which a jury will be permitted to consider all of the necessary evidence

for it to make a fair determination about whether Mr. Thuesen was properly sentenced to death or whether he should have instead been sentenced to life imprisonment without the possibility of parole.

## III.   APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE, IN VIOLATION OF MR. THUESEN'S SIXTH AMENDMENT RIGHTS.

### A.   Appellate counsel failed to argue, on direct appeal, that the trial court erred in denying Mr. Thuesen's pretrial motions to preclude the death penalty.

638.    Trial counsel filed 11 pretrial motions attacking the constitutionality of the death penalty in Mr. Thuesen's case. *See* 1 CR at 189; 2 CR at 218, 225, 230, 243, 306, 310, 337, 342, 350, 355, 364, 377; 3 CR at 401. The trial court denied trial counsel's motions. Those denials amounted to errors of law. Appellate counsel failed to appeal these errors. Appellate counsel's failure to appeal the trial court's errors amounted to deficient performance that prejudiced Mr. Thuesen.

639.    To prove ineffective assistance of counsel under *Strickland v. Washington* and the elaboration on *Strickland* of *Smith v. Robbins*, 528 U.S. 259, the petitioner must show by a preponderance of the evidence that counsel's performance fell outside the ambit of proficient professional conduct and that there is a probability sufficient to undermine the confidence of outcome that the result of the proceeding would have been different but for counsel's unprofessional errors. *See Strickland*, 466 U.S. at 687. If appellate counsel declines to raise an issue on appeal that was "plainly stronger than those actually presented to the appellate court," *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017), then petitioner states a claim for ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

640.    Appellate counsel's failure to appeal any of Mr. Thuesen's pretrial motions related to the constitutionality of the death penalty prejudiced Mr. Thuesen's defense and constituted ineffective assistance. In the appeal, appellate counsel had a "constitutional duty to review the

record and present any meritorious claims." *Meza v. State*, 206 S.W.3d. 684, 689 (Tex. Crim. App. 2006) (noting appellate counsel's "constitutional duty to review the record for any arguable error"). Mr. Thuesen's appellate counsel's performance was deficient. *See, e.g.*, *Evitts v. Lucey*, 469 U.S. 387, 394 n.6 (1985) ( "In a situation like that here, counsel's failure was particularly egregious in that it essentially waived respondent's opportunity to make a case on the merits; in this sense, it is difficult to distinguish respondent's situation from that of someone who had no counsel at all."). Appellate counsel's failure to appeal the trial court's erroneous denials of Mr. Thuesen's pretrial motions was objectively unreasonable and prejudiced Mr. Thuesen's Sixth Amendment rights guaranteed by the Constitution and relevant statutes and common law precedent.

641.    Trial counsel filed 11 motions requesting relief from the death penalty, and at least six (nos. 1, 2, 4, 6, 7, and 11) asserted constitutional grounds:

1.    Motion to Declare Chapter 19 of the Texas Penal Code Unconstitutional and to Set Aside the Indictment

2.    Motion to Find Article 37.071 Unconstitutional Because it Fails to Provide a Meaningful Appellate Review of the Jury's Answers to the Special Issues at Punishment

3.    Motion to Preclude the Death Penalty Due to the Grand Jury's Failure to Allege in the Indictment All Elements Necessary to Make Thuesen Death-Eligible

4.    Article 37.071 is Unconstitutional (Burden of Proof on Defendant to Prove Mitigation is Sufficient to Warrant Life)

5.    Motion to Preclude the Death Penalty as a Sentencing Option: Probability

6.    Code of Criminal Procedure Article 37.071 is Unconstitutional Due to Unreliability

7.    Motion to Find Article 37.071, Section 2(F)(4) Unconstitutional

8.    Motion to Preclude the State from Seeking Death Related to Requiring Mitigation to be Considered

9.    Motion to Prohibit the State from Seeking the Death Penalty Relating to Predictions of Future Danger Not Reliable

10. Motion to Permit the Introduction of Evidence of Other Sentences Imposed in Capital Cases in Brazos County

11. "Motion to Preclude the Death Penalty as a Sentencing Option or, in the Alternative, to Quash the Indictment Under *Apprendi v. New Jersey*/*Ring v. Arizona*/*Blakely v. Washington* & *Bush v. Gore*, or, in the Alternative, Request to Voir Dire/Requested Instructions/Motions in Limine, Related to Issues Raised by This Motion."

642. Appellate counsel should have raised these claims on appeal, and that failure amounted to ineffective assistance. Each of these claims is described next.

### 1. Motion to Declare Chapter 19 of the Texas Penal Code Unconstitutional and to Set Aside the Indictment

643. Mr. Thuesen filed a pretrial motion asking the court to declare Chapter 19 of the Texas Penal Code unconstitutional both facially and as applied to Mr. Thuesen, and to set aside the indictment. 2 CR at 218; 5 RR at 40-48. The trial court erroneously denied this motion, 8 RR at 188, and appellate counsel's failure to raise this erroneous denial constitutes ineffective assistance.

### 2. Motion to Find Article 37.071 Unconstitutional Because it Fails to Provide a Meaningful Appellate Review of the Jury's Answers to the Special Issues at Punishment

644. The trial court denied Mr. Thuesen's motion asking the court to find Article 37.071 unconstitutional because that article fails to provide a meaningful appellate review of the jury's answers to the special issues at punishment. 2 CR at 230; ruling 5 RR at 70. This denial was in error, and appellate counsel was ineffective for failing to raise it on direct appeal.

645. The trial court erroneously denied Mr. Thuesen's motion to preclude the death penalty as a sentencing option. 2 CR at 310; ruling 8 RR at 188. That ruling was in error, and appellate counsel's failure to raise this constitutes ineffective assistance.

### 3.  Motion to Preclude the Death Penalty Due to the Grand Jury's Failure to Allege in the Indictment All Elements Necessary to Make Mr. Thuesen Death-Eligible

646.    The trial court erroneously denied Mr. Thuesen's pretrial motion to preclude the death penalty due to the grand jury's failure to allege in the indictment all elements necessary to make Mr. Thuesen death-eligible. 2 CR at 337; ruling 8 RR at 188. This erroneous denial should be reversed, and appellate counsel was ineffective by not raising this erroneous denial in Mr. Thuesen's direct appeal.

### 4.  Article 37.071 is Unconstitutional (Burden of Proof on Defendant to Prove Mitigation is Sufficient to Warrant Life)

647.    The trial court erroneously denied Mr. Thuesen's pretrial motion prohibiting the State from seeking the death penalty based upon the unconstitutionality of Article 37.071. 2 CR at 342; ruling 8 RR at 188. Appellate counsel failed to raise this on direct appeal, and that omission constitutes ineffective assistance.

### 5.  Motion to Preclude the Death Penalty as a Sentencing Option: Probability

648.    Mr. Thuesen filed a pretrial motion asking the trial court to preclude the death penalty as a sentencing option because the inquiry into death unconstitutionally lowers the reasonable doubt standard in violation of the United States Constitution, as interpreted in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). 2 CR at 350; ruling 8 RR at 188. The trial court erroneously denied this motion, and appellate counsel was ineffective for failing to raise it in Mr. Thuesen's direct appeal.

### 6.  Code of Criminal Procedure Article 37.071 is Unconstitutional Due to Unreliability

649.    The trial court erroneously denied Mr. Thuesen's pretrial motion asking the court to preclude the State from seeking the death penalty because Article 37.071 is unconstitutional due to its unreliability. 2 CR at 355; ruling 8 RR at 188. Appellate counsel was ineffective in failing to

raise the denial on Mr. Thuesen's direct appeal.

### 7.  Motion to Find Article 37.071, Section 2(F)(4) Unconstitutional

650.    Mr. Thuesen filed a pretrial motion asking the trial court to find Article 37.071, section (2)(F)(4) unconstitutional as the instruction to the jury to consider mitigating evidence too narrowly limits that evidence only to that which "might reduce moral blameworthiness." 2 CR at 364; ruling 8 RR at 188. The trial court erroneously denied this motion, and appellate counsel was ineffective in failing to raise it in Mr. Thuesen's direct appeal.

### 8.  Motion to Preclude the State from Seeking Death Related to Requiring Mitigation to be Considered

651.    The trial court erroneously denied Mr. Thuesen's motion seeking to preclude the State from seeking death because Article 37.071, sections (2)(e) and (2)(f) fail to require mitigation be considered. 2 CR at 374; ruling 8 RR at 188. Appellate counsel was ineffective in failing to raise this argument in Mr. Thuesen's direct appeal.

### 9.  Motion to Prohibit the State from Seeking the Death Penalty Relating to Predictions of Future Danger Not Reliable

652.    Mr. Thuesen filed a motion prohibiting the State from seeking the death penalty because the jurors' predictions of Mr. Thuesen's future dangerousness would be unreliable. 3 CR at 401; ruling 8 RR at 188. The trial court erroneously denied this motion, and appellate counsel was ineffective in failing to raise it on direct appeal.

### 10. Motion to Permit the Introduction of Evidence of Other Sentences Imposed in Capital Cases in Brazos County

653.    The trial court erroneously denied Mr. Thuesen's motion to permit the introduction of evidence of other sentences imposed in capital cases in Brazos County, the county in which Mr. Thuesen was tried. 2 CR at 225; ruling 5 RR at 52. This denial was in error, and appellate counsel was ineffective for failing to raise this on direct appeal.

