# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN THUESEN, | § | |
| | § | |
| Petitioner | § | |
| | § | |
| v. | § | Case No. 4:20-cv-852 |
| | § | |
| BOBBY LUMPKIN, Director, Texas | § | **CAPITAL CASE** |
| Department of Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |
| | § | |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254 OF A PERSON IN STATE CUSTODY

### ROBINS KAPLAN LLP
*Pro Bono Attorneys for Petitioner*

Glenn A. Danas (admitted *pro hac vice*)
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
(310) 552-0130
GDanas@RobinsKaplan.com

Miles A. Finn, Ph.D. (admitted *pro hac vice*)
900 Third Avenue, Suite 1900
New York, NY 10022
(212) 980-7400
MFinn@RobinsKaplan.com

Jennifer W. Leland (admitted *pro hac vice*)
2049 Century Park E #3400
Los Angeles, CA 90067
(310) 552-0130
JLeland@RobinsKaplan.com

Timothy W. Billion (admitted *pro hac vice*)
140 North Phillips Ave., Suite 307
Sioux Falls, SD 57104
(605) 335-1300
TBillion@RobinsKaplan.com

Ryan M. MacDonald (*pro hac vice* pending)
800 Boylston Street, Suite 2500
Boston, MA 02199
(617) 267-2300
RMacDonald@RobinsKaplan.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... 1

PRELIMINARY STATEMENT .......................................................................... 1

JURISDICTION AND VENUE .......................................................................... 8

THE PARTIES ..................................................................................................... 8

TIMELINESS OF THE PETITION AND THE AMENDED PETITION ............ 8

PRELIMINARY STATEMENT REGARDING CITATIONS .......................... 9

REQUEST FOR BRIEFING ............................................................................... 9

STATEMENT REGARDING EXHAUSTION OF CLAIMS .......................... 9

ELIGIBILITY FOR RELIEF ............................................................................ 10

STATEMENT OF FACTS ................................................................................ 10

    I.      THE TRIAL ........................................................................................ 17

    II.     PUNISHMENT PHASE .................................................................... 21

PROCEDURAL HISTORY ............................................................................... 28

    I.      TRIAL COURT PROCEEDINGS ..................................................... 28

    II.     DIRECT APPEAL .............................................................................. 30

    III.   STATE HABEAS CORPUS PROCEEDINGS ................................. 30

        A.   Judge Bryan was temporarily recused. ................................. 37

        B.   Following an evidentiary hearing, Judge Bryan recommended granting Mr. Thuesen relief on multiple claims. ........................................ 41

            1.   Trial counsel failed to effectively investigate and present mitigation evidence related to PTSD at the punishment phase (Claims One, Five and Eight). .... 43

            2.   Trial counsel failed to adequately investigate and present evidence that there was no meaningful probability of future violence (Claim Six). .................... 49

            3.   Trial counsel was ineffective for failing to impeach Amanda Ward (Claim Ten). ........................................................................... 50

            4.   Trial counsel was ineffective during jury selection (Claim Thirteen). .......... 51

            5.   Trial counsel failed to present evidence of history of mental illness (Claim Fifteen). ............................................................ 52

            6.   Trial counsel was ineffective for failing to mention mental illness during opening (Claim Sixteen). ........................................... 53

            7.   Trial counsel failed to object to State's improper closing argument (Claim Seventeen). ........................................................ 54

        C.   The CCA ordered the parties to brief Judge Bryan's recusal. .............................. 55

D.    The CCA vacated Judge Bryan's Findings of Fact and Conclusions of Law....... 57

E.    Judges Alcala and Walker dissented, characterizing the State's position on the recusal issue as "gamesmanship."......................................................................... 58

F.    A second evidentiary hearing is held before Judge Langley. ............................... 59

IV.    FEDERAL HABEAS REPRESENTATION DURING THE GLOBAL PANDEMIC 66

RELEVANT LEGAL STANDARDS ........................................................................................ 67

I.    STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL ....... 67

II.    DUE PROCESS ......................................................................................................... 69

CLAIMS FOR RELIEF ............................................................................................................ 69

I.    TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE GUILT/INNOCENCE PHASE OF TRIAL, IN VIOLATION OF MR. THUESEN'S SIXTH AMENDMENT RIGHTS. ................................................................................. 69

A.    The Court is not procedurally barred from conducting a *de novo* review of Mr. Thuesen's claim for ineffective assistance of trial counsel related to investigating, developing, preparing, and presenting evidence that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the guilt/innocence phase (State Habeas Claims 1, 2, 3, 4, 7, 14)..................................................................... 69

1.    Claim below: State Habeas Claim 1 ............................................................. 70

a)    The state court failed to decide State Habeas Claim 1 on the merits..... 70

b)    The state court denied relief on State Habeas Claim 1 based on unreasonable determinations of fact. ...................................................... 73

2.    Claim below: State Habeas Claim 2 ............................................................. 77

a)    The state court failed to decide State Habeas Claim 2 on the merits..... 77

b)    The state court denied relief on State Habeas Claim 2 based on an unreasonable determination of fact. ..................................................... 78

3.    Claim below: State Habeas Claim 3 ............................................................. 82

a)    The state court failed to decide State Habeas Claim 3 on the merits..... 83

b)    The state court denied relief on State Habeas Claim 3 based on unreasonable determinations of fact. ...................................................... 84

4.    Claim below: State Habeas Claim 4 ............................................................. 85

a)    The state court failed to decide State Habeas Claim 4 on the merits..... 85

b)    The state court denied relief on State Habeas Claim 4 based on unreasonable determinations of fact. ...................................................... 86

5.    Claim below: State Habeas Claim 7 ............................................................. 87

a)    The state court failed to decide State Habeas Claim 7 on the merits..... 88

b) The state court denied relief on State Habeas Claim 7 based on an unreasonable determination of fact. ...................................................... 89

6. Claim below: State Habeas Claim 14 .......................................................... 91

a) The state court failed to decide State Habeas Claim 14 on the merits... 92

b) The state court denied relief on State Habeas Claim 14 based on unreasonable determinations of fact. ..................................................... 92

B. Mr. Thuesen's trial counsel provided constitutionally ineffective assistance by failing investigate, develop, prepare, and present evidence that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the guilt/innocence phase. ............................................................................. 95

1. Trial counsel were ineffective because they failed to investigate and secure expert witnesses to testify at the guilt/innocence phase regarding the effects of PTSD on Mr. Thuesen, including regarding how PTSD affected his ability to form the requisite intent, and that failure prejudiced Mr. Thuesen. .......... 95

2. Trial counsel were ineffective because they failed to present evidence demonstrating that Mr. Thuesen was never diagnosed with PTSD nor adequately treated for the condition, and that failure prejudiced Mr. Thuesen. ................................................................................................. 112

3. Trial counsel were ineffective because they affirmatively presented evidence during the guilt/innocence phase that undermined their own chosen defense strategy, and that conduct prejudiced Mr. Thuesen. .................................. 120

a) Dr. Saunders ..................................................................................... 122

b) Dr. Carlo .......................................................................................... 130

c) Theresa Cannon ................................................................................ 131

4. Trial counsel provided ineffective assistance when they failed to develop, prepare, and present testimony related to the PTSD recovery period and confabulations, and that failure prejudiced Mr. Thuesen. ........................... 134

5. Trial counsel provided ineffective assistance when they failed to present testimony of Mr. Thuesen's family history of mental health through his mother, Patricia Thuesen, and that failure prejudiced Mr. Thuesen. .......... 140

II. TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE PUNISHMENT PHASE OF TRIAL, IN VIOLATION OF MR. THUESEN'S SIXTH AMENDMENT RIGHTS. ........................................................................................ 143

A. The Court is not procedurally barred from conducting a *de novo* review of Mr. Thuesen's claim for ineffective assistance of trial counsel related to investigating, developing, preparing, and presenting expert evidence that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the punishment phase (State Habeas Claims 1, 5, 7, and 16). ............................................... 148

     1.    Claim below: State Habeas Claim 1 ............................................................ 148

     2.    Claim below: State Habeas Claim 5 ............................................................ 150

         a)    The state court failed to decide State Habeas Claim 5 on the merits... 150

         b)    The state court denied relief on State Habeas Claim 5 based on unreasonable determinations of fact. .................................................... 150

     3.    Claim below: State Habeas Claim 7 ............................................................ 156

     4.    Claim below: State Habeas Claim 16 .......................................................... 156

         a)    The state court failed to decide State Habeas Claim 16 on the merits. 157

         b)    The state court denied relief on State Habeas Claim 16 based on an unreasonable determination of fact. ...................................................... 157

B.    Trial counsel provided deficient assistance that prejudiced Mr. Thuesen when they failed to investigate, develop, prepare, and present expert evidence that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the punishment phase. ......................................................................................... 158

C.    The Court is not procedurally barred from conducting a *de novo* review of Mr. Thuesen's claim for ineffective assistance of trial counsel related to investigating, developing, preparing, and presenting adequate evidence that Mr. Thuesen would not pose a continuing threat of future violence (State Habeas Claim 6). .......... 172

     1.    Claim below: State Habeas Claim 6 ............................................................ 172

         a)    The state court failed to decide State Habeas Claim 6 on the merits... 173

         b)    The state court denied relief on State Habeas Claim 6 based on unreasonable determinations of fact. .................................................... 173

D.    Trial counsel provided deficient assistance that prejudiced Mr. Thuesen when they failed to investigate, develop, prepare, and present adequate evidence that Mr. Thuesen would not pose a continuing threat of future violence. ................. 175

E.    The Court is not procedurally barred from conducting a *de novo* review of Mr. Thuesen's claim for ineffective assistance of trial counsel related to failing to impeach Amanda ("Mandy") Ward's aggravation testimony (State Habeas Claim 10). ..................................................................................................................... 180

     1.    Claim below: State Habeas Claim 10 .......................................................... 181

F.    Trial counsel provided deficient assistance that prejudiced Mr. Thuesen when they failed to impeach Amanda ("Mandy") Ward's aggravation testimony. ..... 181

G.    The Court is not procedurally barred from conducting a *de novo* review of Mr. Thuesen's claim for ineffective assistance of trial counsel related to failing to object to the State's improper closing argument during the punishment phase (State Habeas Claim 17). ................................................................................... 184

     1.    Claim below: State Habeas Claim 17 .......................................................... 185

a) The state court failed to decide State Habeas Claim 17 on the merits. 185

b) The state court denied relief on State Habeas Claim 17 based on an unreasonable determination of fact. ...................................................... 186

H. Trial counsel provided deficient assistance that prejudiced Mr. Thuesen when they failed to object to the State's improper closing argument during the punishment phase. ............................................................................. 187

III. THE STATE HABEAS PROCEEDINGS VIOLATED MR. THUESEN'S RIGHTS UNDER THE DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS. ............................................................................. 190

A. A state court must observe due process when adjudicating constitutional claims raised in a post-conviction proceeding. ............................................ 190

B. The state habeas court violated due process by permitting the State to removal of the first habeas judge after he issued a ruling adverse to the State. .................... 191

1. Removing Judge Bryan, to whom the State had consented, and vacating his findings at the behest of the State only after he issued a ruling finding in favor of Mr. Thuesen on multiple bases, deprived Mr. Thuesen of due process of law. ............................................................................. 192

2. The CCA denied Mr. Thuesen a fair process when it countenanced the State's argument that Judge Bryan should not have presided over the habeas hearing. ............................................................................. 195

C. The Court may adjudicate the claim. ................................................. 201

1. This claim is not barred under the AEDPA because it raises federal issues of constitutional due process under the Fifth and Fourteenth Amendments, which may be heard pursuant to 28 U.S.C. §§ 2254(b)(1)(B)(ii) and (d)(1). ............................................................................. 201

2. This claim could not have been raised below because it arose during the adjudication of Mr. Thuesen's state habeas petition. ................................... 203

3. This claim falls into an exception to 28 U.S.C. § 2254(d)(2)'s relitigation bar because the findings of fact made by Judge Langley constituted an unreasonable determination of the facts in light of the evidence presented before Judge Bryan. ..................................................................... 203

IV. THE STATE COURTS DID NOT ADJUDICATE MR. THUESEN'S SUBSTANTIVE HABEAS CLAIMS ON THE MERITS OR PROVIDE A PROCESS THAT EFFECTIVELY PROTECTED HIS RIGHTS BECAUSE THE CCA'S RULING VACATING JUDGE BRYAN'S GRANT OF RELIEF, JUDGE LANGLEY'S DECISION, AND THE CCA'S SUBSEQUENT AFFIRMANCE OF JUDGE LANGLEY'S DECISION WERE RENDERED IN VIOLATION OF MR. THUESEN'S FIFTH AND FOURTEENTH AMENDMENT DUE PROCESS RIGHTS. ............................................................................. 205

A.    No deference to the state proceeding is owed under § 2254(d)(1) and (2), and the court should review all of Mr. Thuesen's claims *de novo*. ................................ 205

    1.    The procedural deficiencies and due process violations in the state habeas adjudication mean that there was no "adjudication of the merits" within the meaning of § 2254(d). ......................................................................... 205

    2.    Without an actual "adjudication on the merits" of Mr. Thuesen's habeas claims, this Court should review his claims *de novo*. ................................ 211

B.    The procedural defects and due process violations in the state habeas proceeding also requires *de novo* review under § 2254(b)(1)(B)(ii). .................................... 212

V.    MR. THUESEN'S DEATH SENTENCE SHOULD BE VACATED BECAUSE TEXAS REQUIRED PUNISHMENT-PHASE JURY INSTRUCTION IMPROPERLY RESTRICTS THE EVIDENCE THE JURY MAY CONSIDER AS MITIGATING  212

A.    The jury must be permitted to hear all mitigating evidence in a death penalty proceeding. ...................................................................................................... 212

B.    The trial court gave instructions to the jury that prevented it from considering all mitigating evidence. ........................................................................................... 215

C.    Mr. Thuesen presented mitigating evidence that the jury was actually or effectively precluded from considering. ............................................................. 217

D.    Even if the trial court's instructions were proper, in Mr. Thuesen's case the State's gloss on those instructions improperly instructed the jury to ignore and not consider certain mitigating evidence. .................................................................. 220

E.    The Court may adjudicate the claim. ................................................................. 222

VI.    MR. THUESEN'S DEATH SENTENCE VIOLATES THE CONSTITUTION BECAUSE TEXAS'S STATUTORY SCHEME SET FORTH IN CODE OF CRIMINAL PROCEDURE, ARTICLE 37, IS ARBITRARY ................................... 223

A.    United States Supreme Court precedent precludes administering the death penalty pursuant to arbitrary procedures. ..................................................................... 223

B.    Texas's death penalty scheme is arbitrary. ....................................................... 224

VII.    MR. THUESEN'S DEATH SENTENCE VIOLATES THE CONSTITUTION BECAUSE TEXAS'S STATUTORY SCHEME SET FORTH IN CODE OF CRIMINAL PROCEDURE, ARTICLE 37, DENIES THE RIGHT OF EQUAL PROTECTION TO PEOPLE WITH MENTAL HEALTH DISORDERS ................. 231

PRAYER FOR RELIEF ......................................................................................... 232

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul-Kabir v. Quarterman*,
  550 U.S. 233 (2007)........................................................................... *passim*

*Ake v. Oklahoma*,
  470 U.S. 68 (1985)...................................................................................97

*Anderson v. Bessemer City*,
  470 U.S. 564 (1985).................................................................................65

*Andrus v. Texas*,
  140 S. Ct. 1875, 207 L. Ed. 2d 335 (2020).....................................68, 144, 146, 162

*Apprendi v. New Jersey*,
  530 U.S. 466 (2000)...............................................................................229

*Beasley v. State*,
  634 S.W.2d 320 (Tex. Crim. App. 1982)..................................................199

*Bigelow v. Haviland*,
  576 F.3d 284 (6th Cir. 2009) ..................................................................110

*Borjan v. State*,
  787 S.W.2d 53 (Tex. Crim. App. 1990)...................................................186

*Brewer v. Quarterman*,
  550 U.S. 286 (2007)...............................................................................222

*Brewster v. Hetzel*,
  913 F.3d 1042 (11th Cir. 2019) .......................................................... *passim*

*Busby v. State*,
  253 S.W.3d 661 (Tex. Crim. App. 2008)................................................230

*Cadd v. State*,
  587 S.W.2d 736 (Tex. Crim. App. 1979)................................................199

*Coble v. State*,
  330 S.W.3d 253 (Tex. Crim. App. 2010)................................................154

*Cone v. Bell*,
  --- U.S. ----, 129 S.Ct. 1769 (2009) ......................................................206

*Cone v. Bell*,
556 U.S. 449 (2009)........................................................................................71, 211

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993).................................................................................. *passim*

*Davis v. Crist Industries, Inc.*,
98 S.W.3d 338 (Tex. App. 2003).........................................................................195

*Davis v. State*,
114 S.W. 366 (Tex. Crim. App. 1908)..................................................................188

*Davis v. State*,
956 S.W.2d 555 (Tex. Crim. App. 1997)..............................................................197

*Dodson v. Stephens*,
611 F. App'x 168 (5th Cir. 2015) ..........................................................................68

*Drake v. Portuondo*,
321 F.3d 338 (2d Cir. 2003)........................................................................206, 210

*Draughon v. Dretke*,
427 F.3d 286 (5th Cir. 2005) .............................................................97, 121, 126

*Dunn v. Cnty of Dallas*,
794 S.W.2d 560 (Tex. App. 1990).............................................................198, 208

*Escamilla v. Stephens*,
602 F. App'x 939 (5th Cir. 2015) ..........................................................................68

*Evitts v. Lucey*,
469 U.S. 387 (1985).............................................................................................190

*Ford v. Wainwright*,
477 U.S. 399 (1986)....................................................................................190, 209

*Franks v. State*,
90 S.W.3d 771 (Tex. App. 2002).........................................................................199

*Fuentes v. Shevin*,
407 U.S. 67 (1976)................................................................................................69

*In re Gen. Elec. Capital Corp.*,
63 S.W.3d 568 (Tex. App. 2002)...............................................................196, 197

*Godfrey v. Georgia*,
446 U.S. 420 (1980)..............................................................223, 224, 226, 230

*Gregg v. Georgia*,
   428 U.S. 153 (1976).......................................................................................224

*Guidry v. Dretke*,
   397 F.3d 306 (5th Cir. 2005) .................................................................76, 175

*Harrington v. Richter*,
   562 U.S. 86 (2011)...................................................................................70, 71

*Henderson v. Cockrell*,
   333 F.3d 592 (5th Cir. 2003) ............................................................... *passim*

*Hinton v. Alabama*,
   512 U.S. 263 (2014)........................................................................................68

*Hollabaugh v. State*,
   1994 WL 284093 (Tex. App. 1994)..............................................................196

*Jackson v. State*,
   2012 WL 955361 (Tex. App. 2012)..............................................................196

*Jackson v. State*,
   529 S.W.2d 544 (Tex. Crim. App. 1975).....................................................188

*Jefferson v. Upton*,
   560 U.S. 284 (2010)........................................................................................65

*Johnson v. Cain*,
   215 F.3d 489 (5th Cir. 2000) .............................................158, 175, 181, 187

*Johnson v. State*,
   698 S.W.2d 154 (Tex. Crim. App. 1985)..............................................187, 188

*Johnson v. Williams*,
   568 U.S. 289 (2013)................................................................................ *passim*

*Jurek v. Texas*,
   428 U.S. 262 (1976)......................................................................................226

*Kelley v. State*,
   823 S.W.2d 300 (Tex. Crim. App. 1992)......................................................199

*Kimmelman v. Morrison*,
   477 U.S. 365 (1986)......................................................................................110

*Kingsbury v. State*,
   625 S.W.3d 686 (Tex. App. 2021).................................................................154

*Lines v. Larkins*,
   208 F.3d 153 (3d Cir. 2000)..................................................................212

*Lisenba v. People of State of California*,
   314 U.S. 219 (1941)............................................................................209

*Lockett v. Ohio*,
   438 U.S. 586 (1978)......................................................................213, 222

*Lott v. Trammell*,
   705 F.3d 1167 (10th Cir. 2013) .........................................................210

*Marshall v. Jerrico, Inc.*,
   446 U.S. 238 (1980)............................................................................202

*Maupin v. State*,
   930 S.W.2d 267 (Tex. Crim. App. 1996)............................................188

*McCleskey v. Kemp*,
   481 U.S. 279 (1987)............................................................................213

*McFarland v. State*,
   989 S.W.2d 749 (Tex. Crim. App. 1999).............................................186

*Mercadel v. Cain*,
   179 F.3d 271 (5th Cir. 1999) .......................................................70, 211

*Miller v. Johnson*,
   200 F.3d 274 (5th Cir. 2000) .......................................158, 175, 181, 187

*Miniel v. State*,
   831 S.W.2d 310 (Tex. Crim. App.), *cert. denied*, 506 U.S. 885 (1992).................................81

*Monroe v. Angelone*,
   323 F.3d 286 (4th Cir. 2003) .............................................................206

*Penry v. Johnson*,
   532 U.S. 782 (2001)............................................................................216

*Penry v. Lynaugh*,
   492 U.S. 302 (1989)......................................................................217, 220

Ex *parte Pete*,
   517 S.W.3d 825 (Tex. Crim. App. 2017)............................................199

*Pike v. Guarino*,
   492 F.3d at 67 (1st Cir. 2007) ...........................................................206

4

*Porter v. McCollum,*
    558 U.S. 30 (2009).........................................................................................*passim*

*Prystash v. State,*
    3 S.W.3d 522 (Tex. Crim. App. 1999)..................................................................199

*Ex parte Reed,*
    271 S.W.3d 698 (Tex. Crim. App. 2008).......................................................65, 204

*Rhodes v. State,*
    240 S.W.3d 882 (Tex. Crim. App. 2007)..............................................................199

*Rodriguez v. State,*
    No. 10-15-00371-CR, 2016 WL 7437786 (Tex. App. Dec. 21, 2016)..................196

*Rompilla v. Beard,*
    545 U.S. 374 (2005)..................................................................................68, 118

*Ruiz v. Stephens,*
    728 F.3d 416 (5th Cir. 2013) ................................................................................68

*Saldano v. State,*
    232 S.W.3d 77 (Tex. Crim. App. 2007)................................................................230

*Sears v. Upton,*
    561 U.S. 945 (2010)................................................................................................68

*Simmons v. South Carolina,*
    512 U.S. 154 (1994)..............................................................................................228

*Skipper v. South Carolina,*
    476 U.S. 1 (1986)........................................................................................214, 217

*Smalis v. Pennsylvania,*
    476 U.S. 140 (1986)..............................................................................................203

*Smith v. State,*
    2013 WL 4774054 (Tex. App. 2013)..........................................................198, 199

*Solis v. Cockrell,*
    342 F.3d 392 (5th Cir. 2003) ..............................................158, 175, 181, 187

*State v. Mendoza,*
    365 S.W.3d 666 (Tex. Crim. App. 2012).........................................................64, 65

*Ex parte Storey,*
    584 S.W.3d 437 (Tex. Crim. App. 2019)..............................................................204

*Strickland v. Washington*,
    466 U.S. 668 (1984) ...................................................................................... *passim*

*In re Tasby*,
    120 S.W.3d 443 (Tex. App. 2003) .......................................................................197

*Tennard v. Dretke*,
    542 U.S. 274 (2004) ............................................................................................213

*Thuesen v. State*,
    No. AP-76,375, 2014 WL 792038 (Tex. Crim. App. Feb. 26, 2014) ..............30, 61

*Ex parte Thuesen*,
    546 S.W.3d 145 (Tex. Crim. App. 2017) ......................................................57, 208

*Ex parte Thuesen*,
    546 S.W.3d 158 (Tex. Crim. App. 2018) ...........................................57, 58, 200

*Ex parte Thuesen*,
    No. WR-81,584-01, 2017 WL 2131777 (Tex. Crim. App. May 3, 2017) ..............57

*Ex parte Thuesen*,
    No. WR-81,584-01, 2020 WL 584368 (Tex. Crim. App. Feb. 5, 2020) ........ *passim*

*United States v. Cronic*,
    466 U.S. 648 (1984) ............................................................................................111

*United States v. Mullins*,
    315 F.3d 449 (5th Cir. 2002) ................................................................................81

*Walker v. Harrison*,
    597 S.W.2d 913 (Tex. 1980) ..............................................................................198

*Whitaker v. Quarterman*,
    200 Fed. Appx. 351 (5th Cir. 2006) ...................................................................154

*Wiggins v. Smith*,
    539 U.S. 510 (2003) ...................................................................................... *passim*

*Williams v. State*,
    No. 07-15-00294-CR, 2016 WL 6024348 (Tex. App. Oct. 13, 2016) ...............195

*Williams v. Taylor*,
    529 U.S. 362 (2000) ......................................................................................68, 71

*Wilson v. Sellers*,
    138 S. Ct. 1188 (2018) ..................................................................................66, 210

*Wilson v. State*,
 977 S.W.2d 379 (Tex. Crim. App. 1998)................................................196

*Wilson v. Workman*,
 577 F.3d 1284 (10th Cir. 2009) ................................................206, 210

*Winston v. Kelly*,
 592 F.3d 535 (4th Cir. 2010) ................................................209, 210

*Woodall v. State*,
 336 S.W.3d 634 (Tex. Crim. App. 2011).................................................199

*Woodfox v. Cain*,
 772 F.3d 358 (5th Cir. 2014) ................................................71

*Woodson v. North Carolina*,
 428 U.S. 280 (1976)................................................223, 229, 230

**Statutes**

28 U.S.C. § 2201 ................................................1

28 U.S.C. § 2241(a) ................................................8

28 U.S.C. § 2241(c)(3) ................................................1

28 U.S.C. § 2241 *et seq.* ................................................1

28 U.S.C. § 2244(d)(1) ................................................8

28 U.S.C. § 2254 ................................................1, 9, 10, 201

28 U.S.C. § 2254(a) ................................................1, 3

28 U.S.C. § 2254(b)(1) ................................................*passim*

28 U.S.C. § 2254(b)(1)(A) ................................................9

28 U.S.C. § 2254(b)(1)(B)(ii) ................................................10, 201, 212

28 U.S.C. § 2254(c) ................................................201, 223

28 U.S.C. § 2254(d) ................................................*passim*

28 U.S.C. § 2254(d)(1) ................................................10, 201, 222, 229

28 U.S.C. § 2254(d)(2) ................................................*passim*

28 U.S.C. § 2254(e) ................................................222

42 U.S.C. § 247(d) ........................................................................................66

Tex. Code Crim. Proc. art. 11.071 § 8(a) ........................................................32

Tex. Code Crim. Proc. art. 11.071 § 9(a) ........................................................32

Tex. Code Crim. Proc. art. 37.071 ...........................................................*passim*

Tex. Code Crim. Proc. art. 37.071(b)(1) .......................................................226

Tex. Code Crim. Proc. art. 37.071(d)(2) .......................................................227

Tex. Code Crim. Proc. art. 37.071, § 2(b)(1) ................................................215

Tex. Code Crim. Proc. art. 37.071 § 2(c) ......................................................226

Tex. Code Crim. Proc. art. 37.071, § 2(e) .......................................................36

Tex. Code Crim. Proc. art. 37.071, § 2(e)(1) ................................................215

Tex. Code Crim. Proc. art. 37.071, § 2(f)(4) .................................36, 215, 216

Tex. Gov't Code Ann. § 74.046 ....................................................................197

Tex. Gov't Code § 24.002 .............................................................................207

Tex. Penal Code § 6.03(a), (b) ......................................................................111

Tex. Penal Code § 19.02 ...............................................................................110

Tex. Penal Code § 19.03 ...............................................................................110

Texas Code Crim. Proc. Ann. art. 37.071, § 2(b)(1) ....................................224

Texas Code Crim. Proc. Ann. art. 37.071, § 2(e)(1) ....................................224

Texas Code Crim. Proc. Ann. art. 37.071, § 2(f)(4) .....................................224

Texas Code Crim. Proc. Ann. art. 37.0711, § 2(b) .......................................231

**Constitutional Authorities**

Tex, Const. Art. XVI, Sec. 1(b) ....................................................................196

Tex. Const. Art. XVI, Sec. 1(c) ....................................................................196

U.S. Const. amend. V ............................................................................*passim*

U.S. Const. amend. VI ...........................................................................*passim*

U.S. Const. amend. VIII................................................................................... *passim*

U.S. Const. amend. XIV .................................................................................. *passim*

U.S. Const. amend. XIV, § 1 ..................................................................................69

U.S. Const. art. III ...................................................................................................1

U.S. Const. § 9 ........................................................................................................1

U.S. Const. § 9, cl. 2 ...............................................................................................8

**Rules**

Tex. R. App. P. 56.1(c) ........................................................................................199

Tex. R. Civ. P. 18a(g)(2).............................................................................207, 208

Texas R. of Civ. P. 18a .......................................................................................207

Texas R. Civ. P. 18b(e).......................................................................................207

**Other Authorities**

38 C.F.R. § 14.803 ...............................................................................................131

38 C.F.R. § 14.808 ...............................................................................................131

Brian R. Means, Postconviction Remedies § 29:6 (June 2021 Update) ............... *passim*

RAND Corp., *One in Five Iraq and Afghanistan Veterans Suffer from PTSD or Major Depression*, RAND (Apr. 17, 2008) ...................................................................3

Shawn P. Cahill & Kristin Pontoski, *Post-traumatic stress disorder and acute stress disorder I: their nature and assessment considerations*, 2(4) PSYCHIATRY 14-25 (Edgmont 2005)................................................................14, 124

State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel*, Guideline 10.1...................................................................................................145

State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel*, Guideline 11.1...................................................................................................145

Mr. Thuesen, by and through undersigned counsel, pursuant to all rights available under Article I, Section 9 and Article III of the United States Constitution; the, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; 28 U.S.C. § 2201; and 28 U.S.C. § 2241 *et seq*., including 28 U.S.C. § 2254, respectfully petitions this Court for a Writ of Habeas Corpus declaring his custody in violation of the Constitution of the United States and ordering him released because his conviction for murder as well as the resulting death sentence were unconstitutionally obtained. 28 U.S.C. §§  2241(c)(3) & 2254(a).

## PRELIMINARY STATEMENT

John Thuesen is a decorated veteran who enlisted in the Marines at the young age of eighteen following the events of 9/11 out of a keen sense of patriotism and duty. Mr. Thuesen served his country honorably and bravely in Iraq under extraordinary strains. Mr. Thuesen's fellow soldiers and superiors recognized his courage and selflessness, with Mr. Thuesen receiving a Meritorious Mast for his participation in numerous combat patrols and convoy security missions. This award is given in exceptional cases when a Marine performs above and beyond the usual requirements of duty by demonstrating exceptional industry, judgment, or initiative.

Unfortunately, Mr. Thuesen's service to his country came at a great personal cost. Mr. Thuesen's experience in Iraq can only be described as horrific. Having been trained primarily as a radio operator, Mr. Thuesen was thrust almost immediately into active combat. Mr. Thuesen spent most of his time "outside the wire" (i.e., outside of the security perimeter of the base) and in the war zone as a machine gunner. This was a particularly dangerous role given the setting. Mr. Thuesen was stationed in Anbar Province, which includes the cities of Haditha and Fallujah, two cites under the influence of insurgents in which much of the most intense violence occurred at and around the time of Mr. Thuesen's deployment. A month before his arrival, Iraqi insurgents in

1

Fallujah ambushed a convoy containing four American private military contractors from Blackwater USA. The insurgents murdered all four contractors by machine gun fire and a grenade thrown through a window of their SUVs. A mob then set their bodies on fire, dragged their corpses through the streets, and hung the bodies over a bridge.[1] The Second Battle of Fallujah, led by the U.S. Marines, would become the highest point of conflict during the Iraq War. The U.S. military called it "some of the heaviest urban combat U.S. Marines have been involved in since the Battle of Hue in Vietnam in 1968."[2]

Mr. Thuesen's missions stretched over many days, with little chance for rest. It was so cold that he suffered frostbite. He recalls his fellow soldiers urinating into a canteen, and then holding the canteen against their faces for warmth. In addition to the horrendous living conditions, Mr. Thuesen often experienced or witnessed life and death situations. Haditha was an insurgent stronghold. Mr. Thuesen took fire from rocket and mortar rounds and saw first-hand the injuries and death caused by improvised explosive devices (IEDs) and land mines. He and his fellow soldiers were under a constant state of siege. Adding to the stress of the situation was the fact that it was not always clear who were the enemies. Drivers who approached checkpoints without stopping were assumed to be enemy combatants. Once they passed the trigger point unauthorized, Marines were ordered to shoot. On one occasion, Mr. Thuesen was ordered to open fire on a vehicle that failed to stop at a checkpoint. It turned out the occupants of the car were not suicide bombers but a civilian family. A young child, covered in his family's blood, emerged from the vehicle and ran towards Mr. Thuesen's Humvee. Another time he was ordered to shoot a woman – although

---

[1] https://en.wikipedia.org/wiki/First_Battle_of_Fallujah

[2] https://en.wikipedia.org/wiki/Second_Battle_of_Fallujah

she was an enemy combatant – she had been disguised to appear pregnant. These deeply traumatic events changed Mr. Thuesen.

Not surprisingly, Mr. Thuesen returned from Iraq a different man. Due to the trauma and violence that he experienced, Mr. Thuesen came home with post-traumatic stress disorder ("PTSD") that was never properly diagnosed or treated. PTSD is a growing problem for a huge number of returning combat soldiers. The National Center for PTSD and the RAND Corporation estimated that up to 20 percent of veterans who served in Iraq and Afghanistan suffer from PTSD or major depression.[3] Also common is the fact that violence frequently occurs among returning soldiers who have been exposed to horrific wartime violence. Compounding the problem, "many service members said they do not seek treatment for psychological illnesses because they fear it will harm their careers. But even among those who do seek help for PTSD or major depression, only about half receive treatment that researchers consider 'minimally adequate' for their illnesses." *Id.*

Without the benefit of any formal re-entry program for returning soldiers, Mr. Thuesen struggled to return to the civilian life he knew before. Mr. Thuesen's platoon sergeant described Mr. Thuesen as an "all around nice guy" before Iraq, one who was focused and goal-oriented. By all accounts, this was what others thought of him as well. He was a loving son and brother and actively involved in his community. Although his life was not without difficulties, he was sociable, well liked, and had been doing well in school prior to Iraq. Upon returning home, however, friends and family described Mr. Thuesen much differently. He seemed unsure of himself, hyper-vigilant, depressed, lacking direction, and on edge. At times, he seemed to lack emotion. At other times, he

---

[3] RAND Corp., *One in Five Iraq and Afghanistan Veterans Suffer from PTSD or Major Depression*, RAND (Apr. 17, 2008), https://www.rand.org/news/press/2008/04/17.html.

would start crying. He started to carry a gun on him wherever he went. It was clear to those who knew him that something was wrong but, like so many other veterans suffering from PTSD, Mr. Thuesen did not receive the help he needed to treat his illness.

As is typical with PTSD, Mr. Thuesen's symptoms became increasingly pronounced, and by 2007, his symptoms became severe. By 2008, Mr. Thuesen's symptoms had become so severe that he called a suicide hotline and admitted to having thoughts of killing himself. He was admitted to a psychiatric ward. He reported all the symptoms that should have resulted in a PTSD diagnosis, but, inexplicably, he was never diagnosed with PTSD; instead, he was referred to a clinical social worker and prescribed an anti-depressant.

In August 2008, just ten days after his release from the psychiatric ward, Mr. Thuesen met Rachel Joiner. Mr. Thuesen reported to the social worker that he was excited and happy to have met someone. He stopped taking his antidepressant without guidance or supervision by a doctor. But, not long after they began dating, in February 2009, Ms. Joiner began to pull away from Mr. Thuesen. She told Mr. Thuesen that she needed space and wanted time apart. In early March 2009, Mr. Thuesen's social worker noted that Mr. Thuesen seemed to suffer from lack of sleep and was anxious and irritable. These are all classic symptoms of PTSD, but Mr. Thuesen remained undiagnosed and untreated. He was not referred to a psychiatrist. No one made sure that he was taking his medication. No one even suggested to him that he was suffering from PTSD. He was left to deal with an illness that he did not know he had all on his own. On March 6, 2009, Mr. Thuesen fatally shot Ms. Joiner and her brother.

In 2010, Mr. Thuesen was convicted and sentenced to death. For reasons that will be detailed herein, Mr. Thuesen deserves a new trial.

At the time of the shootings, Mr. Thuesen was in midst of an acute PTSD crisis. Yet, this fact and the connection between his PTSD and his actions on March 6, 2009 were not presented to the jury. Had trial counsel adequately investigated, prepared and presented an effective defense based on PTSD to the jury, Mr. Thuesen's case likely would have turned out differently. His trial counsel, however, failed to do so. As an initial matter, they waited until the last minute to prepare much of their case, and the only expert called at trial was a psychologist who, admittedly, was not an expert in PTSD. During the guilt phase, the jury never learned about deeply traumatic events – including the fatal shooting of civilians – that Mr. Thuesen experienced, despite their obvious connection to Mr. Thuesen's PTSD. Trial counsel failed to interview numerous available witnesses and ignored the statements of others. One friend told trial counsel that he witnessed Mr. Thuesen experience what he described as a "flashback," in which Mr. Thuesen suddenly started yelling orders at an empty porch. After he "snapped out of it," Mr. Thuesen had no recollection of what occurred. Trial counsel, however, never called this friend as a witness at either phase of the trial. In fact, the judge and jury at Mr. Thuesen's trial heard only a fraction of the trauma that Mr. Thuesen experienced in Iraq and its impact on his life—and all through lay witnesses.

Trial counsel's incompetence manifested itself most clearly in their selection and preparation of their sole testifying expert witness, Dr. Roger Saunders, a psychologist who was not an expert in PTSD. Originally retained to testify at the punishment phase, trial counsel decided to switch his testimony from the punishment phase to the guilt/innocence phase of trial without vetting his proffered testimony or adequately preparing him to testify. Dr. Saunders' testimony did more harm than good, leaving the incorrect and damaging impression that Mr. Thuesen suffered primarily from a Dependent Personality Disorder, not PTSD. Even worse, Dr. Saunders' testimony wholly failed to explain to the jury the effects of PTSD. Relevant to both the guilt and the

punishment phases of the trial, Dr. Saunders did not explain that PTSD left Mr. Thuesen with an exaggerated fight-or-flight response to threatening or stressful events: in cases of extreme stress, the blood flow to the cerebrum (the part of the brain that controls a person's thinking, reasoning, and voluntary muscles) diminishes, and forces one to rely on more rudimentary, reflexive, parts of the brain. Not once did trial counsel offer evidence that the PTSD crisis could affect his *mens rea*.

Because of the foregoing and a series of other crucial missteps, Mr. Thuesen's conviction was all but certain by the time the case went to a jury.

Making matters worse, trial counsel's errors poured over into the penalty phase where they failed to effectively present mitigating evidence regarding Mr. Thuesen's PTSD to the jury and failed to argue that PTSD was a mitigating circumstance warranting a life sentence rather than the death penalty. Notably, they failed to call a single expert witness on PTSD (or any other mental illness). These were not minor mistakes. In *Porter v. McCollum*, 558 U.S. 30 (2009), the United States Supreme Court recognized that combat and military related trauma are serious conditions that are critically relevant when assessing moral culpability for capital murder. The Supreme Court in *Porter* vacated the death sentence of a Korean War veteran after finding that his trial counsel had not effectively presented the jury with mitigation evidence of his wartime experience and PTSD:

> Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines. . . . [T]he relevance of Porter's extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on [him].

558 U.S. at 43. Without an explanation for Mr. Thuesen's behavior on the day of and following the shootings, the jury was left thinking (wrongly) that Mr. Thuesen had no remorse for the deaths

of Rachel and Travis Joiner, and that he was a future threat to society. Worse yet, the jury was left with the State's essentially unrebutted characterization of Mr. Thuesen as "pure evil." Even minimally competent counsel would have presented the available, compelling counter-narrative that Mr. Thuesen was not "evil," but a man suffering from a mental illness who had been in the grips of an acute PTSD crisis at the time of the killings.

In 2015, Judge Bryan (the judge who had presided over Mr. Thuesen's trial, and was intimately familiar with the facts) found in favor of Mr. Thuesen on multiple claims of constitutional error. After an extensive evidentiary hearing, he expressly found numerous instances in which trial counsel's ineffectiveness violated Mr. Thuesen's rights under the Constitution and recommended that Mr. Thuesen be given a new penalty phase trial. But the Texas Criminal Court of Appeals (CCA) threw out that informed recommendation based on a novel, arbitrary application of a state law rule of civil procedure, in violation of Mr. Thuesen's constitutional rights. The CCA's decision was so divisive that it occasioned a scathing, 15-page dissent from Judge Elsa Alcala, joined by Judge Walker, in which Judge Alcala criticized the State for engaging in "gamesmanship."[4]

Thus, after years of post-conviction proceedings, and after obtaining relief, Mr. Thuesen had to start all over with different state habeas counsel and a different judge who was unfamiliar with the matter. The new judge, Judge Langley, denied Mr. Thuesen's requested relief without explaining how he reached such a drastically different conclusion. Indeed, Judge Langley adopted the State's Proposed Findings of Fact and Conclusions of Law wholesale, without a single edit or

---

[4] Judge Alcala was so bothered by the CCA's handling of death penalty cases that shortly after the CCA's reversal in Mr. Thuesen's case in 2018, she left the bench. *See*, https://www.texastribune.org/2019/01/16/texas-court-of-criminal-appeals-elsa-alcala-departure/

interlineation, only nine days after the State submitted its proposal.[5] The CCA then adopted Judge

Langley's Findings of Fact and Conclusions of Law almost entirely in a seven-page unpublished

decision that contained almost no analysis.

This Court represents the best and only forum for Mr. Thuesen to vindicate his federal

constitutional rights and secure *vacatur* of his unlawful conviction and death sentence.

## JURISDICTION AND VENUE

1.      Subject matter jurisdiction is conferred by 28 U.S.C. § 2241(a) and Amendments

Five, Six, Eight and Fourteen to the United States Constitution and Section 9, Clause 2 of the

United States Constitution.

## THE PARTIES

2.      Petitioner John Thuesen is a 38-year-old United States veteran suffering from post-

traumatic stress disorder currently confined on death row at the State of Texas Department of

Criminal Justice's Institutional Division at the Polunsky Unit in Livingston, Texas. His inmate

number is 999557.

3.      Defendant Bobby Lumpkin is the Director of the Texas Department of Criminal

Justices' Institutional Division.

## TIMELINESS OF THE PETITION AND THE AMENDED PETITION

4.      Under 28 U.S.C. § 2244(d)(1), a state prisoner has one year from the date that direct

review concludes to petition for a writ of habeas corpus in federal court. The one-year deadline is

tolled during the pendency of state post-conviction or other collateral review. *See* 28 U.S.C.

§ 2254(d)(2).

---

[5] Given the rapid turn-around by Judge Langley, it should not be surprising that he was not able to address Mr. Thuesen's claims on their merits, and that he made unreasonable determinations of facts in his analysis.

5.      Mr. Thuesen filed his state habeas application on October 9, 2012.

6.      The CCA denied Mr. Thuesen's state petition for post-conviction relief on February 5, 2020. Consistent with the Court's order dated October 7, 2021, Dkt. No. 31, the deadline for filing this Amended Petition is November 24, 2021. Accordingly, this Amended Petition is timely filed.

## PRELIMINARY STATEMENT REGARDING CITATIONS

7.      Citations to "RR" are to the Reporter's Record in Mr. Thuesen's underlying capital trial. Citations to "CR" refer to the Clerk's Record, Direct Appeal to the Court of Criminal Appeals of Texas, Trial Cause No. 09-02136-CRF-272, Volumes 1 to 6. Citations to "Supp. CR" are to the Supplemental Clerk's Record. Citations to "HR" are to the Evidentiary Hearing held on June 9-13, 2014 before Judge Bryan. Citations to "HR2" are to the Second Evidentiary Hearing held on December 3-5, 2018, before Judge Langley.

## REQUEST FOR BRIEFING

8.      Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts provides in relevant part that a petition for writ of habeas corpus "must: (1) specify all grounds for relief available to the petitioner; (2) state the facts supporting each ground; [and] (3) state the relief requested." In compliance with the requirements of Rule 2, Mr. Thuesen files this petition. Undersigned counsel believes that this Amended Petition meets those requirements. Mr. Thuesen will seek the Court's permission to file an additional brief(s) in support of the Amended Petition as required.

## STATEMENT REGARDING EXHAUSTION OF CLAIMS

9.      Federal habeas petitioners generally must exhaust state court remedies. 28 U.S.C. § 2254(b)(1)(A). Each of Mr. Thuesen's claims either is exhausted or falls within an exception to

the exhaustion requirement. No claims are procedurally barred. Because procedural default and failure to exhaust are affirmative defenses that Respondent must assert and can waive, Mr. Thuesen reserves his right to reply to any such arguments.

## ELIGIBILITY FOR RELIEF

10.    This Petition sets forth grounds for relief that implicate rights set forth in the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. In particular, Mr. Thuesen sets forth claims that his rights to due process of law and effective assistance of counsel, and a penalty hearing that comported with the Eighth Amendment to the United States Constitution, were violated as set forth herein.

11.    Relief is not barred by subpart (d) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which is codified at 28 U.S.C. § 2254. The so-called relitigation bar, section 2254(d), contains an exception for any claim that was not adjudicated on the merits in State court proceedings. Further subparts (d)(1) and (2) provide additional exceptions to the relitigation bar. Subpart (d)(2) provides an exceptions were adjudication of a state claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Further, subpart (b)(1)(B)(ii) provides an exception where circumstances exist that render the State's process ineffective to protect the rights of the applicant.

12.    Each of the exceptions (d) ("on the merits"), (d)(2) ("unreasonable determination of the facts"), and (b)(1)(B)(ii) (State's "process ineffective to protect the rights of the applicant") applies here.

## STATEMENT OF FACTS

13.    Mr. Thuesen was born on November 18, 1983 to Patricia and Dennis Thuesen. He has two older siblings, a sister Michelle and a brother Michael. They grew up in Cat Spring, Texas,

a small community in southern Austin County, Texas. Although his childhood was not perfect—his father was abusive at times and he had some early troubles with alcohol—Mr. Thuesen was well liked, a good student, and engaged with school and his community.

14.     In November 2001, following the events of 9/11, Mr. Thuesen enlisted in the Marine Corps Reserve. Still a senior in high school, he had just turned 18. In 2002, Mr. Thuesen attended Marine Corps boot camp and training in Southern California, where his friend was killed and nearly decapitated in a training accident. Mr. Thuesen saw his friend after the accident who appeared to be in shock, yet neither he nor the other Marines who witnessed the accident were given time to process the tragedy or mourn—a reality that would be repeated over and over after deployment. 53 RR at 9-13; 3 HR2 at 22-23; 4 HR2 at 155-156. Mr. Thuesen completed his training and entered the reserve unit in Houston. In August 2004, Mr. Thuesen was deployed to Iraq and stationed in various places, including Haditha. 44 RR at 127:15-25; 131:5-12; 132:9-19. He was not yet 21 years old. Although he was trained as a radio operator, by the time Mr. Thuesen arrived in Iraq, an insurgency had started and Mr. Thuesen was required to take on roles that he not been trained or prepared for, including that of a machine gunner providing direct fire in support infantrymen, working checkpoints, sweeping for improvised explosive devises ("IEDs"), conducting raids, and engaging in combat. State Habeas Ex. 13 at 157 (exhibit submitted at evidentiary hearing); 45 RR at 135:2-5; 4 HR2 at 10-16, 22-24, 27, 29, 41, 157-60. At times, Mr. Thuesen had to spend days or weeks on end in enemy territory, was subject to mortar attacks, and was ordered to shoot people at checkpoints. *Id.*; State Habeas Ex. 13 at 58, 157, 166-67 (exhibit submitted at evidentiary hearing). On one occasion, he was ordered to shoot at a vehicle that refused to stop at a checkpoint. It turned out that the car was occupied not by enemy combatants but by civilians, including a young boy who was the sole survivor of the incident. On another

11

occasion, he killed a woman who had a bomb strapped under her dress to make her look pregnant while walking toward the soldiers with two young children. 4 HR2 at 41-47, 161-162; State Habeas Ex. 13 at 58 (exhibit submitted at evidentiary hearing). He saw his fellow soldiers and enemy combatants die or suffer serious wounds. 4 HR2 at 161-62; State Habeas Ex. 13 at 166-67 (exhibit submitted at evidentiary hearing).

15.     Upon his return to the States, there was no formal reintegration program in place for reserve Marines. The Marine Corps simply expected soldiers to return from combat to the civilian life they had before. Initially, it appeared as if Mr. Thuesen could resume life as he once knew it, or something similar to it. He enrolled in Blinn College, was earning good grades, and resumed seeing Leah Mathis, a young woman he had started dating before deployment and with whom he had continued to correspond while he was in Iraq. 50 RR at 131-133; 52 RR at 212.

16.     The reality is, however, that Mr. Thuesen returned to the United States in March 2005 mentally broken. Signs and symptoms of PTSD began to emerge in 2006 and worsened as time went on. Gone was the usually social and engaged young man Mr. Thuesen had been prior to going off to war. Friends, family members, and his counselor noted his problems with intrusive memories, hypervigilance, difficulty sleeping, interpersonal problems, irritability, and angry outbursts—all markers or symptoms of PTSD. 46 RR at 132-134; 50 RR at 134-135, 136-137; 4 HR2 at 134, 137, 167-172; State Habeas Ex. 12 (exhibit submitted at evidentiary hearing). Mr. Thuesen's delayed onset of PTSD is not unusual. In one study, the authors found delayed onset among a quarter of PTSD cases and, in particular, those involving individuals who served in combat. 4 HR2 at 140; State Habeas Ex. 12 (exhibit submitted at second evidentiary hearing).

17.     In 2007, Mr. Thuesen began to deteriorate rapidly. He began drinking heavily and became possessive and physically abusive towards his girlfriend, Leah Mathis. Following several

breakups and unsuccessful attempts to reunite, Ms. Mathis ended the relationship. In July of 2007, during an attempt to confront Ms. Mathis about continuing their relationship, Mr. Thuesen was arrested for stalking her. 50 RR at 120. The State used these facts at trial to portray Mr. Thuesen as an abusive partner, but Mr. Thuesen's behavior was directly related to his PTSD. 4 HR2 at 169-171. Indeed, his medical records from the Veterans Administration ("VA") show that during this same time period, Mr. Thuesen had been experiencing symptoms of anger, loss of control, problems with physical aggression, emotional numbing, hypervigilance, and startle response. 4 HR2 at 175-177; State Habeas Ex. 13 at 154 (evidence submitted at evidentiary hearing). Mr. Thuesen's academics began to suffer as well, and he failed the fall 2007 semester at Blinn College.

18.    Untethered from connections to school and a girlfriend, Mr. Thuesen began drifting, and his psychological health steadily declined. During 2008, Mr. Thuesen struggled to find employment and he had only a few, short-lived romantic relationships. In August of 2008, Mr. Thuesen called the Veterans Suicide Hotline. He complained of feeling depressed and having frequent and intrusive thoughts, and of thinking about shooting himself in the head. He said, "I have been feeling very lonely, and I can't talk to anybody about what I have done in Iraq." 4 HR2 at 179. Mr. Thuesen was admitted into the psychiatric ward at the VA hospital in the city, where, Dr. Ismael Carlo diagnosed him with major depressive disorder and prescribed medication. 45 RR at 20:7-8; 20:18-21:9; 21:21-25; 22:1-13; 22:14-24: 16; 27:10-18; 83:25-84:4 However, despite his family's concerns that Mr. Thuesen needed more treatment, doctors from the VA sent him home after four days without diagnosing or properly treating his PTSD. *Id.* at 29:8-16. The VA did not diagnose Mr. Thuesen with or treat him for PTSD because, despite his testing positive on checklists for PTSD symptoms, he denied experiencing a "traumatic event," which was required for a diagnosis of PTSD under the prevailing standard of the time, the DSM-IV. 47 RR at 32;

Shawn P. Cahill & Kristin Pontoski, *Post-traumatic stress disorder and acute stress disorder I:*
*their nature and assessment considerations*, 2(4) PSYCHIATRY 14-25 (Edgmont 2005).[6] Had the
VA questioned Mr. Thuesen about his experiences in the war in Iraq, the VA staff would have
discovered numerous "traumatic events," and would have arrived at a correct diagnosis of PTSD.

19.     After his release from the VA hospital in August 2008, Mr. Thuesen began to see a
licensed clinical social worker, Teresa Cannon, on a monthly basis for depression, anxiety, and
PTSD symptoms. 45 RR at 74:10-16; 78:19-79:7; 79:21-25; 80:3-82:25. These symptoms included
hypervigilance, anger, rage, hallucinations, seeing images out of the corner of his eye, and hearing
voices. *Id.* at 81:10-82:25; 84:17-25; 85:4-23. Ms. Cannon, however, failed to diagnose or treat
Mr. Thuesen for PTSD. Indeed, the VA had not diagnosed Mr. Thuesen with PTSD, and Ms.
Cannon was not qualified to make that diagnosis herself.

20.     Ten days after his release from the psychiatric ward, Mr. Thuesen met Rachel
Joiner. She also attended Blinn College, and they took some classes together. Mr. Thuesen reported
to his counselor, Ms. Cannon, that he was excited and happy to have met someone. He very much
wanted a girlfriend and eventually to get married and have a family. 45 RR at 87:2-12; 155:20-
156:3. In November 2008, Mr. Thuesen told Ms. Cannon that he was no longer depressed and
attributed it to his new girlfriend. *Id.* at 97. During this time, he was working and going to school.
45 RR at 33, 85-86. In December 2008, Ms. Joiner introduced Mr. Thuesen to her parents. *Id.* at
100. Things appeared to be improving; without guidance or supervision by a doctor, Mr. Thuesen

---

[6] In 2013, the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) reclassified PTSD
as a "trauma and stressor-related disorders." Previously, it was classified as an anxiety disorder.
The DSM-V also more clearly defines what events are considered traumatic. Among other
changes, the DSM-V removed the requirement that a person's response involve intense fear,
helplessness, or horror. It also expanded events to include direct and indirect experiences of
trauma.

decided to stop taking Celexa, an antidressant medication that Dr. Carlo had prescribed him. *Id.* at 111. In Mr. Thuesen's mind, things were getting better. Yet, while Mr. Thuesen may have been less depressed, he was still suffering from (undiagnosed) PTSD and exhibiting PTSD symptoms, including hypervigilance and anxiety. *Id.* at 126-127; 4 HR2 at 184, 191.

21.     Not long after they began dating, in February 2009, Ms. Joiner began to pull away from Mr. Thuesen while he sought ever more attention from her. She told Mr. Thuesen that she needed "space" and wanted time apart from Mr. Thuesen. 45 RR at 19-21. The more Mr. Thuesen wanted to be with her, the more Ms. Joiner pulled away. The fear that Ms. Joiner was going to abandon him caused enormous stress for Mr. Thuesen.

22.     Mr. Thuesen knew his behavior was not ideal, and he discussed it with Ms. Cannon. On March 4, 2009, Mr. Thuesen met with Ms. Cannon and reported that he and his girlfriend were having some problems. Ms. Cannon noted that Mr. Thuesen was tired, irritable and stressed, and that he was not sleeping well. 45 RR at 102-103.

23.     Later that night, Mr. Thuesen went to Ms. Joiner's house. She was there with Johnny Matthys, a friend and someone she had dated on and off for the prior two years. Ms. Joiner and Mr. Matthys had finished studying and were watching a movie. Ms. Joiner and Mr. Thuesen went into a bedroom to talk. There was no shouting or raised voices. 39 RR at 42-43. Mr. Matthys stayed another hour until the movie was over and then left without saying goodbye. *Id.* Ms. Joiner called Mr. Matthys about twenty minutes after he had left her house. He returned to Ms. Joiner's home and then the two of them went to Mr. Matthys's home. *Id.* at 44-45.

24.     The next day, on March 5, 2009, Mr. Thuesen went to Mr. Matthys's home—he wanted to talk with Ms. Joiner and understand why she no longer wanted to be with him. She told him to leave, and he did. *Id.* at 49; 48 RR at 65; State's Trial Ex. 200 [Confession] at 4-5, 14-15.

Later that evening, Ms. Joiner, Mr. Matthys and his brother went out together. 39 RR at 49-50.

That evening, Ms. Joiner did not return to her home but stayed at Mr. Matthys's house. *Id.* at 51.

25.    On the afternoon of March 6, 2009, Ms. Joiner returned to the home she shared with her older brother, Travis Joiner, to find Mr. Thuesen waiting in her room. Mr. Thuesen had let himself in through the garage in the early morning hours and waited for her to return. He had a gun. Exhausted from lack of sleep and upset, Mr. Thuesen confronted Ms. Joiner. He wanted to know why she wanted space from him and why she was refusing to see him anymore. She asked him to leave and told Mr. Thuesen that her brother, Travis Joiner, had a gun. They argued, and Mr. Thuesen pointed the gun at himself, telling Ms. Joiner that he loved her. Ms. Joiner was able to take the gun from Mr. Thuesen and told him she would give the gun back to him outside. They went downstairs together. Mr. Thuesen took the gun back from Ms. Joiner, she ran away, he followed her, she pushed him, and he shot her in the back. It was a brief event. Travis Joiner, hearing the shot, suddenly burst out of his room, surprising Mr. Thuesen, who quickly shot Mr. Joiner three times. Ms. Joiner ran back toward Mr. Thuesen, perhaps in response to the additional shots fired. Mr. Thuesen told the police that he "didn't know what to do . . . but then she came at me and I shot her again." When asked by the police why he kept shooting, Mr. Thuesen said, "I don't know. I felt like felt like I was in a mode . . . like training or a game or something . . . ." 47 RR at 210; 48 RR at 66, 90-95; State's Trial Ex. 200 [Confession] at 16-21, 24-25, 26-35; 48-56. When the police arrived, they discovered Mr. Thuesen waiting with Ms. Joiner. He had called 911 and had been applying pressure to her chest in an effort to stop the bleeding. 44 RR at 55: 20-57:17. He surrendered to the police without incident. 44 RR at 58:11-24. Rachel and Travis Joiner were taken to a local hospital, where they both died shortly after.

## I.     THE TRIAL

26.     At trial, the State called approximately twenty witnesses, including the victims' father, neighbors, friends, classmates, first responders, medical professionals, and forensic experts. 38 RR at 45, 65, 113, 121; 39 RR at 5, 23, 124; 40 RR at 13, 50, 71, 101; 41 RR at 59, 130, 154; 42 RR at 11, 49, 148, 152, 162.

27.     Wayne Joiner, father of Travis and Rachel Joiner, testified to the living arrangement between Travis and Rachel Joiner, his children's dreams and aspirations, and the nature of the relationship between Mr. Thuesen, Ms. Joiner, and the rest of the Joiner family. 38 RR at 45, 54-64. After Wayne Joiner, the Joiner children's neighbor, Tabitha Foreman, testified that she saw Mr. Thuesen shortly after the police had arrived at the Joiner residence and that he did not seem mad or angry and had "a look of no remorse." 38 RR at 88-89, 106:17.

28.     The State also called a Marine gunnery sergeant, Brian Keith, who testified that Mr. Thuesen had called him the night before the shooting asking for relationship advice concerning Ms. Joiner. 38 RR at 125.

29.     The State then called two friends of the Joiner siblings, Douglas Perry and Johnny Matthys—who testified to their relationships with the siblings. 39 RR at 5-90.

30.     The State concluded its case by calling a number of law enforcement officers and medical and forensic professionals to establish a timeline for the shootings, as well as to provide cause and time of death. 39 RR at 124; 40 RR at 13, 50, 71, 101; 41 RR at 59, 130, 154; 42 RR at 11, 49, 148, 152, 162.

31.     The defense called twelve witnesses, including responding officers, Dr. Carlo, Teresa Cannon, former Marines who served with Mr. Thuesen, Mr. Thuesen's mother, and Dr. Roger Saunders. 44 RR at 55, 95; 45 RR at 11, 20, 74, 127; 46 RR at 14, 55, 119, 150, 179; 47 RR at 5.

32.     The first witness called was Officer Tom Jagielski, the officer who arrived at the scene after Mr. Thuesen called 911. Like the neighbor, Tabitha Foreman, Officer Jagielski testified that Mr. Thuesen's face showed no emotion; that he had a "flat affect." 44 RR at 67.

33.     It is important to note that the DSM-V recognizes that PTSD can cause dissociative behavior. DSM-V 300.6 (F48.1). Dissociative behavior means responding to trauma-related stimuli with dissociative symptoms (depersonalization or derealization) and associated emotional detachment, such as "[e]xperiences of unreality, detachment, or being an outside observer with respect to one's thoughts, feelings, sensations, body, or actions (e.g., perceptual alterations, distorted sense of time, unreal or absent self, emotional and/or physical numbing)" or "[e]xperiences of unreality or detachment with respect to surroundings (e.g., individuals or objects are experienced as unreal, dreamlike, foggy, lifeless, or visually distorted)." *Id.*

34.     Dissociative features may include having flashbacks to traumatic events; briefly losing touch with events going on around oneself (like daydreaming); blanking out or being unable to remember anything for a period of time; memory loss about certain events, people, information, or time periods; a distorted or blurred sense of reality; feeling disconnected or detached from one's emotions; feeling that the world is unreal and distorted; feeling numb or distant from oneself and one's surroundings; and having an altered sense of time and place. This dissociative behavior can be triggered by a PTSD crisis. Dissociative behavior may include involuntary behavior (such as training, habits, or instincts), flat affect, memory loss, and emotional detachment. It is generally short-term.

35.     Shortly after a PTSD event, a person suffering from PTSD could be expected to have a flat affect or otherwise seem emotionally detached from recent events.

36.     Similarly, during a PTSD incident, it is difficult to form and retrieve memories. Thus, a person suffering from PTSD could be expected to confabulate. Confabulation can involve gaps in memory, or it could involve filling in those gaps with misinterpreted, distorted, or imagined information that then seems true. Soldiers are trained to recover quickly from firefights, and to report immediately on what happened. This training can further suppress a "normal" emotional affect and accuracy of reporting.

37.     Trial counsel, however, never developed or presented any evidence establishing the foregoing, and the State seized upon it as evidence that Mr. Thuesen lacked remorse.

38.     Dr. Carlo, the psychiatrist who treated Mr. Thuesen at the VA Hospital, testified about his diagnosis and treatment of Mr. Thuesen following his arrival at the hospital until his discharge. Dr. Carlo noted PTSD symptoms, but diagnosed Mr. Thuesen with major depressive disorder. He discharged Mr. Thuesen from the VA hospital with the understanding that he would continue to take his prescribed anti-depressant medication and participate in outpatient treatment in College Station. 45 RR at 72. Although Dr. Carlo's notes of his initial interview with Mr. Thuesen indicates he had PTSD symptoms, Dr. Carlo did not diagnose him with PTSD, and was not asked by trial counsel if he thought Mr. Thuesen was suffering from PTSD at the time Dr. Carlo interviewed him.

39.     Fellow Marines Jeremy Abbott and Romero Garcia testified about their experiences in Iraq serving with Mr. Thuesen, Mr. Thuesen's duties during deployment, and their own experiences after returning to civilian life. 45 RR at 127-157; 46 RR at 150-177. Sergeant Abbott testified that Mr. Thuesen had been a machine gunner in his platoon in Iraq. Sergeant Abbott described their duties and activities while in Iraq and testified that they were under fire several

times, including one occasion where two rocket-propelled grenades exploded about ten to fifteen feet from their vehicle.

40.     Marine Corps Sergeant Romero Garcia supervised Mr. Thuesen's platoon in Iraq. He testified that their platoon's mission was to drive through populated areas and draw fire so that they could locate and defeat armed adversaries. He described how they set up vehicle checkpoints where they sometimes had to "take out" vehicles that did not stop to be searched. At times, women and children would be in those vehicles. Sergeant Garcia, who himself had been diagnosed with PTSD upon returning to the United States, testified that he believed that Mr. Thuesen also had PTSD.

41.     Mr. Thuesen's mother, Patti Thuesen, testified that she noticed a difference in Mr. Thuesen about six to eight months after he returned home. For example, his room was orderly with everything in a certain place. If something was moved, he knew it. He startled so easily that he would grab for her if she tapped him on the shoulder, and he would "take a swing" when she went into his room to wake him up in the morning. Sometimes when Mr. Thuesen had been drinking, he would cry and tell her he "didn't mean to do it, but . . . [he] had to save [his] brothers." 46 RR at 132-133.

42.     David Ottmer, a friend of Mr. Thuesen's family who was also a veteran, testified that, when Mr. Thuesen returned from Iraq in 2005, he had a look in his eyes like he was disconnected from reality. 46 RR at 120.

43.     However, missing from the defense's case was testimony establishing a causal connection between Mr. Thuesen's experiences in Iraq, his PTSD, and the deaths of Rachel and Travis Joiner.

44.     Dr. Saunders was the last witness called by the defense in the guilt/innocence phase of the trial. 47 RR at 5. He was questioned about the mental illnesses he suspected Mr. Thuesen suffered from: dependent personality disorder, borderline personality disorder, PTSD, and depression. 47 RR at 18-21, 33, 142-143. Dr. Saunders explained generally the causes and symptoms of PTSD and gave his opinion that Mr. Thuesen suffered from this disorder, but Dr. Saunders was not offered as, and was not, a PTSD expert. Dr. Saunders also testified that, in his opinion, Mr. Thuesen did not intentionally or knowingly cause the deaths of Rachel and Travis Joiner, but his testimony focused on his diagnoses of personality disorders, not PTSD. 47 RR at 37-46; 61-62. Dr. Saunders did not explain to the jury that, at the time of the shooting, something triggered in Mr. Thuesen a maladapted "fight-or-flight" response. He did not, nor was he asked to, explain how PTSD might have reduced Mr. Thuesen's moral culpability in causing their deaths.

## II.     PUNISHMENT PHASE

45.     The State opened the punishment phase of Mr. Thuesen's trial on May 21, 2010, with the State delivering a very brief opening statement informing the jury it would hear testimony about Mr. Thuesen's history of "escalation." 50 RR at 34-35.

46.     The State called several witnesses to testify to previous incidents where it alleged that Mr. Thuesen displayed emotional instability. 50 RR at 36, 60, 110, 129; 51 RR at 9. For its first punishment-phase witness, the State called Amanda Ward, who testified to an incident at a party she and Mr. Thuesen attended when they were in high school. 50 RR at 37-49. According to Ms. Ward, Mr. Thuesen had a verbal altercation with a boy at the party who was talking with her. However, Mr. Thuesen dropped Ms. Ward off at Haley McDowell's house, where they had met up that night, and went home to go to sleep. Though Ms. Ward related an incident later at her house with her mother, and an altercation with another boy. Both Ms. Ward's mother and the boy signed

affidavits that that they had no memory of any such incident. Mr. Thuesen, to this day, has no idea where Ms. Ward's home was at the time. 50 RR at 37-49.

47.     Despite three credible witnesses being available to refute Amanda Ward's testimony—including Ms. Ward's own mother, and two other people Ms. Ward alleged were involved in the incident—Mr. Thuesen's trial counsel failed to offer evidence that would have impeached Ms. Ward's credibility. Trial counsel's proffered reasons for failing to impeach Ms. Ward—that it was better to ignore her testimony and hope the jury did too rather than address it— were objectively unreasonable. 5 HR at 224-226. This was a boon for the State, allowing it to argue in punishment phase closing that Ms. Ward's testimony was "unimpeached." 54 RR at 21.

48.     The State also called James Powlowski, an acquaintance of Mr. Thuesen, and Leah Mathis, Mr. Thuesen's former girlfriend. Both testified as to several incidents in which Mr. Thuesen had been violent with Ms. Mathis. 50 RR at 136, 138, 147, 154, 158-164. The State also called Ms. Mathis's mother Joanne to support her daughter's testimony and give her impression of Mr. Thuesen as "obsessive[]" and "not normal." 51 RR at 28.

49.     After calling witnesses whom the State argued established Mr. Thuesen's long-standing pattern of violence against women, the State also called witnesses to provide victim impact statements. 50 RR at 51, 85. Travis and Rachel Joiner's aunt testified to Mr. Joiner and Ms. Joiner's good characters and personalities, as well as to the impact the shooting had on the lives of the Joiner family. 50 RR at 51-59. The State also called Kitty Gibson, a former track coach for Ms. Joiner, who expressed a high opinion of Ms. Joiner. 50 RR at 85-96.

50.     After the State rested its case, trial counsel Michele Esparza gave a brief opening statement highlighting Mr. Thuesen's good upbringing, his eventual alcoholism, and his remorse for the killings. 51 RR at 35-38. At no point did Ms. Esparza's opening statement mention PTSD

22

or mental illness, despite those conditions likely being the strongest mitigating factors available to the defense.

51.     Trial counsel began by calling witnesses to testify regarding Mr. Thuesen's academic achievement in high school—including his principal, who testified that Mr. Thuesen was a "good student"; his government teacher, who testified that Mr. Thuesen was a "very good student" who "always had his work done" and whose defining trait would be "respect"; and his pre-calculus teacher, who spoke about Mr. Thuesen's aptitude for math, and the pride he felt in serving his country in the Marines. 51 RR at 43, 51, 101, 104, 113-14.

52.     Next, the defense called several of Mr. Thuesen's former employers, each of whom spoke to his commendable work ethic. 51 RR at 44, 115; 52 RR at 20, 36. These witnesses described Mr. Thuesen as "always eager" and "hard-working" 51 RR at 51; "trustworthy" and "respectful" 51 RR at 116; a "quiet" person who "did his work" 52 RR at 26; and, as a very "diligent" person. 52 RR at 41. One employer testified that Mr. Thuesen helped to tutor her son in algebra. 51 RR at 117.

53.     To help the jury understand Mr. Thuesen's military experience, the defense called a number of former active-duty Marines who served in Iraq around the same time as Mr. Thuesen. 52 RR at 89, 146, 190; 53 RR at 5. These Marines explained that the duty of Mr. Thuesen's unit was to draw and return fire to the enemy in Iraq, 52 RR at 94-95, 149; 53 RR at 17-19. They also testified that the job was often violent, frightening, and stressful, 52 RR at 97, 105, 149-56; 53 RR at 17-19, 23-24; and that the unit came into frequent contact with IEDs. 52 RR at 149; 53 RR at 18. Across the board, the Marines testified that Mr. Thuesen had come back from Iraq a changed man. 52 RR at 97-99, 195-96; 53 RR at 29-31.

54.     Two Marine witnesses who served directly with Mr. Thuesen for extended periods, Corporal Tim Rojas and Sergeant Rodney Townsend, spoke positively about his service and his commitment to his country. 52 RR at 165-66; 53 RR at 25-27. One Marine described a harrowing and traumatizing experience for Mr. Thuesen in gruesome detail: he was ordered to open fire on a vehicle that, it was discovered, contained not enemy combatants but a civilian family. A young child, covered in his family's blood, emerged from the vehicle and ran towards Mr. Thuesen's Humvee. 52 RR at 158-63.

55.     However, while this testimony might have shown that Mr. Thuesen had experienced difficult, violent conditions, Mr. Thuesen's counsel failed to connect it with the dearth of services available to reserve soldiers, like Mr. Thuesen, upon return. Mr. Thuesen's trial counsel likewise failed to present testimony that would have explained to the jury how such traumatic events would have affected the fight-or-flight responses of a soldier like Mr. Thuesen, or how they actually affected Mr. Thuesen when he was in the grip of an acute PTSD episode, as he was in the fateful period of March 4-6, 2009.

56.     When the Marines finished testifying, the defense abandoned the topic of PTSD, and simply moved on to calling witnesses who went to junior high and high school with Mr. Thuesen, who testified primarily about his solid work ethic and capacity for friendship. 51 RR at 85, 89, 121; 52 RR at 44, 49, 54. These witnesses alternatively described him as a "good team member" in his high-school band, 51 RR at 86-8; as a "very hard worker," 51 RR at 92; as someone who "was always pushing to better himself as best he could," 51 RR at 126; as someone who had become more despondent and an alcoholic after Iraq, 51 RR at 128-29; as "one of the good guys," 52 RR at 51; and as a "caring, understanding, [and] dependable" individual. 52 RR at 55. One high-school classmate testified that she wrote letters to Mr. Thuesen when he was in county jail

awaiting trial, and that he helped her overcome the grief she felt over losing her own husband. 52 RR at 44-47.

57.     The defense called an employee of the medical division of the Brazos County Sheriff's Office who testified that those who have mental illnesses often neglect to take their medication and end up acting out as a result, but that Mr. Thuesen took his medication and was "very respectful [and] calm" in the jail setting". 52 RR at 6-7, 20. Similarly, a jailer at the Brazos County Sheriff's Office who had minimal personal contact with Mr. Thuesen testified that Mr. Thuesen was always well-behaved, and that he would be comfortable describing Mr. Thuesen as a "model prisoner." 52 RR at 126. The defense did not, however, call any of the numerous available corrections officers from the Brazos Country Detention Center with whom Mr. Thuesen interacted regularly, despite their praise for him and availability to testify.

58.     Trial counsel called several members of Mr. Thuesen's family who testified regarding Mr. Thuesen's good character, including his altruism. Mr. Thuesen's brother testified that he had been "proud" of his brother for his helpfulness before the incident. 52 RR at 74. Mr. Thuesen's sister testified that Mr. Thuesen had helped her raise her young son. 52 RR at 75. Mr. Thuesen's aunt described Mr. Thuesen as "a very caring, compassionate person" who was "willing to give up his time to [her] family, to share, be joyful." 52 RR at 137. Mr. Thuesen's father admitted that he and his son never developed a relationship where they could share their feelings with each other, but also testified that Mr. Thuesen was "the nicest son a father could ask for," and that he missed his son very much. 52 RR at 180-181, 186-87. Finally, Mr. Thuesen's mother told a story about Mr. Thuesen wherein he volunteered his bed to a friend so that this friend would not have to sleep on the floor, and a story about how Mr. Thuesen volunteered to push the wheelchair of the disabled mother of a deceased friend. 52 RR at 202-04.

59.     Notably absent from Mr. Thuesen's family's testimony was any mention about the Thuesen family's long history with mental illness. Several of Mr. Thuesen's relatives have been diagnosed with bipolar disorder, including a great aunt, an aunt, an uncle, a cousin, and Mr. Thuesen's sister. 4 HR2 at 152-53; App'x 68, 123, 124, 129-131.

60.     Several of the Thuesen family's friends also testified on Mr. Thuesen's behalf at sentencing. 51 RR at 146; 52 RR at 139. Cynthia Freeman, a registered nurse who had known Mr. Thuesen since he was a baby, testified that when Mr. Thuesen was on his medication, he could be "distant and depressed," or he could smile, depending on the circumstances. 51 RR at 155.

61.     Finally, the sister of a former girlfriend of Mr. Thuesen testified that Mr. Thuesen's break-up with her sister had been amicable and that they had remained friends. 51 RR at 59. However, she also described Mr. Thuesen as "needy." 51 RR at 64.

62.     Despite putting on 31 witnesses during the punishment phase, trial counsel failed to elicit any testimony regarding Mr. Thuesen's PTSD that would allow the jury to understand the disorder as a potential source of mitigation. Not a single expert opined on how PTSD might have affected Mr. Thuesen's brain or his decision-making ability. Not a single witness provided a basis for connecting Mr. Thuesen's PTSD to the shooting in any way, such as that he had been in the midst of an acute PTSD episode when he shot Rachel and Travis Joiner, triggered by panic over losing Ms. Joiner, and compounded by Mr. Joiner (whom Mr. Thuesen knew to own a gun) bursting unexpectedly into the room. Trial counsel failed to offer testimony that could have been instrumental in explaining Mr. Thuesen's diminished volition in the shootings.

63.     The defense also failed to offer any testimony whatsoever to rebut the State's argument that Mr. Thuesen was likely to commit other violent acts in the future, leaving unanswered the State's testimony satisfying the statutory future dangerousness issue.

64.     Trial counsel also presented no testimony showing that the staff at the VA Hospital failed to diagnose him with PTSD despite his apparent PTSD or treat him for the condition.

65.     After both sides rested and closed their punishment-phase cases, the court charged the jury, and both sides delivered their closing arguments. 53 RR at 60; 54 RR at 5, 14, 32, 51, 68.

66.     The State's closing argument addressed the impact the crime had on the Joiner family, asserted that Mr. Thuesen's emotional instability did not result from his experience in Iraq, and argued that Mr. Thuesen's upbringing was not a source of mitigation. 54 RR at 14, 21-22, 27-28. The State also offered the jury an opinion as to what constituted PTSD, expressly asserting that Mr. Thuesen did not suffer from PTSD. The prosecutor explained to the jury that his own stepfather, a World War II veteran, would suffer from flashbacks whenever he heard gunshots and would hurry his family indoors to prevent them from being harmed. 54 RR at 82. "That," the prosecutor concluded, "is PTSD"—the implication being that whatever Mr. Thuesen suffered from was not PTSD. 54 RR at 82. Critically, trial counsel failed to object to this damaging testimony regarding what the prosecutor believed constituted PTSD, despite the total absence of evidence supporting the State's opinion in the record.

67.     Trial counsel Esparza's closing argument consisted of a condensed telling of "the John Thuesen story," starting from his birth and leading to the afternoon of the shootings. 54 RR at 34. While Ms. Esparza alluded to Mr. Thuesen's suffering from PTSD, she failed to explain how Mr. Thuesen's PTSD was mitigating. 54 RR at 39. Trial counsel William Carter emphasized the severity of a life-without-parole sentence, and rehashed much of the testimony given in the guilt and punishment phases of Mr. Thuesen's trial. 54 RR at 68. Like Ms. Esparza, Mr. Carter made only a terse reference to PTSD, but offered no explanation how and why PTSD was a source of mitigation. 54 RR at 82.

68.     Later that day, Thursday, May 27, shortly before noon, the jury retired to deliberate. 54 RR at 90. At 8:30 p.m. that evening, the jury had still not reached a verdict, so the court ordered its overnight sequestration. 54 RR at 92-93. When the jury returned the next morning, Friday, May 28, it deliberated for another two hours before returning with its verdict: "Yes" to the first Special Issue (whether Mr. Thuesen presented a threat of future dangerousness), and "No" to the second (whether there was sufficient evidence of mitigation). 55 RR at 7. The trial court then sentenced John Thuesen, decorated veteran of the Iraq War, to death on the Friday before Memorial Day weekend, 2010.

## PROCEDURAL HISTORY

## I.     TRIAL COURT PROCEEDINGS

69.     On May 14, 2009, a grand jury indicted Mr. Thuesen for capital murder for intentionally causing the deaths of Rachel Joiner and her brother, Travis Joiner. CR at 1.

70.     The court initially appointed William Carter and Michele Esparza to represent Mr. Thuesen. CR at 8-9. Ms. Esparza withdrew as counsel on May 18, 2009, and Clint Sare was appointed as second chair trial counsel. CR at 11. On February 10, 2010, the court granted Ms. Esparza's motion to replace Sare as Mr. Carter's co-counsel and she resumed her former position as second chair trial counsel. CR at 167. Mr. Carter and Ms. Esparza represented Mr. Thuesen at trial, along with Frank Blazek. 6 RR at 2.

71.     Mr. Thuesen was arraigned on June 15, 2009, and entered a plea of not guilty. 2 RR at 4. The State filed notice of intent to seek the death penalty on January 29, 2010. CR at 15; 3 RR at 4.

72.     Voir dire commenced on March 29, 2010. 6 RR at 8. After the reading of the indictment, the State gave its opening statement on May 10, 2010. 8 RR at 28-30. The State rested its case on May 12, 2010. 42 RR at 210. On May 14, 2010, trial counsel gave its opening statement

and rested its case on May 20, 2010. 44 RR at 50; 49 RR at 85. The trial was presided over by Judge Travis Bryan, III.

73.     The case was submitted to the jury for guilt/innocence determination on May 20, 2010. 49 RR at 111. Following approximately 3 hours of deliberation, the jury returned a verdict of guilt. 49 RR at 112.

74.     The punishment phase began on May 21, 2010. 50 RR at 5. Jury deliberations commenced on May 27, 2010. 54 RR at 90.

75.     The jury was tasked with answering two special verdict questions. The first question (Special Issue One) asked the jury to answer:

> Whether there is a probability that the defendant, John Thuesen, would commit criminal acts of violence that would constitute a continuing threat to society.

54 RR at 6.

76.     In the event of a "Yes" to the first question, the jury was directed to answer the following question (Special Issue Two):

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, John Thuesen, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

54 RR at 7-8.

77.     The following day, the jury returned the verdict answering "Yes" to special issue one and "No" to special issue two. 55 RR at 4. Mr. Thuesen was then sentenced to death. 55 RR at 7.

78.     Mr. Thuesen filed a motion for new trial on June 25, 2010 and an amended motion on June 28, 2010. 1 Supp. CR at 27-42. The trial court denied the first amended motion for a new trial on July 29, 2010. 1 Supp. CR at 76.

79.     On May 28, 2010, the court appointed John Edward Wright to represent Mr. Thuesen in his post-conviction habeas litigation. 6 CR at 1233-34; 1 Supp. CR at 23-26. On June 2, 2010, the court appointed Frank Blazek to represent Mr. Thuesen in his direct appeal. 1 Supp. CR at 25-26. On December 21, 2010, the court substituted the Office of Capital & Forensic Writs ("OCFW") to represent Mr. Thuesen in his post-conviction habeas litigation, permitting Mr. Wright withdraw.

## II.     DIRECT APPEAL

80.     Mr. Blazek timely filed a notice of direct appeal on Mr. Thuesen's behalf with the CCA.

81.     Mr. Thuesen filed his opening appellate brief on December 23, 2011, raising forty-five claims of error.

82.     The State filed their response on May 29, 2012. Counsel for Mr. Thuesen did not file a reply brief.

83.     The case was submitted to the CCA on September 12, 2012, following oral argument.

84.     On February 26, 2014, the CCA affirmed Mr. Thuesen's conviction and sentence on direct appeal, rejecting all forty-five claims of error. *Thuesen v. State*, No. AP-76,375, 2014 WL 792038 (Tex. Crim. App. Feb. 26, 2014). Mandate was issued on March 24, 2014.

## III.     STATE HABEAS CORPUS PROCEEDINGS

85.     On October 9, 2012, while Mr. Thuesen's direct appeal was pending in the CCA, Mr. Thuesen filed an Initial Application for Writ of Habeas Corpus ("State Habeas Petition"),

alleging twenty-two claims of error: (1) trial counsel failed to properly develop expert witnesses for trial; (2) trial counsel failed to effectively present expert testimony at the guilt phase regarding Mr. Thuesen's intent; (3) trial counsel failed to effectively present evidence of PTSD at the guilt/innocence phase of trial; (4) trial counsel failed to adequately prepare and rehabilitate their one expert witness; (5) trial counsel failed to present expert testimony at the punishment phase of Mr. Thuesen's trial; (6) trial counsel was ineffective in their presentation of evidence that Mr. Thuesen would not be a future danger in prison; (7) trial counsel was ineffective by failing to present evidence that Mr. Thuesen was never diagnosed or treated for PTSD; (8) trial counsel failure's to effectively investigate, discover and present lay witness testimony regarding Mr. Thuesen's PTSD prejudiced his punishment phase of trial; (9) trial counsel failed to file a motion for change of venue; (10) trial counsel was ineffective for failing to impeach the testimony of Amanda Ward; (11) trial counsel was ineffective for failing to object to the State's preemptory strike of venirewoman Brownlee on the basis of her gender; (12) appellate counsel was ineffective for failing to appeal the trial court's ruling on trial counsel's Batson objection to venirewoman Brownlee; (13) trial counsel was ineffective in jury selection; (14) trial counsel was ineffective in the selection and presentation of certain lay witness testimony; (15) trial counsel was ineffective for failing to recall Patricia Thuesen, at either phase of trial, to testify about Mr. Thuesen's family history of mental illness; (16) trial counsel was ineffective for failing to raise the theme of mental illness in opening punishment phase argument; (17) trial counsel was ineffective by failing to object to the prosecutor's closing argument that included comments on evidence not on the record; (18) trial counsel failed to sufficiently preserve error by making proper, timely objections to each introduction of inadmissible evidence during trial; appellate counsel was ineffective for failing to raise these issues on direct appeal; (19) Mr. Thuesen's death sentence should be vacated because

appellate counsel was ineffective for failing to argue that the trial court erred in failing to grant Mr. Thuesen's pretrial motions precluding the death penalty; (20) trial counsel was ineffective for objecting to the statutory "10-12" instruction and then reminding the jurors, twice, of the rule during closing argument; (21) Mr. Thuesen's death sentence should be vacated because the punishment phase jury instruction restricted the evidence the jury could determine was mitigating; and (22) Mr. Thuesen's death sentence is unconstitutional because it was assigned based on Texas's arbitrary system of administering the death penalty.

86.     On February 4, 2013, the trial court granted the State's Motion for Extension of Time to file its response.

87.     On April 8, 2013, the State filed its response.

88.     Once an application challenging a judgment imposing death is filed, the Texas Code of Criminal Procedure directs the habeas court to determine, based on the application and the State's answer, "whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist" and then "issue a written order of the determination." Tex. Code Crim. Proc. art. 11.071 § 8(a).

89.     Section 9 of Article 11.071, entitled "Hearing," governs the proceeding when the habeas court "determines that controverted, previously unresolved factual issues exist material to the legality of [ ] confinement exist." Tex. Code Crim. Proc. art. 11.071 § 9(a). In that circumstance, the habeas court must designate by written order the issues of fact that are to be resolved and the manner by which the court will consider evidence to resolve those issues. *Id.* To resolve the issues, the court can hold a hearing appropriate to the case; the statute authorizes the court to receive evidence via affidavits, depositions, interrogatories, live witnesses, and personal recollection. *Id.*

90.     Judge Bryan, who had presided over Mr. Thuesen's trial, was assigned to hear Mr. Thuesen's state habeas petition and make Findings of Fact and Conclusions of Law.

91.     On April 26, 2013, Judge Bryan ordered twenty factual issues to be resolved following an evidentiary hearing:

92.     Claim One: Whether Applicant was denied the effective assistance of trial counsel during the selection, preparation and presentation of their defense (by allegedly failing to develop expert testimony regarding PTSD).

93.     Claim Two: Whether Applicant was denied the effective assistance of trial counsel when counsel presented the testimony of their expert, Dr. Roger Saunders, during the guilt/innocence phase.

94.     Claim Three: Whether Applicant was denied the effective assistance of trial counsel during the selection, preparation and presentation of their defense (by allegedly failing to present expert testimony regarding PTSD during the guilt/innocence phase).

95.     Claim Four: Whether Applicant was denied the effective assistance of trial counsel during the selection, preparation and presentation of their defense (by allegedly failing to adequately prepare and rehabilitate Dr. Saunders).

96.     Claim Five: Whether Applicant was denied the effective assistance of trial counsel during the selection, preparation and presentation of their defense (by allegedly failing to present expert testimony regarding PTSD during the punishment phase).

97.     Claim Six: Whether Applicant was denied the effective assistance of trial counsel during its presentation of evidence concerning whether Applicant would be a future danger (Special issue no. 1).

98.     Claim Seven: Whether Applicant was denied the effective assistance of trial counsel during the selection, preparation and presentation of their defense (by allegedly not fully reviewing Applicant's military records in their possession and presenting evidence that Applicant was never treated for PTSD).

99.     Claim Eight: Whether Applicant was denied the effective assistance of trial counsel during the selection, preparation and presentation of their defense, through the testimony of the following lay witnesses during the punishment phase: Patricia Thuesen; Dennis Thuesen; Michael Thuesen; Michelle Thuesen; Jeremy Abbott; Rodney Townsend; Charisse Blezinger; Lisa Gisler. Also whether Applicant was denied the effective assistance of trial counsel because the following witnesses were not called to testify: Mark Torres and Jeff Hood; Craig Novak; Michael Novak; Karolyn Ottmer; Stephen Snell; Brian Smith; Dianne Appolito; Andy Rodnesny.

100.     Claim Nine: Whether Applicant was denied the effective assistance of trial counsel when counsel failed to file for a motion for change of venue.

101.     Claim Ten: Whether Applicant was denied the effective assistance of trial counsel when counsel allegedly failed to impeach Amanda Ward's testimony by failing to call Haley McDowell, Jimmy Kleimann and Amanda Ward's mother, Sandra, to impeach Ms. Ward's testimony.

102.     Claim Eleven: Whether Applicant was denied the effective assistance of trial counsel when counsel allegedly failed to object to the State's peremptory strike of venireperson Brownlee on the basis of her gender.

103.     Claim Twelve: Whether Applicant was denied the effective assistance of appellate counsel when counsel allegedly failed to appeal the trial court's overruling of trial counsel's Batson challenge.

104.   Claim Thirteen: Whether Applicant was denied the effective assistance of trial counsel during jury selection for: failing to object to the State's removal of venireperson Burroughs; failing to use a peremptory strike on juror Bryant; failing to use a peremptory strike on juror Brynildsen. Also whether appellate counsel was ineffective for failing to raise the above issues on direct appeal.

105.   Claim Fourteen: Whether Applicant was denied the effective assistance of trial counsel in the selection and presentation of the following defense lay witnesses: by calling Officer Tom Jagielski as a witness during the guilt phase; by failing to call Janet Walker as a witness during the guilt phase; by calling Amanda Wagner as a witness during the punishment phase.

106.   Claim Fifteen: Whether Applicant was denied the effective assistance of trial counsel for allegedly failing to call Patricia Thuesen about the Thuesen's family history of mental illness.

107.   Claim Sixteen: Whether Applicant was denied the effective assistance of trial counsel for allegedly failing to raise the theme of mental illness in opening punishment phase argument.

108.   Claim Seventeen: Whether Applicant was denied the effective assistance of trial counsel for failing to object to the State's allegedly improper closing argument. Also whether *appellate* counsel was ineffective for failing to argue, on direct appeal, that trial counsel was ineffective as to this issue.

109.   Claim Eighteen: Whether Applicant was denied the effective assistance of trial counsel for allegedly failing to preserve error as to the introduction of evidence: by stating "no objection" when the State offered a protective order into evidence; by opening the door to Tabitha Foreman's testimony—that Applicant had a look of no remorse; by not timely objecting to

background character evidence of the victims (Rachel and Travis Joiner) obtained from Wayne Joiner, Douglas Jordan Perry and Johnny Matthys; by not continuing to object to phone records each time the State used them; by objecting to an anti-sympathy charge-as a result of counsel's objection, the charge was omitted which "could have left the jury with the impression that sympathy for the victims was sufficient to impose death." Also whether appellate counsel was ineffective for failing to raise the above issues on direct appeal.

110.    Claim Nineteen: Whether Applicant was denied the effective assistance of appellate counsel for failing to raise, on direct appeal, the trial court's rulings on Applicant's pretrial motions: Motion to declare Tex. Pen. Code Chapter 19 unconstitutional; Motion to find Tex. Code Crim. Proc. art. 37.071 unconstitutional because it fails to provide a meaningful appellate review for the jury's answers to the special issues at punishment; Motion to preclude death penalty due to grand jury's failure to allege all elements in the indictment necessary to make Applicant death eligible; Motion to declare Tex. Code Crim. Proc. art. 37.071 unconstitutional because it places the burden of proof, as to mitigation, on the defendant; Motion to preclude the death penalty as a sentencing option: probability; Motion to find Tex. Code Crim. Proc. art. 37.071 unconstitutional because it is unreliable; Motion to find Tex. Code Crim. Proc. art. 37.071, § 2(f)(4) unconstitutional; Motion to preclude the State from seeking death because Tex. Code Crim. Proc. art. 37.071, §§ 2(e) and 2(f)(4) fail to require that mitigation be considered; Motion to preclude the State from seeking death because the juror's predictions of Applicant's future dangerousness would be unreliable; Motion to admit evidence of other Brazos County sentences in capital cases; Motion to preclude the death penalty as a sentencing option, or in the alternative, to quash the indictment under *Apprendi v. New Jersey/Ring v. Arizona/Blakely v. Washington/Bush v. Gore*.

111.    Claim Twenty: Whether Applicant was denied the effective assistance of trial counsel when it allegedly objected to the "10-12" rule but later reminding the jurors, during closing argument in the punishment phase, of the rule.

112.    Judge Bryan scheduled the evidentiary hearing for December 10, 2013.

**A.    Judge Bryan was temporarily recused.**

113.    Before the evidentiary hearing took place, on November 18, 2013, Judge Bryan *sua sponte* signed an order voluntarily recusing himself from the case and requesting that the proceeding be assigned to another judge. The Voluntary Recusal Order did not specify a basis for the recusal. Thus, that same day, the OCFW sent an email to Judge Bryan, cc-ing counsel for the State, asking for an opportunity to discuss the matter with the court. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. B]. Judge Bryan responded, informing counsel for both parties that he had decided to recuse himself because he had recently made a campaign contribution to Michele Esparza, one of the trial lawyers who had represented Mr. Thuesen, who was then running for the Republican primary nomination to the 361st District Court. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. C]. Although he believed that he could be objective, Judge Bryan was concerned about the appearance of partiality. *Id.* The OCFW suggested, and later confirmed after conferring with Mr. Thuesen, that the recusal was unnecessary and should be reconsidered. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. D].

114.    On November 20, 2013, counsel for the State sent an email taking the position that Judge Bryan should proceed with the recusal based on purported concerns that *Mr. Thuesen* might use Judge Bryan's involvement as a basis to seek relief from an unfavorable result:

> The last thing that I don't think we can defend against is that some capital writ lawyer in the federal system . . . doesn't come back and say at a later time the fact that Michelle [Esparza] lost, now her livelihood depends on her private practice and that that would somehow, because you have backed her in the election, that you had

> some reason to make sure that she didn't be found ineffective [sic] in a capital death penalty case and that that somehow inadvertently swayed your ability to make a straight call.

Ex. 18 [Response to Court's Order of February 24, 2016, Ex. E].

115.    On November 20, 2013, the Honorable Olen Underwood, Presiding Judge of Second Administrative Judicial Region, entered an order assigning the matter to the Honorable Harold R. Towslee ("Order of Assignment"). Ex. 18 [Response to Court's Order of February 24, 2016, Ex. G]. The Order of Assignment stated that Judge Towslee's "assignment shall continue as may be necessary . . . or until termination by the Presiding Judge." *Id.*

116.    In light of the reassignment, on November 21, 2013, the scheduled evidentiary hearing was postponed. The parties filed an "Agreed Upon Motion to Reset Evidentiary Hearing Date." Ex. 18 [Response to Court's Order of February 24, 2016, Ex. H]. The next day, on November 22, 2013, the parties received a "Notice of Setting" from the court coordinator for the 272nd District Court setting a status conference before Judge Towslee on December 10, 2013. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. I.]

117.    After the status conference before Judge Towslee, the parties received another "Notice of Setting" on December 19, 2013, setting a bench conference for March 24, 2014, to be followed by an evidentiary hearing to commence on June 9, 2014 before Judge Towslee. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. J].

118.    Shortly before that bench conference was to take place, Ms. Esparza was defeated on March 4, 2014 in the primary election for the Republican nomination to the 361st District Court. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. K]. Thereafter, on March 11, 2014, the OCFW, on Mr. Thuesen's behalf, filed a Motion to Reassign Original Trial Court Judge ("Motion to Reassign") because the basis for Judge Bryan's recusal—his campaign contribution

to Ms. Esparza—had been resolved with Ms. Esparza's defeat in the Republican primary. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. L].

119.    On March 14, 2014, in response to the Motion to Reassign, Presiding Judge Underwood contacted Judge Bryan directly and advised him that, since he had originally recused himself *sua sponte*, Judge Bryan could now enter an order withdrawing his own recusal order.

120.    That same day, Judge Bryan, through his court coordinator, informed counsel for both parties of this development. *Id.* Judge Bryan stated that he had responded to Presiding Judge Underwood, advising that he would soon file an order withdrawing the voluntary recusal. *Id.* Judge Bryan also relayed that, according to Presiding Judge Underwood, "it will then fall on either of the parties to object to [Judge Bryan's] presence in the case." *Id.* Both Presiding Judge Underwood and Judge Towslee were cc-ed on these communications. *Id.*

121.    Counsel for the State responded by email that it objected to the reassignment. *Id.* at 2. Judge Bryan held a telephonic hearing on March 17, 2014 to reconsider the voluntary recusal and the State's objection. Ex. 18 [Response to Court's Order of February 24, 2016, Ex. B]. During that hearing, Judge Bryan advised that he had spoken with Judge Underwood "who suggested that [Judge Bryan] withdraw [his] recusal and get back on the case." *Id.* at 4. Judge Bryan reported that he had initially been concerned that, because of the voluntary recusal, he was no longer the judge on the case and thus could not enter an order. *Id.* at 5. However, Presiding Judge Underwood had told Judge Bryan that he could do so. *Id.*

122.    The State initially stated that its concern was the "perception of bias," not concern of actual bias. *Id.* at 5-6. If Judge Bryan denied Mr. Thuesen relief, the State argued, future federal habeas counsel for Mr. Thuesen might be able to use the possible bias to support a claim attacking the denial. *Id.* at 8.

123.    In response, Mr. Thuesen's counsel stated categorically that they had no intention

of trying to inject error into the process by declining to object to Judge Bryan presiding over the

habeas proceeding. *Id.* at 16-17. The OCFW also noted that there had never been facts sufficient

to suggest the appearance of partiality based on a campaign donation to Ms. Esparza—and

especially not now that the campaign was over. *Id.* at 10.

124.    The State advised that it wanted to confer with a member of the Harris County

District Attorney's Office, Roe Wilson, to get advice about the issue because she spent all of her

time on state writs. *Id.* at 9. The State also described plans to confer with the Attorney General's

Office about the issue. *Id.*

125.    Judge Bryan noted that, even if he did overrule the State's objection, the State

would "*still have the right to file an involuntary recusal against me and have a full blown hearing

on that.*" *Id.*[7]

126.    On March 18, 2014, Judge Bryan signed an "Order Withdrawing Recusal and

Withdrawing Request to Assign Another Judge." Ex. 18 [Response to Court's Order of February

24, 2016, Ex. N].

127.    That same day, *the State withdrew its objection* to Judge Bryan presiding over the

matter in an e-mail:

> Judge Bryan,
>
> The State of Texas no longer has any objections relating to you
> presiding over the John Thuesen writ. Based on further research and
> contact with a number of experts in the area of federal writs, the
> statements and assurances made by the Office of Capital Writs in
> the telephone hearing yesterday, March 17, 2014, are sufficient to
> alleviate our concerns about their motives for having you preside.
> With those issues resolved, our original desire to have you preside

---

[7] In this Amended Petition, all emphasis in quotations is added, unless otherwise stated.

> can now be realized without any apprehension of future legal
> ramifications

Ex. 18 [Response to Court's Order of February 24, 2016, Ex. M].

128.     Subsequently, neither the State nor Mr. Thuesen filed a motion seeking to recuse Judge Bryan or otherwise objecting to his presiding over the Article 11.071 proceeding.

   **B.     Following an evidentiary hearing, Judge Bryan recommended granting Mr. Thuesen relief on multiple claims.**

129.     From June 9-13, 2014, with the agreement of all the parties, Judge Bryan presided over a five-day evidentiary hearing during which voluminous documentary evidence was admitted and numerous witnesses appeared live and were subjected to cross-examination, including appellate counsel Frank Blazek; trial counsel William Carter and Michele Esparza; Dr. Mark Cunningham; Dr. Eric Elbogen; Dr. Kenneth Kopel; Craig Novak; Michelle Novak; Karolyn Ottmer; Dr. Elspeth Ritchie; Brian Smith; Stephen Snell; John Stetter; Dennis Thuesen; Michelle Thuesen; and Patricia Thuesen.

130.     These witnesses testified as to Mr. Thuesen's military service; the trauma that service engendered; the lack of care he received following his return to the United States; Mr. Thuesen's struggles following his return due to inadequate care; his relationships with his family; his relationships with women; Mr. Thuesen's demeanor in the Brazos County Detention Center; how PTSD affects the brain and behavior (including following induction of the fight-or-flight response in a PTSD crisis); the likelihood that Mr. Thuesen would have committed future violence; and the decision making of his trial attorneys.

131.     In addition, Judge Bryan admitted 145 exhibits into evidence, including Mr. Thuesen's medical records following his service.

132.     Judge Bryan specifically and explicitly found that the testimony of each of the expert witnesses who testified—Dr. Ritchie, Dr. Elbogen, Dr. Cunningham, and Dr. Kopel—was

credible. Judge Bryan's Findings of Fact and Conclusions of Law ("FFCL")[8] at 2. In addition, he found that testimony from each would have been admissible at Mr. Thuesen's trial and would have met sufficient reliability standards under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993). *Id.*

133.    Judge Bryan also found credible the testimony of lay witnesses Patricia Thuesen, Dennis Thuesen, Michelle Thuesen, Craig Novak, Brian Smith, Karolyn Ottmer, Stephen Snell, Michael Novak, and John Stetter. *Id.*

134.    After reviewing affidavits submitted by fourteen other lay witnesses and an expert sociologist focusing on veteran reintegration, Dr. William Brown, Judge Bryan found the testimony of all, "both expert and lay, to be credible based on their affidavits." *Id.* at 3. Further, he found that Dr. Brown's testimony met "sufficient reliability standards under *Daubert*" such that it "would be admitted at a live hearing." *Id.* at 2.

135.    Finally, while Judge Bryan found Mr. Thuesen's trial counsel, William Carter and Michele Esparza, and trial and appellate counsel Frank Blazek, to be credible overall, he excluded "specific determinations of the credibility to particular factual issues" in line with his decisions finding their representation ineffective. *Id.*

136.    Reviewing the evidence presented at the evidentiary hearing, Judge Bryan recommended that Mr. Thuesen be granted relief on Claims One, Five, Six, Seven, Eight, Ten, Thirteen (in part), Fifteen, Sixteen, Seventeen, and denied as to Claims Two, Three, Four, Nine, Eleven, Twelve, Fourteen, Eighteen, Nineteen, Twenty, Twenty-One, and Twenty-Two.

---

[8] In this Amended Petition "Bryan FFCL" refers to the Findings of Fact and Conclusions of Law issued by Judge Bryan entered July 17, 2015 (Dkt. No. 43).

1.      **Trial counsel failed to effectively investigate and present mitigation evidence related to PTSD at the punishment phase (Claims One, Five and Eight).**

137.    Judge Bryan first addressed the ineffectiveness of trial counsel with regard to the investigation and presentation of mitigation evidence related to PTSD at the punishment phase of the trial, grouping together Claims One, Five, and Eight, and recommending relief based on each.

138.    Judge Bryan determined that, although trial counsel had presented some evidence of Mr. Thuesen's mental illness at trial, trial counsel was ineffective in the punishment phase for failing to adequately explain or present expert witness testimony concerning Mr. Thuesen's illness to the jury.

139.    Mr. Carter testified that at the time he was appointed to represent Mr. Thuesen as lead trial counsel on March 9, 2009, he was counsel in two other capital murder cases, one that ended on March 11, 2009 (Christian Olsen) and one that would go to trial in September 2009 (Jerry Martin). Bryan FFCL ¶ 26. Mr. Carter also testified that he had been counsel on over *fifty* non-capital criminal cases at the time of his appointment to Mr. Thuesen's case. *Id.*

140.    Ms. Esparza testified that she had been appointed to represent Mr. Thuesen as second chair. At the time, Ms. Esparza had just finished working on the Olsen case, was counsel in another pending capital murder case and had between fifty and seventy-five pending non-criminal cases. Bryan FFCL ¶ 27.

141.    Ms. Esparza withdrew as Mr. Thuesen's counsel on June 2, 2009 because she "personally couldn't start another [capital case]" after having just finished the Olsen case. 5 HR at 145, Ex. 51 [Clerk's Record Index]. Ms. Esparza testified that she "didn't do that much work on the [Thuesen] case" prior to withdrawing. 5 HR at 144. Clint Sare was appointed to replace Ms. Esparza on the same day. Mr. Sare did "very little" on the case for the rest of 2009. Bryan FFCL ¶ 29.

142.     In December 2009, Mr. Carter asked Ms. Esparza to rejoin the Thuesen case. 5 HR

at 142-43. Ms. Esparza agreed to rejoin the case because "this was a kid who went to war and came

back different, and [she] wanted to save his life." *Id.* at 146. She was substituted back onto the

case for Mr. Sare in February 2010. 2 HR at 43; Ex. 51 [Clerk's Record Index]. Ms. Esparza and

Mr. Carter represented Mr. Thuesen until the completion his capital trial. 2 HR at 40-44, 120-23;

Bryan FFCL ¶ 30.

143.     Shortly after being appointed, trial counsel hired mitigation specialist Gerald

Byington. Mr. Carter had worked with Mr. Byington before on multiple occasions, including the

Jerry Martin and Christian Olsen cases. 2 HR at 37, 53-54. Mr. Byington's role was to collect and

review records, create timelines based on the records, and summarize discovery. Trial counsel did

not direct Mr. Byington on what records to collect. 2 HR at 53-55. Trial counsel did not "police"

Mr. Byington's work as the mitigation specialist. *Id.* at 59. Instead, counsel's approach was to

"turn him loose and have him do the job he's supposed to do." *Id.* at 54; Bryan FFCL ¶ 34-35.

144.     In late June 2009, Mr. Byington sent out various record requests. Bryan FFCL ¶ 36.

Mr. Carter testified that he expected Mr. Byington to identify relevant witnesses from the records

and interview them. Trial counsel did not personally review any of these records until after January

1, 2010. Bryan FFCL ¶ 37. Mr. Carter also testified that he did not turn his fully attention to Mr.

Thuesen's case until after January 1, 2010. Bryan FFCL ¶ 42.

145.     In March 2009, trial counsel requested psychologist Dr. Roger Saunders be

appointed to Mr. Thuesen's case. Mr. Carter had worked with Dr. Saunders on other cases,

including the recently completed Christian Olsen case and the ongoing Jerry Martin case. 2 HR at

38, 54. Trial counsel did not understand Dr. Saunders to have a particular specialty within

psychology other than "[j]ust the mental health issues for a client." *Id.* ¶¶ 38-39.

146.     Shortly after being appointed, Dr. Saunders met with Mr. Thuesen at the Brazos County Detention Center. Trial counsel did not ask Dr. Saunders to conduct a full assessment of Mr. Thuesen, but only to gain some "preliminary thoughts about [Mr. Thuesen]." 2 HR at 39, 74.

147.     Following his initial meeting with Mr. Thuesen, Dr. Saunders did not take any specific action on the case again until February 2010, when Ms. Esparza returned to the defense team. 2 HR at 75. Bryan FFCL ¶ 40. Dr. Saunders did not meet with Mr. Thuesen again until May 13, 2010, after the trial had already commenced. State Habeas Ex. 39-H at 2 (submitted at evidentiary hearing) [Saunders Billing Records]; 2 HR at 191; Bryan FFCL ¶ 46.

148.     Despite the early indications that PTSD would be a major issue in the trial, trial counsel did not even begin to investigate the matter until the month before trial. It was not until February 2010, for example, that trial counsel hired Rick Starnes as an investigator, and did not hire a second until March 27, 2010. Those investigators, in turn, only began to locate and interview lay witnesses *after* jury selection had already started; they relayed information to trial counsel as counsel was conducting the trial. 2 HR at 104-06; Bryan FFCL ¶ 43.

149.     On February 22, 2010, trial counsel hired Dr. Robert Yohman to conduct a neuropsychological evaluation. 2 HR at 77, 127-28, 177, 188-89; Ex. 51 [Clerk's Record Index].) Dr. Yohman noted that Mr. Thuesen appeared to suffer from PTSD and suggested that trial counsel pursue that issue at trial. 2 HR at 188-89; Bryan FFCL ¶ 47.

150.     In March 2010, trial counsel communicated with Texas Defender Service attorney John Niland, who recommended that trial counsel call an expert to educate the jury about PTSD. 2 HR at 85; Bryan FFCL ¶ 48.

151.     On March 26, 2010, trial counsel contacted Dr. Michael Gottlieb, a family psychologist, who recommended that counsel provide the jury with information about PTSD. 2

HR at 85, 189; 5 HR at 246; State Habeas Ex. 39-E (submitted at evidentiary hearing) [Billing for Dr. Michael Gottlieb]; Bryan FFCL ¶ 4.

152.    Trial counsel contacted Dr. Howard Detwiler, a psychologist in Alaska, in February 2010 in order to discuss potential PTSD testimony but ultimately decided Dr. Detwiler was not the appropriate defense expert. *Id;* 2 HR at 87-92. Dr. Detwiler never met or evaluated Mr. Thuesen. *Id.* Bryan FFCL ¶ 50.

153.    Based on a recommendation from Dr. Saunders, trial counsel retained Dr. Kenneth Kopel, a Houston psychologist with experience treating veterans with PTSD, on April 27, 2010. 4 HR at 140. After sending Dr. Kopel records to review, trial counsel drove to Houston on Saturday, May 22, 2010, to meet personally with Dr. Kopel for the first time. By this time, however, *the punishment phase of Mr. Thuesen's trial was already underway*. Although Mr. Carter planned to call Dr. Kopel as an expert in PTSD, the night before Dr. Kopel was scheduled to testify, trial counsel abruptly decided not to call him. 2 HR at 83-84, 92-93; 4 HR at 141-43; Bryan FFCL ¶ 51.

154.    Despite the multiple strong recommendations that trial counsel pursue a defense related to PTSD, trial counsel did not call any expert to testify about PTSD during the punishment phase of Mr. Thuesen's trial. Bryan FFCL ¶ 52.

155.    Judge Bryan found that other than the above and filing a few form motions, "counsel appears to have done little to no other work on Mr. Thuesen's case during 2009." Bryan FFCL ¶ 41.

156.    Judge Bryan found that trial counsel should have known that PTSD would be a significant issue in the case as early as March 2009. *Id.* at 16. Specifically, Judge Bryan found that a review of the VA's medical records, which trial counsel received in March, 2009, "would have

shown counsel that Thuesen had been consistently reporting symptoms of PTSD for approximately two and half years prior to the crime," *id.*, but that trial counsel "did not begin an investigation into the basis for Mr. Thuesen's PTSD, or consult potential avenues for developing PTSD evidence until the months leading up to trial." *Id.* at 18. Judge Bryan found that, with regard to Mr. Thuesen's specific experiences during combat and evidence of his PTSD, counsel's mitigation specialist and investigators did not begin lay witness interviews in the case until late January to-early-February 2010. *Id.* at 21.

157.     Critically, Judge Bryan found that Mr. Thuesen's counsel failed to present expert testimony to substantiate Mr. Thuesen's PTSD and connect it to the crimes at issue. Judge Bryan found that, "despite the numerous indications that PTSD was a central component in Thuesen's case, and the suggestions by several mental health professionals that counsel present testimony from a PTSD expert, counsel did not secure the assistance of an expert witness or witnesses qualified to explain the mitigating impacts of PTSD." *Id.* at 21-22. As a consequence, "the ultimate presentation of information regarding PTSD during Thuesen's capital trial, including information specific to Thuesen's experience and information placing Thuesen's struggle with PTSD in a broader context, was *significantly incomplete*." *Id.* at 25.

158.     Judge Bryan further found that trial counsel failed to corroborate the PTSD evidence with copious available evidence, including: evidence regarding Mr. Thuesen's military experience and training, the extensive trauma he suffered in Iraq, the lack of counseling or programs available to him upon his return, his difficulty of reintegrating following his service, how reservists, like Mr. Thuesen, often experience the most acute difficulties with reintegration because they often return "directly back to the civilian world" rather than to a military base where others comprehend their experiences, and the lack of proper treatment by the VA. *Id.* at 28-39.

159.    Judge Bryan concluded that, "having identified the predominant issue in their defense case, counsel had a duty to sufficiently investigate the potential building blocks of that case, well in advance of trial. Counsel failed to thoroughly review VA medical records or speak to VA staff who treated Thuesen until the eve of trial." *Id.* at 43. Further, Judge Bryan ruled that trial counsel's "last minute decisions [regarding potentially retaining PTSD experts] were not based on careful and thorough investigation and were therefore not based on strategic grounds." *Id.* at 45.

160.    Judge Bryan ruled that those failures were both deficient compared to professional norms, and that they were prejudicial to Mr. Thuesen at the punishment phase of trial. *Id.* at 45.

161.    Judge Bryan separately recommended granting relief based on trial counsel's failure to investigate and present evidence at the punishment phase showing that Mr. Thuesen was not properly treated for PTSD by the VA. *Id.* at 48.

162.    Judge Bryan noted that the defense's presentation of testimony from VA employees, Dr. Ismael Carlo and social worker Teresa Cannon, actually obscured the fact that the VA never properly diagnosed or treated Mr. Thuesen for PTSD. *Id.* at 48-49.

163.    Judge Bryan found that, "had counsel fully reviewed the records in their possession, they would have noted (and could have presented evidence) that despite Thuesen's consistent report of PTSD symptoms, neither Dr. Carlo nor any other VA medical professional had ever actually diagnosed Thuesen with PTSD or provided proper treatment." *Id.* at 49.

164.    Judge Bryan concluded, "Counsel's failure to investigate and present evidence that the VA failed to properly diagnose and treat Thuesen's PTSD fell below the norms of professional standards for capital counsel. Counsel were clearly aware of the discrepancy between what the VA records showed about Thuesen's treatment and what Dr. Carlo and Teresa Cannon could testify to

at trial. It is unreasonable to suggest that such evidence would not have been compelling and highly mitigating to Thuesen's jury." *Id.* at 55.

165.    Further, Judge Bryan found that counsel's explanation that they did not present this evidence for strategic reasons was "not a reasonable strategic ground" because the decision was "not based on reasonable investigation [of Mr. Thuesen's VA records] and complete information." *Id.* at 55-56.

### 2.    Trial counsel failed to adequately investigate and present evidence that there was no meaningful probability of future violence (Claim Six).

166.    With regard to Mr. Thuesen's Sixth Claim, Judge Bryan ruled that trial counsel was ineffective for failing to adequately investigate and present evidence at the punishment phase that there was no meaningful probability that Mr. Thuesen would commit future violence. *Id.* at 57.

167.    Judge Bryan noted that trial counsel did not present any expert regarding the probability that Mr. Thuesen would commit future violent acts of be a danger to society. *Id.* He further found that Dr. Mark Cunningham, an expert in the field, would have been able to "explain to the jury that Mr. Thuesen exhibited at least nine factors that reduced his risk of future violence and zero factors that increased the risk." *Id.* at 57-58. Without such assistance, Judge Bryan observed that, without a testifying expert, Mr. Thuesen's chances of persuading the jury that he did not pose a future threat to the community were substantially diminished because "jurors tend to inaccurately predict a defendant's risk of future violence because the scientifically-validated factors that impact the risk can be counter-intuitive. One study found that jurors over-predicted future violence by anywhere between fifty and two hundred and fifty fold." *Id.* at 58.

168.    Judge Bryan also found that trial counsel failed to meet minimal levels of competency in their presentation of lay witnesses regarding Mr. Thuesen's risk of future dangerousness. For instance, Judge Bryan noted trial counsel failed to call John Stetter, the

correctional officer at the Brazos County Detention Center who "knew Thuesen better than any other jail personnel." *Id.* at 59-60.

169.     At the evidentiary hearing, Stetter testified "that Thuesen was 'very, very reserved, almost isolated.' There were fights and other altercations in the pod while Thuesen was housed there, but Thuesen was never involved in them. He was never a threat to anyone in the pod or to any of the guards." *Id.* at 61.

170.     Likewise, Judge Bryan found ineffective trial counsel's failure to elicit testimony from correctional officer David Zavala, who testified, "Thuesen was a positive influence on his fellow inmates; that Thuesen was an 'unselfish' inmate; that Zavala did not fear Thuesen; and that Zavala believes he could have turned his back on Thuesen without consequence." *Id.* at 62.

171.     Finally, based on evidence elicited at the June 2014 hearing, Judge Bryan found that calling an expert in PTSD at the punishment phase could have helped the jury understand that the structured environment of prison would have substantially decreased Mr. Thuesen's likelihood of committing any violent acts in the future. *Id.* ("prison is a structured setting, which can provide consistency and treatment for Thuesen's PTSD." Accordingly, it was "very unlikely Thuesen [would] commit any violent acts while incarcerated in the future.")

172.     In light of the testimony for the evidentiary hearing showing that Mr. Thuesen was unlikely to be a threat in the future, Judge Bryan found that trial counsel's failure to present any affirmative evidence that Mr. Thuesen would not have been such a threat deficient and prejudicial, and recommended relief. *Id.* at 63.

### 3.     Trial counsel was ineffective for failing to impeach Amanda Ward (Claim Ten).

173.     Judge Bryan also recommended granting relief on Claim Ten, that trial counsel's failure to impeach witness Amanda Ward's punishment-phase testimony amounted to ineffective

assistance under Strickland. Ms. Ward testified regarding an incident when she and Mr. Thuesen were in high school in which Mr. Thuesen allegedly became violent and jealous after he saw her talking to another boy at a party. *Id.* at 64. This testimony was key to the State's punishment phase strategy of presenting Mr. Thuesen as someone who was habitually violent, even prior to his war service, and especially towards women. Following Ms. Ward's direct testimony, trial counsel explained to the court that another witness, Haley McDowell, was available to testify, and would directly contradict Ms. Ward's testimony. *Id.* at 64-65. More specifically, she could have testified that Mr. Thuesen met her and Amanda Ward at Ms. McDowell's home, and later dropped them off there and left to go home. Therefore, trial counsel stated that they planned to have Ms. McDowell testify and Ms. Ward recalled for cross-examination. Inexplicably, trial counsel failed to call Ms. McDowell or to cross-exam Ms. Ward. These failures allowed the State to argue in closing that Ms. Ward's testimony was unimpeached. *Id.* at 65.

174.     Judge Bryan also found that trial counsel failed to investigate at least two other available witnesses who could have refuted Amanda Ward's testimony—Ms. Ward's friend Jimmy Kleimann and Ms. Ward's mother, Sandra Ward. *Id.* at 65-66. Judge Bryan held that counsel's failure to investigate and call those witnesses was objectively deficient and prejudicial, particularly in light of the State's highlighting of that testimony in its closing argument as evidence that Mr. Thuesen was not suffering from PTSD, but was simply violent toward women, and that it had not been impeached. *Id.* at 66-67. He found that, had the third parties Ms. Ward claimed were involved in the incident testified and refuted her story, it would have undermined the State's theme throughout trial, and that counsel had no valid reason for the deficiency. *Id.* at 67.

### 4.     Trial counsel was ineffective during jury selection (Claim Thirteen).

175.     With regard to Claim Thirteen—that trial counsel was ineffective during jury selection—Judge Bryan recommended granting relief in part, and denying in part. Specifically, the

State moved to excuse a potential juror, Burroughs, for cause. Burroughs was "a former Marine who experienced problems returning from war" who "would likely have benefited the defense as a juror in Thuesen's case." *Id.* at 81. Trial counsel, however, never questioned Burroughs and did not object to his removal. *Id.*

176.    Judge Bryan found that there "was no strategic reason for failing to demand the State provide a reason for challenging prospective juror Burroughs for cause. Rather, given Burroughs [sic] answers during voir dire that appeared to favor the defense's trial strategy, reasonable counsel would have made efforts to keep Burroughs on the jury." *Id.* at 82-83. Judge Bryan also found that trial counsel's failure prejudiced the ultimate selection and makeup of the jury, and recommended that Mr. Thuesen be granted a new punishment phase as a result. *Id.*

### 5.    Trial counsel failed to present evidence of history of mental illness (Claim Fifteen).

177.    Judge Bryan also recommended granting relief pursuant to Claim Fifteen, because trial counsel failed to present evidence from Mr. Thuesen's mother, Patricia Thuesen, regarding Mr. Thuesen's family history of mental illness. During trial, trial counsel had initially attempted to present such evidence, but the court sustained an objection by the State that the evidence could not be presented until the defense's mental health expert, Dr. Saunders, testified regarding Mr. Thuesen's mental health. *Id.* at 85.

178.    After Dr. Saunders testified, however, the defense never elicited testimony from Patricia Thuesen regarding her family's history of mental illness. *Id.* at 86.

179.    Judge Bryan found that, had Patricia Thuesen been called to testify on the subject, she would have explained how "Ms. Thuesen's mother was an alcoholic; Ms. Thuesen's father did not live with the family and her visits with him were monitored by her grandmother; Ms. Thuesen's father showed signs of depression; Ms. Thuesen's brother, George, attended a state school, showed

signs of depression throughout his life, and was then homeless living somewhere in the Corpus Christi area; Ms. Thuesen's half-sister, Lisa, also showed signs of depression and had been admitted to a psychiatric hospital; Ms. Thuesen's daughter, Michelle, also spent time in a psychiatric hospital; and Ms. Thuesen's mother-in-law showed signs of depression and alcoholism." *Id.* at 85.

180.    Judge Bryan found that this evidence would have been probative at the punishment phase, because if presented, it would have provided "a context for the crime by describing a set of life experiences that inspire compassion, empathy, mercy, and understanding." *Id.* at 86-87. He ruled that "[c]ounsel's failure to present it cannot be considered tactical and this deficient performance prejudice Thuesen's case." *Id.* at 87. In addition, he found that "Appellate counsel was also ineffective for failing to raise this record-based claim on direct appeal." *Id.*

### 6.    Trial counsel was ineffective for failing to mention mental illness during opening (Claim Sixteen).

181.    Judge Bryan next recommended relief under Claim Sixteen, because trial counsel was ineffective by failing even to mention mental illness in their punishment phase opening argument during the punishment phase. *Id.* at 88.

182.    He found that "[e]vidence that a defendant is mentally ill can be powerful mitigation when jurors are charged with assessing individualized culpability. To that end, evidence of mental illness may explain the succession of facts and circumstances that led to the crime and how that distorted the defendant's judgment and reactions." *Id.* That was particularly true in Mr. Thuesen's case, Judge Bryan found, because Mr. Thuesen's PTSD, depression, and Dependent Personality Disorder were major defense themes. *Id.*

183.    Because of trial counsel's failure to mention mental illness in the opening, "the jurors were left with little or no guidance from the defense as to what they were looking for in determining that Thuesen should not be sentenced to death." *Id.*

### 7.    Trial counsel failed to object to State's improper closing argument (Claim Seventeen).

184.    Judge Bryan also recommended granting relief as to Claim Seventeen, which was based on trial counsel's failure to object to the State's improper closing argument, in which the prosecutor offered his own lay testimony defining PTSD and that Mr. Thuesen did not suffer from it.

185.    Specifically, during the closing of the punishment phase, the prosecutor offered a "story" about his stepfather and PTSD:

> My stepfather fought in the Battle of the Bulge. His friends and comrades were dying left and right of him as they were there. And years later as we're sitting on the porch after dinner, a gunshot goes off. We all think it is nothing. He knows, he yells for all of us to get down, get inside. That's PTSD.

54 RR at 82.

186.    Judge Bryan held that the argument was improper: "The prosecutor's opinion of whether Thuesen suffered from PTSD falls outside of the acceptable range of subjects during closing argument because it was his personal opinion and unsupported in the record. The State proffered no evidence that suggested Thuesen was not suffering from PTSD. No expert witnesses testified that the type of experience described by the prosecution was the true nature of PTSD, and no lay witness offered any stories that were similar to the one described by the prosecutor of his stepfather. In fact, all the evidence on the record regarding PTSD symptoms was offered in support of finding that Thuesen indeed suffered from PTSD." *Id.* at 90-91.

187.     Judge Bryan found that trial counsel's failure to object to that improper comment by the prosecutor was objectively deficient, and could not have been considered strategic. *Id.* at 91. "The defense's primary theme focused on Thuesen's experiences in Iraq 'outside the wire' and the resulting impacts of PTSD on Thuesen when he returned home. By failing to object, counsel allowed the prosecution to offer 'evidence' about PTSD during the closing argument." *Id.* "Further, trial counsel's failure to object prevented him from being able to challenge the improper comments on direct appeal." *Id.* "No reasonable strategy entails allowing the prosecutor to make unsupported, prejudicial comments and then waive the ability to appeal the harm they cause." *Id.* at 92.

188.     Lastly, Judge Bryan held that "Thuesen's rights were further prejudiced by the failure of his direct appeal counsel to raise the issue of ineffective assistance of trial counsel in not objecting to this closing argument." *Id.*

189.     In all, based on the testimony at the evidentiary hearing, Judge Bryan's evaluation of the credibility of witnesses, and a thorough analysis of the thousands of pages of documentary evidence presented during the hearing, Judge Bryan found that trial counsel's and direct appeal counsel's performance were objectively deficient in numerous respects. Judge Bryan also found that these deficient performances severely prejudiced Mr. Thuesen at the punishment phase of his trial. As a result, Judge Bryan recommended that Mr. Thuesen be granted *habeas corpus* relief and a new punishment phase trial.

190.     The trial court thereafter sent the record to the CCA for review on the merits.

**C.     The CCA ordered the parties to brief Judge Bryan's recusal.**

191.     On February 24, 2016, the CCA entered an order directing the parties to brief three issues related to Judge Bryan's withdrawal of his voluntary recusal:

1.      In the absence of any subsequent written order signed by Judge Underwood, did Judge Bryan have judicial authority to sign and execute an order reinstating himself on applicant's habeas case and, if he did have such authority, what was the legal basis for that authority?

2.      What is the meaning of the term "good cause" in the context present. Did Judge Bryan's reinstatement order show "good cause" for him executing the order, rather than Judge Towslee or Presiding Judge Underwood? Can "good cause" as stated in Tex. R. Civ. P. 18(a)(f)(2) justify a recused judge removing his assigned replacement judge and reinstating himself to take all further actions in a case?

3.      If Judge Bryan lacked the authority to reinstate himself as judge presiding over the instant habeas case, and his action cannot be justified by "good cause" as provided in Tex. R. Civ. P. 18(a)(f)(2), are his rulings while presiding over the evidentiary hearing, other orders he executed in this case after his recusal, and his order adopting findings of fact and conclusions of law "void and of no effect"?

192.    On September 21, 2016, the CCA ordered Judge Underwood to review the record "for any record of an order that he may have rendered removing Judge Towslee and reinstating Judge Bryan, if any such order exists." On October 3, 2016, Presiding Judge Underwood responded, stating that (1) there was no written order because no order was required to reinstate Judge Bryan because no formal motion to recuse had ever been filed; and (2) there was also no order rescinding the appointment of Judge Towslee.

193.    On April 8, 2016, Mr. Thuesen filed a response to the CCA's request for briefing.

194.    In its response, the State—*for the first time*—argued that Judge Bryan lacked jurisdiction to withdraw his recusal and then preside over the five-day-long evidentiary hearing. In other words, following receipt of this unfavorable ruling from Judge Bryan—who the State had explicitly consented to have presided with Mr. Thuesen's habeas petition—the State switched

gears, and proceeded to pursue a litigation strategy focused around retroactively replacing Judge Bryan and thereby manufacturing a second bite at that apple.

**D.     The CCA vacated Judge Bryan's Findings of Fact and Conclusions of Law.**

195.    On February 8, 2017, almost two years after Judge Bryan found that Mr. Thuesen should be granted a new punishment phase trial, the CCA delivered its Opinion, finding that Judge Bryan lacked authority to preside over Mr. Thuesen's evidentiary hearing or rule on the habeas petition and, therefore, his findings and conclusions would be disregarded. *Ex parte Thuesen*, 546 S.W.3d 145, 157 (Tex. Crim. App. 2017). The CCA concluded, "[b]ecause Judge Underwood [had] not issued a written order rescinding Judge Towslee's assignment, Judge Towslee retains judicial authority to preside over [Mr. Thuesen's] habeas proceedings" and remanded the habeas case to the lower court to its position immediately following Judge Towslee's assignment to the case. *Id.*

196.    On February 21, 2017, Presiding Judge Underwood terminated Judge Towslee's assignment and reassigned Mr. Thuesen's case to the Honorable J.D. Langley.

197.    On February 24, 2017, Mr. Thuesen filed a motion for rehearing and a request to stay the proceedings in the lower court pending the rehearing.

198.    On May 3, 2017, the CCA *granted* Mr. Thuesen's motion for rehearing and request for a stay. *Ex parte Thuesen*, No. WR-81,584-01, 2017 WL 2131777 (Tex. Crim. App. May 3, 2017) (not designated for publication).

199.    Nearly a year later, on March 7, 2018, the CCA issued a cursory order announcing that its previous order granting a rehearing had been improvidently granted. The CCA lifted the stay of the lower court proceedings, but failed to offer any basis for the decision. *Ex parte Thuesen*, 546 S.W.3d 158, 159 (Tex. Crim. App. 2018) (stating only that it "conclude[d] that the motion was improvidently granted.").

**E.      Judges Alcala and Walker dissented, characterizing the State's position on the recusal issue as "gamesmanship."**

200.      Judge Elsa Alcala dissented from the denial of rehearing, joined by Judge Scott Walker, and stated that the CCA should have "accepted [Judge Bryan's] findings of fact and conclusions of law, and grant applicant relief in the form of a new punishment trial." *Id.*, Alcala Dissent at 2.

201.      Judge Alcala's dissent centered on how the Court disregarded ruling in favor of granting state habeas relied on by the trial court judge and, instead, agreed with the State current position that, because of missing administrative paperwork, that trial court judge could not have properly presided over the state habeas proceedings. Judge Alcala highlighted that, in so arguing, the State "flip-flop[ped]" its position—"agreeing to have Judge Travis Bryan preside over the habeas case before he ruled against the State and then complaining about him having presided over the case after he ruled against the State." Alcala Dissent at 2. She described the State's conduct as "the type of gamesmanship or manipulation by parties that has no place in death penalty proceedings." *Id.*

202.      Judge Alcala finished by noting that the majority opinion, rejecting the agreed-upon authority of Judge Bryan, "has improperly elevated a recusal matter into one of jurisdiction and a judge's authority to act, in conflict with the rules of civil procedure that permit a knowing waiver of recusal matters." *Id.* at 10.

203.      On May 3, 2018, Mr. Thuesen's application for writ of habeas corpus was remanded to the trial court. Unlike the previous remand order that required that the entire evidentiary hearing, as well as the Court's findings of fact and conclusions of law, be accomplished in 180 days, neither the CCA's March 7, 2018 order or the May 3, 2018 Mandate imposed a deadline to complete the process.

**F.    A second evidentiary hearing is held before Judge Langley.**

204.    Following the CCA's remand, Mr. Thuesen's case was reassigned to the Judge J.D. Langley.

205.    Judge Langley then conducted a second, abbreviated evidentiary hearing, from December 3 to December 5, 2018. All of the attorneys from the OCFW who represented Mr. Thuesen at the first evidentiary hearing in 2014 had since departed the OCFW. Accordingly, a new team of attorneys from the OCFW had to be assembled to represent Mr. Thuesen at the second evidentiary hearing.

206.    Instead of rehearing the witnesses from the first hearing, Judge Langley instead merely took judicial notice of the first hearing. Pursuant to the agreement of the parties, the court entered an order granting the admission of the certified transcripts of the testimony and exhibits that had been admitted into evidence at the June 2014 evidentiary hearing before Judge Bryan. Order on Agreed Motion Regarding the Admission of Previous Testimony and Exhibits into Evidence (Apr. 13, 2017); 2 HR2 at 11. Judge Langley therefore denied himself the opportunity to measure each witness's credibility in person, contrary to the strong preference of Texas public policy. However, eight additional witnesses did provide live testimony.

207.    Mr. Thuesen's company commander Stace Hayward, squad leader Thomas Rogers, and Lance Corporal Edgar Kyger testified to the intensity of Mr. Thuesen's military experience in Iraq. They testified that Mr. Thuesen and others in his unit were not adequately trained for the tasks they were required to perform. Mr. Hayward testified that "the reality on the ground . . . was different than what we had . . . focused our effort in training for before we got [to Iraq]." Before going to Iraq, Mr. Thuesen was trained to serve as a radio operator in a unit that would primarily support troops from behind the lines. Upon arrival in Iraq, instead of operating a radio, Mr. Thuesen spent most of his time "outside the wire," (i.e., outside the safety zone) working as a

machine gunner, providing direct fire in support infantrymen. Bryan FFCL ¶ 308; 2 HR2 at 62-66, 64-65; 3 HR2 at 20-21, 50, 62, 76; 4 HR2 at 48. Former Staff Sergeant Ramiro Garcia, who served with Mr. Thuesen, testified that his tour in Iraq was the worst of many tours that he was deployed on. Sergeant Garcia testified that he suffered from and was being treated for PTSD. 2 HR2 at 94, 160-163.

208.     Mr. Thuesen presented evidence that, unlike active-duty Marines, Mr. Thuesen and other reservists returned to civilian life without a formal reintegration program. 6 HR at 31-33.

209.     Dr. Erin Bigler, a neuropsychologist, testified that brain-imagining technology has shown brain deviations in the sizes of brains of people suffering from PTSD, including smaller than normal hippocampi, the area of the brain that relates to memory and recall, and reductions in the thickness or volume of the cerebral cortex, whose functions include rational decision-making.

210.     Dr. Stephen Xenakis, a retired Brigadier General in the United States Army and expert in adult/child psychiatry, PTSD, and the treatment of military personnel and veterans, testified that Mr. Thuesen's brain was still developing when he was deployed to Iraq, specifically, the prefrontal cortex that regulates executive functioning such as rational decision-making. He also testified as to research showing that traumatic experiences before the brain has fully developed could disrupt the prefrontal cortex's normal development and increase the risk of developing PTSD.

211.     Dr. Xenakis also testified that family history can increase a person's risk of developing PTSD. Specifically, studies have found that a genetic history of psychiatric disorders increases the risk of PTSD. In this case, several of Mr. Thuesen's relatives have been diagnosed with bipolar disorder, including a great aunt, an aunt, an uncle, a cousin, and Mr. Thuesen's sister. As a result, Dr. Xenakis testified that Mr. Thuesen had a higher likelihood of returning from Iraq

with PTSD than others who served alongside him and did not have a family history of serious mental illness. 4 HR2 at 152-53; App'x 68, 123, 124, 129-131.

212.    Dr. Xenakis testified that PTSD may not show up right away but may take months or years to manifest, and that "flashbacks" are *un*common. He testified that common symptoms include hypervigilance, difficulty sleeping, irritability or outbursts of anger, difficulty concentrating, and exaggerated startle responses. In his opinion, Mr. Thuesen returned from Iraq with PTSD, which went undiagnosed and untreated, and was exhibiting the signs and symptoms of the illness at the time of the shootings.

213.    The State and Mr. Thuesen submitted their respective Proposed Findings of Fact and Conclusions of Law on January 18, 2019.

214.    On January 27, 2019, Judge Langley signed the State's proposed Findings of Fact and Conclusions of Law wholesale,[9] ignoring all of Judge Bryan's recommendations, and issued an Order recommending that Mr. Thuesen be denied all relief. In doing so, and at the State's behest, Judge Langley ignored the majority of the witness testimony, affidavit testimony and documentary evidence that had been presented at either the 2014 writ hearing or the 2018 writ hearing.

215.    Judge Langley did not critically engage with the testimony of witnesses at the first evidentiary hearing. His Findings are, in large part, merely extended quotations from testimony, unaccompanied by analysis or explication.[10] Notably, the Findings do not address the majority of

---

[9] Indeed, Judge Langley's only alteration to the State's proposed findings of fact and conclusions of law were changes to the case number, the document title and two paragraphs at the end ordering that additional portions of the record be forwarded to the CCA. The Findings are otherwise a verbatim adoption of the State's proposed findings of fact and conclusions of law submitted on January 18, 2019.

[10] At times, Judge Langley's Findings rely on and quote from the CCA ruling on Mr. Thuesen's direct appeal, 2014 WL 792038 (Tex. Crim. App. 2014), which is unpublished, not part of the record, and an inappropriate basis for making factual findings following an evidentiary hearing.

the witness testimony, affidavit testimony, or documentary evidence that had been presented at the first evidentiary hearing. Despite not attending the hearing, and not making credibility determinations of his own, Judge Langley's rulings were undergirded by implicit findings of credibility diametrically opposed to the findings of Judge Bryan, despite his lacking the ability to observe the testimony of those witnesses first hand.

216.   Even more concerning, Judge Langley's Findings also largely fail to address the majority of testimony adduced from the eight witness during the three-day 2018 evidentiary hearing, over which he presided. The focus on the first evidentiary hearing in the State's proposed findings, which Judge Langley adopted verbatim, raises the concerning inference that they may have largely been drafted before the second evidentiary hearing even occurred.

217.   Mr. Thuesen presented new witness testimony and evidence about his PTSD, military history and family psychiatric history. Judge Langley's Findings provide no explanation for why he ignored the additional and substantial evidence that was presented regarding those topics.

218.   As described above, for example, Mr. Thuesen presented the expert testimony of Retired Brigadier General Stephen Xenakis. Dr. Xenakis's testimony was relevant to both Mr. Thuesen's guilt/innocence-phase and punishment-phase claims. Dr. Xenakis's testimony comprises approximately 200 pages of the record. 4-5 HR at 2.[11] However, Judge Langley's findings dispatch with Dr. Xenakis's testimony in one paragraph. They dismiss Dr. Xenakis's testimony as being cumulative of Dr. Saunders' testimony at trial. Langley FFCL[12] at 130 ¶ 239. Judge Langley's Findings totally ignore the substance and relevance of Dr. Xenakis's testimony.

---

[11] A declaration by Dr. Xenakis was submitted with this Petition. It is cited as "Xenakis Decl."

[12] In this Amended Petition "Langley FFCL" refers to the Findings of Fact and Conclusions of Law issued by Judge Langley entered January 27, 2019 (Dkt. No. 97).

219.    The testimony was not cumulative, however. Dr. Xenakis provided testimony regarding PTSD, covering seven major topics that had not been discussed in any testimony presented at trial. Unlike Dr. Saunders, Dr. Xenakis explained that: (1) PTSD is an injury; (2) PTSD impacts veterans in multiple ways; (3) the military lacked a reintegration process for soldiers like Mr. Thuesen, who returned from Iraq in 2005; (4) Mr. Thuesen had an increased risk for developing PTSD due to his age and his family history of mental illness; (5) the VA failed to diagnose and properly treat Mr. Thuesen for PTSD and alcoholism; (6) medical records documented the decline of Mr. Thuesen's mental health in the months leading up to this offense; and (7) the correlation between combat-related PTSD and violence is a national problem. 4 HR2 at 137-38, 141, 142, 147-53, 163-64, 169-171, 173-80, 186, 201-09, 211-2, 215-16, 236, 255-60; *accord* Xenakis Decl. ¶¶ 44-47.

220.    Additionally, as described in ¶¶ 411-420 of Mr. Thuesen's proposed findings of fact and conclusions of law, trial counsel's expert, Dr. Saunders, did not present to the jury information that was available, compelling and relevant to Mr. Thuesen's *mens rea*. *See* Proposed Findings of and Conclusions of Law Relating to Mr. Thuesen's Article 11.071 Writ Application filed on Jan. 18, 2019. Rather, Dr. Saunders, who was not a specialist in PTSD, testified that Mr. Thuesen has dependent personality disorder, a personality disorder. However, Dr. Xenakis testified unequivocally that Mr. Thuesen does *not* suffer from any personality disorder. 4 HR2 at 193, 196; Xenakis Decl. ¶ 49. Dr. Xenakis further testified that Mr. Thuesen's service in the Marines, his school and employment records, his medical records and his extracurricular activities show Mr. Thuesen did not suffer from any disorder prior to serving in the Iraq War. 4 HR2 at 192-201, 254; *accord* Xenakis Decl. ¶ 18.

221.    The testimony of Retired Colonel Dr. Elspeth Ritchie corroborated Dr. Xenakis's opinion. She also unequivocally testified that Mr. Thuesen does not suffer from a personality disorder. Dr. Ritchie testified that Mr. Thuesen could not have completed boot camp or his service with the Marines with a personality disorder. 6 HR at 72, 80-82, 101.

222.    Although the State offered no rebuttal of Dr. Xenakis's opinions, Judge Langley essentially ignored the substance of Dr. Xenakis's testimony in adopting the State's proposed findings of fact, merely noting that he believed it duplicative of Dr. Saunders' testimony. This was a clearly incorrect factual conclusion, even judging solely from the differences in opinion between Drs. Saunders and Xenakis about Mr. Thuesen's purported dependent personality disorder. Accordingly, by finding only that Dr. Xenakis's testimony was duplicative of Dr. Saunders', Judge Langley failed to make findings meaningfully informed by the evidence presented.

223.    The pattern holds, again and again, regarding the witnesses and documentary evidence presented at the 2018 hearing. Aside from a footnote indicating that Dr. Bigler was an unreliable witness due to his not meeting with Mr. Thuesen before testifying—despite Dr. Bigler's testimony being educational in nature and limited to describing the biological effects of PTSD, unrelated to the specific claims of Mr. Thuesen—and a similar assertion related to Dr. Brown, Judge Langley did not make credibility determinations regarding any of Mr. Thuesen's witnesses.

224.    It was incumbent upon the trial court to make explicit factual findings and determine the credibility of the witnesses. A reviewing court cannot speculate, nor should it have to speculate, about implicit credibility determinations or ambiguous factual findings. *State v. Mendoza,* 365 S.W.3d 666, 670-673 (Tex. Crim. App. 2012). Instead, Judge Langley's Findings rely heavily on the testimony of certain witnesses, but not others, *without any explanation*.

225.     Notably, Judge Langley accepted the State's proposed findings wholesale, despite both the CCA and the United States Supreme Court having criticized lower courts for adopting wholesale the allegations and conclusions offered by the State during post-conviction proceedings. *Jefferson v. Upton*, 560 U.S. 284, 293-94 (2010); *Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985); *Ex parte Reed*, 271 S.W.3d 698, 729 (Tex. Crim. App. 2008). In addition to unnecessarily complicating the CCA's independent review of the record, *Ex parte Reed*, 271 S.W.3d 698, 698 (Tex. Crim. App. 2008), the practice raises serious doubts about the fairness of proceedings that are intended to ensure that this State's most-severe punishment has been lawfully imposed. *See also Mendoza,* 365 S.W.3d at 670-673.

226.     On February 6, 2019, Mr. Thuesen filed objections to the Findings of Fact and Conclusions of Law.

227.     The record was then conveyed to the CCA for review on the merits/writ.

228.     On February 5, 2020, the CCA offered a cursory affirmation of Judge Langley's Findings of Fact and Conclusions of Law. The entirety of the analysis offered by the CCA, after it had laid out the legal framework, was that "[i]n the instant case, Applicant has failed to satisfy the *Strickland* test regarding all of his allegations of ineffective assistance."[13] *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). The CCA denied all relief. *Id.*

229.     In this Amended Petition, the State's denial of Mr. Thuesen's claims for relief, is often referred to as "Judge Langley's" decision or as his reasoning. This is not to suggest that the final rejection of Mr. Thuesen's claims was the decision of the CCA. Rather, it is to draw attention

---

[13] The only exceptions were Factual Findings 12, 137, the first sentence of 145, sub-claim E of 253, 262, footnote 5, and Conclusions of Law 2 and 60. CCA Decision Dkt. No. 104 at 6.

to decision in which the State's desired outcome are purported to be explained. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (Supreme Court directed a federal habeas court to 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale").

230.   The sole relevant difference between Judge Langley's FFCL and the CCA's decision is that the CCA rejected Judge Langley's conclusion of law 60 ("The only exceptions were Factual Findings 12, 137, the first sentence of 145, sub-claim E of 253, 262, footnote 5, and Conclusions of Law 2 and 60.") CCA Decision Dkt. No. 104 at 6.

## IV.   FEDERAL HABEAS REPRESENTATION DURING THE GLOBAL PANDEMIC

231.   Following the CCA's denial, undersigned federal habeas pro bono counsel began its preparation of Mr. Thuesen's federal habeas petition on June 4, 2020. By this time, the country was already in the midst of the COVID-19 pandemic.

232.   On March 11, 2020, the World Health Organization officially classified a novel strain of coronavirus, COVID-19, as a pandemic. On March 13, 2020, the White House declared a national emergency under Section 319 of the Public Health Service Act, 42 U.S.C. § 247(d) and issued guidance a few days later recommending that, for the next eight weeks, gatherings of ten persons or more be cancelled or postponed.

233.   On March 13, 2020, the Governor of the State of Texas issued a disaster proclamation stating that COVID-19 posed an imminent threat of disaster for all counties in the State of Texas. In each subsequent month, the Governor has issued proclamations renewing the disaster declaration for all Texas counties, with the latest proclamation issued on January 5, 2021.

234.   On March 11, 2020, Harris County issued a Declaration of Local Disaster. On March 13, 2020, the Institutional Division's Polunsky Unit suspended visitation until further notice.

235.     On March 19, 2020, the Commissioner of the Department of State Health Services issued a public health disaster declaration in Texas that prohibited gatherings of more than 10 people. On March 24, 2020, Harris County issued a stay-at-home order.

236.     As of January 15, 2021, the New York Times reported that the State of Texas alone had more than 2.1 million cases, with a daily average of 23,006 new cases per day.

237.     Notwithstanding Mr. Thuesen's and undersigned counsel's reasonable diligence in preparing his federal habeas petition since June 2020, national, state and local emergency responses to the pandemic have prevented counsel from visiting Mr. Thuesen in person as well as impeded their ability to communicate with Mr. Thuesen and others with information relevant to his petition, including investigators, experts, and witnesses. Counsel has also faced difficulty collecting documents and records.

238.     As an example, at least one member of Mr. Thuesen's current defense team and one of their investigators have contracted COVID-19. As a result, their work on this matter has been interrupted and delayed. Because of the pandemic, counsel's consultant and expert witness, Dr. Xenakis, also has been unable to travel, both to work with counsel and to interview Mr. Thuesen.

239.     Pursuant to the Court's scheduling order (Dkt. No. 23) as modified by the Court's order (Dkt. No. 31), Mr. Thuesen files this Amended Petition. The undersigned anticipate the need to file further amended petitions in response to information learned in Evidentiary Hearing(s).

## RELEVANT LEGAL STANDARDS

## I.     STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL

240.     Under *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner seeking to establish the ineffective assistance of trial counsel must show: (1) that counsel's performance was deficient because it fell below "an objective standard of reasonableness," *id*. at 688; and (2) that

the deficient performance prejudiced the defense because there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt with respect to the defendant's guilt or the appropriate punishment, *id*. at 695; *see also Hinton v. Alabama*, 512 U.S. 263, 267 (2014) (prejudice exists because of reasonable probability that new evidence would lead jury to have reasonable doubt about defendant's guilt); *Sears v. Upton*, 561 U.S. 945, 955-56 (2010); *Porter v. McCollum*, 558 U.S. 30, 32 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 538 (2003); *Williams v. Taylor*, 529 U.S. 362, 398 (2000).

241.   To show deficiency, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S at 688. Counsel in a death-penalty case has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. [citations omitted]." *Andrus v. Texas*, 140 S. Ct. 1875, 1880, 207 L. Ed. 2d 335 (2020) "To assess whether counsel exercised objectively reasonable judgment under prevailing professional standards, [the court] first ask[s] 'whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." *Id.* at 1882 (quoting *Wiggins*, 539 U.S. at 523).

242.   In assessing prejudice, a reviewing court considers the effects of more than one deficiency cumulatively. *Dodson v. Stephens*, 611 F. App'x 168, 178-79 (5th Cir. 2015) (unpublished) (assuming that cumulative prejudice analysis is required and collecting cases). In assessing prejudice at the penalty phase of a capital case, a reviewing court must decide if there is a reasonable probability that, but for counsel's deficient performance, at least one juror would have voted for life. *See Wiggins*, 539 U.S. at 537; *Escamilla v. Stephens*, 602 F. App'x 939, 941-42 (5th Cir. 2015); *Ruiz v. Stephens*, 728 F.3d 416, 424 (5th Cir. 2013).

## II.    DUE PROCESS

243.    The Fourteenth Amendment of the United States Constitution protects against deprivation of life, liberty, or property by the State "without due process of law." U.S. Const. amend. XIV, § 1. "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1976) (quoting *Baldwin v. Hale*, 1 Wall. 223, 233 (1863)). "It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner." *Id.* (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

## CLAIMS FOR RELIEF

244.    Each State claim is discussed below. This Court should grant relief for each State claim for the stated reasons. This Court has the power to decide each claim, despite the AEDPA relitigation bar. Accordingly, this Court can, in a *de novo* review, grant relief to Mr. Thuesen.

## I.    TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE GUILT/INNOCENCE PHASE OF TRIAL, IN VIOLATION OF MR. THUESEN'S SIXTH AMENDMENT RIGHTS.

### A.    The Court is not procedurally barred from conducting a *de novo* review of Mr. Thuesen's claim for ineffective assistance of trial counsel related to investigating, developing, preparing, and presenting evidence that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the guilt/innocence phase (State Habeas Claims 1, 2, 3, 4, 7, 14).

245.    For reasons discussed here, trial counsel provided ineffective assistance when they failed to investigate, develop, prepare, and present evidence that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the guilt/innocence phase. Mr. Thuesen requests that the Court evaluate his claim for ineffective assistance of trial counsel *de novo*, without deference to the state court's findings, and grant relief. Mr. Thuesen exhausted his claim (based

on State Habeas Claims 1, 2, 3, 4, 7, and 14), the state court did not adjudicate the claim on the merits, and/or the state court denied Mr. Thuesen relief on the merits based on an unreasonable determination of fact.

### 1.      Claim below: State Habeas Claim 1

246.    To the extent that Mr. Thuesen's claim for ineffective assistance of trial counsel during the guilt/innocence phase is based on theories advanced in State Habeas Claim 1 ("Trial counsel failed to properly develop expert witnesses for Thuesen's trial."), State Habeas at 20, that claim is exhausted. State Habeas Petition, Claim 1. On February 5, 2020, the CCA affirmed Judge Langley's Findings of Fact and Conclusions of Law, denying Mr. Thuesen relief on State Habeas Claim 1. *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). Texas law provides for no additional review of the CCA's decision. Thus, State Habeas Claim 1 is exhausted. *See* 28 U.S.C. § 2254(b)(1).

247.    Further, the AEDPA's relitigation bar, 28 U.S.C. § 2254(d), does not prevent the Court from adjudicating Mr. Thuesen's claim for ineffective assistance of trial counsel during the guilt/innocence phase. The state court failed to decide State Habeas Claim 1 on the merits (*see* § 2254(d)), and/or rejected State Habeas Claim 1 based on an unreasonable determination of fact (*see* § 2254(d)(2)).

#### a)      *The state court failed to decide State Habeas Claim 1 on the merits.*

248.    Section 2254(d), the "relitigation bar," does not apply when the state courts did not adjudicate petitioner's claim on the merits. 28 U.S.C. § 2254(d); *see Johnson v. Williams*, 568 U.S. 289, 302 (2013) ("The language of 28 U.S.C. § 2254(d) makes it clear that this provision applies only when a federal claim was 'adjudicated on the merits in State court.'"); *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999) ("the AEDPA

deference scheme outlined in 28 U.S.C. § 2254(d) does not apply" because claim was not "adjudicated on the merits"). Instead, under these circumstances, the federal habeas court's review is *de novo*. *Cone v. Bell*, 556 U.S. 449, 472 (2009).

249.    The Supreme Court has stated that, in the context of § 2254(d), the word "merits" means "[t]he intrinsic rights and wrongs of a case as determined by matters of substance, in distinction from matters of form." *Williams*, 568 U.S. at 302 (citations omitted). As such, a matter is not "adjudicated on the merits" for purposes of §2254(d) unless it "was heard and [the court] evaluated the evidence and the parties' substantive arguments." *Id.* A claim was not "adjudicated on the merits" if it was "rejected as a result of sheer inadvertence." *Id.*

250.    State courts are presumed to have decided habeas claims on the merits even where no reasoning was provided or only some of the petitioner's claims are addressed expressly. *Richter*, 562 U.S. at 99; *see Williams*, 568 at 298-299; *Woodfox v. Cain*, 772 F.3d 358, 370 (5th Cir. 2014). However, as is the case here, this "presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99-100. Here, the record confirms that the state courts did not adjudicate Mr. Thuesen's IAC claims on the merits, overcoming any contrary presumption.[14]

251.    The state court did not decide State Habeas Claim 1 (and, as a result, the issues that Mr. Thuesen raises in his claim for ineffective assistance of trial counsel during the guilt/innocence

---

[14] In cases where it is "unclear" whether a claim was "adjudicated on the merits" for purposes of §2254(d), the Fifth Circuit applies a "three-part test" wherein the court considers: "(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state courts' opinions suggest reliance upon procedural grounds rather than a determination on the merits." *Woodfox*, 772 F. 3d at 371 (quoting *Mercadel*, 179 F.3d at 275). However, as discussed infra, it is by no means "unclear" that the state court failed to render an adjudication on the merits with respect to Mr. Thuesen's IAC claim. Therefore it is unnecessary to apply this test.

phase) on the merits because the CCA mishandled Judge Bryan's recusal and deprived Mr. Thuesen of Due Process when Judge Langley adjudicated his claims. *See infra* Claims for Relief § IV. *De novo* review is therefore appropriate.

252.   Separately, in State Habeas Claim 1, Mr. Thuesen argued that "trial counsel failed to properly develop expert witnesses for Thuesen's trial." State Habeas Petition, Claim 1. State Habeas Petition at 20. Judge Langley—even if he were properly appointed to hear and adjudicate Mr. Thuesen's claims—did not decide State Habeas Claim 1 *as Mr. Thuesen presented his claim*, and that failure provides the Court with a separate basis to review State Habeas Claim 1 *de novo*. Judge Langley did not decide State Habeas Claim 1 on the merits because the record makes plain that he recast State Claim 1 in rendering his findings, rather than make findings regarding the claim as Mr. Thuesen presented it. "[A] claim is not deemed to have been adjudicated on the merits for purposes of AEDPA where the state court recast the claim as something other than the actual one presented." Brian R. Means, Postconviction Remedies § 29:6 (June 2021 Update); *Brewster v. Hetzel*, 913 F.3d 1042, 1051 (11th Cir. 2019).

253.   Judge Langley decided only that trial counsel presented evidence that Mr. Thuesen suffered from PTSD, i.e., the *existence* of PTSD. He made no findings regarding whether trial counsel developed or presented evidence regarding *the effect* of PTSD. Langley FFCL at 19, ¶ 39 ("[T]rial counsel effectively presented accurate and credible evidence to the jury that applicant *suffered from* PTSD."). This factual determination is both unreasonable and, more to the point, elides the entire basis for Mr. Thuesen's claim and cannot, alone, qualify as an adjudication of Mr. Thuesen's claim on the merits. *See* Brian R. Means, Postconviction Remedies § 29:6 (June 2021 Update); *Brewster*, 913 F.3d at 1051.

254.     Mr. Thuesen argued that his counsel could have, but ineffectively did not, present a PTSD expert (or experts) to testify at the guilt/innocence phase of the trial. As already noted, despite the limited time he had to prepare, Dr. Kopel—a psychologist, PTSD expert, and veteran— a month before trial and without enough time to evaluate Mr. Thuesen in person, *could have* testified about these issues at trial, to Mr. Thuesen's benefit. Notwithstanding the time constraint, Mr. Thuesen argued that Dr. Kopel could have testified that Mr. Thuesen's PTSD crisis, and the time of the shootings, destroyed his *mens rea*.

255.     The failure to present *those opinions* during the guilt/innocence phase, not merely the fact of Mr. Thuesen's PTSD, was the basis for Mr. Thuesen's State Habeas Claim 1.

256.     Because Judge Langley's Findings of Fact and Conclusions of Law demonstrates that he did not address the core of Mr. Thuesen's State Habeas Claim 1 or "evaluate[] the evidence and the parties' substantive arguments" with respect to that claim, he did not adjudicate the claim on the merits. *Williams*, 568 U.S. at 302.

> b)     *The state court denied relief on State Habeas Claim 1 based on unreasonable determinations of fact.*

257.     Even if Judge Langley did adjudicate State Habeas Claim 1 on the merits, Judge Langley denied Mr. Thuesen relief on State Habeas Claim 1 based on unreasonable determinations of fact: that "Applicant [Mr. Thuesen] concedes that trial counsel, William Carter and Michele Esparza, properly investigated Applicant's criminal case and personal background and concluded that Post-Traumatic Stress Disorder ('PTSD') 'would be a central theme in the defendant's case'" (Langley FFCL at 7, ¶ 12), and that trial counsel, William Carter, properly investigated Mr. Thuesen's background and was credible and reliable when he testified that decisions regarding PTSD evidence were based on "distancing the jury from the crime itself" (Langley FFCL at 21, ¶ 41; *see generally id.* at 21-31, ¶¶ 41-43 (citing and adopting large swaths of trial counsel's

testimony regarding State Habeas Claim 1)). The first involves a purported concession about the quality of trial counsel's investigation that was nowhere in the record, and the second involves a determination that necessarily ignores the bulk of the record.

258. **Judge Langley unreasonably determined that Mr. Thuesen conceded that trial counsel had properly investigated and developed Mr. Thuesen's defense.** Judge Langley unreasonably relied on a manufactured concession. The record shows that Mr. Thuesen *did* dispute that trial counsel "properly investigated" his case and, in particular, his PTSD. The evidence shows that trial counsel's investigation was deficient, last-minute, and unreasonably limited. Judge Langley miscited Mr. Thuesen's state habeas application, which explained that trial counsel *knew enough to know to investigate PTSD and failed to conduct the investigation.* Indeed, Judge Langley cites a portion of Mr. Thuesen's application in which he argues that trial counsel's failure to present proper PTSD evidence—their decision to "rob Thuesen of the most powerful evidence that could have been presented on his behalf and in his defense"—was "based on an incomplete investigation." Langley FFCL at 7, ¶ 12. Judge Langley relied on an unreasonable determination of fact; the determination relies on a misstatement of the record. *Wiggins*, 539 U.S. at 528.

259. **Judge Langley unreasonably determined that that trial counsel properly investigated Mr. Thuesen's background.** That finding ignores the bulk of the record before Judge Langley, rendering it unreasonable. The evidence showed that trial counsel did not properly investigate his background:

- The evidence showed that trial counsel's investigation was deficient, last-minute, and unreasonably limited. *See supra* Procedural History, section II.C *supra*.

- The first 12 months of the investigation did not involve engaging or working with mental health experts. *See* ¶¶ 141-58.

- Trial counsel only first reached out to Dr. Saunders for help with mitigation in February 2010 (the month before voir dire began). *See supra* ¶ 149.

- Trial counsel contacted Dr. Kopel (the only PTSD expert they even considered calling) late. "With little more than a month before trial, defense counsel decided to abandon the use of Dr. Detwiler. Instead, trial counsel turned to the expert previously recommended by Dr. Saunders: Dr. Kenneth Kopel, a licensed psychiatrist and former military veteran. **Dr. Kopel was contacted by defense counsel in April 2010, a mere month before trial [and _during_ voir dire]**, and asked to evaluate Thuesen for PTSD, as well as to evaluate the medical and mental health care Thuesen received through the VA system." _See supra_ ¶ 155.

- However, counsel pulled back from fully developing PTSD as a theme, out of the belief that PTSD's symptoms of anger and outbursts would appear scary and dangerous to a jury. Mired by this fear, **counsel failed to adequately research the issue of PTSD and secure expert assistance in developing this theme.** Had counsel done so, they would have realized that their fears were unfounded. _See supra_ ¶¶ 141-158.

- Mr. Thuesen's state habeas attorney, Ms. Lepingwell, stated in open court, to Judge Langley, that trial counsel's investigation of Mr. Thuesen's criminal case was improper and deficient: "We're not saying that trial counsel in this case didn't do anything. They did. They put on an expert. They put on lay witnesses. What we're saying is that due to their failure to investigate they presented only the tip of the iceberg of the information that was out there relating to John's military background and his PTSD and how that impacted him at the time of the crime." January 14, 2019 RR 6.

- Ms. Lepingwell went on to explain that, "John's story had the power to change minds, if the truth had been told; but it wasn't because it was never investigated. . . . They hadn't investigated the evidence they needed to present in a way that not only got him convicted of capital murder but also sentenced to death." January 14, 2019 RR 8.

- Further, at the second Texas habeas hearing, Mr. Thuesen's counsel argued "[T]he State was able to play on common misperceptions about PTSD, **misperceptions that trial counsel wasn't able to refute because they didn't have the evidence**." January 14, 2019 RR 8. One of those common misperceptions embraced by the State that trial counsel was unable to contradict was that those with PTSD suffer "flashbacks." **"[Trial counsel] never investigated PTSD to have this information to be able to put in front of the jury to rebut those arguments**, one being that flashbacks are something that is a sign of PTSD. And that's what was argued . . . that this wasn't PTSD because John didn't have a flashback." January 14, 2019 RR 59.

260.    The record before Judge Langley showed that trial counsel did not adequately investigate, develop, and prepare expert witnesses. As but one example, trial counsel did not meet with Dr. Kopel, the PTSD expert, to discuss what Der. Kopel had concluded from his investigation or any potential testimony until May 22, 2010. Langley FFCL at 36, ¶ 57. At that point, "Applicant

had already been found guilty." *Id.*; *see also* 2 HR at 83-84, 92-93; 4 HR at 141-42 ("After sending Dr. Kopel records to review, trial counsel drove to Houston on Saturday, May 22, 2010, to meet personally with Dr. Kopel for the first time. The punishment phase of Thuesen's trial was already underway.").

261.    Accordingly, trial counsel's preparation was inadequate, and it was unreasonable for Judge Langley to find otherwise. *Guidry v. Dretke*, 397 F.3d 306, 326-27 (5th Cir. 2005) ("Consistent with this scheme, and pursuant to subpart (e)(1), the district court did not accept the state court's determinations of fact because the trial court made no findings on considerable evidence critical to Guidry's claim. Consequently, under subpart (d)(2), the district court concluded the trial court's decision 'was based on an unreasonable determination of the facts").

262.    And even further, the comparison between Judge Langley's fact and the facts found by the trial judge (Judge Bryan) sitting as a habeas judge, shows that there is yet an additional reason to find Judge Langley's fact unreasonable.

263.    Notably, Judge Bryan—who had the advantage over Judge Langley of presiding at trial—found a fact that directly contradicts Judge Langley's fact: "Despite the numerous indications that PTSD was a central component in Thuesen's case, and the suggestions by several mental health professionals that counsel present testimony from a PTSD expert, counsel did not secure the assistance of an expert witness or witnesses qualified to explain the mitigating impacts of PTSD." Bryan FFCL ¶ 69. Judge Bryan recognized trial counsel's need for expert assistance. And, in light of his finding that "[c]ounsel did not begin an investigation into the basis for Thuesen's PTSD, or consult potential avenues for developing PTSD evidence until the months leading up to trial," (Bryan FFCL ¶ 62), he understood that trial counsel's preparation was

inadequate. This factual finding is opposite from Judge Langley's determination, further highlighting the unreasonableness of Judge Langley's determination.

264. Judge Langley's finding recited at 7, ¶ 12, that Mr. Thuesen's counsel admitted that trial counsel properly investigated any part of the matter is objectively unreasonable.

265. For the reasons stated above, the relitigation bar of the AEDPA does not apply to State Habeas Claim 1, and this Court can decide the claim's merits *de novo*.

## 2.      Claim below: State Habeas Claim 2

266. To the extent that Mr. Thuesen's claim for ineffective assistance of trial counsel during the guilt/innocence phase is based on theories advanced in State Habeas Claim 2 ("Trial counsel failed to effectively present expert testimony at the guilt phase regarding Thuesen's intent."), State Habeas at 29, that claim is exhausted. State Habeas Petition, Claim 2. On February 5, 2020, the CCA affirmed Judge Langley's Findings of Fact and Conclusions of Law, denying Mr. Thuesen relief on State Habeas Claim 2. *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). Texas law provides for no additional review of the CCA's decision. Thus, State Habeas Claim 2 is exhausted. *See* 28 U.S.C. § 2254(b)(1).

267. Further, the AEDPA's relitigation bar, 28 U.S.C. § 2254(d), does not prevent the Court from adjudicating Mr. Thuesen's claim for ineffective assistance of trial counsel during the guilt/innocence phase. The state court failed to decide State Habeas Claim 2 on the merits (*see* § 2254(d)), and/or rejected State Habeas Claim 2 based on an unreasonable determination of fact (*see* § 2254(d)(2)).

> a)      *The state court failed to decide State Habeas Claim 2 on the merits.*

268. The state court did not decide State Habeas Claim 2 (and, as a result, the issues that Mr. Thuesen raises in his claim for ineffective assistance of trial counsel during the guilt/innocence

phase) on the merits because the CCA mishandled Judge Bryan's recusal and deprived Mr. Thuesen of Due Process when Judge Langley adjudicated his claims. *See infra* Claims for Relief § IV. *De novo* review is therefore appropriate.

269.    Separately, Judge Langley did not decide State Habeas Claim 2 on the merits for the same reason that he did not reach State Habeas Claim 1 on the merits: he did not adjudicate Mr. Thuesen's claim *as he presented it*. *See* Brian R. Means, Postconviction Remedies § 29:6 (June 2021 Update) ("[A] claim is not deemed to have been adjudicated on the merits for purposes of AEDPA where the state court recast the claim as something other than the actual one presented."); *Brewster*, 913 F.3d at 1051; *see also Williams*, 568 U.S. at 302.

270.    Judge Langley imported his State Habeas Claim 1 findings to deny Mr. Thuesen relief on Claim 2. As with respect to Claim 1, Judge Langley improperly focused on whether trial counsel presented the *fact* of PTSD to the jury, rather that the *effect* of PTSD on Mr. Thuesen. *See supra* Claims for Relief § I.A.1. *See* Langley FFCL at 33 ¶ 48; 31, ¶ 44; *see also id*. at 8-13 ¶¶ 14-26; 15-31 ¶¶ 29-43. That constitutes a failure by Judge Langley to adjudicate the claim on the merits.

> b)    *The state court denied relief on State Habeas Claim 2 based on an unreasonable determination of fact.*

271.    Even if Judge Langley did adjudicate State Habeas Claim 2 on the merits, Judge Langley denied Mr. Thuesen relief on State Habeas Claim 2 based on an unreasonable determination of fact: that "[t]rial counsel's decision not to call Dr. Kopel was sound trial strategy." Langley FFCL at 44, ¶ 75. The purported strategy was that trial counsel must present a defense but not (1) alienate the jury, (2) make Mr. Thuesen out to be a "ticking time bomb," and (3) discredit other defenses. "Kopel's opinion, that PTSD caused Applicant to be 'on fight-or-flight automatic pilot' after Ms. Joiner tried to run away, would have alienated a jury, made Applicant out to be a

ticking time bomb and discredited any remaining defensive theory." Langley FFCL at 44, ¶ 75; *see also id.* at 155, ¶ 17.

272.    This determination is objectively unreasonable for a number of reasons, *central to which is that the record confirms that the purported strategy did not exist at the time of trial*. Trial counsel's contemporaneous notes established that the putative strategy did not exist in time for use at the guilt/innocence phase, or even at the punishment phase.

273.    A review of the timeline of trial counsel's knowledge shows that they—because of their inadequate investigation—did not have the stated strategy (or indeed any strategy) because they did not have even a rudimentary understanding of the effects of PTSD on the thought processes of the people who suffer from it. More explicitly, with respect to guilt/innocence, trial counsel did not know about the effects of PTSD, and about how a PTSD fight-or-flight crisis could destroy the ability of forming the requisite *mens rea* during a crisis.

274.    Just three days before voir dire commenced on March 29, 2010, trial counsel received an email from John Niland of the Texas Defender Service, who assisted the trial team. Niland was not just an incidental observer. He was, according to Michele Esparza, a person with "day in and day out" death penalty experience on whom she relied in preparing for trial. 5 HR at 195-96.

275.    Niland's email admits that the trial counsel and their team did not have a theory of how PTSD affected Mr. Thuesen's intent. It reads, with respect to guilt, "How did this PTSD impact the commission of the crime? We don't know."

verizon | MyVerizon | ... 0 | Verizon Message Center • Re: Family dynamic in Theusen

*veri_on*
**Verizon Message Center**

Friday, Mar 26 at 4:49 PM

**From:**"John Niland" <jniland@texasdefender.org>

**To:**"Gerald Byington" GLByington@gmail.com, "Billy Carter" wfcarter73@yahoo.com, mpesparza1@verizon.net , "Michael Gottlieb" mcgottlieb@juno.com

**Cc:**"John Niland" , "Robin Conley"

**Subject:**Re: Family dynamic in Theusen

Folks, here are some ideas based upon our discussion. Please feel free to slice and dice this to your heart's content, but I think it is a start on working theories for both phases. Let's make sure that the theories work seamlessly together. I would suggest you stay away with the personality disorders including borderline as I see this doing no good.

CULPABILITY PHASE

1. It was not his conscious objective or desire to cause her death nor was he reasonably certain that his actions would cause her death. *Jackson v. State*, 160 S.W.3d 568 (Tex.Crim.App. 2005). He wanted her to stop so he could talk to her. [This may be a stretch, but I would rather have the jurors talking about what his state of mind was rather than some of the more unseemly aspects of the case.

    The brother, not so sure, plausible imprefect self defense.

    (a) This was an impulsive act - the camping out at her apartment was not "laying in wait" because if it was, he would have shot her as soon as she came in. He would not have talked to her. (I had an identical case with a female who waited in her boyfriend's apartment. She went there to "commit suicide" but the psychologist suggested that she actually wanted him to talk her out of killing herself as a sign of his love and acceptance - "I        take back my rejection of you".

    (b) the 911 call is proof of that he did not want her to die. Not many of our clients (i) call 911 and (ii) try to save the life of the victim.

    (c) his crying and remorse shown while giving his confession is evidence of his true feelings.

    (d) the police were concerned about his mental state.

2. He suffers from PTSD from/or exacerbated by the military service - How did this PTSD impact the commission of the crime? We don't now know, but the each juror needs to hear this so that they can understand the condition of his        mind (TCCP Art. 38.36). Each needs to hear everything about him before making such an important decision.

    (a) He was being treated for PTSD by military therapists;

    (b) He was on the wrong meds. How did this impact the event? We don now know for sure, but .....

3. He was drinking at the time of each troublesome episode in his life.

STATE'S
EXHIBIT
____ # 2
____ 6-9-14

https://mail.verizon.com/webmail/public/print.jsp?wid=vz_widget_Ma...20Center%20-%20Re%3A%20Family%20dynamic%20in%20Theusen&1.1.20.28.7        Page 1 of 4

w

276.    The only permissible conclusion is that Judge Langley's purported fact that trial counsel had a strategy that counselled against presenting a PTSD-based defense with respect to intent was erroneous. And, because Mr. Niland's email was in evidence in front of Judge Langley, his determination that trial counsel had a strategy on how to deal with the effects of Mr. Thuesen's PTSD is unreasonable.

277.    In addition, Judge Langley's finding is unreasonable because it relies on improper hindsight bias. According to Judge Langley, trial counsel made a strategic choice not to call Dr. Kopel—the only PTSD expert trial counsel even considered calling—because "counsel agreed that Kopel 'got beat up on the guilt issue pretty badly the other day' [i.e., during the evidentiary hearing] and *should not have been used during the guilt-innocence phase, after hearing his proposed testimony*." Langley FFCL at 39, ¶ 64.

278.    But, of course, trial counsel did not talk to Dr. Kopel until after the guilt-innocence phase was concluded. Mr. Thuesen's trial began on March 29, 2010. Trial counsel only retained Dr. Kopel a month later, April 27, 2010—and at that point only sent Dr. Kopel records to review. 4 HR at 140. Even worse, trial counsel did not meet with Dr. Kopel or discuss proposed testimony until May 22, 2010. Langley FFCL at 36, ¶ 57. At that point "Applicant had already been found guilty and [trial counsel] only intended to use Kopel during punishment." *Id.*; *see also* 2 HR at 83-84, 92-93; 4 HR at 141-42 ("After sending Dr. Kopel records to review, trial counsel drove to Houston on Saturday, May 22, 2010, to meet personally with Dr. Kopel for the first time. The punishment phase of Thuesen's trial was already underway.").

279.    As Judge Langley acknowledges, "Hindsight analysis is not permitted in determining whether trial strategy was sound. *See United States v. Mullins*, 315 F.3d 449, 456 fn. 24 (5th Cir. 2002); *Miniel v. State*, 831 S.W.2d 310, 323 (Tex. Crim. App.), *cert. denied*, 506 U.S.

81

885 (1992) (stressing need to avoid 'distorting effects of hindsight')." Langley FFCL at 149, ¶ 5. Judge Langley's improper application of hindsight notwithstanding, trial counsel's decision making must be measured by what trial counsel knew at the time they made those decisions. It is objectively unreasonable to conclude that counsel made an informed, strategic decision about whether to offer relevant expert testimony during the guilt-innocence phase when counsel did not speak with the proposed expert and hear the proposed testimony until after the guilt-innocence phase had ended.

280.    For the reasons stated above, the relitigation bar of the AEDPA does not apply to State claim 2, and this Court can decide the claim's merits *de novo*.

### 3.    Claim below: State Habeas Claim 3

281.    To the extent that Mr. Thuesen's claim for ineffective assistance of trial counsel during the guilt/innocence phase is based on theories advanced in State Habeas Claim 3 ("Trial counsel failed to effectively present evidence of PTSD at the guilt/innocence phase of trial."), State Habeas at 39, that claim is exhausted. State Habeas Petition, Claim 3. On February 5, 2020, the CCA affirmed Judge Langley's Findings of Fact and Conclusions of Law, denying Mr. Thuesen relief on State Habeas Claim 3. *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). Texas law provides for no additional review of the CCA's decision. Thus, State Habeas Claim 3 is exhausted. *See* 28 U.S.C. § 2254(b)(1).

282.    Further, the AEDPA's relitigation bar, 28 U.S.C. § 2254(d), does not prevent the Court from adjudicating Mr. Thuesen's claim for ineffective assistance of trial counsel during the guilt/innocence phase. The state court failed to decide State Habeas Claim 3 on the merits (*see* § 2254(d)), and/or rejected State Habeas Claim 3 based on an unreasonable determination of fact (*see* § 2254(d)(2)).

a)      *The state court failed to decide State Habeas Claim 3 on the*
*merits.*

283.    The state court did not decide State Habeas Claim 3 (and, as a result, the issues that

Mr. Thuesen raises in his claim for ineffective assistance of trial counsel during the guilt/innocence

phase) on the merits because the CCA mishandled Judge Bryan's recusal and deprived Mr.

Thuesen of Due Process when Judge Langley adjudicated his claims. *See infra* Claims for Relief

§ IV. *De novo* review is therefore appropriate.

284.    Separately, like State Habeas Claims 1 and 2, Judge Langley denied State Habeas

Claim 3 based on a mischaracterization of the claim, meaning there was no determination on the

merits. *See* Brian R. Means, Postconviction Remedies § 29:6 (June 2021 Update) ("[A] claim is

not deemed to have been adjudicated on the merits for purposes of AEDPA where the state court

recast the claim as something other than the actual one presented."); *Brewster*, 913 F.3d at 1051;

*see also Williams*, 568 U.S. at 302.

285.    For State Habeas Claim 3, Judge Langley yet again readopted his findings that trial

counsel presented evidence regarding the *existence* of Mr. Thuesen's PTSD, while failing to make

findings regarding the effect. Langley FFCL at 41, ¶ 67 ("[Mr. Thuesen] argues that Saunders was

not a PTSD expert and that Dr. Carlo and Ms. Cannon did not offer substantial support that

Applicant suffered from PTSD.").

286.    But, as with State Habeas Claims 1 and 2, that is not the crux of Mr. Thuesen's

State Habeas Claim 3. Rather, like State Habeas Claims 1 and 2, State Habeas Claim 3 challenged

the failure to present evidence on the *effect* of PTSD.

287.    But by characterizing State Habeas Claim 3 so narrowly (and incorrectly), this

avoided the issue of whether trial counsel had presented *any* evidence about the effects on PTSD

on Mr. Thuesen's behavior. Judge Langley's failure to grapple with the claim Mr. Thuesen actually made means he failed to render a determination on the merits.

>   b)   *The state court denied relief on State Habeas Claim 3 based on unreasonable determinations of fact.*

288.   Even if Judge Langley did adjudicate State Habeas Claim 3 on the merits, Judge Langley denied Mr. Thuesen relief on State Habeas Claim 3 based on unreasonable determinations of fact: that "trial counsel's decision to admit PTSD during the guilt-innocence phase through the testimony of Dr. Roger Saunders, Dr. Ismael Carlo and Teresa Cannon was based on a **thorough investigation** and was based on **reasonable trial strategy**." Langley FFCL at 155-156, ¶ 20.

289.   As established above with respect to State Habeas Claims 1 and 2, *supra*, no reasonable investigation regarding how PTSD affected Mr. Thuesen was ever performed. What trial counsel knew at the time of voir dire and the guilt/innocence phase of Mr. Thuesen's trial was a pale shadow of what they could have learned from Dr. Kopel had they spoken with Dr. Kopel regarding Mr. Thuesen's claims before the end of the guilt-innocence phase. *See* ¶¶ 155, 141-158, 257-264. As discussed above with respect to State Habeas Claim 1, the differences between the evidence Dr. Kopel could have offered about PTSD and what was offered was immense. Dr. Kopel addressed Mr. Thuesen's PTSD fight-or-flight crisis and its effect on his behavior, while the witnesses who did testify did not address those issues. *See* ¶¶ 248-267, 273-280.

290.   As similarly discussed regarding State Habeas Claim 2, trial counsel had no reasonable strategy about how to deal with PTSD. They had no understanding of the effects of PTSD on Mr. Thuesen's behavior, so they could not have had a reasonable strategy for handling PTSD at the guilt/innocence phase of Mr. Thuesen's trial. *See* ¶¶ 248-267, 271-279.

291.   For the reasons stated above, the relitigation bar of the AEDPA does not apply to State claim 3, and this Court can decide the claim's merits *de novo*.

### 4.      Claim below: State Habeas Claim 4

292.      To the extent that Mr. Thuesen's claim for ineffective assistance of trial counsel during the guilt/innocence phase is based on theories advanced in State Habeas Claim 4 ("Trial counsel failed to adequately prepare and rehabilitate one of their expert witnesses [Dr. Saunders]."), State Habeas at 48, that claim is exhausted. State Habeas Petition, Claim 4. On February 5, 2020, the CCA affirmed Judge Langley's Findings of Fact and Conclusions of Law, denying Mr. Thuesen relief on State Habeas Claim 4. *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). Texas law provides for no additional review of the CCA's decision. Thus, State Habeas Claim 4 is exhausted. *See* 28 U.S.C. § 2254(b)(1).

293.      Further, the AEDPA's relitigation bar, 28 U.S.C. § 2254(d), does not prevent the Court from adjudicating Mr. Thuesen's claim for ineffective assistance of trial counsel during the guilt/innocence phase. The state court failed to decide State Habeas Claim 4 on the merits (*see* § 2254(d)), and/or rejected State Habeas Claim 4 based on an unreasonable determination of fact (*see* § 2254(d)(2)).

>     a)      *The state court failed to decide State Habeas Claim 4 on the merits.*

294.      The state court did not decide State Habeas Claim 4 (and, as a result, the issues that Mr. Thuesen raises in his claim for ineffective assistance of trial counsel during the guilt/innocence phase) on the merits because the CCA mishandled Judge Bryan's recusal and deprived Mr. Thuesen of Due Process when Judge Langley adjudicated his claims. *See infra* Claims for Relief § IV. *De novo* review is therefore appropriate.

295.      Separately, as with the first three State Habeas Claims, Judge Langley denied State Habeas Claim 4 based on a mischaracterization of the claim, meaning there was no determination on the merits. *See* Brian R. Means, Postconviction Remedies § 29:6 (June 2021 Update) ("[A]

claim is not deemed to have been adjudicated on the merits for purposes of AEDPA where the state court recast the claim as something other than the actual one presented."); *Brewster*, 913 F.3d at 1051; *see also Williams*, 568 U.S. at 302.

296.     Thus, with regard to State Habeas Claim 4, Judge Langley yet again readopted his findings that trial counsel presented evidence regarding the *existence* of Mr. Thuesen's PTSD, while failing to make findings regarding the effect. *See* Langley FFCL at 42 ¶ 71; 31, ¶ 44; *see also id.* at 8-13 ¶¶ 14-26; 15-31 ¶¶ 29-43. That, again, constitutes a failure to determine the claim on the merits.

> b)     *The state court denied relief on State Habeas Claim 4 based on unreasonable determinations of fact.*

297.     Even if Judge Langley did adjudicate State Habeas Claim 4 on the merits, Judge Langley denied Mr. Thuesen relief on State Habeas Claim 4 based on unreasonable determinations of fact: that "[a]pplicant has not proven that counsel was ineffective when it decided to present evidence *of* PTSD through the testimony of Dr. Roger Saunders" and "that counsel extensively prepared Sanders to testify." Langley FFCL at 156, ¶ 23.

298.     **First, Langley (unreasonably) assumed that merely "present[ing] evidence of PTSD" was sufficient for trial counsel to perform effectively with respect to Mr. Thuesen's intent.** As discussed, the extensive record confirmed that it was certain *effects of PTSD*, and the ability of these effects during a PTSD fight-or-flight crisis to destroy Mr. Thuesen's intent, that mattered. What mattered was not merely *whether* Mr. Thuesen had PTSD. Not a shred of Judge Langley's analysis, nor the facts he found to deny relief on Claim 4, address the issues that matter.

299.     **Second, Judge Langley unreasonably determined that trial counsel extensively prepared Dr. Saunders to testify.** The record reveals the opposite—that trial counsel failed to "prepare [Dr. Saunders] effectively on the issues that matter[ed]" to the guilt/innocence phase,

namely whether Mr. Thuesen's PTSD precluded him from forming the requisite intent. Although the record shows that Dr. Saunders talked extensively with trial counsel, there is no evidence in the record before Judge Langley showing that trial counsel ever prepared Dr. Saunders to discuss how PTSD would affect Mr. Thuesen's ability to form the requisite intent. In fact, the evidence of the State's Writ 2 Exhibit (discussed above at ¶ 275) confirms that trial counsel was ignorant of this topic just a few days before voir dire began. Accordingly, it was unreasonable for Judge Langley to conclude that trial counsel prepared Dr. Saunders.

300.   For the reasons stated above, the relitigation bar of the AEDPA does not apply to State Habeas Claim 4, and this Court can decide the claim's merits *de novo*.

### 5.   Claim below: State Habeas Claim 7

301.   To the extent that Mr. Thuesen's claim for ineffective assistance of trial counsel during the guilt/innocence phase is based on theories advanced in State Habeas Claim 7 ("Trial counsel was ineffective for failing to present evidence that Thuesen was never diagnosed or treated for PTSD"), State Habeas at 101, that claim is exhausted. State Habeas Petition, Claim 7. On February 5, 2020, the CCA affirmed Judge Langley's Findings of Fact and Conclusions of Law, denying Mr. Thuesen relief on State Habeas Claim 7. *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). Texas law provides for no additional review of the CCA's decision. Thus, State Habeas Claim 7 is exhausted. *See* 28 U.S.C. § 2254(b)(1).

302.   Further, the AEDPA's relitigation bar, 28 U.S.C. § 2254(d), does not prevent the Court from adjudicating Mr. Thuesen's claim for ineffective assistance of trial counsel during the guilt/innocence phase. The state court failed to decide State Habeas Claim 7 on the merits (*see* § 2254(d)), and/or rejected State Habeas Claim 7 based on an unreasonable determination of fact (*see* § 2254(d)(2)).

a)      *The state court failed to decide State Habeas Claim 7 on the merits.*

303.     The state court did not decide State Habeas Claim 7 (and, as a result, the issues that Mr. Thuesen raises in his claim for ineffective assistance of trial counsel during the guilt/innocence phase) on the merits because the CCA mishandled Judge Bryan's recusal and deprived Mr. Thuesen of Due Process when Judge Langley adjudicated his claims. *See infra* Claims for Relief § IV. *De novo* review is therefore appropriate.

304.     Separately, once again, Judge Langley denied State Habeas Claim 7 based on a mischaracterization of the claim, meaning there was no determination on the merits. *See* Brian R. Means, Postconviction Remedies § 29:6 (June 2021 Update) ("[A] claim is not deemed to have been adjudicated on the merits for purposes of AEDPA where the state court recast the claim as something other than the actual one presented."); *Brewster*, 913 F.3d at 1051; *see also Williams*, 568 U.S. at 302.

305.     Judge Langley characterized State Habeas Claim 7 as follows:

> Applicant argues that counsel was ineffective because they never "fully reviewed the military records in their possession, [and] they would have noted that neither Dr. Carlo nor any other VA medical professional had ever diagnosed [Applicant] with PTSD.["]

Langley FFCL 68, ¶ 123. The language is quoted correctly, but Judge Langley (and the State) has mischaracterized Mr. Thuesen's argument by representing that the quotation is the heart of Claim 7.

306.     It is not. Mr. Thuesen argued not the particular failure of trial counsel to review VA documents, but the failure of trial counsel to *present evidence during the guilt/innocence phase* showing that Mr. Thuesen was never properly diagnosed with PTSD by the VA, and as a result never received proper treatment.

307.    For example, Dr. Kopel was able to deduce from the VA records that Mr. Thuesen was receiving "only nominal care" from the VA, and that he "was not receiving adequate care for that PTSD." State Habeas Petition at 110-111. Even Dr. Carlo recognized that. *Id.* at 111 ("The treatment [Mr. Thuesen] received . . . were designed to impact his suicidal thoughts and depression, and is not how I would treat PTSD."). But neither testified at trial, and the state court did not recognize that distinction.

308.    Indeed, instead of recognizing the distinction, Judge Langley doubled down on his previous errors. "The Court adopts its findings to Claim One and reiterates that trial counsel conducted a thorough investigation into Applicant's medical history and background and *presented evidence that Applicant suffered from PTSD*." Langley FFCL at 68, ¶ 124.

309.    The state court's failure to grapple with the actual claims raised means that no adjudication on the merits was made, permitting this Court to decide the issue *de novo*.

> b)    *The state court denied relief on State Habeas Claim 7 based on an unreasonable determination of fact.*

310.    Even if Judge Langley did adjudicate State Habeas Claim 7 on the merits, Judge Langley denied Mr. Thuesen relief on State Habeas Claim 7 based on an unreasonable determination of fact: that "trial counsel conducted a thorough investigation into Applicant's medical history and background." Langley FFCL at 160, ¶ 34.

311.    Indeed, the evidence pointed *only* in a single direction—that trial counsel conducted a deficient investigation into Mr. Thuesen's medical history. Judge Bryan, the first state habeas judge, noted that it was precisely this failure that led to trial counsel presenting erroneous testimony that Mr. Thuesen had been treated for PTSD when he had not been. "Had counsel fully reviewed the records in their possession, they would have noted (and could have presented evidence) that despite Thuesen's consistent report of PTSD symptoms, neither Dr. Carlo nor any other VA

medical professional had ever actually diagnosed Thuesen with PTSD or provided proper treatment." Bryan FFCL ¶ 156.

312.    In support of the opposite conclusion, Judge Langley points only to statements by trial counsel that they believe they read the medical records:

> Mr. Carter:
>
> Q. There's an allegation within that that you didn't fully review his military records. Did you fully review John Thuesen's military record?
>
> A. I think Ms. Esparza and I fully reviewed everything.
>
> Q. The concept that you didn't -- when you reviewed the records, did you ever find a specific place where the VA or VA hospital diagnosed him with PTSD? I know you talked to Ms. Crawford about this but –
>
> A. There was a place, if I remember, in the records where they had asked him some questions. They asked about PTSD, and his answers to me indicated that he had PTSD, you know. But, you know, from what Ms. Cannon was saying, it looked like somebody had diagnosed him with PTSD from the VA, so.

Langley FFCL at 68-69, ¶ 125.

> Ms. Esparza:
>
> The other part of Claim 7 is that there is a claim you failed to fully review the military records; is that a fair statement?
>
> A. The military records?
>
> Q. Yes, his VA records, did you review those records?
>
> A. I reviewed those records.

Langley FFCL at 69-70, ¶ 126.

313.    These statements say so little. Nothing in them refers to trial counsel finding any record of the VA treating Mr. Thuesen for PTSD. Nothing in these statements refer to trial counsel

using any expert to help them decipher the VA records. And, Mr. Carter's reliance on Ms. Cannon to conclude that "somebody" had diagnosed Mr. Thuesen with PTSD is just wrong because Ms. Cannon was wrong.[15]

314.    Thus, these facts determined by Judge Langley do not dispute that trial counsel's presentation actually obscured evidence that Mr. Thuesen was never properly diagnosed or treated by the VA system for his PTSD.

315.    Accordingly, Judge Langley's findings, such as they were, were objectively unreasonable, which further establishes that the AEDPA's relitigation bar does not apply to this claim.

**6.    Claim below: State Habeas Claim 14**

316.    To the extent that Mr. Thuesen's claim for ineffective assistance of trial counsel during the guilt/innocence phase is based on theories advanced in State Habeas Claim 14 ("Trial counsel was ineffective in the selection and presentation of certain lay witness testimony"), that claim is exhausted. State Habeas Petition, Claim 14. On February 5, 2020, the CCA affirmed Judge Langley's Findings of Fact and Conclusions of Law, denying Mr. Thuesen relief on State Habeas Claim 14. *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). Texas law provides for no additional review of the CCA's decision. Thus, State Habeas Claim 14 is exhausted. *See* 28 U.S.C. § 2254(b)(1).

---

[15] Ms. Cannon was unable able to determine that Mr. Thuesen was likely suffering from PTSD. State Habeas Petition at 44-45 ("She never received any medical records from the VA system, including past diagnoses, treatment history, or mental health assessments. (Id.) Further, Ms. Cannon had herself never diagnosed Mr. Thuesen with PTSD, as she was unqualified to do so. As a social worker, Ms. Cannon cannot diagnose or prescribe treatment of patients. (Ex. 3 at ¶9 [Aff. of Teresa Cannon].)").

317.    Further, the AEDPA's relitigation bar, 28 U.S.C. § 2254(d), does not prevent the Court from adjudicating Mr. Thuesen's claim for ineffective assistance of trial counsel during the guilt/innocence phase. The state court failed to decide State Habeas Claim 14 on the merits (*see* § 2254(d)), and/or rejected State Habeas Claim 14 based on an unreasonable determination of fact (*see* § 2254(d)(2)).

> a)    *The state court failed to decide State Habeas Claim 14 on the merits.*

318.    The state court did not decide State Habeas Claim 14 (and, as a result, the issues that Mr. Thuesen raises in his claim for ineffective assistance of trial counsel during the guilt/innocence phase) on the merits because the CCA mishandled Judge Bryan's recusal and deprived Mr. Thuesen of Due Process when Judge Langley adjudicated his claims. *See infra* Claims for Relief § IV. *De novo* review is therefore appropriate.

> b)    *The state court denied relief on State Habeas Claim 14 based on unreasonable determinations of fact.*

319.    Even if Judge Langley did adjudicate State Habeas Claim 14 on the merits, Judge Langley denied Mr. Thuesen relief on State Habeas Claim 14 based on an unreasonable determination of fact: Judge Langley unreasonably determined that trial counsel's decision not to call Janet Walker as a witness during the guilt phase was a strategic or tactical decision, despite the testimony of Ms. Esparza to the contrary; Judge Langley unreasonably determined that trial counsel did not call Ms. Walker out of a fear that she would be impeached, despite the testimony of Ms. Esparza to the contrary and Ms. Walker's firm testimony in response to such impeachment during the penalty phase of the trial; and Judge Langley unreasonably determined that trial counsel did not call Ms. Walker out of a fear that her testimony would discredit Dr. Saunders, despite no such testimony from Ms. Esparza and the fact that Ms. Walker's testimony actually supported Dr. Saunders' testimony.

320.    Regarding the first unreasonable determination, Judge Langley erroneously concluded that trial counsel's decision in failing to call Ms. Walker as a witness during the guilt phase of Mr. Thuesen's trial "was an objectively reasonable, strategic or tactical decision by trial counsel." Langley FFCL at 165, ¶¶ 50-51.

321.    This finding is contradicted by the evidence. In reality, Ms. Esparza testified that she could not remember why trial counsel failed to call Ms. Walker as a witness during the guilt phase of Mr. Thuesen's trial. 5 HR at 231. Further, Ms. Esparza admitted that she made a mistake by failing to call Ms. Walker at the guilt phase of Mr. Thuesen's trial. 5 HR at 230. Thus, the evidence discussed by Judge Langley does not establish any reasonable strategic or tactical decision—in fact, it establishes the absence of any such justification. It was unreasonable for Judge Langley to find that trial counsel made a reasonable strategic or tactical decision when trial counsel testified that she should have called Ms. Walker as a witness at the guilt phase and could not remember what basis she might have had for not doing so.

322.    Turning to the second reason Judge Langley's determination was unreasonable, he determined that, "had defense counsel brought Janet Walker to testify that Applicant did not make the statement in question to her, she would have been cross-examined and discredited with the fact that Applicant admitted to making the statement to police immediately after the offense[.]" Langley FFCL at 121, ¶ 225.

323.    However, Ms. Esparza's testimony contradicted Judge Langley's determination that trial counsel avoided calling Ms. Walker due to concerns about impeachment. When specifically asked about the possibility of such impeachment, Ms. Esparza disagreed that she thought Ms. Walker could be impeached, testifying "I think Janet would have remembered if he [Mr. Thuesen] said that." Langley FFCL at 121, ¶ 224.

324.     Judge Langley's concern about impeachment was based on hindsight. Regardless of whether Judge Langley believed that Ms. Walker could be impeached, the testimony Judge Langley cited actually establishes that *trial counsel* was not concerned about impeachment at the time that trial counsel made the decision not to call Ms. Walker. It was thus unreasonable for Judge Langley to ascribe to trial counsel a trial strategy that was inconsistent with trial counsel's testimony.

325.     Regarding the third reason Judge Langley's determination was unreasonable, Judge Langley unreasonably concluded that calling Ms. Walker at the guilt phase would have discredited Dr. Saunders. Langley FFCL at 121, ¶ 225.

326.     A comparison of Dr. Saunders' testimony and Ms. Walker's testimony, both cited by Judge Langley, shows the opposite. Dr. Saunders testified that "[Mr. Thuesen] wasn't for sure whether he had done that [told Janet Walker that he thought about shooting Rachel Joiner]." Langley FFCL at 118-19, ¶ 221. Ms. Walker, in turn, testified that Mr. Thuesen never told her he intended to shoot Rachel Joiner. *Id*. at 120, ¶ 223. Far from discrediting Dr. Saunders, Ms. Walker's testimony would actually have reinforced Dr. Saunders' testimony and damaged the State's theory. It was thus unreasonable for Judge Langley to conclude otherwise.

327.     The Court may decide this claim because it falls into an exception to 28 U.S.C. § 2254(d)(2)'s relitigation bar because the findings of fact made by Judge Langley constituted an unreasonable determination of the facts in light of the evidence presented. Despite the testimony of Ms. Walker and Ms. Esparza, both of which were available to (and cited by) Judge Langley, Judge Langley made unreasonable determinations of fact when he rejected Mr. Thuesen's claim regarding Ms. Walker.

**B.      Mr. Thuesen's trial counsel provided constitutionally ineffective assistance by failing investigate, develop, prepare, and present evidence that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the guilt/innocence phase.**

328.    Trial counsel provided ineffective assistance when they failed to investigate, develop, prepare, and present expert witnesses who would have explained and contextualized Mr. Thuesen's PTSD during the guilt/innocence phase of trial. Trial counsel did not prepare for trial and, thus, left valuable mitigating evidence undeveloped and unpresented.

329.    As a result of trial counsel's failure to investigate, develop, prepare, and present expert witness testimony related to Mr. Thuesen's PTSD, the jury received (1) no expert's explanation of PTSD or, important, its *effects* and, related, no explanation of *Mr. Thuesen's* PTSD and how it affected him; and (2) no evidence connecting fact witness observations to expert diagnosis or demonstrating how that diagnosis triggered a trained, automatic response the day of the crime and, thus, reduced Mr. Thuesen's moral culpability for the crime.

330.    Trial counsel's failure to prepare for trial amounted to deficient performance that prejudiced Mr. Thuesen's defense during the guilt/innocence phase of Mr. Thuesen's trial.

**1.      Trial counsel were ineffective because they failed to investigate and secure expert witnesses to testify at the guilt/innocence phase regarding the effects of PTSD on Mr. Thuesen, including regarding how PTSD affected his ability to form the requisite intent, and that failure prejudiced Mr. Thuesen.**

331.    Mr. Thuesen's trial counsel were appointed approximately fifteen months before the guilt/innocence phase of the trial commenced.

332.    Their initial investigation revealed a high likelihood that PTSD would be a major theme of his defense. From several of the witnesses interviewed during this investigation, trial counsel learned that Mr. Thuesen had been a well-liked, "All-American" kid, but he returned from his tour of duty in Iraq a changed person. *See, e.g.*, State Habeas Petition, Ex. 35 ¶¶ 18-19 ("It

95

looked to me like he was having a flashback to Iraq the way he was giving directives to persons who were not there. Jeff and I ended up restraining John. I held his shoulders from the front and Jeff held John's waist. John snapped out of it and went back to normal. He did not seem to be aware of what had happened. A few weeks later, I mentioned what had happened that night to John, but he did not appear to remember it at all."); Ex. 36 ¶¶ 4, 6-7 ("After John returned from Iraq, he was shaky and unsure of himself, unlike the John I knew before who was goal oriented and focused. John post-Iraq consistently sought approval from others, lacked direction and drive, and seemed depressed and edgy. I also noticed that every time I saw John he was carrying around a pistol. He was also edgy and hyper-alert."); Ex. 25 ¶¶ 2, 4-10 ("John Thuesen and I knew each other growing up. . . . After John returned from Iraq he seemed changed—even damaged. He was a totally different person, more edgy. He would often have a blank look on his face. . . . I remember one incident where John and I were at a bar. While describing an episode in Iraq where he shot some people in a car, John went from showing no emotion to hysterical crying."); Ex. 26 ¶¶ 4-10 ("When John and the other two Marines got back from Iraq, a bunch of mothers from the area, including Patty and I, organized a gathering for them. John was the first to arrive. It was then that I noticed John had definitely changed. He seemed as if he had a mask on and did not show emotions."); Ex. 29 ¶¶ 2, 4-7, 9-10 ("I have known John Thuesen since the fourth or fifth grade. . . . Before John went over and fought in Iraq, I would describe him as a great guy, energetic, happy-go-lucky, and someone that everybody loved to be around. After his return from Iraq, participating in social events seemed like a chore for John. I could tell that John was different. . . . Prior to John's trial, I spoke with a male investigator on the telephone. I was asked questions about John, and how he behaved before and after Iraq. I also met with John's attorney, Billy Carter. I remember I told one of them that John was a completely different person when he returned from Iraq. When

I went to John's trial, during the punishment phase, Billy Carter told me my testimony was not necessary because 'they had everything they needed.' I went back the following day and again asked Billy if my testimony was needed. Again Billy said that it was not. I was really surprised.").

333.    These witnesses described a vivid change in Mr. Thuesen's behavior and personality and provided a stark picture of someone devastated by traumatic wartime experiences and PTSD, struggling to return to civilian life.

334.    Trial counsel had this information before trial. Despite that evidence, trial counsel did not reasonably investigate Mr. Thuesen's PTSD, nor did trial counsel reasonably present evidence of Mr. Thuesen's PTSD to the jury. Instead, trial counsel's investigation and presentation of Mr. Thuesen's PTSD fell below prevailing professional norms.

335.    In cases where the mental health of the defendant may be an issue, the Supreme Court has recognized that "the potential accuracy of the jury's determination is so dramatically enhanced" by expert testimony regarding mental health issues. *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). Consequently, trial counsel had a duty to effectively prepare expert witnesses to present evidence of innocence. *See Wiggins*, 539 U.S. at 522; *Draughon v. Dretke*, 427 F.3d 286, 296 (5th Cir. 2005) (counsel ineffective for failing to present an expert that, in turn, "set up an unchallenged factual predicate for the State's main argument.").

336.    Here, Mr. Thuesen admitted shooting both victims. The theory that trial counsel presented during the guilt/innocence phase was that Mr. Thuesen did not commit capital murder because he lacked the requisite intent to kill Rachel and Travis Joiner. 49 RR at 55, 61.

337.    However, trial counsel failed to take what little information they gathered in their minimal investigation—that Mr. Thuesen was suffering from PTSD—and identify vital expert witness testimony regarding PTSD and its impact on Mr. Thuesen's actions and behavior. Trial

counsel never developed expert testimony regarding the effects of PTSD, and how it could have affected his ability to form the requisite intent to kill Rachel and Travis Joiner. Instead, trial counsel only developed vague themes of mental health and military service. Trial counsel never effectively presented evidence of Mr. Thuesen's PTSD or explained how it affected his culpability. Had the jury received a more effective presentation of available evidence, they would have understood the significance of Mr. Thuesen's PTSD and why it he could not have intended to kill Rachel and Travis Joiner. That error prejudiced Mr. Thuesen, in violation of his Sixth Amendment rights.

338.   Trial counsel focused on the impact that Mr. Thuesen's "mental illness, generally, had on his actions during the crime." 49 RR at 44-47. Ultimately, the evidence that trial counsel did present was either so muddled that it was not helpful to the jury, or it actually undermined Mr. Thuesen's PTSD defense. Ultimately, the evidence that trial counsel *did* manage to present was poorly focused and could not help the jury understand the relationship of Mr. Thuesen's PTSD to the critical guilt-phase issue: whether Mr. Thuesen intended to kill Rachel and Travis Joiner.

339.   Trial counsel's initial consultation with a mental health expert—though late in the game—should have confirmed that trial counsel needed to investigate and prepare expert testimony related to Mr. Thuesen's PTSD for the guilt/innocence phase. Mr. Carter first contacted Dr. Roger Saunders in early March 2009 to conduct a general psychological interview of Mr. Thuesen for competency. 47 RR at 9-10. Dr. Saunders, a licensed clinical psychologist who does assessments for courts of behavioral problems, competency, insanity, and mental retardation, determined that Mr. Thuesen was competent but suffering from severe depression. 47 RR at 6-10; State Habeas Petition, Ex. 15 at 22, Ex. 10 ¶¶ 4-5.

340.   It was not until February 2010, just one month before voir dire commenced, that trial counsel consulted with Dr. Saunders regarding Mr. Thuesen's possible PTSD. (Mr. Thuesen

had yet to receive a diagnosis of PTSD.) Dr. Saunders was *not* a PTSD expert. But through his evaluations of Mr. Thuesen, Dr. Saunders identified PTSD as a "significant condition germane to the case." State Habeas Petition, Ex. 10 ¶ 7. However, Dr. Saunders informed trial counsel that PTSD was not a diagnosis that he could develop for the case, as he was not a "specialist" in PTSD. *Id.* ¶¶ 7, 8. Instead, Dr. Saunders told trial counsel that he believed that Mr. Thuesen also suffered from Dependent Personality Disorder, which could be a primary focus of his presentation in mitigation. *Id.* ¶ 6. In addition, Dr. Saunders recommended that counsel consult a PTSD expert he knew, Dr. Kenneth Kopel. *Id.* ¶ 8.

341.    Around this same period, trial counsel consulted Dr. Richard Yohman, a clinical neuropsychologist from Houston. On February 20, 2010, Dr. Yohman conducted a neuropsychological evaluation of Mr. Thuesen at the Brazos County Jail. State Habeas Petition, Ex. 11 ¶¶ 6-8. During the interview with Dr. Yohman, Mr. Thuesen disclosed his combat experience in Iraq as well as his suffering from daily nightmares in 2008 and 2009 about killing people and being attacked. Mr. Thuesen told Dr. Yohman that he felt threatened in public and would sit in a corner so he could always keep an eye on the door of the room. Mr. Thuesen also stated that he watched You Tube videos of battles in Iraq. *Id.* ¶¶ 9, 10. Based on his evaluation, Dr. Yohman told trial counsel that Mr. Thuesen "met diagnostic criterion for PTSD." *Id.* ¶ 11. But trial counsel told Dr. Yohman that they "were going in a 'different direction,' and would not need [Dr. Yohman] as a testifying witness." *Id.* ¶ 13.

342.    Further, trial counsel consulted with Dr. Michael Gottlieb in March 2010 for advice regarding the themes that they should presented in Mr. Thuesen's defense. State Habeas Petition, Ex. 40 at 1-2. Dr. Gottlieb, a psychologist in Dallas, Texas, advised trial counsel to put on evidence of Mr. Thuesen's "military service and subsequent diagnosis" and "how serious this disorder can

be." *Id.* at 1, 3. He noted that evidence could be presented by someone who evaluated Mr. Thuesen or, at the very least, "a pure/education expert might help to explain the disorder as it is easily misunderstood—even today." *Id.* at 1. Dr. Gottlieb also advised trial counsel to explore whether Mr. Thuesen's "drinking was exacerbated after his trauma." *Id.* "This sadly, is a very common reaction," he noted, telling trial counsel that "[s]oldiers and vets have strong prejudices against mental health treatment, and when they develop symptoms, they self medicat[e]—with alcohol. Doing so often makes matters much worse for them." *Id*.

343.    As a result of these consultations, in addition to the investigation done in Mr. Thuesen's case, it was, or should have been, abundantly clear to counsel that Mr. Thuesen's PTSD was a significant factor in Mr. Thuesen's behavior and would be relevant to his intent during the guilt/innocence phase. It was objectively unreasonable for trial counsel to fail to adequately investigate or prepare the necessary expert testimony to develop this defense or theme at trial. Trial counsel's performance was deficient.

344.    Trial counsel did not engage in the selection of expert witnesses for trial until early 2010, just before trial began. Even then, despite discussions with fact witnesses and warnings from Dr. Saunders, Dr. Yohman, and Dr. Gottlieb, trial counsel declined to develop, prepare, or present expert testimony sufficient to address Mr. Thuesen's PTSD and its relationship to Mr. Thuesen's intent during the guilt/innocence phase. Trial counsel failed to ultimately secure the assistance and testimony of a PTSD expert. That unreasonable decision amounted to deficient performance.

345.    Trial counsel's first contact with a potential PTSD expert was in late February 2010, with Dr. Howard Detwiler, a psychiatrist from Anchorage, Alaska. Despite communicating throughout March and April 2010, trial counsel ultimately decided to abandon Dr. Detwiler *after*

voir dire had commence and little more than a month before Mr. Thuesen's guilt/innocence phase of trial.

346.    Instead, trial counsel turned to the expert previously recommended by Dr. Saunders: Dr. Kenneth Kopel, a licensed psychiatrist and former military veteran. State Habeas Petition, Ex. 10 ¶ 8. Trial counsel contacted Dr. Kopel in April 2010—again, *after* voir dire had commenced and a mere month before the guilt/innocence phase would start—and asked Dr. Kopel to evaluate Mr. Thuesen and the medical and mental health care that Mr. Thuesen received through the VA system.

347.    Because of the severe time constraints created by trial counsel's delay, Dr. Kopel's case review was limited to reading various records, including Mr. Thuesen's military and medical records, police reports, and interviews with individuals who knew Mr. Thuesen while in the military. State Habeas Petition, Ex. 8 ¶ 7. Dr. Kopel was not asked and did not have time for an in-person interview with Mr. Thuesen. Ex. 8 ¶ 9. After a review of the records, Dr. Kopel informed counsel that he believed that Mr. Thuesen suffered from PTSD and Major Depressive Disorder. *Id.* ¶ 8. Dr. Kopel was willing to testify to that opinion and about Mr. Thuesen's inadequate VA medical care—i.e., how Mr. Thuesen suffered from *untreated* PTSD. *Id.*

348.    Most significant, Dr. Kopel informed trial counsel that Mr. Thuesen's PTSD impaired his ability to form the intent to kill during the crime itself, raising a defense to capital murder. *Id.* ¶ 31. *Accord* Xenakis Decl. ¶36. Dr. Kopel believed that Mr. Thuesen's PTSD had caused his startle response, or "fight-or-flight" response, to become exaggerated. According to Dr. Kopel, during the crime, Mr. Thuesen's actions suggested that he was acting out of this exaggerated "fight or flight" response, a clear consequence of his wartime trauma and PTSD, rather than out of intentional conduct. *Id.* ¶ 37; *accord* Xenakis Decl., ¶¶ 37-40.

349.     Yet trial counsel never prepared Dr. Kopel for testimony. *Id.* ¶ 11. The day before he was scheduled to testify, Mr. Carter contacted Dr. Kopel and said he would not be needed as a witness. *Id.* ¶ 10.

350.     Instead of presenting evidence related to Mr. Thuesen's PTSD through a proper expert, trial counsel offered only the testimony of Dr. Saunders. Dr. Saunders is a forensic psychologist who explicitly disclaimed expertise in PTSD. State Habeas Petition, Ex. 10 ¶ 2. He is not trained in the area of medical pathology—the area of study that would relate to trajectory of bullets and bullet wounds. *Id.* ¶ 9.

351.     Initially, trial counsel did not have any PTSD expert prepared to testify at the guilt/innocence phase. They planned to use Dr. Saunders to testify during the punishment phase. However, trial counsel made a sudden, inexplicable change during the state's case-in-chief. Upon hearing the testimony of the State's medical examiner, Dr. Saunders concluded that Mr. Thuesen did not intend to kill Rachel Joiner.[16] He based his theory in part on reviewing the autopsy reports and on "the trajectory of the three bullet wounds [Ms. Joiner] had suffered at close range that did not immediately cause her death." *Id.* ¶ 10. Notably, Dr. Saunders is a psychologist, not a physician nor a medical examiner, and he never explained his qualifications to opine on bullet wound trajectories. Dr. Saunders believed that Mr. Thuesen was simply trying to prevent Ms. Joiner from leaving the house. *Id.*

---

[16] The medical examiner testified that the shot to Rachel Joiner's chest likely passed through some other object, likely her hand, before entering the chest. 42 RR at 117-18. With this information, the defense may have been attempting to suggest that Ms. Joiner's hand was not near her chest, but deflected the bullet there. 42 RR at 125-29. This would suggest that the gunshots were aimed at Ms. Joiner's extremities and not the center of her body / her vital organs. 42 RR at 134.

352.   Dr. Saunders, however, seemingly ignored the fact that Ms. Joiner told Mr. Thuesen that her brother, in the house, had a gun, and that this knowledge could have been interpreted by Mr. Thuesen as a significant threat. Xenakis Decl. ¶ 37.

353.   Based on Dr. Saunders' theory, trial counsel decided to present his testimony during the guilt/innocence phase of trial. State Habeas Petition, Ex. 10 ¶ 10. In his testimony, Dr. Saunders told the jury that he had diagnosed Mr. Thuesen with Dependent Personality Disorder, depression, and PTSD. 47 RR at 15-18, 33. Dr. Saunders believed that on the day of the crime, Mr. Thuesen's anxiety and dependency issues came to bear on him at the moment of the shooting. 47 RR at 35. The psychologist further explained that Mr. Thuesen's identity was tied with Ms. Joiner in a way that would prohibit him from wanting her dead. 47 RR at 38, 43.

354.   To Dr. Saunders, Mr. Thuesen's actions during the shooting suggested that his goal was to reestablish the relationship, not end it. Dr. Saunders further speculated that Mr. Thuesen sought reassurance from Ms. Joiner and reconnection. 47 RR at 38. The shooting itself, according to Dr. Saunders, provided evidence that Mr. Thuesen was trying to stop Ms. Joiner from leaving. 47 RR at 41. Dr. Saunders concluded that Mr. Thuesen did not have the intent to kill or cause the death of Rachel Joiner, but he could not offer an opinion on the death of Travis Joiner. 47 RR at 63. Of course, Mr. Thuesen's recollection of, and statements about, the shooting are inherently unreliable because one of the symptoms of his PTSD crisis is the inability to form a memory of the event or to accurately report on the event, perhaps causing Mr. Thuesen to confabulate. *See* Xenakis Decl., ¶ 41.

355.   Trial counsel unreasonably relied on Dr. Saunders as the sole expert at the guilt/innocence phase and in asking Dr. Saunders to testify outside his expertise. First, Dr. Saunders developed his theory based on evidence he was not qualified to evaluate—Rachel

Joiner's bullet wounds. And second, trial counsel was well aware of this fact as they had consulted a qualified expert witness (Dr. Charles Harvey, M.D., a specialist in Anatomic, Clinical, and Forensic Pathology) who not only could have testified on this topic, but also warned them about potential limitations of the evidence. *See* State Habeas Petition, Ex. 7.

356.    The gravity of trial counsel's mistakes quickly became apparent when the State zeroed in on Dr. Saunders' lack of qualification during cross-examination. The State asked Dr. Saunders about his theory that the bullet wounds showed that Mr. Thuesen did not intend to kill. 47 RR at 164. Dr. Saunders was forced to admit that he had looked at the evidence of the gunshots and "abandoned looking" because the evidence was inconclusive. 47 RR at 165. Eventually, Dr. Saunders even admitted that his theory had been based on "speculating" about the wounds and that he was not an expert in that field. 47 RR at 167. Yet the evidence of the bullet wounds and the testimony of the medical examiner about those wounds was supposedly the catalyst for Dr. Saunders to testify about Mr. Thuesen's intent. Without the support of this evidence, Dr. Saunders was forced to fall back on the evidence that Mr. Thuesen rendered aid to Ms. Joiner as proof that he did not intend to kill her. 47 RR at 166. Dr. Saunders relied on his own diagnosis of Mr. Thuesen with Dependent Personality Disorder to suggest that Mr. Thuesen could not have formed an intent to kill. 47 RR at 173-74. Dr. Saunders' unhelpful, and ultimately, harmful, testimony as Mr. Thuesen's only expert witness during the guilt/innocence phase of trial confirms that trial counsel was objectively unreasonable to not prepare and present (1) a PTSD expert capable of testifying regarding Mr. Thuesen's diminished intent, or (2) a *qualified* bullet trajectory expert, like Dr. Harvey. Trial counsel set their *one* mental health expert up to fail by asking him to offer baseless opinions outside of his expertise.

357.     Trial counsel had two other available options for expert testimony, Dr. Harvey and

Dr. Kopel, and inexplicably declined to pursue them. Dr. Harvey was available to testify in Mr.

Thuesen's case. State Habeas Petition, Ex. 7 ¶ 10. Trial counsel asked Dr. Harvey to look at the

autopsy reports in Mr. Thuesen's case and opine as to whether there was evidence that showed

that Mr. Thuesen did not intend to kill either victim. *Id.* ¶ 6. After reviewing the evidence, Dr.

Harvey, who billed at least 35 hours for this matter, concluded that an argument could be made

that the trajectory of the bullets indicated that Mr. Thuesen did not intend to kill Rachel Joiner. *Id.*

¶ 8. However, trial counsel did not take advantage of his availability. This failure meant that trial

counsel had no choice but to present this testimony through Dr. Saunders, even though Dr.

Saunders did not have the education, training, or experience needed to adequately testify. That

decision, alone, amounted to deficient performance.

358.     Trial counsel also could have called Dr. Kopel. Had Dr. Kopel—or *any* PTSD

expert, for that matter—testified, the jury would have received critical information from a qualified

expert regarding Mr. Thuesen's PTSD and, especially important to the guilt/innocence phase, how

that condition affected Mr. Thuesen's intent, or lack thereof, during the crime. Dr. Kopel's

testimony would have provided a meaningful defense to capital murder in a way that lay witness

testimony regarding Mr. Thuesen's behavior could and did not. *Accord* Xenakis Decl. ¶ 34

(explaining that diminished rational thought during a PTSD crisis is outside the public's

appreciation of PTSD at the time of the trial).

359.     Had Dr. Kopel testified, he could have told the jury that Mr. Thuesen was suffering

from PTSD because of his wartime experiences while serving his country in Iraq. State Habeas

Petition, Ex. 8 ¶¶ 13-22. Dr. Kopel would have testified that Mr. Thuesen's PTSD diminished his

ability to form an intent to kill on the day of the crime. *Id.* ¶ 31. Specifically, the effect that Mr.

Thuesen's PTSD had on his "fight-or-flight" response impaired his capacity to form an intent to kill Rachel or Travis Joiner. *Id.*; *accord* Xenakis Decl. ¶¶ 31-36.

360.    Dr. Kopel would have testified that a normal person experiences a startle response, or "fight-or-flight" response, when the person encounters a danger or experiences fear. State Habeas Petition, Ex. 8 ¶ 32. Physiologically, the "fight-or-flight" response has significant impact on a person's brain. When a person goes into "fight-or-flight," blood flow increases in the areas of the brain that are responsible for creating intense emotions. At the same time, the blood flow in the brain decreases in areas that are responsible for planning, anticipating consequences, and inhibiting inappropriate responses. Thus, these appropriate responses are impaired. *Id.* ¶ 33. The brain's ability to create normal memory storage gets disrupted. *Id.* ¶ 34. Also, the blood flow in the brain decreases in the area of the brain responsible for translating an experience into communicable language, making it difficult for a person to express himself or herself. *Id.* ¶ 33.

361.    In addition, Dr. Kopel would have testified that the "fight-or-flight" response also impacts a person's physical response. When startled, the body releases hormones that increase the person's heart rate and blood pressure, impairing the body's normal "autonomic" (or reflex) nervous system responses. This means that individuals who are experiencing a "fight-or-flight" response are more likely to have cognitive impairment, dissociative experience, and to react physically even if not appropriate to the situation. *Id.* ¶ 35.

362.    According to Dr. Kopel, people suffering from PTSD often have what is called an exaggerated startle response. *Id.* ¶ 32. Often, their "fight-or-flight" response will be triggered by non-dangerous events such as loud noises or sudden movements. *Id.* Veterans suffering PTSD are also likely to have "fight-or-flight" responses that are more intense and last longer than a normal startle response. *Id.* ¶ 36.

363.     Rather than decreasing as time goes on, veterans with PTSD are likely, according to Dr. Kopel, to instead have exaggerated "fight-or-flight" responses to increasingly innocuous stimuli. This is true even if the stimuli do not resemble the traumatic war experience of the veteran. Veterans with PTSD will experience this exaggerated "fight-or-flight" even when the veteran knows intellectually that the situation is not dangerous and does not deserve an emotional response. *Id.* ¶ 32. Thus, as veterans continue to suffer from PTSD, they are likely to react to innocuous events when presented suddenly or in stressful situations and to react emotionally and physically, rather than with planning or communication. *Id.* ¶ 36.

364.     Based on his review of Mr. Thuesen's records and evidence from witnesses, Dr. Kopel formed the opinion that Mr. Thuesen experienced an exaggerated "fight-or-flight" response on the day of the crime. *Id.* ¶ 37; *accord* Xenakis Decl. ¶¶ 30, 32. Evidence showed that leading up to the crime, Mr. Thuesen was experiencing significant stressors related to his school, his work, financial pressures, and the instability of his relationship with Rachel Joiner. State Habeas Petition, Ex. 8 ¶ 37. This instability would have put Mr. Thuesen under stress, as many people with PTSD are hypersensitive about rejection from others and react in intense ways when attempting to regain control of their relationships. *Id.*

365.     Dr. Kopel would have testified that based on this stressful situation, Ms. Joiner's decision to end the relationship and her physical attempt to leave the house that day may have caused Mr. Thuesen to feel threatened. *Accord* Xenakis Decl. ¶ 37. This caused his body to overreact and enter an exaggerated "fight-or-flight" response. State Habeas Petition, Ex. 8 ¶ 37. Mr. Thuesen's statements to the police immediately after the crime support that he experienced a "fight-or-flight" response. Mr. Thuesen stated that during the shooting he felt "in a mode . . . like training" and that he "came to" after the shooting was over. *Id.* ¶ 38. In addition, Mr. Thuesen was

able to express details about what happened leading up to the shooting, but not during, suggesting that the blood in Mr. Thuesen's brain had moved from the parts devoted to memory into the parts that inspire emotion and impulsive action. *Id.* ¶ 38.

366.    Further, Dr. Kopel would have testified that the nature of the shooting itself suggested Mr. Thuesen experienced an exaggerated "fight-or-flight" response. Mr. Thuesen reacted reflexively, and in line with his military training, when an unexpected threat suddenly appeared in the form of a quickly-moving Travis Joiner. Mr. Thuesen *stopped* shooting Rachel Joiner as soon as her action ceased. With no movement to stimulate his "fight-or-flight" response, Mr. Thuesen stopped reacting, called 911, and attempted to render aid. This sequence of events is consistent with the conclusion that Mr. Thuesen's body was acting reflexively and without thought until the shooting ended. *Id.* ¶ 39; *accord* Xenakis Decl. ¶ 43 (discussing the "instinctive" and not "rational" behavior engendered by the PTSD crisis, especially given the Marine Corp's training of Mr. Thuesen to suppress his "flight" response and strengthen his "fight" response). Because of this, according to Dr. Kopel, Mr. Thuesen did not form any intent to kill either Rachel or Travis Joiner.

367.    PTSD may impact intent, and Dr. Kopel would have testified as much had trial counsel prepared and presented his testimony, or *any* PTSD expert to speak to intent. Trial counsel never presented Dr. Kopel's testimony to the jury at all. Instead, trial counsel relied on Dr. Saunders' unsupported and unqualified testimony regarding the crucial element of intent.

368.    Had trial counsel timely engaged a PTSD expert, afforded the expert sufficient time and resources to develop opinions related to Mr. Thuesen's PTSD and his intent, and allowed the expert to testify during the guilt/innocence phase, trial counsel could have provided a wealth of

information to the jury regarding PTSD and how Mr. Thuesen's symptoms prevented him from forming intent the day of the crime.

369.    Trial counsel similarly failed to secure an expert on how PTSD affects veterans receiving inadequate treatment and subject to the stressors of re-entry into civilian life. *See* Brown Aff. ¶¶ 11-15, 43. An expert like Dr. Brown could have testified how war educates soldiers for war, not peace, and in doing so reverses the customary moral values of society. *Id.* at ¶10. For example, recruits are trained to respond instantaneously and aggressively to any and all perceived danger, without hesitation. Recruits are made to respond with a "fight" response, rather than "flight," when confronted with a stressful circumstance. *Id.* at ¶ 20. This instantaneous response extends to the use of deadly weapons. *Id.* at ¶ 22. Trial counsel failed to secure an expert, like Dr. Brown, who could explain how veterans struggle to unwind this training upon their return to civilian life, and how PTSD can complicate that process.

370.    The failure to prepare and present expert testimony about Mr. Thuesen's PTSD— and specifically to decline to present any expert testimony related how that PTSD would have affected Mr. Thuesen's ability to form the requisite criminal intent—amounted to deficient performance.

371.    Trial counsel's deficient performance prejudiced Mr. Thuesen's guilt/innocence phase defense. By failing to present expert testimony regarding Mr. Thuesen's PTSD, symptoms, and treatment, trial counsel presented only a shadow of the picture that could have been presented regarding Mr. Thuesen's PTSD. The effect of this presentation was to rob Mr. Thuesen of the most powerful evidence that could have been presented on his behalf and in his defense in each of the trial's two phases.

372.     Trial counsel's decisions were not reasoned trial strategy but were instead the result of a woefully incomplete investigation. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). Trial counsel engaged late in the process of developing their themes and expert testimony. The PTSD expert they ultimately hired (though never used), Dr. Kopel, had little more than a month to review materials and provide guidance. Without sufficient assistance from a PTSD expert, in the face of clear evidence that PTSD was a significant defense in the case, counsel did not have the proper information to make a decision whether and how to present that information. *Id.* at 527 ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

373.     Ultimately, trial counsel's decision to not present a full picture of Mr. Thuesen's PTSD, including especially an enhanced fight-or-flight response in certain limited circumstances, for fear of compromising the issue of future danger was not based on sufficient investigation and was, therefore, neither tactical nor reasonable. Without the full presentation of PTSD, counsel failed to present any explanation of Mr. Thuesen's behavior. Thus, counsel's actions cannot be considered strategic, or even reasonable. *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986); *Bigelow v. Haviland*, 576 F.3d 284, 288 (6th Cir. 2009).

374.     To establish Mr. Thuesen's guilt, the State had to prove that he acted intentionally or knowingly. Tex. Penal Code §§ 19.02 and 19.03. A PTSD expert such as Dr. Kopel would have testified that Mr. Thuesen did not act with the intent to kill Rachel or Travis Joiner. State Habeas Petition, Ex. 8 ¶ 40. Instead, he acted instinctively in the midst of a PTSD crisis as he was compelled to act by his "fight-or-flight" response and his military training. *Id.*, ¶¶ 31-40; Xenakis

Decl. ¶¶ 35-43. This testimony would have given the jury a strong basis on which it could have determined that Mr. Thuesen did not act intentionally or knowingly, and therefore that he was not guilty of capital murder.

375.    Instead, Mr. Thuesen's jury heard a muddled, unsupported theory regarding Mr. Thuesen's mental state, rather than a cohesive presentation regarding the impact of Mr. Thuesen's PTSD on his intent during the crime.

376.    Trial counsel's decision to present Dr. Saunders as their sole testifying expert prejudiced Mr. Thuesen's guilt-phase defense. This decision was unreasonable given Dr. Saunders' lack of expertise, lack of preparation for this line of testimony, and disconnection from the defense's main theme. Had counsel not made this error, the jury would have heard relevant testimony about Mr. Thuesen's "fight-or-flight" response and diminished intent.

377.    Particularly, this evidence would have directly affected the jury's decision about whether Mr. Thuesen was guilty of capital murder. Evidence of Mr. Thuesen's PTSD and "fight-or-flight" response would have undermined the State's arguments that Mr. Thuesen had a "conscious objective or desire" to commit murder or that he was "aware that his conduct is reasonably certain to cause the result." *See* Tex. Penal Code § 6.03(a), (b) (definitions of "intentionally" and "knowingly").

378.    Thus, had the jury heard the information above, reasonable doubt would have been raised about an essential element of the crime. At least one juror reasonably would have questioned whether Mr. Thuesen intended to kill the Joiners. Because trial counsel squandered this opportunity, Mr. Thuesen was deprived his opportunity for "meaningful adversarial testing" of the State's case. *United States v. Cronic*, 466 U.S. 648, 656 (1984). But for this error, there is a

reasonable probability that the results of the proceedings at Mr. Thuesen's trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

> **2.      Trial counsel were ineffective because they failed to present evidence demonstrating that Mr. Thuesen was never diagnosed with PTSD nor adequately treated for the condition, and that failure prejudiced Mr. Thuesen.**

379.      Trial counsel presented testimony from Dr. Ismael Carlo, the VA physician who had treated Mr. Thuesen at the VA Medical Center following his call to the suicide hotline. Trial counsel used Dr. Carlo to testify about some of Mr. Thuesen's mental health treatment. But Dr. Carlo never diagnosed Mr. Thuesen with PTSD, and even if he had, Dr. Carlo was statutorily precluded from testifying beyond his diagnosis of depression. Trial counsel also presented evidence from the VA counselor who gave Mr. Thuesen counseling sessions for PTSD, Ms. Theresa Cannon, a licensed master social worker. Because of her role, she was not qualified to diagnose nor treat Mr. Thuesen's PTSD, a deficiency with her testimony that became apparent on cross-examination.

380.      At the end of his deployment in Iraq, Mr. Thuesen completed a post-deployment health assessment survey in March 2005, just before being sent home. State Habeas Petition, Ex. 12 at 136-37. The only medical issue Mr. Thuesen noted at that time was that he had experienced frostbite, which had been resolved. *Id.* The assessment did not ask any questions regarding symptoms that could indicate PTSD.

381.      A little more than a year later, in August 2006, Mr. Thuesen was again given a post-deployment health assessment. *Id.* at 118-21. That assessment specifically asked Mr. Thuesen whether he was experiencing any mental health symptoms. *Id.* at 119-20. In it, Mr. Thuesen reported having "problems sleeping," "difficulty remembering," "weakness," and "numbness." *Id.*

at 119. Mr. Thuesen also agreed that he had "a health concern or condition that . . . is related to [his] deployment" and that it was "[o]ther than wounds or injuries." *Id.*

382.    Following and as a result of that assessment, Mr. Thuesen was referred to a military health care provider for further evaluation. State Habeas Petition, Ex. 12 at 120-21. That provider noted that Mr. Thuesen complained of "feeling numb or detached from others, activities, or [his] surroundings," as well as having "little interest or pleasure in doing things" and "feeling down, depressed, or hopeless." *Id.* at 121. Mr. Thuesen indicated that these feelings were making it "very difficult" to do his work, to take care of things at home, and to get along with others. *Id.* Despite the symptoms reported by Mr. Thuesen, he was not tested further for PTSD, diagnosed with the condition, or treated for it.

383.    Mr. Thuesen was not seen again the VA system for another "Iraq/Afghanistan Mental Health Assessment" until March 2007. State Habeas Petition, Ex. 13 at 154. During that assessment, Mr. Thuesen reported that he was "constantly on guard, watchful, or easily startled." *Id.* He also reported feeling "numb or detached from others, activities, or [his] surroundings." *Id.* Those two reported symptoms—hypervigilance and avoidance symptoms—are two of the four identifying symptoms of PTSD. *See* Xenakis Decl., ¶ 26. In addition, the VA counselor and psychologist conducting the survey noted that Mr. Thuesen endorsed symptoms of depressed mood, impaired concentration, irritability, reduced energy level, worthlessness, anger, loss of control, emotional numbing, hypervigilance, startle response, and the experience of a traumatic event. State Habeas Petition, Ex. 13 at 158-59.

384.    Yet in the results of the assessment aligning almost perfectly with the classic symptoms of PTSD, there is no indication that the survey conductors diagnosed Mr. Thuesen with PTSD, made any special note of his positive endorsement of PTSD symptoms in his file, or

informed Mr. Thuesen of the possibility that he suffered from PTSD. Indeed, the only problems identified by the counselor and psychologist were "anger/irritability" and "some mild depressed mood." *Id.* at 160. As a result, Mr. Thuesen *still* did not receive treatment for PTSD.

385.    Mr. Thuesen next encountered the VA was four months later, following his July 2007 arrest, when his mother brought him to see a VA psychiatrist. *Id.* at 148. Although Mr. Thuesen did not endorse any specific symptoms of PTSD at that time, the psychiatrist noted that she had the results of the prior assessment Mr. Thuesen had completed. *Id.* at 149. However, that VA psychiatrist again ignored the strong evidence Mr. Thuesen was suffering from PTSD and merely recommended "counseling at the Vet Center or through church to improve quality of life and deal with psychosocial stressors." *Id.* at 153.

386.    Following his visit to the VA in July 2007, Mr. Thuesen followed the recommendation of the psychiatrist and sought counseling from a private counselor, social worker Dianne Appolito. State Habeas Petition, Ex. 1 ¶ 4. Unlike the VA, Appolito was able to recognize almost immediately that Mr. Thuesen was suffering from PTSD. *Id.* ¶¶ 6, 7. She noted his description of several of the same symptoms noted in the March VA assessment—depression, hypervigilance, and angry outbursts. *Id.* ¶ 7. Unfortunately, as a social worker, Appolito was unable to formally diagnose Mr. Thuesen, and her therapy ended after only six sessions when Mr. Thuesen relocated. *Id.* ¶¶ 4, 6.

387.    Over the course of the next year, Mr. Thuesen's struggle with PTSD continued unnoted and untreated. In July 2008, Mr. Thuesen returned to the VA with complaints of lower back pain. State Habeas Petition, Ex. 13 at 139-41. While being treated, Mr. Thuesen completed a PTSD screening that asked four questions related to the common symptoms of PTSD. *Id.* at 139. Mr. Thuesen answered "Yes" to all four questions, indicating symptoms of re-experiencing the

trauma, avoidant thoughts, hypervigilance, and emotional numbing. *Id.* In response to Mr. Thuesen's answers, a VA nurse practitioner noted that the results "have been reviewed and the patient assessed including assessment of suicidal risk." *Id.* at 138. But still, two years after Mr. Thuesen first began reporting symptoms consistent with PTSD, the VA failed to diagnose him. The VA nurse who saw him specifically disclaimed that treatment for PTSD was necessary; she noted there was "[n]o mental health condition requiring further intervention" and instructed that "[i]n case of crisis" Mr. Thuesen was to the call the National Suicide Prevention Lifeline. *Id.*

388.    Forty-five days later, on August 29, 2008, Mr. Thuesen called the suicide hotline. State Habeas Petition, Ex. 13 at 136. He was intoxicated and stated he was having thoughts of shooting himself. *Id.* Mr. Thuesen was picked up by the police and taken to the Houston VA Medical Center. *Id.* at 133-36. During his initial evaluation on admission to the hospital, the admitting psychologist noted that Mr. Thuesen had experienced wartime trauma and was experiencing symptoms consistent with PTSD, including nightmares, irritability, and an increased startle response. *Id.* at 130. Although Mr. Thuesen did not report experiencing flashbacks or aggressive outbursts at that time, the psychologist requested that further treating physicians determine whether a diagnosis of PTSD was warranted. *Id.*

389.    Unfortunately, that diagnosis was not made. Mr. Thuesen's primary diagnosis and treatment focus was limited to depression and suicidal ideation. *Id.* at 131. It was at this stage that Mr. Thuesen was seen by Dr. Carlo, the VA psychiatrist. *Id.* at 113-20. And once again, the VA doctor treating Mr. Thuesen ignored the symptoms of PTSD he reported. Dr. Carlo focused his diagnosis and treatment on the major problem Mr. Thuesen presented, which was his risk of suicide. State Habeas Petition, Ex. 4 ¶¶ 6, 7. Dr. Carlo neither confirmed nor ruled out PTSD as a diagnosis, but instead prescribed Mr. Thuesen an antidepressant and a period of detox for his

alcohol abuse. *Id.* ¶ 6. Because Mr. Thuesen came to the VA Medical Center on a Friday before a holiday weekend, he was kept for the next three days and observed by the VA's nursing staff. *Id.* ¶ 8. Despite the additional observation time, no further mental health assessment for PTSD was done, and there is no further mention of PTSD or PTSD symptoms in the records of his stay at the VA Medical Center that weekend. State Habeas Petition, Ex. 13 at 70-112.

390.    On the following Tuesday, Mr. Thuesen expressed that he was feeling better and wanted to return home so that he could resume classes and work. *Id.* at 71. Dr. Carlo again evaluated Mr. Thuesen's condition with regard to his suicide risk and depression, and found that Mr. Thuesen had logical reasons for returning home and was no longer at an immediate risk of suicide. *Id.* at 62-64. Yet again, despite the triage psychologist noting that follow-up regarding PTSD was necessary, Dr. Carlo made no inquiry or findings regarding a potential diagnosis of PTSD, nor recommended to Mr. Thuesen that he seek treatment for PTSD.

391.    On the day of his release, a VA social worker performed one final assessment of Mr. Thuesen's mental health. State Habeas Petition, Ex. 13 at 58. And once again, Mr. Thuesen indicated he was struggling with his wartime experiences. Mr. Thuesen told the social worker that he had trouble talking to other people about his war trauma and that he felt his excessive use of alcohol was his way of "trying to deal with what happened and not fitting in in the civilian world." *Id.* In this assessment, Mr. Thuesen went into further detail about the trauma he had experienced, describing the incident at the checkpoint as well as a time his unit had encountered a woman with a bomb strapped to herself. *Id.* Mr. Thuesen admitted that he was having trouble with drinking and that his anger was difficult to manage. *Id.* The VA social worker did not make any notations in Mr. Thuesen's file regarding possible PTSD, noting only that her assessment was unable to be completed. *Id.* Upon his release, Mr. Thuesen was given a prescription for an antidepressant and

the recommendation to seek counseling through the VA to manage his depression. *Id.* at 62-64. No diagnosis of PTSD was made.

392.    Mr. Thuesen confirmed multiple times that he was very interested in individual psychotherapy sessions. State Habeas Petition, Ex. 13 at 57, 58. Unfortunately, when he did go to see a social worker, Teresa Cannon, the VA failed to transfer the bulk of the years of assessments he had completed indicated symptoms consistent with PTSD. Cannon received only cursory information over the phone from the suicide prevention coordinator at the Houston VA Medical Center regarding Mr. Thuesen's brief treatment related to his suicide threat. State Habeas Petition, Ex. 3 ¶ 6. She never received any medical records from the VA system, including past diagnoses, treatment history, or mental health assessments. *Id.* Staff at the Houston VA Medical Center only followed up with Mr. Thuesen a few times to ensure that he was in contact with Cannon and that he was no longer at risk of suicide. State Habeas Petition, Ex. 13 at 51-54. No follow up was made regarding Mr. Thuesen's symptoms consistent with PTSD.

393.    Even without Mr. Thuesen's previous records, Cannon was able to determine that Mr. Thuesen was likely suffering from PTSD. State Habeas Petition, Ex. 13 at 41- 43; Ex. 3 ¶ 7. As a social worker, however, Cannon was neither qualified to diagnose medical disorders nor could she prescribe treatment. State Habeas Petition, Ex. 3 ¶ 9.

394.    Despite noting that Mr. Thuesen was likely suffering from PTSD, and knowing that she was not qualified to formally diagnose or to treat the condition, Cannon did not refer Mr. Thuesen to see a VA physician about his PTSD.

395.    Cannon only provided Mr. Thuesen with supportive counseling sessions once a month, during which they discussed his symptoms or other issues he wanted to discuss. State Habeas Petition, Ex. 3 ¶¶ 8, 9, 12. Ultimately, after decreasing the frequency of her counseling

sessions, Cannon saw Mr. Thuesen just two days before the crime occurred. State Habeas Petition, Ex. 13 at 16. During that session, Mr. Thuesen again noted suffering from issues of anger, panic, hypervigilance, and avoidance, all consistent with PTSD. *Id.* In response, Cannon provided supportive counsel, offering "symptom management techniques," so that Mr. Thuesen could recognize and deal with these symptoms on his own. *Id.*

396.    While supportive counseling is beneficial, proper treatment of PTSD requires much more intensive outpatient treatment, such as a combination of cognitive-based therapy, exposure therapy, medication, and counseling with a psychologist or physician. State Habeas Petition, Ex. 9 ¶¶ 52-53; Ex. 8 ¶ 25. Some patients may even need to be treated in an in-patient residential program for months. State Habeas Petition, Ex. 9 ¶ 53.

397.    The only time Cannon did refer Mr. Thuesen to a treating physician was after he ran out of his antidepressant medication in late 2008. State Habeas Petition, Ex. 13 at 33. At that time, Mr. Thuesen reported—on a video conference with a VA nurse practitioner arranged by Ms. Cannon—that his depression was lessening and that he was feeling "pretty upbeat." *Id.* at 32. As a result, based only on this one short video session the nurse practitioner canceled Mr. Thuesen's prescription for the antidepressant and removed all psychiatric diagnoses from Mr. Thuesen's chart. *Id.*

398.    Had trial counsel fully reviewed the military records in their possession, they would have noted that neither Dr. Carlo nor any other VA medical professional had ever actually diagnosed Mr. Thuesen with PTSD. *See Rompilla v. Beard*, 545 U.S. 374, 385 (2005) (finding counsel committed deficient performance by failing to review a "readily available file").

399.    Of course, as detailed above, trial counsel failed to hire a PTSD expert (other than Dr. Detwiler, whom they never used, and Dr. Kopel, whom they retained late and never used) or

properly investigate or develop expert testimony regarding PTSD. Had trial counsel properly investigated Mr. Thuesen's mental health condition, trial counsel would have known that Mr. Thuesen did not receive and appropriate diagnosis or treatment for his PTSD. *Wiggins*, 539 U.S. at 527 ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

400.    The central theme trial counsel could have presented during the guilt/innocence phase of Mr. Thuesen's trial was that Mr. Thuesen suffered through horrific trauma while serving in Iraq, and that those experiences caused Mr. Thuesen to develop PTSD. Mr. Thuesen's PTSD impacted every aspect of his life, and the onset of an acute PTSD event was directly related to Mr. Thuesen's crime. *See* Xenakis Decl., ¶¶ 34-40. Evidence of the acute PTSD episode was paramount to trial counsel's argument that Mr. Thuesen did not intend to kill Rachel and Travis Joiner, and was therefore not guilty of capital murder.

401.    One of the primary reasons that Mr. Thuesen suffered an acute PTSD event was that he had never received appropriate medical treatment. Trial counsel, however, failed to explain to the jury how abjectly the VA had failed Mr. Thuesen by neglecting to provide the necessary care for his condition.

402.    Trial counsel's failure to offer testimony to the jury showing that Mr. Thuesen was never diagnosed and properly treated for PTSD prejudiced his defense. This evidence would have impacted the jury's decision regarding Mr. Thuesen's guilt/innocence phase for multiple reasons.

403.    First, this evidence would have shown the jury that Thuesen was receiving only nominal care from the VA system. State Habeas Petition, Ex. 8 ¶ 23.

404.    Second, this testimony would have helped neutralize damaging testimony the State was able to elicit from Cannon and Dr. Carlo. During Ms. Cannon's testimony, the State suggested

that in the days before the crime Mr. Thuesen did not appear to be in any distress. 45 RR at 108-09. And during Dr. Carlo's testimony, the State targeted the symptoms of PTSD not reported in Dr. Carlo's records, suggesting that Mr. Thuesen may not have truly been suffering from PTSD at all. 45 RR at 31, 35. The history of Mr. Thuesen's reports to the VA of PTSD symptoms would have countered this suggestion by the State by making clear that while Mr. Thuesen had continuously struggling with PTSD, neither Dr. Carlo no anyone else at the VA had properly diagnosed Mr. Thuesen or provided adequate care for his PTSD. State Habeas Petition, Ex. 8 ¶¶ 23-25; Ex. 4 ¶ 13 ("The treatment [Mr. Thuesen] received . . . were designed to impact his suicidal thoughts and depression, and is not how I would treat PTSD.").

405.    Third, this evidence would have given needed support to the argument that PTSD—rather than simple jealousy—was the major factor behind Mr. Thuesen's behavior. As both Drs. Kopel and Xenakis opined—and could have testified, if called by trial counsel—people with PTSD can suffer PTSD crises cause by unwinding relationships. Xenakis Decl. ¶ 37, State Habeas Petition, Ex. 8 ¶ 27, 28. Had it heard the evidence, the jury would have seen a starkly different picture than the one that came out at trial—instead of a jealous, violent boyfriend, Mr. Thuesen's behavior was the sign of an ongoing mental health crisis, tragically ignored by the VA system. Instead of a disinterested, irresponsible patient, his declarations were a signal that he needed and was asking for help that he never received.

### 3.    Trial counsel were ineffective because they affirmatively presented evidence during the guilt/innocence phase that undermined their own chosen defense strategy, and that conduct prejudiced Mr. Thuesen.

406.    In addition to their failure to call experts able to explain PTSD to the jury, and its effects on Mr. Thuesen, trial counsel also made several erroneous decisions regarding how they presented Mr. Thuesen's PTSD during the guilt/innocence phase of trial.

407.     As discussed above, trial counsel had a duty to effectively prepare expert witnesses to present evidence of innocence. *See Wiggins*, 539 U.S. at 522; *Draughon v. Dretke*, 427 F.3d 286, 296 (5th Cir. 2005) (counsel ineffective for failing to present an expert that, in turn, "set up an unchallenged factual predicate for the State's main argument.").

408.     Trial counsel provided ineffective assistance when they failed to effectively present evidence of PTSD during the guilt/innocence phase of trial. The evidence presented failed to do so. Instead, trial counsel only developed vague themes of mental health and military service. Worse, though, the evidence that trial counsel did present was either so muddled that it was not helpful to the jury, or it actually undermined Mr. Thuesen's PTSD defense. Ultimately, the evidence that trial counsel *did* manage to present was poorly focused and could not help the jury understand the relationship of Mr. Thuesen's PTSD to the critical guilt-phase issue: whether Mr. Thuesen intended to kill Rachel and Travis Joiner.

409.     Had the jury received a more effective presentation of available evidence, they would have understood the significance of Mr. Thuesen's PTSD and why he could not have intended to kill Rachel and Travis Joiner.

410.     First, as discussed above, their primary (and ultimately only) expert witness in the guilt phase, Dr. Saunders, had informed them that he was not a PTSD expert and that his testimony could not focus on that disorder as a primary motivator of Thuesen's conduct. Independent and apart from trial counsel's failure to develop the expert testimony they needed but never introduced, trial counsel further erred by presenting the evidence that they did submit to the jury. That evidence was confusing, contradictory, and made it impossible for the jury to adequately assess the impact of Mr. Thuesen's PTSD on his intent.

411.    Trial counsel also presented testimony from Dr. Ismael Carlo, the VA physician who had treated Mr. Thuesen at the VA Medical Center following his call to the suicide hotline. Trial counsel used Dr. Carlo to testify about some of Mr. Thuesen's mental health treatment. But Dr. Carlo never diagnosed Mr. Thuesen with PTSD, and even if he had, Dr. Carlo was statutorily precluded from testifying beyond his diagnosis of depression.

412.    Finally, the VA counselor, Ms. Theresa Cannon, a licensed master social worker, could neither properly diagnose nor treat Mr. Thuesen's PTSD, and the deficiency in using her testimony became apparent on cross-examination.

a)    *Dr. Saunders*

413.    Trial counsel called Dr. Saunders to testify during the guilt/innocence phase of trial regarding Mr. Thuesen's intent to kill. Dr. Saunders discussed the three diagnoses he had made of Mr. Thuesen's mental health: Dependent Personality Disorder, depression, and PTSD. 47 RR at 15; State Habeas Petition, Ex. 10 ¶ 5. Regarding Mr. Thuesen's PTSD, Dr. Saunders testified that he diagnosed Mr. Thuesen with PTSD based on Mr. Thuesen's experience of trauma in Iraq and the reporting of distinct personality changes upon his return to the States. 47 RR at 18. Dr. Saunders reviewed the symptoms of PTSD that Mr. Thuesen experienced, including avoiding talking about his time in Iraq, estrangement from others, hypervigilance, exaggerated startle response, and outbursts of anger and irritability. *Id.* Dr. Saunders noted that the PTSD symptoms that Mr. Thuesen experienced would interfere with interpersonal relationships. 47 RR at 26. He also stated that PTSD would make it difficult for Mr. Thuesen to negotiate his emotions, which could easily spill out onto others. 47 RR at 27.

414.    Trial counsel knew, or should have known, that Dr. Saunders' testimony would obscure the critical importance of Mr. Thuesen's PTSD. As Dr. Saunders had informed trial counsel in advance, the primary focus of his testimony was that Mr. Thuesen was suffering from

Dependent Personality Disorder, a condition marked by fear of separation and an excessive need to be taken care of. 47 RR at 33-35. Dr. Saunders believed that on the day of the crime, Mr. Thuesen's Dependent Personality Disorder prevented him from forming an intent to kill. 47 RR at 37-44. Though Mr. Thuesen's PTSD contributed to his mental condition at the time of the crime, Dr. Saunders believed it merely exacerbated the anxiety and depression already present because of the Dependent Personality Disorder. 47 RR at 47.

415.    Dr. Saunders' lack of expertise in PTSD led to several incorrect statements about Mr. Thuesen's particular experience with PTSD, muddying trial counsel's presentation to the jury about Mr. Thuesen's mental state and his intent. Dr. Saunders downplayed the significance of Mr. Thuesen's PTSD based on symptoms he believed Mr. Thuesen was not experiencing. *Id.* For example, he disagreed with testimony from Mr. Thuesen's VA counselor that Mr. Thuesen's experience of auditory hallucination was a symptom of PTSD. 47 RR at 27. Further, according to Dr. Xenakis, if both PTSD and Dependent Personality Disorder were both present—a point he disputes—then the effects of PTSD would be the ones that matter. *See* Xenakis Decl. ¶ 29-30.

416.    Dr. Saunders offered additional PTSD-related opinions that further confused the jury's view of PTSD. He stated that Mr. Thuesen did not experience war flashbacks, which was a criterion for PTSD according to Dr. Saunders, and that specifically there was no evidence that Mr. Thuesen was experiencing a flashback at the time of the crime. 47 RR at 33, 139; State Habeas Petition, Ex. 10 ¶ 7. In reality, Mr. Thuesen *had* experienced flashback episodes following his return from Iraq. State Habeas Petition, Ex. 35 ¶¶ 11-13, Ex. 21 ¶ 5, Ex. 8 ¶ 44. Also, regardless of whether Mr. Thuesen experienced flashbacks, Dr. Saunders was incorrect to suggest that all PTSD patients will experience flashbacks. State Habeas Petition, Ex. 8 ¶ 45; *accord* Xenakis Decl. ¶ 24. The impact of PTSD presents itself differently depending on the person. *Id.* For someone like

Mr. Thuesen, PTSD flare-ups might be triggered by a breakdown in feeling order and control in the world around him, rather than experiencing conditions that reminded him of his war trauma. State Habeas Petition, Ex. 8 ¶ 46.

417.    Dr. Saunders also lacked of knowledge that Mr. Thuesen experienced traumatic events while in Iraq.

418.    The DSM-IV requires both of the following for an event to qualify as a "trauma": (A1) that person has "experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or threat to the physical integrity of self or others" and the subjective criterion (A2) that "the person's response involved intense fear, helplessness, or horror" be met. Shawn P. Cahill & Kristin Pontoski, *Post-traumatic stress disorder and acute stress disorder I: their nature and assessment considerations*, 2(4) PSYCHIATRY (Edgmont) 14-25 (2005); *accord* Xenakis Decl. ¶ 23.

419.    Sitting in trial counsel's files was an interview summary, dated April 29, 2010, with Tim Rojas. Ex. 10. The notes describe a traumatic event Rojas observed in Iraq, when Mr. Thuesen shot his "big gun" at a car containing an elderly man and a young boy. Of the event, Rojas stated, "Thuesen's fear was an elderly man and a young boy [died], and even though they survived, *it doesn't go away.*" *Id.*

420.    This event was a "traumatic event" within the meaning of the DSM-IV that would have allowed Dr. Saunders to fill the gap and to make a diagnosis of PTSD. Trial counsel knew it had Rojas's testimony. Indeed, they called Rojas during the punishment phase to explain the horrific event. 52 RR at 158-162. Yet trial counsel never prepared Dr. Saunders with this information.

421.    Another fact known to trial counsel, but not properly marshalled to aid in Mr. Thuesen's defense, came from Jeremy Abbott, a witness trial counsel called the day before Dr. Saunders would testify.

422.    Abbott was a friend of Mr. Thuesen's in Iraq. Abbott was a radioman, and Mr. Thuesen was his machine gunner. 46 RR at 156-157. Abbott testified to the jury on May 17, 2010, one day before Dr. Saunders testified to the jury. Abbott described a second devastating, traumatic event that Mr. Thuesen experienced in Iraq. Mr. Thuesen and Abbott were part of a 15-Marine deployment that was ordered to hold a bridge against an unknown number of insurgents rumored to be 500 strong. A resupply vehicle hit a mine. Mr. Thuesen's unit had to extract the badly-injured driver and navigator from the vehicle under fire so they could be evacuated. 46 RR at 161-162. Abbott testified that experience was the most frightening event he encountered during his service. *Id*.

423.    In light of trial counsel's knowledge of the traumatic experiences that Mr. Thuesen underwent in Iraq, trial counsel clearly failed to prepare Dr. Saunders to testify accurately regarding Mr. Thuesen's experiences. Had trial counsel properly prepared Dr. Saunders to testify with information that was clearly available to trial counsel, Dr. Saunders could have testified in a manner helpful to the jury, consistent with Dr. Carlo and Ms. Cannon, and in support of Mr. Thuesen defense related to intent. Trial counsel's failure to effectively prepare and present Dr. Saunders' testimony was unreasonable and amounted to deficient performance.

424.    Because of the brevity and misleading nature of Dr. Saunders' testimony regarding Mr. Thuesen's PTSD and mental health generally, the jury received only a cursory, confusing, and "technical" description of it. State Habeas Petition, Ex. 8 ¶ 43. Dr. Saunders' testimony failed to provide the jury with anything more than a general description of the PTSD symptoms that Mr.

Thuesen suffered and barely touched on how those symptoms directly impacted Mr. Thuesen's behavior, relationships with others, and, more important, his intent during the crime. *Id.*

425.    The incorrect opinions and gaps in Dr. Saunders' testimony likely created a misconception in the jury's mind that Mr. Thuesen was either not truly suffering PTSD or, even if he were, that PTSD was not a significant factor in Mr. Thuesen's life and the events surrounding the crime.

426.    Trial counsel also provided ineffective assistance when they failed to adequately prepare and rehabilitate Dr. Saunders, their only expert witness.

427.    As discussed above, trial counsel performed deficiently by failing to present adequate expert testimony on Mr. Thuesen's PTSD. The testimony that trial counsel did introduce through Dr. Saunders damaged Mr. Thuesen's defense. In addition to those shortcomings, trial counsel also failed to adequately prepare Dr. Saunders to testify, and then failed to rehabilitate him following cross-examination, which failures critically damaged the credibility of the sole defense expert who testified at the guilt/innocence phase of Mr. Thuesen's trial.

428.    Capital trial counsel have a well-established duty to investigate, prepare, and present evidence of innocence at a defendant's trial. *See Wiggins v. Smith*, 539 U.S. 510, 522 (2003). To sufficiently present this testimony, though, counsel must adequately prepare the expert witness. *See Draughon*, 427 F.3d at 296 (finding counsel ineffective for failing to present an expert that, in turn, "set up an unchallenged factual predicate for the State's main argument.").

429.    Dr. Saunders' consultation on Mr. Thuesen's case began in earnest only a few months before trial. Although Dr. Saunders initially evaluated Mr. Thuesen in March 2009 for competency, he was not retained by trial counsel to investigate how Mr. Thuesen's mental health may have impacted his ability to form a criminal intent until February 2010, one month before voir

dire and three months before the guilt/innocence phase would commence. State Habeas Petition, Ex. 15 at 22. After interviewing Mr. Thuesen in March 2010, Dr. Saunders consulted with trial counsel *once* that month and *once* again in April. *Id.*

430.    Trial counsel spent the most time consulting with Dr. Saunders just days before the trial, on May 9, 13, and 17, 2010. *Id.* at 23. In fact, Dr. Saunders was still working on his evaluation during this time, interviewing Mr. Thuesen again on May 13, 2010. *Id.* Counsel only prepared Dr. Saunders for his testimony just briefly the day before.

431.    However, this little preparation was not enough given that the focus of Dr. Saunders' testimony had shifted just before his testimony. *Strickland*, 466 U.S. at 688 ("[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."). Dr. Saunders was originally retained to evaluate Mr. Thuesen for general mental health mitigation themes and to testify at the punishment phase of trial. State Habeas Petition, Ex. 10 ¶ 10. As previously discussed, though, upon hearing the testimony of the State's medical examiner, Dr. Saunders told trial counsel that he could testify about Mr. Thuesen's lack of intent during the crime. *Id.* Trial counsel chose at that point to switch Dr. Saunders' testimony from the punishment phase to the guilt/innocence phase of trial. *Id.*

432.    Trial counsel did not augment their preparation.

433.    As a predictable result, Dr. Saunders' testimony was unprepared and provided testimony with factual mistakes and statements harmful to Mr. Thuesen's defense. It was apparent from Dr. Saunders' testimony regarding Mr. Thuesen's lack of intent that trial counsel had not fully considered or prepared this testimony. 47 RR at 37.

434.    Dr. Saunders stated multiple times that the evidence was not actually supportive that Mr. Thuesen did not intend to kill Travis Joiner—a harmful and damaging statement. 47 RR at 63, 112, 163.

435.    Dr. Saunders struggled throughout cross-examination to define when Mr. Thuesen did or did not have the capacity to form intent. He first suggested that Mr. Thuesen was aware of his actions and intended them up to the moment he pulled the trigger, but that he lacked the intent to kill after that moment. 47 RR at 102. Next, he explained that Mr. Thuesen had the intent to shoot Ms. Joiner to stop her, forming "an intent" but just not the specific intent to kill. 47 RR at 107. Finally, Dr. Saunders offered that Mr. Thuesen could have formed the intent to kill Ms. Joiner and Travis in the days leading up to the crime, but just not at the moment of the crime itself. 47 RR at 169.

436.    The State's devastating cross-examination of Dr. Saunders' testimony was entirely predictable and illustrative of trial counsel's lack of preparation.

437.    Several other points of Dr. Saunders' testimony were not beneficial to Mr. Thuesen's case because they were inaccurate and prejudicial. For example, Dr. Saunders stated that Mr. Thuesen had presented himself as "well defended" during their interviews. 47 RR at 58-59. This meant that Mr. Thuesen hid his feelings and suppressed his emotions. However, this characterization of Mr. Thuesen directly conflicted with lay witness testimony that Mr. Thuesen was often needy and emotional, and that he cried frequently. 46 RR at 133, 166; 51 RR at 64.

438.    Dr. Saunders also posited that Mr. Thuesen had gone to Ms. Joiner's house the day of the crime to make a suicidal gesture. 47 RR at 40. However, Mr. Thuesen had stated to the police that he was not intending to use the gun. The fact that his testimony was in direct contrast to the statements made by Mr. Thuesen (and known to the jury) simply undermined Dr. Saunders'

credibility. And trial counsel knew or should have known that those contradictions would undermine Mr. Thuesen's defense. In addition, this testimony damaged the credibility of both Dr. Saunders and Mr. Thuesen—whose version of events was impacted by the effects of PTSD, such as an inability to form memories and the risk of confabulation. *See* Xenakis Decl. ¶ 41.

439. Finally, Dr. Saunders' testimony left the jury with the incorrect impression that Mr. Thuesen suffered from Borderline Personality Disorder. 47 RR at 142. He stated that Mr. Thuesen showed "borderline features" and agreed with the State that a Borderline patient would have unstable relationships, rage, and anger. *Id.* Yet Dr. Saunders had not in fact diagnosed Mr. Thuesen with that disorder. 47 RR at 36 (diagnosing Mr. Thuesen with PTSD, Dependent Personality Disorder, and depression). Borderline Personality Disorder is an incurable disorder known for causing rage and anger. Leaving this suggestion hanging out for the jury with no further explanation amounted to deficient performance.

440. With adequate preparation, trial counsel would have been aware of the above problematic statements from Dr. Saunders and taken steps to cure them. Further, trial counsel failed to rehabilitate Dr. Saunders' testimony sufficiently on redirect. In the few questions they asked on redirect, trial counsel elicited from Dr. Saunders that Mr. Thuesen was overly dependent on Ms. Joiner, he went into a rapid descent into mental illness before the crime, and he did not intend to kill Ms. Joiner. 47 RR at 173-78. The questioning did not address any of the issues brought up during the cross-examination including what specifically Dr. Saunders' opinion was regarding when Mr. Thuesen could and could not form an intent, whether Mr. Thuesen did or did not have the intent to kill Travis Joiner, and whether Mr. Thuesen did or did not suffer from Borderline Personality Disorder.

441.    As the sole expert witness provided by the defense, Dr. Saunders' testimony was critical to support the defense theory that Mr. Thuesen was suffering from PTSD and lacked the necessary intent to commit capital murder. Trial counsel's failure to sufficiently prepare Dr. Saunders led to inaccurate, damaging testimony that hurt Dr. Saunders' credibility before the jury.

442.    Had trial counsel instead spent the necessary time preparing him, Dr. Saunders' testimony might have been seen as credible, ultimately leading to a different verdict.

> b)    *Dr. Carlo*

443.    Trial counsel was deficient in presenting evidence through Dr. Carlo because Dr. Carlo never diagnosed Mr. Thuesen with PTSD and Dr. Carlo was statutorily prohibited from offering any expert opinions about PTSD. Trial counsel knew or should have known these crucial limitations prior to Dr. Carlo's testimony, yet trial counsel called Dr. Carlo anyway, creating significant confusion and doubt on the central issue of Mr. Thuesen's PTSD.

444.    Dr. Carlo was Mr. Thuesen's treating physician during his four-day stay at the Houston VA Medical Center following his call to the suicide hotline. 45 RR at 21. Dr. Carlo testified that Mr. Thuesen was severely depressed on admission to the hospital. 45 RR at 22-23. Based upon his observations and discussions with Mr. Thuesen, Dr. Carlo diagnosed him with Major Depressive Disorder. 45 RR at 24. Dr. Carlo testified that Mr. Thuesen was still a long way away from being well when he was discharged from the hospital. 45 RR at 28.

445.    Dr. Carlo only diagnosed Mr. Thuesen with depression, and that was the condition he treated, because Mr. Thuesen's immediate presentation at the hospital was suicidal ideation. State Habeas Petition, Ex. 4 ¶ 7. Of course, the State highlighted this fact on cross-examination, including that Mr. Thuesen's chart at the time said "[p]atient denied any traumatic event." 45 RR at 35. The State also noted that Mr. Thuesen did not report symptoms of flashbacks, avoidance, or aggression. 45 RR at 31. Thus, one of trial counsel's key witnesses regarding Mr. Thuesen's PTSD

had not actually diagnosed Mr. Thuesen with PTSD and could not provide the evidence that trial counsel wanted and needed to present.

446.    Further, trial counsel unsuccessfully attempted to have Dr. Carlo diagnose Mr. Thuesen with PTSD after the fact. 45 RR at 37-58. However, as a federal employee, Dr. Carlo was permitted to testify only as a fact witness on permission of the United States Attorney's Office. 45 RR at 54-57; *see* 38 C.F.R. §§ 14.803, 14.808. Because he had not diagnosed Mr. Thuesen with PTSD when treating him at the VA Medical Center, Dr. Carlo could not offer any expert opinions about whether Mr. Thuesen suffered from PTSD.

447.    Trial counsel objected to this limitation, causing a heated argument at the bench with an Assistant U.S. Attorney who represented the VA. Counsel wanted to ask Dr. Carlo his opinion about whether Mr. Thuesen had PTSD (even though Dr. Carlo had never formally diagnosed Thuesen with it). 45 RR at 37. Because of the federal regulation governing expert testimony by a federal employee like Dr. Carlo, however, the trial court did not order Dr. Carlo to provide an expert opinion.

448.    Trial counsel should have known this limitation on Dr. Carlo's testimony. Instead, trial counsel had to attempt to offer statutorily-barred testimony through Dr. Carlo to make up for their own lack of preparation and planning on the presentation of expert testimony. Had trial counsel reasonably investigated and prepared, trial counsel would have known the limitations on Dr. Carlo's testimony prior to calling him as a witness.

c)    *Theresa Cannon*

449.    The other VA witness relied upon by trial counsel proved no better a source of evidence of Mr. Thuesen's PTSD. Instead, trial counsel deficiently created further confusion about Mr. Thuesen's PTSD by calling Theresa Cannon without also giving the jury a complete picture of Mr. Thuesen's mental health.

450.     Ms. Teresa Cannon, a VA social worker, treated Mr. Thuesen with supportive counseling sessions following his four-day stay at the Houston VA Medical Center. 45 RR at 78-79. Trial counsel elicited testimony from Ms. Cannon regarding the various elements of PTSD that Mr. Thuesen self- reported during their sessions together. 45 RR at 81-94. In addition, Ms. Cannon testified about the positive impact Mr. Thuesen's relationship with Rachel Joiner had on his mental state. 45 RR at 93-101.

451.     There were numerous, obvious flaws with Ms. Cannon's testimony. Trial counsel either should not have called her, or should have been prepared to clear up the confusion her testimony created. Instead, trial counsel's decision to call Ms. Cannon further muddied the presentation of Mr. Thuesen's PTSD to the jury.

452.     Ms. Cannon had herself never diagnosed Mr. Thuesen with PTSD, as she was unqualified to do so. As a social worker, Ms. Cannon cannot diagnose or prescribe treatment of patients. State Habeas Petition, Ex. 3 ¶ 9.

453.     Ms. Cannon only offered Mr. Thuesen limited supportive counseling sessions. *Id.* ¶ 10. But those counseling sessions did not adequately address or treat Mr. Thuesen's PTSD symptoms. State Habeas Petition, Ex. 8 ¶ 25 ("While well-intentioned, this course of treatment did nothing to repair the daily damage PTSD would have done to Thuesen's functioning in society."), State Habeas Petition Ex. 9 ¶ 53 ("Supportive therapy, while somewhat helpful in some cases, does not address the specific triggers that may set off a veteran's PTSD."). Thus, not only was Ms. Cannon's testimony damaging to the defense, but it prevented the defense from developing the theme that Mr. Thuesen's PTSD was not properly treated.

454.     What's more, Ms. Cannon *mistakenly* testified that Mr. Thuesen had been diagnosed with PTSD before starting sessions with her. 45 RR at 80. In actuality, Mr. Thuesen had

never been diagnosed with or properly treated for PTSD, even while in treatment at the VA Medical Center in Houston. Ms. Cannon had received only cursory information over the phone from the suicide prevention coordinator at the Houston VA regarding Mr. Thuesen's brief treatment related to his call to the suicide hotline. State Habeas Petition, Ex. 9 ¶ 6. She never received any medical records from the VA system, including past diagnoses, treatment history, or mental health assessments. *Id.* This further confused the issue of Mr. Thuesen's PTSD for the jury, and damaged the defense by incorrectly implying that Mr. Thuesen's PTSD was being managed at the time of the incident.

455.    Unsurprisingly, on cross examination the State undermined any impact of Ms. Cannon's testimony, by suggesting either Mr. Thuesen was not really suffering from PTSD or Ms. Cannon was not that familiar with Mr. Thuesen's condition. The prosecution elicited from Ms. Cannon that she had never seen Mr. Thuesen withdraw from his family or experience trouble with employment or school. 45 RR at 107. In addition, she confirmed that Mr. Thuesen chose to stop taking his medication and declined to go to group therapy sessions.[17] 45 RR at 111-13. Finally, Ms. Cannon stated that Mr. Thuesen requested their sessions be decreased from once every month to once every sixty days. 45 RR at 120-21. This cross-examination further left the jury with the impression that Mr. Thuesen was somehow responsible for his condition, or that it could not have been too serious, because he was not taking medication or attending counseling.

456.    The evidence the defense was able to elicit from these witnesses was insufficient because trial counsel were wholly unprepared. It would have been possible to convince the jury that Mr. Thuesen had PTSD and that it severely impacted his intent during the crime. But by the

---

[17] In fact, "[a]version to taking medication is very common in service members for a host of reasons, including side-effects and the patient's belief that the medication may interfere with their work or social life." State Habeas Petition, Ex. 9 ¶ 56.

end of Dr. Saunders' testimony, the jury realized what trial counsel already knew—Dr. Saunders was not a PTSD expert, and his testimony was therefore not relevant to the PTSD that was central to the defense theory.

457.   Compounding the inadequacy of Dr. Saunders' testimony, Dr. Carlo and Ms. Cannon did not provide evidence of PTSD that trial counsel believed they would provide. If anything, their testimony was damaging, highlighting the lack of a formal diagnosis or treatment of Mr. Thuesen's PTSD by the VA system.

458.   The testimony presented by trial counsel failed to specifically draw a connection between Mr. Thuesen's PTSD and the crime. Rather than use these witnesses to tie Mr. Thuesen's struggles with PTSD to his actions during the crime, trial counsel deferred to Dr. Saunders' unsupported theory about bullet wounds and Dependent Personality Disorder and allowed Dr. Carlo and Ms. Cannon to question whether Mr. Thuesen even *has* PTSD. As a result, the modest evidence presented to the jury about Mr. Thuesen's PTSD (from lay witness testimony about changes in Mr. Thuesen's behaviors) was left untethered to any coherent or reasonable defense theory.

**4.    Trial counsel provided ineffective assistance when they failed to develop, prepare, and present testimony related to the PTSD recovery period and confabulations, and that failure prejudiced Mr. Thuesen.**

459.   In 2013, DSM-V reclassified PTSD from the category of anxiety disorders and into the "trauma and stressor-related disorders."

460.   Significantly, DSM-V recognized that PTSD can cause dissociative behavior. DSM-V 300.6 (F48.1) (attached as Ex. 11). Dissociative behavior means responding to trauma-related stimuli with dissociative symptoms (depersonalization or derealization) and associated emotional detachment. Depersonalization means "[e]xperiences of unreality, detachment, or being an outside observer with respect to one's thoughts, feelings, sensations, body, or actions (e.g.,

perceptual alterations, distorted sense of time, unreal or absent self, emotional and/or physical numbing)." *Id.* Derealization means "[e]xperiences of unreality or detachment with respect to surroundings (e.g., individuals or objects are experienced as unreal, dreamlike, foggy, lifeless, or visually distorted)." *Id.*

461.    Dissociative features may include having flashbacks to traumatic events; briefly losing touch with events going on around oneself (like daydreaming); blanking out or being unable to remember anything for a period of time; memory loss about certain events, people, information, or time periods; a distorted or blurred sense of reality; feeling disconnected or detached from your emotions; feeling that the world around you is unreal and distorted; feeling numb or distant from yourself and your surroundings; and having an altered sense of time and place. This dissociative behavior can be triggered by a PTSD crisis. Dissociative behavior may include involuntary behavior (such as training, habits, or instincts), flat affect, memory loss, and emotional detachment. It is generally short-term.

462.    Consistent with DSM-V, shortly after a PTSD event, a person suffering from PTSD could be expected to have a flat affect or otherwise seem emotionally detached from recent events. Xenakis Decl. ¶¶ 38-40.

463.    Similarly, during a PTSD incident, it is difficult to form and retrieve memories. Xenakis Decl. ¶ 32; State Habeas Petition, Ex. 8 ¶¶ 34, 38. Thus, a person suffering from PTSD could be expected to confabulate. Xenakis Decl. ¶ 41. Confabulation can involve gaps in memory, or it could involve filling in those gaps with misinterpreted, distorted, or imagined information which then seems true. Soldiers are trained to recover quickly from firefights, and to report immediately on what happened. This training can further suppress emotional affect and accuracy

of reporting. Mr. Thuesen's lack of memory of the event is consistent with a PTSD crisis and sympathetic storm, which can also cause a flat affect. *See* Xenakis Decl. ¶¶ 35-43.

464.    Trial counsel knew, or should have known, that they needed to present critical evidence that their client was suffering from PTSD. That also meant they should *not* present witnesses who would undermine that PTSD defense. Instead, trial counsel presented a witness at the guilt phase (Officer Jagielski) whose testimony significantly undermined the defense's PTSD theory; trial counsel failed to call at the guilt phase a witness (Janet Walker, not called until punishment phase) that they could and should have called to counter the State's position that Mr. Thuesen intended to kill Ms. Joiner; and trial counsel failed to rebut the testimony of another lay witness (Tabitha Foreman), whose testimony indicated that Mr. Thuesen lacked remorse, when in reality his flat affect was a product of his PTSD crisis.

465.    In their opening guilt/innocence phase argument, trial counsel told the jury that Mr. Thuesen suffered from a hodgepodge of mental illnesses—PTSD, depression, and Dependent Personality Disorder—and therefore did not have the requisite intent to be convicted of capital murder. 44 RR at 50-55. Moments later, the defense called their first guilt/innocence phase witness.

466.    The first witness the defense called during the guilt/innocence phase was City of College Station Police Officer Tom Jagielski, who testified that he saw nothing wrong, mentally, with Mr. Thuesen immediately following the crime.

467.    Officer Jagielski was one of the police officers who responded to the Joiner's residence immediately after the shooting. Officer Jagielski testified to the following: as he approached the Joiner house the garage door opened and Mr. Thuesen was there crouching next to Ms. Joiner; Mr. Thuesen showed his hands and laid in the grass as instructed; Mr. Thuesen was

very cooperative with the officer; Mr. Thuesen was then transported to the police station. 44 RR at 55-58. Officer Jagielski, who had training to assist people in mental health crises, testified that Mr. Thuesen had a "flat affect" and an "emotionally stone face." *Id.* at 67-69. Officer Jagielski also testified that Mr. Thuesen cried, expressed concern for the victims, and did not appear to be angry or hostile. *Id.* at 70-75.

468.    This testimony falsely conveyed the impression that Mr. Thuesen was remorseless. Competent, adequately prepared counsel would have been able to use such testimony as evidence that Mr. Thuesen was experiencing a mental health crisis. *See* Xenakis Decl. ¶¶ 35-40.

469.    On cross-examination, however, Officer Jagielski testified that in his opinion as a certified health crisis officer Mr. Thuesen was *not* experiencing a mental health crisis that night, and that Mr. Thuesen appeared mentally competent, seemed to understand the consequences of his actions, and was not experiencing delusions or seeing things. Officer Jagielski also testified that if you wanted to kill someone you would do it with a gun rather than a knife and that you would shoot someone multiple times as opposed to a single time—referring to Mr. Thuesen's shooting of the Joiners. 44 RR at 78. Officer Jagielski also testified that Mr. Thuesen was crying like Officer Jagielski's three-year-old granddaughter would after being scolded—as a way to get sympathy. *Id.* at 83.

470.    There is no strategic or reasonable explanation for trail counsel to call a witness like Officer Jagielski, whose testimony would inflict such damage to their central defense theme; or be so unprepared to address the testimony in a way that was consistent with Mr. Thuesen's defense. The only explanation is that trial counsel was unprepared; they failed to prepare adequately and conduct the reasonable investigation that would have either flagged this witnesses' testimony as damaging or prepared them to counter or limit the damage.

471.     Officer Jagielski's testimony was the exact opposite of what counsel intended to tell the jury, i.e., that Mr. Thuesen was experiencing a mental health episode and that, as a result, he could not have formed the intent required for capital murder. Instead, Officer Jagielski testified that Mr. Thuesen did *not* appear to be experiencing a mental health crisis, that he appeared to be mentally competent, and that bringing a gun to the scene and shooting the individuals multiple times *demonstrated* intent to kill. In other words, Officer Jagielski's testimony was unequivocally detrimental to Mr. Thuesen's case.

472.     Trial counsel never re-directed the witness regarding a lack of fear, flashback, hallucination, or anger. Instead, trial counsel minimized the impact of the defense's own witness by confirming that the officer did not know whether or not Mr. Thuesen was experiencing a mental health crisis at the time of the incident. 44 RR at 88.

473.     Trial counsel's failure to develop, prepare, and present testimony related to Mr. Thuesen's PTSD recovery period and confabulations and their failure in calling Officer Jagielski prejudiced Mr. Thuesen's defense.

474.     Trial counsel also failed to contradict damaging lay testimony about Mr. Thuesen's intent. Dr. Saunders testified at the guilt/innocence phase of trial that Mr. Thuesen told his friend Janet Walker that he was so mad at Ms. Joiner that he could shoot her. However, Janet Walker testified at the punishment phase that Mr. Thuesen never made such a comment to her. Trial counsel could, and should, have called Ms. Walker at the guilt/innocence phase of the trial to refute this alleged damaging statement.

475.     There is no reasonable strategy that supports trial counsel's decision to not call Ms. Walker at the guilt/innocence phase. The entire issue at guilt was whether Mr. Thuesen had the requisite intent to kill Ms. Joiner that would subject him to a conviction of capital murder. Trial

counsel however, left unchecked the allegation that Mr. Thuesen told Walker that he thought about shooting Ms. Joiner. This false statement lent support to the State's theory that Mr. Thuesen went to Ms. Joiner's house intentionally to shoot her. Trial counsel knew that Ms. Walker could rebut this by clearly stating that Mr. Thuesen had never told her such a thing. Without reason, counsel chose not to call Ms. Walker at the guilt/innocence phase, where her testimony would have been important and relevant evidence for the jury to hear and take into account when evaluating guilt.

476.    Adding to the evidence that Mr. Thuesen acted with intent to kill, Rachel Joiner's neighbor, Tabitha Foreman, testified that she saw Mr. Thuesen in the minutes after the murders. She testified that she saw his face clearly, and that he did not seem mad or angry. 38 RR at 88-89. On redirect, she testified that the expression was "a look of no remorse." 38 RR at 106.

477.    Although there is significant evidence that flat affect and lack of memory were additional symptoms of a PTSD crisis, those facts were actually used to support Mr. Thuesen's conviction, further cementing the misunderstanding and mishandling of Mr. Thuesen's PTSD at the guilt/innocence phase of trial.

478.    Trial counsel's decision to call Officer Jagielski, failure to understand Officer Jagielski's testimony in light of the PTSD defense, failure to rebut the impact of Ms. Foreman's testimony, and failure to call Ms. Walker at the guilt/innocence phase of the trial prejudiced Mr. Thuesen and was objectively deficient. The testimony should have showed that Mr. Thuesen's behavior immediately following the killings was consistent with a person in a PTSD crisis. *See* Xenakis Decl. ¶¶ 35-43. Instead, the jury was left with the impression that Mr. Thuesen was remorseless.

**5.     Trial counsel provided ineffective assistance when they failed to present testimony of Mr. Thuesen's family history of mental health through his mother, Patricia Thuesen, and that failure prejudiced Mr. Thuesen.**

479.     Trial counsel knew that Mr. Thuesen's mother, Patricia Thuesen, was available and willing to testify about the history of mental health challenges in the Thuesen family. This testimony would have further established Mr. Thuesen's PTSD defense and supported a jury conclusion that Mr. Thuesen did not form the requisite intent to be guilty of capital murder. Instead, trial counsel failed to call Mrs. Thuesen, leaving the jury without material evidence about Mr. Thuesen's mental health, the central issue for the defense.

480.     Trial counsel actually moved to call Mrs. Thuesen to testify on the Thuesen family mental health history. Before Mrs. Thuesen's guilt-phase testimony about the Thuesen family history of mental illness, the State objected on relevance grounds. 46 RR at 92-93. In response, trial counsel argued that Mr. Thuesen's family had an "incredible, severe history of mental illness," and the evidence was relevant as Dr. Saunders relied upon it when coming to his conclusions about Mr. Thuesen's own mental health. 46 RR at 93-94; *accord* Xenakis Decl. ¶¶ 44-46.

481.     Trial counsel proffered what Mrs. Thuesen would testify to: that Mrs. Thuesen's mother was an alcoholic; that Mrs. Thuesen's father did not live with the family and her visits with him were monitored by her grandmother; that Mrs. Thuesen's father showed signs of depression; that Mrs. Thuesen's brother, George, attended a state school, showed signs of depression throughout his life, and was at that time homeless and living somewhere in the Corpus Christi area; that Mrs. Thuesen's half-sister, Lisa, also showed signs of depression and had been admitted to a psychiatric hospital; that Mrs. Thuesen's daughter, Michelle, also spent time in a psychiatric hospital; and that Mrs. Thuesen's mother-in-law showed signs of depression and alcoholism. 46 RR at 108-12.

482.    After hearing argument, 46 RR at 107, the court sustained the State's objection "until Dr. Saunders testifies." *Id.* at 107-08, 112.

483.    Dr. Saunders' testimony unequivocally laid the foundation for Mrs. Thuesen's testimony and primed the jury to understand its relevance. He testified that there is a genetic component to mental health, and that people with first or second-degree relatives with mental health conditions have a higher degree of suffering themselves from such conditions—and then linked that to Mr. Thuesen's own family history of mental health conditions (which he had read about). 47 RR at 50-53; *accord* Xenakis Decl. ¶¶ 44-46.

484.    Shortly after Dr. Saunders offered his testimony, the court ruled that "the testimony of Mrs. Thuesen, the mother, regarding mental illness of her family members is now relevant and admissible." 47 RR at 120. Inexplicably, however, trial counsel never recalled Mrs. Thuesen or presented this evidence to the jury.

485.    In light of their initial attempt to have Mrs. Thuesen testify regarding the history of mental health challenges members of Thuesen family have faced, and with knowledge of Dr. Saunders' opinion that a family history of mental health were more likely to suffer from mental health conditions, trial counsel knew or should have known that Mrs. Thuesen's testimony was critical to Mr. Thuesen's defense at the guilt/innocence phase of the trial.

486.    Trial counsel's failure to call Mrs. Thuesen was objectively deficient. Trial counsel inexplicably failed to recall Mrs. Thuesen after Dr. Saunders testified. As a result, she never presented critically important testimony about her family's struggles with mental health. 46 RR at 130-49.

487.    Trial counsel's decision not to call Mrs. Thuesen to testify on this point was unreasonable and could not have been strategic. Given Dr. Saunders' testimony that family history

of mental health conditions was a strong predictor of whether an individual was at risk of developing a mental health condition, any reasonable counsel would have known that it was critical to develop testimony regarding the history of mental health conditions faced by Mr. Thuesen's family.

488.    Mr. Thuesen was prejudiced by trial counsel's failure to offer this testimony.

489.    Evidence of Mr. Thuesen's family history of mental health conditions was relevant as it formed the basis, at least in part, for Dr. Saunders' testimony that Mr. Thuesen suffered from Dependent Personality Disorder and depression, both of which could have been the result of multi-generational history of similar mental health conditions. The court even agreed with counsel that the evidence was relevant following Dr. Saunders' testimony.

490.    It is reasonably probable that had the jury heard this evidence directly from Patricia Thuesen, the jury would have given more credibility to Dr. Saunders' intent testimony. Had trial counsel not neglected to offer Mrs. Thuesen's testimony on this issue, the jury would have had further contextualization for Dr. Saunders' opinions that Mr. Thuesen suffered from a variety of mental health conditions and may have reconsidered whether those conditions prevented him from forming the intent necessary to be held criminally liable.

491.    As it was presented, the jury was left without a valuable piece of information bolstering the defense that Mr. Thuesen suffered from a mental health condition.

492.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about Mr. Thuesen's guilt or innocence.

493.    Had trial counsel properly investigated, prepared, and presented the testimony of Dr. Saunders, Dr. Carlo, and Cannon, the three would have presented a cohesive picture of Mr.

Thuesen's PTSD symptoms. Dr. Saunders could have testified regarding Mr. Thuesen's mental health generally, providing evidence of diminished intent and culpability. Dr. Carlo and Cannon could have testified to Mr. Thuesen's crises, need for treatment, and symptoms. Rather than allowing the lack of PTSD diagnosis and treatment to hurt Mr. Thuesen's defense, effective trial counsel would have known to use the testimony to show that Mr. Thuesen was living undiagnosed and untreated until the night of the crime.

494.    There is a reasonable probability that the ineffective presentation of Mr. Thuesen's PTSD, and his lack of treatment for that PTSD, led the jury to reject the notion that Mr. Thuesen actually suffered from PTSD. As a result, by the punishment phase, the jury had rejected Dr. Saunders' theory that mental illness impacted Mr. Thuesen's behaviors during the crime.

495.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new guilt/innocence phase trial.

## II.    TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE PUNISHMENT PHASE OF TRIAL, IN VIOLATION OF MR. THUESEN'S SIXTH AMENDMENT RIGHTS.

496.    The Sixth Amendment guarantees Mr. Thuesen the right to counsel. *Strickland*, 466 U.S. at 684 ("[T]his Court has recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial."). And "the right to counsel is the right to the effective assistance of counsel." *Id.* at 686.

497.    To state a claim for ineffective assistance of trial counsel, Mr. Thuesen must show that trial counsel's performance was deficient and that trial counsel's deficient performance prejudiced his defense—"[t]his requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

498.    To prove deficient performance, Mr. Thuesen must show that trial counsel's performance fell below an objective standard of reasonableness. *Porter*, 558 U.S. at 38. And "[t]o

establish prejudice, [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 38-39.

499.    "It is unquestioned that under the prevailing professional norms . . . counsel had an obligation to conduct a thorough investigation of the defendant's background." *Id.* at 39. Trial counsel cannot "ignore[] pertinent avenues for investigation of which he should have been aware." *Id.* at 40. Important, counsel *must conduct a mitigation investigation*. *Id.*; *see also Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020) (finding ineffective assistance when "counsel performed almost no mitigation investigation, overlooking vast tranches of mitigating evidence").

500.    Indeed, the American Bar Association ("ABA") Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases state that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."[18] Trial counsel "at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation."[19] And trial counsel must consider expert and fact witnesses "to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs; or otherwise support a sentence less

---

[18] https://www.americanbar.org/groups/committees/death_penalty_representation/resources/aba_guidelines/2003-guidelines/2003-guideline-10-7/ (Guideline 10.7).

[19] https://www.americanbar.org/groups/committees/death_penalty_representation/resources/aba_guidelines/2003-guidelines/2003-guideline-10-11/ (Guideline 10.11).

than death; and/or to rebut or explain evidence presented by the prosecutor."[20] In short, "[c]ounsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client."[21] *See also Strickland*, 466 U.S. at 688-89 (discussing the use of ABA standards as guides for determining "[p]revailing norms of practice"). Texas has similar—if not more rigorous—guidelines in place for capital counsel.[22]

501.    The U.S. Supreme Court has held that trial counsel's failure to investigate, prepare, and present mitigating evidence during the punishment phase of trial constitutes ineffective assistance. For example, in *Porter*, the petitioner was a veteran with combat experience that "left him a traumatized, changed man." *Porter*, 558 U.S. at 30. A jury convicted Mr. Porter of two counts of first-degree murder after he killed his former girlfriend and her boyfriend, and the trial court sentenced Mr. Porter to death. *Id.* at 31. Mr. Porter's trial counsel failed to discover and present critical mitigating evidence during the punishment phase of trial. Evidence presented during Mr. Porter's state habeas proceedings confirmed that trial counsel left compelling mitigating evidence unpresented during the punishment phase of trial. After Mr. Porter returned from the Korean War, he experienced nightmares and would attempt to climb his bedroom walls with knives, and he "developed a serious drinking problem and began drinking so heavily that he would get into fights and not remember them at all." *Id.* at 35-36. A neuropsychology expert concluded that Mr. Porter suffered from brain damage and "extreme mental or emotional disturbance." *Id.* at 36. The Court held that trial counsel provided ineffective assistance when they

---

[20] *Id.*

[21] *Id.*

[22] State Bar of Texas, *Guidelines and Standards for Texas Capital Counsel*, Guideline 10.1 (requiring the defense team employ a "mitigation expert"), Guideline 11.1, https://www.texasbar.com/AM/Template.cfm?Section=Consider_a_State_Bar_Committee&Template=/CM/ContentDisplay.cfm&ContentID=28741.

failed to conduct a thorough investigation into Mr. Porter's background. *Id.* at 39. Trial counsel "ignored pertinent avenues for investigation of which he should have been aware." *Id.* at 40. And "[t]he decision not to investigate did not reflect reasonable professional judgment." *Id.* Indeed, "the sentence would have been different if the sentencing judge and jury had heard the significant mitigation evidence that Porter's counsel neither uncovered nor presented." *Id.* at 31.

502. In *Andrus*, too, trial counsel's mitigation investigation and presentation fell short of professional standards. Trial counsel did not contact some witnesses "until just before *voir dire*" and became aware of others "only partway through trial." *Andrus*, 140 S. Ct. at 1882. Trial counsel did not meet with or call witnesses "whom had disturbing stories about Andrus' upbringing." *Id.* As in *Porter*, trial counsel in *Andrus* "ignored pertinent avenues for investigation of which he should have been aware"—trial counsel knew that Andrus had been diagnosed with a "seemingly serious mental health issue." *Id.* at 1882-83. "In short, counsel performed virtually no investigation, either of the few witnesses he called during the case in mitigation, or of the many circumstances in Andrus' life that could have served as powerful mitigating evidence." *Id.* at 1883. And trial counsel failed to investigate and rebut the State's aggravating evidence. *Id.* at 1884.

503. The facts in Mr. Thuesen's case are strikingly similar to those in Mr. Porter's and Mr. Andrus's and compel similar findings that trial counsel here were also ineffective.

504. Had Mr. Thuesen's trial counsel been effective, "the judge and jury would have learned of the kind of troubled history [the U.S. Supreme Court has] declared relevant to assessing a defendant's moral culpability." *Porter*, 558 U.S. at 41.

505. Mr. Thuesen's trial counsel failed to prepare for the punishment phase of trial. They failed to investigate and prepare critical mitigating evidence. As part of trial counsel's investigation and preparation for the punishment phase of trial, they needed to develop expert and

fact witness testimony relevant to Mr. Thuesen's moral culpability. Expert testimony related to a defendant's mental health, in particular, is critical to educating the jury and to explaining how it reduces the defendant's moral culpability.

506.    As in the guilt phase of trial, trial counsel failed to investigate, develop, prepare, and present an effective mitigation strategy for the punishment phase. Trial counsel did not develop or prepare evidence related to Mr. Thuesen's PTSD and other related compelling mitigating evidence. Trial counsel knew about Mr. Thuesen's PTSD symptoms. But trial counsel ignored Mr. Thuesen's PTSD during the punishment phase and presented no argument or evidence regarding PTSD's effect on Mr. Thuesen's behavior, much less any cohesive narrative regarding diminished moral culpability. Mr. Thuesen's trial counsel—Mr. Carter and Ms. Esparza—were overwhelmed with other cases and, as a result, their investigation of critical punishment phase issues was delayed, hurried, and incomplete. They failed to secure a PTSD expert who would actually testify about how the condition affected Mr. Thuesen's behavior and his culpability and did not call available witnesses or meaningfully review critical evidence related to Mr. Thuesen's PTSD and how it affected his behavior.

507.    By failing to promptly commence and develop an investigation into mitigating evidence, trial counsel's performance was deficient. Moreover, trial counsel's failures prejudiced Mr. Thuesen's defense during the punishment phase of the trial. Available mitigating evidence—in particular, evidence explaining how Mr. Thuesen's PTSD affected his behavior—was reasonably likely to have altered the jury's punishment phase determinations.

508.    Mr. Thuesen asks this Court to grant him relief on his ineffective assistance of trial counsel claims related to the punishment phase of trial and grant him a new sentencing hearing, as Judge Bryan intended.

A.    **The Court is not procedurally barred from conducting a *de novo* review of Mr. Thuesen's claim for ineffective assistance of trial counsel related to investigating, developing, preparing, and presenting expert evidence that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the punishment phase (State Habeas Claims 1, 5, 7, and 16).**

509.    For reasons discussed here, trial counsel provided ineffective assistance when they failed to investigate, develop, prepare, and present evidence that would have explained and contextualized Mr. Thuesen's PTSD and its effect on his behavior to the jury during the punishment phase. Mr. Thuesen requests that the Court evaluate his claim for ineffective assistance of trial counsel *de novo*, without deference to the state court's findings, and grant relief. Mr. Thuesen exhausted his claim (based on State Habeas Claims 1, 5, 7, and 16), the state court did not adjudicate the claim on the merits, and/or the state court denied Mr. Thuesen relief on the merits based on unreasonable determinations of fact. The Court has the power to address Mr. Thuesen's claim despite the AEDPA relitigation bar and grant the requested relief.

1.    **Claim below: State Habeas Claim 1**

510.    Mr. Thuesen showed that to the extent his claim for ineffective assistance of trial counsel during the punishment phase is based on theories advanced in State Habeas Claim 1 ("Trial counsel failed to properly develop expert witnesses for Thuesen's trial."), that claim is exhausted and the relitigation bar does not apply. *See supra* Claims for Relief § I.A.1.

511.    Particularly relevant to this punishment-phase claim, Judge Langley rejected State Habeas Claim 1 based on unreasonable determinations of fact: that "Applicant [Mr. Thuesen] concedes that trial counsel, William Carter and Michele Esparza, properly investigated Applicant's criminal case and personal background and concluded that Post-Traumatic Stress Disorder ('PTSD') 'would be a central theme in the defendant's case'" (Langley FFCL at 7, ¶ 12), and that trial counsel, William Carter, was credible and reliable when he testified that decisions regarding PTSD evidence were based on "distancing the jury from the crime itself" (Langley FFCL at 21, ¶

148

41; *see generally id.* at 21-31, ¶¶ 41-43 (citing and adopting large swaths of trial counsel's testimony regarding State Habeas Claim 1)).

512.     **Judge Langley unreasonably determined that Mr. Thuesen conceded that trial counsel had properly investigated and developed Mr. Thuesen's defense.** The record shows that Mr. Thuesen *did* dispute that trial counsel "properly investigated" his case and, in particular, his PTSD. The evidence shows that trial counsel's investigation was deficient, last-minute, and unreasonably limited. Judge Langley miscited Mr. Thuesen's state habeas application, which explained that trial counsel *knew enough to know to investigate PTSD and failed to conduct the investigation.* Indeed, Judge Langley cites a portion of Mr. Thuesen's application in which he argues that trial counsel's failure to present proper PTSD evidence—their decision to "rob Thuesen of the most powerful evidence that could have been presented on his behalf and in his defense"—was "based on an incomplete investigation." Langley FFCL at 7, ¶ 12. Judge Langley relied on an unreasonable determination of fact.

513.     **Judge Langley unreasonably determined that Mr. Carter was credible regarding his investigation and development of mitigating PTSD evidence.** Judge Langley's decision to credit and adopt trial counsel's self-interested testimony as fact findings was unreasonable in light of the overwhelming expert testimony on the subject of trial counsel's preparation and investigation of PTSD issues. Moreover, Judge Langley's decision to tether many of his "fact findings" to the idea of "distancing the jury" from the underlying crime is nonsensical. The jury received evidence regarding the underlying crime. The record shows that trial counsel ultimately failed Mr. Thuesen in refusing to develop and present evidence putting those details in context: Mr. Thuesen suffered from PTSD.

### 2.  Claim below: State Habeas Claim 5

514.    To the extent that Mr. Thuesen's claim for ineffective assistance of trial counsel during the punishment phase is based on theories advanced in State Habeas Claim 5 ("Trial counsel failed to present expert testimony at the punishment phase of Thuesen's trial."), that claim is exhausted. State Habeas Petition, Claim 5. On February 5, 2020, the CCA affirmed Judge Langley's Findings of Fact and Conclusions of Law, denying Mr. Thuesen relief on State Habeas Claim 5. *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). Texas law provides for no additional review of the CCA's decision. Thus, State Habeas Claim 5 is exhausted. *See* 28 U.S.C. § 2254(b)(1).

515.    Further, the AEDPA's relitigation bar, 28 U.S.C. § 2254(d), does not prevent the Court from adjudicating Mr. Thuesen's claim for ineffective assistance of trial counsel during the punishment phase. The state court did not decide State Habeas Claim 5 on the merits (*see* § 2254(d)), and/or rejected State Habeas Claim 5 based on unreasonable determinations of fact (*see* § 2254(d)(2)).

a)    *The state court failed to decide State Habeas Claim 5 on the merits.*

516.    The state court did not decide State Habeas Claim 5 (and, as a result, the issues that Mr. Thuesen raises in his claim for ineffective assistance of trial counsel during the punishment phase) on the merits because the CCA mishandled Judge Bryan's recusal and deprived Mr. Thuesen of Due Process when Judge Langley adjudicated his claims. *See infra* Claims for Relief § IV. *De novo* review is therefore appropriate.

b)    *The state court denied relief on State Habeas Claim 5 based on unreasonable determinations of fact.*

517.    Even if Judge Langley did adjudicate State Habeas Claim 5 on the merits, Judge Langley denied Mr. Thuesen relief on State Habeas Claim 5 based on unreasonable determinations

of fact: Judge Langley unreasonably discounted Dr. Kopel, Dr. Elbogen, and Dr. Brown. Dr. Kopel, Dr. Elbogen, and Dr. Brown offered compelling testimony showing how trial counsel mishandled the mitigation investigation and critical mitigating evidence related to the effect and magnitude of Mr. Thuesen's PTSD. Those experts, alone or in combination, confirmed that trial counsel provided ineffective assistance. Judge Langley relied on unreasonable determinations of fact to discount their expert assessments and, thus, deny Mr. Thuesen relief.

518.    **Judge Langley unreasonably determined that trial counsel should not have called Dr. Kopel.** *See* Langley FFCL at 44, ¶ 75 ("[T]rial counsel's decision not to call Kopel [during the punishment phase] was sound trial strategy" and "Kopel's opinion, that PTSD caused Applicant to be 'on fight-or-flight automatic pilot' after Ms. Joiner tried to run away, would have alienated a jury, made Applicant out to be a ticking time bomb and discredited any remaining defensive theory."). Judge Langley's "fact finding" is at odds with the overwhelming record evidence showing that had trial counsel prepared and called Dr. Kopel, Dr. Kopel would have explained how Mr. Thuesen's PTSD played a role in the crime and how it mitigated Mr. Thuesen's moral culpability. *See infra* Claims for Relief § II.B. Judge Langley took Dr. Kopel's testimony out of context (Langley FFCL at 37, ¶ 59) and unreasonably reduced it to one point: that the jury knew that PTSD was at issue. But Judge Langley overlooked and unreasonably assessed Dr. Kopel's testimony regarding the *significance* of Mr. Thuesen's PTSD (more than the *fact* of Mr. Thuesen's PTSD). Dr. Kopel confirmed that trial counsel's mitigation investigation and development of the defense was deficient. *See also* Claims for Relief § I.A.1. (discussing State Habeas Claim 1 and Dr. Kopel's opinions).

519.    **Judge Langley unreasonably discredited Dr. Elbogen.** Judge Langley unreasonably determined that "[Dr.] Elbogen's reliance on studies to support his testimony—that

151

persons with PTSD have a higher risk for violence—was later discredited by Dr. Elspeth [sic, Ritchie]." Langley FFCL at 53-54, ¶ 93; *see also id.* at 157-58, ¶ 28. Judge Langley's finding was objectively unreasonable and contrary to the record evidence.[23] Specifically, during the first evidentiary hearing, Dr. Elbogen provided testimony about studies regarding veterans with PTSD and their risk of violence. 5 EH1RR at 50:8-10. Dr. Elbogen explained that:

> based on a review of the literature at 2010, and at the time there were 72 studies that met criteria for having looked at, well, what are some risk factors that related to violence in veterans. And of that review, the most consistent finding was that . . . the veterans who had post-traumatic stress disorder were at higher risk than the veterans without post-traumatic stress disorder. Now, those same studies show that the vast majority of veterans with PTSD weren't violent . . . . But all things being equal, the vets who had PTSD were at higher risk.

5 EH1RR at 50:11-23. The next day, Dr. Ritchie testified *consistent with* Dr. Elbogen:

> [w]hat we are seeing with veterans coming back from Iraq is an increase in gun charges and domestic violence. They are very common. And usually it's going—to the best of our knowledge, the data is not real solid on it in all cases. That's one thing we're trying to get better data on. But in most cases it's a relationship with PTSD, alcohol, and domestic violence.

6 EH1RR at 48:18-25.

520.    Judge Langley's factual determination that Dr. Ritchie's statements discredited Dr. Elbogen's testimony is objectively unreasonable and unfounded based on a plain-language comparison of the experts' testimony. The experts consistently testified that, statistically, a veteran with PTSD is more likely to be violent than a veteran without PTSD.

---

[23] The Court should note that Judge Langley also determined that trial counsel was reasonable when they did not develop or prepare testimony akin to Dr. Ritchie's, for the flimsy reason that the State could have cross-examined her. Langley FFCL 49-50, ¶ 88.

521.     Moreover, after identifying only one comment from Dr. Ritchie that purportedly discredited Dr. Elbogen's testimony, Judge Langley unreasonably discredited and undervalued all of Dr. Elbogen's testimony, without explanation, ignoring the fact that the experts supported one another's opinions. For example, consistent with Dr. Ritchie's testimony regarding alcohol abuse creating an increased risk of violence in veterans with PTSD, 6 EH1RR at 47:17-48:25, Dr. Elbogen testified that:

> [i]f you look at whether that veteran at the initial stage had PTSD, then 19.5 percent of them in the next year were severely violent. Whereas if they said they didn't meet criteria for PTSD, 6.4 percent were severely violent. Same thing with alcohol misuse. Alcohol misuse, 17.4 percent were violent the next year; and 5.97 who didn't have alcohol. So you could see both are risk factors. Both elevate risk. But the problem is comorbidity. Some of those people . . . abuse alcohol, some of them don't . . . . So if you slice the pie a different way and you look at PTSD plus alcohol use, that's the co-occurrence. That's why it's an interaction. That's why that number jumps up to 36 percent engage in severe violence in the next year if you had those two things together. So you can see that it's more than the sum of the parts. It's far more than that because if you look at just the PTSD only, it's 10 percent. If you look at the alcohol abuse only, it's 11 percent. But it's over triple those when you have those two factors.

5 EH1RR at 58:25-59:21; *see also* 5 EH1RR at 61:6-20 (Dr. Elbogen testifying, "[W]hat it tells us is that it's really the combination of the two [PTSD and alcohol] that is at the marked increase risk."). The experts were consistent, and Judge Langley unreasonably concluded otherwise and discounted Dr. Elbogen, wholesale, in the process.

522.     Judge Langley unreasonably determined that Dr. Brown's testimony was neither relevant nor reliable. Dr. Brown, a sociologist who served in the military, offered testimony on several topics relevant to how military training and PTSD can affect soldiers' behavior. Despite the fact that Mr. Thuesen received military training and was a soldier, Judge Langley dismissed Dr. Brown as irrelevant and unreliable:

> The Court finds that Dr. William Brown did not testify during any
> writ hearing. Consequently, the Court was not able to judge his
> potential performance in front of a jury. In his affidavit, Brown
> stated that he would have testified generally to the problems many
> veterans experience as they attempt to reintegrate back into civilian
> culture. (7 Writ Hearing RR—Application exhibit 2, p. 22). The
> Court finds that the Brown affidavit does not incorporate an
> individualized assessment of Applicant and therefore, any potential
> testimony from Brown would not be relevant or reliable.

Langley FFCL at 54, ¶ 94. Judge Langley unreasonably ignored the fact that Dr. Brown's

testimony applied to Mr. Thuesen and that jurors extrapolate from generalized information about

a particular group to draw conclusions about individuals within that group. To conclude otherwise

would make it impossible, for example, for an expert witness to provide testimony regarding how

methamphetamine intoxication affects children, in general, if the expert could not speak to a

particular child.[24]

523.    Further, Judge Langley provided no reason why Dr. Brown's affidavit was

unreliable. Judge Langley did not challenge Dr. Brown's education (PhD in Sociology with an

emphasis in Criminology, earned at the University of Nevada, Las Vegas), or his training

(including membership in Pacific Sentencing Initiative, The Bunker Project, Center on Juvenile

and Criminal Justice, American Sociological Association, Midwestern Sociological Society,

---

[24] See Kingsbury v. State, 625 S.W.3d 686, 692 (Tex. App. 2021) ("Even when the general subject
matter is within the average juror's comprehension, a trial court need not exclude expert testimony
so long as the witness has some specialized knowledge on the topic that will 'assist' the
jury.") (quoting Tillman v. State, 354 S.W.3d 425, 441 (Tex. Crim. App. 2011)). Expert witness
testimony is one of the most powerful tools an attorney can use to present their case. See Coble v.
State, 330 S.W.3d 253, 281 (Tex. Crim. App. 2010) (noting the "high persuasive value of
'scientific' expert testimony"). The use of expert witnesses to present mental health and mitigation
evidence is standard practice in capital cases. See Whitaker v. Quarterman, 200 Fed. Appx. 351,
356 (5th Cir. 2006) (unpublished) (noting that a "mental health expert is frequently a valuable
source of mitigation evidence in capital sentencing proceedings"). Indeed, the more complex the
subject matter, "the more the jury looks to the background, experience, and status of the expert
himself rather than to the content of his testimony." Coble, 330 S.W.3d at 268.

American Society of Criminology, Western Society of Criminology, and Amnesty International), or his experience (provided expert consultations/evaluations and/or testimony in numerous criminal cases that involved veteran defendants, in California, Colorado, Georgia, Louisiana, North Carolina, Oregon, Washington, and Texas, for cases including Capital Murder, Murder, Attempted Murder, Aggravated Assault, Sex Offenses, and Domestic Violence, plus military experience as a combat veteran who served as an infantryman with the 173rd Airborne Brigade, a Drill Sergeant at Fort Lewis, Washington, a Leadership Honor Graduate from Officer Candidate School at Fort Benning, Georgia as a Platoon Leader in B Company 75th Rangers). Judge Langley discarded Dr. Brown without explanation.

524.    The factual record belies Judge Langley's determination that Dr. Brown's proposed testimony would have been irrelevant or unreliable, as evidenced in part by Judge Bryan's extensive reliance on Dr. Brown's affidavit in making factual findings. Relying on Dr. Brown's expertise, Judge Bryan found that "[w]ar educates soldiers for war, not peace, and in doing so reverses the customary moral values of society. (Ex. 2 at ¶10 [Aff. of Dr. William Brown].) For example, in the civilian world, the act of killing is regarded as something to feel remorse over. In contrast, a 'kill' in combat is rewarded and those who have not killed are looked down upon. (*Id.*)" Bryan FFCL ¶ 91. Judge Bryan credited Dr. Brown's testimony that the military educates recruits via "[a] collection of rules, customs, values, habits, and beliefs [that] are instilled into military recruits, otherwise known as the Military Total Institution (MTI). (Ex. 2 at ¶12 [Aff. of Dr. Brown].) The purpose behind the MTI is to transition individuals, through acculturation and training, from the civilian environment to the military context. (*Id.* at ¶6.) Military institutions have adopted this manner of complete training of individual recruits in order to maximize its ability to complete its mission-defeat, destroy, or kill the enemy. (*Id.* at ¶12.)" Bryan FFCL ¶ 92. "In civilian

society, people are expected to think before acting or responding to a situation. In contrast, military recruits are trained to react instantaneously to stimuli they perceive as a potential threat. (*Id.* at ¶17.) In combat, hesitation to act may result in serious injury or death. Thus, in the military context, making a bad decision is far less detrimental than making no decision and failing to act. (*Id.*)" Bryan FFCL ¶ 93. Finally, Judge Bryan credited Dr. Brown's opinion that "[r]ecruits are trained to respond instantaneously and aggressively to any and all perceived danger, without hesitation. Recruits are made to respond with a 'fight' response, rather than 'flight,' when confronted with a stressful circumstance. (Ex. 2 at ¶20 [Aff. of Dr. Brown].) This instantaneous response extends to the use of deadly weapons. . . . (*Id.* at ¶ 22.)" Bryan FFCL ¶ 94.

525.    Though Dr. Brown did not meet and evaluate Mr. Thuesen, the record (and Dr. Brown's testimony, on its face) confirm that Dr. Brown had relevant expertise to share with a jury. Judge Langley's dismissal of that testimony out of hand, simply because Dr. Brown never spoke with Mr. Thuesen, was objectively unreasonable. Judge Langley's determination ignored that Dr. Brown is a sociologist and that sociologists (unlike psychiatrists or psychologists) do not see patients and instead study groups of people.

526.    Judge Langley's decision to deny relief on State Habeas Claim 5 was based on unreasonable determinations of fact, and the AEDPA relitigation bar does not attach.

### 3.    Claim below: State Habeas Claim 7

527.    Mr. Thuesen showed that to the extent his claim for ineffective assistance of trial counsel during the punishment phase is based on theories advanced in State Habeas Claim 7, that claim is exhausted and the relitigation bar does not apply. *See supra* Claims for Relief § I.A.5.

### 4.    Claim below: State Habeas Claim 16

528.    To the extent that Mr. Thuesen's claim for ineffective assistance of trial counsel during the punishment phase is based on theories advanced in State Habeas Claim 16 ("Trial

counsel was ineffective for failing to raise the theme of mental illness in opening punishment phase argument."), that claim is exhausted. State Habeas Petition, Claim 16. On February 5, 2020, the CCA affirmed Judge Langley's Findings of Fact and Conclusions of Law, denying Mr. Thuesen relief on State Habeas Claim 16. *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). Texas law provides for no additional review of the CCA's decision. Thus, State Habeas Claim 16 is exhausted. *See* 28 U.S.C. § 2254(b)(1).

529.    Further, the AEDPA's relitigation bar, 28 U.S.C. § 2254(d), does not prevent the Court from adjudicating Mr. Thuesen's claim for ineffective assistance of trial counsel during the punishment phase. The state court failed to decide State Habeas Claim 16 on the merits (*see* § 2254(d)), and/or rejected State Habeas Claim 16 based on an unreasonable determination of fact (*see* § 2254(d)(2)).

        a)    *The state court failed to decide State Habeas Claim 16 on the merits.*

530.    The state court did not decide State Habeas Claim 16 (and, as a result, the issues that Mr. Thuesen raises in his claim for ineffective assistance of trial counsel during the punishment phase) on the merits because the CCA mishandled Judge Bryan's recusal and deprived Mr. Thuesen of Due Process when Judge Langley adjudicated his claims. *See infra* Claims for Relief § IV. *De novo* review is therefore appropriate.

        b)    *The state court denied relief on State Habeas Claim 16 based on an unreasonable determination of fact.*

531.    Even if Judge Langley did adjudicate State Habeas Claim 16 on the merits, Judge Langley denied Mr. Thuesen relief on State Habeas Claim 16 based on an unreasonable determination of fact: that trial counsel employed a reasonable strategy regarding handling PTSD evidence (or lack thereof). Langley FFCL at 166, ¶ 56 ("The Court finds that trial counsel's

157

decision not to specifically address Applicant's mental illness during opening statement was reasonable trial strategy.").

532. As discussed *supra*, Judge Langley could not reasonably conclude that trial counsel's last minute, deficient investigation and development of critical mitigating PTSD evidence was "reasonable trial strategy." Strategy based on inadequate investigation cannot be reasonable. *See Wiggins*, 539 U.S. at 521 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

533. Judge Langley's decision to deny relief on State Habeas Claim 16 was based on an unreasonable determination of fact, and the AEDPA relitigation bar does not attach.

**B.      Trial counsel provided deficient assistance that prejudiced Mr. Thuesen when they failed to investigate, develop, prepare, and present expert evidence that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the punishment phase.**

534. A federal court must apply a *de novo* standard of review when the state courts have not adjudicated a claim for habeas relief on the merits. *Solis v. Cockrell*, 342 F.3d 392, 394 (5th Cir. 2003) (holding that review is *de novo* where there has been no adjudication on the merits in state court); *Henderson v. Cockrell,* 333 F.3d 592, 598 (5th Cir. 2003) (same); *Johnson v. Cain*, 215 F.3d 489, 494 (5th Cir. 2000) (same); *Miller v. Johnson*, 200 F.3d 274, 281 n.4 (5th Cir. 2000) (same). Applying that standard, the Court should find that relief is due on Mr. Thuesen's claim for ineffective assistance of trial counsel related to investigating, developing, preparing, and presenting expert testimony that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the punishment phase.

535. Trial counsel provided ineffective assistance when they failed to investigate, develop, prepare, and present expert witnesses who would have explained and contextualized Mr.

Thuesen's PTSD during the punishment phase of trial. Trial counsel did not prepare for trial and, thus, left valuable mitigating evidence undeveloped and unpresented.

536.    As a result of trial counsel's failure to investigate, develop, prepare, and present expert witness testimony related to Mr. Thuesen's PTSD, the jury received (1) no expert's explanation of PTSD or, more important, its *effect* on a sufferer's behavior and no explanation of *Mr. Thuesen's* PTSD and how it affected him; and (2) no evidence connecting fact witness observations to expert diagnosis or demonstrating how that diagnosis triggered a trained, automatic response the day of the crime and, thus, reduced Mr. Thuesen's moral culpability for the crime.

537.    Trial counsel's failure to prepare for trial amounted to deficient performance that prejudiced Mr. Thuesen's defense during the punishment phase and, as a result, will cost him his life. Under the most rudimentary professional standards, trial counsel was obligated to prepare and present an expert (or experts) who would have explained to the jury (1) that many combat veterans returning from Iraq and Afghanistan, like Mr. Thuesen, suffer from PTSD; (2) that PTSD affects all aspects of Mr. Thuesen's life and mental processes; (3) how PTSD symptoms manifest in general and, important, how they manifest in Mr. Thuesen's behavior and actions; and (4) how Mr. Thuesen's PTSD diagnosis impacted his decision-making to create a perfect storm the evening of the crime. With expert testimony, the jury would have understood valuable mitigating evidence: Mr. Thuesen is a wounded warrior, driven and deeply affected by a disease that the VA neither diagnosed nor treated. Experts would have shown the jury that he is not, as the State contended, "pure evil."

538.    Expert witnesses would have provided crucial, relevant, mitigating evidence for the jury to consider during punishment phase deliberations, placing Mr. Thuesen's symptoms and behaviors in the appropriate medical context.

539.   Trial counsel knew or should have known that Mr. Thuesen suffers from PTSD; that a PTSD expert (or experts) would educate the jury and explain that Mr. Thuesen's post-Iraq behavior and mental state are consistent with and attributable to PTSD; that more than a dozen fact witnesses would testify that war changed Mr. Thuesen and, thus, support an expert's PTSD opinions; and that expert and fact witness testimony explaining the effects of Mr. Thuesen's PTSD would provide compelling mitigating evidence during the punishment phase.

540.   Mr. Thuesen's trial timeline provides context critical to understanding trial counsel's complete failure to prepare compelling mitigating evidence for the punishment phase, even though they *knew* better and were duty-bound to *do* better.

- On **March 9, 2009**, the court appointed Mr. Carter and Ms. Esparza to represent Mr. Thuesen. 2 HR at 33.

- On **May 14, 2009**, a grand jury indicted Mr. Thuesen for capital murder. 1 CR at 1.

- On **May 18, 2009**, Ms. Esparza withdrew as counsel, and she only re-joined the case on **February 10, 2010**. 1 CR at 167.

- Voir dire commenced more than one year after the court appointed trial counsel, on **March 29, 2010**, notwithstanding the fact that Ms. Esparza had returned to the case little more than a month before (and despite her having only worked on the case for two months prior to her withdrawal). 6 RR at 8.

- Trial commenced on **May 10, 2010**. 38 RR at 28.

- The parties submitted the case to the jury for guilt / innocence deliberation on **May 20, 2010**. 49 RR at 110-11.

- The jury returned a guilty verdict later that day, and the punishment phase commenced on **May 21, 2010**. 49 RR at 112; 50 RR at 5.

- The parties submitted the punishment phase case to the jury for sentencing deliberation on **May 27, 2010**. 54 RR at 90.

- The next day, the jury returned its verdict, answering "yes" to Special Issue No. 1 and "no" to Special Issue No. 2. 55 RR at 4. The court sentenced Mr. Thuesen to death. 55 RR at 7.

541.    Trial counsel knew early in its representation—in 2009—that PTSD "may be an issue in this case." 2 HR at 79. Trial counsel moved the court to appoint Dr. Roger Saunders to Mr. Thuesen's case in March 2009, and trial counsel, knowing "very little about the case at that time," asked Dr. Saunders to speak with Mr. Thuesen and provide "preliminary thoughts." State Habeas Petition, Ex. 10 ¶ 4; 2 HR at 37-40. Trial counsel did not ask Dr. Saunders "to conduct a full assessment." 2 HR at 39. But Dr. Saunders and trial counsel "talked about [it] being a strong possibility" that Mr. Thuesen suffers from PTSD and that "[t]hat was one of the directions we felt like we would be going down." 2 HR at 79.

542.    Trial counsel knew that they needed to start investigating Mr. Thuesen's background. Trial counsel hired a mitigation specialist, Gerald Byington, and in June 2009, Byington collected records relevant to building Mr. Thuesen's story. *See, e.g.*, 2 HR at 37, 40, 53-54, 59-60. "A review of these records would have shown counsel that Thuesen had been consistently reporting symptoms of PTSD for approximately two and half years prior to the crime." Bryan FFCL ¶ 55 (citing Mr. Thuesen's military and VA records). But trial counsel did not review those records *until early 2010*, mere months before voir dire would begin. 2 HR at 192.

543.    Effective counsel would have known that they needed to investigate and develop evidence related to Mr. Thuesen's PTSD. Yet trial counsel did not begin any meaningful PTSD investigation until the eve of trial. Trial counsel hired one investigator, Rick Starnes, in late February 2010 and a second investigator, Pamela "Kay" Sanders, two days before voir dire would begin. 2 HR at 104. Trial counsel relied on the investigators "pretty heavily to locate and interview witnesses" for them. *Id.* One year into trial counsel's representation of Mr. Thuesen, *during trial*, the investigators' interviews confirmed that Mr. Thuesen "returned from his tour of duty in Iraq a changed person." Bryan FFCL ¶ 67 (citing fact witness affidavits).

544.    More significant, trial counsel knew or should have known that they needed to prepare a PTSD expert. Trial counsel did not consult any mental health expert—let alone a PTSD expert—until they reengaged Dr. Saunders in February 2010, one month before voir dire would begin—despite the fact that PTSD is a complex subject, and one that is largely outside the understanding of the generally public. *See* Xenakis Decl. ¶ 34. And just days before voir dire began, trial counsel had no explanation for Mr. Thuesen's behavior. *Cf. Andrus*, 140 S. Ct. at 1882 (wherein ineffective trial counsel did not contact some witnesses "until just before *voir dire*" and became aware of others "only partway through trial"). Although Dr. Saunders evaluated Mr. Thuesen in 2009, trial counsel did not ask Dr. Saunders to "take any specific action on Mr. Thuesen's case" until almost one year later. 2 HR at 75.

545.    Dr. Saunders was not a PTSD expert. Still, after evaluating Mr. Thuesen, Dr. Saunders diagnosed Mr. Thuesen as suffering from Dependent Personality Disorder, Depression, and PTSD. State Habeas Petition, Ex. 10 ¶ 5. Dr. Saunders told trial counsel that, in his opinion, Mr. Thuesen's Dependent Personality Disorder "was a primary condition that impacted Mr. Thuesen's behavior and should be a primary focus of their mitigation presentation." *Id.* ¶ 6.[25] But Dr. Saunders also told trial counsel that Mr. Thuesen's PTSD "was a significant condition germane to the case." *Id.* ¶ 7. Dr. Saunders emphasized to trial counsel that he was not qualified to and would not develop a PTSD diagnosis for the case. *Id.* ¶ 8. Dr. Saunders recommended that trial counsel contact Dr. Kenneth Kopel to provide additional information specific to whether Mr. Thuesen suffers from PTSD, and if so, how it affected him. *Id.*

[25] Dr. Xenakis, a retired soldier, disputes this diagnosis, noting that "[i]t is uncommon for soldiers to graduate from boot camp with either BPD or [Dependent Personality Disorder]. That is because these disorders make it very difficult for those individuals to adjust to military life and to succeed in the military environment." Xenakis Decl. ¶43.

546.    Trial counsel also consulted Dr. J. Robert Yohman (again, just one month before voir dire, in February 2010). State Habeas Petition, Ex. 11 ¶ 6. Dr. Yohman conducted a "complete neuropsychological evaluation" of Mr. Thuesen—trial counsel had requested the evaluation "and wanted to know if there [were] any neuropsychological impairment as a result of Thuesen's military service." *Id.* ¶ 7. Based on his evaluation, Dr. Yohman told trial counsel that Mr. Thuesen "met diagnostic criterion for PTSD." *Id.* ¶ 11. Yet despite Dr. Yohman's findings, trial counsel inexplicably told Dr. Yohman that they "were going in a 'different direction,' and would not need [Dr. Yohman] as a testifying witness." *Id.* ¶ 13. In that moment, trial counsel had the opportunity to develop and prepare expert testimony diagnosing Mr. Thuesen with PTSD. But trial counsel walked away, with no alternative and no plan.

547.    In March 2010—another month closer to trial—trial counsel consulted Dr. Michael Gottlieb. Dr. Gottlieb encouraged trial counsel to "put someone on to talk about" Mr. Thuesen's "military service and subsequent diagnosis [of PTSD]" and "how serious this disorder can be." State Habeas Petition, Ex. 40 at 1. Important, Dr. Gottlieb encouraged trial counsel to use a "pure/education expert . . . to explain the disorder as it is easily misunderstood." *Id.*

548.    Consistent with Dr. Gottlieb's recommendation, the Texas Defender Service told trial counsel to retain and present an expert to "educate the jury on PTSD" and "provide the jury with a full explanation of [PTSD]." 2 HR at 51, 84-85.

549.    Trial counsel knew or should have known that they needed to investigate, develop, prepare, and present expert testimony related to Mr. Thuesen's PTSD and its effects on his behavior and actions. Indeed, they had experts *telling them as much*. Trial counsel knew that Mr. Thuesen suffers from PTSD and, more important, that expert testimony explaining its significance would provide critical mitigating evidence during the punishment phase. But trial counsel's limp,

eleventh-hour investigation and attempt at trial preparation fell short. And despite valuable interviews with fact witnesses and advice and warnings from experts—including Dr. Saunders, Dr. Yohman, Dr. Gottlieb, and the Texas Defender Service—trial counsel did not prepare *any* expert testimony related to Mr. Thuesen's PTSD for the punishment phase. Trial counsel's failure to investigate, develop, prepare, and present critical mitigating evidence during the punishment phase amounted to deficient performance.

550.    Trial counsel did not engage a PTSD expert, Dr. Kopel, until *after* voir dire was underway, on the eve of the guilt phase of trial (late April 2010). State Habeas Petition, Ex. 8 ¶ 6.[26] Trial counsel asked Dr. Kopel to evaluate whether Mr. Thuesen suffers from PTSD. *Id.* Although Dr. Kopel had the opportunity to review Mr. Thuesen's records, due to his late engagement he did *not* have the opportunity speak with Mr. Thuesen, nor did he have the opportunity to advise trial counsel or participate in or contribute to Mr. Thuesen's punishment phase defense. *Id.* ¶ 7. Still, Dr. Kopel *did* diagnose Mr. Thuesen with PTSD, and trial counsel asked Dr. Kopel to testify during the punishment phase. *Id.* ¶¶ 8-9.

551.    But trial counsel took no steps to prepare Dr. Kopel to testify, including failing to work with Dr. Kopel to develop an outline of his testimony. *Id.* ¶ 11. In light of trial counsel's failure to take even the most basic steps to prepare Dr. Kopel's testimony, it is unsurprising that trial counsel cancelled Dr. Kopel's testimony the day before he planned to testify—trial counsel never called him as a witness. *Id.* ¶ 10.

---

[26] Trial counsel contacted a prospective PTSD expert, Dr. Howard Detwiler, in February 2010, but trial counsel "was not satisfied . . . that he was going to be as good a witness as people at told [them]," and trial counsel "decided [they were] not going down that road." 2 HR at 88. Indeed, based on Dr. Detwiler's CV, his practice focused on general psychiatry as opposed to PTSD diagnosis and treatment. Bryan FFCL ¶ 72 (citing H. Detwiler CV).

552. Trial counsel's failure to prepare expert testimony for the punishment phase prejudiced Mr. Thuesen's defense. Had trial counsel prepared and called Dr. Kopel,[27] he would have testified that Mr. Thuesen "suffered from PTSD stemming from trauma he experienced while serving in Iraq with the Marine Corps Reserves." *Id.* ¶ 13. Dr. Kopel would have explained Mr. Thuesen's diagnosis and the bases for the diagnosis. *Id.* ¶¶ 14-19. For example, he would have explained to the jury that PTSD often induces hyperarousal, hypervigilance, and an exaggerated startle response. *Id.* ¶ 14. Dr. Kopel would have explained that Mr. Thuesen's medical records track consistent PTSD symptoms following his return from Iraq, yet no one treated him. *Id.* ¶¶ 15-19. Dr. Kopel would have explained that Mr. Thuesen had yet to receive proper treatment for his PTSD. *Id.* ¶¶ 23-25 ("First, it does not appear the VA system fully identified or diagnosed that Thuesen was suffering from PTSD. . . . Next, the treatment that Thuesen did in fact receive that targeted his PTSD was inadequate to treat Thuesen's PTSD."). Indeed, Dr. Kopel would have explained to the jury that the VA's "course of treatment did nothing to repair the daily damage PTSD would have done to Thuesen's functioning in society. Rather, he was left to self-medicate with alcohol and rely on relationships for support, such as the ones with Leah Mathis and Rachel Joiner." *Id.* ¶ 25. Further, Dr. Kopel would have explained how Mr. Thuesen's PTSD played a role in the crime and how it mitigated Mr. Thuesen's moral culpability. *Id.* ¶¶ 26-30 ("I believe that PTSD played a significant factor in Thuesen's behavior leading up to and during the crime. . . . It is my opinion, and I would have so testified, that the presence of PTSD (and the lack of treatment for his illness) greatly contributed to Thuesen's actions leading up to and during the crime."). "Unlike a healthy individual not confronted with PTSD symptoms, Thuesen was an individual

---

[27] During the state habeas proceedings, Judge Bryan determined that Dr. Kopel was credible and that his "testimony would have been admissible at Mr. Thuesen's trial and would have met sufficient reliability standards under *Daubert*." Bryan FFCL ¶ 3.

who served his country and came back with a debilitating, long-lasting illness that impacted every moment of his life, including during the crime." *Id.* ¶ 30; *accord* Xenakis Decl. ¶ 50.

553.   Had trial counsel prepared and called a PTSD expert like, for example, Dr. Ritchie,[28] she would have explained Mr. Thuesen's PTSD *in context* and with respect to Mr. Thuesen's "final breakdown leading up to the crime." State Habeas Petition, Ex. 9 ¶ 61. Dr. Ritchie—a physician with military and PTSD expertise—would have testified that "at the time of the crime Thuesen was suffering from PTSD" and that Mr. Thuesen's "PTSD clearly contributed to impairments in his social and occupational functioning." *Id.* ¶¶ 26, 34. Dr. Ritchie would have walked the jury through Mr. Thuesen's combat experience, how Mr. Thuesen's "military service has numerous hallmarks of the traumatic exposure that can lead to PTSD," how no one prepared Mr. Thuesen to re-enter civilian life, how war changed Mr. Thuesen and affected all aspects of his daily life and functioning, and, ultimately, Mr. Thuesen's downward, PTSD-induced spiral, among other important testimony that would explain Mr. Thuesen's behaviors in context and undercut the State's story of a violent man. *See generally id.* Dr. Ritchie's testimony would have provided compelling evidence showing that Mr. Thuesen's PTSD diminished his moral culpability for the crime. Without expert testimony, the jury did not understand PTSD, did not understand that Mr. Thuesen suffered from PTSD, and had no reason to correlate Mr. Thuesen's PTSD with his conduct, much less understand that Mr. Thuesen's PTSD mitigated against imposing the death penalty. Further, expert testimony, like Dr. Ritchie's, would have allowed trial counsel to rebut the State's arguments mischaracterizing PTSD and dismissing Mr. Thuesen's condition. Expert testimony explaining PTSD and educating the jury would have allowed trial counsel to rebut the

---

[28] During the state habeas proceedings, Judge Bryan determined that Dr. Ritchie was credible and that her "testimony would have been admissible at Mr. Thuesen's trial and would have met sufficient reliability standards under *Daubert*." Bryan FFCL ¶ 3.

State's arguments related to, for example, Leah Mathis. A PTSD expert would have connected Mr. Thuesen's behavior with Mathis to his PTSD, undermining the State's themes related to Mr. Thuesen's purported pattern of violence. *See also* 4 HR2 at 137-38, 141, 142, 147-53, 163-64, 169-71, 173-80, 186, 201-09, 211-12, 215-16, 236, 255-60 (Dr. Xenakis explaining that (1) PTSD is an injury; (2) PTSD impacts veterans in multiple ways; (3) the military lacked a reintegration process for soldiers like Mr. Thuesen, who returned from Iraq in 2005; (4) Mr. Thuesen had an increased risk for developing PTSD due to his age and his family history of mental illness; (5) the VA failed to diagnose and properly treat Mr. Thuesen for PTSD and alcoholism; (6) medical records documented the decline of Mr. Thuesen's mental health in the months leading up to this offense; and (7) the correlation between combat-related PTSD and violence is a national problem).

554.    Had trial counsel prepared and called a PTSD expert like, for example, Dr. Elbogen,[29] the jury would have understood that Mr. Thuesen's experience was not unlike other combat veterans'. A PTSD expert, like Dr. Elbogen, would have explained to the jury that Mr. Thuesen's actions were not pathologies of his personality but were instead symptoms of PTSD. For example, Dr. Elbogen would have explained the scientific connection between PTSD and violence, in particular domestic or intimate partner violence. State Habeas Petition, Ex. 6 ¶¶ 11-20. "Whatever the exact relationship, studies done before and after May 2010 have confirmed violence and aggression are problems for Iraq and Afghanistan War veterans." *Id.* ¶ 30. An expert—like Dr. Elbogen—would have armed the jury with data to understand the link between combat experience, PTSD, and domestic violence. *See* Xenakis Decl. ¶¶ 44-46.

---

[29] During the state habeas proceedings, Judge Bryan determined that Dr. Elbogen was credible and that his "testimony would have been admissible at Mr. Thuesen's trial and would have met sufficient reliability standards under *Daubert*." Bryan FFCL ¶ 3.

555.    Had trial counsel prepared and called a PTSD expert like, for example, Dr. Brown,[30] he would have explained to the jury military culture (the "Military Total Institution"), how Mr. Thuesen's military training reprogrammed his thinking (e.g., "recruits are trained to react instantaneously to social stimuli they perceive as a threat," and recruits "are conditioned to select the 'fight' option" over flight), and the problems that many combat veterans experience as they attempt to reintegrate into civilian life. State Habeas Petition, Ex. 2. Again, a PTSD expert, like Dr. Brown, would have armed the jury with knowledge to better understand Mr. Thuesen's mental state leading up to and during the crime, providing valuable mitigating evidence to consider.

556.    But trial counsel did not prepare *any* expert to testify during the punishment phase.[31] Denied any expert testimony as a result of trial counsel's deficient performance, the jury could not connect Mr. Thuesen's PTSD symptoms to his conduct—a connection would have provided significant mitigating evidence for the jury to consider. As stated by Dr. Xenakis, the enhanced fight or flight response of a person in a PTSD crisis, and their diminished rational thought, is outside the public's appreciation. Xenakis Decl. ¶ 34.

---

[30] During the state habeas proceedings, Judge Bryan determined that Dr. Brown "would meet sufficient reliability standards under *Daubert*, and that [his] complete testimony would be admitted at a live hearing." Bryan FFCL ¶ 7.

[31] Indeed, trial counsel inexplicably and unreasonably relied on only Dr. Saunders to provide testimony regarding PTSD, during the guilt phase of trial. But Dr. Saunders' guilt phase testimony was no substitute for Dr. Kopel's or another PTSD expert's testimony. First, Dr. Saunders testified only during the guilt phase—he considered criminal intent, not mitigating evidence or moral culpability. State Habeas Petition, Ex. 5 ¶ 26 (Guilt phase "testimony did not educate the jury about the logical nexus between the damaging factors in Mr. Thuesen's background and the capital offense—why, even if Thuesen's conduct was intentional . . . Thuesen's struggle with PTSD formed the person that he was when he committed the criminal acts."). Second, Dr. Saunders was not a PTSD expert and did not testify as one. Claims for Relief § I.A., *supra*. For example, as Dr. Kopel explains, Dr. Saunders' "testimony was deficient in linking [PTSD] symptoms to their impact on Thuesen as an individual. Dr. Saunders downplayed their significance, focusing too heavily on symptoms of PTSD allegedly not experienced by Thuesen, such as flashback and auditory hallucinations." State Habeas Petition, Ex. 8 ¶ 43. Moreover, in returning a guilty verdict, the jury had already rejected Dr. Saunders' testimony.

557. Indeed, in support of Mr. Thuesen's state habeas petition, Dr. Cunningham explained the importance of expert testimony in understanding and weighing moral culpability: "[a]n understanding of evidence impacting the moral culpability of a defendant is critical to a jury's consideration of the appropriate punishment for a capital offense." State Habeas Petition, Ex. 5 ¶ 10. During the state habeas proceedings, Judge Bryan determined that Dr. Cunningham was credible and that his "testimony would have been admissible at Thuesen's trial and would have met sufficient reliability standards under *Daubert*." Bryan FFCL ¶ 3. According to Dr. Cunningham, when the jury considers moral culpability, it must consider "the degree to which the background and circumstances of the defendant influenced, predisposed, or diminished the defendant's moral sensibility and the exercise of volition or free will." *Id.* ¶ 12. Only a PTSD expert would have been in a position to equip the jury with the information it needed when it considered Mr. Thuesen's moral culpability. And, as Dr. Cunningham notes, an effective defense "educate[s] the jury about the various damaging and impairing factors that exist in the defendant's life *and then further* [explains] how these factors played a role in shaping the conduct of the defendant." *Id.* ¶ 20 (emphasis in original). Indeed, a PTSD expert would have been critical to providing this explanation, and a PTSD expert would have rebutted the State's efforts to focus the jury on criminal responsibility (as opposed to moral culpability). *Id.* Using an expert "is standard professional practice in capital trials." *Id.* ¶ 23. Particularly because "[t]he nexus between psychological impairment and adult behavior is typically neither conscious nor simplistically obvious." *Id.* ¶ 28. In Dr. Cunningham's expert opinion,

> With this wealth of evidence about [Mr.] Thuesen's military experience, it was imperative that the defense team presented the testimony of someone that had an expertise in diagnosing, treatment, and/or researching the impacts of PTSD. Such a PTSD-focused expert witness could have educated the jury about how that specific

psychological impairment would have affected Thuesen's mental health and outward behaviors.

*Id.* ¶ 25. But Mr. Thuesen's jury received *no* "explanation for how [Mr. Thuesen's] experience related to Thuesen's moral culpability for the capital offense." *Id.* ¶ 21.

558.    Had trial counsel provided effective assistance and prepared critical mitigating expert testimony for the punishment phase, the jury would have learned, for example, that not only was Mr. Thuesen at great risk of developing PTSD based on his specific military experience, but that many other veterans were also suffering the same disorder. The jury would have reached the conclusion that, when Mr. Thuesen experienced the perfect storm—feelings of hypervigilance and hyperarousal, difficulty sleeping and irritability, stress at work and school, trouble with fitting back into society, and ultimately the crumbling of the relationship he relied on with Rachel Joiner—his struggle with PTSD led Mr. Thuesen to lash out.

559.    Because trial counsel did not arm the jury with sufficient information to connect PTSD to mitigation or to place the State's "aggravating" evidence in its proper context, trial counsel's deficient performance prejudiced Mr. Thuesen's punishment phase defense.

560.    With the wealth of information that trial counsel had received from lay witnesses and military records, trial counsel should have presented the testimony of someone with expertise in diagnosing, treating, and researching the impact of PTSD. Such an expert could have explained the specific psychological impairments and symptoms associated with PTSD, the impact of those impairments on Mr. Thuesen's daily life, as well as the prevalence of PTSD as a disorder in military veterans nationally and the connection research has shown between PTSD and violent conduct. Had trial counsel engaged PTSD expert assistance during the preparation of the defense's case, they would have been aware of all these important points mitigating against moral culpability and, thus, death.

561.     Further, trial counsel mishandled presentation of fact witnesses during the guilt phase and obscured the limited record that they managed to develop on Mr. Thuesen's PTSD. During the guilt phase of trial, trial counsel called Dr. Carlo and Cannon ostensibly to speak to Mr. Thuesen's longstanding struggle with PTSD. But had trial counsel understood Mr. Thuesen's records[32] and the limits on Dr. Carlo's and Cannon's testimony—i.e., had trial counsel prepared for trial—they would have understood that despite Mr. Thuesen's persistent PTSD symptoms, neither Dr. Carlo nor any other VA medical professional diagnosed Mr. Thuesen with PTSD or provided proper treatment. Instead, trial counsel mishandled Dr. Carlo's and Cannon's testimony, failing to teach the jury about critical mitigating evidence[33]: at the time of the crime, Mr. Thuesen was suffering from undiagnosed, untreated PTSD.

562.     As a result of trial counsel's ineffective assistance during the punishment phase of trial, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

563.     Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claims 1, 5, 7, 16.

564.     Judge Langley did not address Mr. Thuesen's claims on the merits. *See supra* Claims for Relief § II.A.

565.     During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the

---

[32] Trial counsel had access to Mr. Thuesen's VA records and knew or should have known that his reported symptoms did not match the treatment he received. 2 HR at 102-03; 5 HR at 170-71.

[33] *See* Claims for Relief § I.

punishment phase of trial, it resulted in a decision that was based on unreasonable determinations of fact in light of the evidence presented. *See supra* Claims for Relief § II.A.

566.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new punishment phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about whether Mr. Thuesen was properly sentenced to death or whether he should have instead been sentenced to life imprisonment without the possibility of parole.

**C.    The Court is not procedurally barred from conducting a *de novo* review of Mr. Thuesen's claim for ineffective assistance of trial counsel related to investigating, developing, preparing, and presenting adequate evidence that Mr. Thuesen would not pose a continuing threat of future violence (State Habeas Claim 6).**

567.    For reasons discussed here, trial counsel provided ineffective assistance when they failed to investigate, develop, prepare, and present evidence that Mr. Thuesen would not pose a continuing threat of future violence. Mr. Thuesen requests that the Court evaluate his claim for ineffective assistance of trial counsel *de novo*, without deference to the state court's findings, and grant relief. Mr. Thuesen exhausted his claim (State Habeas Claim 6), the state court did not adjudicate the claim on the merits, and/or the state court denied Mr. Thuesen relief on the merits based on an unreasonable determination of fact. The Court has the power to address Mr. Thuesen's claim despite the AEDPA relitigation bar and grant the requested relief.

### 1.    Claim below: State Habeas Claim 6

568.    Mr. Thuesen's claim for ineffective assistance of trial counsel during the punishment phase is based in part on theories advanced in State Habeas Claim 6 ("Trial counsel was ineffective in their presentation of evidence that Thuesen would not be a future danger in prison—Special Issue No. One."), and that claim is exhausted. State Habeas Petition, Claim 6. On February 5, 2020, the CCA affirmed Judge Langley's Findings of Fact and Conclusions of Law,

denying Mr. Thuesen relief on State Habeas Claim 6. *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). Texas law provides for no additional review of the CCA's decision. Thus, State Habeas Claim 6 is exhausted. *See* 28 U.S.C. § 2254(b)(1).

569.    Further, the AEDPA's relitigation bar, 28 U.S.C. § 2254(d), does not prevent the Court from adjudicating Mr. Thuesen's claim for ineffective assistance of trial counsel during the punishment phase. The state court failed to decide State Habeas Claim 6 on the merits (*see* § 2254(d)), and/or rejected State Habeas Claim 6 based on an unreasonable determination of fact (*see* § 2254(d)(2)).

> a)      *The state court failed to decide State Habeas Claim 6 on the merits.*

570.    The state court did not decide State Habeas Claim 6 (and, as a result, the issues that Mr. Thuesen raises in his claim for ineffective assistance of trial counsel during the punishment phase) on the merits because the CCA mishandled Judge Bryan's recusal and deprived Mr. Thuesen of Due Process when Judge Langley adjudicated his claims. *See infra* Claims for Relief § IV. *De novo* review is therefore appropriate.

> b)      *The state court denied relief on State Habeas Claim 6 based on unreasonable determinations of fact.*

571.    Even if Judge Langley did adjudicate State Habeas Claim 6 on the merits, Judge Langley denied Mr. Thuesen relief on State Habeas Claim 6 based on unreasonable determinations of fact: that Dr. Cunningham's testimony had little to no value (Langley FFCL at 54-61, ¶¶ 96-109), that "Stetter's proposed testimony, that Applicant was a model prisoner, is not materially different from that testified by Wright or Zavala" (Langley FFCL at 67, ¶ 120), and that "Zavala's proposed testimony, contained in his affidavit, is not materially different from that testified by Wright or Penny Jones" (Langley FFCL at 67, ¶ 121).

572.     **Judge Langley unreasonably rejected Dr. Cunningham's testimony.** Judge
Langley rejected Dr. Cunningham's testimony after determining that he received unfavorable
reviews in another case and dismissed him as "arrogant." Langley FFCL at 158-59, ¶¶ 30-31. Judge
Langley focused on the State's cross-examination and did not make findings regarding Dr.
Cunningham's testimony, his credibility, or its relevance. Expert testimony like Dr. Cunningham's
would have reassured the jury that Mr. Thuesen's PTSD was not a condition that rendered him
inherently and uncontrollably dangerous—or, as the State framed the issue, "pure evil." And, in
fact, Mr. Thuesen's PTSD placed his crime in context and suggested that he would not be a future
danger.

573.     Indeed, if Judge Langley had not improperly discredited Dr. Kopel and Dr. Brown,
*supra* (discussion of State Habeas Claim 5), the available expert testimony would have rebutted
the State's argument that Mr. Thuesen was violent and dangerous in all settings. Judge Langley
misunderstood Mr. Thuesen's central argument: that the effects of PTSD and the struggles of
reintegration with society affect veterans most when receiving no or inadequate treatment. *See,
e.g.*, State Habeas Petition, Ex. 2, ¶ 43 ("[I]f PTSD and serious depression are not treated, or if
they are undertreated, there exists a cascading set of consequences, which include suicide, drug
and alcohol abuse, marital problems, unemployment, etc."). Indeed, the weight of expert testimony
confirmed that Mr. Thuesen, with treatment, could thrive in a regimented prison setting and that
Mr. Thuesen's actions the evening of the crime resulted from a "perfect storm" of PTSD triggering
events.

574.     **Judge Langley unreasonably determined that Stetter's testimony was
cumulative.** Judge Langley's fact-finding was unreasonable and buried critical evidence
demonstrating that Stetter knew Mr. Thuesen better than any other jail employee. *See infra* Claims

for Relief § II.D. Stetter interacted with Mr. Thuesen about 14 days per month over 15 months. 2 HR at 200-01; 5 HR at 219. While Wright and Zavala provided positive testimony about Mr. Thuesen, the record confirms that neither spent as much time with Mr. Thuesen or could judge how he dealt with potentially explosive, violent situations. Stetter's testimony would have been materially different. *See Guidry v. Dretke*, 397 F.3d 306, 326-27 (5th Cir. 2005) (noting that a determination of fact was unreasonable when "the trial court made no findings on considerable evidence critical to [the] claim.").

575. **Judge Langley unreasonably determined that Zavala's testimony was cumulative.** Judge Langley's finding overlooked evidence demonstrating that had trial counsel developed more fulsome testimony, Zavala would have testified that Mr. Thuesen "did well in a structured environment" and "was a positive influence on the others" housed in his unit. State Habeas Petition, Ex. 38 ¶¶ 5, 7. Zavala never feared Mr. Thuesen or worried that he posed a threat. *Id.* ¶ 10. That additional testimony *is* materially different from the testimony that trial counsel offered. *See Guidry*, 397 F.3d at 326-27 (noting that a determination of fact was unreasonable when "the trial court made no findings on considerable evidence critical to [the] claim.").

576. Judge Langley's decision to deny relief on State Habeas Claim 6 was based on unreasonable determinations of fact, and the AEDPA relitigation bar does not attach.

**D.    Trial counsel provided deficient assistance that prejudiced Mr. Thuesen when they failed to investigate, develop, prepare, and present adequate evidence that Mr. Thuesen would not pose a continuing threat of future violence.**

577. A federal court must apply a *de novo* standard of review when the state courts have not adjudicated a claim for habeas relief on the merits. *Solis*, 342 F.3d at 394; *Henderson*, 333 F.3d at 598; *Johnson*, 215 F.3d at 494; *Miller*, 200 F.3d at 281 n.4. Applying that standard, the Court should find that relief is due on Mr. Thuesen's claim for ineffective assistance of trial counsel

related to investigating, developing, preparing, and presenting evidence that Mr. Thuesen would not pose a continuing threat of future violence.

578.    Trial counsel provided ineffective assistance when they failed to investigate, develop, prepare, and present adequate evidence that Mr. Thuesen would not pose a continuing threat of future violence in prison (assuming a sentence of life without parole).

579.    At the conclusion of the punishment phase, the court required the jury to answer two "Special Issue" questions to determine Mr. Thuesen's sentence. Special Issue No. 1 asks the jury whether "there is a probability that [Mr. Thuesen] would commit criminal acts of violence that would constitute a continuing threat to society." 6 CR at 1223.

580.    Trial counsel knew that Mr. Thuesen's life would turn on whether the jury received evidence showing that Mr. Thuesen did not pose a continuing threat of future violence. Trial counsel—experienced capital murder defense attorneys—knew that the jury would need to answer Special Issue No. 1. Trial counsel knew or should have known that they needed an expert—or experts—to testify that PTSD does not create a likelihood of future violence in a controlled environment. Trial counsel knew or should have known that the jury was unlikely to understand that Mr. Thuesen did not pose a continuing threat of future violence absent expert testimony.

581.    Trial counsel knew enough to present two fact witnesses to testify to Mr. Thuesen's temperament in jail, awaiting trial. Wright, a sergeant in the medical division within the Brazos County Sheriff's Office, testified that she and her staff treated Mr. Thuesen during his pretrial confinement, that Mr. Thuesen took his medicine without problem, and that Mr. Thuesen's behavior had "been very respectful, very calm." 52 RR at 6-8. Wright testified that Mr. Thuesen performed well in the structured environment. *Id.* Zavala, a Brazos County Sheriff's Office jailer, often escorted Mr. Thuesen when he was awaiting trial and testified that "John Thuesen has been

an inmate that always complied with the orders given," that he "[n]ever had any incident reports," and that Mr. Thuesen was a "model prisoner." 52 RR at 125-26.

582.    Trial counsel knew that they needed to investigate and present evidence related to Special Issue No. 1 and whether Mr. Thuesen posed a continuing threat of future violence. Trial counsel knew to call Brazos County Sherriff's Office employees. Yet trial counsel failed to prepare additional helpful testimony from Zavala regarding Mr. Thuesen's temperament in a controlled prison environment, and trial counsel failed to investigate, develop, prepare, and present John Stetter's testimony. Stetter, a Brazos County Sherriff's Office detention officer, knew Mr. Thuesen better than any other jail employee, as the two interacted regularly over 15 months. Trial counsel never contacted Stetter. State Habeas Petition, Ex. 30 ¶ 19.

583.    Trial counsel had a duty to prepare and present evidence that Mr. Thuesen would not pose a continuing threat of future violence. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.11 cmt. ("Studies show that future dangerousness is on the minds of most capital jurors, and is thus 'at issue' in virtually all capital trials, whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration.").[34] Trial counsel did not prepare or present an expert to testify to whether Mr. Thuesen posed a continuing threat of future violence. Nor did trial counsel prepare and present its most valuable fact witness testimony. Those unreasonable decisions amounted to deficient performance that prejudiced Mr. Thuesen's punishment phase defense.

584.    Indeed, without expert guidance, "jurors often make predictions of future violent conduct based on multiple faulty conceptual strategies." State Habeas Petition, Ex. 5 ¶ 34; 3 HR

---

[34] https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/2003guidelines.pdf.

at 40 ("Unassisted by expert testimony . . . jurors are subject to grave errors" when judging whether a defendant poses a continuing threat to society.). An expert would have testified that Mr. Thuesen would not pose a continuing threat of future violence in prison, for a variety of reasons supported by empirical studies and data. An expert, like Dr. Cunningham, would have opined that "there is a very low likelihood that [Mr. Thuesen] could commit serious acts of violence confined for life in the Texas Department of Criminal Justice." 3 HR at 33. An expert, like Dr. Cunningham, would have explained to the jury that Mr. Thuesen exhibits at least nine factors that reduce his risk of future violence:

- Mr. Thuesen's age;

- The fact that he had been a model inmate when awaiting trial (no disciplinary issues over 15 months);

- The level of security correctional staff provided (e.g., low given Mr. Thuesen's offense);

- Mr. Thuesen's education (high school diploma and college credits);

- Mr. Thuesen's employment history;

- Mr. Thuesen's continuing contact and relationships with family and friends;

- The fact that Mr. Thuesen would be a capital inmate serving a life term;

- The fact that Mr. Thuesen would be serving life without parole;

- The fact that Mr. Thuesen would be serving his sentence in the Texas Department of Criminal Justice.

3 HR at 49-76; *see also* State Habeas Petition, Ex. 5 ¶ 33 ("[E]vidence that Mr. Thuesen is likely to have a positive adjustment to a life sentence in TDCJ would tend to rebut any implicit, if erroneous, future risk implications of personal characteristics, offense features, or other aggravating factors that may be asserted or implied by the State."), ¶¶ 37-155. Zero factors increased Mr. Thuesen's risk of future violence. 3 HR at 76. Further, an expert would have rebutted

the State's unsupported arguments related to Mr. Thuesen's alleged future dangerousness.

585.    Further, had trial counsel prepared and presented expert testimony related to Mr. Thuesen's PTSD, that expert or those experts would have helped the jury understand how Mr. Thuesen's infrequent violent behavior are connected to PTSD fight-or-flight crises and, more important, that Mr. Thuesen could receive treatment for those symptoms. They would have also heard how those symptoms were likely to manifest differently in a structured setting—like prison—such that Mr. Thuesen was unlikely to present a risk of future violence while incarcerated. State Habeas Petition, Ex. 9 ¶ 71.

586.    Had trial counsel investigated, prepared, and presented Stetter's testimony, he would have testified that he got to know Mr. Thuesen as he awaited trial in the Brazos County jail. Stetter "never saw John act up or step out of line." State Habeas Petition, Ex. 30 ¶ 8. Despite all Mr. Thuesen was experiencing, he remained a "model prisoner." *Id.* ¶ 13.

587.    Had trial counsel developed more fulsome testimony from the fact witness that they *did* offer—Zavala—he would have further testified that Mr. Thuesen "did well in a structured environment" and "was a positive influence on the others" housed in his unit. State Habeas Petition, Ex. 38 ¶¶ 5, 7. Zavala never feared Mr. Thuesen or worried that he posed a threat. *Id.* ¶ 10.

588.    Trial counsel's failure to prepare either expert or fact witness testimony related to Special Issue No. 1 amounted to deficient performance that prejudiced Mr. Thuesen's punishment phase defense. With additional, more helpful evidence relevant to Special Issue No. 1, members of the jury may have answered Special Issue No. 1 in favor of life without parole, rather than death.

589.    As a result of trial counsel's ineffective assistance during the punishment phase of trial, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

590.    Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 6.

591.    Judge Langley did not address Mr. Thuesen's claim on the merits. *See supra* Claims for Relief § II.C.

592.    During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the punishment phase of trial, it resulted in a decision that was based on unreasonable determinations of fact in light of the evidence presented. *See supra* Claims for Relief § II.C.

593.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new punishment phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about whether Mr. Thuesen was properly sentenced to death or whether he should have instead been sentenced to life imprisonment without the possibility of parole.

E.    **The Court is not procedurally barred from conducting a *de novo* review of Mr. Thuesen's claim for ineffective assistance of trial counsel related to failing to impeach Amanda ("Mandy") Ward's aggravation testimony (State Habeas Claim 10).**

594.    For reasons discussed here, trial counsel provided ineffective assistance when they failed to impeach Amanda ("Mandy") Ward's aggravation testimony. Mr. Thuesen requests that the Court evaluate his claim for ineffective assistance of trial counsel *de novo*, without deference to the state court's findings, and grant relief. Mr. Thuesen exhausted his claim (State Habeas Claim 10), and the state court did not adjudicate the claim on the merits. The Court has the power to address Mr. Thuesen's claim despite the AEDPA relitigation bar and grant the requested relief.

### 1.    Claim below: State Habeas Claim 10

595.    Mr. Thuesen's claim for ineffective assistance of trial counsel during the punishment phase is based in part on theories advanced in State Habeas Claim 10 ("Trial counsel was ineffective in for failing to impeach Mandy Ward's testimony."), and that claim is exhausted. State Habeas Petition, Claim 10. On February 5, 2020, the CCA affirmed Judge Langley's Findings of Fact and Conclusions of Law, denying Mr. Thuesen relief on State Habeas Claim 10. *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). Texas law provides for no additional review of the CCA's decision. Thus, State Habeas Claim 6 is exhausted. *See* 28 U.S.C. § 2254(b)(1).

596.    Further, the AEDPA's relitigation bar, 28 U.S.C. § 2254(d), does not prevent the Court from adjudicating Mr. Thuesen's claim for ineffective assistance of trial counsel during the punishment phase. The state court failed to decide State Habeas Claim 10 on the merits (*see* § 2254(d)).

597.    The state court did not decide State Habeas Claim 10 (and, as a result, the issues that Mr. Thuesen raises in his claim for ineffective assistance of trial counsel during the punishment phase) on the merits because the CCA mishandled Judge Bryan's recusal and deprived Mr. Thuesen of Due Process when Judge Langley adjudicated his claims. *See infra* Claims for Relief § IV. *De novo* review is therefore appropriate.

### F.    Trial counsel provided deficient assistance that prejudiced Mr. Thuesen when they failed to impeach Amanda ("Mandy") Ward's aggravation testimony.

598.    A federal court must apply a *de novo* standard of review when the state courts have not adjudicated a claim for habeas relief on the merits. *Solis*, 342 F.3d at 394; *Henderson*, 333 F.3d at 598; *Johnson*, 215 F.3d at 494; *Miller*, 200 F.3d at 281 n.4. Applying that standard, the Court

should find that relief is due on Mr. Thuesen's claim for ineffective assistance of trial counsel related to failing to impeach Amanda ("Mandy") Ward's aggravation testimony.

599. During the punishment phase, Amanda ("Mandy") Ward, a woman who dated Mr. Thuesen for a short time when Ms. Ward and Mr. Thuesen were in high school—before he deployed to Iraq—testified (for the State) that she experienced an incident with Mr. Thuesen in high school in which Mr. Thuesen displayed inappropriate jealousy. The State used Ms. Ward's testimony to argue that Mr. Thuesen has always acted with extreme possessiveness in his domestic relationships and that, as a result, the crime had nothing to do with PTSD.

600. Trial counsel knew that they could impeach Ms. Ward's testimony. Trial counsel knew that three individuals present during the purported event, Haley McDowell, Jimmy Kleimann, and Ms. Ward's mother, could call Ms. Ward's testimony into question. None remembered the angry, obsessive Mr. Thuesen that Ms. Ward described.

601. But trial counsel neither cross examined Ms. Ward nor offered Ms. McDowell, Mr. Kleimann, or Ms. Ward's mother. Trial counsel's failure amounted to deficient performance that prejudiced Mr. Thuesen's defense. Indeed, trial counsel's failure to cross or impeach Ms. Ward allowed the State to argue that her testimony stood unrebutted and that Mr. Thuesen's troubling, aggravating behavior is "his character" and "his nature." 54 RR at 20.

602. Had trial counsel called Ms. McDowell, she would have testified that she remembers the party that Ms. Ward described but that she remembers little else about the evening. State Habeas Petition, Ex. 23-A (mislabeled 33-A). Ms. McDowell would not have testified that Mr. Thuesen was aggressive; she remembers no violent outbursts. *Id.* She remembers only feeling like she "was in the middle of John and Mandy's date gone wrong." *Id.* ¶ 3.

603.     At least two uncalled witnesses' testimony would have called Ms. Ward's story into doubt. First, had trial counsel called Mr. Kleimann, he would have testified that he does not remember the events Ms. Ward described. He does not recall John Thuesen. And he has "no idea why Ms. Ward listed me in the police report." State Habeas Petition, Ex. 22.

604.     And second, the testimony of Ms. Ward's mother would have done the same. Had trial counsel called her, she would have testified that she has no specific memory involving Mr. Thuesen, that she does not know Mr. Kleimann, and that she does not recall any incidents involving Mr. Kleimann at her home. State Habeas Petition, Ex. 37.

605.     Moreover, trial counsel should have known that they could impeach Ms. Ward during cross examination using information in her probation records. Trial counsel failed to investigate and obtain records related to Ms. Ward's deferred-adjudication community supervision for cocaine possession. Had trial counsel investigated Ms. Ward, they would have been able to question her motivation for testifying against Mr. Thuesen and her ability to recall past events.

606.     Trial counsel's deficient performance—their failure to investigate and their decision to leave Ms. Ward's testimony unrebutted—prejudiced Mr. Thuesen's punishment phase defense. The State used Ms. Ward's testimony to discredit Mr. Thuesen's most compelling mitigating evidence: that his combat experience changed him and that his PTSD played a significant role in the underlying crime. Ms. Ward's unimpeached testimony allowed the State to argue that Mr. Thuesen displayed a pattern of violence against women and that the pattern began before his combat experience. Ms. Ward's testimony was important enough that the State pointed to it in their closing argument, reminding the jury that it was unrebutted. 54 RR at 20.

607.    As a result of trial counsel's ineffective assistance during the punishment phase of trial, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

608.    Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See supra* State Habeas Petition, Claim 10.

609.    Judge Langley did not address Mr. Thuesen's claim on the merits. *See supra* Claims for Relief § II.E.

610.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new punishment phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about whether Mr. Thuesen was properly sentenced to death or whether he should have instead been sentenced to life imprisonment without the possibility of parole.

**G.    The Court is not procedurally barred from conducting a *de novo* review of Mr. Thuesen's claim for ineffective assistance of trial counsel related to failing to object to the State's improper closing argument during the punishment phase (State Habeas Claim 17).**

611.    For reasons discussed here, trial counsel provided ineffective assistance when they failed to object to the State's improper closing argument during the punishment phase. Mr. Thuesen requests that the Court evaluate his claim for ineffective assistance of trial counsel *de novo*, without deference to the state court's findings, and grant relief. Mr. Thuesen exhausted his claim (State Habeas Claim 17), the state court did not adjudicate the claim on the merits, and/or the state court denied Mr. Thuesen relief on the merits based on an unreasonable determination of fact. The Court has the power to address Mr. Thuesen's claim despite the AEDPA relitigation bar and grant the requested relief.

### 1.      Claim below: State Habeas Claim 17

612.    Mr. Thuesen's claim for ineffective assistance of trial counsel during the punishment phase is based in part on theories advanced in State Habeas Claim 17 ("Trial counsel was ineffective by failing to object to the prosecutor's closing argument that included comments on evidence not on the record."), and that claim is exhausted. State Habeas Petition, Claim 17. On February 5, 2020, the CCA affirmed Judge Langley's Findings of Fact and Conclusions of Law, denying Mr. Thuesen relief on State Habeas Claim 17. *Ex parte Thuesen*, No. WR-81,584-01, 2020 WL 584368, at * 6 (Tex. Crim. App. Feb. 5, 2020). Texas law provides for no additional review of the CCA's decision. Thus, State Habeas Claim 17 is exhausted. *See* 28 U.S.C. § 2254(b)(1).

613.    Further, the AEDPA's relitigation bar, 28 U.S.C. § 2254(d), does not prevent the Court from adjudicating Mr. Thuesen's claim for ineffective assistance of trial counsel during the punishment phase. The state court failed to decide State Habeas Claim 17 on the merits (*see* § 2254(d)), and/or rejected State Habeas Claim 17 based on an unreasonable determination of fact (*see* § 2254(d)(2)).

### a)      *The state court failed to decide State Habeas Claim 17 on the merits.*

614.    The state court did not decide State Habeas Claim 17 (and, as a result, the issues that Mr. Thuesen raises in his claim for ineffective assistance of trial counsel during the punishment phase) on the merits because the CCA mishandled Judge Bryan's recusal and deprived Mr. Thuesen of Due Process when Judge Langley adjudicated his claims. *See infra* Claims for Relief § IV. *De novo* review is therefore appropriate.

b)      *The state court denied relief on State Habeas Claim 17 based on an unreasonable determination of fact.*

615.    Even if Judge Langley did adjudicate State Habeas Claim 17 on the merits, Judge Langley denied Mr. Thuesen relief on State Habeas Claim 17 based on an unreasonable determination of fact: that the State's comments during closing argument for the punishment phase were "not severe" and did not "inject[] new facts, harmful to the accused, into the trial." Langley FFCL at 168, ¶¶ 62-63.[35] Judge Langley's determination that the comments were "not severe" and did not "inject[] new facts, harmful to the accused, into the trial" must be rejected as unreasonable, as they introduced *new* evidence (not in the record) that was unequivocally harmful to Mr. Thuesen. Moreover, Mr. Thuesen's trial counsel failed to object to this improper, prejudicial evidence.

616.    **Judge Langley unreasonably determined that the State's closing comments were not harmful.** The record confirms that the State's comments during closing—characterizing PTSD as limited to a reaction to a perceived gunshot—limited PTSD to a startle response and, as a result, undermined Mr. Thuesen's mitigation evidence. When making arguments to the jury, counsel is limited to commenting on the "summation of evidence presented at trial, reasonable deductions drawn from evidence, answers to opposing counsel's argument, or plea for law enforcement." *McFarland v. State*, 989 S.W.2d 749, 751 (Tex. Crim. App. 1999). Arguments cannot extend to evidence that is not in the record or to the personal opinion of counsel. *Borjan v.*

---

[35] Despite being within Judge Langley's Conclusions of Law section, this statement is a finding of fact. As acknowledged by Judge Langley, "[r]egardless of how a trial court labels its findings of fact and conclusions of law, an appellate court must examine the substance of the findings and conclusions and treat them by their substance rather than by their label." Langley FFCL at 1, n.3 (citing *State v. Sheppard*, 271 S.W.3d 281, 291-92 (Tex. Crim. App. 2008)).

*State*, 787 S.W.2d 53, 57 (Tex. Crim. App. 1990); *Johnson v. State*, 698 S.W.2d 154, 167 (Tex. Crim. App. 1985).

617.    The prosecutor offered the jury his personal opinion regarding what constitutes PTSD, based on his stepfather's Battle of the Bulge story. The closing argument comment impermissibly introduced new evidence and planted seeds of doubt in the jury's mind regarding the "legitimacy" of Mr. Thuesen's PTSD and how it manifested. The prosecutor's comment was harmful.

618.    Judge Langley's decision to deny relief on State Habeas Claim 17 was based on an unreasonable determination of fact such that the AEDPA relitigation bar does not attach.

**H.    Trial counsel provided deficient assistance that prejudiced Mr. Thuesen when they failed to object to the State's improper closing argument during the punishment phase.**

619.    A federal court must apply a *de novo* standard of review when the state courts have not adjudicated a claim for habeas relief on the merits. *Solis*, 342 F.3d at 394; *Henderson*, 333 F.3d at 598; *Johnson*, 215 F.3d at 494; *Miller*, 200 F.3d at 281 n.4. Applying that standard, the Court should find that relief is due on Mr. Thuesen's claim for ineffective assistance of trial counsel related to failing to object to the State's improper closing argument during the punishment phase.

620.    Trial counsel provided ineffective assistance when they failed to object to the State's improper closing argument related to PTSD during the punishment phase of trial.

621.    Specifically, the prosecutor told a story about his stepfather with PTSD and proceeded to tell the jury what PTSD is by explaining his stepfather's reaction to a gunshot. By doing this, the State offered an oversimplified, inaccurate, non-expert characterization of what PTSD is—and, by implication, what it is *not*:

> [L]et me tell you a story. My stepfather fought in the Battle of the Bulge. His friends and comrades were dying left and right of him as they were there. And years later as we're sitting on the porch after

> dinner, a gunshot goes off. We all think it is nothing. He knows, he
> yells for all of us to get down, get inside. That's PTSD.

54 RR at 82. The State went on to argue that Mr. Thuesen's symptoms were *not* arising from

PTSD. 54 RR at 84. Mr. Thuesen's trial counsel never objected to the State's argument. This

amounted to deficient performance that prejudiced Mr. Thuesen's punishment phase defense.

622.    Texas law states that closing arguments in which the prosecutor holds himself out

as having a special expertise in an area are improper. *See Maupin v. State*, 930 S.W.2d 267, 270

(Tex. Crim. App. 1996) ("[I]t is clear that it is improper for a prosecutor to give a personal opinion

that is also, impliedly or overtly, based on his expertise as a prosecutor or based on some other

special knowledge possessed by the prosecutor."); *Johnson*, 698 S.W.2d at 167 ("The implication

of special expertise coupled with an implied appeal to the jury to rely on that expertise in deciding

the contested issues before it is improper."). An improper, prejudicial comment by counsel during

jury arguments is reversible error. *Jackson v. State*, 529 S.W.2d 544, 546 (Tex. Crim. App. 1975).

623.    The prosecutor's comment regarding how PTSD *should* affect an individual was

improper closing argument; he offered a *personal* opinion without record support. The State had

proffered no evidence suggesting that Mr. Thuesen was not suffering from PTSD. In fact, no expert

witnesses testified that the type of experience described by the State were the only effects

encompassing PTSD. Likewise, no lay witness offered any stories that were similar to the one that

the prosecutor described. Thus, the prosecutor's comments amounted to an improper analysis of a

medical condition based on his stepfather's experience that he witnessed. *See Davis v. State*, 114

S.W. 366, 372 (Tex. Crim. App. 1908) (reversing the conviction due the State's improper closing

argument that testimony by the defense's medical expert was not reliable).

624.    Mr. Thuesen's trial counsel knew or should have known that the State's PTSD

comments were improper and unsupported by the evidence in the record. A prosecutor cannot

claim in closing argument to have certain expertise that he or she does not, and (likewise) cannot introduce new facts that were not presented during the trial. As such, Mr. Thuesen's trial counsel had a duty to object to the State's improper argument. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.8 cmt.[36]

625.    Had trial counsel objected, the court would have sustained the objection and corrected or mitigated the State's statements to the jury. That, or the court's failure to sustain the objection, would have constituted reversible error.

626.    Trial counsel's failure to object to the State's improper arguments prejudiced Mr. Thuesen's punishment phase defense. The State's improper, unsupported statements—presenting his personal opinion as a medical diagnosis—planted seeds of doubt in the jury's mind as to whether Mr. Thuesen actually suffered from PTSD. This injection of the prosecutor's personal opinion was the only "evidence" presented by any party that Mr. Thuesen did *not* suffer from PTSD.

627.    As a result of trial counsel's ineffective assistance during the punishment phase of trial, Mr. Thuesen is in custody and sentenced to death in violation of the Sixth Amendment to the Constitution of the United States.

628.    Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 17.

629.    Judge Langley did not address Mr. Thuesen's claim on the merits. *See supra* Claims for Relief § II.G.

---

[36] https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/2003guidelines.pdf.

630.    During the state habeas proceedings, the state courts did not dispose of Mr. Thuesen's claims on an independent and adequate state ground. Rather, when the state courts adjudicated Mr. Thuesen's claims regarding trial counsel's ineffective assistance during the punishment phase of trial, it resulted in a decision that was based on unreasonable determinations of fact in light of the evidence presented. *See supra* Claims for Relief § II.G.

631.    As a result of trial counsel's ineffective assistance, Mr. Thuesen is entitled to a new punishment phase trial, in which a jury will be permitted to consider all of the necessary evidence for it to make a fair determination about whether Mr. Thuesen was properly sentenced to death or whether he should have instead been sentenced to life imprisonment without the possibility of parole.

## III.    THE STATE HABEAS PROCEEDINGS VIOLATED MR. THUESEN'S RIGHTS UNDER THE DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS.

### A.    A state court must observe due process when adjudicating constitutional claims raised in a post-conviction proceeding.

632.    When a state provides a mechanism for a habeas applicant to collaterally attack a criminal conviction, the procedures employed must comport with due process. *See Evitts v. Lucey*, 469 U.S. 387, 401 (1985) ("[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution— and, in particular, in accord with the Due Process Clause.").

633.    In "capital proceedings generally, this Court has demanded that fact-finding procedures aspire to a heightened standard of reliability." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).

**B.** **The state habeas court violated due process by permitting the State to removal of the first habeas judge after he issued a ruling adverse to the State.**

634.   As described in more detail *supra*, the relevant underlying facts are straightforward. The judge who presided over the trial that led to Mr. Thuesen's conviction and who pronounced the sentence of death on him, The Honorable Travis Bryan III, also held the first evidentiary hearing in his state habeas case. Both parties explicitly consented to Judge Bryan heading the state habeas petition. There, following a 5-day evidentiary hearing and with the benefit of having witnessed the conduct of Mr. Thuesen's lawyers, Judge Bryan found that Mr. Thuesen's attorneys had been ineffective across numerous modes, recommending relief regarding ten claims raised by Mr. Thuesen's petition, Claims 1, 5, 6, 7, 8, 10, 13 (in part), 15, 16, and 17. Judge Bryan ultimately recommended that because of the serious constitutional deficiencies in the conduct of his trial and appellate attorneys, Mr. Thuesen should be granted a new penalty phase trial.

635.   After Judge Bryan had ruled in Mr. Thuesen's favor, however, the State, reneging on its previous consent to have Judge Bryan decide, adopted the argument that a minor administrative error deprived Judge Bryan of authority to adjudicate the case.

636.   The CCA accepted the State's post-ruling change of heart, and ruled that Judge Bryan did not have authority to preside over Mr. Thuesen's evidentiary hearing because Presiding Judge Underwood had "not issued a written order rescinding Judge Townslee's assignment." In doing so, the CCA undid the parties' prior agreement, even despite the facts that Presiding Judge Underwood himself having advised Judge Bryan both that no such written order was necessary, and that the administrative error was not jurisdictional.

637.   The CCA remanded Mr. Thuesen's case for assignment to a new judge. That decision was akin to allowing the State to charge Mr. Thuesen a second time for the same conduct, and effectively denied Mr. Thuesen the right to appear before a neutral arbitrator, enshrined in the

Due Process clauses of the Fifth and Fourteenth Amendments. Because the process implemented by Texas in Mr. Thuesen's case offends the basic notions of fairness at the very core of the justice system established by the United States Constitution, Mr. Thuesen's petition for habeas corpus should be granted.

> **1.   Removing Judge Bryan, to whom the State had consented, and vacating his findings at the behest of the State only after he issued a ruling finding in favor of Mr. Thuesen on multiple bases, deprived Mr. Thuesen of due process of law.**

638.    Removing Judge Bryan and vacating his findings was wrong according to the Texas Rules Of Practice in District and County Courts and because, even if an error occurred, the error was invited by the State. Texas law precludes parties inviting such errors from seeking relief; the CCA regularly applies the principle to the detriment of criminal defendants.

639.    Texas Rule Of Practice in District and County Courts 18b(e), which governs the habeas evidentiary hearing, is explicit: "The parties to a proceeding may waive any ground for recusal after it is fully disclosed on the record." The requirements of that Rule are clearly met in this case.

640.    Judge Bryan's grounds for recusal were fully disclosed on the record. Following the defeat of the political candidate to whom Judge Bryan had donated, the OCFW filed the Motion to Reassign the Original Trial Court Judge. In light of the Motion to Reassign, Judge Bryan emailed the Parties—both Mr. Thuesen and the State—that Presiding Judge Underwood had advised him that since he had recused himself *sua sponte* he could and should enter the order withdrawing his own recusal, with Presiding Judge Underwood's consent. Copying Judge Towslee and Presiding Judge Underwood, Judge Bryan stated he intended to issue such an Order in the near future, and noted that if either Mr. Thuesen or the State wished to object to his rescinding his recusal, they

were free to do so. Counsel for the State responded to that email, respectfully objecting to Judge Bryan withdrawing his recusal.

641.    However, just four days after it raised its objection, the State explicitly waived any grounds it had to argue for recusal following Judge Bryan's reinstatement. The State initially objected to Judge Bryan presiding over the case based on purported concerns that **Mr. Thuesen** might use Judge Bryan's involvement as a basis to seek relief from an unfavorable result and indicated it intended to move for recusal:

> The last thing that I don't think we can defend against is that some capital write lawyer in the federal system . . . doesn't come back and say at a later time the fact that Michelle [Esparza] lost, now her livelihood depends on her private practice and that that would somehow, because you have backed her in the election, that you had some reason to make sure that she didn't be found ineffective [sic] in a capital death penalty case and that that somehow inadvertently swayed your ability to make a straight call.

Ex. 18 [Response to Court's Order of February 24, 2016, Ex. E].

642.    However, the State ultimately withdrew those objections in an email from prosecutor Brian Baker to Judges Underwood, Bryan, and Towslee among others, based on "further research and contact with a number of experts in the area of federal writs, [and] the statements and assurances made by the Office of Capital Writs in the telephone hearing yesterday." Ex. 18 [Response to Court's Order of February 24, 2016, Ex. M at 1]. Mr. Baker went on to state that "The State of Texas no longer has any objections relating to [Judge Bryan] presiding over the John Thuesen writ. . . . [O]ur original desire to have you preside can now be realized without any apprehension of future legal ramifications." *Id.*

**From:** Brian Baker [mailto:BBaker@brazoscountytx.gov]
**Sent:** Tuesday, March 18, 2014 9:43 AM
**To:** Brad Levenson; Lisa L. Parker; Doug Howell; Robert Romig;
Cathryn Crawford; Jarvis Parsons
**Cc:** olen.underwood@mctx.org; Travis Bryan III;
btowslee@verizon.net; kkyriell@gmail.com; Ernest J. Montoya
**Subject:** RE: 11.07 capital writ in Thuesen case

Judge Bryan,


The State of Texas no longer has any objections relating to you
presiding over the John Thuesen writ.  Based on further research and
contact with a number of experts in the area of federal writs, the
statements and assurances made by the Office of Capital Writs in the
telephone hearing yesterday, March 17, 2014, are sufficient to
alleviate our concerns about their motives for having you
preside.  With those issues resolved, our original desire to have you
preside can now be realized without any apprehension of future legal
ramifications.

Brian M. Baker
First Assistant District Attorney
Brazos County, Texas
979.361.4320

643.    Accordingly, through that email, the State expressly waived any ground for recusal,

after the grounds were fully disclosed.

644.    Further, at no point did the State move to recuse Judge Bryan, nor did it raise—at

any point—the contention that Judge Bryan's withdrawal of his recusal, pursuant to the

administrative process advised by Presiding Judge Underwood—had been ineffective. As such,

the State actually consented to Judge Bryan presiding over Mr. Thuesen's habeas evidentiary

hearing.

**2.** **The CCA denied Mr. Thuesen a fair process when it countenanced the State's argument that Judge Bryan should not have presided over the habeas hearing.**

645.    Judge Bryan presided over an evidentiary hearing, and ruled that Mr. Thuesen should be granted a new punishment phase of his trial. Afterward, on February 24, 2016, the CCA entered an order directing the parties to brief three issues related to Judge Bryan's withdrawal of his voluntary recusal.

646.    In its brief the State—*for the first time*—argued that Judge Bryan had not had the jurisdiction to withdraw his recusal and then preside with the five-day-long evidentiary hearing. In other words, following receipt of this unfavorable ruling from Judge Bryan—who the State had explicitly consented to have preside with Mr. Thuesen's habeas petition—the State switched gears, and proceeded to pursue a litigation strategy focused around retroactively replacing Judge Bryan and thereby manufacturing a second bite at that apple.

647.    Unfortunately, CCA ultimately blessed the State's decision to play games with the death penalty, and allowed the State a mulligan; on February 8, 2017 it remanded to allow reargument of Mr. Thuesen's habeas claims.

648.    The CCA regularly permits non-jurisdictional issues and administrative shortcomings to be waived, finding that the parties' consent overcomes non-jurisdictional shortcomings. In other circumstances, Texas courts find that minor administrative flaws do not deprive a judge of the power to hear a case; the general rule is that if "the complaint is that the judge acted in a case without statutory or procedural authority, the alleged error is not void, but voidable, and must therefore be raised by objection or complaint to be preserved for appellate review." *Davis v. Crist Industries, Inc.*, 98 S.W.3d 338 (Tex. App. 2003); *see also Williams v. State*, No. 07-15-00294-CR, 2016 WL 6024348, at *3 (Tex. App. Oct. 13, 2016) ("when the judge

is otherwise qualified and the error is merely procedural, the order is only voidable and can be waived.").

649.    Thus, under CCA precedents, a party "may not object, for the first time on appeal, to a procedural irregularity in the assignment of a former judge who is otherwise qualified." *Rodriguez v. State*, No. 10-15-00371-CR, 2016 WL 7437786, at *2 (Tex. App. Dec. 21, 2016). A party "may object pretrial; if he does not, he may not object later or for the first time on appeal." *Wilson v. State*, 977 S.W.2d 379, 380 (Tex. Crim. App. 1998); *see also Hollabaugh v. State*, 1994 WL 284093, at *1 (Tex. App. 1994) (not designated for publication) ("That complaint was never raised in the trial court. . . . We overrule the first point."); *Jackson v. State*, 2012 WL 955361, at *3 (Tex. App. 2012) (not designated for publication) (appellant's failure to object at the time of trial about the judge not being qualified to serve waives any complaint he now has on appeal).

650.    For example, Article XVI, Sec. 1(b) of the Texas Constitution requires that, before a judge may take the oath of office, he or she must take an anti-bribery oath. Pursuant to subsection (c), the judge must file that oath "with the Secretary of State before taking the Oath or Affirmation of office." Tex. Const. Art. XVI, Sec. 1(c). The Oath or Affirmation of Office, in turn, is required before the judge may "enter upon the duties of their office[ ]." *Id.* at Sec. 1(a).

651.    The application is illustrated in *In re Gen. Elec. Capital Corp.*, 63 S.W.3d 568 (Tex. App. 2002). There, the court was called to consider whether a judge who had failed to file the anti-bribery oath with the Secretary of State, as required by the Texas Constitution, lacked the power to preside over a hearing. It found the minor administrative lapse to be immaterial: "The record shows that Judge Priest took the required anti-bribery oath on November 10, 1998, but failed to file the oath with the Secretary of State in a timely manner. The fact that the anti-bribery oath was not filed is not sufficient to render Judge Priest's oath void. The failure to file the oath with the

Secretary of State does not vitiate the oath or deprive the judge of the authority to preside in a case." *Id.* at 571-72. "Failing to file an oath of office does not, alone, deprive the judge of the authority to act." *In re Tasby*, 120 S.W.3d 443, 445 (Tex. App. 2003).

652.    The error in this case—a lack of Presiding Judge Underwood issuing a written order reinstating Judge Bryan—was not jurisdictional. "Jurisdiction . . . is something possessed by courts, not by judges. . . . The authority and powers of a judge are incident to, and grow out of, the jurisdiction of the court itself. Strictly speaking then, jurisdiction encompasses only the power of the tribunal over the subject matter and the person." *Davis v. State*, 956 S.W.2d 555, 557–58 (Tex. Crim. App. 1997) (citing *Ex parte George*, 913 S.W.2d 523 (Tex. Crim. App. 1995)).

653.    There is no question that the district court possessed jurisdiction over both the subject matter—the state habeas petition—and over Mr. Thuesen. Indeed, presiding judges of state administrative regions lack the power under Texas law to either expand or contract the jurisdictional powers of the courts within their administrative region. Tex. Gov't Code Ann. § 74.046.

654.    What is more, there was actual agreement from Presiding Judge Underwood that Judge Bryan had his consent to execute and issue an order withdrawing his recusal and preside over the evidentiary hearing.

655.    Presiding Judge Underwood explicitly advised Judge Bryan that, since he had recused himself *sua sponte*, he could enter an order withdrawing his own recusal order—no written order from Presiding Judge Underwood was necessary. Presiding Judge Underwood's Order of Assignment expressly stated that Judge Towslee's assignment would continue "as may be necessary for the assigned Judge to dispose of any accumulated business" or "until terminated by the Presiding Judge." Therefore, pursuant to the terms of the Order of Assignment itself, Presiding

Judge Underwood had authority to terminate Judge Towslee's assignment at any time. He also retained authority to direct Judge Bryan to reassume responsibility for the matter.

656.    Judge Bryan only effected his reinstatement in response to Presiding Judge Underwood's explicit blessing. Under Texas law, that is enough. "[O]rders may be orally pronounced." *Walker v. Harrison*, 597 S.W.2d 913, 915 (Tex. 1980). Alternatively, "subject to a specific requirement of the rules, any form of communication between the court and the parties for the efficient and expeditious handling of the court's business is acceptable." *Dunn v. Cnty. of Dallas*, 794 S.W.2d 560, 562 (Tex. App. 1990).

657.    In light of the actual instruction from Presiding Judge Underwood that no written approval was necessary, and the actual directive from Presiding Judge Underwood that Judge Bryan should sign and execute an order reinstating himself, and the communication of that determination to the parties, there was no error. Judge Bryan's Findings of Fact and Conclusions of Law should have remained intact.

658.    However, even if an error existed, it was, at most, the type of mere administrative failure that Texas Courts regularly find does not deprive a judge with the power to act. Petitioner is aware of no authority which existed before this case requiring that the Presiding Judge issue a written order reinstating a self-recused judge—as opposed to direct the judge him- or herself to do so.

659.    The Texas Court of Appeals has previously held that precisely such an error may be waived through consent, as the State did here. In *Smith v. State*, 2013 WL 4774054, at *3 (Tex. App. 2013) the court held that "[t]he record shows that Smith knew that the visiting judge would be presiding over his case and that he did not object that an order memorializing the assignment did not appear of record when the trial commenced. We hold that by failing to object before trial

commenced about the procedural irregularity . . . Smith failed to preserve his complaint for our review on appeal." *Id.*

660.    Indeed, "as a general rule, [a party] cannot invite error and then complain about it on appeal." *Franks v. State*, 90 S.W.3d 771 (Tex. App. 2002) (citing *Hess v. State*, 953 S.W.2d 837, 840 (Tex. App. 1997, pet. ref'd)).[37] In other words, a party "may not create reversible error by his own manipulation." *Beasley v. State*, 634 S.W.2d 320, 321 (Tex. Crim. App. 1982); *see also Kelley v. State*, 823 S.W.2d 300, 302 (Tex. Crim. App. 1992). Texas Courts, including the CCA, frequently apply the doctrine of invited error to rule against defendants on a wide variety of matters, including errors that might amount to fundamental or structural errors. *See Rhodes v. State*, 240 S.W.3d 882, 892 (Tex. Crim. App. 2007) ("A defendant who has enjoyed the benefits of an agreed judgment prescribing a too lenient punishment should not be permitted to collaterally attack that judgment on a later date on the basis of the illegal leniency."); *Cadd v. State*, 587 S.W.2d 736, 741 (Tex. Crim. App. 1979) (applying the rule of invited error to dispose of an issue on rehearing which, on original submission, the court determined constituted fundamental error); *see also, e.g.*, *Woodall v. State*, 336 S.W.3d 634, 644 (Tex. Crim. App. 2011) ("The law of invited error provides that a party cannot take advantage of an error that it invited or caused, even if such error is fundamental. In other words, a party is estopped from seeking appellate relief based on error that it induced."); *Prystash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999) (noting that the doctrine of invited error is distinct from waiver and is properly thought of as estoppel).

661.    Texas courts, therefore, routinely find waiver in exactly the type of circumstances that occurred here—and regularly use that waiver doctrine against defendants. *See, e.g.*, *Ex parte*

---

[37] When a petition has been "refused," it is deemed to have the same precedential value as if the decision had been rendered by the Texas Supreme Court itself. *See* Tex. R. App. P. 56.1(c).

*Pete*, 517 S.W.3d 825, 833 (Tex. Crim. App. 2017) ("A defendant who positively asks the trial court to grant a mistrial that is limited to the punishment phase may not be heard later to complain, after the trial court grants his request, that the limited mistrial compromised his right to have 'the same' jury resolve both phases of his trial."). Due process mandates that the same waiver requirements also apply against the State.

662.   Because the error was merely procedural under well-settled Texas law, the State's waiver should have precluded consideration of the lack of written administrative paperwork on appeal to the CCA.

663.   At worst, as Judge Alcala explained in her dissent at the CCA (joined by Judge Walker), the remedy to the administrative snafu most in harmony with the CCA's prior case law and with due process would have been a remand to:

> permit any necessary corrections in the administrative paperwork with the appropriate documentation so that Judge Bryan may be reinstated on the case. The best way to effectuate the prior agreement of the parties—to proceed under Judge Bryan in this case—is for them to obtain the missing paperwork from the Presiding judge that would formally reinstate Judge Bryan on these habeas proceedings through an appropriate order. That would put these parties exactly where they agreed to be when the habeas hearing was held. Judge Bryan could then take judicial notice of the proceedings that had already occurred before him, and he could reissue his order and findings of fact and conclusions of law. That outcome would conform to this Court's established practice of preferring the trial judge who actually presided over the jury trial to act as the fact finder in a habeas proceeding. And the State, having already agreed to have the hearing in front of Judge Bryan, should not have any valid complaint in allowing Judge Bryan to reinstate his ruling and findings.

*Ex parte Thuesen*, 546 S.W.3d 158, 166 (Tex. Crim. App. 2018) (Alcala, J., dissenting).

664.   The CCA's treatment of the administrative paperwork as foundational here, when it has not done so in other circumstances, appears to be outcome driven—toggling the doctrine of

invited error on and off as needed to tip the scales in the direction of the State. That procedure raises federal constitutional concerns that were not addressed by the Texas state courts in adjudicating Mr. Thuesen's state habeas petition. As a result, Mr. Thuesen's imprisonment is unconstitutional.

### C.    The Court may adjudicate the claim.

665.    The merits of this claim may be adjudicated subject to 28 U.S.C. § 2254.

666.    A state remedy is not available with respect to this claim. *See* 28 U.S.C. § 2254(c).

667.    The due process violations of the habeas court could not have been brought until after the termination of the state habeas proceedings. Accordingly, there is no adjudication on the merits of Mr. Thuesen's due process claims as applied to the habeas court.

668.    There is cause and prejudice for the failure to properly present the claim to a state court. There is cause because the factual basis for Mr. Thuesen's due process claims arising from the habeas court proceedings could not have arisen until after the termination of those proceedings. There is prejudice because the procedures for adjudicating habeas corpus applications in Texas blessed by the CCA were fundamentally unfair and retroactively denied Mr. Thuesen a grant of habeas relief.

### 1.    This claim is not barred under the AEDPA because it raises federal issues of constitutional due process under the Fifth and Fourteenth Amendments, which may be heard pursuant to 28 U.S.C. §§ 2254(b)(1)(B)(ii) and (d)(1).

669.    By choosing to sidestep well-settled Texas law when the effect of that law worked to the detriment of the State, rather than the detriment of a criminal defendant, the CCA undermined Mr. Thuesen's right to have his state habeas claims governed by the due process of law.

670.     The due process clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution prohibit such outcome-driven decision-making by courts; they provide the right to "an impartial and disinterested tribunal in . . . criminal cases." *Marshall v. Jerrico, Inc*., 446 U.S. 238 (1980). The "requirement of neutrality" helps to preserve "both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done, by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." *Id.*

671.     By ignoring the state law requirements of waiver that the CCA regularly applies to criminal defendants to their detriment when those same rules worked against the state, the CCA failed to act as an impartial and disinterested tribunal. Instead, it improperly placed its finger on the scales to weigh in favor of the State.

672.     The second issue raises questions of due process under the Fifth and Fourteenth Amendments which, although presented to the CCA by Mr. Thuesen, that court glossed over and ultimately ignored. Specifically, in allowing the State to invent and pursue a purported reason for voiding Judge Bryan's adverse opinion, the CCA endorsed something close to double jeopardy, letting the State avoid the effects of a ruling against it and instead begin again before a new judge with a clean slate.

673.     That process does not comport with constitutional due process. If the State had a problem with Judge Bryan's withdrawal of his self-recusal, it was obligated to raise that complaint before consenting to have Judge Bryan preside over the hearing. It is simply not compatible with due process to allow the State to wait until a court issues an adverse ruling before deciding whether to be bound by the ruling, especially if the State had already explicitly consented to appear before the Judge. The state process that can be undone by the State once it receives an unfavorable result

deprived Mr. Thuesen of his constitutional due process right to have a fair habeas hearing before a neutral arbitrator. *Cf. Smalis v. Pennsylvania*, 476 U.S. 140, 145–46 (1986) ("A post-acquittal appeal is barred by the double jeopardy clause when reversal of the order appealed from would lead either to a second trial or to 'further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged.'") (quoting *U.S. v. Martin Linen Supply Co.*, 430 U.S. 564, 570 (1977)).

674.    The foregoing claims were presented to the CCA pursuant to its request for briefing, and were implicitly decided by the CCA's ruling that Judge Bryan lacked appropriate administrative paperwork to preside over Mr. Thuesen's habeas hearing. In so doing, the CCA based its decision entirely on state law, thus ignoring the constitutional claims. Accordingly, the claim is not barred by Section 2254(b).

### 2.    This claim could not have been raised below because it arose during the adjudication of Mr. Thuesen's state habeas petition.

675.    The foregoing claims were presented to the CCA pursuant to its request for briefing, and were implicitly decided by the CCA's ruling that Judge Bryan lacked appropriate administrative paperwork to preside over Mr. Thuesen's habeas hearing. But the CCA wholly ignored the constitutional infirmities in the process it created. As a consequence, this claim cannot have been exhausted in the state proceedings.

### 3.    This claim falls into an exception to 28 U.S.C. § 2254(d)(2)'s relitigation bar because the findings of fact made by Judge Langley constituted an unreasonable determination of the facts in light of the evidence presented before Judge Bryan.

676.    Judge Bryan conducted the post-trial evidentiary hearing on Mr. Thuesen's state habeas petition, which lasted five days and involved live testimony from and cross-examination of 13 witnesses. Critically, those witnesses included both of the attorneys around whom his ineffective assistance of counsel claims centered.

677.    Following that hearing, and with the unique benefit of having seen the testimony of the witnesses in person, Judge Bryan made findings of fact that expressly included credibility determinations; overall, he found Mr. Thuesen's expert and lay witnesses credible.

678.    In light of his findings, Judge Bryan recommended that Mr. Thuesen receive habeas relief. But, as described *supra*, the CCA found that one piece of administrative paperwork had been missing, and as a result granted the State another "bite at the apple." The case was then reassigned to Judge Langley.

679.    Judge Langley did not hear the witnesses who had testified before Judge Bryan. Rather, he ordered the admission of the testimony and exhibits presented at the evidentiary hearing before Judge Bryan into evidence. Based on the paper record, rather than the actual testimony, Judge Langley made Findings of Fact and Conclusions of Law that cannot be squared with Judge Bryan's credibility determinations—and Judge Langley's Findings of Fact and Conclusions of Law denying relief were devoid of any alternative credibility analysis. *See Ex parte Storey*, 584 S.W.3d 437, 439 (Tex. Crim. App. 2019), *cert. denied sub nom. Storey v. Texas*, 140 S. Ct. 2742 (2020) ("In most circumstances, [the CCA] defer[s] to the trial judge's findings of fact and conclusions of law *because the trial judge is in the best position to assess the credibility of the witnesses*.").

680.    It is incumbent upon the court to make explicit factual findings and determine the credibility of the witnesses. *Ex parte Reed*, 271 S.W.3d 698, 746 (Tex. Crim. App. 2008) ("Implicit in the requirement that a habeas petitioner present reliable evidence is the expectation that a factfinder will assess credibility.").

681.    But, because Judge Langley did not have opportunity to observe Mr. Thuesen's habeas witnesses when they testified, he was unable to make fully informed credibility

determinations as to those witnesses. It was, therefore, unreasonable for him to make tacit credibility determinations that conflicted with the informed determinations made by Judge Bryan. As a result, Judge Langley's Findings of Fact and Conclusions of Law are necessarily unreasonable.

682.   For these reasons, the Court should grant Mr. Thuesen relief by ordering that he be granted a new punishment phase of his trial as recommended by Judge Bryan.

## IV.   THE STATE COURTS DID NOT ADJUDICATE MR. THUESEN'S SUBSTANTIVE HABEAS CLAIMS ON THE MERITS OR PROVIDE A PROCESS THAT EFFECTIVELY PROTECTED HIS RIGHTS BECAUSE THE CCA'S RULING VACATING JUDGE BRYAN'S GRANT OF RELIEF, JUDGE LANGLEY'S DECISION, AND THE CCA'S SUBSEQUENT AFFIRMANCE OF JUDGE LANGLEY'S DECISION WERE RENDERED IN VIOLATION OF MR. THUESEN'S FIFTH AND FOURTEENTH AMENDMENT DUE PROCESS RIGHTS.

### A.   No deference to the state proceeding is owed under § 2254(d)(1) and (2), and the court should review all of Mr. Thuesen's claims *de novo*.

#### 1.   The procedural deficiencies and due process violations in the state habeas adjudication mean that there was no "adjudication of the merits" within the meaning of § 2254(d).

683.   Section 2254(d) of 28 U.S.C. provides AEDPA's framework for reviewing habeas petitions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Given this statutory language, § 2254(d) applies only when the claims submitted have been

"adjudicated on the merits" in state court. When a claim *has not been adjudicated on the merits* by the state court, a federal court reviews the claim *de novo*. *Cone v. Bell,* --- U.S. ----, ----, 129 S.Ct. 1769, 1784 (2009); *Monroe v. Angelone,* 323 F.3d 286, 297 (4th Cir. 2003); *Wilson v. Workman,* 577 F.3d 1284, 1290 (10th Cir. 2009); *Pike v. Guarino,* 492 F.3d at 67 (1st Cir. 2007); *Drake v. Portuondo,* 321 F.3d 338, 345 (2d Cir. 2003).

684.    Here, the CCA interpreted and applied Texas's procedural rules in a manner that resulted in extreme unfairness and a deprivation of Mr. Thuesen's right to procedural and substantive due process. In fact, the due process violation was so severe that it cannot be said that Judge Langley's decision constituted a decision on the merits; *de novo* review is therefore appropriate on this basis.

685.    As detailed in the statement of facts and procedure above, Judge Bryan recused himself in order to avoid any appearance of bias in that campaign donations he made to Michele Esparza, one of Mr. Thuesen's trial lawyers who was no longer active on the case, could make it appear he was hesitant to rule she had performed deficiently. On March 14, 2014, Presiding Judge Underwood had contacted Judge Bryan directly, advising him that he had the authority to enter an order withdrawing his voluntary recusal. *See* Ex. 18 [Response to Court's Order of February 24, 2016, Ex. M]. Judge Underwood further explained that it would then be incumbent on the state to file an objection to Judge Bryan's presence in the case. *Id*. Judge Bryan then voluntarily withdrew his recusal, over the State's objection. On March 18, 2014, after a hearing on the issue, the State withdrew its objection. *Id*. The State never objected or sought to recuse Judge Bryan again. Indeed, the state affirmatively abandoned the recusal issue until years later, and after Judge Bryan had ruled in favor of Petitioner on numerous claims—and ruled that Ms. Esparza's representation of Mr. Thuesen had violated *Strictland*.

686.     Mr. Thuesen's claims in state habeas were properly before Judge Bryan. Judge Bryan recommended relief on nine of them fully and one (State Habeas Claim 13) in part. Indeed, Judge Bryan recommended a new punishment phase trial based on the multiple constitutional errors, collectively demonstrating that Mr. Thuesen's trial counsel had been woefully deficient in numerous respects. Specifically, Judge Bryan found Mr. Thuesen was entitled to a new trial at least due to: (1) counsel's failure to present mitigation evidence related to PTSD at the punishment phase; (2) counsel's failure to investigate and present evidence that there was no meaningful probability of future violence; (3) counsel's failure to impeach Amanda Ward; (4) counsel was ineffective during jury selection; (5) counsel's failure to present evidence of Mr. Thuesen's history of mental illness; (6) counsel's failure to mention mental illness during the opening; and (7) counsel's failure to object to the State's improper closing argument.

687.     Even though Texas R. of Civ. P. 18a required the State to file a motion seeking recusal (which the State never did), and Texas R. Civ. P. 18b(e) expressly permits a party to waive any ground for recusal after disclosure (which the state expressly did here), the CCA held as a matter of first impression that Tex. Gov't Code § 24.002[38] trumps those provisions. The CCA nullified Judge Bryan's order removing his voluntary recusal, *and* Judge Underwood's express authorization of Judge Bryan to do so, ***solely because Judge Underwood's directive was oral and not in writing***. *See* Dkt. No. 53 at p. 15 (the CCA providing a novel construction of Tex. R. Civ. P. 18a(g)(2)).

---

[38] "If a district judge determines on the judge's own motion that the judge should not sit in a case pending in the judge's court because the judge is disqualified or otherwise should recuse himself or herself, the judge shall enter a recusal order, request the presiding judge of that administrative judicial region to assign another judge to sit, and take no further action in the case except for good cause stated in the order in which the action is taken. A change of venue is not necessary because of the disqualification of a district judge in a case or proceeding pending in the judge's court." *Id.*

688.     Acknowledging that it had "not previously confronted this set of circumstances in a published opinion," the CCA would rest the denial of relief to Petitioner on the slimmest of reeds: a novel interpretation of an obscure procedural rule that had never been applied in this rigid a manner. The CCA could only reach this result by ignoring several provisions of Texas procedural law that supported Judge Bryan's reassertion of authority over the habeas proceeding. For instance, the CCA primarily relied on an unpublished Texas intermediate appellate court decision stating: "[c]ertainly, logic tells us that, subject to a specific requirement of the rules, any form of communication between the court and the parties for the efficient and expeditious handling of the court's business is acceptable." *Dunn v. County of Dallas*, 794 S.W.2d 560, 562 (Tex. App.—Dallas 1990, no writ).

689.     Further, the CCA ruled as such despite acknowledging that Judge Underwood's clear intention was to authorize Judge Bryan to resume duty on the case. *Ex parte Thuesen*, 546 S.W.3d 145, 150-151 (Tex. Crim. App. 2017) The CCA also found that that the State unequivocally waived its objection to the resumption of Judge Bryan's duty on the case but wrote this off on grounds that Judge Bryan had no authority to rule in the first place in light of its novel requirement that reinstatement of a judge who recused himself must be pursuant to written order. *Id.* at 156-157.

690.     While Texas of course has authority to enact and apply its own procedural law, the Texas courts may *not*, consistent with Federal Due Process, apply their rules in a way that is arbitrary or capricious. Prior to the CCA's decision, the Texas courts had held that any method of communicating a judicial order may be acceptable. Yet here the CCA ignored this Texas decisional law (while cherry-picking other language from the same case) and required adherence to a novel interpretation of Tex. R. Civ. P. 18a(g)(2). That ruling—emphasizing arcane procedure over

substance—would have the effect of hastening an execution despite the numerous constitutional infirmities identified by Judge Bryan.

691.    Under well-established federal constitutional law, when a state authorizes its judiciary to act that judiciary must "play fair" and afford due process to those who play by its rules. Otherwise, the game itself is a sham and those induced to play, based on false expectations of fairness, have a constitutional right to cry "foul." *See Lisenba v. People of State of California*, 314 U.S. 219, 236 (1941) ("As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice."); *see also Ford v. Wainwright*, 477 U.S. 399, 413, 424 (1986) (explaining the floor of constitutional process that states are required to provide). In *Ford*, for instance, although there was no dispute that state law pertaining to the determination of whether a prisoner was insane was followed, and thus the prisoner was not subject to a sentence of execution, the Court held that the procedure contemplated by that state law fell short of the protections provided by the Eighth Amendment. *Id.* The law violated the Eighth Amendment in several ways, including that it vested the power for making insanity evaluations in the executive branch, which could not be deemed neutral with respect to such matters given that state prosecutors—who "long sought" a sentence of execution that could not be carried out if the prisoner was determined to be insane—also worked for an executive branch agency. *Id.*

692.    Indeed, the federal appellate courts have found due process violations during state habeas proceedings sufficient to overcome § 2254(d)'s hurdles in numerous contexts. For example, in *Winston v. Kelly*, 592 F.3d 535 (4th Cir. 2010), the court held that where a petitioner claimed that a state habeas court improperly limited the scope of evidence it would consider, preventing further development of the facts, "deference to the state court's judgment would be inappropriate

because judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d)." *Id.* at 555-556.

693.    And in *Drake v. Portuondo,* 321 F.3d 338 (2d Cir. 2003), the Second Circuit concluded that *de novo* review of the petitioner's due process claim was appropriate when "the state courts did not permit the development of the factual record" and therefore relied on an incomplete record in denying the claim. *Id.* at 345. Indeed, the Second Circuit actually remanded the case for discovery and an evidentiary hearing. In *Wilson v. Workman,* 577 F.3d 1284 (10th Cir. 2009), the Tenth Circuit, sitting *en banc*, concluded that *de novo* review of the petitioner's ineffective assistance claims was appropriate because the Oklahoma state courts had denied the claims based "on a factual record that was, solely as a result of [a] state procedural rule, incomplete." *Id.* at 1290-91.[39]

694.    During the adjudication of Mr. Thuesen's state habeas claims:

- The trial court judge recused himself because of a concern that might appear biased *against* Mr. Thuesen;

- The trial court judge reinstated himself expressly conveying to all interested parties that this was appropriate and done in conjunction with the Presiding Judge;

- The State, after claiming to have consulted with "experts," waived any objection to the judge resuming duty and stated that it would not raise the issue in future proceedings (*see* Ex. 18 [Response to Court's Order of February 24, 2016, Ex. M]);

- That judge found in favor of Mr. Thuesen on multiple claims;

---

[39] Though *Wilson* was later abrogated by *Lott v. Trammell*, 705 F.3d 1167, 1212 (10th Cir. 2013), this was only the case because the Oklahoma court responsible for habeas petitions clarified that it actually *did* consider all evidence presented to it on the merits. Thus, *Wilson*'s holding that state law procedural infirmities (to the extent they exist) that limit the state court's consideration of evidence can require *de novo* review on federal habeas review remains good law.

- The State, frustrated with the result, sought to undo its waiver and reneged on its unequivocal consent to Judge Bryan's authority to rule, ignoring its earlier representation that the State would not later lodge a challenge;

- The CCA invented a new rule of law that an order concerning resumption of a trial judge's involvement after a prior recusal must be in writing; and

- The State was given a second bite at the apple, forcing Mr. Thuesen to prepare for a new evidentiary hearing in front of a new trial court judge, who ultimately held that Mr. Thuesen was not entitled to relief.

- The new trial court judge adopted the State's proposed Findings of Fact and Conclusions of Law wholesale, without a single edit or interlineation, only 9 days after the State submitted its proposed order (*see* State's Proposed FFCL (2019) at 1; *see also* Langley FFCL at 173).

695.    That the CCA applied a novel interpretation of a purely procedural rule to nullify findings that Mr. Thuesen's trial had been completely infected by Constitutional violations, and did so despite state court authority that would have supported Judge Bryan's order and reinstatement, gives the impression of an outcome-driven, arbitrary process. Such patent, Kafkaesque unfairness undercuts even the most basic notions of justice and due process. As such, to find that Mr. Thuesen's claim was "decided on the merits" would be beyond the pale. Mr. Thuesen's claims are entitled to *de novo* review. *See* § 2254(d).

### 2.    Without an actual "adjudication on the merits" of Mr. Thuesen's habeas claims, this Court should review his claims *de novo*.

696.    Where state habeas claims were not "adjudicated on the merits," "the AEDPA deference scheme outlined in 28 U.S.C. § 2254(d) does not apply." *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999). "adjudicated on the merits"). Instead, under these circumstances, the federal habeas court's review is *de novo*. *Cone v. Bell*, 556 U.S. 449, 472 (2009); *Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir. 2003). Because, as demonstrated above, the Texas courts did not adjudicate Thuesen's claims on the merits within any reasonable understanding of that concept, *de novo* review is appropriate.

**B.     The procedural defects and due process violations in the state habeas proceeding also requires *de novo* review under § 2254(b)(1)(B)(ii).**

697.    A court may grant habeas relief under § 2254(b)(1)(B)(ii) when "circumstances exist that render [the state court habeas] process ineffective to protect the rights of the applicant." In such a circumstance, *de novo* review is appropriate—for obvious reasons it would make no sense for a federal court to pay deference to a fundamentally unfair state habeas proceeding. As explained by the Third Circuit in discussing § 2254(b)(1)(B)(ii):

> If an appropriate remedy does not exist or its utilization is frustrated by the state system ... [t]he deference accorded the state judicial process must give way to the primary role of the federal courts to redress constitutional deprivations.... If it appears that the prisoner's rights have become an "empty shell" or that the state process is a "procedural morass" offering no hope of relief, then the federal courts … may directly consider the prisoner's constitutional claims.

*Lines v. Larkins*, 208 F.3d 153, 163 (3d Cir. 2000) (emphasis added) (quoting *Hankins v. Fulcomer*, 941 F.2d 246, 249-250 (3d Cir.1991)).

698.    As discussed above, due to the patently unfair and unconstitutional maneuvering by the Texas courts, the state "process" was nothing more than an "empty shell" and "procedural morass" that was patently "ineffective to protect the rights of" Mr. Thuesen. As such, no deference is owed to the Texas habeas proceeding and *de novo* review is appropriate on this ground as well.

**V.     MR. THUESEN'S DEATH SENTENCE SHOULD BE VACATED BECAUSE TEXAS REQUIRED PUNISHMENT-PHASE JURY INSTRUCTION IMPROPERLY RESTRICTS THE EVIDENCE THE JURY MAY CONSIDER AS MITIGATING**

**A.     The jury must be permitted to hear all mitigating evidence in a death penalty proceeding.**

699.    Mr. Thuesen presented mitigating evidence that the jury was precluded from considering, in violation of the U.S. Constitution's 8th and 14th Amendments.

700.    "[T]he Eighth and Fourteenth Amendments [of the U.S. Constitution] require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original), aff'd, *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982). The Lockett Court's decision was animated by "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty," and it accordingly found unconstitutional a state statute that "prevent[ed] the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation." *Id.* at 605.

701.    The Supreme Court requires that a jury "be permitted to 'consider fully' [] mitigating evidence" that provides a basis for a sentence of life rather than death." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007). "[S]uch consideration," the Court has explained, "would be meaningless unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Id.* (internal quotations omitted). Each juror is entitled to broad discretion in assessing the import of the mitigating evidence the defense proffers; at the same time, the State may not limit this evidence to those categories which the State deems as mitigating. *See Id.*

702.    As the Court stated in *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (internal quotations omitted), "[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." *See also McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.").

703.     Consistent with this jurisprudence, the avenues of mitigation open to a capital jury cannot be limited to evidence that relates solely to the defendant's culpability, the nature of his crime, or what the crime says about that individual defendant. *See Abdul-Kabir*, 550 U.S. at 246 (establishing a low threshold for what constitutes "mitigating evidence," namely, that which "might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future").

704.     For example, evidence that a defendant has adjusted well in prison prior to his trial qualifies as mitigating evidence because "there is no question but that [inferences drawn from the evidence] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (quoting *Lockett*, 438 U.S. at 604). Importantly, the *Skipper* court observed that the proffered evidence—the testimony of two guards and a prison visitor—"would not relate specifically to petitioner's culpability for the crime he committed." *Id.* at 4. Nevertheless, it could "hardly be disputed" that the exclusion of the evidence "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." *Id.* at 4; *see also Abdul-Kabir*, 550 U.S. at 259 ("Like Penry's evidence, Cole's evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence."). In other words, mitigating evidence cannot be limited to evidence that relates solely to "moral blameworthiness," and such evidence cannot "be excluded from the sentencer's consideration." *Skipper*, 476 U.S. at 5.

705.     The Texas statute governing capital trials gives rise to this risk by expressly limiting the evidence that a jury may consider mitigating for purposes of punishment in violation of the

Eighth and Fourteenth Amendments. Mr. Thuesen's sentence therefore violates his rights under the United States Constitution and United State Supreme Court case law.

### B. The trial court gave instructions to the jury that prevented it from considering all mitigating evidence.

706.    Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries. The statute requires a trial court to submit at least two special issues to the jury at the punishment stage: (1) whether there is a probability that the defendant constitutes a continuing threat to society; and (2) whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole instead of death. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1), (e)(1). With respect to the mitigating circumstances issue, the court must instruct the jury that it must answer this special issue "Yes" or "No," that it may not answer "No" unless by unanimous agreement, that it may not answer "Yes" unless ten or more jurors agree, and that the jurors need not agree on which evidence in particular is mitigating. *Id.* at § 2(f)(1)-(3).

707.    The Texas Code of Criminal Procedure requires a capital trial court to submit the following special issue to the jury at the punishment stage: whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole instead of death. Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).

708.    Further, Texas law requires the court to instruct the jury that mitigating evidence is "evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071 § 2(f)(4). However, the statute fails to define "moral blameworthiness" and requires no additional instructions on the matter.

215

709. The trial court in this case gave the statutorily mandated instructions during the punishment phase of trial and before the jury retired to deliberate. *See* 54 RR at 12. Specifically, the court twice charged the jury as follows:

> Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

54 RR at 7:22-8:4; 12:13-20. The charge also included the following direction: "In deliberating on Special Issue No. 2, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." 54 RR at 9:2-5.

710. The Texas statutorily-mandated instruction to consider only mitigating evidence that bears on "moral blameworthiness" fatally undermines the jury's capacity to give effect to the broader types of mitigating evidence described above. Tex. Code Crim. Proc. art. 37.071, § 2(f)(4); see also CR at 968. Put differently, this instruction precluded jurors from considering mitigating evidence unrelated to Mr. Thuesen's "moral blameworthiness," a limitation wholly at odds with three decades of U.S. Supreme Court precedent. Had Mr. Thuesen's jurors (or any one of them) credited such evidence—that is, evidence that did not reduce Mr. Thuesen's moral blameworthiness for the crime but still warranted a life sentence—they would be in violation of the court's instructions. *Penry v. Johnson*, 532 U.S. 782, 800 (2001). Because "[w]e generally presume that jurors follow their instructions," there exists a reasonable probability that the result of Mr. Thuesen's trial would have been different had a constitutionally adequate instruction been given. *Id.* at 799.

### C.   Mr. Thuesen presented mitigating evidence that the jury was actually or effectively precluded from considering.

711.   At the punishment phase, Mr. Thuesen presented mitigating evidence that bore no relationship to his moral blameworthiness for the capital crime. Like the defendant in *Skipper*, Mr. Thuesen presented to the jury evidence regarding his background and character as mitigation evidence. Some of this evidence related to the conceptualization of mitigation expressed in *Wiggins* that "defendants who commit criminal acts that are ***attributable*** to a disadvantaged background . . . may be less *culpable*." *Wiggins*, 539 U.S. at 535 (quoting *Penry v. Lynaugh*, 492 U.S. at 319). However, other evidence—*i.e.*, that Mr. Thuesen had been a loving son and brother, that Mr. Thuesen had performed admirably as a Marine, that Mr. Thuesen had been a positive influence on other inmates at the Brazos County jail—bore no specific link to his legal or moral blameworthiness for the crime in question. Rather, such evidence offered compelling sentiment that, although legally and morally to blame for the crime, Mr. Thuesen was a worthwhile person who was not deserving of a death sentence. Just as much as evidence that Mr. Thuesen's background contributed to the crime, this type of evidence held equal potential for jurors to weigh and decide it mitigated Mr. Thuesen's overall deservingness of execution. *See Penry v. Lynaugh*, 492 U.S. at 327 ("[S]o long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant.").

712.   For instance, Mr. Thuesen's high school principal testified that Mr. Thuesen was a "good student." 51 RR at 43. Similarly, his high-school government teacher testified that Mr. Thuesen was a "very good student" who "always had his work done" and whose defining trait would be "respect." 51 RR at 101, 104. Mr. Thuesen's pre-calculus teacher spoke about Mr.

Thuesen's aptitude for math, and the pride he felt in serving his country in the Marines. 51 RR at 113-14.

713.    Trial counsel also called various witnesses who, as former employers of Mr. Thuesen, could speak to his commendable work ethic. 51 RR at 44, 115; 52 RR at 20, 36. These witnesses described Mr. Thuesen as "always eager" and "hard-working," 51 RR at 51; as "trustworthy" and "respectful," 51 RR at 116; as a "quiet" person who "did his work," 52 RR at 26; and, as a very "diligent" person, 52 RR at 41. One employer testified that Mr. Thuesen helped to tutor her son in algebra. 51 RR at 117.

714.    To help the jury understand Mr. Thuesen's military experience, trial counsel called a number of former active-duty Marines who served in Iraq around the same time as Mr. Thuesen. 52 RR at 89, 146, 190; 53 RR at 5. These marines explained that the duty of Mr. Thuesen's unit was to draw and return fire to the enemy in Iraq 52 RR at 94-95, 149; 53 RR at 17-19; that the job was often violent and frightening 52 RR at 97, 105, 149-56; 53 RR at 17-19, 23-24; and that the unit came into contact with improvised explosive devices ("IEDs"), 52 RR at 149; 53 RR at 18. The two Marines who served extensively with Mr. Thuesen spoke in glowing terms about his service and his commitment to his country. 52 RR at 165-66; 53 RR at 25-27. One marine described a harrowing experience for Mr. Thuesen: he was ordered to open fire on a vehicle that, it was discovered, contained not enemy combatants but a civilian family. A young child, covered in his family's blood, emerged from the vehicle and ran towards Mr. Thuesen's Humvee. 52 RR at 158-63.

715.    Trial counsel called several witnesses who went to junior-high and high school with Mr. Thuesen. 51 RR at 85, 89, 121; 52 RR at 44, 49, 54. These witnesses alternatively described him as a "good team member" in his high-school band 51 RR at 86-87; as a "very hard worker,"

51 RR at 92; as someone who "was always pushing to better himself as best he could," 51 RR at 126; as someone who had become more despondent and an alcoholic after Iraq, 51 RR at 128-29; as "one of the good guys," 52 RR at 51; and as a "caring understanding, [and] dependable" individual. 52 RR at 55. One high-school classmate testified that she wrote letters to Mr. Thuesen when he was in county jail awaiting trial, and that he helped her overcome the grief she felt over losing her own husband. 52 RR at 44-47.

716.    Trial counsel also called an employee of the medical division of the Brazos County Sheriff's Office who testified that Mr. Thuesen was "very respectful [and] calm" in the jail setting. 52 RR at 6-7. A jailer at the Brazos County Sheriff's Office testified that Mr. Thuesen was always well-behaved, and that he would be comfortable describing Mr. Thuesen as a "model prisoner." 52 RR at 126.

717.    A longtime neighbor of the Thuesen family testified that Mr. Thuesen's crime was not consistent with the behavior of the young man she had known for many years. 52 RR at 142-44. Trial counsel also called a clergywoman of the Lutheran Church, who testified that Mr. Thuesen "still has gifts to give," and that "God still has a purpose for his life," potentially including participation in prison ministry. 52 RR at 80-81. This witness's husband also took the stand to corroborate his wife's testimony. 52 RR at 114-20.

718.    Finally, trial counsel called several members of the Mr. Thuesen's family, including Mr. Thuesen's brother, who testified that he had been "proud" of his brother for his helpfulness before the incident. 52 RR at 74. Mr. Thuesen's sister testified that Mr. Thuesen had helped her raise her young son. 52 RR at 75. Mr. Thuesen's aunt described Mr. Thuesen as "a very caring, compassionate person" who was "willing to give up his time to [her] family, to share, be joyful." 52 RR at 137. Finally, Mr. Thuesen's mother told a story about Mr. Thuesen wherein he

volunteered his bed to a friend so that this friend would not have to sleep on the floor; she also shared an anecdote about how Mr. Thuesen volunteered to push the wheelchair of the disabled mother of a deceased friend. 52 RR at 202-04.

719.    This evidence, though unrelated to Mr. Thuesen's moral blameworthiness for the crime, bolstered the argument that Mr. Thuesen nevertheless was a worthwhile person undeserving of a death sentence. Such evidence is equally meaningful for jurors as background and character evidence when deciding whether to impose a sentence of death. *See Penry v. Lynaugh*, 492 U.S. 302, 327 (1989) ("[S]o long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant.").

720.    In this case, the application of the Texas death penalty statute and the exhortations of the State that the jury ignore mitigating evidence impaired Mr. Thuesen's rights to have ***all*** mitigating evidence considered by the jury in assessing whether he deserved a life or death sentence. *Id*. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence he introduced."). Therefore, Mr. Thuesen's death sentence should be reversed, and Mr. Thuesen should be granted a new punishment-phase trial.

> **D.    Even if the trial court's instructions were proper, in Mr. Thuesen's case the State's gloss on those instructions improperly instructed the jury to ignore and not consider certain mitigating evidence.**

721.    "A jury may be precluded from [considering mitigation evidence] not only as a result of the instructions it is given, but also as a result of prosecutorial argument dictating that such consideration is forbidden." *Abdul-Kabir*, 550 U.S. at 259 n.21; *see also Penry*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence he introduced.").

722.    That is exactly what occurred in Mr. Thuesen's case. While it is unclear how any evidence of a positive character and worthwhile life, as opposed to a "disadvantaged background," would be given effect by the jury under the Texas statute, the prosecutor explicitly and unconstitutionally argued to the jury at the punishment phase that consideration of such mitigating factors was forbidden.

723.    In its closing argument, the State instructed the jury as follows:

> He had people who loved him. How is that mitigation that you were smart, that you work hard, which means you don't have a bad work ethic, but you still go out and do this.
>
> If you came from a crime-ridden family, if you came from a family that raised you up to lie, cheat and steal and you did something you may say, "I have an excuse."
>
> But he has no excuse. He had nothing. That is not mitigation.

54 RR at 27-28. The State continued, arguing that any positive evidence from Mr. Thuesen's background was irrelevant: "You heard a lot of people talk about raising turkeys, going and working at Blue Bell and being in the band. I would submit to you that those are not reasons that tend to reduce your moral blameworthiness or make you less that fully responsible." 54 RR at 26.

724.    The State's argument at closing was precisely the sort of prosecutorial instruction *Abdul-Kabir* warns against.

725.    Given the ambiguity of the State statute, at least one juror could reasonably have interpreted the State's closing to mean that they were prohibited from considering such mitigating evidence.

726.    Mr. Thuesen was prejudiced as a result of the State's argument. It is highly likely that, without the State's instruction that consideration of such mitigating evidence was prohibited, the jury would have found that Mr. Thuesen should be sentenced to life in prison, and not to death.

727.   Even if the statute itself passes constitutional muster, the State's instruction to the jury during its closing argument that the jury not to consider certain types of mitigating evidence rendered the statute's application unconstitutional in Mr. Thuesen's case. As a result, Mr. Thuesen is entitled to habeas relief and a new punishment phase trial.

**E.     The Court may adjudicate the claim.**

728.   The merits of this claim may be adjudicated subject to 28 U.S.C. § 2254(e) and 28 U.S.C. § 2254(d)(1).

729.   The state court's decision was contrary to, and involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

730.   That Court has held that "the Eighth and Fourteenth Amendments [of the U.S. Constitution] require that the sentence . . . not be precluded from considering, ***as a mitigating factor***, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. Applying that standard, the Supreme Court has repeatedly criticized the Texas sentencing statute, noting that the Court of Criminal Appeals' interpretation clashes with the constitutional requirements because it fails to permit a jury "to 'consider fully' [] mitigating evidence," including by being permitted to "give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Abdul-Kabir*, 550 U.S. at 260. Further, in both *Brewer v. Quarterman*, 550 U.S. 286 (2007) and *Abdul-Kabir*, 550 U.S. 233 (2007), the Supreme Court expressly held that "jury instructions that merely articulate[] the Texas 'special issues' without directing the jury 'to fully consider [Defendant's] mitigating evidence as it bears on his personal culpability,' d[o] not provide [a] sentencing jury with an adequate opportunity to decide whether that evidence might provide a legitimate basis for imposing a sentence other than death." *Brewer*, 550 U.S. at 288.

731.    Despite the clarity offered by the Supreme Court on precisely this point, the State Court disposed of this issue merely by citing to a Texas Court of Criminal Appeals decision that based on previous Court of Criminal Appeals decisions. *See* Langley FFCL at 172 ¶ 74 (citing *Mays v. State*, 318 S.W.3d 368, 396 (Tex. Crim. App. 2010)). Critically, *Mays* neither acknowledges nor cites to any of the on-point Supreme Court decisions that abrogate the very precedent *Mays* relies on. The state court's determination was therefore contrary to clearly established federal law as laid down by the United States Supreme Court.

732.    A state remedy is not available with respect to this claim. *See* 28 U.S.C. § 2254(c).

733.    Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 21.

## VI.    MR. THUESEN'S DEATH SENTENCE VIOLATES THE CONSTITUTION BECAUSE TEXAS'S STATUTORY SCHEME SET FORTH IN CODE OF CRIMINAL PROCEDURE, ARTICLE 37, IS ARBITRARY

### A.    United States Supreme Court precedent precludes administering the death penalty pursuant to arbitrary procedures.

734.    Capital punishment schemes must have "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976). When these schemes lack such standards, or when such standards fail in their application, or when "[t]here is no principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not," it cannot be maintained that the imposition of a death sentence was "based on reason rather than caprice or emotion." *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980).

735.    "[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at

223

428. (quoting *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

736.    "This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.' It must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Id.*

### B.    Texas's death penalty scheme is arbitrary.

737.    The Texas death penalty statute is set forth in Texas Code of Criminal Procedure, Article 37.071. At various points, that statute asks the jury to consider "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society"; "the personal moral culpability of the defendant"; and mitigating evidence, but only to the extent the juror might regard it "as reducing the defendant's moral blameworthiness." Texas Code Crim. Proc. Ann. art. 37.071 §§ 2(b)(1), (e)(1), & (f)(4). That statute is facially unconstitutional because it violates the Fifth, Sixth, Eighth, and Fourteenth Amendments in at least the following non-exclusive ways:

738.    *First*, the statute is vague and overbroad for failure to define (i) "probability"; (ii) "criminal acts of violence"; (iii) "continuing threat to society"; (iv) "personal moral culpability"; and (v) "moral blameworthiness." This failure on the part of the legislature to define these terms, and to require the trial court to do so, denies the jury the guidance necessary to exercise its discretion and ensures that the death penalty will be applied in an unconstitutionally arbitrary manner. *Gregg v. Georgia*, 428 U.S. 153 (1976).

739.     Requiring twelve jurors to predict the probability (whatever that means) that a person will commit criminal acts of violence (whatever that means) that constitute a continuing threat to society (whatever that means) when mental health professionals are not able to reliably make such predictions, particularly over a long term, is necessarily arbitrary and capricious and violates the evolving standards of decency of our society.

740.     *Second*, the state legislature has failed to provide any guidance to local district attorneys on which cases should be prosecuted as death penalty cases and which should be prosecuted as non-death penalty capital cases, much less a uniform and objective framework for making that determination. Because the Texas death penalty scheme does not give district attorneys guidance in exercising their discretion in determining who will face the death penalty, the determination is often reduced to a question of how much money the county is willing or has to spend to prosecute and defend a death penalty case, who the prosecutor is, the social standing of the victim, the race of the defendant, and the race of the victim. Those factors are self-evidently incompatible with the constitutionally required system of narrowing the application of the death penalty so that only the worst of the worst face death. Thus, because the statute is not based on a uniform standard marked by objective criteria, it results in the arbitrary, capricious, freakish and wanton imposition of the death penalty.

741.     That constitutional infirmity is compounded by the fact that the statute does not provide for a proportionality review to determine if the penalty imposed in any specific case is proportionate to other similar offenses.

742.     As a result, only a small minority of Texas's counties are responsible for an overwhelming majority of the death sentences that have been assessed in the modern history of the state. That disparity that cannot be explained merely by reference to county populations. Thus,

whereas sentences of death should be reserved only for the most egregious offenses, in Texas this determination is, to a degree both substantial and improper, an arbitrary one.

743.    Since 1976, 1,113 defendants have been sentenced to death in Texas.[40] Collectively, less than half of Texas's 254 counties account for the overwhelming majority of those sentences. Four counties—Harris, Dallas, Bexar, and Tarrant—account for 49.9% of these defendants, as well as for over 49% of those who have been executed (279 out of 570). In the past thirty-nine years, 83% if counties have sentenced someone to death three times or less, or not at all.

744.    The experience of the last forty years has shown that the practical consequence of prosecutorial discretion has not been to narrow the field of death-eligible defendants to the most serious and heinous cases. The influence of geographical factors within Texas's capital punishment system has undermined the Supreme Court's expectations that this system would be an "evenhanded, rational, and consistent" one. *Jurek v. Texas*, 428 U.S. 262, 276 (1976).

745.    Because the capital sentencing scheme does not "provide a 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not,'" *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (quoting *Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J., concurring) (alteration in original), it cannot constitutionally be imposed and Mr. Thuesen should be granted resentencing.

746.    ***Third***, the statute is unconstitutional in that Art. 37.071(b)(1) requires the jury to apply a murky and undefined "probability" standard to the reasonable-doubt determination. The statutory framework, under which jurors must decide if the probability has been established

---

[40] All statistics are taken from Tex. Dep't Crim. Justice, http://www.tdcj.state.tx.us/death_row/ (last visited January 31, 2021).

"beyond a reasonable doubt," Art. 37.071 § 2(c), encourages the jury to focus on the probability language and thereby improperly apply a standard less stringently than the proof-beyond-a-reasonable-doubt standard. For that reason, the application of Art. 37.071 is arbitrary and capricious.

747.     ***Fourth***, the statute is unconstitutional because it fails to ***require*** that mitigation be considered.

748.     ***Fifth***, the statute denies the accused due process and equal protection of the law by permitting introduction at the punishment phase of "any matter that the court deems relevant to sentence."

749.     ***Sixth***, Art. 37.071(d)(2) is unconstitutional because it requires that jurors be instructed that ten votes are required to answer "no" to Special Issue 2, the response that results in a life sentence. When jurors are instructed that they may not give a verdict of life unless ten or more agree upon a life answer in response to Special Issue 2, it provides an incorrect picture of the state of the law—it unconstitutionally shifts the jury's perspective by labeling the death penalty the "default," and life in prison the penalty requiring agreement when, in fact, if only one juror concludes that sufficient mitigation exists to warrant the imposition of a life sentence, the death penalty will not be imposed.

750.     In effect, the statute implicitly shifts the burden from requiring the state to prove that the death penalty should be applied to requiring the defendants to prove that it should not be applied. So long as the Texas statute equates the sentencing consequences of a life verdict with the consequences of a non-verdict, the jury must not be misled to believe that anything more than one vote for life is required to secure that sentence.

751.    In addition, the false distinction between a "life" answer of ten or more jurors and a non-answer of less than ten jurors is impermissibly vague and arbitrary and violates due process and *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994).

752.    Moreover, the ten-twelve rule violates the right to a fair and impartial jury by manufacturing confusion in the minds of the jury and preventing the court or attorneys from correcting it. The ten-twelve rule thus creates fertile ground for jurors to draw upon their own biases and preconceived notions in coming to a verdict.

753.    **Seventh**, execution by lethal injection is cruel and unusual punishment and otherwise unconstitutional.

754.    **Eighth**, the statute is unconstitutional because it prohibits the judge and the parties from informing the jury that a hung jury (failure to achieve unanimity on Special Issue No. 1 or less than ten "no" votes on Special Issue No. 2) will result in a life sentence. This is in effect a denial of the juror's right to know the consequences of disagreement between jurors, as they are intentionally misinformed about how such a conflict will affect the verdict. The statute requires that they be told that the verdict rests with ten or twelve when, in effect, a verdict for life rests with only one juror.

755.    This scheme artificially frustrates those jurors who would vote for life if properly instructed, and unconstitutionally makes "hold out" jurors more susceptible to the pressures from the death voting majority, encouraging them to vote for death despite contrary convictions. There is no such thing as a "mistrial" during the penalty phase of a capital trial and the jurors should be so informed.

756.    **Ninth**, the statute permits the introduction of unadjudicated extraneous offenses at the punishment phase, despite the requirement in capital cases that a heightened need for reliability

be applied at the punishment phase. *Woodson*, 428 U.S. 280 at 305. Allowing evidence of unadjudicated offenses, particularly in situations where those offenses would be inadmissible in a non-capital trial, denies the jury's verdict and the Court's sentence the reliability required by the Eighth Amendment to the United States Constitution.

757.    **Tenth**, the statute is unconstitutional because there are no appellate standards for determining the sufficiency of the evidence to support the jury's answers to the Special Issues, and the Texas Court of Criminal Appeals has repeatedly and consistently refused to conduct any meaningful appellate review of mitigation sufficiency.

758.    **Eleventh**, the statute is unconstitutional because, contrary to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), it does not require the indictment to allege special issues, *i.e.* the "facts" relied upon to enhance the capital sentence from life to death.

759.    As a result of each of those constitutional infirmities individually, as well as all of them collectively, Texas Code of Criminal Procedure, Article 37.071 facially violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Because the Texas statute violates the United States Constitution, defendants, including Mr. Thuesen, cannot constitutionally be indicted, convicted, or sentenced to death based on it.

760.    Mr. Thuesen exhausted the remedies available in the state courts during his state habeas proceedings, pursuant to 28 U.S.C. § 2254(b)(1). *See* State Habeas Petition, Claim 22.

761.    This Court is also empowered to hear this claim pursuant to 28 U.S.C. § 2254(d)(1), because the state court's decision was contrary to, and involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

762.    The Supreme Court has unequivocally held that capital punishment schemes must have "objective standards to guide, regularize, and make rationally reviewable the process for

imposing a sentence of death." *Woodson*, 428 U.S. at 303. "[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980).

763.     Rather than grapple with these issues, the state habeas court resolved this claim merely by citing a single Court of Criminal Appeals case purporting to overrule a similar claim. Findings of Fact and Conclusions of Law at 172 (citing *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008)). The sum total of the constitutional analysis offered by the Court of Criminal Appeals in *Busby*, in turn, is that "Appellants' multifarious arguments presented in this point of error have been rejected." *Busby*, 253 S.W.3d. at 667 (citing *Saldano v. State*, 232 S.W.3d 77, 109-109 (Tex. Crim. App. 2007)). But notably, none of *Busby*, nor *Saldano*, which it relies on for support, nor even a single case cited by *Saldano* for the same proposition, grapple with or even cite to *Woodson* or *Godfrey*.

764.     Though the Texas Court of Criminal Appeals has long stuck its head in the sand to avoid binding Supreme Court precedent, and the state habeas court followed its lead in doing so, those rulings cannot be squared with binding Supreme Court precedent. The ruling and its antecedents ignore binding Supreme Court precedent because they are knowingly contrary to that clearly established federal law.

765.     Because Mr. Thuesen was improperly and unconstitutionally indicted, convicted, and sentenced to death under Article 37.071, he is entitled to habeas relief.

VII.   **MR. THUESEN'S DEATH SENTENCE VIOLATES THE CONSTITUTION
BECAUSE TEXAS'S STATUTORY SCHEME SET FORTH IN CODE OF
CRIMINAL PROCEDURE, ARTICLE 37, DENIES THE RIGHT OF EQUAL
PROTECTION TO PEOPLE WITH MENTAL HEALTH DISORDERS**

766.    Texas Code of Criminal Procedure, Article 37 is impermissibly tilted toward

applying the death penalty to defendants suffering from mental health disorders at the time they

committed a death-eligible crime, compared to those defendants who were not in mental health

crisis when they commit death-eligible crimes.

767.    More specifically, 37.0711 section 2(b)(3) provides that a defendant may be spared

death if their conduct was a reasonable response to a provocation by the deceased:

> (b) On conclusion of the presentation of the evidence, the court shall
> submit the following three issues to the jury:
>
> . . .
>
> (3) if raised by the evidence, whether the conduct of the defendant
> in killing the deceased was unreasonable in response to the
> provocation, if any, by the deceased.

Texas Code Crim. Proc. Ann. art. 37.0711, § 2(b).

768.    Texas does not permit a jury instruction explaining that any determination of

whether a defendant responded "reasonably" to a provocation must take into account whether the

defendant suffered from an acute mental health condition. In doing so, it provides more protection

to defendants who commit death-eligible crimes following thought processes the jury can

empathize with than it does those who commit the same crimes following thought processes which,

through no fault of the defendant, are outside the jury's first-hand experience.

769.    Thus, a person without severe mental disease may "snap" at whatever provocation

that person experiences, and the jury is instructed that they should not impose a death sentence so

long as that "snap" is one that other people might also reasonably experience. In contrast, the jury

receives no instruction not to impose death penalty if a person ***with*** a mental health disease

responds to what they perceive to be a provocation in a way reasonable to them in light of their disease.

770.   Thus, these two people are given different protection by Texas 37.0711.

771.   The unequal treatment of these two people accordingly violates the right of equal protection.

772.   Mr. Thuesen suffered from undiagnosed and untreated PTSD. The record shows that, on the day of the crime, Mr. Thuesen suffered an acute crisis due to the disease causing hyper-sensitiveness to provocation.

773.   The jury was entitled to decide whether Mr. Thuesen's conduct was a reasonable response to provocation *in light of his untreated PTSD,* but the Texas statute denied them that opportunity. Because Mr. Thuesen belongs to the class denied equal protection by the Texas death penalty statute, Texas unconstitutionally denied him the right of equal protection when it sentenced him to death. His petition for habeas corpus should be granted.

## PRAYER FOR RELIEF

**WHEREFORE**, in consideration of the claims enumerated herein, Petitioner John Thuesen prays that this Court:

A.   Grant Mr. Thuesen any other documents or materials ascertainable after a reasonable opportunity for discovery and an evidentiary hearing so that he can investigate and offer evidence in support of his claims;

B.   Order an evidentiary hearing for the purpose of examining the merits of his claims;

C.   Order a briefing schedule;

D.   Grant Mr. Thuesen a writ of habeas corpus and order him released from the custody of the State;

E.     Vacate his death sentence and conviction; and

F.     Grant any other relief that law of justice may require.


Dated: November 24, 2021                          Respectfully submitted,

                                                  *s/ Glenn A. Danas*
                                                  Glenn A. Danas (admitted *pro hac vice*)
                                                  ROBINS KAPLAN LLP
                                                  2049 Century Park East, Suite 3400
                                                  Los Angeles, CA 90067
                                                  (310) 552-0130
                                                  GDanas@RobinsKaplan.com

                                                  Miles A. Finn, Ph.D. (admitted *pro hac vice*)
                                                  ROBINS KAPLAN LLP
                                                  900 Third Avenue, Suite 1900
                                                  New York, NY 10022
                                                  (212) 980-7400
                                                  MFinn@RobinsKaplan.com

                                                  Jennifer W. Leland (admitted *pro hac vice*)
                                                  ROBINS KAPLAN LLP
                                                  2049 Century Park E #3400
                                                  Los Angeles, CA 90067
                                                  (310) 552-0130
                                                  JLeland@RobinsKaplan.com

                                                  Timothy W. Billion (admitted *pro hac vice*)
                                                  ROBINS KAPLAN LLP
                                                  140 North Phillips Ave., Suite 307
                                                  Sioux Falls, SD 57104
                                                  (605) 335-1300
                                                  TBillion@RobinsKaplan.com

                                                  Ryan M. MacDonald (*pro hac vice* pending)
                                                  800 Boylston Street, Suite 2500
                                                  Boston, MA 02199
                                                  (617) 267-2300
                                                  RMacDonald@RobinsKaplan.com

                                                  *Counsel for Petitioner John Thuesen*

## CERTIFICATE OF SERVICE

I hereby certify that on the November 24, 2021, I electronically filed the foregoing

Amended Petition for Writ of Habeas Corpus with the Clerk of Court using the CM/ECF system

which will send notification of such filing to the following:

Edward Larry Marshall
Ellen Stewart-Klein
Office of the Attorney General
PO Box 12548
Austin, TX 78711
512-936-1400
Fax: 512-320-8132
Email: caddocket@oag.texas.gov
Email: ellen.stewart-klein@oag.texas.gov


*s/ Glenn A. Danas*
Glenn A. Danas

61866590.1