United States District Court
Southern District of Texas
**ENTERED**
April 04, 2024
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN THUESEN, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | H-20-CV-852 |
| | § | |
| BOBBY LUMPKIN, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

In 2010, a Texas jury convicted John Thuesen of capital murder for killing siblings Rachel and Travis Joiner. He received a death sentence. After unsuccessfully seeking Texas appellate and habeas remedies, Thuesen petitioned for federal habeas corpus relief. Respondent Bobby Lumpkin has moved for summary judgment, and Thuesen has replied. After considering the record, the parties' arguments, and the applicable law, the Court **GRANTS IN PART** the motion for summary judgment. The reasons for this ruling are set out below.

## Background

### I.     Factual Background

John Thuesen was born in Cat Spring, Texas in 1983. While still in high school, Thuesen joined the Marine Corps following the events of September 11, 2001. He skipped high school graduation to attend boot camp. Thuesen honorably served in the Marine Reserve for six years, including several months in Iraq.

While in Iraq during 2004 and 2005, Thuesen was stationed in Anbar Province, which includes the cities of Haditha and Fallujah, both active combat areas. Although he was trained as a radio operator, Thuesen served most of his time "outside the wire" (that is, beyond the base's

security perimeter) as a machine gunner on a Humvee. Thuesen's unit had the task of patrolling to draw out enemy fire. Thuesen also had the responsibility to man vehicle checkpoints. In his role, Thuesen had to shoot vehicles that did not stop to be searched. In one instance, he was ordered to open fire on a vehicle that was later discovered to have a civilian family with young children inside. These events caused profound mental trauma. The horrors of war left deep wounds in Thuesen's mental state when he returned in 2005.

Once Thuesen returned home from Iraq, his friends and family noticed significant changes in his demeanor. Thuesen began to startle easily. He would cry when he drank and would grieve acts he had committed to keep his fellow soldiers safe. Thuesen kept in close contact with his friends from his Marine service. Thuesen would call them late at night, often while drunk. His Marine friends, family members, and his counselor felt that he suffered from Post-Traumatic Stress Disorder ("PTSD"). Family friends observed that Thuesen seemed disconnected from reality. He became possessive and jealous in one romantic relationship, which ended in a protective order against him.

Soon, mental illness permeated much of his life. As described in Thuesen's habeas petition, "[g]one was the usually social and engaged young man Mr. Thuesen had been prior to going off to war. Friends, family members, and his counselor noted his problems with intrusive memories, hypervigilance, difficulty sleeping, interpersonal problems, irritability, and angry outbursts—all markers or symptoms of PTSD." (Dkt. 33 at 12).[1]

As time progressed, Thuesen's symptoms worsened, culminating in a call to the Veterans

---

[1]     Unless otherwise noted, citations to the pleadings and the record will refer to the pagination of docket entries in the federal case management/electronic case-filing (CM/ECF) system.

Administration suicide hotline in fall 2008. Thuesen was admitted to a psychiatric ward at a VA hospital. On admittance, it was observed that Thuesen had a flat, deflated affect. A VA hospital psychologist, Dr. Ismael Carlo, noted PTSD symptoms. The VA psychologist diagnosed Thuesen with major depressive disorder, a chronic condition requiring lifelong treatment. But Thuesen's treatment was brief; he was released after promising to give his parents his gun for safekeeping, to continue taking anti-depressant medication, and to participate in outpatient treatment.

Only days after leaving the VA hospital, Thuesen met Rachel Joiner. They began dating not long thereafter. At that time, Rachel Joiner and her brother Travis Joiner were both students at Texas A&M University in College Station.[2] Rachel and Travis lived together in a home not far from campus.

Soon after Thuesen and Rachel began dating, Thuesen reported to his outpatient VA licensed clinical social worker, Teresa Cannon, that he no longer felt depressed, and he attributed the improvement to his new girlfriend. Without guidance or supervision of a doctor, Thuesen decided to stop taking his prescribed antidepressant medication.

By February 2009, Rachel began to distance herself from Thuesen. Rachel told Thuesen that she needed "space" from him. Rachel began ignoring some of his phone calls and texts. The fear of losing Rachel caused stress for Thuesen, and he responded poorly. Rachel grew angry at Thuesen's failure to respect her space.

The night before the shootings, Thuesen confronted Rachel at the home of an ex-boyfriend. She was angry and told Thuesen that he was lucky she did not call the police. Thuesen went home

---

[2] The state court opinions refer to Rachel and Travis by their first names. The Court will also do so to preserve continuity with the record.

and began drinking.

At around 2:00 a.m., Thuesen parked his car down the street from the Joiner's house and watched. A short time later Thuesen entered the empty home carrying a .45 caliber handgun loaded with hollow-point bullets. Thuesen waited in Rachel's room for hours, growing angrier but remaining silent even when he heard Travis return home at 4:00 a.m. While he waited, Thuesen exchanged text messages with Rachel. He tried to call her six times. Rachel was irritated by Thuesen's phone calls. Thuesen sent Rachel misleading text messages saying that he had gone out with his friends.

Rachel returned home after noon. She confronted Thuesen, and the situation quickly escalated. Thuesen brandished his gun and held Rachel down on the couch. On direct appeal, the Court of Criminal Appeals summarized the subsequent events leading up to the shootings as follows:

> Rachel told [Thuesen] that if he would leave, she would not call the police. Instead of leaving, however, [Thuesen] turned his gun on himself. He told Rachel that he could not be with her any more and there was probably no going back after what had happened. [A police officer later] asked [Thuesen] why he turned the gun on himself. [Thuesen] stated, "I just wanted to end it because I was hurting and I didn't want to hurt her." Rachel asked [Thuesen] for the gun, so he uncocked it and handed it to her. She told him that he needed to leave and that she would give him the gun once he was outside. She walked [Thuesen] down the stairs, saying that [her ex-boyfriend] was probably waiting for her outside. [Thuesen] stopped Rachel by the front door and grabbed for his gun, but she resisted. [Thuesen] explained that he had been about to leave before he grabbed the gun, but then he changed his mind, telling himself, "I can't leave right now, we just need to clear it up right now. Let's clear this up and talk about it." They struggled over the gun until [Thuesen] got it from her. Rachel then tried to leave through the front door, but [Thuesen] would not let her. He told her that he just wanted to be with her, and he did not "want it to come to that," but she pushed him and kneed him in the crotch and ran through the house toward the garage, still trying to go outside.

> The garage door had been closed, but Rachel ran to the interior doorway

4

and pushed the garage door button to open it. She was headed toward the opening garage door when [Thuesen] reached the interior doorway and pushed the button to make the door to go back down. [Thuesen] stated that he closed the garage door "to try and stop her," but Rachel did not stop. She was facing away from [Thuesen], trying to crawl under the closing garage door, but then she stood up and he "popped her." [Thuesen] stated that he wanted to keep her from leaving and he "didn't want her to make a spectacle."

After the first shot, Rachel was "really hurting," and there was blood spatter everywhere inside. She turned to go back inside and ran toward the kitchen. [Thuesen] followed her inside, and "that's when her brother surprised [him]." [Thuesen] feared that Travis had a gun because Rachel had told [Thuesen] that her brother had a gun while she was telling him to leave. [Thuesen] said, "Everything just happened so fast and I just reacted." Travis ran out from his bedroom and met Rachel in the kitchen area. He was standing on the other side of a separator between the kitchen and the hall. He looked at [Thuesen], and [Thuesen] fired over the separator. [Thuesen] shot Travis in his "center mass," and when Travis turned and moved toward the stairs, [Thuesen] shot him in the lower right hip. [A police officer later] asked [Thuesen] if Travis had a gun, and [Thuesen] responded that he did not see a gun. [Thuesen] could not see Travis's hands; he only saw his face.

Rachel ran past [Thuesen] while he was shooting Travis. After the second shot to Travis, [Thuesen] immediately turned back to Rachel. He shot Rachel a second time, and when she turned to go back into the garage, [Thuesen] shot her a third time. Rachel turned around, looked at him, "went blank," and fell over. "She couldn't say anything for the longest while it seemed," and then she just started moaning.

*Thuesen v. State*, 2014 WL 792038, at *7-8 (Tex. Crim. App. 2014). Thuesen then called 9-1-1.

As recounted by the Court of Criminal Appeals on direct appeal, the jury heard the audio from that

call:

[Thuesen] was breathing hard and fast as he gave the dispatcher the address and told him that there were two gunshot victims. When the dispatcher asked him what happened, [Thuesen] stated, "I got mad at my girlfriend and I shot her." He told the dispatcher that she had a "sucking chest wound." She was "just breathing" and moaning, and she could not say anything. The dispatcher placed a paramedic on the line to talk to [Thuesen]. [Thuesen] stated that he did not think that she was "going to make it." Following the paramedic's instructions, [Thuesen] checked Rachel's airway. He stated that Rachel was trying to say something but she could not get it out. He could hear the air moving in and out of her chest. [Thuesen] informed the

paramedic that her brother "surprised" him and [Thuesen] "shot him, too." Again following the paramedic's instructions, he went to check on Travis. [Thuesen] reported that he thought Travis was dead because he was not breathing, was nonresponsive, and did not have a pulse. The dispatcher then asked [Thuesen] to step outside, and [Thuesen] stated that he was unloading his gun. Rachel could be heard moaning in the background. At that point, the recording ended.

*Thuesen*, 2014 WL 792038, at *3.

Thuesen sat on the garage floor holding Rachel as he tried to close her wounds using plastic as he had been taught in his military training. Police officers quickly arrived and arrested Thuesen as he walked out of the victims' garage. Thuesen was cooperative.

When the first responders arrived, Travis had no pulse. Rachel was still alive. She had difficulty breathing but said her "boyfriend" named "John" shot her. Both siblings were taken to the hospital where they died.

Thuesen gave the police an audiotaped interview in which he described his background, his mental-health struggles, and the shootings.

Thuesen's mother visited him in jail soon after the arrest. She observed that he did not look like himself and seemed drawn in and disoriented. Thuesen was put on a suicide watch at the jail and remained in a mental-health cell until his trial.

## II.    The Trial

The State of Texas charged Thuesen with capital murder for killing more than one person during the same criminal transaction. (Dkt. 43-9 at 11); *see* Tex. Penal Code Ann. § 19.03(a)(7). Thuesen stood trial in the 272nd District Court of Brazos County under cause no. 09-02136-CRF-272 with the Honorable Travis B. Bryan, III, presiding.

In May 2009, the trial court appointed William Carter and Michele Esparza to represent

Thuesen.[3] Mr. Carter was a criminal defense attorney who had practiced law since 1973. Ms. Esparza had practiced criminal law since 1987. Both attorneys had criminal trial experience and had tried several capital cases. (Dkt. 66-4 at 6-10). Along with those two attorneys, the trial court appointed attorney Frank Blazek to represent Thuesen in any subsequent appeal. Mr. Blazek "assist[ed] [the defense] during the trial to make sure [they had] preserved the record and preserved the proper points of appeal," but did not assist with preparation for trial. (Dkt. 46-11 at 38). As the issues in Thuesen's federal habeas petition focus on his trial attorneys' representation, the Court will explore their efforts at length.

### A.   Trial Counsel's Pre-Trial Efforts

Thuesen's case moved on an expedited timeline. Less than a year passed between Thuesen's indictment on May 14, 2009, and the guilt/innocence phase of his trial which began on May 10, 2010. Soon after appointment, the defense moved for a continuance of the trial date. (Dkt. 43-9 at 15). On June 10, 2009, the trial court granted the motion but did not set a trial date. (Dkt. 43-9 at 22). The State assured the defense that it would let them know if it intended to seek a death sentence "with all deliberate speed." (Dkt. 46-8 at 4). The State announced in open court on August 28, 2009, that it would seek a death sentence in Thuesen's case. (Dkt. 44-5 at 62, 46-9 at 4).

Soon after appointment, trial counsel had hired Gerald ("Jerry") Byington as a mitigation specialist. In addition to Mr. Byington, the defense hired an investigator a few months before the beginning of the guilt/innocence phase. At some point, the defense also secured the services of a second investigator. (Dkt. 60-10 at 204-05).

---

[3]     The Court will refer to Thuesen's trial attorneys conjunctively unless it is necessary to identify the individual lawyer.

In March 2009, the defense spoke to a psychologist, Dr. Roger Saunders, about the case. (Dkt. 60-7 at 39). Trial counsel had Dr. Saunders meet with Thuesen soon thereafter but did not have him complete a full assessment of Thuesen at that time. (Dkt. 60-7 at 39). Beginning in June 2009, Mr. Byington, the mitigation specialist, began accumulating records related to Thuesen's military service and his mental health history. (Dkt. 60-7 at 62-65).

The record does not contain a full description of what preparations the defense made throughout fall 2009.[4] Thuesen's lead counsel appears not to have spent much time on this case throughout the fall of 2009, as he was busy handling another capital-murder trial amid a heavy non-capital case load. (Dkt. 60-7 at 23-24).

The State filed an official notice of intent to seek a death sentence on January 29, 2010, (Dkt. 43-9 at 25), roughly two months before trial was set to begin.[5] Around this time, the defense began its first effort to explore Thuesen's mental health. The Court will examine trial counsel's investigative efforts when considering his federal habeas claims. Ultimately, the trial defense coalesced into a "sole defensive theory" which "was that he lacked intent or knowledge with respect to the result of his conduct when he shot the victims." *Thuesen*, 2014 WL 792038 at *32. Trial counsel questioned Thuesen's intent on the grounds that "due to his mental illness, he was so overwhelmed by the stress of being rejected by his girlfriend that he was unable to appreciate that his conduct of shooting the victims would kill them, not simply stop them." *Thuesen*, 2014 WL 792038, at *3.

---

[4]     The clerk's docket sheet shows that the court held pre-trial hearings for which no transcript exists. (Dkt. 44-5 at 62).

[5]     At some point, the trial court ordered that jury selection would begin on March 29, 2010.

**B.      The Guilt/Innocence Phase**

The State began its case-in-chief on May 10, 2010. (Dkt. 49-6). The State called witnesses who provided background information about Thuesen's relationship with Rachel. Witnesses described the events surrounding the shootings, including Thuesen's actions and demeanor after the shootings. Thuesen's videotaped confession was the focal point of the State's case.

The defense presented its case through several witnesses. Two police officers' testimony suggested that Thuesen was suffering a mental-health crisis at the time of the shooting. Dr. Ismael Carlo, the psychologist who treated Thuesen at the VA hospital, testified that he had diagnosed Thuesen with a major depressive disorder and observed signs of PTSD. However, trial counsel did not ask Dr. Carlo if he thought Thuesen was suffering from PTSD at the time Dr. Carlo interviewed him. Teresa Cannon, a VA social worker, described counseling with Thuesen and treating his PTSD symptoms. She also described signs of PTSD which she had observed, such as hypervigilance, intrusive thoughts, anger, rage, hallucinations. Fellow soldiers described traumatic events Thuesen experienced in Iraq.[6] They believed that Thuesen suffered from PTSD.

---

[6]       The Court of Criminal Appeals summarized Marine Corps Sergeant Jerry Abbot's testimony about Thuesen's service as a machine gunner for his platoon in Iraq:

> Abbot chose [Thuesen] to ride in his vehicle when they patrolled because he trusted [Thuesen] and [he] was very good at his job. Abbot described their duties and activities while in Iraq and testified that they were under fire several times. On one occasion when they were approaching a supposedly safe location, two rocket-propelled grenades exploded about ten to fifteen feet from their vehicle. Often the people who shot at them would hide in a crowd, so they could not respond. Sometimes they were called upon to raid houses at night.

*Thuesen v. State*, 2014 WL 792038, *2. Marine Sergeant Romero Garcia supervised Thuesen's platoon in Iraq in 2004. Sergeant Garcia continued the testimony about Thuesen's traumatic service in Iraq:

> He testified that [Thuesen] was a machine gunner and that their platoon's mission was to drive through populated areas and draw fire so that they could locate and defeat armed adversaries. They also set up vehicle checkpoints where they sometimes had to "take out" vehicles that did not stop to be searched. [Thuesen] was one of the people who would be ordered to take them out. Sometimes women and children would be in those vehicles. Garcia acknowledged that, from their experience

Forensic psychologist Dr. Saunders was the defense's penultimate guilt/innocence witness. The Court will discuss Dr. Saunders' testimony in greater detail with the associated federal claims. Dr. Saunders diagnosed Thuesen with "severe depression and anxiety" and "dependent personality disorder." (Dkt. 66-4 at 16-18). Although Dr. Saunders also "diagnosed [Thuesen] with PTSD," (Dkt. 66-4 at 17), Dr. Saunders was not a specialist in PTSD, and was not offered as one at trial. Dr. Saunders "concluded that [Thuesen] intentionally and knowingly shot the victims but did not intentionally or knowingly cause their deaths." *Thuesen*, 2014 WL 792038, at *10. Dr. Saunders testified that Thuesen's general psychological condition precluded him from being able to form the intent necessary for a capital-murder convictions. Trial counsel walked Dr. Saunders through the precise questions the jurors would have to answer during deliberations. (Dkt. 50-3 at 62-63). Dr. Saunders' responses to those questions, framed by his psychological evaluations of Thuesen, provided jurors a roadmap that the defense hoped would have allowed for his acquittal of capital murder. (Dkt. 50-3 at 62-63). However, against the advice of several doctors and attorneys that trial counsel consulted with, they chose not to present a PTSD expert, nor did they provide a detailed explanation of exactly how Thuesen's PTSD may have contributed to the shootings.

## C.     Summation and the Jury Verdict

The loss of two young lives hung heavily over the guilt/innocence closing arguments. The defense did not minimize the pain felt by the victims' parents, which "must be like a rolling ocean."

---

in Iraq, [Thuesen] had personal knowledge of what a bullet does to a human being. Garcia, who suffered from PTSD upon returning to the United States, believed that [Thuesen] also had PTSD.

*Id.* (citations omitted).

But the defense urged jurors not to forget their task under the law:

> . . . their pain is great, and the State wants you to focus on their pain and their horrible loss. But, ladies and gentlemen, your courageous, honorable task here is not to focus on their pain, but to focus on the law. That is our duty here today: The law.
>
> And although we are all drawn to their pain and their suffering and their loss, we are told to focus on the law. And the law in the State of Texas says that all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense, that you can consider relevant.

(Dkt. 50-5 at 44). Trial counsel told jurors that Thuesen was mentally ill and ascribed the shootings to Thuesen's "deteriorating mental state." (Dkt. 50-5 at 44-48). While trial counsel mentioned Thuesen's depression, dependency disorder, and PTSD (Dkt. 50-5 at 51, 55, 56), the summation primarily revolved around his mental state generally and his feelings for Rachel. Trial counsel argued that Thuesen "loved Rachel, or at least he believed he did, and he believed it with all certainty, and he believed it was love. He believed it." (Dkt. 50-5 at 51). Combining these themes, trial counsel argued that because of "the mental illness this young man suffered, he was not capable of forming that intent to kill. And not only was he not capable of intentionally or knowingly killing her, he never wanted her to die. And that is your most compelling evidence. He never wanted her to die." (Dkt. 50-5 at 57-58). Trial counsel's brief mention of Thuesen's PTSD focused on how his PTSD could have raised his anxiety level about losing Rachel. (Dkt. 50-5 at 56).

Trial counsel urged jurors to find: "He was so mentally ill, he was impaired in his judgment. His impairment was of such a degree at the time of this offense that he is not insane, but . . . was not able to form a conscious objective or desire to kill. He was not aware his conduct was reasonably certain to cause death." (Dkt. 50-5 at 74). Trial counsel told jurors that Thuesen "had deep remorse. He cried. He shows remorse in his statement. When he learned of the death, he was

suicidal and held in a mental health cell with suicide watch in the jail. . . . [H]e was severely depressed. He was remorseful." (Dkt. 50-5 at 53). With that framework, trial counsel insisted that jurors should find Thuesen guilty only of the lesser offense of murder. (Dkt. 50-5 at 59).[7] The jury found Thuesen guilty of capital murder. (Dkt. 50-5 at 112).

### D.  The Penalty Phase

Texas determines a capital defendant's sentence through answers to special-issue questions. In this case, jurors considered two questions:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

> Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

(Dkt. 44-5 at 40-41).

---

[7]    The defense had strenuously argued for the trial court to instruct jurors on lesser-included offenses. The jury instructions allowed for Thuesen's conviction under three different offenses: capital murder, murder, and manslaughter. As instructed by the trial court, each of the three offenses required a different level of intent for conviction:

> A person commits the offense, of capital murder if the person intentionally or knowingly causes the death of more than one individual during the same criminal transaction.

> A person commits the offense of murder if the person intentionally or knowingly causes the death of an individual; or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

> A person commits the offense of manslaughter if the person recklessly causes the death of an individual.

(Dkt. 44-5 at 25-26).

The Court of Criminal Appeals summarized the State's penalty-phase testimony as follows:

Several witnesses testified for the State at punishment. Amanda Ward, [Thuesen's] ex-girlfriend from high school, testified that in 2001, [Thuesen] became jealous and angry when she talked to another boy at a party. His behavior on that occasion frightened her, and as a result, she told him that she did not want a boyfriend. However, he did not want to break up, and he kept trying to contact her.

James Pawlowski testified that he knew [Thuesen] and Leah from the time they were in high school. He testified that, in July 2007, [Thuesen] attempted to take Leah from Pawlowski by force when she was sitting in his truck one evening. In a later incident, [Thuesen] retaliated against Pawlowski and threatened to kill him.

Sergeant Noel Shelton testified that on July 30, 2007, he responded to a call around 4:00 a.m. regarding someone trying to break into a house. When Shelton arrived, he walked around the house carefully because he had been advised that the suspect was a former Marine. He saw [Thuesen] lying under some bushes and ordered him to show his hands. [Thuesen] complied. When Shelton handcuffed [Thuesen], he smelled a strong odor of alcohol and observed that [Thuesen] was so intoxicated that he was unsteady on his feet. Shelton arrested [Thuesen] for public intoxication, told him that he was prohibited from going onto that property, and explained that he could be arrested if he set foot there again. [Thuesen] seemed to understand. He was visibly upset, began to cry, and signed the trespass warning. However, [Thuesen] returned to the house the next day. These events led to the issuance of stalking and trespass warrants against [Thuesen].

