UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN DARRELL THUESEN, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CAUSE NO. 4:20-CV-0852 |
| | § | |
| | § | |
| ERIC GUERREO, Director, Texas | § | |
| Department of Criminal Justice, | § | CAPITAL HABEAS CASE |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**PETITIONER JOHN THUESEN'S REPLY**

**IN FURTHER SUPPORT OF HABEAS RELIEF UPON *DE NOVO* REVIEW**

MAUREEN FRANCO
FEDERAL PUBLIC DEFENDER

Humphreys McGee
Assistant Federal Public Defender
Federal Defender Office
919 Congress, Suite 950
Austin, Texas 78701
737-207-3020 (tel.)
512-499-1584 (fax)
humphreys_mcgee@fd.org

Attorneys for Petitioner

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      Introduction: The Proper Standard of Review ..................................................... 1

II.     Statement of incorporation of previous arguments and of this Court's
        existing findings and conclusions. ....................................................................... 3

III.    Thuesen's counsel were ineffective for failure to present a PTSD
        expert at the guilt-innocence phase. .................................................................... 4

        A.      Thuesen has not altered his claim. ........................................................... 4

        B.      The State is incorrect on the merits. ........................................................ 8

        C.      Conclusion ............................................................................................... 11

IV.     Trial counsel's strategic decisions were unreasonable because their
        preparation and investigation were unreasonable. ........................................... 11

        A.      The record shows counsel's investigation was destined to
                produce unsound decisions. .................................................................... 12

V.      Counsel mishandled Officer Jagielski as a witness in every respect. ............ 16

VI.     Misleading the jury that Thuesen had been diagnosed and treated for
        PTSD was deficient and prejudicial. ................................................................ 21

VII.    Counsel were ineffective in the penalty phase. ............................................... 23

VIII.   Counsel failed to object to inflammatory and prejudicial closing
        argument. ........................................................................................................... 27

IX.     Conclusion ......................................................................................................... 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alejandro v. State,*
    493 S.W.2d 230 (Tex. Crim. App. 1973)..........................................................29, 30

*Anderson v. Butler,*
    858 F.2d 16 (1st Cir. 1988)..................................................................................8

*Andrew v. White,*
    145 S. Ct. 75 (2025) ..........................................................................................6

*Andrus v. Texas,*
    590 U.S. 806 (2020) ....................................................................................11, 23

*Bledsoe v. Bruce,*
    569 F.3d 1223 (10th Cir. 2009) ....................................................................10, 11

*Chaidez v. United States,*
    568 U.S. 342 (2013) ........................................................................................6, 7

*Davis v. State,*
    114 S.W. 366 (Tex. Crim. App. 1908)..................................................................30

*Dowthitt v. Johnson,*
    230 F.3d 733 (5th Cir. 2000) ..............................................................................28

*Freeman v. State,*
    340 S.W.3d 717 (Tex. Crim. App. 2011)..............................................................28

*Harrington v. Richter,*
    562 U.S. 86 (2011) ............................................................................................27

*Maupin v. State,*
    930 S.W.2d 267 (Tex. Crim. App. 1996)..............................................................29

*Miller v. Francis,*
    269 F.3d 609 (6th Cir. 2002) ..........................................................................9, 11

*Milton v. State,*
    572 S.W.3d 234 (Tex. Crim. App. 2019)..............................................................29

*Neal v. Vannoy,*
    78 F.4th 775 (5th Cir. 2023) ........................................................ 1, 2, 3

*Porter v. McCollum,*
    558 U.S. 30 (2009) ............................................................ 23, 24, 27

*Richards v. Quarterman,*
    566 F.3d 553 (5th Cir. 2009) ............................................................ 3

*Rompilla v. Beard,*
    545 U.S. 374 (2005) ..................................................................... 24

*Sears v. Upton,*
    561 U.S. 945 (2010) ................................................................. 23, 24

*Strickland v. Washington,*
    466 U.S. 668 (1984) .............................................................*passim*

*Teague v. Lane,*
    489 U.S. 288 (1989) ...................................................................... 5

*United States v. Dorr,*
    535 F.2d 117 (5th Cir. 1981) ......................................................... 30

*United States v. Garza,*
    608 F.2d 659 (5th Cir. 1979) ......................................................... 29

*United States v. Phea,*
    953 F.3d 838 (5th Cir. 2020) ..................................................... 7, 24

*United States v. Smith,*
    678 F.Supp.3d 172 (D.D.C. 2023) ................................................... 8

*Wesbrook v. State,*
    29 S.W.3d 103 (Tex. Crim. App. 2000).............................................. 29

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ....................................................... 11, 13, 21, 27

*Williams v. Taylor,*
    529 U.S.362 (2000) ....................................................... 1, 7, 15, 24

## Constitutional Provisions

Sixth Amendment ....................................................................... 8

U.S. Const. amend. VI ................................................................. 6

**Statutes**

28 U.S.C. § 2254(a) ........................................................................ 31

28 U.S.C. § 2254(d)(1) ................................................................ *passim*

28 U.S.C. § 2254(e)(1)'s ............................................................... 1, 2

## I.    INTRODUCTION: THE PROPER STANDARD OF REVIEW

The question underlying every claim before this Court is not whether Thuesen's counsel had any strategy for defending their client against the death penalty; it is whether their strategy was reasonable. The State contends that it is still "particularly relevant [that] a 'state's court's factual finding that trial counsel acted strategically is subject to Section 2254(e)(1)'s presumption of correctness and clear and convincing evidence standard.'" Dkt. 147 at 12 (quoting *Neal v. Vannoy*, 78 F.4th 775, 786 (5th Cir. 2023)). The State recites § 2254(e)(1)'s standards accurately, but it overstates the importance of those standards in this Court's *de novo* review.

Thuesen does not quibble with the state habeas court's purely factual findings that his trial counsel's decisions about presenting post-traumatic stress disorder (PTSD) in both phases of trial were, strictly speaking, "strategic" decisions. However, the State is incorrect to characterize the state court's findings on such discrete factual issues as "particularly relevant" to the claims that have survived the high standard set by 28 U.S.C. § 2254(d)(1).