11. **Motion to Preclude the Death Penalty as a Sentencing Option or, in the Alternative, to Quash the Indictment Under *Apprendi v. New Jersey*/*Ring v. Arizona*/*Blakely v. Washington* & *Bush v. Gore*, or, in the Alternative, Request to Voir Dire/Requested Instructions/Motions in Limine, Related to Issues Raised by This Motion**

654.     Trial counsel argued that Mr. Thuesen had the constitutional right to have a grand jury consider in the indictment all the specific facts legally essential to his conviction and death and that the jury determine, beyond a reasonable doubt, all the facts legally essential to his sentence. 2 CR at 377. The trial court erred in denying this motion and appellate counsel was ineffective for failing to raise it on appeal.

**B.    Appellate counsel's failure to appeal the trial court's denial of Mr. Thuesen's pretrial motions related to the death sentence fell below the objective standard of reasonableness.**

655.     The claims appellate counsel did not raise were related to the death penalty. Although, as discussed above, trial counsel, including Blazek (who was also appellate counsel), failed to investigate information about Mr. Thuesen's mental health. In failing to do the investigation required by *Porter v. McCullum*, appellate counsel fell below the objective standard of reasonable standard of reasonableness required by that case.

**C.    Appellate counsel's failure to appeal the trial court's denial of Mr. Thuesen's pretrial motions related to the death sentence prejudiced Mr. Thuesen.**

656.     Appellate counsel's failure prejudiced Mr. Thuesen because, at a minimum, claims that properly addressed the effects of PTSD on Mr. Thuesen's moral culpability, *i.e.*, those informed by the understanding of PTSD that trial counsel did not appreciate, as explained above, would more accurately place the motions in the context of the facts of the case.

## IV.    POST-CONVICTION COUNSEL WAS INEFFECTIVE

657.      In violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 569 U.S. 413

(2013), Mr. Thuesen's post-conviction counsel, OCFW, rendered ineffective assistance when they failed to adequately plead, prepare, investigate, and present compelling and substantial claims that Mr. Thuesen was entitled to post-conviction relief, including but not limited to all of the claims presented in this petition.

658.    By way of non-limiting example, the OCFW provided ineffective assistance in the following ways.

**A.    Post-conviction counsel failed to appreciate that trial counsel's ineffectiveness was established on the trial record, even in the absence of additional expert testimony, and so failed to fully argue trial counsel's effectiveness.**

659.    OCFW appreciated that PTSD should have been a central theme at trial. *See supra,* Claims for Relief, § I. B.

660.    But OCFW failed to plead, prepare, investigate, and present compelling and substantial claims that trial counsel investigate, develop, prepare, and present evidence about Mr. Thuesen's PTSD. For example, despite the importance of trial counsel educating itself about Mr. Thuesen's mental health, trial counsel failed to appreciate that the record its own investigator developed contained vital information. Had Dr. Saunders seen that vital information while preparing for his guilt/innocence phase testimony, he would have been able to answer the question "Did Mr. Thuesen have PTSD, and not merely did he exhibit some PTSD symptoms?" This testimony would have been important for trial counsel to prepare and present to the venirepersons during voir dire and to the jury during the guilt/innocence phase of the trial and could have been dispositive on the question of whether Mr. Thuesen had PTSD.

**1.    There was a gap in Dr. Saunders' knowledge of the facts about Mr. Thuesen's mental health.**

661.    When he testified during the guilt/innocence phase of the trial, Dr. Saunders was unable to testify that Mr. Thuesen had PTSD. This was, he testified, because while Mr. Thuesen

had *symptoms* of PTSD, he had not undergone the "traumatic event" necessary for the diagnosis traumatic experience. 47 RR at 32 ("There was no report of him ever being back in a traumatic, life-threatening situation.").[36]

662.    Indeed, to be diagnosed with PTSD at the time of trial, DSM-IV required that a patient have certain symptoms, as well as undergoing a traumatic event. *See* Xenakis Decl. ¶ 23.

663.    For an event to qualify as a trauma, according to the DSM-IV, requires both the objective criterion (A1) that person has "experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or threat to the physical integrity of self or others" and the subjective criterion (A2) that "the person's response involved intense fear, helplessness, or horror" be met. Cahill S.P. & Pontoski K. *Post-traumatic stress disorder and acute stress disorder I: their nature and assessment considerations*, Psychiatry (Edgmont). 2005;2(4):14-25; *accord* Xenakis Decl. ¶ 23.

664.    Accordingly, this lack of knowledge about a traumatic event in Mr. Thuesen's history was the "gap"—as far as Dr. Saunders understood, at least—in concluding that Mr. Thuesen had PTSD.

665.    Dr. Saunders was not ignorant about the effects of PTSD on its victims.

666.    Although he was not a particular expert in PTSD, Dr. Saunders knew enough about it to present credible and material testimony at the guilt/innocence phase of the trial. Indeed, weeks before Dr. Saunders denied to the jury that Mr. Thuesen had PTSD he had testified about PTSD at

---

[36] *See also* Mr. Thuesen's proposed FFCL at the second evidentiary hearing, ¶ 408, discussing where Dr. Saunders mistakenly identified the lack of flashbacks as being the "one specific criterion for PTSD" Mr. Thuesen purportedly lacked. In fact, Mr. Thuesen *had* experienced flashbacks. Pet. at 42. Whatever gap there was for Dr. Saunders to make a PTSD diagnosis for Mr. Thuesen, during the guilt/innocence phase of the trial, in reality, the gap didn't exist, and trial counsel knew, or should have known it.

a *Daubert* hearing, out of the presence of the jury (which had yet to be empaneled). There, he testified that people with PTSD have diminished intent. 44 RR at 19-23. Further, he testified (again, not to the jury) that PTSD can destroy the requisite *mens rea*.

> Q. What would you anticipate in an anxious person as far as anxiety?
>
> A. Once again, *there's what we refer to as "elevated sympathetic nervous system tone." This is what's commonly referred to sometimes as the "fight-or-flight" mechanism. That means there is increased respiration, increased heart rate, muscle tone. There is a release of the stress hormones where basically your body is gearing up to act…*
>
> *Unfortunately, during that time there's an impairment in thinking clearly, and thoughts are racing through. He has had great difficulty understanding, being able to sequence, being able to rationally think out.* That is what would happen in a normal stress response. *PTSD is an anxiety disorder*, but there is also anxiety outside of that that he is experiencing.
>
> . . .
>
> *my opinion is that he was -- he lacked the capacity to form that* mens rea *for intentionally or knowingly.*

44 RR at 22-23, 31 (emphasis added).

667.    Dr. Kopel's written testimony from the state habeas proceedings confirms Dr. Saunders's *Daubert* (non-jury) testimony:

> Q. So given your conclusions regarding the fight-or-flight response Mr. Thuesen was exhibiting and his actions after the crime, do you believe Mr. Thuesen intended to kill Rachel and Travis Joiner?
>
> A. It's my opinion that that was not his intent.

4 HR at 135.

668.    At the conclusion of the *Daubert* hearing, the trial judge accepted Dr. Saunders' testimony. 44 RR at 45.

### 2. The gap in Dr. Saunders's knowledge of the facts about Mr. Thuesen's PTSD could have been filled at the time of the guilt/innocence phase of the trial by facts known to trial counsel.

669.    Even though, at the time of the guilt/innocence phase of the trial, Dr. Saunders was ignorant of the traumatic events giving rise to Mr. Thuesen's PTSD, trial counsel knew the facts necessary to fill that gap. Trial counsel knew how to fill this gap in two ways.

670.    First, sitting in trial counsel's files was an interview summary, dated April 29, 2010 (before the guilt/innocence phase of the trial began) with Tim Rojas. Ex. 10. The notes describe a traumatic event Rojas observed in Iraq, when Mr. Thuesen shot his "big gun" at a car containing an elderly man and a young boy. Of the event, Rojas stated, "Thuesen's fear was an elderly man and a young boy, and even though they survived, *it doesn't go away.*" (emphasis added). *Id.*

671.    This was a traumatic event that Dr. Saunders needed to fill the gap in making a diagnosis of PTSD *during the guilt/innocence phase of the trial*. The extreme level of trauma was explicated by trial counsel's examination of Rojas during the punishment phase of the trial. 52 RR at 158-162.

672.    The second gap-filling fact known to trial counsel came from Mr. Thuesen's witness Jeremy Abbott, in open court, the day before Dr. Saunders denied that Mr. Thuesen had undergone a traumatic event in Iraq.

673.    Mr. Abbott was a buddy of Mr. Thuesen's in Iraq. Mr. Abbott was a radioman, and Mr. Thuesen was his machine gunner. 46 RR at 156, 157. Abbott testified to the jury on May 17, 2010, one day before Dr. Saunders testified to the jury (but after Dr. Saunders's *Daubert* hearing).

> Q. Were you under fire?
>
> A. Yes.
>
> Q. Was John Thuesen with you?
>
> A. Yes.

Q. On few or many occasions?

A. Enough.

Q. When you say "enough," young man, what do you mean?

A. One time is plenty for everybody.

Q. What do you mean by that?

A. Something you'll never forget.

Q. What do you mean?

A. Devastating. You feel hopeless, and you can't do anything.

46 RR at 158.

674.    This "devastating" event is a traumatic event in Mr. Thuesen's life, described in open court, on direct exam by trial counsel. It, like the event testified to by Rojas, should have enabled Dr. Saunders to make a diagnosis of PTSD for Mr. Thuesen on the stand, during the guilt/innocence phase of the trial.

> **3.    When Dr. Saunders testified to the jury and demonstrated a gap in his knowledge of Mr. Thuesen's life, trial counsel knew or should have known exactly how to fill the gap.**

675.    In light of trial counsel's knowledge of the traumatic experiences Mr. Thuesen underwent in Iraq, trial counsel knew exactly how fill the gap in Dr. Saunders's knowledge. Trial counsel could, and should, have referred to the above-referenced testimony and documents, if not in preparing Dr. Saunders's for trial, then during his direct examination.