Leah and her mother, Joanne Mathis, testified that [Thuesen] physically and verbally abused Leah and would not leave her alone when Leah tried to end their relationship. Leah and her family did not pursue criminal charges against [Thuesen] because they believed that he needed mental health treatment.

*Thuesen*, 2014 WL 792038, at *11-12.

The defense called thirty witnesses in the penalty phase. The defense witnesses provided jurors with insight into Thuesen's background. Testimony about Thuesen's positive character traits, particularly before his military service, came from teachers, friends, supervisors, family members, and coworkers. The defense called several fellow Marines who had served with Thuesen and who described the horrible things he had experienced. Thuesen's fellow Marines gave jurors

insight into the lasting negative effects of his military service. Witnesses testified "about the changes they observed in [Thuesen] after he returned from Iraq, including being extremely needy and depressed and exhibiting PTSD symptoms such as a startle response, hypervigilance and paranoia in crowds, and nightmares." *Thuesen*, 2014 WL 792038, at *12. Jail staff and pastors who had ministered to Thuesen before trial testified about his "family background, childhood, admirable qualities, good works, and ability to function well in a highly structured setting." *Id*. The defense did not to put forward any evidence on Thuesen's PTSD during the penalty phase. (Dkt. 60-10 at 181).

On May 28, 2010, jurors answered Texas' special issues in a manner requiring the imposition of a death sentence. (Dkt. 50-10 at 4-5). The trial court sentenced Thuesen to death. (Dkt. 50-10 at 7).

## IV.    Direct Appeal

Attorney Frank Blazek represented Thuesen on automatic direct appeal to the Court of Criminal Appeals. Thuesen's appellate brief raised forty-five points of error. The Court of Criminal Appeals affirmed Thuesen's conviction and sentence in an unpublished opinion on February 26, 2014. *Thuesen*, 2014 WL 792038, at *1. Thuesen did not seek a petition for a writ of certiorari in the United States Supreme Court.

## V.    State Habeas Review

While his direct appeal was pending, Thuesen filed an initial application for a writ of habeas corpus on October 10, 2012. (Dkt. 67-1). Thuesen's state application raised twenty-two claims for relief. Judge Bryan—the same jurist who oversaw Thuesen's trial—initially presided over his habeas proceedings. Procedural interruptions drew out the habeas proceedings and

complicated the state court record. Because Thuesen raises claims based on his state habeas proceedings, the Court will extensively discuss what happened in state court.

**A.     Initial Habeas Proceedings Before Judge Bryan**

Judge Bryan signed an order designating issues for resolution and scheduled an evidentiary hearing. Before holding the hearing, however, Judge Bryan signed a written order recusing himself from the habeas proceedings. In an email exchange with Thuesen's habeas counsel, Judge Bryan "stat[ed] that he was recusing himself because he had donated $1,000 to the judicial campaign of [Thuesen's] trial attorney, Michele Esparza. He further stated that Esparza had worked for him for six years and that he had tried several high profile cases with [Thuesen's] other trial attorney, Billy Carter." *Ex parte Thuesen*, 546 S.W.3d 145, 148 (Tex. Crim. App. 2017).

Judge Bryan asked the presiding administrative judge to appoint another judicial officer to preside over the habeas action. Judge Bryan, however, said that he would "reconsider" the recusal "if BOTH sides request." *Id*. Thuesen's "counsel replied that they had consulted with [Thuesen] and he agreed with their request for Judge Bryan to reconsider his recusal. The State responded that Judge Bryan should proceed with the voluntary recusal. Judge Bryan's court coordinator then notified the parties on the same day that the judge was going forward with the recusal." *Id*.

The presiding administrative judge assigned a new judicial officer—Senior Judge Harold R. Towslee—to oversee Thuesen's habeas action. Judge Towslee signed an order rescheduling the evidentiary hearing in this case.

On March 13, 2014, Thuesen moved to reassign Judge Bryan. Thuesen argued that any conflict had been resolved because Esparza had lost her election. At that point, Judge Bryan sent his court coordinator an email stating:

> Judge Underwood called this morning and advised me that if I am willing, since I originally recused myself, I can now enter an order withdrawing my own recusal order. This would put me back on the capital writ hearing. I told him I would do this on Monday. The reason I will is because my original recusal reason, [Esparza's] campaign and my donation to her, is now moot. He said it will then fall on either of the parties to object to my presence in the case. He believes this is the proper procedure. If anyone objects, Judge Underwood or his designee will then hear the involuntary recusal motion.
>
> By copy of this email, you may notify both sides and Judge Towslee of my intent. Please copy Judge Underwood also to confirm my conversation with him. I will enter the order on Monday. Travis Bryan III.

*Id*. The court coordinator forwarded the email to both parties. The State responded that it "must respectfully object due to potential claims on this issue being raised post state writ." *Id.*

Judge Bryan then held a phone conference to address the situation. Judge Bryan assured the parties that he could be fair. Judge Bryan subsequently entered an order withdrawing his previous order of voluntary recusal. That same day, the State sent Judge Bryan an email, and copied it to Judge Towslee and the administrative judge:

> Judge Bryan,
>
> The State of Texas no longer has any objections relating to you presiding over the John Thuesen writ. Based on further research and contact with a number of experts in the area of federal writs, the statements and assurances made by the Office of Capital Writs in the telephone hearing yesterday, March 17, 2014, are sufficient to alleviate our concerns about their motives for having you preside. With those issues resolved, our original desire to have you preside can now be realized without any apprehension of future legal ramifications.

*Id*. at 149.

Having withdrawn his recusal and obtained the consent of both parties, Judge Bryan presided over a five-day state habeas evidentiary hearing. Judge Bryan subsequently issued a written order finding in Thuesen's favor and recommended that the Court of Criminal Appeals

grant the habeas writ. (Dkt. 63-9 at 3-109). Specifically, Judge Bryan recommended that the Court of Criminal Appeals grant relief on Thuesen's claims that trial counsel provided ineffective assistance by failing to:

- properly develop expert testimony for trial (state claim one);
- present expert testimony at the penalty phase (state claim five, six);
- present effectively lay testimony about his PTSD in the penalty phase (state claim eight);
- impeach witness Mandy Ward (state claim ten);
- make specific objections during jury selection (state claim thirteen)
- recall Thuesen's mother to testify about a family history of mental illness (state claim fifteen);
- raise mental illness as a theme in punishment opening arguments (state claim sixteen); and
- object during the prosecutor's closing arguments (state claim seventeen).

In doing so, Judge Bryan identified serious issues with trial counsel's handling of evidence related to Thuesen's PTSD. He found that "[d]espite the numerous indications that PTSD was a central component in Thuesen's case, and the suggestions by several mental health professionals that counsel present testimony from a PTSD expert, counsel did not secure the assistance of an expert witness or witnesses qualified to explain the mitigating impacts of PTSD." *Id.* at 29-30. In fact, "[c]ounsel did not . . . consult potential avenues for developing PTSD evidence until the months leading up to trial." *Id.* at 26. Further, Judge Bryan concluded that "[t]rial counsel performed deficiently by failing to object to the improper arguments made by the State" about Thuesen's PTSD during its closing arguments. *Id.* at 99. In sum, "[t]he ultimate presentation of information regarding PTSD during Thuesen's capital trial . . . was significantly incomplete." *Id.* at 33.

### B. Court of Criminal Appeals Decision Vacating the Initial Recommendation

The case moved to the Court of Criminal Appeals. The Court of Criminal Appeals ordered

17

the parties to address questions "regarding Judge Bryan's voluntary recusal and his authority, if any, to reinstate himself as the judge presiding over the instant habeas case." *Thuesen*, 546 S.W.3d at 150. Despite consenting to Judge Bryan's reinstatement, the State changed course after Judge Bryan's ruling in Thuesen's favor. The State argued that "Texas law provides that, after a judge voluntarily recuses himself, he can take no further action. Thus, in the absence of any subsequent written order signed by Judge Underwood, Judge Bryan did not have judicial authority to sign and execute the order reinstating himself on [Thuesen's] case, and his subsequent rulings are void." *Thuesen*, 546 S.W.3d at 150. Thuesen argued that, even though he had not entered an official written order, the administrative judge authorized Judge Bryan to preside over the habeas action and that the State acquiesced to that authority.

On February 8, 2017, the Court of Criminal Appeals found that Judge Bryan lacked authority to preside over Thuesen's writ proceedings. *Id*. at 156. The Court of Criminal Appeals held that any oral directive for Judge Bryan to resume authority was insufficient—that such orders "must be made in writing, signed by the presiding judge, and entered of record in the case." *Id*. Thus, the Court of Criminal Appeals found that "Judge Bryan presided over [Thuesen's] evidentiary hearing and issued findings of fact and conclusions of law at a point in time when he lacked the authority to do so." *Id*. at 157. The Court of Criminal Appeals "exercise[d] [its] authority to disregard Judge Bryan's unauthorized findings and conclusions and remand this habeas proceeding to Judge Towslee to complete his assignment and enter findings of fact and conclusions of law." *Id*.

### C.    Proceedings Before Judge Langley

On February 21, 2017, the presiding administrative judge terminated Judge Towslee's

18

appointment and reassigned the case to the Honorable J.D. Langley. (Dkt. 65-8 at 43-45). Judge Langley oversaw a second evidentiary hearing. Although Judge Langley took judicial notice of the prior hearing (Dkt. 52-2 at 11), he subsequently entered proposed findings of fact and conclusions of law recommending the denial of habeas relief. (Dkt. 66-4 at 4-177).

### D. Appellate Decision Denying Relief

After "review[ing] all the evidence in the writ record, the record of both writ hearings, the habeas court's findings of fact and conclusions of law, Thuesen's filings, and the relevant portions of the direct appeal record," the Court of Criminal Appeals entered an order on February 5, 2020. The Court of Criminal Appeals "f[ound] that the record supports the habeas court's findings and conclusions and . . . adopt[ed] them" with limited exceptions. *See Ex parte Thuesen*, 2020 WL 584368, at *3 (Tex. Crim. App. 2020).[8] The Court of Criminal Appeals denied relief. Thuesen did not seek certiorari review in the United States Supreme Court.

### The Federal Petition

On February 4, 2021, Thuesen filed a federal petition for a writ of habeas corpus. (Dkt. 20). Thuesen amended his petition on November 24, 2021. (Dkt. 33). Thuesen's amended petition raises the following grounds for relief:

1. Trial counsel provided ineffective assistance in the guilt-innocence phase by failing to investigate, develop, prepare, and present evidence that would have explained and contextualized his PTSD.

2. Trial counsel provided ineffective assistance in the penalty phase by:

   A. Failing to present evidence to contextualize Thuesen's PTSD.
   B. Failing to investigate and present evidence relating to

---

[8] Specifically, the Court of Criminal Appeals did not adopt "finding 12, finding 137, the first sentence of finding 145, sub-claim E of finding 253, finding 262, footnote 5, and conclusions of law 2 and 60." *Thuesen*, 2020 WL 584368, at *3.

           Thuesen's future dangerousness.

    C.      Failing to impeach a punishment phase witness's testimony.

    D.      Failing to object to the State's closing argument.

3.      The state habeas proceedings violated Thuesen's right to due process.

4.      Alleged deficiencies in the state habeas proceedings entitle Thuesen to de novo review.

5.      Texas' punishment-phase jury instruction restricts the evidence the jury may consider as mitigating

6.      Texas's death penalty scheme is arbitrary.

7.      Texas's statutory scheme denies equal-protection rights to people with mental health disorders.

Respondent has moved for summary judgment. (Dkt. 71).[9] Thuesen has filed a reply. (Dkt. 121). This matter is ripe for adjudication.

## **Relevant Legal Standards**

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, 562 U.S. 86, 91 (2011). Important principles of comity, federalism, and finality, however, place boundaries on a federal court's ability to grant a federal habeas writ. *See Calderon v. Thompson*, 523 U.S. 538, 555–56 (1998); *Barefoot v. Estelle*,

---

[9]      Early in this case, the Court ordered the parties to submit a joint proposed scheduling order. The parties conferred and submitted a proposed order which provided for a process in which Respondent would answer the petition with a motion for summary judgment. (Dkt. 22). Consistent with the parties' agreed procedure, Respondent designated its responsive pleading in this case a motion for summary judgment. (Dkt. 71). Thuesen argues that the absence of a specifically designated answer makes a difference in this case. (Dkt. 121 at 25) (citing 28 U.S.C. § 2248). Federal law does not place strict requirements on an answer other than it "must address the allegations in the petition" and "must state whether any claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, non-retroactivity, or a statute of limitations." Rule 5(b), Rules Governing Section 2254 Cases in the United States District Courts. The substance of Respondent's summary-judgment motion is the same as an answer, all that is lacking is a title. *See Williams v. Calderon*, 52 F.3d 1465, 1483 (9th Cir.1995) ("The purpose of the answer is to frame the issues in dispute, as well as to ferret out unmeritorious petitions."). The Court, therefore, will invoke its inherent authority and construe the responsive pleading as both an answer and a motion for summary judgment.

463 U.S. 880, 887 (1983); *Engle v. Isaac*, 456 U.S. 107, 128 (1982). By the time a habeas petitioner reaches federal court, a presumption exists that he was convicted by the due process of law. Any presumption of innocence has dissipated, and a habeas litigant is viewed as having been lawfully convicted. *See Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005); *Schlup v. Delo*, 513 U.S. 298, 326 n.42 (1995); *Herrera v. Collins*, 506 U.S. 390, 399-400 (1993). As a result, "the habeas petitioner generally bears the burden of proof." *Garlotte v. Fordice*, 515 U.S. 39, 46 (1995).

Traditional jurisprudence and federal statutory law place high burdens on the availability of habeas review and relief.[10] As an initial consideration, the exhaustion doctrine guarantees the States "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (internal citations and quotations omitted); *see also* 28 U.S.C. § 2254(b)(1)(A). As a corollary to exhaustion, the procedural-bar doctrine requires habeas petitioners to litigate their claims in compliance with state procedural law. *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). A petitioner may overcome the procedural bar by showing: (1) cause and actual prejudice or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent.'" *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

When an individual had presented his claims to the state courts, and they have denied the

---

[10]    Thuesen's response contends that various principles of federal habeas jurisprudence, such as the procedural-bar doctrine and AEDPA deference, violate the Constitution. (Dkt. 121 at 45-97). Thuesen's arguments center on the understanding of the habeas writ from early in this nation's history. However, this Court's habeas review is bound by precedent from the Fifth Circuit and the Supreme Court, which created and repeatedly endorsed the practices and procedures that Thuesen challenges. Given the extensive binding precedent establishing the constitutionality of modern habeas practices, the Court must reject Thuesen's arguments to the contrary.

merits, the Antiterrorism and Effective Death Penalty Act (AEDPA) affords a deferential review.[11]

Under AEDPA's rigorous requirements, a federal court reviews "[c]laims presenting questions of

law" under Section 2254(d)(1). *Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. 2023). Section

2254(d)(1) "is . . . divided into two categories: the 'contrary to' standard, and the 'unreasonable

application' standard." *Id*. A habeas petitioner may only secure relief after showing that the state

court's rejection of his claim was "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §

2254(d)(1), (2).

Claims presenting questions of fact are reviewed under two sections of AEDPA. First, a

federal habeas court presumes the underlying factual determinations of the state court to be correct,

unless the habeas petitioner "rebut[s] the presumption of correctness by clear and convincing

evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003); *Young

v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state

habeas court's factual findings, both implicit and explicit."). Second, a petitioner must show that

the state court's ultimate decision "was based on an unreasonable determination of the facts in

---

[11]     Thuesen asserts that the state courts did not adjudicate his exhausted claims because the Court of Criminal
Appeals "rubber-stamped" the lower court's recommendation and did not issue a detailed opinion discussing his
claims. (Dkt. 121 at 34-44). The Fifth Circuit has rejected similar arguments. *Freeney v. Davis*, 737 F. App'x 198,
205 (5th Cir. 2018). Thuesen had an opportunity to be heard in state court. Pursuant to Texas law, the parties each
submitted proposed findings and conclusions. As is common in Texas practice, the lower courts signed one of the
proposed orders. Even though the Supreme Court has generally "criticized courts for their verbatim adoption of
findings of fact prepared by prevailing parties," it has held that "the findings are those of the court and may be reversed
only if clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 572 (1985); *see also Green v.
Thaler*, 699 F.3d 404, 416 (5th Cir. 2012) (stating that the Fifth Circuit "has never found" adopting one habeas
litigant's findings and conclusions "violate[s] due process or . . . entitle[s] a state court's decision to less deference
under AEDPA"). The Court of Criminal Appeals considered the findings and conclusions and, after its own review,
denied relief in a brief order. Federal habeas courts have never placed opinion-writing requirements on the state courts.
In fact, the Supreme Court has recognized that "it is not the uniform practice of busy state courts to discuss separately
every single claim to which a defendant makes even a passing reference." *Johnson v. Williams*, 568 U.S. 289, 298
(2013). Thuesen's arguments that the state courts did not decide the merits of his claims are without merit.

light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Miller-El*, 537 U.S. at 340. "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "Claims presenting mixed questions of law and fact are reviewed under a combination of these provisions; a state court's ultimate legal conclusion is reviewed under Section 2254(d)(1), while the underlying factual findings supporting that conclusion are reviewed under Sections 2254(d)(2) and (e)(1)." *Neal*, 78 F.4th at 783.

"[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires habeas petitioners to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 572 U.S. 415, 420 (2014) (quoting *Richter*, 562 U.S. at 103); *see also Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). If the AEDPA "standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Respondent has moved for summary judgment.[12] Summary judgment is proper when the record shows "no genuine dispute as to any material fact and that the moving party is entitled to

---

[12]     Thuesen contends that Respondent "has the burden of persuasion and proof" relating to AEDPA's deferential review of state-court judgments. (Dkt. 121 at 30). Disagreeing with the Supreme Court's statement that the "petitioner carries the burden of proof," *Pinholster*, 563 U.S. at 181, Thuesen apparently believes that Respondent assumed the burden of proof by electing to file a motion for summary judgment. (Dkt. 121 at 30-31). Thuesen contends that "Texas seeks summary judgment at the pleading stage of the case based on an erroneous belief about what a habeas corpus application must contain, as opposed to what the petitioner must ultimately show." (Dkt. 121 at 26). However, "a petitioner cannot rely on summary judgment principles to escape his burden of showing that he is in custody in violation of the Constitution of the United States." Brian R. Means, Fed. Habeas Manual § 8:36 (2023). Under long-standing practice in this circuit, a petitioner is expected to have complied with AEDPA's demanding requirements

judgment as a matter of law." FED. R. CIV. P. 56(a). "As a general principle, Rule 56 of the Federal

Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of

habeas corpus cases," *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000), except that a habeas

court must view the summary judgment evidence through "the prism of the substantive evidentiary

burden." *Anderson*, 477 U.S. at 254. Here, AEDPA requires deference to a state court's factual

findings and places the burden on the petitioner to show constitutional error. *See Smith v. Cockrell*,

311 F.3d 661, 668 (5th Cir. 2002) ("[Rule 56] applies only to the extent that it does not conflict

with the habeas rules."), *abrogated on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

## <u>Analysis</u>

## I.    Ineffective Assistance of Counsel in the Guilt/Innocence Phase (Claim One)

Thuesen challenges the guilt/innocence representation provided by his trial attorneys in

five separate subclaims:

1.    "failed to investigate and secure expert witnesses to testify at the guilt/innocence phase regarding the effects of PTSD on Mr. Thuesen, including regarding how PTSD affected his ability to form the requisite intent" (Dkt. 33 at 111)

2.    "failed to present evidence demonstrating that Mr. Thuesen was never diagnosed with PTSD nor adequately treated for the condition" (Dkt. 33 at 128)

3.    "affirmatively presented evidence during the guilt/innocence phase that undermined their own chosen defense strategy" (Dkt. 33 at 136)

4.    "failed to develop, prepare, and present testimony related to the PTSD recovery period and confabulations" (Dkt. 33 at 150)

5.    "failed to present testimony of Mr. Thuesen's family history of mental

---

after he has filed a petition and submitted a reply (whether Respondent has filed an answer or summary judgment motion). Thuesen filed a petition and has had an opportunity to file a reply. Under both traditional habeas practice and AEDPA, Thuesen is the one who must now shoulder the burden of proving his entitlement to habeas relief.

health through his mother" (Dkt. 33 at 156)

The state habeas court adjudicated these claims on the merits when Thuesen presented them on state habeas review.[13] Thuesen bears the burden of showing that the state habeas adjudication was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

Before turning to the specific subclaims, the Court will discuss the constitutional standards governing an attorney's representation and then review the efforts trial counsel made to present a guilt/innocence defense based on Thuesen's mental health.

### A.     The *Strickland* Standard

A reviewing court evaluates allegations of ineffective assistance under the two-pronged test set out in *Strickland v. Washington*, 466 U.S. 668 (1984): an attorney's representation violates a criminal defendant's Sixth Amendment rights when his "*performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

The deficient-performance prong asks if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins*, 539 U.S. at 521. Instead, a reviewing court "measure[s] . . . attorney performance" for "reasonableness under prevailing professional norms"; an assessment that can

---

[13]     In his petition, Thuesen specifically argues that his first claim encompasses claims one, two, three, four, seven, and fourteen from his state habeas application. (Dkt. 33 at 85).

be guided by "American Bar Association Standards and the like." *Strickland*, 466 U.S. at 688. This is a "highly deferential" review which eliminates "the distorting effect of hindsight" by looking at "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 689-90. In that light, federal courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Id.* at 689.

A petitioner must also show prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. In setting forth the "reasonable probability" standard, the Supreme Court acknowledged that habeas petitioners "need not show that counsel's deficient conduct more likely than not altered the outcome in the case," as a proceeding can be deemed unfair "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 693-94. Where counsel engages in multiple instances of deficient performance, as Thuesen alleges in this case, the *Strickland* "prejudice" analysis considers whether the cumulative effect of the errors creates the reasonable probability that the outcome would have been different. *Dodson v. Stephens*, 611 F. App'x 168, 178-79 (5th Cir. 2015) (collecting cases); *cf. Strickland*, 466 U.S. at 695 ("[A] court hearing an ineffectiveness claim must consider the *totality of the evidence* before the judge or jury. . . [t]aking the unaffected findings as a given, and taking due account of the *errors* on the remaining findings.") (emphasis added).