Instead, in this Court's *de novo* review, the fact that trial counsel's conduct reflected some strategic consideration—or as the Fifth Circuit puts it in *Neal*, the historical fact "that trial counsel *acted* strategically"—is not relevant. *Neal*, 78 F.4th at 786 (emphasis added). The relevant question is whether trial counsel made *reasonable* or *sound* strategic decisions. *See Williams v. Taylor,* 529 U.S.362, 396 (2000); *Strickland v. Washington*, 466 U.S. 668, 689 (1984). On that question, this Court has already made up its mind on all of Thuesen's surviving claims: "the decision not to put on a PTSD expert cannot be attributed to sound trial strategy," Dkt. 123

1

at 46; "[e]ven if the Court were to respect that counsel made a strategic decision …
their examination of Officer Jagielski *actively undermined* their theory[,]" *id.* at 61;
counsel's failure to present a PTSD expert during the penalty phase "cannot be
attributed to a competent strategic maneuver," *id.* at 74; and counsel's failure to
object during the prosecution's closing argument "cannot be attributed to sound trial
strategy, *id.* at 86. *See also* Dkt. 123 at 51 ("It was not reasonable for trial counsel to
downplay the VA's lack of proper diagnosis and treatment of Thuesen's PTSD.").

The State thus misses the point when it prioritizes the state courts' factual
findings as dispositive in this Court's *de novo* review of Thuesen's *Strickland* claims.
That approach is incorrect because "the ultimate question of whether trial counsel's
decision was based on a reasonable trial strategy presents mixed questions of law and
fact[.]" *Neal*, 78 F.4th at 786.

Across seventy-three pages, the State's brief does not at any point invoke,
much less engage with, the "mixed question of law and fact" standard that governs
the Court's review. Instead, the State seeks shelter repeatedly under § 2254(e)(1)'s
umbrella of deference to state-court fact-finding, leaving out the legal question
entirely. The State is particularly emphatic on the presumptive correctness of the
state courts' findings that trial counsel were credible when they testified at the state
habeas hearing about their own strategic decision-making. *See* Dkt. 147 at 20-21, 24.
But trial counsel's credibility about what they decided and when and why they
decided it does not weigh in determining the constitutional sufficiency of their
conduct. "[C]ourts are 'not required to condone unreasonable decisions parading

2

under the umbrella of strategy[.]" *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (citation omitted).

Put another way, the State's argument covers only the factual half of the mixed inquiry required under *Strickland*; it omits "[w]hether trial counsel's conduct constituted ineffective assistance of counsel," which is "a separate, legal question[.]" *Neal*, 78 F.4th at 786. Indeed, that is the primary question at hand: now that this Court has determined that Claims One and Two survive § 2254(d)(1)'s highly deferential standard for litigating legal questions, this Court no longer defers to the state court in deciding "the ultimate question of whether trial counsel's decision was based on a *reasonable* trial strategy." *Id.* (emphasis added). This Court's *de novo* decision on that question is all that's left.[1]

## II. STATEMENT OF INCORPORATION OF PREVIOUS ARGUMENTS AND OF THIS COURT'S EXISTING FINDINGS AND CONCLUSIONS.

Thuesen stands on all substantive arguments and allegations in his amended petition (Dkt. 33), response to the motion for summary judgment (Dkt. 121), and his brief in support of habeas relief upon *de novo* review (Dkt. 131, "merits brief"). By this specific reference, Thuesen incorporates all the arguments and allegations of those previous filings here.

---

[1] The State also insists on the presumptive correctness of the state courts' findings that trial counsel called several witnesses in support of its *mens rea* theory; that those witnesses were credible; that the expert witnesses' qualifications were not questioned; and that Thuesen's PTSD was uncontroverted. Dkt. 147 at 15-16. As with the factual existence of a "strategic decision," Thuesen does not quibble with these very basic, record-based findings. Again, the important point is that none of those findings dispose of this Court's legal analysis on *de novo* review.

Thuesen respectfully suggests that the Court's existing analyses of the claims that have survived 28 U.S.C. § 2254(d)(1) are already sufficient to stand as *de novo* determinations that relief is warranted as to each of those claims. However, the State's brief in opposition warrants a reply on numerous grounds, which Thuesen discusses herein.

III.    **THUESEN'S COUNSEL WERE INEFFECTIVE FOR FAILURE TO PRESENT A PTSD EXPERT AT THE GUILT-INNOCENCE PHASE.**

In its memorandum order and opinion, the Court thoroughly analyzes the state-court record according to the standards set by *Strickland*. *See* Dkt. 123 at 41-47, 66-68. The Court has concluded that, as to the performance prong of the *Strickland* standard, "the decision not to put on a PTSD expert [to negate *mens rea*] cannot be attributed to sound trial strategy." *Id.* at 46. It has also concluded, as to *Strickland*'s prejudice prong, that without a PTSD expert's "specific focus, the jury received an imprecise and disarrayed understanding of what caused Thuesen to pull the trigger. A properly informed jury would have likely viewed Thuesen's intent in a much more favorable light." *Id.* at 67.

A.    **Thuesen has not altered his claim.**

The State begins its argument by suggesting that the "broken promises" discussion in Thuesen's initial merits brief alters his operative claim that counsel were ineffective in developing PTSD as part of his *mens rea* defense. *See* Dkt. 147 at 12-14 (referencing Dkt. 131 at 11-16). This suggestion is not well taken: Thuesen's "broken promises" argument does not change his *Strickland* claim regarding presentation of PTSD in the guilt-innocence phase.

4

As Thuesen stated in his initial merits brief, "[t]he gravamen of the claim is counsel failed to call witnesses who would deliver on their big promise about the role of PTSD on the night of the crime[.] … The witnesses they called could not speak to how PTSD rendered Thuesen unable to form the intent necessary to commit capital murder." Dkt. 131 at 13. That statement is consistent with the claim Thuesen has pled—i.e., that it was "objectively unreasonable to not prepare and present … a PTSD expert capable of testifying regarding Mr. Thuesen's diminished intent[.]" Dkt. 33 at 120 (Amended Petition ¶356). Counsel's promise in opening argument that the jury would hear evidence of "what was going on in the mind of John Thuesen" was deficient and prejudicial under *Strickland* precisely because, as the amended petition alleges, counsel "[i]nitially … did not have any PTSD expert prepared to testify at the guilt/innocence phase." *Id.* at 118; *see also* Dkt. 60-7 at 103 (testimony of trial counsel that "I wasn't specifically, when the trial began, relying on Teresa Cannon, nor Dr. Saunders, to make my case for PTSD.").

### 1.    Thuesen's "broken promises" argument presents nothing novel for a *Strickland* analysis.

The State goes on to contend that because there is "no binding Supreme Court or Fifth Circuit precedent that holds that such an abridged promise is sufficient to prove [ineffectiveness]," Thuesen's "broken promises" discussion now bars his PTSD claim under *Teague v. Lane*, 489 U.S. 288 (1989)[,]" Dkt. 147 at 13-14. The State further suggests in a footnote, presumably as an alternative to its *Teague* argument, that this Court must go back to analyze the claim anew under § 2254(d)(1), where the claim must fail. *Id.* at 14 n.3. Both of these arguments are meritless.