676.    But trial counsel, inexplicably, did not do that. They missed the opportunity to use the knowledge about the ramifications of PTSD on the intent of those—like Mr. Thuesen—who are in the midst of a PTSD crisis. Xenakis Decl. ¶¶ 32, 43. Accordingly, trial counsel missed their opportunity to establish a basis for arguing that Mr. Thuesen's PTSD diminished his intent to commit the charged crime.

**4. Post-conviction counsel provided inadequate assistance in failing to identify, during the state habeas proceedings, trial counsel's failure to use the information in their possession to undercut the State's proof of *mens rea.***

677.     All the information described above about Mr. Thuesen's trauma in Iraq was in the hands of trial counsel during the guilt/innocence phase of the trial. Post-conviction counsel failed to point this fact out. Post-conviction counsel failed to explain to the state court during the state habeas proceedings that Mr. Thuesen's trial counsel could have made a strong case that he lacked the requisite *mens rea* for capital murder, as the intent element could be attacked. Trial counsel's failure to do so amounted to ineffective assistance, as discussed above. And post-conviction counsel's failure to bring that claim for ineffective assistance amounted to deficient performance because it was a fundamental duty of post-conviction counsel to detect trial counsel's errors. This failure of post-conviction counsel to identify this failure of trial counsel prejudiced Mr. Thuesen because, had the post-conviction court concluded that trial counsel's performance was deficient, then Mr. Thuesen likely would have prevailed at the state post-conviction proceeding.

**B. Post-conviction counsel failed to raise claims based on child abuse and its relation to PTSD, in opposition to Mr. Thuesen's requests.**

678.     Child abuse increases the likelihood that a victim may suffer PTSD later in life. *See, e.g.*, Wisdom, C. S., & Hiller-Sturmhöfel, S. *Alcohol abuse as a risk factor for and consequence of child abuse*. Alcohol Research & Health: The Journal of the National Institute on Alcohol Abuse and Alcoholism, 25(1), 52–57 (2001); Xenakis Decl. ¶¶ 44-46.

679.     Trial counsel did not investigate the links between PTSD, childhood abuse, alcohol abuse, and violence. 2 HR at 95-98; 5 HR at 173-77. Post-conviction counsel, on the other hand, was aware of this link between childhood violence and alcohol abuse. Ex. 2; Proposed Order, Dkt. 95 ¶ 99.

680.     Both alcohol abuse and violence were present in Mr. Thuesen's family when he

was a child. Post-conviction counsel knew that.

681.    Mr. Thuesen requested that post-conviction counsel investigate the role, if any, child abuse played in his development of PTSD. Further, he requested that post-conviction counsel use research on this topic, even research published after the trial, to buttress claims that he had PTSD at the time of the killings, and further that this PTSD, in crisis situations, diminished his intent at the time of the killings and further served to reduce his moral culpability.

682.    Mr. Thuesen's request of the post-conviction counsel were supported by facts known to post-conviction counsel and facts discoverable after reasonable investigation, and so were reasonable. Post-conviction counsel had a duty to follow reasonable leads in its work for Mr. Thuesen. Accordingly, post-conviction counsel's failure to follow this reasonable request amounted to deficient performance. This failure prejudiced Mr. Thuesen because an expert's guidance on this subject would have informed post-conviction counsel about further examples of ineffective assistance of trial counsel.

### C. Post-conviction counsel failed to raise claims based on new science concerning Mr. Thuesen's purported failure to regret his actions and concerning his statements immediately following the crime.

683.    At trial, the State introduced testimony suggesting that in the minutes and hours after the killings, Mr. Thuesen did not show regret for this actions. This evidence included lay witnesses' conclusions about the expression on Mr. Thuesen's face, which the witnesses interpreted as showing an absence of regret. It also included statements he made during that period. The presence or absence of signs of regret was important in the guilt/innocence phase of the trial, and likely to the juror's consideration of mitigating evidence. Therefore, it is highly relevant to the trial.

684.    However, as described in the Xenakis Declaration ¶ 41, the standard for

understanding a behavior of a person in the immediate aftermath of a PTSD crisis, like Mr. Thuesen, changed between the time of the trial and the time of the state habeas proceedings. More specifically, DSM-IV (TR) was used at trial, but by the time of the state habeas proceedings, DSM-V was published. DSM-V explains that people in the aftermath of a PTSD crisis may be in a dissociative state, a state where their facial expressions may not reflect their actual emotional state. Further, as is reflected in DSM-V (but not in DSM-IV), people in the aftermath of a PTSD crisis may confabulate. The research shows that such people, at least partially because the PTSD crisis makes it difficult to form memories, may "make up," or confabulate, in response to questions. *See* Xenakis Decl. ¶ 41.

685.     Post-conviction counsel failed to appreciate that the new science described in DSM-V would cast a different light on Mr. Thuesen's demeanor and statements made in the minutes and hours after the shooting. More specifically, expert testimony would show that his demeanor at that time could not be used to infer a lack of remorse. Further, given the difficulties that the PTSD crisis would have caused in forming memories, expert testimony would have shown that an untrained interviewer would likely extract confabulations, not the truth, from an interview with Mr. Thuesen.

686.     It was ineffective assistance of post-conviction counsel to fail to make such evidence available to the state court, and without that testimony, the state court itself could not understand the implications of Mr. Thuesen's demeanor or statements in the minutes and hours immediately following the shooting.

## V.     THE STATE HABEAS PROCEEDINGS VIOLATED THUESEN'S RIGHTS UNDER THE DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS.

**A. A State Court Must Observe Due Process When Adjudicating Constitutional Claims Raised in a Post-Conviction Proceeding.**

687.    When a state provides a mechanism for a habeas applicant to collaterally attack a criminal conviction, the procedures employed must comport with due process. *See Evitts v. Lucey*, 469 U.S. 387, 401 (1985) ("[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause.").

688.    In "capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).

**B. The state habeas court violated due process by permitting the State to removal of the first habeas judge after he issued a ruling adverse to the State.**

689.    As described in more detail *supra*, the relevant underlying facts are straightforward. The judge who presided over the trial that led to Mr. Thuesen's conviction and who pronounced the sentence of death on him, The Honorable Travis Bryan III, also held the first evidentiary hearing in his state habeas case. Both parties explicitly consented to Judge Bryan heading the state habeas petition. There, following a 5-day evidentiary hearing and with the benefit of having witnessed the conduct of Mr. Thuesen's lawyers, Judge Bryan found that Mr. Thuesen's attorneys had been ineffective across numerous modes, recommending relief regarding ten claims raised by Mr. Thuesen's petition, Claims 1, 5, 6, 7, 8, 10, 13 (in part), 15, 16, and 17. Judge Bryan ultimately recommended that because of the serious constitutional deficiencies in the conduct of his trial and appellate attorneys, Mr. Thuesen should be granted a new penalty phase trial.

690.    After Judge Bryan had ruled in Mr. Thuesen's favor, however, the State, reneging on its previous consent to have Judge Bryan decide, adopted the argument that a minor administrative error deprived Judge Bryan of authority to adjudicate the case.

691.    The CCA accepted the State's post-ruling change of heart, and ruled that Judge Bryan did not have authority to preside over Mr. Thuesen's evidentiary hearing because Presiding Judge Underwood had "not issued a written order rescinding Judge Townslee's assignment." In doing so, the CCA undid the parties' prior agreement, even despite the facts that Presiding Judge Underwood himself having advised Judge Bryan both that no such written order was necessary, and that the administrative error was not jurisdictional.

692.    The CCA remanded Mr. Thuesen's case for assignment to a new judge. That decision was akin to allowing the State to charge Mr. Thuesen a second time for the same conduct, and effectively denied Mr. Thuesen the right to appear before a neutral arbitrator, enshrined in the Due Process clauses of the Fifth and Fourteenth Amendments. Because the process implemented by Texas in Mr. Thuesen's case offends the basic notions of fairness at the very core of the justice system established by the United States Constitution, Mr. Thuesen's petition for habeas corpus should be granted.

**1.    Removing Judge Bryan, to whom the State had consented, and vacating his findings at the behest of the State only after he issued a ruling finding in favor of Mr. Thuesen on multiple bases, deprived Mr. Thuesen of due process of law.**

693.     Removing Judge Bryan and vacating his findings was wrong according to the Texas Rules Of Practice in District and County Courts and because, even if an error occurred, the error was invited by the State. Texas law precludes parties inviting such errors from seeking relief; the CCA regularly applies the principle to the detriment of criminal defendants.

694.     Texas Rule Of Practice in District and County Courts 18b(e), which governs the *habeas* evidentiary hearing, is explicit: "The parties to a proceeding may waive any ground for recusal after it is fully disclosed on the record." The requirements of that Rule are clearly met in this case.

695.    Judge Bryan's grounds for recusal were fully disclosed on the record. Following the defeat of the political candidate to which Judge Bryan had donated, the OCFW filed the Motion to Reassign the Original Trial Court Judge. In light of the Motion to Reassign, Judge Bryan emailed the Parties—both Mr. Thuesen and the State—that Presiding Judge Underwood had advised him that since he had recused himself *sua sponte* he could and should enter the order withdrawing his own recusal, with Presiding Judge Underwood's consent. Copying Judge Towslee and Presiding Judge Underwood, Judge Bryan stated he intended to issue such an Order in the near future, and noted that if either Mr. Thuesen or the State wished to object to his rescinding his recusal, they were free to do so. Counsel for the State responded to that email, respectfully objecting to Judge Bryan withdrawing his recusal.