When a state court has adjudicated a habeas petitioner's federal *Strickland* claim, the "court must be granted deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Richter*, 562 U.S. at 101; *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). AEDPA requires that federal courts use a "doubly

26

deferential" standard of review that affords "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Pinholster*, 563 U.S. at 190). Under this doubly deferential standard of review, the ultimate question for this Court to decide is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.[14]

Thuesen alleges that his trial counsel was constitutionally ineffective in several regards. The Court will review each instance and then determine whether Thuesen has "established that the state habeas court's findings were based upon an unreasonable determination of the facts or involved an unreasonable application of clearly established Supreme Court precedent." *Dodson*, 611 F. App'x at 176.

### B.      *Strickland* Prong One

### 1.   Investigation and Presentation of Expert Testimony about PTSD

---

[14]       The Fifth Circuit has, on at least two occasions, remarked that "[t]here is no double deference for [the *Strickland*] prejudice inquiry." *Sanchez v. Davis*, 888 F.3d 746, 749 (5th Cir. 2018); *see also Spicer v. Cain*, No. 18-60791, 2021 WL 4465828, at *7 (5th Cir. Sept. 29, 2021). *But see Anaya v. Lumpkin*, 976 F.3d 545, 554 (5th Cir. 2020) (applying double deference to the prejudice prong). And sister circuits have explained that federal courts should not apply the "doubly deferential" standard of review when assessing *Strickland*'s prejudice prong. *Hardy v. Chappell*, 849 F.3d 803, 825 & n.10 (9th Cir. 2016); *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1333-34 (11th Cir. 2013) (Jordan, J., concurring). Those courts acknowledge that double deference applies to the performance prong—that is, deference under § 2254(d) of AEDPA is properly layered atop *Strickland*'s command to defer to the state court's "scrutiny of counsel's performance." 466 U.S. at 689. By contrast, the prejudice inquiry is a purely legal one—that is, it requires assessing a hypothetical situation in which counsel's errors are corrected—and so it "makes no sense to say that initial judicial review as to whether prejudice resulted from counsel's deficient performance—on its own, before adding AEDPA deference—involves any deference." *Evans*, 703 F.3d at 1334 (Jordan, J., concurring). As such, the argument goes, only § 2254(d) deference is appropriate in federal habeas courts' prejudice analysis. *See also Ruiz v. Sec'y, Fla. Dep't of Corr.*, 439 Fed. App'x. 831, 835 (11th Cir. 2011) ("Analyzing a claim of ineffective assistance under § 2254(d) adds a 'double layer' of deference to *counsel's performance*.") (emphasis added); *Bowling v. Haeberlin*, 2012 WL 4498647, at *6 (E.D. Ky. Sept. 28, 2012) (prejudice review "is not doubly deferential like the performance inquiry"). This Court acknowledges the sound reasoning of jurists who have concluded that double deference does not apply to *Strickland*'s prejudice prong. However, because this Court ultimately concludes that Thuesen has demonstrated prejudice even under the doubly deferential standard of review, it need not analyze the prejudice prong under a less-than-doubly deferential standard.

The first argument in claim one alleges that trial counsel failed to "investigate, develop, prepare, and present evidence that would have explained and contextualized Mr. Thuesen's PTSD to the jury during the guilt/innocence phase." (Dkt. 33 at 95). Thuesen says that "[t]he unmistakable, unmissable gravamen of [his] claims is that . . . defense counsel failed to submit any evidence that PTSD could prevent an individual from forming intent, although there was abundant evidence available to show [his] PTSD symptoms precluded a finding that he possessed the requisite *mens rea* for a first-degree murder conviction." (Dkt. 121 at 102). As previously discussed, trial counsel's guilt/innocence witnesses testified that they believed Thuesen suffered from PTSD and provided basic descriptions of symptoms associated with PTSD to challenge Thuesen's intent. Thuesen, however, faults trial counsel for failing to call a PTSD-specific expert.

Thuesen contends that "[t]rial counsel's incompetence manifested itself most clearly in their selection and preparation of their sole testifying expert witness, Dr. Roger Saunders, a psychologist who was not an expert in PTSD." (Dkt. 33 at 5). According to Thuesen, calling an expert who specialized in PTSD should not have been difficult because trial counsel had consulted with Dr. Kenneth Kopel "—a psychologist, PTSD expert, and veteran—a month before trial." (Dkt. 33 at 73). Thuesen argues that counsel should have used Dr. Kopel or a similar expert to present "appropriate expert testimony concerning what PTSD meant for Mr. Thuesen's case." (Dkt. 121 at 85). Thuesen further argues that his attorney should have shown that his "PTSD caused a 'fight or flight' response that prevented him from forming specific intent sufficient to convict him for capital murder." (Dkt. 121 at 107). In essence, Thuesen alleges that despite its clear importance to the guilt/innocence phase, trial counsel did not put forth essential PTSD evidence— that is, the witnesses presented offered only a surface-level understanding of PTSD, rather than an

28

expert account of its effects on the brain.

### a. PTSD and Intent

Before turning to Thuesen's challenge to the defense's guilt/innocence defensive theory, the Court pauses to discuss how a defense attorney may challenge a defendant's criminal intent using PTSD. To secure a capital-murder conviction, the State had to prove that Thuesen "intentionally or knowingly cause[d] the death of more than one individual during the same criminal transaction." (Dkt. 44-5 at 26). A person acts intentionally "when it is his conscious objective or desire to cause the result" and acts knowingly "when he is aware that his conduct is reasonably certain to cause the result." (Dkt. 44-5 at 26); *see also* TEX. PENAL CODE § 6.03(a), (b).

In Texas, "both the State and defendant may offer testimony as to 'all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.'" *Ruffin v. State*, 270 S.W.3d 586, 596 (Tex. Crim. App. 2008) (quoting TEX. CODE CRIM. PROC. art. 38.36). Evidence which "negate[s] the *mens rea* element" may "sometimes include evidence of a defendant's history of mental illness." *Jackson v. State*, 160 S.W.3d 568, 574 (Tex. Crim. App. 2005); *see also Lizcano v. State*, No. AP-75,879, 2010 WL 1817772, at *19 (Tex. Crim. App. 2010) ("As with other elements of an offense, relevant evidence may be presented that a jury may consider to negate any *mens rea* elements.").[15] "Thus, during the guilt/innocence phase of the trial, evidence of a mental illness . . . can. . . . negate the *mens rea* element of the offense—i.e., show that a defendant did not act knowingly or intentionally because, for example, he was under a

---

[15]   "Negating the *mens rea* element" of a capital murder charge "is a different concept from mitigation evidence." *Green v. Lumpkin*, 860 F. App'x 930, 944 (5th Cir. 2021). Negating the *mens rea* element is also different from the recognized affirmative defense of insanity. *See Ruffin v. State*, 270 S.W.3d 586, 592 n.15 (Tex. Crim. App. 2008) ("[P]ersons [who are] legally insane are not necessarily lacking *mens rea*. Even defendants who are most demonstrably legally insane rarely lack the *mens rea* for the highest charged offense.").

delusion or hallucination at the time of the alleged crime." *Green v. Lumpkin*, 860 F. App'x 930, 943 (5th Cir. 2021). A successful defense, however, must truly "negate *mens rea*" rather than just rely on "evidence present[ing] an excuse for the crime." *Jackson*, 160 S.W.3d at 572.

### b.   Trial counsel's preparation

Thuesen contends that the evidence presented on state habeas review "pointed only in a single direction—that trial counsel conducted a deficient investigation into [his] medical history." (Dkt. 33 at 89). The record shows that trial counsel understood the need to investigate Thuesen's mental health, sought the assistance of various experts, and formulated a guilt/innocence defense based on psychological testimony. Thuesen contends that that, though trial counsel knew through its pre-trial investigation that Thuesen's PTSD should play a central role in the defense, counsel failed to call a PTSD expert and did not put forth testimony during the guilt/innocence phase that would allow the jury to have a more than surface-level understanding of PTSD such that it could negate *mens rea*.

*Initial Steps*: Trial counsel began a cursory investigation into Thuesen's mental health nearly a year before trial. "[A]s soon as [trial counsel] was appointed," they had Dr. Saunders "go to the jail, talk to [Thuesen], get his thoughts on that." (Dkt. 60-7 at 39). Dr. Saunders' initial meeting with Thuesen in 2009 was not a formal evaluation, but rather a brief interview. Trial counsel had previously worked with Dr. Saunders on several cases. (Dkt. 60-4 at 18-19). Early on, trial counsel also directed the defense investigator to begin collecting records relating to Thuesen's military service and mental-health treatment. (Dkt. 60-7 at 39).

By December 2009, trial counsel had decided that the defense would use PTSD as a means of challenging Thuesen's intent to "form the *mens rea* for the crime." (Dkt. 60-10 at 171). The

defense thought that PTSD could be relevant because "it may have lessened his culpability" and "affected his thought processes as far as his intent to kill." (Dkt. 60-7 at 95). The defense began taking steps toward building a PTSD defense before the end of 2009. (Dkt. 60-10 at 171). Trial counsel met with a representative from the United States Marine Corps Wounded Warrior Regiment and sought information about the "Marines and PTSD." (Dkt. 60-10 at 199-200).

Other than these actions, however, the record suggests that trial counsel did not begin an intense investigation into a mental-health defense during 2009.

*Initial Reliance on Dr. Saunders*: The defense began making serious efforts to develop psychological evidence in January 2010—only a few months before trial. Dr. Saunders conducted evaluations of Thuesen in early 2010. As recognized by the state habeas court, Dr. Saunders "diagnosed [Thuesen] with PTSD and noted that [he] showed [various] symptoms of PTSD." (Dkt. 66-4 at 17); *see also* Dut. 50-3 at 66 (affirming that Dr. Saunders "diagnosed the defendant with PTSD"). Thuesen contends that "Dr. Saunders was not a PTSD expert." (Dkt. 33 at 178). Indeed, Dr. Saunders himself noted that, while he could diagnose and treat patients for PTSD, he "did not consider [himself] a 'specialist' in PTSD, as [he] had not conducted research in the area or seen more than a couple hundred patients referred for assessment and/or treatment of war-related PTSD." (Dkt. 33-33 at ¶ 8). In their initial conversations, Dr. Saunders recommended that trial counsel consult with Dr. Kopel as a potential PTSD expert. *Id.* Dr. Saunders was the only expert hired by trial counsel to conduct an assessment of Thuesen that explored PTSD (as discussed below, neuropsychologist Dr. Yohman, was hired solely to examine Thuesen for traumatic brain injury, though he also expressed concerns about Thuesen's PTSD). (Dkt. 60-10 at 186-87).

*Consultation with Other Experts*: Leading up to and during the trial, the defense team

31

consulted with other attorneys who had tried similar cases involving PTSD. Trial counsel had "met with some people from the Texas Defender Service, and . . . talked to some State's experts. And they also said that [the defense] might have some trouble with the PTSD because of the facts of the case looked more like a—like he had some other problems." (Dkt. 60-10 at 187). However, these attorneys did not evaluate Thuesen directly. *Id.* Other attorneys recommended seeking help from Dr. Howard F. Detwiler, Jr. (Dkt. at 60-10 at 201). The defense understood that Dr. Detwiler, a psychiatrist and former army officer, was a specialist in PTSD. (Dkt. 60-7 at 82, 90).[16] Trial counsel contacted Dr. Detwiler in February 2010. (Dkt. 60-7 at 91-92). The defense sent Dr. Detwiler various records and had spoke with him in the phone in later February. The record shows "numerous . . . phone conferences with Dr. Howard Detwiler." (Dkt. 65-1 at 28).

Dr. Detwiler recommended that the defense have a neuropsychological examination performed on Thuesen to explore the possibility that he had suffered a brain injury. Dr. Detwiler recommended that the defense contact Dr. Richard Yohman, a clinical neuropsychologist from Houston. (Dkt. 60-7 at 130). In February 2010, trial counsel consulted with Dr. Yohman. *Id.* Dr. Yohman conducted a neuropsychological evaluation but did not find any evidence of a brain injury. *Id.* Dr. Yohman informed trial counsel that, based on his evaluation, Thuesen met the diagnostic criteria for PTSD and dysthymic disorder (a chronic condition characterized by depressive symptoms). (Dkt. 61-2 at 149). Trial counsel informed Dr. Yohman that they would not need him as a testifying witness during trial. However, Dr. Yohman stated in his affidavit that, had he permitted to testify, he "believe[s] that [he] could have made a strong argument that John

---

[16]     Thuesen now questions Dr. Detwiler's expertise, saying that "based on Dr. Detwiler's CV, his practice focused on general psychiatry as opposed to PTSD diagnosis and treatment." (Dkt. 33 at 180, n. 26). But in state habeas court Thuesen himself described Dr. Detwiler as a "PTSD expert." (Dkt. 63-4 at 22).

suffered from PTSD." *Id.* at 150. Dr. Yohman recommended that trial counsel secure the services of a PTSD specialist. (Dkt. 60-4 at 20).

By March 2010, the defense was consulting with John Niland, an attorney with Texas Defenders Service. Mr. Niland recommended that the defense secure the assistance of an expert to educate the jury on PTSD and explained that it was "especially important that the jury understand the condition of PTSD." (Dkt. 60-7 at 86-87). Mr. Niland suggested that trial counsel contact Dr. Michael Gottlieb, a general psychologist, for advice regarding the psychological themes that the defense should present. *Id.* at 182. Trial counsel consulted with Dr. Gottlieb in March 2010. (Dkt. 60-10 at 246).

Dr. Gottlieb advised trial counsel to put on evidence of Thuesen's "military service and subsequent diagnosis." (Dkt. 33-64 at 2). Dr. Gottlieb advised counsel to explore whether Thuesen's "drinking was exacerbated after his trauma." (Dkt. 33-64 at 2). Dr. Gottlieb "recommended that [trial counsel] be sure to provide the jury with a full explanation of post-traumatic stress disorder." (Dkt. 60-7 at 87). In fact, Dr. Gottlieb encouraged counsel to "focus on the PTSD angle" and, if possible, to "stay[] away from" testimony regarding any possible personality disorder diagnoses. (Dkt. 60-7 at 192-93).

Despite Mr. Niland, Dr. Gottlieb, and Dr. Yohman's advice, trial counsel decided against calling a PTSD-specific expert. Trial counsel decided not to call Dr. Detweiler because counsel "did not feel like that [Dr. Detwiler] was going to be in [the defense's] corner and do a good job for [them]," particularly because trial counsel "did not get a good feeling that he was embracing [their] case like [they] wanted him to." (Dkt. 60-7 at 179). Dr. Detwiler "started to backtrack on [them], and he didn't want to testify." (Dkt. 60-10 at 182). Specifically, trial counsel asserted that

Dr. Detwiler "would harm [the] case because" he opined that Thuesen had "a possible borderline personality situation and that . . . made him more susceptible to PTSD," which "meant that PTSD wasn't the only mental illness he had." (Dkt. 60-10 at 182). Without Dr. Detwiler's testimony, then, the only other PTSD expert trial counsel considered calling was Dr. Kopel. (Dkt. 49-5 at 5).

*Dr. Kopel*: As noted above, Dr. Saunders recommended that the defense contact Dr. Kenneth Kopel, a Houston psychologist and veteran. (Dkt. 60-7 at 80). Dr. Kopel had over 30 years of clinical experience treating veterans with PTSD, including twenty-three years of employment with the Veterans Administration. (Dkt. 33-31 at ¶ 2-3; 54-2 at 8-9). Trial counsel contacted Dr. Kopel on April 27, 2010, partway through jury selection. (Dkt. 54-2 at 43). Trial counsel wanted to speak with Dr. Kopel because the defense "wasn't sure about . . . what else [it] was going to do at punishment . . . about PTSD." (Dkt. 60-7 at 88).

Trial counsel sent Dr. Kopel records to review. Trial counsel did not ask Dr. Kopel to interview or assess Thuesen. However, Dr. Kopel's review of Thuesen's VA records "[v]ery clearly" showed signs of PTSD. (Dkt. 54-2 at 24). But Dr. Kopel observed that no one at the VA diagnosed him with PTSD and that he received "inadequate" treatment for it. (Dkt. 33-31 at ¶¶ 23-25).

The post-trial review shows that Dr. Kopel would have developed critical evidence relating to Thuesen's mental state at the time of the murder, at a level of detail at which Dr. Saunders was unable to opine. The urging of those experienced in the field to put forth a PTSD expert buttresses this conclusion. *See, e.g.*, Dkt. 60-7 at 86-87; Dkt. 60-7 at 87.

Dr. Kopel saw evidence of PTSD in Thuesen's actions: "It's my opinion that the minute Rachel started to run, the startle reaction flight-or-fight began, and he went into military action,

34

which basically meant kill or be killed and that he took that response. And after it was over, returned to normal." (Dkt. 54-2 at 36-37, 59-61). Dr. Kopel also could have opined as to the effects of PTSD on one's brain function. He described that:

> Studies show that [an] exaggerated startle response is triggered in veterans with PTSD even though the veterans can intellectually identify whether a situation should or should not elicit an emotion response. Physiologically, this exaggerated startle response has a significant impact on a person's mental and physical reactions to stressful situations. When presented with a triggering stimulus, blood flow increases in areas of the brain responsible for intense emotions. Simultaneously, blood flow is decreased to areas of the frontal lobe of the brain. This means that brain functions related to planning, anticipating consequences, and inhibiting inappropriate responses become less active. Blood flow also decreases in the area of the brain responsible for the translation of experience into communicable language. . . . In addition to impacts on a veteran's mental process, the startle response also influences the body's physical response. . . . The body releases hormones (such as epinephrine) that increase heart rate and blood pressure. The combination of these results in impairments to the body's normal regulation of its autonomic nervous system responses. **Veterans suffering PTSD are therefore more prone to react in physical ways that may not be appropriate to the situation.**

(Dkt. 33-31 at ¶¶ 32-33, 35) (citations omitted) (emphasis added).

With that, Dr. Kopel did not believe that Thuesen intended to kill. *Id.* at ¶ 37; *see also* Dkt. 54-2 at 38. However, despite Dr. Kopel's proffered testimony, inexplicably, trial counsel only considered using Dr. Kopel as a witness during the punishment phase, not the guilt/innocence phase. (Dkt. 60-7 at 85).

### c.  Trial testimony about PTSD

The state habeas court found that trial counsel "extensively prepared [Dr. Saunders] to testify." (Dkt. 66-4 at 159). As trial approached, Dr. Saunders performed two psychological interviews with Thuesen. (Dkt. 60-10 at 240-41). Dr. Saunders believed PTSD was a "very compelling issue," but he did not believe it operated in isolation. (Dkt. 60-10 at 243-44). Trial counsel testified that Dr. Saunders felt that both PTSD and Thuesen's dependent disorder operated

to lessen his culpability. (Dkt. 60-10 at 243-44). Trial counsel worked that opinion into the "sole defensive theory" which "was that [Thuesen] lacked intent or knowledge with respect to the result of his conduct when he shot the victims." *Thuesen*, 2014 WL 792038, at *32.

The Court of Criminal Appeals described the defense's theory: "[D]ue to his mental illness, [Thuesen] was so overwhelmed by the stress of being rejected by his girlfriend that he was unable to appreciate that his conduct of shooting the victims would kill them, not simply stop them." *Thuesen*, 2014 WL 792038, at *32. "[T]rial counsel proffered the defensive theory [regarding *mens rea*] through the following witnesses: Officer Mica Lunt, Dr. Ismael Carlo, Teresa Cannon, Marine Sergeant Jerry Abbot, Marine Sergeant Romero Garcia, Dr. Roger Saunders." (Dkt. 66-4 at 12). The lay witnesses described behavior they observed that was consistent with PTSD.

Dr. Ismael Carlo, the psychiatrist who "handled [Thuesen's] emergency admission to the VA hospital" in 2008, testified as a non-expert treating physician about his diagnosis and treatment of Thuesen. *Thuesen*, 2014 WL 792038, at *37. Dr. Carlo testified that he "noted post-traumatic stress disorder ('PTSD') symptoms and diagnosed [Thuesen] with major depressive disorder, a chronic condition requiring lifelong treatment." *Id.* at *1. Federal regulations limited Dr. Carlo's testimony to the contents of Thuesen's medical records and prevented trial counsel from asking Dr. Carlo whether, in his opinion, Thuesen has PTSD. *Id.* at *38. However, the government informed trial counsel that they could ask Dr. Carlo whether he believed Thuesen suffered from PTSD *at the time Dr. Carlo treated him* in 2008. *Id.* Counsel rejected this option and declined to ask Dr. Carlo his opinion on this question.

Teresa Cannon, a clinical social worker at an outpatient VA clinic, testified that Thuesen had been referred to her by the VA hospital in Houston after his hospitalization there in 2008. (Dkt.

36

50-1 at 80). [17] Ms. Cannon gave extensive testimony about the nature of PTSD, its effect in a

veteran's life, and signs of PTSD she observed in Thuesen.

The defense presented the main thrust of evidence about PTSD through Dr. Saunders.[18] In

trial counsel's summation, the defense described the purpose behind Dr. Saunders' testimony:

> We have a guy who is mentally ill, of which there is no dispute, none whatsoever.
> He was so mentally ill, he was impaired in his judgment. His impairment was of
> such a degree at the time of this offense . . . he . . . was not able to form a conscious
> objective or desire to kill. He was not aware his conduct was reasonably certain to
> cause death. Does that mean he is not guilty? No. That does not mean that. What it
> means is that if you have a reasonable doubt as to whether, because of his mental
> impairment, that he did not form an intentional mental state and a knowing mental
> state, you can't find him guilty of capital murder. That is what that means.

(Dkt. 50-5 at 74).

Dr. Saunders opined that Thuesen suffered from PTSD and described what he considered

to be the source of the PTSD as well the effect it had on Thuesen's life. Unlike Dr. Kopel, however,

who was able and willing to explain how PTSD can impair brain function in cases of extreme

---

[17]     Thuesen says that Ms. Cannon "was not qualified to make the [PTSD] diagnosis herself." (Dkt. 33 at 14). Ms. Cannon explained: "Because I do not hold a medical or psychiatric degree, I am not able to diagnose someone with a particular illness or disorder." (Dkt. 63-4 at 301). She, however, was qualified to discuss PTSD symptoms with Thuesen after counseling veterans suffering from PTSD for many years. (Dkt. 50-1 at 86, 99).