First, as explained immediately above, Thuesen's "broken promises" discussion introduces nothing substantively new to the claim regarding his lawyers' ineffective preparation and presentation of expert PTSD testimony in the guilt-innocence phase. Again: "[t]he gravamen of the claim is *counsel failed to call witnesses who would deliver* on their big promise about the role of PTSD on the night of the crime[.]" Dkt. 131 at 13 (emphasis added). Indeed, this Court has already made a substantively similar statement, observing that while the jury was "left … with the clear impression that Thuesen suffered from PTSD[,] … no expert provided a picture of how that diagnosis physiologically impacted Thuesen's brain and his physical response on the night of the shooting." Dkt. 123 at 42. Emphasizing the unreasonableness of counsel's promise to connect PTSD to "what was going on in the mind of John Thuesen" does not change what Thuesen has already claimed and this Court has already found. It simply spotlights an already glaring manifestation of the deficiency and prejudice that accrued from counsel's unpreparedness to produce evidence of that connection.

Second, the Supreme Court has recently stated that "[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court." *Andrew v. White*, 145 S. Ct. 75, 82 (2025). The general legal principle here, established at least since the holding in *Strickland*, is that the right to effective counsel under the Sixth Amendment requires a criminal defense lawyer to perform reasonably, in accord with existing professional norms. In fact, according to the precedent that the State offers, *Chaidez v. United States*, 568 U.S. 342 (2013),

factual variations within the *Strickland* framework rarely, if ever, create a new legal rule.

In *Chaidez*, the Supreme Court reiterated that *Strickland*'s two-part standard of objectively unreasonable performance and prejudice "'provides sufficient guidance for resolving virtually all' claims of ineffective assistance, even though their particular circumstances will differ." *Chaidez*, 568 U.S. at 348 (quoting *Williams v. Taylor,* 529 U.S. 362, 391 (2000)). As a result, "we have granted relief under *Strickland* in diverse contexts without ever suggesting that doing so required a new rule." *Id.* (citations omitted). Simply put, "garden-variety applications of the test in [*Strickland*] … do not produce new rules." *Id. See also United States v. Phea*, 953 F.3d 838, 842 (5th Cir. 2020) (stating that "the absence of directly controlling precedent does not preclude a finding of deficient performance") (citation omitted). Thuesen's "broken promises" argument presents one of those "garden-variety applications."

*Chaidez* also reiterated that courts determine objective unreasonableness under *Strickland* primarily by reference to "'prevailing professional norms.'" 568 U.S. at 348 (citation omitted). The State does not go so far as to say that a capital defense lawyer still performs within professional norms when he breaks a promise to present evidence that will reduce the defendant's culpability. Instead, the State dismisses the numerous "broken promises" cases on which Thuesen relies simply because they are from other federal circuits and districts. *See* Dkt. 147 at 13.

The "broken promises" cases Thuesen cites use an emphatic tone born of longstanding professional norms to describe the deficiency and prejudice in breaking

an opening-statement promise. *See* Dkt. 131 at 11. The First Circuit, for example, has said that "*little is more damaging* than to fail to produce important evidence that had been promised in an opening."[2] *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988) (emphasis added). The federal district court for the District of Columbia puts it more colloquially, warning that "when defense counsel promises the jury some alternative version of events and a witness to support that version, *he had better be ready* to follow through." *United States v. Smith*, 678 F.Supp.3d 172, 185 (D.D.C. 2023) (emphasis added). These are not fringe enforcements of a novel or cutting-edge standard of performance. To the contrary, these cases affirm that Thuesen's "broken promises" argument presents a fundamental deficiency in attorney performance for this Court to consider under *Strickland*.

### B.    The State is incorrect on the merits.

The State's discussion of the merits of this claim amounts to little more than an indirect disagreement with the Court's analysis. On deficient performance, the State maintains, in the face of what the Court has already found, that the evidence of PTSD was reasonably tailored to explain what Thuesen experienced psychologically at the time of the murders. On prejudice, the State simply extends its insistence that counsel performed reasonably to say that there could have been no prejudice.

---

[2] At one point, Thuesen's merits brief erroneously says that *Anderson* is a case from the Second Circuit.

### 1.    Deficient performance

The State includes a long excerpt from Dr. Saunders's trial testimony to argue that defense counsel were not "deficient in regard to allegedly failing to meet [their] promise." Dkt. 147 at 16-19. At the end of that long excerpt, the State cites a section of this Court's memorandum opinion and order, "detailing Dr. Saunders's testimony about PTSD." *Id.* at 19. The cited section includes a succinct statement of why Dr. Saunders's testimony was inadequate: "as a psychologist who does *not* specialize in PTSD, Dr. Saunders offered surface-level and generally-applicable descriptions of PTSD symptoms." Dkt. 123 at 38. The State adds that "Thuesen's assertion that counsel failed to call witnesses who would deliver on their big promise about the role of PTSD,' is patently false considering the record." *Id.* at 20. But this Court has reviewed the record and concluded that Thuesen is patently correct:

> The record is clear that trial counsel neglected to offer testimony from a qualified witness who could build the critical connections between Thuesen's military training and service, his resulting PTSD, the inadequate PTSD-specific treatment he received upon returning from Iraq, and his maladapted "fight-or-flight" response the night of the shootings.

Dkt. 123 at 42.

The State does not directly address either of these statements from the Court's memorandum opinion, nor does it offer much legal argument why any of the Court's findings do not describe deficient performance under *Strickland*. The State offers only the usual incantations of "strategy" and deference to the state habeas court's positive view of counsel's credibility—factual deference that, as explained above, is not dispositive when this Court reviews the reasonableness of counsel's performance *de*

novo. *See* Section I, above. But "the noun 'strategy' is not an accused lawyer's talisman that necessarily defeats a charge of constitutional ineffectiveness." *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2002) (citation omitted). "[T]he mere incantation of 'strategy' does not insulate attorney behavior from review." *Bledsoe v. Bruce*, 569 F.3d 1223, 1236 (10th Cir. 2009) (citation and quotation marks omitted).

### 2.    Prejudice

As for prejudice, the State's argument is conclusory, averring that "since counsel did attack mens rea through Dr. Saunders, no prejudice can be established." Dkt. 147 at 21. As shown above, Thuesen's "broken promises" argument illustrates the *Strickland* prejudice inherent in counsel's "failure to take basic steps to ensure that the jury had a specific and complete understanding of PTSD—that is, their failure to put on a single PTSD-specific expert, despite receiving advice to do so from multiple sources, including Dr. Saunders[.]" Dkt. 123 at 46; *see* Section II.A.1, above (discussing prejudice in broken-promises cases). Having given the jury the expectation that they would understand the connection between PTSD and Thuesen's actions, counsel's failure to meet those expectations with a qualified PTSD expert created a weakness that the prosecution could easily exploit. The prosecutor did exactly that when he told the jury in closing that

> [e]ven Dr. Saunders says you can have PTSD, you can have dependency issues, you can have depression, and you can still intend or knowingly commit crimes. Even he says that.