696.    However, just four days after it raised its objection, the State explicitly waived any grounds it had to argue for recusal following Judge Bryan's reinstatement. The State initially objected to Judge Bryan presiding over the case based on purported concerns that *Mr. Thuesen* might use Judge Bryan's involvement as a basis to seek relief from an unfavorable result and indicated it intended to move for recusal:

> The last thing that I don't think we can defend against is that some capital write lawyer in the federal system . . . doesn't come back and say at a later time the fact that Michelle [Esparza] lost, now her livelihood depends on her private practice and that that would somehow, because you have backed her in the election, that you had some reason to make sure that she didn't be found ineffective [sic] in a capital death penalty case and that that somehow inadvertently swayed your ability to make a straight call.

Ex. 18 [Response to Court's Order of February 24, 2016, Exhibit E].

697.    However, the State ultimately withdrew those objections in an email from prosecutor Brian Baker to Judges Underwood, Bryan, and Towslee among others, based on "further research and contact with a number of experts in the area of federal writs, [and] the

statements and assurances made by the Office of Capital Writs in the telephone hearing yesterday."
Ex. 18 [Response to Court's Order of February 24, 2016, Ex. M at 1]. Mr. Baker went on to state
that "The State of Texas no longer has any objections relating to [Judge Bryan] presiding over the
John Thuesen writ. . . . [O]ur original desire to have you preside can now be realized without any
apprehension of future legal ramifications." *Id.*

> **From:** Brian Baker [mailto:BBaker@brazoscountytx.gov]
> **Sent:** Tuesday, March 18, 2014 9:43 AM
> **To:** Brad Levenson; Lisa L. Parker; Doug Howell; Robert Romig;
> Cathryn Crawford; Jarvis Parsons
> **Cc:** olen.underwood@mctx.org; Travis Bryan III;
> btowslee@verizon.net; kkyriell@gmail.com; Ernest J. Montoya
> **Subject:** RE: 11.07 capital writ in Thuesen case
>
> Judge Bryan,
>
>
> The State of Texas no longer has any objections relating to you
> presiding over the John Thuesen writ.  Based on further research and
> contact with a number of experts in the area of federal writs, the
> statements and assurances made by the Office of Capital Writs in the
> telephone hearing yesterday, March 17, 2014, are sufficient to
> alleviate our concerns about their motives for having you
> preside.  With those issues resolved, our original desire to have you
> preside can now be realized without any apprehension of future legal
> ramifications.
>
> Brian M. Baker
> First Assistant District Attorney
> Brazos County, Texas
> 979.361.4320

698.    Accordingly, through that email, the State expressly waived any ground for recusal,
after the grounds were fully disclosed.

699.    Further, at no point did the State move to recuse Judge Bryan, nor did it raise—at

199

any point—the contention that Judge Bryan's withdrawal of his recusal, pursuant to the administrative process advised by Presiding Judge Underwood—had been ineffective. As such, the State actually consented to Judge Bryan presiding over Mr. Thuesen's habeas evidentiary hearing.

> **2.   The CCA denied Mr. Thuesen a fair process when it countenanced the State's argument that Judge Bryan should not have presided over the habeas hearing.**

700.   Judge Bryan presided over an evidentiary hearing, and ruled that Mr. Thuesen should be granted a new punishment phase of his trial. Afterward, on February 24, 2016, the CCA entered an order directing the parties to brief three issues related to Judge Bryan's withdrawal of his voluntary recusal.

701.   In its brief the State—*for the first time*—argued that Judge Bryan had not had the jurisdiction to withdraw his recusal and then preside with the five-day-long evidentiary hearing. In other words, following receipt of this unfavorable ruling from Judge Bryan—who the State had explicitly consented to have preside with Mr. Thuesen's habeas petition—the State switched gears, and proceeded to pursue a litigation strategy focused around retroactively replacing Judge Bryan and thereby manufacturing a second bite at that apple.

702.   Unfortunately, CCA ultimately blessed the State's decision to play games with the death penalty, and allowed the State a mulligan; on February 8, 2017 it remanded to allow reargument of Mr. Thuesen's habeas claims.

703.   The CCA regularly permits non-jurisdictional issues and administrative shortcomings to be waived, finding that the parties' consent overcomes non-jurisdictional shortcomings. In other circumstances, Texas courts find that minor administrative flaws do not deprive a judge of the power to hear a case; the general rule is that if "the complaint is that the judge acted in a case without statutory or procedural authority, the alleged error is not void, but

voidable, and must therefore be raised by objection or complaint to be preserved for appellate review." *Davis v. Crist Industries, Inc.*, 98 S.W.3d 338 (Tex. App. 2003); *see also Williams v. State*, No. 07-15-00294-CR, 2016 WL 6024348, at *3 (Tex. App. Oct. 13, 2016) ("when the judge is otherwise qualified and the error is merely procedural, the order is only voidable and can be waived.").

704.    Thus, under CCA precedents, a party "may not object, for the first time on appeal, to a procedural irregularity in the assignment of a former judge who is otherwise qualified." *Rodriguez v. State*, No. 10-15-00371-CR, 2016 WL 7437786, at *2 (Tex. App. Dec. 21, 2016). A party "may object pretrial; if he does not, he may not object later or for the first time on appeal." *Wilson v. State*, 977 S.W.2d 379, 380 (Tex. Crim. App. 1998); *see also Hollabaugh v. State*, 1994 WL 284093, at *1 (Tex. App. 1994) (not designated for publication) ("That complaint was never raised in the trial court. . . . We overrule the first point."); *Jackson v. State*, 2012 WL 955361, at *3 (Tex. App. 2012) (not designated for publication) (appellant's failure to object at the time of trial about the judge not being qualified to serve waives any complaint he now has on appeal).

705.    For example, Article XVI, Sec. 1(b) of the Texas Constitution requires that, before a judge may take the oath of office, he or she must take an anti-bribery oath. Pursuant to subsection (c), the judge must file that oath "with the Secretary of State before taking the Oath or Affirmation of office." Tex. Const. Art. XVI, Sec. 1(c). The Oath or Affirmation of Office, in turn, is required before the judge may "enter upon the duties of their office[ ]." *Id.* at Sec. 1(a).

706.    The application is illustrated in *In re Gen. Elec. Capital Corp.*, 63 S.W.3d 568 (Tex. App. 2002). There, the court was called to consider whether a judge who had failed to file the anti-bribery oath with the Secretary of State, as required by the Texas Constitution, lacked the power to preside over a hearing. It found the minor administrative lapse to be immaterial: "The record

shows that Judge Priest took the required anti-bribery oath on November 10, 1998, but failed to file the oath with the Secretary of State in a timely manner. The fact that the anti-bribery oath was not filed is not sufficient to render Judge Priest's oath void. The failure to file the oath with the Secretary of State does not vitiate the oath or deprive the judge of the authority to preside in a case." Id. at 571-72. "Failing to file an oath of office does not, alone, deprive the judge of the authority to act." *In re Tasby*, 120 S.W.3d 443, 445 (Tex. App. 2003)

707.    The error in this case—a lack of Presiding Judge Underwood issuing a written order reinstating Judge Bryan—was not jurisdictional. "Jurisdiction . . . is something possessed by courts, not by judges. . . . The authority and powers of a judge are incident to, and grow out of, the jurisdiction of the court itself. Strictly speaking then, jurisdiction encompasses only the power of the tribunal over the subject matter and the person." *Davis v. State*, 956 S.W.2d 555, 557–58 (Tex. Crim. App. 1997) (citing *Ex parte George*, 913 S.W.2d 523 (Tex. Crim. App. 1995)).

708.    There is no question that the district court possessed jurisdiction over both the subject matter—the state habeas petition—and over Mr. Thuesen. Indeed, presiding judges of state administrative regions lack the power under Texas law to either expand or contract the jurisdictional powers of the courts within their administrative region. Tex. Gov't Code Ann. § 74.046.

709.    What is more, there was actual agreement from Presiding Judge Underwood that Judge Bryan had his consent to execute and issue an order withdrawing his recusal and preside over the evidentiary hearing.

710.    Presiding Judge Underwood explicitly advised Judge Bryan that, since he had recused himself *sua sponte*, he could enter an order withdrawing his own recusal order—no written order from Presiding Judge Underwood was necessary. Presiding Judge Underwood's Order of

202

Assignment expressly stated that Judge Towslee's assignment would continue "as may be necessary for the assigned Judge to dispose of any accumulated business" or "until terminated by the Presiding Judge." Therefore, pursuant to the terms of the Order of Assignment itself, Presiding Judge Underwood had authority to terminate Judge Towslee's assignment at any time. He also retained authority to direct Judge Bryan to reassume responsibility for the matter.

711.    Judge Bryan only effected his reinstatement in response to Presiding Judge Underwood's explicit blessing. Under Texas law, that is enough. "[O]rders may be orally pronounced." *Walker v. Harrison*, 597 S.W.2d 913, 915 (Tex. 1980). Alternatively, "subject to a specific requirement of the rules, any form of communication between the court and the parties for the efficient and expeditious handling of the court's business is acceptable." *Dunn v. Cnty of Dallas*, 794 S.W.2d 560, 562 (Tex. App. 1990).

712.    In light of the actual instruction from Presiding Judge Underwood that no written approval was necessary, and the actual directive from Presiding Judge Underwood that Judge Bryan should sign and execute an order reinstating himself, and the communication of that determination to the parties, there was no error. Judge Bryan's Findings of Fact and Conclusions of Law should have remained intact.