[18]     Thuesen's federal petition claims that the defense "planned to use Dr. Saunders to testify during the punishment phase. However, trial counsel made a sudden, inexplicable change during the state's case-in-chief." (Dkt. 33 at 118). The record shows otherwise. "[B]efore the trial started," trial counsel had decided that the defense was "going to call Dr. Saunders on the intent-to-kill issue, *mens rea*." (Dkt. 60-7 at 84-85). There is some debate as to why counsel chose to call Dr. Saunders as a witness. On state habeas review, Thuesen alleged that trial counsel decided to call Dr. Saunders as a guilt/innocence witness after he concluded that the trajectory of the bullets indicated that Thuesen did not shoot to kill. (Dkt. 63-4 at 49). Trial counsel had consulted with a qualified expert who "concluded that an argument could be made that the trajectory of the bullets indicated that Thuesen did not intend to kill Rachel Joiner." (Dkt. 33 at 1231). At trial, Dr. Saunders testified that he initially thought that Thuesen only meant to stop Rachel because, despite his training, Thuesen did not fire killing shots. (Dkt. 50-3 at 164-65). Dr. Saunders testified that he had "gone through in great detail the number of shots, when they were fired, the areas they were fired in," but "abandoned looking at . . . that data as being anything that was very conclusive." (Dkt. 50-3 at 165). Thuesen argues that Dr. Saunders was not qualified to render any conclusion about bullet trajectory and that counsel should not have switched tactics on that basis. Trial counsel, however, never testified that they changed any tactics based on any bullet-trajectory theory; only Dr. Saunders speculated that trial counsel switched gears on that basis.

stress, Dr. Saunders did not describe how PTSD operates on a physiological level. Instead, as a psychologist who does *not* specialize in PTSD, Dr. Saunders offered surface-level and generally-applicable descriptions of PTSD symptoms.

Dr. Saunders told jurors that Thuesen had "experienced trauma during [his military service] due to exposure to death and having caused death there. He was not able to get, really, assistance for some of the experiences that he had at the time." (Dkt. 50-3 at 18). Dr. Saunders explained that he saw symptoms of PTSD in Thuesen such as "consistently avoiding talking about his experiences surrounding death that he experienced in Iraq; diminished responsiveness to pretty much the external world. There was psychic numbing or emotional amnesia." (Dkt. 50-3 at 19). Dr. Saunders also observed difficulty "showing his feelings," "difficulty staying asleep," and "hypervigilance," which is "basically being on guard all the time, looking for threats in the environments, looking over one's shoulder feeling—an anticipation that something may happen that would threaten his physical integrity." (Dkt. 50-3 at 20). As described by the state habeas court, Dr. Saunders observed other signs of PTSD: "[c]onsistently avoiding talking about his experiences surrounding the death he experienced In Iraq," "[p]sychic numbing—not showing your emotions outwardly," "[e]strangement—or reduced ability to feel emotions," "[d]ifficulty staying asleep," "[h]ypervigilance—basically being on guard all the time, looking for threats in the environment," "[e]xaggerated startled response—someone who is easily startled," "[i]rritability or outbursts of anger," and "[p]ainful guilt feelings." (Dkt. 66-4 at 17-18).

Dr. Saunders, however, also stated before the jury that Thuesen did not display some symptoms of PTSD, such as "auditory hallucinations; paranoia; immediate response to a traumatic event, where the military had disincentives for a soldier reporting distress; flashbacks." (Dkt. 66-

38

4 at 17) (citations omitted).

Dr. Saunders testified that Thuesen's PTSD operated in conjunction with his "dependent personality disorder," which "basically is characterized by a pervasive and excessive need to be taken care of by others, it can include being submissive or clinging behavior, fears of separation." (Dkt. 50-3 at 33). Dr. Saunders also diagnosed him with a mood disorder called "depression disease." (Dkt. 50-3 at 34). Dr. Saunders "agreed that [Thuesen] already had depression and dependent personality disorder, before suffering from PTSD." (Dkt. 66-4 at 18).

Dr. Saunders described for jurors how Thuesen's mental health was interwoven with his commission of the offense.[19] He testified that Thuesen's PTSD, dependent personality disorder, depression, and anxiety came to bear at the time of the shooting. (Dkt. 50-3 at 35-37). Dr. Saunders stated that "he was so enmeshed with Rachel that he was—he felt as if he was unable to go on without her. His whole identity is tied up with her." (Dkt. 66-4 at 19). Dr. Saunders told jurors that the incident was

> [h]is last effort here to get her [Rachel], to recruit her back to talk to him, to hopefully shore up the relationship. And he is fearing not only the physical but the psychological threats to him. This is the most intense time he has ever experienced.
>
> At the time of the shootings, his goal prior to the shootings is to prevent her from leaving and to prevent Travis from assisting her in leaving. He doesn't want either one of them to leave. He stops only when she is unable to leave.

---

[19]     In a *Daubert* hearing before his testimony came before jurors, Dr. Saunders explained how PTSD would fit into a guilt/innocence defense. Dr. Saunders testified that Thuesen had "basically . . . a sense that there was a physical threat to him" because "Travis Joiner had a gun at the time in the house and that also possibly Rachel's ex-boyfriend, Johnny Matthys, was perhaps going to be on the scene and that he also had a gun or could have had a gun." (Dkt. 49-12 at 19). That "threat to his physical integrity" would have raised Thuesen's "'sympathetic nervous system arousal,' basically an alarm arousal" which would have made him "unable to gather his thoughts" and caused him to go "on an action mode." (Dkt. 49-12 at 20). He was "hypervigilant" with an "increased . . . anxiety level" that "cause[d] him to respond more on action than on thought." (Dkt. 49-12 at 20). Dr. Saunders testified that PTSD was part of what "caused him to act." (Dkt. 49-12 at 20). Thus "there is really no rational thinking" but he was acting "part out of instinct; part out of training." (Dkt. 49-12 at 20).

(Dkt. 66-4 at 19).

Dr. Saunders explained that there was "an acceleration" in the days before which "cause[d] impaired judgement in thinking and making decisions" and left him in a mental-health crisis. (Dkt. 50-3 at 61). Dr. Saunders described Thuesen's mental state on that day being one of anxiety, insecurity because of the "disintegration of the relationship, and a desperate need for reassurance and reconnection." (Dkt. 50-3 at 38). Dr. Saunders opined that Thuesen went to Rachel's house "to scare her back to reuniting with him." (Dkt. 50-3 at 40). When Thuesen perceives a "threat to the physical integrity" because "the brother is in the house, has a weapon" and her ex-boyfriend was coming over, Thuesen "is seeing not only a physical threat to himself, but also to a greater degree a psychological threat." (Dkt. 50-3 at 40).

Dr. Saunders testified that Thuesen did not "have the conscious objective to cause the death" of the victims. (Dkt. 50-3 at 62-63). Particularly regarding Rachel's death, Dr. Saunders opined that "[t]he evidence is quite compelling that it would not have been his intent and—or that he would have known at the time that his actions would have caused her death." (Dkt. 50-3 at 63).

### d. Trial Counsel's Summation

The defense's closing argument focused on how Thuesen's "three mental diseases"—PTSD, depression disease, and a dependency disorder—impaired his mental state at the time of the shooting, such that "he was not capable of forming [an] intent to kill." (Dkt. 50-5 at 55, 57).

Trial counsel strongly urged jurors to find that Thuesen could not form the knowing or intentional mental state required for a capital murder conviction. PTSD formed an important part of this theory, but trial counsel presented it as only one of the mental problems that plagued Thuesen. Trial counsel urged jurors to consider his intent because of his depression, dependency

disorder, alcohol abuse, and PTSD. (Dkt. 50-5 at 84). Trial counsel insisted that Thuesen "was so mentally ill, he was impaired in his judgment. His impairment was of such a degree at the time of this offense that he is not insane, but he . . . was not able to form a conscious objective or desire to kill. He was not aware his conduct was reasonably certain to cause death." (Dkt. 50-5 at 74). On that basis, trial counsel advocated for jurors still to find Thuesen guilty, but only a lesser offense like murder or manslaughter.[20]

### e.   Thuesen's Federal Claim

Thuesen contends that trial counsel provided constitutionally deficient representation because "the jury received (1) no expert's explanation of PTSD or, important, its *effects* and, related, no explanation of *Mr. Thuesen's* PTSD and how it affected him; and (2) no evidence connecting fact witness observations to expert diagnosis or demonstrating how that diagnosis triggered a trained, automatic response the day of the crime and, thus, reduced Mr. Thuesen's moral culpability for the crime." (Dkt. 33 at 111) (emphasis in original). Because the state habeas court rejected Thuesen's PTSD-defense arguments, he must meet the "doubly deferential" standard in play when the state courts adjudicate the merits of a *Strickland* claim. *Woods v. Etherton*, 578 U.S. 113, 117 (2016) ("AEDPA review is 'doubly deferential' because counsel is 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"). "[D]oubly deferential" means that a court will

---

[20]    Here, the jury instructions provided for a conviction on simple murder or manslaughter. (Dkt. 50-5 at 62). "A jury could have convicted [Thuesen] of murder by finding that he intended to cause serious bodily injury" and "a jury could have convicted him of manslaughter only if it found that he lacked the *mens rea* to commit murder and that he recklessly caused the victims' death." *Thuesen*, 2014 WL 792038, at *31. "On the facts of this case, the jury could have found [Thuesen] not guilty of any of these offenses only if it found that the State had not proven beyond a reasonable doubt that [he] intentionally or knowingly killed the victims, intentionally harmed the victims, or consciously disregarded a substantial and unjustifiable risk that the victims' deaths would occur." *Id.*

"afford 'both the state court and the defense attorney the benefit of the doubt.'" *Id.* (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)). Even under this highly deferential standard of review, the Court concludes that the state habeas court was unreasonable in finding that trial counsel provided constitutionally sufficient representation under *Strickland* prong one: the record is clear that trial counsel neglected to offer testimony from a qualified witness who could build the critical connections between Thuesen's military training and service, his resulting PTSD, the inadequate PTSD-specific treatment he received upon returning from Iraq, and his maladapted "fight-or-flight" response the night of the shootings.

As the discussion above plainly shows, trial counsel were advised on multiple occasions by several individuals with whom they consulted that it was critically important to put on a PTSD-specific expert to educate the jury on PTSD. To be sure, trial witnesses left the jury with the clear impression that Thuesen suffered from PTSD. And Dr. Saunders provided testimony regarding PTSD symptoms Thuesen experienced, and symptoms Thuesen did not experience. But no expert provided a picture of how that diagnosis physiologically impacted Thuesen's brain and his physical response on the night of the shooting.

Respondent argues that "the trouble with this claim is [Thuesen] is not arguing that counsel failed to investigate and present mitigating evidence, but that counsel did not present enough evidence." (Dkt. 71 at 49). To the contrary, Thuesen argues that, despite its centrality to the defense's purported strategy, trial counsel failed to put the *most* important PTSD evidence before the jury.

Thuesen contends that his trial attorneys "were ineffective at presenting this defense because they failed to demonstrate that [his] PTSD caused a 'fight or flight' response that

prevented him from forming specific intent sufficient to convict him for capital murder." (Dkt. 121 at 108). Through testimony he developed on habeas review,[21] Thuesen argues that trial counsel should have called an expert who would have told jurors that he experienced a "PTSD fight-or-flight crisis" that "destroy[ed] the ability of forming the requisite *mens rea* during a crisis." (Dkt. 33 at 79).

The state habeas court concluded that "trial counsel fully investigated that [Thuesen] suffered from PTSD and presented said unimpeached evidence to the jury during both the guilt-innocence and punishment phases." (Dkt. 66-4 at 157). The state habeas court found that trial counsel's decision about presenting PTSD evidence "was based on a thorough investigation and was based on reasonable trial strategy." *Id.* The court's findings of fact included a finding "that trial counsel effectively presented accurate and credible evidence to the jury that [Thuesen] suffered from PTSD." *Id.* at 22. "The fact that another attorney might have pursued a different strategy will not support a finding of ineffective assistance of counsel." *Id.* at 151. On that basis, the state habeas court found that Thuesen had "fail[ed]" to show deficient performance, much less harm." *Id.* at 157.

The state court's finding that Thuesen had failed to show deficient performance under

---

[21]     Thuesen based his state habeas action on several expert witnesses on PTSD. In the state habeas hearing, Thuesen called Dr. Eric Elbogen and Dr. Elspeth Ritchie to testify in the hearing. "Dr. Eric Elbogen . . . is a forensic psychologist at the University of North Carolina who treats individuals with PTSD, including veterans" whose "testimony was only to inform the Court about research which showed a link between PTSD in veterans and violence." (Dkt. 66-4 at 53). "Dr. Elspeth Ritchie . . . is a psychiatrist with the Department of Behavioral Health" who "was also an Army psychiatrist for many years" and who "had treated many patients with PTSD." (Dkt. 66-4 at 53). Thuesen also provided an affidavit from Dr. William Brown explaining that he "would have testified generally to the problems many veterans experience as they attempt to reintegrate back into civilian culture." (Dkt. 66-4 at 57). Dr. Stephen Xenakis testified in the second evidentiary hearing that Thuesen "was in a startled and fight/flight state of mind and the incident occurred in that fight/flight state of mind." (Dkt. 52-4 at 217). Only Dr. Elbogen examined Thuesen personally, the other experts relied on reviewing records.

*Strickland* prong one was unreasonable. First, the record shows that counsel did not seriously investigate Thuesen's PTSD and develop PTSD evidence until 2010—just a few months before trial—despite being on notice starting in March 2009 that Thuesen had served in Iraq and that PTSD was likely going to be a theme in the case. Counsel's failure to meaningfully investigate PTSD until the months and weeks leading up to trial is explained only by trial counsel's heavy caseload, and thus cannot conceivably be attributed to an understandable "strategic decision" or "reasonable professional judgment." *See Strickland*, 466 U.S. at 689-90; *see also* ABA Guidelines, Guideline 10.7 (requiring counsel to conduct "thorough and independent investigations relating to the issues of both guilt and penalty"). Second, while trial counsel did ultimately present evidence that Thuesen suffered from PTSD, counsel failed to show the jury one of the most important pieces of their PTSD defense: that Thuesen's PTSD manifested that night of the shootings in a fight-or-flight response that made him wholly unable to form the requisite intent. This case represents one in which "the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Harrington v. Richter*, 562 U.S. 86, 106 (2011); *see also ABA Guidelines,* Guideline 10.11 cmt. ("Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an 'all-purpose' expert who may have insufficient knowledge or experience to testify persuasively."). Multiple consulting experts confirmed the importance of expert testimony to comprehensively educate the jury on PTSD. The state habeas court found "no evidence that Dr. Saunders . . . [was] not qualified to testify about PTSD or that [Thuesen] had PTSD." (Dkt. 64-4 at 21). However, Dr. Saunders himself informed trial counsel he was not a PTSD expert and recommended consulting with Dr. Kopel. Despite being advised at multiple turns to introduce a PTSD expert, trial counsel exclusively relied on lay witnesses and

44

one individual who explicitly disclaimed his expertise in PTSD.

Moreover, Thuesen complains that the way trial counsel used PTSD "was either so muddled that it was not helpful to the jury, or it actually undermined Mr. Thuesen's PTSD defense." (Dkt. 33 at 114). Dr. Saunders testified that PTSD was one of the trio of disorders which made Thuesen unable to form the requite intent.[22] However, counsel did not distill this testimony into a pointed, clear argument that Thuesen's PTSD response at the time of the shooting prevented him from forming the required criminal intent when he pulled the trigger. Moreover, as further discussed below, Dr. Carlo's testimony that he noted PTSD symptoms while treating Thuesen at the VA Medical Center and Ms. Cannon's testimony regarding her counseling sessions with Thuesen may have actually obscured to the jury the fact that the VA never actually diagnosed or properly treated Thuesen for his PTSD, thereby undermining Thuesen's PTSD defense.

When resolving another claim, the state habeas court found that trial counsel's decision not to call Dr. Kopel, a PTSD expert, "was sound trial strategy." Dr. Kopel's believed that "[b]ecause of Thuesen's struggles with PTSD, his lack of adequate treatment by the VA system, and the significant stressors he was experiencing leading up to the crime, . . . Thuesen could not have formed the intent to kill during the commission of the crime. The evidence suggests that during the crime, Thuesen experienced a 'Fight or Flight' response." (Dkt. 33-31 at 12). The state habeas court reasoned that Dr. Kopel's "opinion, that PTSD caused [Thuesen] to be on 'fight-or-flight

---

[22] Dr. Gottlieb, the psychologist with whom trial counsel consulted in March 2010, explicitly encouraged counsel to "focus on the PTSD angle" and, if possible, to "stay[] away from" testimony regarding personality disorders. (Dkt. 60-7 at 192-193). Despite this advice, Dr Saunders' testimony focused on how Thuesen suffered from three primary mental health conditions—dependent personality disorder, PTSD, and depression disease. In fact, Dr. Saunders told trial counsel that he believed Thusen's dependent personality disorder "was a primary condition" and "should be a primary focus of their mitigation presentation," and that "PTSD was a significant condition germane to the case, but that it was not the primary diagnostic feature that [he] would develop in the case." (Dkt. 33-33 at 3).

automatic pilot' after Rachel tried to run away, would have alienated a jury, made [Thuesen] out to be a ticking time bomb and discredited any remaining defensive theory. Moreover, counsel did not want to allow the State to relive the whole crime again for the jury, through their cross-examination." (Dkt. 66-4 at 158). As a general matter, an attorney presenting testimony about PTSD must exercise caution. The impulsivity and loss of control associated with PTSD may make that testimony "a double-edged sword" which "may not have helped [the defendant] anyway." *Mendoza v. Secretary, Fla. Dept. of Corrections*, 761 F.3d 1213, 1239 n. 23 (11th Cir. 2014); *see also Hummel v. Davis*, 807 F. App'x 282, 284 (5th Cir. 2020); *Easley v. Dretke*, 122 F. App'x 124, 130 (5th Cir. 2005).

Here, however, the decision not to put on a PTSD expert cannot be attributed to sound trial strategy. For reasons stated above, trial counsel's only hope of negating Thuesen's *mens rea* at the guilt phase was to present a clear picture of how PTSD impaired Thuesen's brain and behavior on the day of the shootings and diminished his ability to form an intent to kill. Dr. Kopel, a PTSD expert, was prepared to provide this clear picture. However, following the trial, counsel even went so far as to acknowledge that Dr. Saunders told the jury that he "didn't believe that PTSD was the primary part of the crime." (Dkt. 60-7 at 102). Trial counsel's failure to take basic steps to ensure that the jury had a specific and complete understanding of PTSD—that is, their failure to put on a single PTSD-specific expert, despite receiving advice to do so from multiple sources, including Dr. Saunders—simply cannot be justified by a tactical decision to avoid possible negative stigma associated with PTSD. *Cf. (Terry) Williams v. Taylor*, 529 U.S. 362, 396 (2000) (concluding that trial counsel's failure to put on favorable evidence "was not justified by a tactical decision" even though "not all of the additional evidence was favorable to [petitioner]"). On the whole, the state

46

habeas court acted unreasonably when it concluded that trial counsel's failure to put on Dr. Kopel—or *any* PTSD-specific expert, for that matter—was sound trial strategy.

## 2. Trial Counsel's Choices About Putting PTSD Before the Jury

Thuesen's second, third, and fourth challenges to trial counsel's guilt/innocence representation involve how counsel put PTSD before jurors. Thuesen contends that trial counsel should have approached PTSD differently by (1) crafting a defense which highlighted the VA system's lack of procedures for formal diagnosis and treatment of Thuesen's PTSD upon his return to the US; (2) focusing the evidence that they did present so that it would better help jurors understand PTSD; and (3) presenting testimony about the dissociative behavior which follows a PTSD episode. (Dkt. 33 at 150).

### a. *Absence of a PTSD diagnosis in VA records*

Thuesen's second *Strickland* argument contends that counsel should have emphasized the VA's failure to diagnose and treat his PTSD. Even though Thuesen had several interactions with mental health professionals and displayed "the classic symptoms of PTSD," no expert had diagnosed him with PTSD before the shootings. (Dkt. 33 at 113). Thus, Thuesen argues that his "struggle with PTSD continued unnoted and untreated." (Dkt. 33 at 114).

Thuesen specifically lays blame on the VA hospital for not diagnosing his PTSD after his suicide outcry. Thuesen contends that "[o]ne of the primary reasons [he] suffered an acute PTSD event," resulting in the shootings, "was that he had never received appropriate medical treatment." (Dkt. 33 at 119). Thuesen wishes counsel would have emphasized the absence of a PTSD diagnosis and appropriate treatment for three reasons: (1) to show he only received nominal help from the VA; (2) to help neutralize testimony suggesting that Thuesen did not appear to be in distress in the

47

days leading up to the shooting; and (3) support his argument that an ongoing, overlooked PTSD crisis—not jealousy—was the reason he shot the Joiners. (Dkt. 33 at 136-37). Thuesen says counsel should have tied his actions the night of the shootings to the failures of the medical systems that were responsible for providing him appropriate care.

In the state evidentiary hearing, trial counsel testified that the defense was familiar with the VA records. Trial counsel testified that "it looked like somebody had diagnosed him with PTSD from the VA." (Dkt. 60-7 at 149). Trial counsel opined that "Teresa Cannon was treating him for PTSD, so somewhere along there somebody thought he had PTSD." (Dkt. 60-10 at 170) Still, trial counsel knew that, probably from "some kind of lack of communication," Thuesen likely "was [not] ever diagnosed by the VA" with PTSD. (Dkt. 60-10 at 170). Trial counsel acknowledged that the VA probably did not treat Thuesen appropriately for PTSD. (Dkt. 60-10 at 170).[23]

Dr. Kopel, the PTSD expert whom trial counsel declined to call, reviewed the medical records from Thuesen's treatment at the VA and concluded that "Thuesen received nominal treatment" through the VA system:

First, it does not appear the VA system fully identified or diagnosed that Thuesen was suffering from PTSD. The treatment he received at the VA medical center in Houston

---

[23]   When asked if the VA appropriately treated Thuesen, trial counsel explained:

I'm not an expert at that. I know this; That when I was surprised they let him out when they did after four days after I reviewed everything. But then when he got out, the VA counselor, Teresa Cannon, was treating him for PTSD and the suicide thing. So she was treating him based on the fact that he had, that she said, the VA had diagnosed him with PTSD. That's what she told the grand jury. And I specifically asked her during the trial if her—if her findings were consistent with what the VA's findings were, and she said yes. So I didn't know if there was something that was, not in the records that she was relying on.