Dkt. 50-5 at 104. The prosecution was able to make this last-word impeachment because defense counsel had given the jury "surface-level and generally-applicable descriptions of PTSD symptoms[,]" Dkt. 123 at 38, instead of expert opinion "'tailored

specifically to the needs of the case.'" *Id.* at 44 (quoting *ABA Guidelines*, Guideline 10.11 cmt.).

### C.    Conclusion

The State offers nothing to re-route this Court from the exhaustive analysis it has already performed on Thuesen's claim that his counsel were ineffective in failing to present evidence that would meaningfully connect Thuesen's PTSD to his state of mind at the time of the shootings. The Court should adopt its existing analysis as its *de novo* review and grant habeas relief as to this claim.

### IV.    TRIAL COUNSEL'S STRATEGIC DECISIONS WERE UNREASONABLE BECAUSE THEIR PREPARATION AND INVESTIGATION WERE UNREASONABLE.

The genesis of trial counsel's ineffectiveness in this case was their failure to perform an investigation that would prepare them to make reasonable, informed decisions about presenting PTSD evidence to reduce Thuesen's culpability. Counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Andrus v. Texas*, 590 U.S. 806, 814 (2020) (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)); *Strickland*, 466 U.S. at 690-91 (1984). This Court has already found they failed to meet that duty. Dkt. 123 at 44.

The throughline in the State's opposition is that counsel's decisions were strategic, in furtherance of a "whole-mental-health defense." *See* Dkt. 147 at 71. But, again, "the mere incantation of 'strategy' does not insulate attorney behavior from review." *Bledsoe*, 569 F.3d at 1236; *see also Miller*, above. Indeed, this Court has

already found that counsel's articulated strategy was neither "sound" nor "tactical" based on the state habeas record. Dkt. 123 at 46-47, 54, 86.

### A. The record shows counsel's investigation was destined to produce unsound decisions.

The record leaves no doubt that counsel's investigation and preparation of the PTSD defense was a chaotic enterprise. Counsel's investigation has been detailed multiple times in these proceedings. Dkt. 33 at 95-103 (Amended Petition); Dkt. 123 at 30-35 (Memorandum and Order); Dkt. at 26-34 (Brief in Support of Habeas Relief upon *De Novo* Review). Thuesen incorporates those statements of fact by this reference. Thuesen also provides the following summary to highlight the hurried and misguided nature of counsel's investigation and to respond to the State's attempts to rationalize it.

Counsel learned shortly after their appointment that Thuesen had served in the U.S. Marine Corps, that he likely suffered from PTSD, and that PTSD would be a significant issue in the case. Dkt. 60-7 at 81 ("We knew that for a good while, yes."). Counsel hired a mitigation specialist to collect, review, and summarize records, but their strategy was to "turn him loose" and not direct or review his work. *Id.* at 54-56, 59; Dkt. 65-5 at 185. Through him, trial counsel obtained voluminous records from the VA but did not review them for nearly a year, until the months leading up to trial. Dkt. 60-7 at 192; Dkt. 65-5 at 195. A review of these records would have shown counsel that Thuesen had been consistently reporting symptoms of PTSD for approximately two and a half years prior to the crime. Dkt. 61-4 at 140, 143-46, 149-51; Dkt. 61-3 at 144-47, 159-63; Dkt. 52-6 at 36-37, 45-47, 66-68.

The State faults Thuesen now because he "does not attack the actions of this specialist but instead chastises counsel for failing to supervise him." Dkt. 147 at 30. But the State does not explain how this complaint undercuts Thuesen's legal claim. It is *counsel's* duty to investigate the case. *Wiggins*, 539 U.S. at 521-22; *ABA Guideline* 11.7(A). When counsel retains a mitigation specialist to act as their agent, it is their duty to direct and supervise the mitigation specialist's work. *ABA Guideline* 10.4(B).

The State further claims that "Thuesen doesn't specify any deficiencies flowing from that lack of supervision other than his constant complaint that counsel waited too long to review records." Dkt. 147 at 30. To the contrary, Thuesen has specified what information counsel would have obtained and why it was important. *See* Dkt. 131 at 27 and citations therein. Thuesen has further demonstrated counsel did not have the mitigation specialist speak to witnesses or hire another investigator until after they started reviewing the VA files in the months leading up to trial. *See id.* at 27-28 and citations therein. Once witnesses were finally contacted and interviewed, it became apparent that Thuesen had returned from war a fundamentally changed man—hyper vigilant, emotionally volatile, edgy, "completely different." *See* Dkt. 33 at 95-97; Dkt. 131 at 28-30.

The State also argues that Thuesen "fails to credit the lawyers with all they were doing" while the mitigation specialist was doing his work. Dkt. 147 at 30. Thuesen's trial counsel has already answered that question: he was working on other cases. Dkt. 60-7 at 38, 194-95. He did not turn his attention fully to Thuesen's case

13

until January 2010. *Id.* at 194. And he was without co-counsel until a month after that. *Id.* at 45.

It was not until one month before voir dire that counsel finally contacted a prospective PTSD expert, a general psychiatrist from Alaska who did not specialize in PTSD. Dkt. 60-7 at 87-92; Dkt. 65-5 at 188. Counsel also circled back to Dr. Saunders and asked for his opinions on Thuesen's PTSD, even though counsel knew Dr. Saunders did not specialize in PTSD. Dkt. 61-2 at 143. Dr. Saunders told them PTSD was a "significant issue germane to the case" but that he "did not consider [him]self a 'specialist' in PTSD, as [he] had not conducted research in the area." *Id.* He directed counsel to consult with a PTSD expert he knew, Dr. Kenneth Kopel. *Id.* That same month, counsel had Thuesen evaluated by a clinical neuropsychologist. Dkt. 61-2 at 149. He told counsel in no uncertain terms that Thuesen "met diagnostic criterion for PTSD." *Id.*

Still searching for a strategy, counsel then contacted an attorney colleague who specialized capital defense. He also recommended they educate the jury about PTSD. Dkt. 60-7 at 85. An email the capital defense specialist sent to counsel three days before voir dire shows that counsel still had no theory of how PTSD affected Thuesen's intent when he committed the homicides. Dkt. 61-6 at 16. That same day, counsel contacted another mental health expert who did not specialize in PTSD—this time, a family psychologist—for advice on presenting Thuesen's PTSD. This psychologist, too, told them to put on evidence of "how serious this disorder can be." Dkt. 61-2 at 262.