713.    However, even if an error existed it was, at most, the type of mere administrative failure that Texas Courts regularly find does not deprive a judge with the power to act. Petitioner is aware of no authority which existed before this case requiring that the Presiding Judge issue a written order reinstating a self-recused judge—as opposed to direct the judge him- or herself to do so.

714.    The Texas Court of Appeals has previously held that precisely such an error may be waived through consent, as the State did here. In *Smith v. State*, 2013 WL 4774054, at *3 (Tex.

App. 2013) the court held that "[t]he record shows that Smith knew that the visiting judge would be presiding over his case and that he did not object that an order memorializing the assignment did not appear of record when the trial commenced. We hold that by failing to object before trial commenced about the procedural irregularity . . . Smith failed to preserve his complaint for our review on appeal." *Id.*

715.   Indeed, "as a general rule, [a party] cannot invite error and then complain about it on appeal." *Franks v. State*, 90 S.W.3d 771 (Tex. App. 2002) (citing *Hess v. State*, 953 S.W.2d 837, 840 (Tex. App. 1997, pet. ref'd)).[37] In other words, a party "may not create reversible error by his own manipulation." *Beasley v. State*, 634 S.W.2d 320, 321 (Tex. Crim. App. 1982); *see also Kelley v. State*, 823 S.W.2d 300, 302 (Tex. Crim. App. 1992). Texas Courts, including the CCA, frequently apply the doctrine of invited error to rule against defendants on a wide variety of matters, including errors that might amount to fundamental or structural errors. *See Rhodes v. State*, 240 S.W.3d 882, 892 (Tex. Crim. App. 2007) ("A defendant who has enjoyed the benefits of an agreed judgment prescribing a too lenient punishment should not be permitted to collaterally attack that judgment on a later date on the basis of the illegal leniency."); *Cadd v. State*, 587 S.W.2d 736, 741 (Tex. Crim. App. 1979) (applying the rule of invited error to dispose of an issue on rehearing which, on original submission, the court determined constituted fundamental error); *see also, e.g., Woodall v. State,* 336 S.W.3d 634, 644 (Tex. Crim. App. 2011) ("The law of invited error provides that a party cannot take advantage of an error that it invited or caused, even if such error is fundamental. In other words, a party is estopped from seeking appellate relief based on error that it induced."); *Prystash v. State,* 3 S.W.3d 522, 531 (Tex. Crim. App. 1999) (noting that

---

[37] When a petition has been "refused," it is deemed to have the same precedential value as if the decision had been rendered by the Texas Supreme Court itself. *See* Tex. R. App. P. 56.1(c).

the doctrine of invited error is distinct from waiver and is properly thought of as estoppel).

716.     Texas courts, therefore, routinely find waiver in exactly the type of circumstances that occurred here—and regularly use that waiver doctrine against defendants. *See, e.g., Ex parte Pete,* 517 S.W.3d 825, 833 (Tex. Crim. App. 2017) ("A defendant who positively asks the trial court to grant a mistrial that is limited to the punishment phase may not be heard later to complain, after the trial court grants his request, that the limited mistrial compromised his right to have 'the same' jury resolve both phases of his trial."); Due process mandates that the same waiver requirements also apply against the State.

717.     Because the error was merely procedural under well-settled Texas law, the State's waiver should have precluded consideration of the lack of written administrative paperwork on appeal to the CCA.

718.     At worst, as Judge Alcala explained in her dissent at the CCA (joined by Judge Walker), the remedy to the administrative snafu most in harmony with the CCA's prior case law and with due process would have been a remand to:

> permit any necessary corrections in the administrative paperwork with the appropriate documentation so that Judge Bryan may be reinstated on the case. The best way to effectuate the prior agreement of the parties—to proceed under Judge Bryan in this case—is for them to obtain the missing paperwork from the Presiding judge that would formally reinstate Judge Bryan on these habeas proceedings through an appropriate order. That would put these parties exactly where they agreed to be when the habeas hearing was held. Judge Bryan could then take judicial notice of the proceedings that had already occurred before him, and he could reissue his order and findings of fact and conclusions of law. That outcome would conform to this Court's established practice of preferring the trial judge who actually presided over the jury trial to act as the fact finder in a habeas proceeding. And the State, having already agreed to have the hearing in front of Judge Bryan, should not have any valid complaint in allowing Judge Bryan to reinstate his ruling and findings.

*Ex parte Thuesen*, 546 S.W.3d 158, 166 (Tex. Crim. App. 2018) (Alcala, J., dissenting).

205

719.   The CCA's treatment of the administrative paperwork as foundational here, when it has not done so in other circumstances, appears to be outcome driven—toggling the doctrine of invited error on and off as needed to tip the scales in the direction of the State. That procedure raises federal constitutional concerns that were not addressed by the Texas state courts in adjudicating Mr. Thuesen's state habeas petition. As a result, Mr. Thuesen's imprisonment is unconstitutional.

**C.  The court may adjudicate the claim.**

720.   The merits of this claim may be adjudicated subject to 28 U.S.C. § 2254.

721.   A state remedy is not available with respect to this claim. *See* 28 U.S.C. § 2254(c).

722.   The due process violations of the habeas court could not have been brought until after the termination of the state habeas proceedings. Accordingly, there is no adjudication on the merits of Mr. Thuesen's due process claims as applied to the habeas court.

723.   There is cause and prejudice for the failure to properly present the claim to a state court. There is cause because the factual basis for Mr. Thuesen's due process claims arising from the habeas court proceedings could not have arisen until after the termination of those proceedings. There is prejudice because the procedures for adjudicating habeas corpus applications in Texas blessed by the CCA were fundamentally unfair and retroactively denied Mr. Thuesen a grant of habeas relief.

**1.  This claim is not barred under the AEDPA because it raises federal issues of constitutional due process under the Fifth and Fourteenth Amendments, which may be heard pursuant to 28 U.S.C. §§ 2254(b)(1)(B)(ii) and (d)(1).**

724.   By choosing to sidestep well-settled Texas law when the effect of that law worked to the detriment of the State, rather than the detriment of a criminal defendant, the CCA undermined Mr. Thuesen's right to have his state habeas claims governed by the due process of law.

725.     The due process clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution prohibit such outcome-driven decision-making by courts; they provide the right to "an impartial and disinterested tribunal in . . . criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980). The "requirement of neutrality" helps to preserve "both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done, by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." *Id.*

726.     By ignoring the state law requirements of waiver that the CCA regularly applies to criminal defendants to their detriment when those same rules worked against the state, the CCA failed to act as an impartial and disinterested tribunal. Instead, it improperly placed its finger on the scales to weigh in favor of the State.

727.     The second issue raises questions of due process under the Fifth and Fourteenth Amendments which, although presented to the CCA by Mr. Thuesen, that court glossed over and ultimately ignored. Specifically, in allowing the State to invent and pursue a purported reason for voiding Judge Bryan's adverse opinion, the CCA endorsed something close to double jeopardy, letting the State avoid the effects of a ruling against it and instead begin again before a new judge with a clean slate.

728.     That process does not comport with constitutional due process. If the State had a problem with Judge Bryan's withdrawal of his self-recusal, it was obligated to raise that complaint before consenting to have Judge Bryan preside over the hearing. It is simply not compatible with due process to allow the State to wait until a court issues an adverse ruling before deciding whether to be bound by the ruling, especially if the State had already explicitly consented to appear before the Judge. The state process that can be undone by the State once it receives an unfavorable result

deprived Mr. Thuesen of his constitutional due process right to have a fair habeas hearing before a neutral arbitrator. *Cf. Smalis v. Pennsylvania*, 476 U.S. 140, 145–46 (1986) ("A post-acquittal appeal is barred by the double jeopardy clause when reversal of the order appealed from would lead either to a second trial or to 'further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged.'") (quoting *U.S. v. Martin Linen Supply Co.*, 430 U.S. 564, 570 (1977)).

729.    The foregoing claims were presented to the CCA pursuant to its request for briefing, and were implicitly decided by the CCA's ruling that Judge Bryan lacked appropriate administrative paperwork to preside over Mr. Thuesen's habeas hearing. In so doing, the CCA based its decision entirely on state law, thus ignoring the constitutional claims. Accordingly, the claim is not barred by Section 2254(b).

### 2.    This claim could not have been raised below because it arose during the adjudication of Mr. Thuesen's state habeas petition.

730.    The foregoing claims were presented to the CCA pursuant to its request for briefing, and were implicitly decided by the CCA's ruling that Judge Bryan lacked appropriate administrative paperwork to preside over Mr. Thuesen's habeas hearing. But the CCA wholly ignored the constitutional infirmities in the process it created. As a consequence, this claim cannot have been exhausted in the state proceedings.

### 3.    This claim falls into an exception to 28 U.S.C. § 2254(d)(2)'s relitigation bar because the findings of fact made by Judge Langley constituted an unreasonable determination of the facts in light of the evidence presented before Judge Bryan.

731.    Judge Bryan conducted the post-trial evidentiary hearing on Mr. Thuesen's state habeas petition, which lasted five days and involved live testimony from and cross-examination of 13 witnesses. Critically, those witnesses included both of the attorneys around whom his ineffective assistance of counsel claims centered.

732.     Following that hearing, and with the unique benefit of having seen the testimony of the witnesses in person, Judge Bryan made findings of fact that expressly included credibility determinations; overall, he found Mr. Thuesen's expert and lay witnesses credible.

733.     In light of his findings, Judge Bryan recommended that Mr. Thuesen receive habeas relief. But, as described *supra*, the CCA found that one piece of administrative paperwork had been missing, and as a result granted the State another "bite at the apple." The case was then reassigned to Judge Langley.