. . . she testified at the grand jury that she was basing her treatment—her—what she was treating him for based on what the VA had told her. And I think it was a psychiatric diagnosis from the VA, if I remember her grand jury testimony. I think [the prosecutor] . . . asked her about that. So it created a problem because he was being treated by the VA lady who's been doing that for years.

(Dkt. 60-7 at 104-05).

> following his suicidal threat was limited to treatment for depression. Although Thuesen
> received some counseling sessions in College Station that focused on his PTSD symptoms,
> the social workers, Teresa Cannon, was not qualified to diagnose and prescribe a treatment
> plan for Thuesen's PTSD.

(Dkt. 33-31 at 6).

Trial counsel did not want to "play . . . as a general theme" that the VA did not diagnose

Thuesen with PTSD. (Dkt. 60-10 at 171). Trial counsel provided various reasons for not blaming

the VA. They felt that a theory based on untreated and undiagnosed PTSD came with risks.

Thuesen himself "had reduced the frequency of their counseling sessions, and against Cannon's

advice, [Thuesen] had stopped taking his anti-depressant medications." *Thuesen*, 2014 WL

792038, at *2. Trial counsel did not "think it would have been a good idea" to highlight that the

VA had not actually diagnosed Thuesen with PTSD, particularly because Thuesen himself told his

VA counselor that he did not want to be diagnosed with that condition. (Dkt. 66-4 at 50, 71

Trial counsel also claim that they did not wish to take away from Ms. Cannon's testimony

by making clear that the VA had not appropriately diagnosed and treated him. Trial counsel looked

to Ms. Cannon's testimony as a means of bolstering Dr. Saunders' diagnosis of PTSD. (Dkt. 60-

10 at 222). Trial counsel was not concerned that Ms. Cannon "was wrong about" a PTSD diagnosis

because her testimony helped establish his illness. Trial counsel was able to show that Thuesen

had been seeing her for PTSD and bring out "a lot of information from her about PTSD." (Dkt.

60-7 at 73). Trial counsel particularly "liked the fact that she was explaining about PTSD in a

simple way to the jury . . . and characteristics that you see. And she deals with veterans all the

time. So [trial counsel] was impressed with her testimony, quite honestly." (Dkt. 60-7 at 74).

Lastly, trial counsel feared that blaming the VA could weaken the PTSD testimony as a

mitigating factor. With the defense strategy of frontloading mitigating evidence, the defense worried about how jurors would respond to the way in which it presented PTSD testimony. Trial counsel opined that "you don't want to get blame in front of the jury when you are trying to get mitigation." (Dkt. 60-10 at 171).

In the end, Ms. Esparza also explained:

I think that that's the kind of thing you just put the information out there and hope the jury grasp it. You know juries are capable of grasping a lot. You don't necessarily come out and, hey, they failed because I'll tell you what screams in this case. The kid goes over there for four days with the worse depression he's ever seen and he gets released, but, you know, the doctor explained that. And I know they have to release him if they can't keep him. Then they red flag his file, but nobody ever goes to check on him. See, nowadays they go check on them, but back then they didn't do it.

(Dkt. 60-10 at 221).

The state habeas court found that: (1) "trial counsel conducted a thorough investigation into [Thuesen's] medical history and background and presented evidence that [he] suffered from PTSD," (Dkt. 66-4 at 71), (2) "trial counsel fully reviewed the military records in their possession," *id.*, and (3) Thuesen "failed to prove both prongs of *Strickland*" regarding any testimony that his PTSD was undiagnosed and untreated before the offense, *id.* at 163.

On balance, the state habeas court's rejection of this claim was an unreasonable application of *Strickland* prong one. The fact that Thuesen's PTSD had long gone undiagnosed and (at the very least) undertreated was central to the theory that he had a severe mental health crisis the night of the shootings. Trial counsel chose to mislead the jury, through Ms. Cannon's testimony, into believing that Thuesen *had* been diagnosed prior to their counseling sessions and that she was providing him appropriate care for his PTSD. Neither was true. And allowing this

testimony to stand uncorrected before the jury prevented the defense from developing a coherent theme that Thuesen's PTSD was not being managed appropriately at the time of the incident. It was not reasonable for trial counsel to downplay the VA's lack of proper diagnosis and treatment of Thuesen's PTSD based on the fact that Thuesen stopped taking his prescribed medication and told his VA counselor he did not want to be diagnosed with PTSD. It is well known that veterans with PTSD often avoid treatment for a range of reasons, including the desire to circumvent being labeled with stigmatizing mental health illnesses, concerns about re-experiencing traumatic events through treatment, and beliefs about the need to handle mental health problems on one's own. *See, e.g.*, Viktoria Kantor, Matthias Knefel, & Brigitte Lueger-Schuster, *Perceived barriers and facilitators of mental health service utilization in adult trauma survivors: A systematic review*, 52 CLINICAL PSYCHOLOGY REV. 52 (2017). Moreover, Thuesen's discontinuation of his anti-depressant medication does not negate the fact that his PTSD was never appropriately treated at the level he needed. In fact, Dr. Kopel's observation that Thuesen only received limited treatment for depression at the VA Medical Center underscores the inadequate care he received.

From this Court's view, the failure of the VA to properly diagnosis Thuesen's PTSD and provide him the level of care he needed may have *directly* contributed to the shooting of the Joiners. Thuesen has shown that the state habeas court's rejection of this argument was unreasonable.

### b. *Presenting Testimony Which Allegedly Undermined the Defense*

Thuesen faults trial counsel for "affirmatively present[ing] evidence during the guilt/innocence phase that undermined their own chosen defense strategy." (Dkt. 33 at 120). Thuesen contends that trial counsel selected a defense that ultimately hurt his chances at avoiding

a capital conviction. According to Thuesen, "trial counsel only developed vague themes of mental health and military service." (Dkt. 33 at 136). Thuesen says that "the evidence that trial counsel did present was either so muddled that it was not helpful to the jury, or it actually undermined Mr. Thuesen's PTSD defense." (Dkt. 33 at 137).

Thuesen specifically complains about the defense's handling of three witnesses: Dr. Saunders, Dr. Carlo, and Ms. Cannon. (Dkt. 33 at 136-37). First, Thuesen complains that Dr. Saunders's testimony focused too heavily on his diagnosis of dependent personality disorder rather than PTSD. Thuesen alleges that Dr. Saunders' lack of experience with PTSD caused him to downplay some of his symptoms, such as auditory hallucinations and flashback episodes. Thuesen alleges "the brevity and misleading nature of Dr. Saunders' testimony regarding [his] PTSD and mental health generally," caused "the jury [to] receive[] only a cursory, confusing, and 'technical' description of [PTSD]." (Dkt. 33 at 141).

Second, Thuesen faults counsel's examination of Dr. Ismael Carlo, the treating physician during his four-day stay at the Houston VA Medical Center. Dr. Carlo only diagnosed Thuesen with one psychological issue, depression, but observed symptoms of PTSD. Because of federal regulations, Dr. Carlo could not offer an expert opinion about whether he believed Thuesen had PTSD. (Dkt. 33 at 146-47) (citing 38 C.F.R. §§ 14.803, 14.808). Thuesen claims that counsel was unaware that federal regulations limited Dr. Carlo's ability to testify about PTSD and that they should have prepared accordingly before trial. Moreover, even though the government allowed trial counsel to ask Dr. Carlo whether he believed Thuesen suffered from PTSD at the time Dr. Carlo treated him in 2008, counsel inexplicably rejected this option.

Third, Thuesen claims that his VA counselor, Theresa Cannon, was a poor source of

information about his PTSD. Thuesen claims that counsel should have recognized "obvious flaws

with Ms. Cannon's testimony," such as the absence of a PTSD diagnosis in his VA records. (Dkt.

33 at 132). Even though Ms. Cannon provided support for his PTSD symptoms in counseling

sessions, Thuesen maintains that her trial testimony was harmful because "it prevented the defense

from developing the theme that [his] PTSD was not properly treated." (Dkt. 33 at 148).

Arguing that the defense was "wholly unprepared" for trial, Thuesen contends that "[i]f

anything, [those three witnesses'] testimony was damaging, highlighting the lack of a formal

diagnosis or treatment of [his] PTSD by the VA system." (Dkt. 33 at 133, 134). "As a result, the

modest evidence presented to the jury about [his] PTSD (from lay witness testimony about changes

in [his] behaviors) was left untethered to any coherent or reasonable defense theory." (Dkt. 33 at

134).

Respondent contends "that any argument on a lack of intent was dubious based on not one

but two shootings." (Dkt. 71 at 56). According to Respondent, it would have been an uphill battle

to "convince[] a jury that Thuesen[,] who unlawfully entered the victim's house, waited for hours

with a loaded gun, and shot two college students[,] did not intend to kill." *Id.*

Trial counsel presented a *mens rea* defense that relied on the interplay between three

psychological conditions (including PTSD). As described by Dr. Saunders, Thuesen "was

suffering from multiple psychiatric diagnoses at the time of the alleged offense, and those included

major depressive disorder, included dependent personality features, and also symptoms of

posttraumatic stress disorder." (Dkt. 48-12 at 15). Trial counsel told jurors that Thuesen

> has three mental diseases, and these three diseases together are not good friends.
> When you have depression disease and dependency disorder, it is complicated by
> PTSD. . . . You know why? Because PTSD raises the anxiety threat to an unrealistic

level. The anxiety threat that you are facing harm, the anxiety threat that you have to do something to survive. It is raised, and in his dependency disease, he has to cling to the girl for survival. She can't leave him.

(Dkt. 50-5 at 56). Trial counsel relied on Dr. Saunders to explain that,

[d]ue to the circumstances that were occurring at the time and the situational variables that were occurring at the time of the alleged offense, having those mental illnesses superimposed on that occasion, and due to the responses of the defendant following the alleged offenses, that he did not form proper mens rea to be able to . . . cause the death of Travis and Rachel Joiner.

(Dkt. 49-12 at 15-16).

As previously discussed, the Court finds that the state habeas court acted unreasonably when it concluded that trial counsel's failure to put on a PTSD expert was sound trial strategy. However, trial counsel still asked jurors to find that PTSD, in conjunction with other disorders, made Thuesen unable to form the criminal intent for capital murder.

Counsel chose to advance this defense primarily through three witnesses. The Court has already discussed trial counsel's decision to rely on testimony from Dr. Saunders. Trial counsel's choice to call Dr. Carlo and Ms. Cannon makes sense—both had observed Thuesen in a mental-health treatment capacity—and served to bolster Dr. Saunders' conclusion. Trial found Ms. Cannon's testimony to be beneficial because she explained the psychological implications of PTSD in an easy-to-understand manner. Thuesen has not shown that the state habeas court was unreasonable in finding that "trial counsel's decision to admit PTSD during the guilt-innocence phase through the testimony of . . . Dr. Ismael Carlo and Teresa Cannon was based on a thorough investigation and was based on reasonable trial strategy." (Dkt. 66-4 at 158-59).

c. *Recovery Period and Confabulation*

Thuesen claims that his attorneys should have focused their defense so that it recognized the dissociative behavior which follows a PTSD episode. (Dkt. 33 at 151). Thuesen complains that trial counsel did not adequately investigate the effects of PTSD on Thuesen's behavior, and therefore did not properly attribute witnesses' observations of him after the crime to the psychological processes of "recovery period" and "confabulation."

Specifically, Thuesen points to the testimony of three witnesses (Tabitha Foreman, Officer Tom Jagielski, Janet Walker). Each observed Thuesen soon after he killed the victims. All three provided accounts of how Thuesen looked and acted after the shootings. Thuesen contends that trial counsel should have used their testimony to show how, "after a PTSD event, a person suffering from PTSD could be expected to have a flat affect or otherwise seem emotionally detached from recent events" which makes it "difficult to form and retrieve memories." (Dkt. 33 at 151). Thuesen describes this as "confabulation" which "can involve gaps in memory, or it could involve filling in those gaps with misinterpreted, distorted, or imagined information which then seems true." (Dkt. 33 at 151). Thuesen does not explicitly state what he means by "recovery period," but the Court assumes that Thuesen considers the "recovery period" to be when "shortly after a PTSD event, a person suffering from PTSD could be expected to have a flat affect or otherwise seem emotionally detached from recent events." *Id.* Thuesen argues that, had trial counsel familiarized themselves with these PTSD effects, they would have recognized that the testimony of the three witnesses who observed Thuesen shortly after the shooting was consistent with common PTSD symptoms.[24]

---

[24] The Court notes that Thuesen relies on psychological standards found in the DSM-V, which was published after trial. (Dkt. 33 at 150). The DSM-IV was in operation at the time of the shooting and trial. However, as one group

Instead, Thuesen argues, trial counsel was unprepared to refute the testimony, which left the jury with the wrong impression that Thuesen exhibited no remorse following the shooting.

*Tabitha Foreman*: The State called Ms. Foreman toward the end of its case-in-chief. As described by the state habeas court, Ms. Foreman "testified that she lived two houses away from Rachel and Travis Joiner" and, on the day of the murders, "she heard six gunshots." "Moments later she observed a police car in front of the victims' home. Ms. Foreman watched as authorities rolled Rachel and Travis out of their home on stretchers." (Dkt. 66-4 at 114-15). In state habeas court, Thuesen alleged that trial counsel "open[ed] the door" to damaging testimony and failed to object when Ms. Foreman testified his facial expression "was a look of no remorse." (Dkt. 63-4 at 223-24). Now, Thuesen claims that trial counsel "failed to rebut" her testimony which "indicated that [he] lacked remorse, when in reality his flat affect was a product of his PTSD crisis." (Dkt. 63-4 at 152).

Trial counsel tried to prevent Ms. Foreman's testimony from coming before the jury. Trial counsel argued that her interpretation of his facial expression was "speculative." (Dkt. 46-5 at 25). Trial counsel objected when the State asked if he seemed "angry" or "mad," to which Ms. Foreman

---

of researchers summarized: "In DSM-5, several criterion-level changes from DSM-IV broadened the definition of PTSD, while others narrowed the definition. . . . Studies agree, though, that substantial overlap exists in PTSD cased based on DSM-IV and DSM-5 criteria, raising the possibility that diagnoses of DSM-5 PTSD might be approximated closely using DSM-IV criteria." Anthony J. Rosellini, *et al.. Approximating a DSM-5 diagnosis of PTSD using DSM-IV Criteria*, 32 Depression and Anxiety 493, 494 (2015). While Thuesen's petition does use some DSM-V-specific language regarding dissociative symptoms (depersonalization and derealization), the diagnostic criteria for PTSD in the DSM-IV contains many of the same symptoms that Thuesen describes experiencing, including: intense psychological distress and physiological reactivity at exposure to cues that symbolize or resemble an aspect of the traumatic event, restricted range of affect, feelings of detachment, inability to recall important aspects of the trauma, difficulty falling or staying asleep, hyper vigilance, exaggerated startle response, and irritability or outbursts of anger. *See Impact of the DSM-IV to DSM-5 Changes on the National Survey on Drug Use and Health Table 3.14: DSM-IV to DSM-5 Posttraumatic Stress Disorder Comparison*, Substance Abuse and Mental Health Services Administration, (2016), https://www.ncbi.nlm.nih.gov/books/NBK519704/table/ch3.t14/.

responded that he did not. (Dkt. 46-5 at 26). After more back-and-forth and continued objection, Ms. Foreman described Thuesen's expression not as a "dazed look" but as "a look of no remorse." (Dkt. 46-5 at 30). Thuesen faults trial counsel for not turning Ms. Foreman's testimony into the defense's favor by tying her observations to PTSD. Thuesen points to "significant evidence that flat affect and lack of memory were additional symptoms of a PTSD crisis." (Dkt. 33 at 155).

The defense understood that the prosecution intended to use Ms. Foreman's testimony to prove he lacked remorse. Trial counsel made aggressive efforts to prevent Ms. Foreman from testifying about his appearance. Trial counsel structured the first portion of the defense case-in-chief as a response to the State's argument that he was remorseless. As discussed below, trial counsel tried to rebut Ms. Foreman's description of Thuesen as remorseless through other witnesses. Perhaps another attorney would have handled it differently, but Thuesen has not shown that his trial attorneys were unreasonable in their efforts to limit Ms. Foreman's testimony.

*Officer Tom Jagielski*: The defense called College Station Police Officer Tom Jagielski as the first defense witness in the guilt/innocence phase. The defense initially believed that Officer Jagielski "has no opinion as to remorse," but the State observed that his testimony would be "directly rebutting what was said by Ms. Foreman." (Dkt. 49-11 at 44-48, 60-61). Trial counsel wanted to suggest that Thuesen had remorse because he "was crying and was very concerned for the victims." (Dkt. 49-11 at 47).

Officer Jagielski testified that he was a mental health peace officer certified to deal with people in mental health crisis. He arrived on scene and was present when the garage door opened; he saw [Thuesen] kneeling next to Rachel Joiner." (Dkt. 66-4 at 116). Trial counsel then asked Officer Jagielski if he noticed "the expression on Mr. Thuesen's face," to which he responded that

he observed a "flat affect, what's commonly known as emotionally stone-faced." (Dkt. 49-12 at 67). Trial counsel asked if a flat affect could be a sign of depression, to which Officer Jagielski responded "[i]t can." *Id.* (On re-direct, however, Officer Jagielski said that while a flat affect *can* be a sign of depression, he "wouldn't call" the look on Thuesen's face "depression." *Id.* at 92.) Trial counsel then asked if Officer Jagielski saw "any other signs, other than the flat affect, that Mr. Thuesen was in a mental health crisis," to which Officer Jagielski responded, "no." *Id.* At 69. Trial counsel asked a couple of questions that would suggest to the jury that Thuesen felt remorse. (Dkt. 49-12 at 110). For instance, Officer Jagielski testified that, while driving Thuesen to the police station, he asked: "Is she going to make it." (Dkt. 49-12 at 74).

On cross examination, Officer Jagielski reiterated his opinion that Thuesen was not in a mental health crisis at the time he dealt with him, *id.* at 76, and, furthermore, did not seem: afraid of Office Jagielski or of firearms, to be having a flashback or hallucinations, jumpy or irritable, having an outburst of anger, or like he was in "in a faraway place or anything like that," *id.* at 80. When asked by the government whether Officer Jagielski would choose a knife, a fist, or a gun if he wanted to kill someone, Officer Jagielski responded that he would choose a gun because it is "more lethal." *Id.* at 78. Officer Jagielski then opined that, when Thuesen was crying in the jail, it was "reminiscent of" his "three-year-old granddaughter" who will "squint their eyes and try to get out one of those big alligator tears" because "they want to cry to get sympathy so you'll feel sorry for them." *Id.* at 83. When asked whether crying and emotional numbness are "opposite ends of the spectrum," Officer Jagielski responded, "yes, sir." *Id.* at 84. To conclude cross examination, the state asked Officer Jagielski whether a "flat affect" is the same thing as a "straight face," and

whether a "straight face" could be "consistent with someone who had just done what they had planned to do." *Id.* at 85. Officer Jagielski responded "yes" to both questions. *Id.*

On redirect, rather than challenging Officer Jagielski's cross-examination by making it clear to the jury that Thuesen's "straight face" and "flat affect" perfectly track symptoms associated with a PTSD crisis, trial counsel instead asked whether "the more [people with mental health illness] are treated and the more they deal with their illness, the more they're able to pull it back when they confront [a police officer]?" *Id.* at 88. This question opened the door for Officer Jagielski to respond that "[i]t depends on the state of their mental illness. The more severe the state, in my opinion, the less ability they have to pull it back." *Id.* Trial counsel's performance fell below constitutional standards in two profound ways. First, they entirely failed to link Thuesen's post-shooting expressions and behaviors to their theories of innocence and mitigation (i.e., that Thuesen was suffering from a trio of mental health illnesses, including PTSD, at the time of the shooting and therefore did not have the requisite intent to be convicted of capital murder). Second, and perhaps most egregiously, they actively harmed their client's case by suggesting to the jury that Thuesen had been extensively treated for his mental illnesses and that his mental health crisis was not severe, as indicated by his ability to "pull [himself] back and hide [the crisis] from people." *Id.* at 87. The Court struggles to imagine a more damaging first witness for the defense in the guilt/innocence phase of a capital murder trial.

On state habeas review, Thuesen faulted his attorneys because their "guilt phase theme was that Thuesen was so mentally ill he did not have the requisite intent to be convicted of the capital murder," yet their "the first witness the defense called at guilt . . . saw nothing wrong mentally with Thuesen." (Dkt. 63-4 at 207). Thuesen continues that theme on federal review, specifying

that trial counsel could have turned that testimony in the defense's favor by saying what the officer viewed as "remorselessness" was really "PTSD recovery period and confabulations." (Dkt. 33 at 154). Thuesen argues that Officer Jagielski's testimony "falsely conveyed the impression that Mr. Thuesen was remorseless. Competent, adequately prepared counsel would have been able to use such testimony as evidence that Mr. Thuesen was experiencing a mental health crisis. " *Id.* at 153.