The State is correct that counsel "talked to, and hired, multiple mental health experts," Dkt. 147 at 31, but the State elides when those conversations occurred or what was said. And even though the State avers this "shows trial counsel's dedication to Thuesen," *id.* at 32, in fact it reveals dilatory investigation and preparation. Counsel waited almost a full year to contact the first PTSD expert. In the following few weeks, they bounced from one mental health expert to the next, none of whom specialized in PTSD but all of whom offered the same advice: to put on a PTSD expert during the guilt-innocence phase.

While voir dire was already underway, counsel finally retained Dr. Kenneth Kopel, an expert who specialized in PTSD and was recommended to counsel months prior by Dr. Saunders. Dkt. 60-9 at 140. But because of the severe time constraints created by trial counsel's delay, Dr. Kopel was not asked and did not have time to interview Thuesen. *Id.* at 213. Nevertheless, based on his review of the records, after a review of the records, Dr. Kopel believed that Thuesen suffered from untreated PTSD and Major Depressive Disorder, which ultimately negated Thuesen's *mens rea* for capital murder. *Id.* at 213, 219. Dr. Kopel was willing to testify to that, but counsel failed to prepare him for testimony and ultimately decided not to call him as a witness. *Id.* at 219.

According to the State, this "strategy" was sound. But Thuesen's argument is not, as the State puts it, that his counsel "pursued too many avenues," Dkt. 147 at 32; it is that counsel wandered without direction until they ran out of time. Any decisions about how to present a PTSD defense after such a chaotic investigation

15

could not have been reasonable because they were not informed. *Cf. (Terry) Williams v. Taylor*, 529 U.S. 362, 396 (2000) (concluding that trial counsel's failure to put on favorable evidence "was not justified by a tactical decision" even though "not all of the additional evidence was favorable to [petitioner]").

## V.    COUNSEL MISHANDLED OFFICER JAGIELSKI AS A WITNESS IN EVERY RESPECT.

Trial counsel knew, because it was recorded on videotape, that Thuesen had a flat affect after the crime. *See* Dkt. 49-12 at 60, 67-68. Trial counsel also knew they needed to present evidence that their client was suffering from a mental health crisis after the crime—because they promised the jury they would. *See id.* at 53-54.

Instead, however, counsel called, as their first witness, Officer Tom Jagielski, who was among the first responders to the crime scene. His testimony clearly suggested that Thuesen was *not* experiencing a mental health crisis. Officer Jagielski testified that Thuesen appeared mentally competent, understood the consequences of his actions, was not afraid or angry, was not experiencing delusions or seeing things, chose the most effective way to kill another person, and cried like a child to get sympathy. Dkt. 49-12 at 75-78, 83.

Officer Jagielski prefaced these damning descriptions of Thuesen's behavior by testifying—at defense counsel's behest—that he had undergone training to assist people in mental health crises, *id.* at 67-68, bolstering his credibility for the jury. At one point, the trial judge, in response to the State's objection and in the presence of the jury, instructed defense counsel to "develop" Officer Jagielski's "expertise" in detecting mental health problems. *Id.* at 67-68. Counsel did exactly that, only to elicit

from Thuesen's first witness the impression that he appeared a calm, manipulative suspect immediately after the shootings. This testimony contradicted counsels' entire PTSD theory right out of the gate. Counsel were ineffective in eliciting it.

The State contends that Thuesen's merits brief substantially alters this claim from exclusively attacking counsel's decision to call Officer Jagielski to exclusively attacking the manner in which counsel presented his testimony. Dkt. 147 at 22-23. The record shows otherwise. Thuesen's Amended Petition includes both attacks. Dkt. 153 at 137 ("There is no strategic or reasonable explanation for [trial] counsel to call a witness like Officer Jagielski … **or** be so unprepared to address the testimony in a way that was consistent with Mr. Thuesen's defense.") (emphasis added). This Court recognized both arguments in its Memorandum and Order. Dkt. 123 at 59 ("The Court struggles to imagine a more damaging first witness for the defense."); *id.* at 61 ("Trial counsel's performance fell far below constitutional standards in their presentation of Officer Jagielski."). And Thuesen argued both in his Merits Brief. Dkt. 131 at 21 ("There is no strategic or reasonable explanation for trial counsel to present [this] testimony ... There is **also** no reasonable explanation for being unprepared to elicit the testimony in a way that was consistent with Thuesen's defense.") (emphasis added). The State's argument that Thuesen has somehow forfeited or conceded anything with respect this part of his guilt-innocence *Strickland* claim is contrary to the record and should be ignored.

In another futile attempt to block this Court from engaging with this argument, the State argues that trial counsel's purported strategy to "steal the

prosecution's thunder" was reasonable because the state habeas court found counsel's factual testimony credible. Dkt. 147 at 23-24. Again, Thuesen does not dispute the factual finding that trial counsel concocted a strategy. *See supra*, Section I ("[T]rial counsel's credibility about what they decided and when and why they decided it does not extend to the constitutional sufficiency of their conduct."). Thuesen disputes the legal conclusion that counsel's strategy was reasonable. *Id.* Indeed, this Court has found that it was not—a finding that has clear support in the record. Dkt. 123 at 61; *see, e.g.*, Dkt. 131 at 19-23; Dkt. 123 at 57-61.

The State argues that "Thuesen fails to demonstrate what trial counsel did wrong" in calling or questioning Officer Jagielski. Dkt. 147 at 26. However, on cross-examination, the prosecution presented a laundry list of commonly known indications of a PTSD or mental health crisis, expecting Officer Jagielski to shoot them down, one-by-one:

> Q. Did he seem to be having a flashback when you saw him?
>
> A. No, sir.
>
> Q. Did he seem to be having hallucinations?
>
> A. No, sir.
>
> Q. Did he seem to be jumpy or irritable?
>
> A. No, sir.
>
> Q. Did he seem to be having an outburst of anger?
>
> A. No, sir.
>
> Q. Did he seem like he was in a faraway place or anything like that?
>
> A. No sir

…

Q. Did it seem that he was mentally competent?

A. Yes, sir.

Q. Did it seem like he knew right from wrong?

A. Yes, sir.

Q. He wasn't insane?

A. No, sir.

Q. Did he seem to understand the consequences of his actions?

A. Yes, sir.

*See* Dkt. 147 at 26 (citing Dkt. 49-12 at 80-81). To the contrary, this testimony demonstrates the damage inflicted by counsel in calling Officer Jagielski in the first place, thus providing the opportunity for pro-prosecution cross-examination.