734.     Judge Langley did not hear the witnesses who had testified before Judge Bryan. Rather, he ordered the admission of the testimony and exhibits presented at the evidentiary hearing before Judge Bryan into evidence. Based on the paper record, rather than the actual testimony, Judge Langley made Findings of Fact and Conclusions of Law that cannot be squared with Judge Bryan's credibility determinations—and Judge Langley's Findings of Fact and Conclusions of Law denying relief were devoid of any alternative credibility analysis. *See Ex parte Storey*, 584 S.W.3d 437, 439 (Tex. Crim. App. 2019), *cert. denied sub nom. Storey v. Texas*, 140 S. Ct. 2742 (2020) ("In most circumstances, [the CCA] defer[s] to the trial judge's findings of fact and conclusions of law *because the trial judge is in the best position to assess the credibility of the witnesses*.") (emphasis added).

735.     It is incumbent upon the court to make explicit factual findings and determine the credibility of the witnesses. *Ex parte Reed*, 271 S.W.3d 698, 746 (Tex. Crim. App. 2008) ("Implicit in the requirement that a habeas petitioner present reliable evidence is the expectation that a factfinder will assess credibility.").

736.     But, because Judge Langley did not have opportunity to observe Mr. Thuesen's habeas witnesses when they testified, he was unable to make fully informed credibility

determinations as to those witnesses. It was, therefore, unreasonable for him to make tacit credibility determinations that conflicted with the informed determinations made by Judge Bryan. As a result, Judge Langley's Findings of Fact and Conclusions of Law are necessarily unreasonable.

737. For these reasons, the Court should grant Mr. Thuesen relief by ordering that he be granted a new punishment phase of his trial as recommended by Judge Bryan.

## VI. MR. THUESEN'S DEATH SENTENCE SHOULD BE VACATED BECAUSE TEXAS' REQUIRED PUNISHMENT-PHASE JURY INSTRUCTION IMPROPERLY RESTRICTS THE EVIDENCE THE JURY MAY CONSIDER AS MITIGATING

### A. The jury must be permitted to hear all mitigating evidence in a death penalty proceeding.

738. Mr. Thuesen presented mitigating evidence that the jury was precluded from considering, in violation of the U.S. Constitution's 8th and 14th Amendments.

739. "[T]he Eighth and Fourteenth Amendments [of the U.S. Constitution] require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original), aff'd, *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982). The *Lockett* Court's decision was animated by "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty," and it accordingly found unconstitutional a state statute that "prevent[ed] the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation." *Id.* at 605.

740. The Supreme Court requires that a jury "be permitted to 'consider fully' [] mitigating evidence" that provides a basis for a sentence of life rather than death." *Abdul-Kabir v.*

*Quarterman*, 550 U.S. 233, 260 (2007). "[S]uch consideration," the Court has explained, "would be meaningless unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Id.* (internal quotations omitted). Each juror is entitled to broad discretion in assessing the import of the mitigating evidence the defense proffers; at the same time, the State may not limit this evidence to those categories which the State deems as mitigating. *See Id.*

741.    As the Court stated in *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (internal quotations omitted), "[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." *See also McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.").

742.    Consistent with this jurisprudence, the avenues of mitigation open to a capital jury cannot be limited to evidence that relates solely to the defendant's culpability, the nature of his crime, or what the crime says about that individual defendant. *See Abdul-Kabir*, 550 U.S. at 246 (establishing a low threshold for what constitutes "mitigating evidence," namely, that which "might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future").

743.    For example, evidence that a defendant has adjusted well in prison prior to his trial qualifies as mitigating evidence because "there is no question but that [inferences drawn from the evidence] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (quoting *Lockett*, 438 U.S. at 604). Importantly, the *Skipper* court observed that the proffered evidence—the testimony of two guards and a prison visitor—"would not relate specifically to petitioner's culpability for the crime he

211

committed." *Id.* at 4. Nevertheless, it could "hardly be disputed" that the exclusion of the evidence "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." *Id.* at 4; *see also Abdul-Kabir*, 550 U.S. at 259 ("Like Penry's evidence, Cole's evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence."). In other words, mitigating evidence cannot be limited to evidence that relates solely to "moral blameworthiness," and such evidence cannot "be excluded from the sentencer's consideration." *Skipper*, 476 U.S. at 5.

744.    The Texas statute governing capital trials gives rise to this risk by expressly limiting the evidence that a jury may consider mitigating for purposes of punishment in violation of the Eighth and Fourteenth Amendments. Mr. Thuesen's sentence therefore violates his rights under the United States Constitution and United State Supreme Court case law.

### B. The trial court gave instructions to the jury that prevented it from considering all mitigating evidence.

745.    Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries. The statute requires a trial court to submit at least two special issues to the jury at the punishment stage: (1) whether there is a probability that the defendant constitutes a continuing threat to society; and (2) whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole instead of death. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1), (e)(1). With respect to the mitigating circumstances issue, the court must instruct the jury that it must answer this special issue "Yes" or "No," that it may not answer "No" unless by unanimous agreement, that it may not answer "Yes" unless ten or more jurors agree, and that the jurors need not agree on which evidence in particular is mitigating. *Id.* at § 2(f)(1)-(3).

746.   The Texas Code of Criminal Procedure requires a capital trial court to submit the following special issue to the jury at the punishment stage: whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole instead of death. Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).

747.   Further, Texas law requires the court to instruct the jury that mitigating evidence is "evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071 § 2(f)(4) (emphasis added). However, the statute fails to define "moral blameworthiness" and requires no additional instructions on the matter.

748.   The trial court in this case gave the statutorily mandated instructions during the punishment phase of trial and before the jury retired to deliberate. *See* 54 RR at 12. Specifically, the court twice charged the jury as follows:

> Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

54 RR at 7:22-8:4; 12:13-20. The charge also included the following direction: "In deliberating on Special Issue No. 2, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." 54 RR at 9:2-5.

749.   The Texas statutorily-mandated instruction to consider only mitigating evidence that bears on "moral blameworthiness" fatally undermines the jury's capacity to give effect to the broader types of mitigating evidence described above. Tex. Code Crim. Proc. art. 37.071, § 2(f)(4) (emphasis added); *see also* CR at 968. Put differently, this instruction precluded jurors from considering mitigating evidence unrelated to Mr. Thuesen's "moral blameworthiness," a limitation wholly at odds with three decades of U.S. Supreme Court precedent. Had Mr. Thuesen's jurors (or

213

any one of them) credited such evidence—that is, evidence that did not reduce Mr. Thuesen's moral blameworthiness for the crime but still warranted a life sentence—they would be in violation of the court's instructions. *Penry v. Johnson*, 532 U.S. 782, 800 (2001). Because "[w]e generally presume that jurors follow their instructions," there exists a reasonable probability that the result of Mr. Thuesen's trial would have been different had a constitutionally adequate instruction been given. *Id.* at 799.

### C. Mr. Thuesen presented mitigating evidence that the jury was actually or effectively precluded from considering.

750.   At the punishment phase, Mr. Thuesen presented mitigating evidence that bore no relationship to his moral blameworthiness for the capital crime. Like the defendant in *Skipper*, Mr. Thuesen presented to the jury evidence regarding his background and character as mitigation evidence. Some of this evidence related to the conceptualization of mitigation expressed in *Wiggins* that "defendants who commit criminal acts that are *attributable* to a disadvantaged background . . . may be less *culpable*." *Wiggins*, 539 U.S. at 535 (quoting *Penry v. Lynaugh*, 492 U.S. at 319) (emphasis added). However, other evidence—*i.e.*, that Mr. Thuesen had been a loving son and brother, that Mr. Thuesen had performed admirably as a Marine, that Mr. Thuesen had been a positive influence on other inmates at the Brazos County jail—bore no specific link to his legal or moral blameworthiness for the crime in question. Rather, such evidence offered compelling sentiment that, although legally and morally to blame for the crime, Mr. Thuesen was a worthwhile person who was not deserving of a death sentence. Just as much as evidence that Mr. Thuesen's background contributed to the crime, this type of evidence held equal potential for jurors to weigh and decide it mitigated Mr. Thuesen's overall deservingness of execution. *See Penry v. Lynaugh*, 492 U.S. at 327 ("[S]o long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy

based on the mitigating evidence introduced by a defendant.").

751.     For instance, Mr. Thuesen's high school principal testified that Mr. Thuesen was a "good student." 51 RR at 43. Similarly, his high-school government teacher testified that Mr. Thuesen was a "very good student" who "always had his work done" and whose defining trait would be "respect." 51 RR at 101, 104. Mr. Thuesen's pre-calculus teacher spoke about Mr. Thuesen's aptitude for math, and the pride he felt in serving his country in the Marines. 51 RR at 113-14.

752.     Trial counsel also called various witnesses who, as former employers of Mr. Thuesen, could speak to his commendable work ethic. 51 RR at 44, 115; 52 RR at 20, 36. These witnesses described Mr. Thuesen as "always eager" and "hard-working," 51 RR at 51; as "trustworthy" and "respectful," 51 RR at 116; as a "quiet" person who "did his work," 52 RR at 26; and, as a very "diligent" person, 52 RR at 41. One employer testified that Mr. Thuesen helped to tutor her son in algebra. 51 RR at 117.