In the evidentiary hearing, trial counsel Esparza explained that the defense "had to call" Officer Jagielski to "steal the [prosecution's] thunder" because they would have called him as a rebuttal witness. (Dkt. 60-10 at 229). The defense did not want the jury to hear Officer Jagielski's testimony after Dr. Saunders or Dr. Carlo. Instead, Ms. Esparza explained: "I wanted to take your witnesses away from you, and I also wanted to be the one that told the whole story and wasn't afraid to tell it because he never meant to kill her. . . . He was trying to save her life." (Dkt. 60-10 at 229-30). The defense also wanted to show that Thuesen was mentally ill and remorseful.[25]

The state habeas court found that "trial counsel's performance was not deficient for calling Officer Jagielski as a witness during the guilt phase," that "[c]ounsel's strategy . . . was an objectively reasonable, strategic or tactical decision by trial counsel," and that Thuesen "had failed to prove both prongs of *Strickland*." (Dkt. 66-4 at 168). This Court finds that Thuesen has established that the state court's rejection of his claim involved an unreasonable application of

---

[25] After Officer Jagielski's testimony, the defense called Karlee Anderson, a case manager who assessed Thuesen in a mental health cell in the Brazos County Jail. Ms. Anderson described how Thuesen had "symptoms consistent with depression when he came in." (Dkt. 49-12 at 98). Ms. Anderson described how Thuesen was remorseful because "[h]e became tearful and made statements consistent with remorse." (Dkt. 49-12 at 98). The defense next followed with Officer Micah Lunt, the mental health officer who responded to Thuesen's cry for help about suicide, who described his affect as "[v]ery flat, very deflated. He just looked very, very depressed." (Dkt. 50-1 at 16). Trial counsel connected Officer Jagielski's observation of a flat affect to Officer Lunt's testimony about depression in closing arguments. (Dkt. 50-5 at 52).

clearly established federal law. Trial counsel's performance fell far below constitutional standards in their presentation of Officer Jagielski. Even if the Court were to respect that counsel made a strategic decision not to hinge their defense on PTSD alone, the discussion above demonstrates how their examination of Officer Jagielski *actively undermined* their theory that Thuesen's combination of PTSD, depression, and dependent personality disorder prevented him from forming the requisite *mens rea* to be held criminally liable for capital murder. One of counsel's proffered reasons for calling Officer Jagielski was to help rebut Ms. Foreman's testimony and show that Thuesen was mentally ill and remorseful—and yet, they accomplished the opposite. Due to what the Court can only attribute to inadequate preparations, trial counsel fumbled a clear opportunity to use Officer Jagielski's testimony to teach the jury about symptoms of PTSD and mental health crises. The jury would have heard, through the first witness in defense's case-in-chief, that Thuesen's demeanor was entirely consistent with a person in crisis. Instead, the jury was left with the following impressions about Thuesen's "flat affect": (1) that it indicated a lack of remorse, (2) that it suggested he planned the shootings and intended to kill the Joiners, and (3) that his mental health conditions are mild enough, and he has received enough treatment that, even if he had been in crisis at the time of the shooting, he was able to regain composure by the time Officer Jagielski arrived on the scene. The "strategic decision" that the state habeas court invokes to justify the trial's counsel's performance "resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations" prior to calling Officer Jagielski. *Wiggins v. Smith*, 539 U.S. 510, 526–27 (2003).

*Janet Walker*: The defense called Janet Walker as a witness in the penalty phase. Thuesen claims that trial counsel provided deficient representation by not calling her as a guilt/innocence

witness. Ms. Walker's testimony became relevant during the cross-examination of Dr. Saunders. Thuesen describes the issue as follows: "Dr. Saunders testified at the guilt/innocence phase of trial that Mr. Thuesen told his friend Janet Walker that he was so mad at Ms. Joiner that he could shoot her." (Dkt. 33 at 154). Dr. Saunders emphasized that Thuesen said he "*probably*" made a comment to Ms. Walker that he could shoot Rachel. (Dkt. 50-3 at 115-16) (emphasis added). Dr. Saunders made it clear to jurors that Thuesen was not sure he had ever said such a thing: "He said 'probably.' He wasn't for sure whether he had done that . . . ." (Dkt. 50-3 at 115-16). Dr. Saunders also explained that the context of any statement was not reflecting murderous intent, but rather common anger: "it would have been in the context of 'Gosh, I am so mad at her maybe I could kill her?' . . . I think we are all capable of that at times. I think it is a very common experience that we say, 'I am so mad I could kill him.' This is entirely opposite of everything else that he is about with respect to his relationship with Rachel." (Dkt. 50-3 at 115-16).

The defense called Ms. Walker in the penalty phase. When asked if Thuesen had ever said "he was going to shoot Rachel," Ms. Walker answered: "Never. I would have done something if he did." (Dkt. 50-7 at 63). Thuesen claims that counsel should have called her in the guilt/innocence phase to show he never said he would kill Rachel. Indeed, trial counsel could not offer a reason as to why she did not call Ms. Walker during the guilt/innocence phase and admitted that she "should have called Janet Walker back" to testify that Thuesen had not made that statement. (Dkt. 601-10 at 230).

The state habeas court observed reasons for which a reasonable attorney could choose not to call Ms. Walker after Dr. Saunders' cross-examination:

The Court finds that, had defense counsel brought Janet Walker to testify that [Thuesen] did not make the statement in question to her, she would have been cross-examined and discredited with the fact that [Thuesen] admitted to making the statement to police immediately after the offense; further, said cross-examination would have re-emphasized the statement before the jury and discredited Dr. Saunders plausible explanation/interpretation for it.

(Dkt. 66-4 at 123-24). On that basis, the state habeas court found that Thuesen failed to "prove both prongs of *Strickland*." (Dkt. 66-4 at 123-24).

The state habeas court's decision was not unreasonable. Dr. Saunders' testimony questioned whether Thuesen had ever made the statement and assured jurors it was not a plan to kill Rachel. Emphasizing that testimony by calling Ms. Walker after the presentation of the other defense witnesses would accentuate a minor concern. The Court finds that the state habeas court's rejection of this claim was not unreasonable.

### 3. Family History of Mental Illness

In his final sub-argument, Thuesen faults trial counsel for not having his mother, Patricia Thuesen, "testify about the history of mental health challenges in the Thuesen family." (Dkt. 33 at 140). The defense called Ms. Thuesen as a witness in the guilt/innocence phase. Ms. Thuesen explained the difference she noticed in Thuesen's behavior several months after he returned from war. Ms. Thuesen testified about various behaviors which solidified Dr. Saunders diagnosis of PTSD. Thuesen, however, contends that trial should have asked her questions about Thuesen's family history of mental illness.

Trial counsel moved for the trial court to allow Ms. Thuesen's testimony about his family history.[26] The State objected to her testimony on relevance grounds. Trial counsel told the trial

---

[26]     Trial counsel questioned Thuesen's mother on voir dire examination and made a proffer of what the defense

court that Thuesen's family had an "incredible, severe history of mental illness," and the evidence was relevant as Dr. Saunders considered it when assessing Thuesen's own mental health. (Dkt. 50-2 at 93). The trial court decided to wait before allowing her testimony to see if it would be relevant. (Dkt. 50-2 at 108).

Dr. Saunders testified about Thuesen's "developmental history," which included his family's history of mental illness. (Dkt. 50-3 at 50). Dr. Saunders described how family members suffered from a variety of concerns such as alcoholism, mental-illness, bi-polar disorder, homelessness, and institutionalization in a psychiatric hospital. (Dkt. 50-3 at 51-52). Dr. Saunders opined that Thuesen had "[a] genetic predisposition for these things." (Dkt. 50-3 at 52). Dr. Saunders testified that Thuesen found himself in "a 'double bind'" where "[t]here is both a genetic disposition" and "a family in which there is not a healthy way in which people can share and negotiate feeling and process the stresses of the day that they may have." (Dkt. 50-3 at 51). Thus, as summarized by the Court of Criminal Appeals, Dr. Saunders testified that "[s]everal close family members had mental illnesses, including depression and alcoholism, making it more likely that [Thuesen] would also have problems with mood and mental illness." *Thuesen*, 2014 WL 792038 at *11.

After Dr. Saunders had testified, the trial court ruled that "the testimony of Mrs. Thuesen,

---

wished to present in the guilt/innocence phase. As summarized in Thuesen's petition:

> Mrs. Thuesen's mother was an alcoholic; that Mrs. Thuesen's father did not live with the family and her visits with him were monitored by her grandmother; that Mrs. Thuesen's father showed signs of depression; that Mrs. Thuesen's brother, George, attended a state school, showed signs of depression throughout his life, and was at that time homeless and living somewhere in the Corpus Christi area; that Mrs. Thuesen's half-sister, Lisa, also showed signs of depression and had been admitted to a psychiatric hospital; that Mrs. Thuesen's daughter, Michelle, also spent time in a psychiatric hospital; and that Mrs. Thuesen's mother-in-law showed signs of depression and alcoholism.

(Dkt. 33 at 140).

the mother, regarding mental illness of her family members is now relevant and admissible." (Dkt. 50-3 at 120). Trial counsel, however, did not recall Ms. Thuesen to the stand. Thuesen argues that "any reasonable counsel would have known that it was critical to develop testimony regarding the history of mental health conditions faced by [his] family." (Dkt. 33 at 140-41).

In the state habeas hearing, trial counsel explained why the defense did not call Thuesen's mother back to testify again: "I thought about that. I just felt we had it, the history of the mental illness in front of the jury. . . . I just felt we were making such—we did such a good job of putting those people on. I just didn't want to put [Ms. Thuesen] through it again. I thought Saunders covered it." (Dkt. 60-10 at 232). On that basis, the state habeas court found "that the jury heard evidence of [Thuesen's] family history of mental illness and that trial counsel made an informed, reasonable strategic decision not to present it again through [his] mother, Patty Thuesen." (Dkt. 66-4 at 132).

The state court's decision was not unreasonable. The question of Thuesen's family history of mental illness was not directly before the jury in the guilt/innocence phase. The record indicates that trial counsel had a firm understanding of both Thuesen's family history and how that history impacted his own mental illness. Counsel elicited substantial testimony from Dr. Saunders about his family's struggles. Dr. Saunders explained how those difficulties factored into Thuesen's own mental illness. Trial counsel was prepared to call family members to bolster that testimony, but ultimately decided not to do so. The record developed in state court shows that this was a strategic decision which deserves deference. Even if trial counsel had Ms. Thuesen talk about a family history of mental illness, Dr. Saunders had already provided similar testimony. Thuesen has not shown a reasonable probability of a different result. The state habeas court's rejection of this claim

was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

**B.    *Strickland* Prong Two**

In claim one, Thuesen challenges the guilt/innocence representation provided by this trial attorneys in five separate subclaims. In the preceding section, the Court found that the state court's rejection of the following subclaims was an unreasonable application of the deficient performance prong of *Strickland*:

> (1) Thuesen's claim that trial counsel "failed to investigate and secure expert witnesses to testify at the guilt/innocence phase regarding the effects of PTSD on Mr. Thuesen, including regarding how PTSD affected his ability to form the requisite intent." (Dkt. 33 at 111).
>
> (2) Thuesen's claim that trial counsel "failed to present evidence demonstrating that Mr. Thuesen was never diagnosed with PTSD nor adequately treated for the condition." (Dkt. 33 at 128)
>
> (3) Thuesen's claim that trial counsel "failed to develop, prepare, and present testimony related to the PTSD recovery period and confabulations" (Dkt. 33 at 150) with regard to Officer Jagielski.

Each of these subclaims relates to trial counsel's handling of critical PTSD evidence. Having satisfied the first prong of *Strickland* for three of his subclaims under the doubly-deferential standard of review, the Court turns to the second prong of *Strickland*, which asks whether Thuesen suffered prejudice as a result of these instances of deficient performance by his trial counsel. To establish *Strickland* prejudice, Thuesen "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "That requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quotations omitted). Where counsel engages in multiple instances of deficient performance, as this Court has now found, the *Strickland* prejudice analysis considers whether the cumulative effect of the errors

66

creates the reasonable probability that the outcome would have been different. *See Dodson*, 611 F. App'x at 178-79.

Before turning to the cumulative effect of the errors, the Court observes that there is a reasonable probability that trial counsel's failure to call a specific PTSD expert in the guilt/innocence phase prejudiced Thuesen. Trial counsel's best case for negating Thuesen's *mens rea* at the guilt phase was to center in on how PTSD impaired his behavior. Dr. Kopel could have given jurors a clear picture of how the PTSD fight-or-flight response caused Thuesen to act. Without that specific focus, the jury received an imprecise and disarrayed understanding of what caused Thuesen to pull the trigger. A properly informed jury would have likely viewed Thuesen's intent in a much more favorable light. With the specific testimony a PTSD expert could provide, it would be unreasonable not to find a "a reasonable probability that . . . at least one juror would have harbored a reasonable doubt." *Buck v. Davis*, 580 U.S. 100, 119-20 (2017). The state habeas court was unreasonable in finding that trial counsel's failure to call a PTSD specialist did not prejudice the defense.

When analyzed in isolation, the other individual instances of deficient performance may not have prejudiced Thuesen. However, viewing them together throws into sharp relief the reasonable probability that, but for counsel's errors, Thuesen would not have been found capable of possessing the *mens rea* necessary to hold him culpable for capital murder. Trial counsel undermined their client's case at multiple turns: they delayed developing evidence relating to Thuesen's PTSD until a few weeks before trial, they rejected the advice of multiple consultants to call a PTSD expert, they obscured critical information about VA system's failure to diagnose his PTSD and provide him an appropriate level of care, they failed to show the jury how Thuesen's

expressions and behaviors post-shooting were textbook symptoms of PTSD and a mental health crisis, and they actively decided to call as their first witness a peace officer who testified that Thuesen was not experiencing a mental health crisis.

The Court finds that the state habeas court was unreasonable when deciding that (1) there was not a reasonable probability that the jury would have found no *mens rea* based on an PTSD specialist's testimony, (2) not assessing whether the cumulative effect of all the deficiencies at the guilt/innocence phase was sufficient to prejudice Thuesen and render the verdict unreliable, and (3) finding that there was *not* a reasonable probability of a different outcome.

### C.     Conclusion

For the forgoing reasons, the Court concludes that the state habeas court's denial of Thuesen's guilt/innocent phase ineffective assistance of counsel claim was based on an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d)(1). Accordingly, the Court denies Respondent's Motion for Summary Judgment as to Thuesen's first claim.

## II.     Ineffective Assistance of Counsel in the Penalty Phase (Claim Two)

Before trial began, defense counsel planned to call several lay witnesses, and then an expert, at the end of the penalty phase. (Dkt. 60-10 at 176). The plan was to conclude the penalty phase with testimony about Thuesen's PTSD and "link it all together" for the jury. (Dkt. 60-10 at 176). In the end, trial counsel presented testimony of Thuesen's teachers, friends, supervisors, family members, coworkers, and jail staff who interacted with Thuesen in jail. *Thuesen*, 2014 WL 792038, at *11-12. These individuals spoke about Thuesen's family background, childhood, admirable qualities, good works, and ability to function well in a highly structured setting. *Id.* Marines who served with Thuesen spoke to their experiences in Iraq and the lasting impact those

experiences had. *Id.* Lastly, Thuesen's family and friends spoke to changes they observed when he returned from Iraq, including being extremely needy and depressed and exhibiting PTSD symptoms such as a startle response, hypervigilance and paranoia in crowds, and nightmares. *Id.* Following this lay witness testimony, trial counsel abandoned its original plan, electing not to introduce any expert testimony in the punishment phase. (Dkt. 60-10 at 176).

Thuesen now challenges trial counsel's punishment-phase representation. Thuesen says his attorneys should have presented expert testimony about PTSD, called expert witnesses to prove he would not be a future societal danger, impeached one of the State's witnesses, and objected during the State's closing argument. The state habeas court concluded that each of Thuesen's proposed points of attorney error failed to clear *Strickland*'s two prongs.

## A. *Strickland* Prong One

### 1. PTSD

Thuesen's first argument contends that trial counsel failed to present "argument or evidence regarding PTSD's effect on Mr. Thuesen's behavior" during the punishment phase. (Dkt. 33 at 163). "Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines . . . ." *Porter v. McCollum*, 558 U.S. 30, 43 (2009). The mitigating value in a veteran's honorable service "under extreme hardship and gruesome conditions" can be exponentially compounded by "the intense stress and mental and emotional toll that combat took on [him]." *Id.* at 43-44. Thuesen's deep mental wounds from experiencing the horrors of war would be a profoundly mitigating factor for the jurors' consideration.

Thuesen says that trial counsel should have "secure[d] a PTSD expert who would actually testify about how the condition affected Mr. Thuesen's behavior and his culpability" and "call[ed] available witnesses or meaningfully review[ed] critical evidence related to . . . PTSD and how it affected his behavior." *Id.* At the conclusion of the guilt/innocence phase, Dr. Kopel was the only expert trial counsel considered calling for the penalty phase, as counsel had elected to put on Dr. Saunders during the guilt/innocent phase instead of the punishment phase and had decided not to put on Dr. Detweiler altogether. (Dkt. 60-10 at ¶ 176).

The state habeas court reasoned that trial counsel's failure to introduce expert testimony about PTSD at the punishment phase amounted to "sound trial strategy." (Dkt. 66-4 at ¶ 75). Specifically, it explained that Dr. Kopel's testimony "that PTSD caused [Thuesen] to be 'on fight-or-flight automatic pilot after Rachel tried to run away, would have alienated a jury, made [Thuesen] out to be a ticking time bomb and discredited any remaining defensive theory." *Id.* at ¶ 75. Further, the state habeas court reasoned that "counsel did not want to allow the State to relive the whole crime again for jury." *Id.* For the reasons that follow, the Court concludes that the state habeas court's decision was an unreasonable application of law.

At the punishment phase, it was clear that PTSD was of central importance to Thuesen's case. Trial counsel's initial strategy was reportedly to "front-load" mitigation evidence by introducing it at the guilt/innocent stage in order to "gain a foothold . . . with the jury." (Dkt. 60-7 at 138-39). However, for the reasons explained in "Analysis" section I.B.1., *supra*, counsel's decision not to put on a PTSD expert in the guilt/innocence phase amounted to constitutionally deficient performance. Here, too, trusting that the jury remained swayed by their recollection of the necessarily incomplete guilt/innocence testimony of a non-PTSD expert at the penalty phase

was constitutionally deficient. Even if the "front-loading" strategy had initially been a sound decision, it crumbled when the jury rendered a guilty verdict. At that point, it was clear that the jury had discounted the most critical portion of Dr. Saunders' testimony—that is, his opinion that Thuesen's PTSD prevented him from forming the requisite intent to be found guilty. Nevertheless, trial counsel decided not to put on a single expert to speak about PTSD during the punishment phase.

As stated above, as trial preparation progressed, the only PTSD expert trial counsel considered having testify was Dr. Kopel. Trial counsel contacted Dr. Kopel in late April 2010— two weeks before Thuesen's trial was set to begin—and provided him with records to review so that he could assess how PTSD impacted Thuesen's case and testify during the punishment phase. (Dkt. 33-31 at ¶¶ 6-7). Trial counsel "never prepared" Dr. Kopel for his testimony and never informed him "specifically what they wanted [him] to testify to." *Id.* at ¶ 11. Then, the day before Dr. Kopel was scheduled to testify, trial counsel "called [Dr. Kopel] and said that the defense had decided not to call [him] as a witness." *Id.* at ¶ 10. As reflected in the state habeas court's findings of fact, counsel elected not to call Dr. Kopel because they felt as though the case "turned a corner" after Marine Tim Rojas testified about the traumatic events that he and Thuesen experienced in Iraq. Dkt. 66-4 ¶ 65; *see id.* at 76-78 (describing Rojas' testimony). Trial counsel worried that calling Dr. Kopel would allow the State the opportunity to go "back through the murder and [make] the focus on the murder instead of our client and his suffering and his mental illness." (Dkt. 66-4 ¶ 65).

Had he testified, Dr. Kopel would have explained that he "believe[d] that Thuesen suffered from PTSD stemming from trauma he experienced while serving in Iraq with the Marine Corps

Reserves." (Dkt. 33-31 at ¶ 13). He would have testified that this belief was based upon the traumatic events Thuesen experienced and the symptoms he reported upon returning home, as evidenced in his medical records and in his family and friends' affidavits. *Id.* at ¶¶ 14-21. He would have opined that any treatment Thuesen received for his PTSD was "nominal" and "inadequate," and then described, based on his decades of experience with PTSD patients, the forms of treatment Thuesen should have received. *Id.* at ¶¶ 23, 25. Dr. Kopel would have explained precisely how Thuesen's "PTSD (and the lack of treatment for his illness) greatly contributed to Thuesen's actions leading up to and during the crime." *Id.* at ¶ 30.

Even under the requisite doubly deferential standard, this Court cannot conclude that it was reasonable for the state court to conclude that counsel's failure to call Dr. Kopel did not amount to deficient performance. By all reasonable accounts, counsel's actions did not clear *Strickland*'s performance prong. Counsel attributed its decision not to call an expert to the fact that they "thought the jury was with [the defense]" after Rojas—the Marine who served with Thuesen— testified as to the traumatic events he and Thuesen experienced in Iraq. (Dkt. 60-10 at 185). Counsel felt that Rojas' testimony, combined with the testimony of other lay witnesses, adequately put the issue of Thuesen's PTSD before the jury, and expert testimony risked "undoing" the strength of the lay witnesses' testimony. (Dkt. 60-7 at 185)

That calculation ignored the fact that the state's aggravating evidence sought to paint Thuesen as an incurably violent man. The jury did not hear any evidence of (1) the physiological impact PTSD has on an individual, including the risk of violence associated with PTSD, (2) the specific manner in which treatment can dramatically decrease the risk of violence, and (3) the fact that Thuesen, though he clearly suffered from PTSD, never received adequate treatment.

Therefore, though Rojas' testimony recounted a tragic tale, in putting Rojas before the jury, trial counsel showed the jury a man who experienced the precise events that Thuesen experienced, but who did not commit the same acts of violence when he was back home. In fact, in its cross examination, the State emphasized that Rojas and Thuesen had the same experiences in Iraq, but Rojas had found "outlets to deal with that stuff that went on in Iraq." (Dkt. 50-8 at 173). Further, lay witnesses who testified about Thuesen's PTSD symptoms only confirmed that he inevitably posed a risk of harm to those around him. Paradoxically, the state habeas court viewed lay witness testimony as to Thuesen's PTSD as a sufficient presentation of mitigating evidence but concluded that additional expert testimony on Thuesen's PTSD would have "made [Thuesen] out to be a ticking time bomb and discredited any remaining defensive theory." (Dkt. 66-4 at 81, 159-61). Without a PTSD expert's testimony painting a fuller picture of Thuesen's PTSD, his inadequate treatment, and the impact that proper treatment would likely have, Rojas and other lay witnesses' testimony was at best incomplete, and at worst could have led jurors to buy into the State's argument that Thuesen was a "ticking time bomb." *Id.* at 159.