On redirect, counsel could have clarified that Thuesen's "straight face" and "flat affect" perfectly track symptoms associated with a PTSD crisis. *See* Dkt. 131 at 17-18. Instead, counsel asked the officer whether "the more [people with mental health illness] are treated and the more they deal with their illness, the more they're able to pull back when they confront [a police officer]?" Dkt. 49-12 at 88. This question opened the door for Officer Jagielski to respond that "[i]t depends on the state of their mental illness. The more severe the state, in my opinion, the less ability they have to pull it back." *Id.* At this point, defense counsel was essentially questioning the officer as though he were a mental health expert, to her client's detriment: the obvious inference from Officer Jagielski's "opinion" was that Thuesen's mental health crisis, if he experienced one at all, was not severe because he was able to "pull [himself] back

19

and hide [the crisis] from people." *Id.* at 87. This performance fell well below professional norms of effective defense advocacy. Again, it created from the outset an image of a suspect in control of himself—an effect clearly prejudicial to any subsequent effort to negate the *mens rea* for capital murder.

In the face of this prejudicial effect, the State argues that trial counsel strategically called Officer Jagielski to "set the stage for Dr. Saunder's [*sic*] testimony." Dkt. 147 at 26. But trial counsel did not testify, and the habeas court did not find, that setting the stage had been their strategy. Dkt. 60-10 at 229-230; Dkt. 66-4 at 120-121. Their strategy with Officer Jagielski was defensive, not offensive— they wanted to *prevent* the State from calling him in rebuttal. Dkt. 60-10 at 229 ("Because you would call him in rebuttal and steal my thunder, so I was going to steal yours . . . I wanted to take your witnesses away from you"). The State has formulated its own *post hoc* rationalization in the form of a new, offensive strategy. This Court should ignore this aspect of the State's argument as well.

In any event, the record disproves that either the State's speculative strategy or trial counsel's actual one was reasonable. Dr. Saunders opined about multiple PTSD symptoms that Officer Jagielski, the eyewitness trained to detect signs of mental health crises, had just testified Thuesen did not have. Dr. Saunders mentioned "diminished responsiveness," Dkt. 50-3 at 19; Officer Jagielski had just said that Thuesen was responsive to his commands. Dkt. 49-12 at 81-82. Dr. Saunders discussed "psychic numbing" and "emotional amnesia," Dkt. 50-3 at 19-20; Officer Jagielski had just said Thuesen was mentally present and feigned his emotions to get

sympathy. Dkt. 49-12 at 81-83. Dr. Saunders mentioned "hypervigilance" and an "exaggerated startled response," Dkt. 50-3 at 23; Officer Jagielski had just said Thuesen was not jumpy, irritable, or afraid. Dkt. 49-12 at 80. Dr. Saunders said that Thuesen, specifically, had the symptom of irritability or outbursts of anger, Dkt. 50-3 at 24; Officer Jagielski had just said Thuesen never showed any outburst of anger. Dkt. 49-12.

By the time Officer Jagielski stepped down from the witness stand, Thuesen's *mens rea* defense theory had been eviscerated. Counsel's strategy in calling and questioning their first witness "resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations.". *Wiggins*, 539 U.S. at 526-27. That is equally true of the State's attempt to completely re-cast defense counsel's strategy, against counsel's own sworn testimony. That and the rest of the State's justifications for counsel's ineffective and prejudicial performance are unavailing. The Court should adopt its existing analysis of Thuesen's *Strickland* claim with respect to Officer Jagielski's testimony and grant relief accordingly.

## VI.   MISLEADING THE JURY THAT THUESEN HAD BEEN DIAGNOSED AND TREATED FOR PTSD WAS DEFICIENT AND PREJUDICIAL.

The State argues that leaving the jury with the false impression that the VA had diagnosed Thuesen with PTSD amounts to "an inconsequential distinction." Dkt. 147 at 48. The State contends that "Thuesen does nothing to show that a diagnosis from the VA would have changed Thuesen's treatment." *Id.* Here again, the State misses the point.

The defense's *mens rea* theory implicitly rested on a case of *untreated* PTSD. As this Court has already put it, "[t]he fact that Thuesen's PTSD had long gone undiagnosed and (at the very least) undertreated was central to the theory that he had a severe mental health crisis the night of the shootings." Dkt. 123 at 50. Allowing the jury to receive a false impression that Thuesen had undergone routine diagnosis and treatment for PTSD was contrary to the guilt-innocence defense that Thuesen was not able to form the requisite intent for capital murder. The prejudice of that deficient performance accrued in "prevent[ing] the defense from developing a coherent theme that Thuesen's PTSD was not being managed appropriately at the time of the incident." *Id.* at 51.

The State's appeal to defense counsel's supposed strategy for muddling the question of diagnosis and treatment is unavailing. Again, counsel pursued an unreasonable strategy because they had not adequately prepared and informed themselves on the nature of a PTSD defense. For example, when counsel testified at the state habeas hearing that he wanted to avoid impeaching Teresa Cannon's statements that Thuesen did not want to be diagnosed with PTSD or receive treatment for it, Dkt. 147 at 49-50, that is the testimony of someone who had not investigated PTSD enough to know that avoiding diagnosis and treatment is characteristic of PTSD. *See* Dkt. 123 at 51 (citing 52 CLINICAL PSYCHOLOGY REV 52 (2017)). Thuesen's avoidance of treatment was evidence of his disorder, not impeachment of it. That aspect of Thuesen's experience should have been explained and submitted to the jury.

It was prejudicial to perpetuate the false impression that the VA had diagnosed and extended appropriate assistance for PTSD. Indeed, leaving the jury with that impression created the very inference that counsel supposedly wanted to avoid—*i.e.*, that Thuesen, not the VA, was to blame for mismanaging his PTSD.

## VII.    COUNSEL WERE INEFFECTIVE IN THE PENALTY PHASE.

The State's argument boils down to this: Thuesen's case "is not comparable" to *Porter v. McCollum*, 558 U.S. 30, 32 (2009), or *Andrus v. Texas*, 590 U.S. 806 (2020), because his counsel's investigation was not as bad, and his background was not as mitigating. Dkt. 147 at 58-60. The State repeats the Supreme Court's summary of the record from both of those cases, then asserts conclusively at the end, "Thuesen's lawyers did a full and proper investigation. They consulted multiple experts and made strategic decisions about what evidence to present." *Id.* Besides pointing out that *Porter* and *Andrus* experienced childhood abuse while Thuesen did not, the State makes no specific comparisons or contrasts to the facts in Thuesen's case and those cases.