753.     To help the jury understand Mr. Thuesen's military experience, trial counsel called a number of former active-duty Marines who served in Iraq around the same time as Mr. Thuesen. 52 RR at 89, 146, 190; 53 RR at 5. These marines explained that the duty of Mr. Thuesen's unit was to draw and return fire to the enemy in Iraq 52 RR at 94-95, 149; 53 RR at 17-19; that the job was often violent and frightening 52 RR at 97, 105, 149-56; 53 RR at 17-19, 23-24; and that the unit came into contact with improvised explosive devices ("IEDs"), 52 RR at 149; 53 RR at 18. The two Marines who served extensively with Mr. Thuesen spoke in glowing terms about his service and his commitment to his country. 52 RR at 165-66; 53 RR at 25-27. One marine described a harrowing experience for Mr. Thuesen: he was ordered to open fire on a vehicle that, it was discovered, contained not enemy combatants but a civilian family. A young child, covered

in his family's blood, emerged from the vehicle and ran towards Mr. Thuesen's Humvee. 52 RR at 158-63.

754.    Trial counsel called several witnesses who went to junior-high and high school with Mr. Thuesen. 51 RR at 85, 89, 121; 52 RR at 44, 49, 54. These witnesses alternatively described him as a "good team member" in his high-school band 51 RR at 86-87; as a "very hard worker," 51 RR at 92; as someone who "was always pushing to better himself as best he could," 51 RR at 126; as someone who had become more despondent and an alcoholic after Iraq, 51 RR at 128-29; as "one of the good guys," 52 RR at 51; and as a "caring understanding, [and] dependable" individual. 52 RR at 55. One high-school classmate testified that she wrote letters to Mr. Thuesen when he was in county jail awaiting trial, and that he helped her overcome the grief she felt over losing her own husband. 52 RR at 44-47.

755.    Trial counsel also called an employee of the medical division of the Brazos County Sheriff's Office who testified that Mr. Thuesen was "very respectful [and] calm" in the jail setting. 52 RR at 6-7. A jailer at the Brazos County Sheriff's Office testified that Mr. Thuesen was always well-behaved, and that he would be comfortable describing Mr. Thuesen as a "model prisoner." 52 RR at 126.

756.    A longtime neighbor of the Thuesen family testified that Mr. Thuesen's crime was not consistent with the behavior of the young man she had known for many years. 52 RR at 142-44. Trial counsel also called a clergywoman of the Lutheran Church, who testified that Mr. Thuesen "still has gifts to give," and that "God still has a purpose for his life," potentially including participation in prison ministry. 52 RR at 80-81. This witness's husband also took the stand to corroborate his wife's testimony. 52 RR at 114-20.

757.    Finally, trial counsel called several members of the Mr. Thuesen's family, including

Mr. Thuesen's brother, who testified that he had been "proud" of his brother for his helpfulness before the incident. 52 RR at 74. Mr. Thuesen's sister testified that Mr. Thuesen had helped her raise her young son. 52 RR at 75. Mr. Thuesen's aunt described Mr. Thuesen as "a very caring, compassionate person" who was "willing to give up his time to [her] family, to share, be joyful." 52 RR at 137. Finally, Mr. Thuesen's mother told a story about Mr. Thuesen wherein he volunteered his bed to a friend so that this friend would not have to sleep on the floor; she also shared an anecdote about how Mr. Thuesen volunteered to push the wheelchair of the disabled mother of a deceased friend. 52 RR at 202-04.

758.    This evidence, though unrelated to Mr. Thuesen's moral blameworthiness for the crime, bolstered the argument that Mr. Thuesen nevertheless was a worthwhile person undeserving of a death sentence. Such evidence is equally meaningful for jurors as background and character evidence when deciding whether to impose a sentence of death. *See Penry v. Lynaugh*, 492 U.S. 302, 327 (1989) ("[S]o long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant.").

759.    In this case, the application of the Texas death penalty statute and the exhortations of the State that the jury ignore mitigating evidence impaired Mr. Thuesen's rights to have *all* mitigating evidence considered by the jury in assessing whether he deserved a life or death sentence. *Penry v. Lynaugh*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence he introduced."). Therefore, Mr. Thuesen's death sentence should be reversed, and Mr. Thuesen should be granted a new punishment-phase trial.

**D. Even if the trial court's instructions were proper, in Mr. Thuesen's case the State's gloss on those instructions improperly instructed the jury to ignore and not consider certain mitigating evidence.**

760.     "A jury may be precluded from [considering mitigation evidence] not only as a result of the instructions it is given, but also as a result of prosecutorial argument dictating that such consideration is forbidden." *Abdul-Kabir*, 550 U.S. at 259 n.21; *see also Penry v. Lynaugh*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence he introduced.").

761.     That is exactly what occurred in Mr. Thuesen's case. While it is unclear how any evidence of a positive character and worthwhile life, as opposed to a "disadvantaged background," would be given effect by the jury under the Texas statute, the prosecutor explicitly and unconstitutionally argued to the jury at the punishment phase that consideration of such mitigating factors was forbidden.

762.     In its closing argument, the State instructed the jury as follows:

> He had people who loved him. How is that mitigation that you were smart, that you work hard, which means you don't have a bad work ethic, but you still go out and do this.
>
> If you came from a crime-ridden family, if you came from a family that raised you up to lie, cheat and steal and you did something you may say, "I have an excuse."
>
> But he has no excuse. He had nothing. That is not mitigation.

54 RR at 27-28. The State continued, arguing that any positive evidence from Mr. Thuesen's background was irrelevant: "You heard a lot of people talk about raising turkeys, going and working at Blue Bell and being in the band. I would submit to you that those are not reasons that tend to reduce your moral blameworthiness or make you less that fully responsible." 54 RR at 26.

763.     The State's argument at closing was precisely the sort of prosecutorial instruction

*Abdul-Kabir* warns against.

764.     Given the ambiguity of the State statute, at least one juror could reasonably have interpreted the State's closing to mean that they were prohibited from considering such mitigating evidence.

765.     Mr. Thuesen was prejudiced as a result of the State's argument. It is highly likely that, without the State's dictation that consideration of such mitigating evidence was prohibited, the jury would have found that Mr. Thuesen should be sentenced to life in prison, and not to death.

766.     Even if the statute itself passes constitutional muster, the State's instruction to the jury during its closing argument that the jury not to consider certain types of mitigating evidence rendered the statute's application unconstitutional in Mr. Thuesen's case. As a result, Mr. Thuesen is entitled to habeas relief and a new punishment phase trial.

### E.  The Court may adjudicate the claim.

767.     The merits of this claim may be adjudicated subject to 28 U.S.C. § 2254(e).

768.     A state remedy is not available with respect to this claim. *See* 28 U.S.C. § 2254(c).

769.     Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). See State Habeas Petition, Claim 21.

## VII.  MR. THUESEN'S DEATH SENTENCE VIOLATES THE CONSTITUTION BECAUSE TEXAS'S STATUTORY SCHEME SET FORTH IN CODE OF CRIMINAL PROCEDURE, ARTICLE 37, IS ARBITRARY

### A.  United States Supreme Court precedent precludes administering the death penalty pursuant to arbitrary procedures.

770.     Capital punishment schemes must have "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976). When these schemes lack such standards, or when such standards fail in their application, or when "[t]here is no principled way to distinguish [a] case, in

which the death penalty was imposed, from the many cases in which it was not," it cannot be maintained that the imposition of a death sentence was "based on reason rather than caprice or emotion." *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980).

771.    "[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 428. (quoting *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

772.    "This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.' It must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Id.*

**B.  Texas's death penalty scheme is arbitrary.**

773.    The Texas death penalty statute is set forth in Texas Code of Criminal Procedure, Article 37.071. At various points, that statute asks the jury to consider "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society"; "the personal moral culpability of the defendant"; and mitigating evidence, but only to the extent the juror might regard it "as reducing the defendant's moral blameworthiness." Texas Code Crim. Proc. Ann. art. 37.071 §§ 2(b)(1), (e)(1), & (f)(4). That statute is facially unconstitutional because it violates the Fifth, Sixth, Eighth, and Fourteenth

Amendments in at least the following non-exclusive ways:

774.   *First*, the statute is vague and overbroad for failure to define (i) "probability"; (ii) "criminal acts of violence"; (iii) "continuing threat to society"; (iv) "personal moral culpability"; and (v) "moral blameworthiness." This failure on the part of the legislature to define these terms, and to require the trial court to do so, denies the jury the guidance necessary to exercise its discretion and ensures that the death penalty will be applied in an unconstitutionally arbitrary manner. *Gregg v. Georgia*, 428 U.S. 153 (1976).

775.   Requiring twelve jurors to predict the probability (whatever that means) that a person will commit criminal acts of violence (whatever that means) that constitute a continuing threat to society (whatever that means) when mental health professionals are not able to reliably make such predictions, particularly over a long term, is necessarily arbitrary and capricious and violates the evolving standards of decency of our society.

776.   *Second*, the state legislature has failed to provide any guidance to local district attorneys on which cases should be prosecuted as death penalty cases and which should be prosecuted as non-death penalty capital cases, much less a uniform and objective framework for making that determination. Because the Texas death penalty scheme does not give district attorneys guidance in exercising their discretion in determining who will face the death penalty, the determination is often reduced to a question of how much money the county is willing or has to spend to prosecute and defend a death penalty case, who the prosecutor is, the social standing of the victim, the race of the defendant, and the race of the victim. Those factors are self-evidently incompatible with the constitutionally required system of narrowing the application of the death penalty so that only the worst of the worst face death. Thus, because the statute is not based on a uniform standard marked by objective criteria, it results in the arbitrary, capricious, freakish and

wanton imposition of the death penalty.

777.    That constitutional infirmity is compounded by the fact that the statute does not provide for a proportionality review to determine if the penalty imposed in any specific case is proportionate to other similar offenses.

778.    As a result, only a small minority of Texas's counties are responsible for an overwhelming majority of the death sentences that have been assessed in the modern history of the state. That disparity that cannot be explained merely by reference to county populations. Thus, whereas sentences of death should be reserved only for the most egregious offenses, in Texas this determination is, to a degree both substantial and improper, an arbitrary one.