Trial counsel also worried that cross-examination of Dr. Kopel would have returned the jury's focus back to the shootings, and/or uncovered features of borderline personality disorder. (Dkt. 60-10 at 182, 185; Dkt. 60-9 at 207). First, the risk of reminding the jury of the shootings was far outweighed by the obvious need for a PTSD expert to speak to Thuesen's PTSD and lack of treatment. *Cf. Williams*, 529 U.S. at 396 ("Of course, not all of the additional evidence was favorable to Williams. The juvenile records revealed that he had been thrice committed to the juvenile system . . . . But as the Federal District Court correctly observed, the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not

73

justified by a tactical decision."). Second, Dr. Kopel's affidavit shows that he attributed Thuesen's symptoms to PTSD, not a separate borderline personality disorder. *See generally* Dkt. 33-31. And trial counsel never prepared Dr. Kopel for his testimony or spoke with him about the specific topics of his testimony. (Dkt. 33-31 at ¶ 11). Under those circumstances, the Court views trial counsel's worries borderline personality disorder as more of "a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations." *Wiggins*, 539 U.S. at 526-27. In any event, any risk of jury bias against Thuesen's mental health struggles was already exposed by lay witnesses testifying as to Thuesen's changed affect after returning home from Iraq.

In the end, at no point during the trial did the jury hear from a single PTSD-specific expert. At no point during the penalty phase—after the record suggested that the jury did not credit Dr. Saunders' opinions on Thuesen's PTSD—did the jury hear from a single expert. All of this after, at each turn of trial preparation, trial counsel knew from their own investigation and from the advice of other attorneys that Thuesen's PTSD was the lynchpin of their case. Indeed, trial counsel acknowledged that it "should have called an expert in the end [of the penalty phase]." (Dkt. 60-10 at 184). Under the circumstances, failure to do so cannot be attributed to a competent strategic maneuver. The Court concludes that the state court unreasonably applied *Strickland*'s performance prong when it concluded otherwise.

### 2. Future Dangerousness

Texas law determines a capital defendant's sentence by asking if he will pose a future societal threat. Specifically, the first special issue asks if "there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society." (Dkt. 44-5 at 40). Thuesen alleges trial counsel failed to investigate, develop, prepare, and present

adequate evidence that he would "not pose a continuing threat of future violence in prison (assuming a sentence of life without parole)." (Dkt. 33 at 172). Thuesen's argument follows two separate lines: (1) trial counsel should have relied on expert testimony about future dangerousness through Dr. Mark Cunningham and (2) counsel should have enhanced the lay testimony about his good behavior while awaiting trial.

> a.   *Dr. Cunningham*

Dr. Mark Cunningham, "a forensic psychologist, nationally recognized for his research concerning factors that predict violence in prison and his research in capital sentencing," has testified in around 200 capital trials. *Coble v. Davis*, 728 F. App'x 297, 300 (5th Cir. 2018). Dr. Cunningham often testifies based on a Power Point presentation which explains the factors he uses to assess a capital defendant's threat in prison. (Dkt. 60-8 at 38). According to Thuesen, "[e]xpert testimony like Dr. Cunningham's would have reassured the jury that Mr. Thuesen's PTSD was not a condition that rendered him inherently and uncontrollably dangerous—or, as the State framed the issue, 'pure evil.'" (Dkt. 33 at 174).

Dr. Cunningham provided a habeas affidavit and testified in the 2014 state habeas hearing. Dr. Cunningham did not personally evaluate Thuesen. Instead, Dr. Cunningham reviewed records and used "the actuarial approach, the group statistical approach, and a past pattern approach in terms of looking at his behavior in custody pretrial as well as the educational history, service history, employment history which are all factors that link back to that group statistical data." (Dkt. 60-8 at 49). Dr. Cunningham testified that "[u]nassisted by expert testimony . . . jurors are subject to grave errors" when assessing future dangerousness. *Id.* at 41. According to Dr. Cunningham's research, "the seriousness of the offense does not predict serious violence" in prison. *Id.* at 39.

Likewise, personality disorders also do not result in an increased risk of violence in prison. *Id.* at 39-40. Applying his actuarial analysis to the circumstances in Thuesen's case, Dr. Cunningham testified that "there is a very low likelihood that [Thuesen] could commit serious acts of violence confined for life in the Texas Department of Criminal Justice." (Dkt. 60-8 at 33).[27] When the prosecutor asked about these conclusions in the evidentiary hearing, Dr. Cunningham confirmed that he considered Thuesen unlikely to commit acts of violence in prison or in the free world. *Id.* at 132, 146-47.

Trial counsel provided various reasons for not presenting testimony from Dr. Cunningham or a similar expert. Mr. Carter said that he had once "put some statistical data in front of the jury," such as that found in Dr. Cunningham's opinion, and his expert "was brutalized on cross." (Dkt. 60-7 at 146). Ms. Esparza expressed concern both about Dr. Cunningham's effectiveness and his demeanor:

> Mark Cunningham is a very nice man when you talk to him. He's really smart and all his data makes sense. But in 2010 his—in my opinion and what I heard from

---

[27]    Dr. Cunningham specifically identified nine factors that would reduce Thuesen's risk of future violence if incarcerated in general population:

- Mr. Thuesen's age;
- The fact that he had been a model inmate when awaiting trial (no disciplinary issues over 15 months);
- The level of security correctional staff provided (e.g., low given Mr. Thuesen's offense);
- Mr. Thuesen's education (high school diploma and college credits);
- Mr. Thuesen's employment history;
- Mr. Thuesen's continuing contact and relationships with family and friends;
- The fact that Mr. Thuesen would be a capital inmate serving a life term;
- The fact that Mr. Thuesen would be serving life without parole;
- The fact that Mr. Thuesen would be serving his sentence in the Texas Department of Criminal Justice.

(Dkt. 33 at 194).

other trial lawyers was that he wasn't that effective anymore because he'd testified
so much. The State had all his previous testimony, and he came across as very
professorial. That's what I was told, and that's why I wasn't going to call him.

(Dkt. 60-10 at 217).

The state habeas court rejected this claim based on trial counsel's strategic decision making
and the likely effect of Dr. Cunningham's testimony. The state habeas court found that "trial
counsel's decision not to call Cunningham at the punishment phase was sound trial strategy"
because trial counsel was already equipped testimony that Thuesen "had been a model prisoner,
which speaks to the future danger issue," and trial counsel did "not have faith that juries buy into
that kind of statistical analysis, based on his prior use of such evidence." (Dkt. 66-4 at 162). The
state habeas court also explicitly endorsed trial counsel's concern that Dr. Cunningham's
demeanor would not make him a favorable witness. The state habeas court found that
"Cunningham would be perceived as arrogant by a jury." The state habeas court found that "[h]is
proposed testimony, that [Thuesen] would not be violent, notwithstanding the facts of the offense,
could offend the jury and lessen trial counsel's credibility with the finder of fact." (Dkt. 66-4 at
162).

The state habeas court's rejection of this claim was not unreasonable. Other courts have
found that Dr. Cunningham's academic actuarial approach can be unpersuasive, and even off-
putting, to jurors.[28] The prosecutor's cross-examination on habeas review revealed a familiarity

---

[28]      *See Russell v. Davis*, 2019 WL 3302719, at *20 (S.D. Tex. 2019) ("The state habeas court, however, found
Dr. Cunningham's affidavit 'unpersuasive' and his conclusions 'far-reaching' because the trial evidence directly
contradicted many of his opinions."); *Quintero v. Westbrooks*, 2017 WL 1196520, at *53 (M.D. Tenn. 2017) ("Dr.
Cunningham's transparently result-driven analysis in this case does a disservice to those mental health professionals
who strive to provide unbiased evaluations to aid juries and courts in reaching difficult decisions."); *United States v.
Bourgeois*, 2011 WL 1930684, at *60 (S.D. Tex. 2011) ("In the evidentiary hearing, Dr. Cunningham's demeanor,
even though his speech was generally of a level pitch, was consistently argumentative and condescending in tone and

with Dr. Cunningham's work and exposed weaknesses in his opinion. Cross-examination revealed that Dr. Cunningham considered only a narrow range of factors which were divorced from the crime and other incidents of violence in Thuesen's life. As shown by the State's cross-examination in the hearing, Dr. Cunningham's many years of providing similar testimony have equipped prosecutors to parry his conclusions and refute his premise before jurors. With that background, calling Dr. Cunningham as a witness would be far from a slam dunk in the penalty phase.

A capital defense attorney could conclude that Dr. Cunningham would not measurably help the defense. Thuesen has not shown that the state habeas court's rejection of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

   b.   *Lay Witnesses*

Thuesen also argues that trial counsel should have enhanced the testimony from lay witnesses about Thuesen's future threat. During the penalty phase, trial counsel called witnesses to convince jurors that Thuesen would not be violent in prison. In particular, three witnesses described Thuesen's behavior while incarcerated before trial:

- *Sergeant Wright*, a Brazos County Sheriff's Office employee who worked in the medical division, testified that Thuesen had responded "very well" to the structured environment of jail. (Dkt. 50-8 at 7). Sergeant Wright described Thuesen as "very respectful, very calm." *Id.* She also testified that he did not have any issues with the female guards or nursing staff. *Id.* at 6-7.

- *Officer Zavala*, a jailor with the Brazos County Sheriff's Office, testified that Thuesen "has been an inmate that always complied with the orders given. Never had any incident reports." *Id.* at 126. Officer Zavala affirmed that he would feel "comfortable describing him as a model prisoner." *Id.*

---

facial expression. Dr. Cunningham openly showed scorn, both in his physical manifestation and his substantive testimony, for the defense's case at trial. He did not appear as an impartial scientific expert, but as someone seeking to advance an agenda."); *Hall v. Quarterman*, 2009 WL 612559, at *42 (N.D. Tex. 2009) (stating that Dr. Cunningham "impressed the court as serving more as [an] advocate[] on behalf of Hall that he should not be executed than as objective witnesses").

- *Jenny Jones*, a pastor at St. John Lutheran Church in Bellville, met Thuesen after his service in Iraq. Pastor Jones and her husband who was a fellow pastor visited Thuesen in jail monthly while he awaited trial. *Id.* at 80. Pastor Jones explained that Thuesen "always seemed very focused," "always very prepared with the Bible study materials," and spoke about how he "often would be available for other inmates who had questions about the Bible or just questions about their life." *Id.* "They were having a hard time, and [Thuesen] would take the time to listen and to try to help the best he could." *Id.* Pastor Jones described Thuesen as "always very forthright about what he was feeling and thinking; always very humble, willing to listen and to learn." *Id.* She believed that Thuesen needed "grief counseling" and would be "for a long time grieving." *Id.* at 81.

Thuesen faults trial counsel for not putting on a more-robust case that he would not be violent in prison. Specifically, Thuesen claims that trial counsel should have called John F. Stetter as a witness and taken greater advantage of Officer Zavala:

- *Officer Stetter* provided an affidavit describing his interaction with Thuesen while incarcerated in the Brazos County jail. (Dkt. 61-2 at 196-99). Officer Stetter described how Thuesen "was very, very reserved, almost isolated" while in jail. (Dkt. 60-7 at 208, 210). Thuesen was housed in a crowded dorm but was "never an issue either for . . . the detention officers, or . . . with any other inmates." (Dkt. 60-7 at 208). Officer Stetter stated that, while other inmates were violent, Thuesen "never did anything to bring himself to [the officers'] attention in a negative way." (Dkt. 60-7 at 208). Even though he was "profoundly depressed," Thuesen was "very consistent" in that "he did not cause any problems." (Dkt. 60-7 at 214). Officer Stetter said that he did not think that Thuesen would be a threat to other inmates. (Dkt. 60-7 at 215).

- *Officer Zavala* provided an affidavit on state habeas review. Officer Zavala explained that, in addition to his trial testimony, he could have testified that Thuesen "did well in a structured environment." In fact, Thuesen "was a positive influence on the others in the tank" and he assumed a "role . . . help[ing] others" and "was unselfish." Thuesen had "common courtesy." Officer Zavala explained that he never "was in fear of [Thuesen] and could have turned [his] back on [Thuesen] without consequence." (Dkt. 33-62 at 2-3).

The state habeas court found that "Stetter's proposed testimony, that [Thuesen] was a model prisoner, is not materially different from that testified by Wright or Zavala" and, accordingly, "counsel's performance was not deficient for failing to call Stetter; nor has [Thuesen]

shown how he was harmed." (Dkt. 66-4 at 162). Similarly, the state habeas court found that the account in Officer Zavala's affidavit "is not materially different from that testified by Wright or [J]enny Jones" and thus he had not shown *Strickland* deficient performance or prejudice. (Dkt. 66-4 at 162).

"[A]ny ineffective assistance claim 'must falter where the evidence to be discovered is so similar and cumulative that failure to find and present it would not prejudice the result.'" *Trottie v. Stephens*, 720 F.3d 231, 246 (5th Cir. 2013) (quoting *Skinner v. Quarterman*, 528 F.3d 336, 345 n.11 (5th Cir. 2008)); *see also Howard v. Davis*, 959 F.3d 168, 173 (5th Cir. 2020) ("Cumulative testimony generally cannot be the basis" of an ineffective assistance of counsel claim.). Trial counsel called witnesses who testified about Thuesen's non-violent behavior while awaiting trial. The trial witnesses allowed jurors to understand that Thuesen was respectful, well-behaved, and helpful to other prisoners. Thuesen's state habeas evidence shows that counsel could have expanded on those themes, but he does not rely on any information that differs in any material way from what counsel presented. "A plea for 'more of the same' does not . . . show that counsel "were not functioning as counsel guaranteed to [the petitioner] by the Sixth Amendment." *United States v. Bernard*, 762 F.3d 467, 476 (5th Cir. 2014) (citing *Strickland*, 466 U.S. at 687). The state habeas court was not unreasonable in finding no *Strickland* deficient performance or prejudice regarding this claim.

### 3.     Impeach Witness Testimony

Thuesen faults trial counsel for not calling witnesses to impeach the testimony of prosecution witness Amanda ("Mandy") Ward. Ms. Ward dated Thuesen while in high school. The prosecution called Ms. Ward to prove that Thuesen's "conduct in his romantic relationships

had grown progressively more violent and dangerous over time, with [Thuesen] becoming increasingly aggressive in his efforts to control, isolate, and harm his girlfriends when they made him unhappy." *Thuesen*, 2014 WL 792038, at *11. Ms. Ward testified about one specific incident on the night she broke up with Thuesen. The Court of Criminal Appeals summarized Ms. Ward's testimony on direct appeal:

> Amanda Ward, [Thuesen's] ex-girlfriend from high school, testified that in 2001, [he] became jealous and angry when she talked to another boy at a party. His behavior on that occasion frightened her, and as a result, she told him that she did not want a boyfriend. However, he did not want to break up, and he kept trying to contact her.

> *Id*.

The defense reserved the cross-examination of Ms. Ward.[29] The defense did not recall Ms. Ward to the stand or call any witnesses to rebut her testimony. The closing arguments of both Thuesen's trial attorneys addressed why the defense did not strongly challenge Ms. Ward's testimony. Mr. Carter explained that he did not impeach the testimony of Ms. Ward because Thuesen was a sixteen-year-old who "had been drinking that night. One night. Didn't bother her again. One night." (Dkt. 50-10 at 60). Ms. Esparza told jurors:

> . . . I want to just respond to a few things he told you. In the Mandy Ward incident, there was a 15- and 16-year-old teenager at a party that got drunk, and went out to her car, and then got in his car and left. There was no violence. That is why we are not addressing that issue. There was no violence. No one ever heard about this incident, no one ever knew about it, no one ever responded. The girl didn't even wake up her parents.

(Dkt. 50-10 at 33). Thuesen's state habeas application faulted his trial attorneys for not

---

[29]   Trial counsel asked the trial court to defer their cross-examination of Ms. Ward until another day. The defense explained to the trial court that the defense investigator had contacted a witness, Hailey McDowell, whose testimony was "not consistent." (Dkt. 50-6 at 50). Ms. McDowell, however, was giving the defense "a lot of trouble" and was "she [was] not allowing [them] to serve her." (Dkt. 50-6 at 50).

81

impeaching Ms. Ward's testimony. Thuesen based his argument on affidavits from three people who would have provided testimony about the high-school incident. As described by Thuesen, the defense "knew that three individuals present during the purported event, Haley McDowell, Jimmy Kleimann, and Ms. Ward's mother, could call Ms. Ward's testimony into question. None remembered the angry, obsessive Mr. Thuesen that Ms. Ward described." (Dkt. 33 at 182).[30]

In the 2010 evidentiary hearing, Ms. Esparza explained the decision not to recall Ms. Ward for cross-examination: "Mandy Ward did a very bad job. You had a lot of trouble with her. She wouldn't cooperate. She—you couldn't drag everything out of her, and I didn't want to give anybody a second shot." (Dkt. 60-10 at 224). The defense found her to be problematic: "She and her little friends were like little teenagers still, and they could be quite uncooperative." (Dkt. 60-10 at 225). Counsel decided that the defense would be "better off just leav[ing] her alone, better off leaving her alone." (Dkt. 60-10 at 224). The defense's strategy was "to ignore her" because her testimony described a "teenager knocking on a window saying let's sneak out together." (Dkt. 60-10 at 225). The defense knew that Ms. Ward "did have inconsistencies in her testimony between all these statements she gave to everybody," but the defense decided that her testimony was "minor compared to what [Thuesen did] post Iraq." (Dkt. 60-10 at 225).

The state habeas court recommended that the Court of Criminal Appeals deny relief on this claim. The state habeas court made specific factual findings discounting the value of Thuesen's habeas affidavits. The state habeas court found that Thuesen's three witnesses testified that they did not remember the "Mandy Ward incident," but that "does not mean that it did not happen."

---

[30]    Thuesen also argued that his attorneys should have impeached Ms. Ward's testimony with records from her deferred-adjudication community supervision for cocaine possession. The state habeas court, however, found that Texas law prohibited the defense from impeaching Ms. Ward with her criminal history. (Dkt. 66-4 at 92).

(Dkt. 66-4 at 89). The state habeas court also found that the affiants would not have impeached Ms. Ward's testimony. (Dkt. 66-4 at 89-90). With that background, the state habeas court found that Thuesen had not shown *Strickland* deficient performance or actual prejudice:

> The Court finds that trial counsel's reasons for not impeaching Amanda Ward's testimony were based on reasonable trial strategy. Counsel was able to effectively argue that "the Amanda Ward incident, there was a 15- and 16-year-old teenager at a party that got drunk, and went out to her car, and then got in his car and left. There was no violence." Moreover, a review of the proposed testimony of witnesses that [Thuesen] claims should have been called show that their testimony would not have impeached Amanda Ward. [Thuesen] has failed to prove both prongs of *Strickland*.

(Dkt. 66-4 at 65).

On federal review, Thuesen renews his argument that trial counsel should have impeached Ms. Ward with testimony from others about the high-school incident. Thuesen does not show that the state habeas court was unreasonable in crediting counsel's efforts to investigate Ms. Ward's testimony, decision not to cross-examine her, choice not to call witnesses to rebut her account, and approach toward dismissing her testimony in closing arguments. Thuesen's witnesses do not contradict Ms. Ward's testimony. Thuesen's affiants only say that they do not remember the events she described, which does not mean that they did not happen. Even so, trial counsel weighed the value of aggressively challenging Ms. Ward's testimony and strategically decided against it. Reviewing courts must defer to that decision, and much more so when placed into the AEDPA context. Thuesen has not shown that the state court was unreasonable in deciding that he had not shown *Strickland* deficient performance or actual prejudice regarding Ms. Ward's testimony.

### 4.    State's Improper Closing Argument

Thuesen also submits that trial counsel erred when it failed to object to the prosecution's allegedly improper comments during closing arguments. The defense had used its closing

arguments to explain how PTSD was a mitigating factor. (Dkt. 50-3 at 38). The prosecutor

challenged the defense's reliance on PTSD. Trial counsel did not object when the prosecutor said:

> The Marine Corps. I really want you-all to understand that there is nothing that we
> are taking away from service to this country. That is not the argument here.
>
> Because let me tell you a story. My stepfather fought in the Battle of the Bulge. His
> friends and comrades were dying left and right of him as they were there. And years
> later as we're sitting on the porch after dinner, a gunshot goes off. We all think it is
> nothing. He knows, he yells for all of us to get down, get inside. That's PTSD. He
> tried to protect us. And even though we didn't believe him, we later found out he
> was right.
>
> (Dkt. 50-10 at 82–84).

Thuesen contends that the "Battle of the Bulge" story amounted to improper argument

because "[t]he prosecutor offered the jury his personal opinion regarding what constitutes PTSD,

. . . impermissibly introduced new evidence[,] and planted seeds of doubt in the jury's mind

regarding the 'legitimacy' of [his] PTSD and how it manifested." (Dkt. 33 at 187). Thuesen also

argues that "the State's comments during closing—characterizing PTSD as limited to a reaction to

a perceived gunshot—limited PTSD to a startle response and, as a result, undermined [his]

mitigation evidence." (Dkt. 33 at 186).

The state habeas court found no constitutional error. It explained that "the prosecutor did

not offer the jury his own opinion of what constituted PTSD. Instead, the prosecutor's argument

was a (1) summation of the evidence and (2) a reasonable deduction from that evidence—that

[Thuesen] did not suffer from flashbacks, a symptom of PTSD, at the time of the offense." (Dkt.

66-4 at 170). The state habeas court found that "the prosecutor's argument . . . was addressing

Special Issue Number 2 (mitigation), to focus the jury on the overwhelming evidence of

petitioner's propensity for violence and that the lack of any 'mitigating evidence' in the record

worthy of the name." (Dkt. 66-4 at 170). On that basis, the state habeas court found that Thuesen "ha[d] not met his burden to prove trial counsel's failure to object fell below an objective standard of reasonableness." (Dkt. 66-4 at 170).

Under Texas law, "[t]he approved general areas of argument are: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) plea for law enforcement." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); *see also McFarland v. State*, 989 S.W.2d 749, 751 (Tex. Crim. App. 1999). In this case, the prosecutor's statements were not a summation of the evidence, nor were they a reasonable deduction from the evidence. They included a description of a different veteran's experience of PTSD. That amounts to new evidence improperly made in a closing argument. *See Freeman v. State*, 340 S.W.3d 717, 728 (Tex.Crim.App.2011) ("Improper references to facts that are neither in evidence nor inferable from the evidence are generally designed to arouse the passion and prejudice of the jury and, as such, are inappropriate."); *Wilson v. State*, No. 13-05-719-CR, 2007 WL 2389596, at *1 (Tex. App. Aug. 23, 2007) (explaining that, while counsel "is generally afforded wide latitude in drawing inferences from the record" that are "reasonable and offered in good faith," a prosecutor "cannot use closing argument to place matters before the jury that are outside the record and prejudicial to the accused").