Thuesen, in contrast, has twice gone through the facts from those cases to show the striking similarities to his. *See* Dkt. 33 at 161-163; Dkt. 131 at 54-60. This Court has made comparisons of its own to *Porter*. Dkt. 123 at 69 (equating Thuesen's "deep mental wounds from experiencing the horrors of war" to Porter's "intense stress and mental and emotional toll that combat took on [him]."). Thuesen incorporates those statements of law and fact by this reference.

The State's argument assumes that a claim for ineffective assistance at the penalty phase must look the same as the leading Supreme Court cases to warrant

relief. The Supreme Court has consistently held otherwise. *E.g., Sears v. Upton*, 561 U.S. 945, 954-55 (2010) ("We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented . . . we also have found deficiency *and* prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase.") (citing *Williams*, 529 U.S. at 398; *Rompilla v. Beard*, 545 U.S. 374, 378 (2005); *Porter*, 558 U.S. at 32 ) (emphasis in original).[3] So while Thuesen's counsel presented more lay witnesses during the punishment phase than Porter's or Andrus's, it is not the number of witnesses but the substance of the unpresented evidence that determines the reasonableness of counsel's performance. In that respect, Thuesen's counsel proceeded with the type of "superficially reasonable mitigation theory" that the Court in *Sears* warned against. 561 U.S. at 954.

The State contends that trial counsel sufficiently investigated Thuesen's PTSD because they reviewed his military records and "retained multiple experts." Dkt. 147 at 61. The State does not acknowledge that trial counsel waited nearly a year to review those records or consult with *any* expert, only doing so during a hurried, wandering attempt to come up with a workable defense and mitigation theory on the eve of trial. *See* Section III, above. As Thuesen has shown, because counsel's investigation was delayed and unreasonably chaotic, they did not retain an expert *they could use* during the punishment phase until voir dire was already underway.

---

[3] *See also Phea*, 953 F.3d at 842 (5th Cir. 2020) (stating that "the absence of directly controlling precedent does not preclude a finding of deficient performance") (citation omitted).

As a result, they failed to prepare the expert for testimony and ultimately decided not to call him. Dkt. 60-9 at 140, 213. At the state habeas hearing, trial counsel admitted that they "should have called an expert in the end [of the penalty phase,]" Dkt. 60-10 at 184, but the State fails to acknowledge that important part of the record as well.

Trial counsel also testified they "thought the jury was with us" after Marine Tim Rojas, who served with Thuesen, testified about the traumatic events they experienced together. Dkt. 60-10 at 185. Counsel believed that Rojas's testimony, combined with the testimony of other lay witnesses, adequately put the issue of Thuesen's PTSD before the jury and that expert testimony risked "undoing" the strength of the lay witness testimony. Dkt. 60-7 at 185. The State argues that Thuesen does not reckon with this strategic decision, which should be "owed enormous deference." Dkt. 147 at 62, 66.

Counsel's decision to leave PTSD with lay witnesses ignored the fact that the prosecution's aggravating evidence painted Thuesen as an incurably violent man. The jury did not hear any expert evidence of (1) the psychological impact PTSD has on an individual, including the risk of violence associated with PTSD; (2) the specific manner in which treatment can dramatically decrease the risk of violence; or (3) the fact that Thuesen, though he clearly suffered from PTSD, had never received adequate treatment. Therefore, though Rojas's testimony recounted a tragic tale, his testimony had a prejudicial effect: without expert testimony to put Rojas's account into proper context, counsel showed the jury a combat veteran who experienced the same events that Thuesen experienced but who did not commit the same acts of

violence when he was back home. The prosecution seized this opportunity when they highlighted how Rojas found "outlets to deal with that stuff," while Thuesen did not. Dkt. 50-8 at 173. Further, the lay witnesses who testified about Thuesen's PTSD symptoms thus supported the prosecution's argument that he posed a risk of future danger. Without a PTSD expert's testimony painting a fuller picture of Thuesen's PTSD, his inadequate treatment, and the palliative impact that proper treatment would likely have, trial counsel's strategy was at best incomplete, and at worst led jurors to accept the State's argument that Thuesen continued to be a "ticking time bomb." Dkt. 66-4 at 159.

In the end, the jury never heard from a PTSD-specific expert at either phase of trial. Thuesen has never claimed that counsel had a duty to obtain "the best or most highly qualified expert in the nation" as the State inaccurately characterizes his argument. Dkt. 147 at 63 (citations and quotations omitted). Thuesen claims simply that counsel had a duty to present an expert who could tell the jury how Thuesen's PTSD and lack of treatment for it explained his actions leading up to and during the crime and/or lessened his moral culpability. Dkt. 33 at 174-75; Dkt. 131 at 56.

To buttress that claim, Thuesen has referred to numerous PTSD experts presented during the state habeas proceedings as examples of experts who could have filled that role. *See* Dkt. 33 at 181-84; Dkt. 131 at 60-65. The State's contention that counsel were not ineffective for failing to call these specific experts misses that point. *See* Dkt. at 147 at 65-71. Apart from Dr. Kopel, who was available and willing to testify, Thuesen does not claim that counsel should have called these specific

witnesses; he offers them to show both that a PTSD expert was attainable and that different experts could have presented different opinions, any of which would have created a reasonable probability of changing the outcome of the penalty phase. *See* Dkt. 131 at 60-65 (beginning every section with, "Had trial counsel prepared and called an expert like, for example, [expert's name]," they would have explained [a different aspect of Thuesen's PTSD or experience]).

The State again mischaracterizes Thuesen's claims when it argues Thuesen was not "entitled to a 'PTSD expert.'" Dkt. 147 at 63. Indeed, this misses the point of *Strickland*, *Porter, Wiggins, et al.*: Thuesen was entitled *to effective counsel*. In this case, effective lawyering meant utilizing meaningful expert testimony on the client's most salient and mitigating psychological impairment, PTSD. This was not one of those cases in the State's string cite in which expert testimony was reasonably optional. *See* Dkt. 47 at 63. This was the other kind of case, in which expert testimony was essential. As this Court has already found with respect to the guilt-innocence phase, "[t]his case represents one in which 'the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.'" Dkt. 123 at 44 (quoting *Harrington v. Richter*, 562 U.S. 86, 106 (2011). That finding applies with equal force to counsel's performance in the penalty phase.

## VIII. COUNSEL FAILED TO OBJECT TO INFLAMMATORY AND PREJUDICIAL CLOSING ARGUMENT.

The prosecution's argument against mitigation was twofold. First, they conceded Thuesen's military service was "great" but exhorted the jury not to "believe it is mitigating." Dkt. 50-10 at 83. Second, they argued Thuesen did not return from

Iraq with PTSD or other mental illness at all.[4] If he did, they said, he would have behaved like the prosecutor's stepfather, who "yells for all of us to get down, get inside" and "tried to protect us" when he heard a nearby gunshot: "That's PTSD." *Id.* at 82.

The problem, of course, is that the prosecutor's stepfather did not testify, no evidence was introduced about him, no evidence supported the anecdote as a legitimate manifestation of PTSD. With his anecdote, the prosecutor sent a message that (1) his experiences gave him special personal knowledge about the true nature of PTSD and (2) in contrast to what his stepfather experienced, Thuesen's PTSD was either concocted or insignificant.  The prosecutor's personal anecdote, in other words, was unsworn lay opinion testimony that Thuesen did not suffer from "real" PTSD, while a different veteran did. That constitutes new evidence improperly made in closing argument. *See Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011) ("Improper references to facts that are neither in evidence nor inferable from the evidence are generally designed to arouse the passion and prejudice of the jury and, as such, are inappropriate.").

The State takes the position that the stepfather anecdote "was still a reasonable deduction from the evidence," Dkt. 147 at 54 (citing *Dowthitt v. Johnson*,

---

[4] Dkt. 50-10 at 17 ("That is not mental illness."); *id.* at 29 ("If he was in a PTSD flashback at that point in time, we would not be here . . . he wasn't in a mental health crisis"); *id.* at 30 ("That is not PTSD"); *id.* at 71 ("He put a façade on. Even after he comes back [from Iraq]. He is working. He is doing well in school. He is being arrested at work. So to the outside world, everything is fine."); *id.* at 84 ("We know what was going on in his mind . . . It is not depression. It is not PTSD. It is not dependency.").

230 F.3d 733, 755 (5th Cir. 2000), which requires any inferences to be "grounded upon evidence."). The evidence from which it was deduced, according to the State, is the prosecutor's *belief* that Thuesen was "not suffering from a PTSD episode at the time [of the crime]," and Dr. Kopel's *post-trial* testimony that Thuesen was "not suffering a PTSD episode" before the crime. *Id.* (citing ten pages of Dr. Kopel's state habeas testimony).

A prosecutor's belief is not evidence. *E.g., United States v. Garza*, 608 F.2d 659, 663 (5th Cir. 1979). Moreover, it is impossible for the prosecutor to have drawn a deduction from testimony that occurred in a state habeas hearing years later. Worse, the State's characterization of that testimony is false: Dr. Kopel testified that Thuesen *was* suffering a PTSD episode in the hours leading up to and during the crime. Dkt. 60-9 at 174 ("Well, he's got PTSD. So is it impacting all of this? Yes, it's impacting every one of those steps.").

With no evidence to point to, the State falls back on the premise that personal anecdotes are *per se* "not objectionable" in Texas. Dkt. 147 at 54. This too is false. *E.g., Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); *Maupin v. State*, 930 S.W.2d 267, 270 (Tex. Crim. App. 1996); *Alejandro v. State*, 493 S.W.2d 230, 231-32 (Tex. Crim. App. 1973). Nor does the State's cited authority support that proposition. *Milton v. State*, 572 S.W.3d 234, 242 (Tex. Crim. App. 2019) says that anecdotes are "sometimes proper, sometimes not"—that is, sometimes objectionable, sometimes not. And the two trial practice guides it cites clarify that anecdotes "may sometimes be related," "if relevant." *See* Dkt. 147 at 54-55.

The State also argues that Thuesen's claim fails because it is distinguishable from *Davis v. State*, 114 S.W. 366, 372 (Tex. Crim. App. 1908). However, Thuesen did not present *Davis* as dispositive or foundational authority. It was offered at the end of Thuesen's argument as an example of a case where a prosecutor's opinion of a medical condition based on facts not in evidence led to a reversal. Dkt. 131 at 53 (citing *Davis* after a "*See*" signal). Thuesen agrees that *Davis* is an old case addressing different medical issues, but the legal principle supports Thuesen's argument that "a statement of a material fact" about a medical diagnosis that is not based in the record or deduced from it "[does] appellant serious injury." *Davis*, 114 S.W. at 372. The State's lengthy complaints about *Davis*, in other words, do not tilt the scales.

Finally, the State argues Thuesen was not prejudiced because the jury was instructed that closing arguments were not evidence. Dkt. 147 at 55. If that were true, then anything said during closing arguments, grounded in evidence or not, no matter how inflammatory or prejudicial, would be permissible so long as the jury is told that closing arguments are not evidence. While it is true that courts may look to the jury instructions to determine prejudice, *United States v. Dorr*, 535 F.2d 117, 120 (5th Cir. 1981), that position overlooks that there no curative instruction was given regarding *this statement*, because trial counsel failed to object to it. As a result, and since it came from a prosecutor, this Court can presume that the jury found it "believable." *See Alejandro*, 493 S.W.2d at 32.

In the end, Thuesen's trial counsel admitted the error. "I just can't remember what I was thinking" but "[i]n hindsight . . . I think I should have objected to that."

Dkt. 60-7 at 171; *see also id.* at 235 ("I should have objected."). It is irrelevant that counsel could not articulate his precise reasons for staying silent, despite the State's assertion that this inability to give a reason precludes relief for Thuesen. Dkt. 147 at 56 ("Thuesen should not have a windfall because trial counsel cannot remember his thoughts year later."). What matters, and what this Court has already found, is that trial counsel's failure to object "cannot be attributed to sound trial strategy." Dkt. 123 at 86. And for that reason, trial counsel's performance was deficient.

## IX.    CONCLUSION

For all the reasons discussed above, in the operative habeas petition, in Thuesen's initial merits brief, and in the Court's previous order concluding that Claims One and Two survive the strict standard of 28 U.S.C. § 2254(d)(1), the Court should find on its *de novo* review that Thuesen is in custody in violation of his rights under the United States Constitution. 28 U.S.C. § 2254(a). A writ vacating his conviction and sentence should issue immediately upon that finding.

DATED: May 15, 2025          Respectfully submitted,

MAUREEN FRANCO
FEDERAL PUBLIC DEFENDER

*/s/ Humphreys McGee*
HUMPHREYS MCGEE
S.D.Tex. Bar No.3888206
Federal Defender Office
919 Congress, Suite 950
Austin, Texas 78701
737-207-3020 (tel.)
512-499-1584 (fax)

Attorneys for Petitioner

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2025, I electronically filed the foregoing, Petitioner's Reply in Further Support of Habeas Upon *de Novo* Review, with the Clerk of Court using the CM/ECF system which will send notify all counsel of record of this filing.

$\quad$ */S/Humphreys McGee* $\quad$
HUMPHREYS McGEE