779.    Since 1976, 1,113 defendants have been sentenced to death in Texas.[38] Collectively, less than half of Texas's 254 counties account for the overwhelming majority of those sentences. Four counties—Harris, Dallas, Bexar, and Tarrant—account for 49.9% of these defendants, as well as for over 49% of those who have been executed (279 out of 570). In the past thirty-nine years, 83% if counties have sentenced someone to death three times or less, or not at all.

780.    The experience of the last forty years has shown that the practical consequence of prosecutorial discretion has not been to narrow the field of death-eligible defendants to the most serious and heinous cases. The influence of geographical factors within Texas's capital punishment system has undermined the Supreme Court's expectations that this system would be an "evenhanded, rational, and consistent" one. *Jurek v. Texas*, 428 U.S. 262, 276 (1976).

781.    Because the capital sentencing scheme does not "provide a 'meaningful basis for

---

[38] All statistics are taken from Tex. Dep't Crim. Justice, http://www.tdcj.state.tx.us/death_row/ (last visited January 31, 2021).

distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not,'" *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (quoting *Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J., concurring) (alteration in original), it cannot constitutionally be imposed and Mr. Thuesen should be granted resentencing.

782.    *Third*, the statute is unconstitutional in that Art. 37.071(b)(1) requires the jury to apply a murky and undefined "probability" standard to the reasonable-doubt determination. The statutory framework, under which jurors must decide if the probability has been established "beyond a reasonable doubt," Art. 37.071 § 2(c), encourages the jury to focus on the probability language and thereby improperly apply a standard less stringently than the proof-beyond-a-reasonable-doubt standard. For that reason, the application of Art. 37.071 is arbitrary and capricious.

783.    *Fourth*, the statute is unconstitutional because it fails to *require* that mitigation be considered.

784.    *Fifth*, the statute denies the accused due process and equal protection of the law by permitting introduction at the punishment phase of "any matter that the court deems relevant to sentence."

785.    *Sixth*, Art. 37.071(d)(2) is unconstitutional because it requires that jurors be instructed that ten votes are required to answer "no" to Special Issue 2, the response that results in a life sentence. When jurors are instructed that they may not give a verdict of life unless ten or more agree upon a life answer in response to Special Issue 2, it provides an incorrect picture of the state of the law—it unconstitutionally shifts the jury's perspective by labeling the death penalty the "default," and life in prison the penalty requiring agreement when, in fact, if only one juror concludes that sufficient mitigation exists to warrant the imposition of a life sentence, the death

penalty will not be imposed.

786.    In effect, the statute implicitly shift the burden from requiring the state to prove that the death penalty should be applied to requiring the defendants to prove that it should not be applied. So long as the Texas statute equates the sentencing consequences of a life verdict with the consequences of a non-verdict, the jury must not be misled to believe that anything more than one vote for life is required to secure that sentence.

787.    In addition, the false distinction between a "life" answer of ten or more jurors and a non-answer of less than ten jurors is impermissibly vague and arbitrary and violates due process and *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994).

788.    Moreover, the ten-twelve rule violates the right to a fair and impartial jury by manufacturing confusion in the minds of the jury and preventing the court or attorneys from correcting it. The ten-twelve rule thus creates fertile ground for jurors to draw upon their own biases and preconceived notions in coming to a verdict.

789.    *Seventh*, execution by lethal injection is cruel and unusual punishment and otherwise unconstitutional.

790.    *Eighth*, the statute is unconstitutional because it prohibits the judge and the parties from informing the jury that a hung jury (failure to achieve unanimity on Special Issue No. 1 or less than ten "no" votes on Special Issue No. 2) will result in a life sentence. This is in effect a denial of the juror's right to know the consequences of disagreement between jurors, as they are intentionally misinformed about how such a conflict will affect the verdict. The statute requires that they be told that the verdict rests with ten or twelve when, in effect, a verdict for life rests with only one juror.

791.    This scheme artificially frustrates those jurors who would vote for life if properly

instructed, and unconstitutionally makes "hold out" jurors more susceptible to the pressures from the death voting majority, encouraging them to vote for death despite contrary convictions. There is no such thing as a "mistrial" during the penalty phase of a capital trial and the jurors should be so informed.

792.     *Ninth*, the statute permits the introduction of unadjudicated extraneous offenses at the punishment phase, despite the requirement in capital cases that a heightened need for reliability be applied at the punishment phase. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Allowing evidence of unadjudicated offenses, particularly in situations where those offenses would be inadmissible in a non-capital trial, denies the jury's verdict and the Court's sentence the reliability required by the Eighth Amendment to the United States Constitution.

793.     *Tenth*, the statute is unconstitutional because there are no appellate standards for determining the sufficiency of the evidence to support the jury's answers to the Special Issues, and the Texas Court of Criminal Appeals has repeatedly and consistently refused to conduct any meaningful appellate review of mitigation sufficiency.

794.     *Eleventh*, the statute is unconstitutional because, contrary to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), it does not require the indictment to allege special issues, *i.e.* the "facts" relied upon to enhance the capital sentence from life to death.

795.     As a result of each of those constitutional infirmities individually, as well as all of them collectively, Texas Code of Criminal Procedure, Article 37.071 facially violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Because the Texas statute violates the United States Constitution, defendants, including Mr. Thuesen, cannot constitutionally be indicted, convicted, or sentenced to death based on it.

796.     Mr. Thuesen exhausted the remedies available in the state courts during his state

225

habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 22.

797.   Because Mr. Thuesen was improperly and unconstitutionally indicted, convicted, and sentenced to death under Article 37.071, he is entitled to habeas relief.

## VIII.   MR. THUESEN'S DEATH SENTENCE VIOLATES THE CONSTITUTION BECAUSE TEXAS'S STATUTORY SCHEME SET FORTH IN CODE OF CRIMINAL PROCEDURE, ARTICLE 37, DENIES THE RIGHT OF EQUAL PROTECTION TO PEOPLE WITH MENTAL HEALTH DISORDERS

798.   Texas Code of Criminal Procedure, Article 37 is impermissibly tilted toward applying the death penalty to defendants suffering from mental health disorders at the time they committed a death-eligible crime, compared to those defendants who were not in mental health crisis when they commit death-eligible crimes.

799.   More specifically, 37.0711 section 2(b)(3) provides that a defendant may be spared death if their conduct was a *reasonable* response to a provocation by the deceased:

> (b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:
>
> . . .
>
> (3) if raised by the evidence, *whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.*

Texas Code Crim. Proc. Ann. art. 37.0711, § 2(b) (emphasis added).

800.   Texas does not permit a jury instruction explaining that any determination of whether a defendant responded "reasonably" to a provocation must take into account whether the defendant suffered from an acute mental health condition. In doing so, it provides more protection to defendants who commit death-eligible crimes following thoughts processes the jury can empathize with than it does those who commit the same crimes following thought processes which, through no fault of the defendant, are outside the jury's first-hand experience.

801.   Thus, a person without severe mental disease may "snap" at whatever provocation

that person experiences, and the jury is instructed that they should not impose a death sentence so long as that "snap" is one that other people might also reasonably experience. In contrast, the jury receives no instruction not to impose death penalty if a person *with* a mental health disease responds to what they perceive to be a provocation in a way reasonable to them in light of their disease.

802.   Thus, these two people are given different protection by Texas 37.0711.

803.   The unequal treatment of these two people accordingly violates the right of equal protection.

804.   Mr. Thuesen suffered from undiagnosed and untreated PTSD. The record shows that, on the day of the crime, Mr. Thuesen suffered an acute crisis due to the disease causing hyper-sensitiveness to provocation.

805.   The jury was entitled to decide whether Mr. Thuesen's conduct was a reasonable response to provocation *in light of his untreated PTSD*, but the Texas statute denied them that opportunity. Because Mr. Thuesen belongs to the class denied equal protection by the Texas death penalty statute, Texas unconstitutionally denied him the right of equal protection when it sentenced him to death. His petition for habeas corpus should be granted.

## PRAYER FOR RELIEF

**WHEREFORE**, in consideration of the claims enumerated herein, Petitioner John Thuesen prays that this Court:

A.   Grant Mr. Thuesen any other documents or materials ascertainable after a reasonable opportunity for discovery and an evidentiary hearing so that he can investigate and offer evidence in support of his claims;

B.   Order an evidentiary hearing for the purpose of examining the merits of his claims;

C.      Order a briefing scheduling;

D.      Grant Mr. Thuesen a writ of habeas corpus and order him released from the

custody of the State;

E.      Vacate his death sentence and conviction; and

F.      Grant any other relief that law or justice may require.


Dated: February 4, 2021                    Respectfully submitted,


                                           *s/ Glenn A. Danas*
                                           Glenn A. Danas (admitted pro hac vice)
                                           Robins Kaplan LLP
                                           2049 Century Park East, Suite 3400
                                           Los Angeles, CA 90067
                                           (310) 552-0130
                                           GDanas@RobinsKaplan.com

                                           Miles A. Finn, Ph.D. (admitted pro hac vice)
                                           Robins Kaplan LLP
                                           339 Park Avenue, Suite 3600
                                           New York, NY 10022
                                           (212) 980-7400
                                           MFinn@RobinsKaplan.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the February 4, 2021, I electronically filed the foregoing Petition for Writ of Habeas Corpus with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

> Edward Larry Marshall
> Office of the Attorney General
> PO Box 12548
> Austin, TX 78711
> 512-936-1400
> Fax: 512-320-8132
> Email: caddocket@oag.texas.gov

*/s/ Glenn A. Danas*
Glenn A. Danas