A trial attorney, however, is not obligated to object each time the prosecution strays from the approved areas for summation. At times, "[a] decision not to object to a closing argument is a matter of trial strategy," and, in such instances, courts afford those decisions great deference. *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992); *see also Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992). "Since an objection may tend to emphasize a particular remark to an otherwise oblivious

jury, the effect of objection may be more prejudicial than the original remarks." *Walker v. United States*, 433 F.2d 306, 307 (5th Cir. 1970).

Here, however, counsel did not make a strategic decision to be silent. In the first evidentiary hearing, trial counsel expressed: "Sometimes [its] just better not to object. Sometimes I think—I hate to say that, in that sometimes I think there're things that . . . may be objectionable but I don't think it's worth objecting to because of the impact it may have on the jury." (Dkt. 60-7 at 171). But trial counsel stated: "I just can't remember what I was thinking" but "[i]n hindsight" he said, "I think I should have objected to that." *Id.*; *see also* Dkt. 60-7 at 235 ("I should have objected.").

All in all, the prosecutor's injection of new and prejudicial evidence into closing arguments was plainly improper. And trial counsel's failure to object cannot be attributed to sound trial strategy. Thus, it was unreasonable for the state habeas court to conclude that trial counsel's failure to object did not amount to deficient performance.

### B. *Strickland* Prong Two

The state habeas court concluded that each of the errors Thuesen highlights did not clear *Strickland*'s prejudice prong. The Court has already held that the state habeas court reasonably applied federal law when it held that it did not prejudice Thuesen when trial counsel failed to (1) call additional witnesses to prove Thuesen would not be a future societal danger and (2) impeach Amanda Ward's testimony. However, the state habeas court *did* apply federal law in an unreasonable manner when it concluded that the remaining errors—that is, trial counsel's failure to call a PTSD expert at the punishment phase and failure to object to the State's closing argument—were not prejudicial. These errors are properly assessed cumulatively. *Dodson*, 611 F. App'x at 178-79. However, even taking each error on its own, it is unreasonable to conclude that,

86

absent the errors, there is no reasonable probability that the "the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

Beginning with counsel's failure to introduce PTSD expert testimony, Thuesen argues that, "[b]ecause trial counsel did not arm the jury with sufficient information to connect PTSD to mitigation or to place the State's 'aggravating' evidence in its proper context, trial counsel's deficient performance prejudiced [his] punishment phase defense." (Dkt. 33 at 186). The state habeas court concluded that any additional testimony Thuesen contends should have been presented at the punishment phase did "not differ in both strength and subject matter from the evidence actually presented at punishment" and was therefore non-prejudicial, "cumulative mitigation evidence." (Dkt. 66-4 at ¶ 37). This conclusion was unreasonable. As already discussed at length, the jury did not hear from a PTSD-specific expert at any point during the trial. Also, as previously discussed, Dr. Kopel's proffered testimony was not cumulative—it would have differed from Dr. Saunders' testimony, and other witnesses' testimony, in significant ways. It would have provided the jury with a much-needed understanding of Thuesen's PTSD, the so-far inadequate treatment of his PTSD, and how proper treatment could reduce his risk of violence in the future. Such an understanding would have directly undercut the State's aggravation arguments and could have reasonably led the jury to determine that a death sentence was not appropriate. Indeed, expert testimony in the area of a capital defendant's mitigating mental disorder has been shown to significantly influence juries at the punishment phase. *See* John H. Montgomery, DO, J. Richard Ciccone, MD, Stephen P. Garvey, JD, and Theodore Eisenberg, JD, *Expert Testimony in Capital Sentencing: Juror Responses*, 33 J. AM. ACAD. PSYCHIATRY LAW 509-18 (2005). The state habeas courts' conclusion that trial counsel's failure to put on this testimony was not prejudicial was an

unreasonable application of federal law.

With respect to trial counsel's failure to object to the prosecutor's closing statement, the state habeas court found that the effect of the prosecutor's comments "was not severe. Instead, the remark covered "a brief story about the stepfather's flashback episode, which was tied in with testimony of [another witness'] flashback episode." *Id.* at 170-71. The state habeas court elaborated that the trial court "had instructed the jury, at the beginning of trial, that closing arguments were not evidence," "the evidence of guilt was overwhelming," and "[a]t punishment, the jury heard more evidence of [Thuesen's] violent nature, which supported the sentence of death." (Dkt. 66-4 at 172). The state habeas court "conclude[d] that the prosecutor's statements were not extreme or manifestly improper or injected new and harmful facts into the trial, in light of the record as a whole. Consequently, [Thuesen] ha[d] not argued, nor can he prove, how he was harmed." (Dkt. 66-4 at 173) (quotation omitted).

Given the point at which the prosecutor's statements occurred, and their direct bearing on such an important issue at the punishment phase, the Court concludes that this assessment of *Strickland* prejudice was unreasonable. *Strickland* prejudice "is a probability sufficient to undermine confidence in the outcome," and can be met "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." 466 U.S. at 694. Differently put, *Strickland* prejudice is met if there is a reasonable chance counsels errors changed the outcome, even if it appears more likely than not that those errors did *not* change the outcome.

The state habeas court appreciated that the jury's understanding of Thuesen's PTSD was pivotal to the defensive strategy. *See, e.g.*, Dkt. 66-4 at ¶ 12. The prosecutor's statements, which directly contradicted the defense's punishment-phase PTSD arguments, were some of the very last

words the jury heard before its deliberations. *See* Dkt. 50-10 at 82-89, 92. Further, only minutes

after the prosecutor spoke at length about what is "not PTSD," he made a brief statement about the

legal standard applicable to mitigating evidence, to which trial counsel objected. *Id.* at 84. Thus,

trial counsel's actions could have reasonably left the jurors with the impression that the

prosecutor's statements regarding PTSD were not objectionable, directly before they convened to

determine whether Thuesen should be sentenced to death.[31]

Taken together, counsel's two errors undoubtedly prejudiced Thuesen. Trial counsel's

failure to call Dr. Kopel at the punishment phase meant that the only expert testimony the jury

heard in the entire trial came from a non-PTSD specialist, Dr. Saunders. Dr. Saunders minimized

Thuesen's PTSD by noting his incorrect assumption that all PTSD patients experience flashbacks

and hallucinations and explaining that Thuesen did not experience those symptoms. (Dkt. 33-31

¶¶ 43, 45). Because they did not hear from Dr. Kopel, the jury did not hear that (1) in fact, not all

PTSD patients experience flashbacks and hallucinations, and, (2) in any event, the record in fact

reflects that Thuesen experienced flashbacks. *Id.* at ¶¶ 44-45. The prosecutor's closing argument

built upon this deficiency in Dr. Saunders' testimony, by describing a veteran who *did* experience

flashbacks, and opining to the jury that *that* veteran, unlike Thuesen, experienced PTSD. Taken

together, no reasonable juror could conclude that trial counsel's errors do not have a reasonable

probability of undermining confidence in the outcome. *See Anaya v. Lumpkin*, 976 F.3d 545, 554

(5th Cir. 2020). Thus, even under AEDPA's "doubly" deferential standard, *see Richter*, 562 U.S.

---

[31] The fact that the trial judge "had instructed the jury, at the beginning of trial, that closing arguments were not evidence" does not undermine this conclusion. (Dkt. 66-4 at 172). This instruction came weeks before closing arguments of the punishment phase. *Id.* at ¶¶ 1–2. Therefore, there remains a reasonable possibility that the jury considered the prosecutor's improper statements in its deliberations.

at 105, the state court's conclusion that trial counsel's errors did not prejudice Thuesen was unreasonable.

### C. Conclusion

All in all, the state habeas court's determination that Thuesen's punishment phase ineffective assistance of counsel claim should be denied was based on an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d)(1). Accordingly, the Court denies Respondent's Motion for Summary Judgment as to claim two.

### III.   Due Process in the State Habeas Process (Claim Three)

Thuesen next argues that the irregularities in his state habeas proceedings should result in federal habeas relief. To summarize, Judge Bryan presided over the trial, the sentencing, and the initial steps of the state habeas process. Judge Bryan signed an order voluntarily recusing himself but withdrew that order when the State consented to him presiding over the case. After a five-day evidentiary hearing, Judge Bryan signed a recommendation that the Court of Criminal Appeals grant a new penalty phase based on deficiencies in trial counsel's representation. The State then "reneg[ed] on its previous consent" and complained to the Court of Criminal Appeals about Judge Bryan's oversight of the case. (Dkt. 33 at 191). The Court of Criminal Appeals remanded case for assignment to a new judge and a re-do of the habeas process.

Judge Langley presided over the second habeas evidentiary hearing which eventually resulted in the denial of Thuesen's state habeas application. Thuesen argues "[t]hat decision was akin to allowing the State to charge Mr. Thuesen a second time for the same conduct, and effectively denied [him] the right to appear before a neutral arbitrator, enshrined in the Due Process clauses of the Fifth and Fourteenth Amendments." (Dkt. 33 at 191-92). Based on those anomalies

in the state habeas process, Thuesen asks the Court to give action to Judge Bryan's first recommendation and order a new trial.

Thuesen did not exhaust this claim in state court. Thuesen says, however, that he does not have to because "[a] state remedy is not available with respect to this claim." (Dkt. 33 at 201) (citing 28 U.S.C. § 2254(c)). Thuesen alternatively argues that he can overcome any procedural bar of this claim.

AEDPA allows for the denial of an unexhausted habeas claim when it conclusively lacks merit. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). It is hornbook law that irregularities and infirmities in the state habeas process do not provide grounds for federal habeas relief. *See Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992). A petitioner's attack on a state post-conviction proceeding "is an attack on a proceeding collateral to the detention and not the detention itself." *Millard v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987); *see also Nichols*, 69 F.3d at 1275 ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself." (cleaned up)). Despite the obvious unfairness of the State's about-face after Judge Bryan found in Thuesen's favor, this Court lacks authority to give redress to Thuesen's complaints about how the state court handled his state habeas application. This claim is summarily denied.

## IV. Nature of Federal Habeas Review (Claim Four)

In his fourth ground for relief, Thuesen argues that "due to the patently unfair and

unconstitutional maneuvering by the Texas courts, the state 'process' was nothing more than an 'empty shell' and 'procedural morass' that was patently 'ineffective to protect" his rights, and "[a]s such, no deference is owed to the Texas habeas proceeding and de novo review is appropriate on this ground." (Dkt. 33 at 212). Thuesen asserts that, "[i]n fact, the due process violation was so severe that it cannot be said that Judge Langley's decision constituted a decision on the merits; *de novo* review is therefore appropriate on this basis." (Dkt. 33 at 206). This boils down to an argument that the Court owes no deference to the state court's findings and may consider Thuesen's arguments *de novo*.

As discussed above, the Court is sympathetic to the unfairness caused by this series of events. The Texas court's interpretation of its procedural rules meant that Judge Bryan's findings were without legal effect, and thus Thuesen was required to relitigate his habeas claims despite the fact that Judge Bryan found in Thuesen's favor. However, Thuesen has identified no authority indicating that this procedural irregularity entitles him to a different standard of review. Therefore, the Court will summarily deny claim four.

## V.     Restrictions on the Consideration of Mitigating Evidence (Claim Five)

Thuesen's fifth habeas claim argues that Texas law violates the Eighth and Fourteenth Amendments because its statutory definition of mitigating evidence limits what a jury may consider. On direct appeal, Thuesen objected to Texas' use of the phrase "moral blameworthiness" when describing mitigating evidence. *See* Tex. Code Crim. Pro. art. 37.071 § 2(f)(4). Thuesen asserted that Texas' definition of "mitigating evidence" allowed the jury to consider only "evidence that a juror might regard as reducing the defendant's moral blameworthiness," and required them "to disregard evidence of [his] mental illness, remorse, good character, efforts to

rehabilitate himself, and good deeds such as military service." *Thuesen*, 2014 WL 792038, at *49. The Court of Criminal Appeals denied relief and found that it "ha[d] previously rejected similar claims" challenging Texas' statutory definition of mitigating circumstances. *Id.* (citing *Coble v. State*, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010); *Russeau v. State*, 291 S.W.3d 426, 436 (Tex. Crim. App. 2009)).

The Fifth Circuit has previously rejected similar attacks on Texas' definition of mitigating evidence. *See Hummel v. Davis*, 908 F.3d 987, 994 (5th Cir. 2018); *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017); *Blue v. Thaler*, 665 F.3d 647, 666 (5th Cir. 2011); *Cantu v. Quarterman*, 341 F. App'x 55, 60-61 (5th Cir. 2009); *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007); *Jackson v. Dretke*, 181 F. App'x 400, 412-13 (5th Cir. 2006); *O'Brien v. Dretke*, 156 F. App'x 724, 735-36 (5th Cir. 2005). In doing so, the Fifth Circuit has found that the Texas definition of mitigating factors "encompasses 'virtually any mitigating evidence.'" *Roach*, 220 F. App'x at 277 (quoting *Beazley*, 242 F.3d at 260). The Supreme Court itself has used the term "moral blameworthiness" in describing what a jury considers in its mitigation inquiry. *See Schriro v. Landrigan*, 550 U.S. 465, 499 (2007); *South Carolina v. Gathers*, 490 U.S. 805, 818 (1984). "Far from rejecting the current scheme regarding mitigation, . . . the Supreme Court [has] implicitly endorsed it." *Oliver v. Quarterman*, 254 F. App'x 381, 387 (5th Cir. 2007) (analyzing *Penry v. Johnson*, 532 U.S. 782 (2001)).

Thuesen argues that, even if the trial court's instruction was not a constitutional error, the State still limited the jury's ability to consider his mitigating evidence through its closing argument. Thuesen complains that the State told jurors that Thuesen's mitigating evidence did not provide "reasons that tend to reduce your moral blameworthiness or make you less tha[n] fully

responsible." (Dkt. 33 at 221). Even so, the trial court instructed jurors about mitigating evidence in a manner consistent with federal law. Nothing in the trial court's instructions precluded the consideration of mitigating evidence as required by the Constitution. Thus, Thuesen has not shown any constitutional error.

## VI.    Constitutionality of Texas' Death Penalty Statue (Claim Six)

Thuesen's sixth claim provides eleven reasons in which Texas' capital-sentencing statute is allegedly unconstitutional. Thuesen did not exhaust most of those reasons in state court, which alone justifies their denial on federal review. Further, federal courts have repeatedly and regularly denied all of the challenges Thuesen has made to Texas' manner of implementing capital punishment. *See, e.g., Johnson v. Lumpkin*, 2023 WL 4573535, at *6 (5th Cir. July 18, 2023); *Buntion v. Lumpkin*, 982 F.3d 945 (5th Cir. 2020); *Hummel v. Davis*, 908 F.3d 987, 994 (5th Cir. 2018); *Parr v. Thaler*, 481 F. App'x 872, 878-79 (5th Cir. 2012); *Druery v. Thaler*, 647 F.3d 535, 543-44 (5th Cir. 2011); *Jackson v. Dretke*, 181 F. App'x 400, 410-11 (5th Cir. 2006); *Granados v. Quarterman*, 455 F.3d 529, 536 (5th Cir. 2006); *Leal v. Dretke*, 428 F.3d 543, 553 (5th Cir. 2005); *Moore v. Johnson*, 225 F.3d 495, 507 (5th Cir. 2000); *Hughes v. Johnson*, 191 F.3d 607, 615–16 (5th Cir. 1999); *Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir. 1987). Thuesen has not distinguished the pervasive and binding federal precedent rejecting each of his eleven arguments. The Court denies claim six as meritless.

## VII.   Equal Protection in Executions (Claim Seven)

In his final claim, Thuesen argues that Texas' capital sentencing structure is "impermissibly tilted toward applying the death penalty to defendants suffering from mental health disorders at the time they committed a death-eligible crime, compared to those defendants who

94

were not in mental health crisis when they commit death-eligible crimes." (Dkt. 22 at 231). Under

Texas law, a trial court may issue a special issue "if raised by the evidence," which asks jurors to

decide "whether the conduct of the defendant in killing the deceased was unreasonable in response

to the provocation, if any, by the deceased." Tex. Code Crim. Pro. art. 37.0711, § 2(b). Thuesen

contends that Texas law is constitutionally deficient because it does not provide instruction

"explaining that any determination of whether a defendant responded 'reasonably' to a provocation

must take into account whether the defendant suffered from an acute mental health condition."

(Dkt. 33 at 231).

This claim fails for several reasons. First, Thuesen did not raise this claim in state court.[32]

Texas' abuse-of-the-writ doctrine would preclude him from raising the claim in a successive state

habeas application. Thuesen's failure to exhaust this claim results in a federal procedural bar of its

merits. Thuesen has not made any effort to overcome this procedural bar.

Second, Thuesen fails to prove how his claim implicates the Equal Protection clause. An

individual complaining of discriminatory exercise of discretion must show that similarly situated

persons are treated dissimilarly. *See United States v. Armstrong*, 517 U.S. 456, 466-67 (1996).

Even if the Constitution required a jury instruction mandating jurors consider mental illness in

deciding the reasonableness of a response to provocation, Thuesen has not shown that he was

---

[32]     Thuesen raised a somewhat-similar claim on direct appeal under different facts and law. There, Thuesen
argued that the Eight Amendment would require jurors to answer a special issue which would exempt him from a
death sentence because of mental illness. The Court of Criminal Appeals found that Thuesen "was free to urge the
jury to give his mental illness determinative mitigating value, but he was not entitled to a jury instruction that it *must*.
Unlike [intellectual disability] or juvenile status, mental illness does not serve to categorically prohibit imposition of
the death penalty. It is but one of many potential mitigating circumstances for the consideration of the finder of fact."
*Thuesen*, 2014 WL 792038, at *48. Thuesen's claim on direct appeal is insufficient to exhaust the basis of his federal
claim.

singled out for disparate treatment.

Third, Thuesen fails to describe why the mitigation special issue itself insufficiently protects the jury's broad discretion to consider his mental illness. *See Beazley v. Johnson*, 242 F.3d at 260 ("[V]irtually any mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability' apart from its relevance to the particular concerns embodied in the Texas special issues." (quoting *Graham v. Collins*, 506 U.S. 461, 476 (1993))). Texas' mitigation special issue "allows the jury to give full effect to any and all forms of mitigating evidence" including "the evidence of mental illness." *Blue v. Thaler*, 665 F.3d 647, 667-68 (5th Cir. 2011). Thuesen has not described why the mitigation special issue was an insufficient vehicle for the jury to factor in how his mental illness may have led to the shootings.

Finally, Thuesen does not demonstrate that he would be entitled to his proposed instruction or that a reasonable attorney would request it. Thuesen's proposed instruction depends on the reasonableness of a defendant's response to "provocation" by the victim. While Thuesen asked jurors to consider his mental illness, his defense was that he "shot Rachel to keep her from leaving without talking to him, and he shot Travis to stop him from helping Rachel leave." *Thuesen*, 2014 WL 792038, at *3. Jurors may not respond favorably if asked to find provocation in the victims' attempts to flee. For those reasons, the Court will deny Thuesen's seventh claim as meritless.

## Evidentiary Development and Additional Briefing

The Court has found that claims one and two have passed through section 2254(d)(1)'s relitigation bar. But "[e]ven if a petitioner can overcome AEDPA's relitigation bar, to win habeas relief, the petitioner 'must still show, on *de novo* review, that he is in custody in violation of the constitution or laws or treaties of the United States.'" *Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir.

2023) (quoting *Langley v. Prince*, 926 F.3d 145, 156 (5th Cir. 2019)); *see also* 28 U.S.C. § 2254(a).
Thuesen asks the Court to "set a schedule for motions for fact-development, then proceed to hear
and determine the facts and grounds for relief." (Dkt. 121 at 138).

Even once a habeas petitioner has cleared the section 2254(d)(1) hurdle, they must still
show that AEDPA allows for additional factual development. *See Pinholster*, 563 U.S. at 185
("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas
relief."). Additionally, a habeas petitioner must show that an evidentiary hearing is necessary to a
full and fair adjudication of his claims. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (finding
that it is appropriate to deny an evidentiary hearing if sufficient facts exist to make an informed
decision on the merits). The Court will allow the parties to brief the need for additional factual
development in this case.

With that briefing, the parties will address whether Thuesen's remaining claims merit relief
under a *de novo* review. Thuesen must shoulder his burden of proving that he "is in custody in
violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The
parties' briefing should address whether Thuesen can meet that standard under the record as it now
stands.

## Conclusion

This case is a tragedy on all sides. Thuesen is a disturbed individual whose life bears the
scars of his honorable military service. Numerous experts have linked his violent actions to trauma
from the horrors of war.

Thuesen raises serious challenges to his conviction and sentence. The Court has thoroughly
reviewed the pleadings, the record, and the law, and has extensively considered the challenges to

Thuesen's conviction and sentence. The Court rejects any argument favoring relief which is not explicitly addressed in the comprehensive Memorandum and Order above. After this detailed review, the Court concludes that the State has not shown that Thuesen has failed to meet the standards for federal habeas relief as to portions of claims one and two. However, the Court concludes that Thuesen has not met the standards for federal habeas relief as to his remaining claims.

Accordingly, the Court **GRANTS IN PART** Respondent's Motion for Summary Judgment and **DENIES** Thuesen's petition for a writ of habeas corpus as to claims three through seven.

Thuesen will file any motion for factual development within **sixty (60) days** from the entry of this Order. Thuesen will specify what evidence he seeks to develop and how he can clear section 2254(e)(2)'s limits on federal factual development. Thuesen will also brief, within the context of the rulings within this Memorandum and Order, the merits of his remaining claims under the factual record as it now stands within a *de novo* review. Respondent will file any response within **thirty (30) days** thereafter.  Thuesen will file a reply **thirty (30)** days afterward. The parties' briefing will also address the merits of Thuesen's remaining claims under the record as it now stands.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this 31st day of March, 2024.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE